UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| CITY OF ATLANTA POLICE OFFICERS' PENSION PLAN and CITY OF ATLANTA FIREFIGHTERS' PENSION PLAN, Individually and On Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>          v.<br><br>CELSIUS HOLDINGS, INC., JOHN FIELDLY, and EDWIN NEGRON-CARBALLO,<br><br>                    Defendants. | Case No. 9:22-cv-80418 (DMM) (WDM)<br><br>The Honorable Donald M. Middlebrooks<br><br>The Honorable William D. Matthewman<br><br>CLASS ACTION<br><br>AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

<u>TABLE OF CONTENTS</u>

Page

I.      NATURE OF THE ACTION AND OVERVIEW ........................................................... 1

II.     JURISDICTION AND VENUE ...................................................................................... 6

III.    PARTIES ......................................................................................................................... 6

        A.  Lead Plaintiff ....................................................................................................... 6

        B.  Defendants ............................................................................................................ 7

        C.  Relevant Non-Parties ........................................................................................... 8

IV.     BACKGROUND ........................................................................................................... 10

        A.  Background of the Company ............................................................................... 10

        B.  Celsius Announced Large Increases in Revenue and Net Income in the Second Growth in the Second Quarter of 2021 ................................................... 10

        C.  Although Celsius's Revenues Soared in the Third Quarter of 2021, Its Disappointing Net Income Sparked a Sell-off as Investors and Analysts Focused on Margins ........................... 12

        D.  CEO Fieldly Enjoy the Fruits of the Company's False Earnings Results ............................... 14

        E.  Celsius Looked to Accounting for Share-Based Compensation as a Means to Lower Costs and Inflate Net Income ............................................ 15

             1.  Celsius Compensates Employees and Directors with Share-Based Compensation .......... 15

             2.  Celsius Accounts for Share-Based Compensation Expenses in Accordance with the FASB's ASC 718 ................................. 17

             3.  Despite That ASC 718 Is Clear and Unambiguous, Celsius Improperly Accounted for SBA of Nine Former Employees and Directors ............................ 19

V.      THE TRUTH IS REVEALED ....................................................................................... 20

VI.     POST CLASS PERIOD DISCLOSURES ..................................................................... 25

VII.    DEFENDANTS' MATERIALLY FALSE STATEMENTS ISSUED DURING THE CLASS PERIOD .................................................... 26

        A.  Celsius's Second and Third Quarter 2021 Financial Metrics Were False ........................... 26

             1.  False Metrics Pertaining to Celsius's Second Quarter in 2021 ........................ 28

             2.  False Metrics Pertaining to Celsius's Third Quarter in 2021 ......................... 32

        B.  Celsius's Statements About the Adequacy of Its Disclosure Controls Were False ................. 36

VIII.   ADDITIONAL SCIENTER ALLEGATIONS ............................................................. 37

        A.  Motive and Opportunity ..................................................................................... 38

        B.  Negron-Carballo's History of Paying Vendors Late to Increase Cash Flow ......................... 39

        C.  Defendants' Positions and the Small Size of the Celsius Accounting Department ................ 40

        D.  The Rudimentary Nature of GAAP Principle ASC 718 ...................................... 40

        E.  The SEC Investigation ........................................................................................ 41

IX.     CLASS ACTION ALLEGATIONS .............................................................................. 42

X.      UNDISCLOSED ADVERSE FACTS ........................................................................... 44

XI.     LOSS CAUSATION ..................................................................................................... 45

**XII.**   PRESUMPTION OF RELIANCE .................................................................................... 45

**XIII.**  INAPPLICABILITY OF STATUTORY SAFE HARBOR ............................................ 46

**XIV.**  CAUSES OF ACTION ................................................................................................. 47

       COUNT I For Violations of Section 10(b) of the Exchange Act and  SEC Rule 10b-5 Against All Defendants ................................................................ 47

       COUNT II For Violations of Section 20(a) of the Exchange Act  Against the Individual Defendants .......................................................................... 50

**XV.**   PRAYER FOR RELIEF ............................................................................................... 51

**XVI.**  JURY TRIAL DEMANDED ........................................................................................ 51

City of Atlanta Police Officers' Pension Plan ("Atlanta Police") and City of Atlanta Firefighters' Pension Plan ("Atlanta Firefighters," and, together with Atlanta Police, "Atlanta P+F or "Lead Plaintiff"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief is based upon, among other things, Lead Counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Celsius Holdings, Inc. ("Celsius" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Celsius; and (c) review of other publicly available information concerning Celsius.

## I.   NATURE OF THE ACTION AND OVERVIEW

1.     This is a class action brought on behalf of persons and entities that purchased or otherwise acquired Celsius common stock between August 12, 2021 and March 1, 2022, inclusive (the "Class Period").  Lead Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Celsius develops, markets, and sells energy drinks, nutritional snacks and liquid supplements.  In order to increase its net income, a key metric for investors, Celsius engaged in accounting fraud during 2021.  Specifically, on March 1, 2022, the Company announced that it had to restate its financial statements for the second and third quarters of 2021, resulting in a net income reduction of 80% in the second quarter, and a transformation of a $2.7 million net income profit to a $9.4 million loss in the third quarter.  The Company also announced that it had experienced material weaknesses in its internal controls during these quarters.

3.     In 2021, Celsius's revenues were growing exponentially, from $50 million in the first quarter, to $65 million in the second, and $94.9 million in the third quarter.  Investors and analysts alike cheered as Celsius experienced this growth, and sent its stock price soaring, from

$58.54 on January 4, 2021 to a high of $108.07 on November 1, 2021.  However, they were careful to look not just at revenue and sales growth, but also at growth in profitability.  Celsius reports its profits as net income and net income per share, and investors and analysts watched these metrics to ensure that the expansion in Celsius's business did not come at such a high cost so that it became unprofitable.

4.      Indeed, Celsius's net income trajectory was more mixed than its revenues.  For example, despite that its revenues had almost doubled in the first quarter 2021 as compared to the first quarter in 2020 ($50 million vs. $28.1 million), its net income remained relatively flat: $585,424 (Q1 2021) compared to $546,051 (Q1 2020).  Celsius thus needed to find a way to cut costs so that its net income could rise in line with its revenues.

5.      Since 2007, Celsius has compensated its employees at all levels not only with annual salaries, but also share-based compensation such as stock options and restricted stock units.  One former employee, CW3 (described below in ¶ 34), explained that Celsius paid notoriously low salaries compared to others in the industry, but issued stock options (which, at the time of issuance, cost nothing) to employees to compensate for the low salaries.

6.      Celsius accounts for its share-based compensation payments in accordance with ASC Topic 718, which measures share-based payments "on the date of grant at the fair value of share-based payments."  There is nothing confusing about ASC Topic 718, and it leaves no room for interpretation.  Lead Plaintiff's accounting expert advised that the accounting community considers its guidance to be unequivocal with regard to expensing share-based compensation on income statements.

7.      Defendants Fieldly, the Company's CEO and former CFO, and Negron-Carballo, the Company's CFO during the Class Period, are both certified public accountants who would be aware of the proper accounting for share-based compensation.  Negron-Carballo also held the title of "Principal Financial and Accounting Officer."  In these roles, he oversaw a very small accounting department, which according to statements made by former employees, employed just

a handful of people.  He took a very hands on role in accounting, personally signing checks to pay vendors, and in at least one example, handling an error in the way stock options were paid out upon termination.   Thus, Negron-Carballo was integrally involved in the day-to-day duties of the accounting department, and oversaw the Company's accounting policies and procedures and preparation of its SEC filings, including the false Forms 10-Q at issue here.

8.    During the second and third quarters of 2021, nine employees and directors resigned or were terminated from Celsius.  As part of their retirement or severance packages, Celsius agreed to accelerate the vesting schedules for their share-based compensation.  (Such was a longstanding practice at Celsius; the Company's 2006 Amended Stock Plan, which was in effect for an entire decade, contained express language about accelerating the vesting conditions of share-based options.)  Thus, for example, if an employee had 600 shares left to vest over the next three years, she was able to collect all 600 shares upon termination.  Under ASC Topic 718, which leaves no ambiguity, Celsius was required to recognize expenses associated with those 600 shares valued based on the trading price as of that date of termination.

9.    This is not how Celsius accounted for the accelerated vesting schedule of the nine employees' share-based compensation in 2021.  Indeed, doing so would have significantly dented Celsius's key metrics of net income and net income per share, and would have quashed the investor and analyst enthusiasm that was propelling the Company's stock to new heights.  Thus, Celsius determined that it would improperly account for these former employees' and directors' share-based compensation, and in turn, report inflated net income and net income per share.

10.    The result was dramatic.  The Company's expenses were understated by a large margin, which resulted in an overstatement of net income for these two quarters.  Specifically, in the second quarter of 2021, the Company reported net income of $3.9 million, but once it corrected the accounting for its share-based compensation, net income dropped 80%, to $779,991.  Its net income per share likewise fell by 80% from $0.05 per share to $0.01 per share.  The effect of Defendants' accounting misstatement in the third quarter of 2021 was even more stark: the

3

Company reported net income of $2.7 million, when in reality, it experienced negative net income of $9.4 million.  Its net income per share also plummeted, from $0.04 to ($0.13) in 3Q 2021.

11.     Defendants revealed the accounting improprieties on March 1, 2022 when, after the market closed, Celsius disclosed that it could not timely file its 2021 annual report due to "staffing limitations, unanticipated delays and identified material errors in previous filings."  Specifically, Celsius "determined that the calculation and expense of non-cash share-based compensation, related to grants of stock options and restricted stock units awarded to certain former employees and retired directors were materially understated for the three and six month periods ended June 30, 2021 and three and nine month periods ended September 30, 2021" due to "an error of interpretation of a Class III modification rule, technical rule, which resulted in an immediate mark-to-market adjustments for the prior periods' stock grants as a non-cash expense."  But as noted, the Individual Defendants, both experienced CPAs and with significant CFO experience, knew there was no room for interpretation when it came to ASC Topic 718.

12.     Speaking for the Company, Celsius's CEO John Fieldly also explained that the Company had determined that "a material weakness existed in the company's internal controls of [its] financial reporting for the company's disclosure controls and procedures."

13.     On this news, the Company's stock price fell to an intra-day low of $56.21 per share from a high of $65 per share on unusually heavy trading volume on March 2, 2022.  Over the course of the March 2, 2022 and March 3, 2022 trading sessions, the Company's stock price fell a total of $5.20, or 8.3% on unusually heavy trading volume to close at $57.60 per share on March 3, 2022.  Investors suffered heavy losses as a result.  But not Fieldly, who reaped personal gains of $1.5 million through his insider trading.

14.     On March 16, 2022, Celsius filed its Form 10-K report with the SEC for FY 2021 which disclosed that the Company had adjusted its general and administrative expenses for both the second and third quarters of FY 2021, and that as a result, it was reporting significantly less

net income for the second quarter, and a net loss in the amount of $9.4 million for the third quarter of its FY 2021.

15.     Fieldly and Negron-Carballo, both CPAs and experienced in corporate accounting, knew that properly accounting for the expenses associated with Celsius's share-based compensation would dampen the investor enthusiasm that was sending the price of Celsius's stock to new heights.  They wanted the ride to continue as long as possible, and therefore, intentionally misrepresented the expenses – and resulting net income and net income per share – for Celsius during the second and third quarters of FY 2021.

16.     Fieldly capitalized personally on this investor frenzy while he could, by entering into a 10b5-1 trading plan in late November 2021, and then proceeding to engage in significant insider trading under that plan, reaping rewards of $1.5 million during the Class Period.

17.     Shortly after these revelations, on April 18, 2022, the Company announced that Negron-Carballo had resigned from the Company effective that same date.  Negron-Carballo continues to serve Celsius in an "executive capacity to ensure a smooth transition."

18.     In order to lessen the downward pressure on Celsius's stock that would result from disclosing its true net income in the second and third quarters of fiscal year ("FY") 2021, Defendants timed their disclosure of the faulty accounting to coincide with a period of cooling in the overall equity markets.  In early 2022, as the broader financial markets were declining in the face of headlines of inflation and the war in Ukraine, Defendants finally revealed the truth – that their net income for the second and third quarters of FY 2021 had been vastly overstated, and that, in fact, the Company realized negative income of over $9 million in the third quarter.

19.     Throughout the Class Period, Defendants made materially false statements about the Company's business, operations, and prospects.  Specifically, Defendants reported incorrect financial metrics in the second and third quarters of FY 2021, including significantly inflated net income and net income per share, and incorrectly stated that the Company had adequate internal controls over financial reporting.

20.     As a result of Defendants' wrongful acts, and the precipitous decline in the market value of the Company's common stock, Lead Plaintiff and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

21.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

22.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

23.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false information, occurred in substantial part in this Judicial District.  In addition, the Company's principal executive offices are in this District.

24.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.     PARTIES

### A.     Lead Plaintiff

25.     Lead Plaintiff City of Atlanta Police Officers' Pension Plan ("Atlanta Police") and City of Atlanta Firefighters' Pension Plan ("Atlanta Firefighters," and, together with Atlanta Police, "Atlanta P+F" or "Lead Plaintiff"), purchased Celsius common stock during the Class Period, and suffered damages as a result of Defendants' violations of the federal securities laws, as further alleged herein.  Atlanta Firefighters is a pension fund that safeguards investments to fund the pensions and retirements of the City of Atlanta's firefighters.  Likewise, Atlanta Police is a pension

fund operating on behalf of Atlanta's police men and women.  Lead Plaintiff's purchases of Celsius common stock during the Class Period are detailed in ECF No. 31.

### B.    Defendants

26.    Defendant Celsius is a global consumer packaged goods company known for providing healthy energy drinks, workout supplements, and protein bars. Celsius is incorporated under the laws of Nevada with its principal executive offices located in Boca Raton, Florida. Celsius's common stock trades on the NASDAQ exchange under the symbol "CELH." Celsius's fiscal year begins on January 1 and ends on December 31.

27.    Defendant John Fieldly ("Fieldly") was the Company's Chief Executive Officer ("CEO") at all relevant times, and was appointed Chairman of the Board of Directors on August 20, 2021.  Fieldly joined the Company in January 2012 as its Chief Financial Officer, a position he held for six years until he became the Company's CEO.  Fieldly is a certified public accountant in Florida.   During the Class Period, Defendant Fieldly made materially false statements to investors, as further alleged herein.  Fieldly engaged in illicit insider trading throughout the Class Period by misappropriating nonpublic and material information regarding Celsius's improper accounting of its share-based compensation payments. In particular, and as further alleged herein, Fieldly entered into a 10b5-1 trading plan during the Class Period – on November 30, 2021 – and less than four weeks later, sold 20,000 shares at the artificially inflated share price of $75, for proceeds of $1.5 million.  Fieldly signed the Company's Forms 10-Q for the second and third quarters of FY 2021.

28.    Defendant Edwin Negron-Carballo ("Negron-Carballo") was the Company's Chief Financial Officer ("CFO") at all relevant times.  Negron-Carballo is a certified public accountant and, according to the Company's public filings, "is well versed in USGAAP and IFRS."  As the Company's CFO, Defendant Negron-Carballo is responsible for internal and external financial reporting, taxes, accounting aspects and compliance, treasury and risk management, financing, assisting with raising capital, business development, maximizing cashflow/profitability and SEC

7

reporting.  Indeed, according to his signature line on the Company's Forms 10-Q, he also holds the title, "Principal Financial and Accounting Officer."  By virtue of Defendant Negron-Carballo's duties as the CFO of Celsius, he was intimately familiar with the Company's accounting procedures.  Defendant Negron-Carballo made materially false statements to investors during the Class Period, as alleged herein.  Negron-Carballo signed the Company's Forms 10-Q for the second and third quarters of 2021.

29.     Defendants Fieldly and Negron-Carballo (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.   The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be materially false prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Indeed, they personally signed the Forms 10-Q and 8-K that contained the false financial metrics and other misstatements alleged herein. Because of their positions and access to material nonpublic information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false.  The Individual Defendants are liable for the false statements pleaded herein.

## C.     Relevant Non-Parties

30.     CW1 is a former employee of Celsius who worked in the Company's Boca Raton office from April 2018 through February 2022.  CW1 joined Celsius as the Head of Sales for the vending sector and was later promoted to Head of Sales for the Company, reporting directly to Jon McKillop, the EVP of Sales, North America, until approximately December 2020.  CW1 worked directly with Defendants Fieldly and Negron-Carballo while employed at Celsius, and was considered part of the "leadership team."

31.     CW2 is a former employee of Celsius who served as its Regional Sales Manager for the Midwest from January 2020 through early March 2022. He resigned in March 2022 to accept a sales position at another company.  CW2 participated in Company-wide town hall meetings a few times per year, including one in late 2021, during which Defendants Fieldly and Negron-Carballo explained that there was an SEC investigation into the Company concerning its lofty stock price.  CW2 also said that Celsius had a very small HR department, which was comprised solely of one employee.  That HR employee also performed other duties as Fieldly's personal assistant.

32.     CW3 was an executive at Celsius who was employed by the Company for many years.  CW3 formally separated from Celsius in 2021.  CW3 cashed in vested Celsius shares at the time of separation.  Upon cashing in shares that were vested, CW3 received far less money from the stock than had been negotiated in the separation agreement.  CW3 contacted Defendant Fieldly, who directed Defendant Negron Carballo to correct the mistake, and within 24 hours, Celsius corrected the error and transferred the correct amount of funds.

33.     CW3 also explained that during one meeting in 2019 or 2020, Defendant Negron-Carballo stated that he had purposefully delayed paying the Company's bills on time in order to "increase cashflow."  Defendant Fieldly was present at this meeting, as well as other executives at the vice president level and above.

34.     CW3 also described Celsius's accounting department as exceedingly small, with only a few individuals employed overall.  It had "very loose accounting processes and procedures" in place.  There were two women in accounting who handled all accounts nationwide, and who always had "stacks and stocks" of paperwork on their desks.  Checks that the Company paid to vendors had to be signed by Negron-Carballo, but they lingered on his desk as he pursued a strategy of delayed payments.  CW3 attributed the anemic accounting department to the Individual Defendants' desire to keep costs low, so that it could elevate cash flow.  Salaries, likewise, were

kept low.  Stock options were an inexpensive way to compensate employees, as they did not cost the Company any out of pocket cash at the time of the award.

35.     CW4 was employed by the Company from 2015 to March 2022, and was most recently a director of sales.  CW4 corroborated information provided by CW3, particularly concerning Negron-Carballo's tendency to "drag[] his feet on paying people Celsius owes money to," which included vendors and customers, because "it saves interest on the money."

## IV.     BACKGROUND

### A.     Background of the Company

36.     Celsius develops, markets, and sells functional drinks and liquid supplements.  Its core offerings include pre- and post-workout functional energy drinks and protein bars.  Celsius was founded in April 2004 and had its initial public offering in 2010.

37.     The Company's common stock is traded on the NASDAQ under the ticker symbol "CELH."

38.     Celsius considers itself to be a "disruptive" leader in the energy drink and workout space, and has a mission to "become the global leader of a branded portfolio which is proprietary, clinically proven or innovative in its category, and offers significant health benefits."

39.     In recent years, Celsius has become an increasingly popular choice of energy drink, competing with established brands such as Monster and Red Bull.  Its products have been promoted by celebrities like Olympian Shaun White, who entered into a partnership with the Company in January 2022, and Jonah Hill who attests that Celsius energy drinks are one of the "10 things he can't live without."  It has also been featured in a number of TikTok videos as of late.

### B.     Celsius Announced Large Increases in Revenue and Net Income in the Second Growth in the Second Quarter of 2021

40.     On May 13, 2021, Celsius held its earnings call for the first quarter of FY 2021 during which Defendant Fieldly touted that Celsius "achieved a record first quarter exceeding $50 million in sales, which were derived by over 100% growth in North America sales from continued

strong demand for our portfolio, and a 25% growth in international sales." Its $50 million in revenues were a massive increase over the $28 million in revenues it had achieved in the same quarter of 2020.

41.     This massive growth came at a cost, however, with its net income increasing only slightly, from $585,424 to $546,051 in the same quarter.

42.     On August 12, 2021, Celsius reported its financial results for the second quarter of FY 2021, which likewise exhibited tremendous growth in revenue: $65 million, compared to $30 million for the same quarter in 2020.

43.     Unlike in the first quarter, however, in the second quarter of 2021, Celsius was able to report a large increase in net income: $3.96 million as compared to $1.2 million in the same quarter of 2020. The $3.96 million figure later proved to be false, as described below in paragraphs 91, 98, 102–103, and 106.

44.     The market reacted positively to the Company's (falsely reported) second quarter financial results over the subsequent weeks, with the Company's share price gradually increasing by 24%, from $73.32 on August 12, 2021, to $96.24 on September 16, 2021.

45.     In the following months, analysts displayed confidence about Celsius's future financial performance. For instance, on October 8, 2021, Sadif Investment Analytics reported that "Celsius Holdings Inc has a bright prospect, with an overall score of 91/100" and that "The current sentiment in relation to Celsius Holdings Inc is bullish with a positive outlook." Further, on October 11, 2021, Buy Sell Signals reported: "Celsius Holdings soars 88% in 2021, beating 93% of the market." On October 21, 2021, Roth Capital Partners reported that it "expect[s] CELH to report very strong growth in net revenue and adjusted EBITDA for the third quarter ended September 30, 2021."

46.     By the beginning of November 2021, Celsius's stock was soaring above $100 per share and on November 5, 2021, Celsius's share price hit an all-time high of $108.07.

47.     Investors – falsely assured by the positive earnings calls and conferences during which the Defendants boasted about the Company's profit margins and reassured by analyst coverage – began pumping millions of dollars into Celsius throughout FY 2021.  For instance, on November 1, 2021, Buy Sell Signals reported that institutional shareholders invested substantially more in Celsius in FY 2021 than they had in FY 2020.  In particular, in the third quarter of FY 2020, institutional shareholders held $876.5 million of Celsius common stock; in the fourth quarter of FY 2020 $1.4 billion; in the first quarter of FY 2021 $2.2 billion; and in the second quarter of FY 2021 $2.33 billion.  Buy Sell Signals further reported that in the first quarter of FY 2021, 59 institutional shareholders increased their holdings in Celsius and in the second quarter of FY 2021, 87 institutional investors increased their holdings of Celsius.  Among those who increased their holdings in Celsius in the second quarter of FY 2021 were: Blackrock, which increased its position by 1,560,394 shares, Vanguard Group by 1,191,768 shares, Voya Investment Management by 677,914 shares, and Wellington Management Group by 387,140 shares.

**C.     Although Celsius's Revenues Soared in the Third Quarter of 2021, Its Disappointing Net Income Sparked a Sell-off as Investors and Analysts Focused on Margins**

48.     Celsius's 2021 third quarter revenues were even more impressive.  On November 11, 2021, Celsius reported $94.9 million in revenue, as compared to $36.5 million in the same quarter of 2020.  Its net income fell, however, from $4.75 million in 2020 to $2.75 million in 2021.  But even the reported $2.75 million figure proved to be false; net income was actually negative $9.4 million for this quarter.  (See ¶¶ 85, 91, 98, 100, 120, 123, and 127, below.)  Celsius attributed the disappointing net income to increased costs associated with aluminum supply chain issues.  Investors, displaying their concern for net income, sold their shares on this news, driving down the price of Celsius stock from $97.77 on November 11, 2021 to $77.77 two trading days later, on November 15, 2022.

49.     Analysts were similarly unimpressed by the Company's relatively disappointing net income and net income per share.  Celsius thus faced pressure from analysts and investors to keep its expenses low, and in turn, prop up its net income (profit) and net income (profit) per share.

50.     Concerned that revenue was not a good marker of the Company's performance, many analysts looked to the Company's net income and net income per share as a better indication of how it was performing.  For example, on March 5, 2021, Validea, an online independent research provider that creates reports on publicly traded companies by using quantitative strategies of some well-known investors, issued a report discussing Celsius's profit margins.  According to Validea's profit margin methodology, a company "with a minimum trailing 12 month after tax profit margin of 7%" is deemed to "pass," and a "pass" means that the company has "strong positions in their respective industries and offer greater shareholder returns."  On March 5, 2021, Validea issued a report that rated Celsius's 4.77% profit margin as a "FAIL."

51.     Thereafter, on April 6, 2021 – just one week after Celsius released its first quarter earnings for FY 2021 – Credit Suisse also expressed concern about Celsius's profit margins, particularly in light of a global aluminum can shortage, which further squeezed the margins.  Credit Suisse noted: "Gross margin is already at a good level, though we expect a decline in 2021 due to costs associated with the importation of aluminum cans and higher freight expenses.  SG&A expenses, however, appear high, even for a company this size and in this stage of growth."  Credit Suisse further cautioned that "Celsius has operated at a loss for most of its recent history" and that Celsius had only just "turned an operating profit for the first time in 2020 – a 6% margin vs. negative double-digit in previous years."

52.     On May 21, 2021, Yahoo Finance held an interview with Defendant and CEO John Fieldly during which Brian Sozzi, an analyst for Yahoo Finance, voiced concerns about Celsius's climbing expenses negatively affecting the Company's margins.  Sozzi asked Fieldly: "And John, in the first quarter, you know, just looking at the margins, margins did take a hit.  And you call that higher input costs.  The can shortage the industry is experiencing – can you get enough cans

right now to make your product?  And then have you raised prices?"  Defendant Fieldly responded: "We have been affected.  There is a can shortage.  There's a can pandemic out there right now, especially in the beverage industry.  We're importing cans from around the world.  We started, actually, this process back in Q4, a little bit ahead of the curve. We started importing cans back in March. So our margins were impacted."

53.    On September 17, 2021, Validea once again reported that Celsius's profit margin of 5.84% was a "FAIL."

54.    On November 11, 2021, Maxim, an analyst group that regularly covers Celsius, released a report with the following headline: "3Q21 Revenue Beats Significantly as Distribution Gains Accelerate Growth, but GM and EPS Lower – Maintain Hold on Valuation."  In the report, Maxim was bullish on revenue, but bearish on net income per share (which Maxim refers to as "EPS"), stating (emphasis added): "Based on 3Q21 results and our expectations, we are significantly increasing our 2021-2023 revenue estimates, while lowering our 2021-2023 GM and GAAP EPS estimates."   The Maxim report further stated: "gross margin of 39.7% was below our at-consensus estimate of 44.0% due to higher supply-chain costs, as well as the company's transition to six warehouses . . . . On lower margins and higher opex, GAAP EPS of $0.04 was below both our estimate of $0.08 and consensus of $0.07."

### D.    CEO Fieldly Enjoy the Fruits of the Company's False Earnings Results

55.    During the Class Period, Defendant Fieldly sold a substantial amount of Celsius common stock pursuant to a trading plan he entered into during the Class Period.

56.    Specifically, on November 30, 2021, four months into the Class Period, Defendant Fieldly executed a 10b5-1 trading plan, which is a written plan for trading securities designed in accordance with Rule 10b5-1(c) of the Securities Exchange Act of 1934.  10b5-1 plans are used by insiders as affirmative defenses against allegations that they traded company stock while in possession of material non-public information.  As further alleged below in paragraph 139, the

timing of Fieldly's 10b5-1 plan initiation, nine years after he joined the Company and four months into the Class Period, is highly suspicious.

57.    Immediately following execution of the 10b5-1 plan, Fieldly sold 20,000 shares of Celsius common stock pursuant to the plan on December 27, 2021 for gross proceeds of $1.5 million.

**E.    Celsius Looked to Accounting for Share-Based Compensation as a Means to Lower Costs and Inflate Net Income**

**1.    Celsius Compensates Employees and Directors with Share-Based Compensation**

58.    Celsius compensates its employees at all levels and directors with noncash share-based compensation because, as the Company has consistently stated, "Management deems it very important to motivate employees by providing them ownership in the business in order to promote their overall performance which translates into the continued success of our business based on key performance attributes."  According to CW3, share-based compensation was an inexpensive way for the Company to compensate its employees.

59.    Celsius began compensating employees with share-based compensation on January 18, 2007, when it adopted its "2006 Incentive Stock Plan."  According to Celsius's proxy statement for FY 2022, the Incentive Stock Plan was:

 [I]ntended to provide incentives which will attract and retain highly competent persons at all levels as employees of the Company, as well as independent contractors providing consulting or advisory services to the Company, by providing them opportunities to acquire the Company's common stock or receive monetary payments based on the value of such shares pursuant to Awards issued.  While the plan terminates 10 years after the adoption date, issued options have their own schedule of termination.

60.    The Amended 2006 Incentive Stock Plan further stated:

Equity incentives may be in the form of stock options with an exercise price not less than the fair market value of the underlying shares as determined pursuant to the Amended 2006 Incentive Stock Plan, stock appreciation rights, restricted stock awards, stock bonus awards, other stock-based awards, or any combination of the foregoing. The Amended 2006 Incentive Stock Plan is administered by our Human Resource and Compensation Committee. Options to purchase 245,000 shares of common stock are outstanding under the 2006 Amended 2006 Incentive Stock Plan

as of the date of this Report.  The Amended 2006 Incentive Stock Plan (but not awards thereunder) expired in January 2017.

61.     Celsius's Amended 2006 Incentive Stock Plan (but not awards thereunder) expired in January 2017.

62.     On April 30, 2015, Celsius adopted its 2015 Stock Incentive Plan ("2015 Plan") which stated, in relevant part:

> The 2015 Plan permits the grant of options and shares for up to 5,000,000 shares. In addition, there is a provision for an annual increase of 15% to the shares included under the plan, with the shares to be added on the first day of each calendar year, beginning on January 1, 2016.

63.     In its proxy statement for FY 2022, Celsius further disclosed:

> There are 7,041,493 shares of our common stock are currently reserved for issuance pursuant to the exercise of awards under the 2015 Incentive Stock Plan. The number of shares so reserved automatically adjusts upward on January 1 of each year, so that the number of shares covered by the 2015 Incentive Stock Plan is equal to 15% of our then issued and outstanding common stock. Stock option and awards to purchase an aggregate of 5,019,646 shares of our common stock are outstanding under the 2015 Incentive Stock Plan as of the date of this Report.

64.     Celsius's Incentive Stock Plan is administered by the Company's Human Resource and Compensation Committee which is headed by board members Joyce Russell, Hal Kravitz, Nick Castaldo, and Alexandre Ruberti.

65.     According to Celsius's Form 10-Q for the third quarter of FY 2021, filed with the SEC on September 30, 2021:

> Under the 2015 Stock Incentive Plan, the Company has issued options to purchase approximately 4.0 million shares at an average price of $7.13 with a fair value of approximately $3.29 million.  For the nine months ended September 30, 2021 and 2020, the Company issued options to purchase 304,750 and 495,274 shares, respectively.  Upon exercise, shares of new common stock are issued by the Company.

66.     Celsius also compensates its employees and directors with restricted stock units ("RSUs"). According to Celsius's 10-K for FY 2021, filed with the SEC on March 16, 2022:

> Restricted stock units are awards that give the holder the right to receive one share of common stock for each restricted stock unit upon meeting service-based vesting conditions (typically annual vesting in three equal annual installments, with a requirement that the holder remains in the continuous employment of the

Company). The holders of unvested units do not have the same rights as stockholders including but not limited to any dividends which may be declared by the Company, and do not have the right to vote. The value of restricted stock units that vest over time is established by the market price on the date of its grant.

### 2.  Celsius Accounts for Share-Based Compensation Expenses in Accordance with the FASB's ASC 718

67.     Equity awards are part of compensation and must follow specific accounting rules. Thus, when Celsius first adopted its Incentive Stock Plan in 2006, in order to remain GAAP compliant, it also needed to adopt the provisions of Accounting Standards Codification Topic 718 "Compensation – Stock Compensation" ("ASC 718"), which it did on January 1, 2006.  In accordance with FASB's ASC Topic 718, Celsius measures share-based compensation payments "on the date of grant at the fair value of the share-based payments."

68.     ASC Topic 718, promulgated by the Financial Accounting Standards Board ("FASB"), provides corporations guidance on how to properly expense employee share-based compensation on a corporate income statement.  The overarching principle of ASC 718 is to account for the fair value of employee awards as compensation expense in the financial statements.

69.     Thus, consistent with ASC 718, Celsius measures share-based compensation costs "on the date of grant at the fair value of the share-based payments" and "[s]uch compensation amounts, if any, are amortized over the respective vesting periods of the grants."  In other words, stock option compensation expenses are supposed to be calculated and recognized on a company's income statement using the fair market value of the stock as of the date of termination or retirement of an employee.

70.     Here, Celsius's share-based compensation awards were "modified" when nine employees were terminated or resigned from Celsius in the second and third quarters of FY 2021, and their stock-based compensation vesting schedule was accelerated.  To account for the expenses associated with this "modification," accountants look to ASC 718-20-55-108, which states:

> [I]f at the date of modification awards are not expected to vest under the original vesting conditions, an entity should recognize compensation cost only if the awards vest under the modified vesting conditions.  Said differently, if the entity believes

that the original performance or service vesting condition is not probable of achievement at the date of the modification, the cumulative compensation cost related to the modified award, assuming vesting occurs under the modified performance or service vesting condition, is the modified award's fair value at the date of the modification.

71.    Assume that a director was awarded 600 RSUs or stock options to vest over three years of service, or 200 RSUs or stock options per year.  Further assume that after the first year, the director resigned, and Celsius agreed to "modify" the awards by allowing the entire 600 RSUs or stock options to vest on the last date of his assignment.  Here, for the 400 RSUs/stock options that would not otherwise have vested, the "original performance or service vesting condition," i.e., additional years of service, was "not probable of achievement" at the date of "modification," i.e., the director's last date of service.  In that case, Celsius must record costs of the "modified award", i.e., the fully vested 400 RSUs or stock options that would not have vested absent the modification, at "fair value at the date of modification."

72.    Negron-Carballo characterized the mistake as a "type III" error in interpretation. ASC 718 defines Type III as an "improbable to probable modification," meaning that the "original performance or service vesting condition" was "not probable of achievement at the date of modification," but the modified performance, i.e., no future service at all, was "probable of achievement at the date of modification."  The modification in the awards transformed the service conditions from "improbable" to "probable."

73.    ASC 718 provides examples of how to account for the Type III modification.  ASC 718-20-55-121 specifically addresses the situation where employees are terminated and the stock grantor decides to accelerate vesting of all options.  It clearly spells out that the "grant date" of the accelerated options, for purposes of accounting for cost, is the date of modification.  There is no room for "interpretation":  Celsius should have recognized costs associated with the accelerated vested stock-based compensation when it accelerated the vesting schedule.

74.    According to Deloitte, FASB's amendments to ASC Topic 718 (emphasis added): "simplifie[d] the accounting for share-based payment arrangements with nonemployees."  In fact,

the "ASU was issued as part of the FASB's simplification initiative, which is intended to reduce the cost and complexity of current U.S. GAAP while maintaining or enhancing the usefulness of the related financial statement information."  In other words, the new requirements pertaining to expensing share-based compensation as set forth by the FASB were not difficult or cumbersome to properly implement.

75.     Lead Plaintiff consulted an accounting expert in connection with preparing this Amended Complaint, who advised that the accounting guidance set forth in ASC 718, including the guidance set forth above pertaining to accelerated vesting schedules for terminated or retired employees, is unequivocal with respect to the modification of stock options and RSUs.   In particular, ASC 718 makes plain that when a grantor terminates an employee, the acceleration of vesting requires the additional compensation expense to be recorded using the fair value of the stock option or RSU as of the date of the modification.

### 3.   Despite That ASC 718 Is Clear and Unambiguous, Celsius Improperly Accounted for SBA of Nine Former Employees and Directors

76.     In 2021, nine employees and members of the Board of Directors were terminated. Each of these nine individuals had participated in Celsius's share-based compensation program and had unvested RSUs or ISOs at the time of their termination.  Pursuant to Board resolutions or severance agreements, Celsius was required to accelerate the vesting conditions of these share-based awards. Thus, when the former directors and employees left the Company, Celsius accelerated the vesting conditions of their share-based compensation awards, a practice that the Company dubbed a "Type III modification" pursuant to ASC 718. A Type III modification requires re-valuing the unvested awards at their fair market value as of the date of the modification.

77.     Thus, under ASC 718, when Celsius accelerated the vesting conditions of these awards, it was supposed to value the RSUs and ISOs at the then-current fair market value of the Company's stock, and recognize such share-based compensation expenses in the second and third quarters of FY 2021 accordingly.  However, by the second quarter of FY 2021, Celsius's stock

19

price was steadily climbing, hitting a high of $81 per share in early June 2021. Defendants Fieldly and Negron-Carballo – both CPAs with significant CFO experience – knew that properly valuing these share-based compensation expenses in accordance with ASC 718 meant that general and administrative expenses for those two quarters would substantially increase, turning what they had hoped would be a net profit for those two quarters, into a net loss.  Further, accelerating the vesting conditions of share-based compensation awards upon termination of employees and directors had been a standard practice at Celsius for years.  Indeed, the Company's 2006 Amended Stock Option Plan contemplates that stock options will be vested on an accelerated schedule in certain circumstances:  "Awards under the Plan may also be subject to such other provisions . . . including . . . provisions for the acceleration of the right to exercise or vesting of awards . . ."

78.     Stock options and restricted stock units awarded to employees and directors are forms of share-based compensation that Celsius recognizes as a non-cash expense on its income statements.   Celsius   classifies   this   noncash   share-based   compensation   as   "general   and administrative expenses" ("G&A") on its income statements.

79.     As a result, Celsius's general and administrative expenses for the second and third quarters of FY 2021 were substantially undervalued at $9.12 million and $11.14 million, respectively.  In turn, Defendants were able to report a positive net income for the second and third quarters, when in fact, cumulative income for those two quarters on a year-to-date basis was actually a net loss of $8.01 million.  Specifically, on a quarterly basis, Celsius overstated net income as $4 million, or net income per share as $0.05 for the second quarter of FY 2021; and Celsius overstated net income as $2.75 million, or net income per share as $0.04 for the third quarter of FY 2021.

## V.     THE TRUTH IS REVEALED

80.     The start to 2022 put the brakes on the heady equity markets.  For example, after closing at an all-time high of 4,766.18 on December 26, 2021, the S&P 500 dropped to 4,397.94 on January 16, 2022, and further declined to 4,225.50 on February 23, 2022, a decline of 11.3%.

81.     Similarly, after reaching its all-time high of 16,057.44 on November 19, 2021, and also closing the year at a lofty 15,871,26 on December 27, 2021, the NASDAQ average began a steep decline, closing at 14,935.90 on January 7, 2022, at 13,352.78 on January 27, 2022, and at 13,037.45 on February 23, 2022, which was 18.8% off its November highs.

82.     News of the war in Ukraine and international supply chain bottlenecks that affected a wide range of industries precipitated these sell-offs.  Defendants viewed these events and resulting market weakness as a prime opportunity to disclose the truth about its hidden expenses associated with stock-based compensation.  Aware of how volatile the markets were, Defendants knew that disclosing the truth to the public at that time would soften the blow to the public about its net loss of $9.4 million for the third quarter of FY 2021, and the effect on the Company's stock price might be dampened or masked by the volatile markets.

83.     Therefore, on March 1, 2022, after the market closed, Celsius disclosed that it could not timely file its 2021 annual report due to "staffing limitations, unanticipated delays and identified material errors in previous filings."  Specifically, Celsius "determined that the calculation and expense of noncash share-based compensation, related to grants of stock options and restricted stock units awarded to certain former employees and retired directors were materially understated for the three and six month periods ended June 30, 2021 and three and nine month periods ended September 30, 2021."  As a result, management concluded that there was a material weakness in the Company's internal controls over financial reporting.

84.     In a Form 8-K filed with the SEC on March 1, 2022, Celsius stated that it would restate its previously issued financial statements for the periods ended June 30, 2021 and September 30, 2021.  Specifically, Celsius stated:

> In connection with the preparation of its consolidated financial statements for the year ended December 31, 2021, the Company determined that the calculation of expense of non-cash share based compensation related to grants of stock options and restricted units ("RSUs") issued to former employees and retired directors was materially understated during the three-and six-month periods ended June 30, 2021 and three- and nine-month periods ended September 30, 2021 (the "Affected Periods"), based on the application of U.S. generally accepted accounting

principles. During the Affected Periods, the stock options and RSUs were modified and the expense should have been calculated and recognized using the fair market value of the awards as of the date of modification and recognized over the remaining service period.

85.   Specifically, the Company expected to record share-based compensation expense of $3.18 million for second quarter of FY 2021, resulting in net income of $779,991, and of $12.116 million for the third quarter of FY 2021, resulting in a net loss of $9.4 million, as displayed in the chart below:

| | Three Month Ended June 30, 2021 | | |
| | As Reported | Adjustments | As Restated |
|---|---|---|---|
| General and administrative expenses | $ 9,119,532 | $ 3,180,353 | $ 12,299,885 |
| Total operating expense | 24,650,520 | 3,180,353 | 27,830,873 |
| Income (loss) from operations | 3,598,849 | (3,180,353) | 418,496 |
| Net income (loss) before income taxes | 3,960,344 | (3,180,353) | 779,991 |
| Net income (loss) | $ 3,960,344 | $ (3,180,353) | $ 779,991 |
| Net income (loss) per share: | | | |
| Basic | $ 0.05 | $ (0.04) | $ 0.01 |
| Diluted | $ 0.05 | $ (0.04) | $ 0.01 |

| | Three Month Ended September 30, 2021 | | |
| | As Reported | Adjustments | As Restated |
|---|---|---|---|
| General and administrative expenses | $ 11,140,030 | $ 12,116,438 | $ 23,256,468 |
| Total operating expense | 33,761,092 | 12,116,438 | 45,877,530 |
| Income (loss) from operations | 3,932,280 | (12,116,438) | (8,184,158) |
| Net income (loss) before income taxes | 3,579,610 | (12,116,438) | (8,536,828) |
| Net income (loss) | $ 2,745,791 | $ (12,116,438) | $ (9,370,647) |
| Net income (loss) per share: | | | |
| Basic | $ 0.04 | $ (0.17) | $ (0.13) |
| Diluted | $ 0.03 | $ (0.15) | $ (0.12) |

86.   On March 1, 2022, Celsius held its earnings call for the fourth quarter of FY 2021 during which Defendant Fieldly explained:

In addition, we have had multiple open positions, and we have been vigorously recruiting top talent into the company's finance area to support our operations and our strong growth in our business, which was impacted by our ability to finalize the Ernst & Young first full year audit. We filed for an extension on our Form 10-K with the SEC earlier this evening and expect to file our 10-K during the 15 calendar day extension period as of the final audit and internal control procedure work are performed and completed.

We have been able to finalize the majority of the pending items prior to our call today, including as reported today in an 8-K filing, and a prior period error correction has been made to the noncash stock expense in our second and third

22

quarter financial results for 2021 totaling approximately $2.7 million and $12.6 million in additional noncash stock expense for those periods, which was the results of prior stock grants that were awarded to foundational individuals, which were modified to allow for continual vesting past their contracted service dates.

This was an error of interpretation of a Class III modification rule, technical rule, which resulted in an immediate mark-to-market adjustments for the prior periods' stock grants as a non-cash expense. We highlighted this financial impact in our full year updated totals on our flash results table at the beginning of our earnings supplement as well as the financial statements on the earnings supplement included in the 8-K filing today, which outlines the prior period of changes reflected in the non-cash stock expense for those periods.

In addition, in light of this error, our management has then concluded that a material weakness existed in the Company's internal controls of our financial reporting for the Company's disclosure controls and procedures, which were not effected as of December 31, 2021, which was disclosed in our 8-K filing earlier today and which will be further discussed in our upcoming filing.

87.     During the same earnings call, Defendant Negron-Carballo stated:

I wanted to start by providing additional clarity on the adjustments that John highlighted regarding the noncash stock compensation expense.  During Q2 and Q3, the company calculated and recognized non-cash stock-based compensation expense related to options and RSUs held by former foundational employees and retired directors ratably over their vesting period.  However, because the options and the RSUs were allowed to continue to pass after the employees separated and the directors retired from the company, those awards were deemed to have been modified. And the expense should have been calculated and recognized using the firm market value of the stock as of the date of termination or retirement.

This led to the adjustments that John discussed, which resulted in the understatement of the stock compensation expense in Q2 in the amount of $3.1 million and $12.1 million for Q3.  These aspects are further detailed in the 8-K that we filed today.

As a result of this situation, the company's management and the Audit Committee of its Board of Directors have determined that the company's previously issued interim unaudited financial statements contained in the company's quarterly reports on Form 10-Q for each of the affected quarters should no longer be relied upon.  The company's management has also concluded that in light of this situation, as previously described, a material weakness existed in the company's internal control over the proper valuation of stock compensation expense regarding the modifications performed to stock awards for some former employees and retired directors.

88.     On March 1, 2022, Celsius also held an earnings call for its fourth quarter earnings for fiscal year 2021, during which Mark Stiefel Astrachan, an analyst for Stifel, Nicolaus & Co., asked Defendant Negron-Carballo whether the SEC investigation is related to Celsius's failure to properly report employee share-based compensation.  Defendant Negron-Carballo responded:

"I'm not sure as it relates to that, not necessarily.  It's more of a situation that happened regarding some of the awards that had to be properly valued at fair market value for some of these employees that were separated and some of the Board members that also retired."  Defendant Fieldly then added, "And I'll just chime in, in regards to some of the employees, it was also – it's a technical aspect there because some of them are still providing services through contractual services.  So there was just a technicality.  That was an error in interpretation there on those stock awards.  So it was definitely an oversight and a correction that was noted."

89.     On this news, the Company's stock price fell to an intra-day low of $56.21 per share from a high of $65 per share on unusually heavy trading volume on March 2, 2022.  Over the course of the March 2, 2022 and March 3, 2022 trading sessions, the Company's stock price fell a total of $5.20, or 8.3% on unusually heavy trading volume to close at $57.60 per share on March 3, 2022.

90.     Celsius officially restated its financial statements on page F-26 of its Form 10-K filed with the SEC on March 16, 2022.  The Company explained that "[s]ubsequent to filing the Company's Quarterly Reports on Form 10-Q for the periods ended June 30, 2021 and September 30, 2021, the Company determined that certain amounts reported in the Company's previously issued unaudited consolidated statements of operations and comprehensive income (loss) and consolidated balance sheets contained misstatements. . . . In accordance with Staff Accounting Bulletin No. 99, Materiality, management evaluated the materiality of the misstatements from a qualitative and quantitative perspective and concluded that the misstatements were material to the three-and six-months ended June 30, 2021 and the three- and nine-months ended September 30, 2021, respectively."

91.     Accordingly, Celsius restated its consolidated financial statements for the three-and six- months ended June 30, 2021, and three- and nine- months ended September 30, 2021 as follows: net income for the second quarter of FY 2021 was actually $779,991, not $3.96 million, as initially reported; and net income for the third quarter of FY 2021 was actually negative net

income of $9.4 million, not $2.75 million as initially reported. Additional metrics were stated, as explained below in paragraphs 97–131.

92.     The Company also explained on page F-24 of the Form 10-K:

There were certain Board of Directors members and employees whose service was terminated during the year. In connection with their terminations, the vesting conditions of the previously granted awards were modified to accelerate the vesting of specified un-vested awards pursuant to Board resolutions or severance agreements. Pursuant ASC 718, these were Type III modifications requiring re-evaluation of un-vested awards to modification date fair value with recognition of compensation expense over the remaining service period. The Company modified awards for nine grantees resulting in approximately $19.3 million in incremental compensation cost during the year ended December 31, 2021.

## VI.     POST CLASS PERIOD DISCLOSURES

93.     In the week following the end of the Class Period, Celsius's stock price continued to substantially decline. Between March 1 and March 8 alone, Celsius's stock price plummeted 26%, from $62.80 on March 1, 2022, to just $46.61 on March 8, 2022.

94.     On March 16, 2022, Celsius finally filed its 10-K with the SEC. Under Item 9A of the 10-K, Celsius disclosed that:

There were certain Board of Directors members and employees whose service was terminated during the year. In connection with their terminations, the vesting conditions of the previously granted awards were modified to accelerate the vesting of specified un-vested awards pursuant to Board resolutions or severance agreements. Pursuant ASC 718, these were Type III modifications requiring re-valuation of un-vested awards to modification date fair value with recognition of compensation expense over the remaining service period. The Company modified awards for nine grantees resulting in approximately $19.3 million in incremental compensation cost during the year ended December 31, 2021. See Note 2 and Unaudited Supplementary Information for the impact of these modifications on the previously reported unaudited 2021 quarterly consolidated statements of operations and comprehensive income (loss) for the periods ending June 30, 2021 and September 30, 2021.

95.     On April 18, 2022, just one month after the end of the Class Period, Celsius filed a Form 8-K with the SEC announcing that Defendant Negron-Carballo would be resigning from his role as CFO of Celsius and would be replaced by Jarrod Langhans. The Company further announced that Negron-Carballo would "continue to serve Celsius in an executive capacity to ensure a smooth transition until he begins his retirement on January 31, 2023."

96.     In its Form 10-Q filed on May 10, 2022, Celsius disclosed that the material weaknesses identified in its internal controls were not yet remedied as of March 31, 2022.  In particular, Celsius reported that:

> Management failed to design effective controls related to the application of U.S. GAAP guidance in their evaluation of modifications to share-based payment arrangements, resulting in the correction of errors in previously issued interim financial statements relating to the recognition of compensation expense described above;
>
> For a substantial portion of the year, management did not design and maintain effective controls over information technology general controls (ITGCs) for information systems and applications that are relevant to the preparation of the consolidated financial statements.  Specifically, management did not design and maintain: sufficient user access controls to ensure appropriate segregation of duties and adequately restrict user and privileged access to financial applications, programs and data to appropriate Company personnel; program change management controls to ensure that information technology (IT) program and data changes affecting financial information technology applications and underlying accounting records are authorized, tested, and implemented appropriately.  As a result, business process controls (automated and it-dependent manual controls) that are dependent on the ineffective ITGCs, or that use data produced from systems impacted by the ineffective ITGCs were deemed ineffective at December 31 2021; and
>
> Management did not have an adequate process in place to monitor and provide oversight over the completion of its testing and assessment of the design and operating effectiveness of internal control over financial reporting in a timely manner.  As such, we determined that management failed to fully implement components of the COSO framework, including elements of the control environment, information and communication, control activities and monitoring activities components, relating to: (i) providing sufficient and timely management oversight and ownership over the internal control evaluation process; (ii) hiring and training sufficient personnel to timely support the Company's internal control objectives; (iii) performing timely monitoring and oversight to ascertain whether the components of internal control are present and functioning effectively.

## VII.    DEFENDANTS' MATERIALLY FALSE STATEMENTS ISSUED DURING THE CLASS PERIOD

### A.    Celsius's Second and Third Quarter 2021 Financial Metrics Were False

97.     As described more fully below, Celsius materially understated its general and administrative expenses, and its total operating expenses for the second and third quarters of FY 2021.  In turn, it materially overstated its net income and its net income per share for those quarters.  As more specifically described below, these false statements appeared in Celsius's Forms 8-K filed

on August 12, 2021 and on November 11, 2021, as well as its Forms 10-Q filed on those same dates. Defendants Fieldly and Negron-Carballo signed all of these public filings which contained the false metrics. As further detailed below, Defendants Fieldly and Negron-Carballo repeated these false metrics during analyst calls and other investor presentations during the Class Period.

98. A summary of the false financial metrics that Celsius reported in its second earnings report – as reported in its Form 8-K filed on August 12, 2021 and its Form 10-Q filed on August 12, 2021 – and in its third quarter earnings reports – as reported in its Form 8-K filed on November 11, 2021, and its Form 10-Q filed on November 11, 2021 – is as follows for the particular quarters:

| 2Q 2021 Reported | 2Q2021 Actual | 2Q2021 Difference | 3Q2021 Reported | 3Q2021 Actual | 3Q2021 Difference |
|---|---|---|---|---|---|
| **Net Income ($)** | | | | | |
| 3,960,344 | 779,991 | -80% | 2,745,791 | (9,370,647) | -441% |
| **Net Income Per Share ($)** | | | | | |
| 0.05 | 0.01 | -80% | 0.04 | (0.13) | -425% |
| **General and Administrative Expenses ($)** | | | | | |
| 9,119,532 | 12,299,885 | 35% | 11,140,030 | 23,256,468 | 109% |
| **Total Operating Expenses ($)** | | | | | |
| 24,650,520 | 27,830,873 | 13% | 33,761,092 | 45,877,530 | 36% |

99. A summary of the false year-to-date financial metrics that Celsius reported in its second and third quarter earnings reports for 2021 is as follows:

| Six Months Ended June 30, 2021 Reported | Six Months Ended June 30, 2021 Actual | Six Months Ended June 30, 2021 Difference | Nine Months Ended Sept. 30, 2021 Reported | Nine Months Ended Sept. 30, 2021 3Q2021 Actual | Nine Months Ended Sept. 30, 2021 Difference |
|---|---|---|---|---|---|
| **Net Income ($)** | | | | | |
| 4,545,768 | 1,365,415 | -70% | 7,251,559 | (8,005,232) | -210% |
| **Net Income Per Share ($)** | | | | | |
| 0.06 | 0.02 | -67% | 0.10 | (0.11) | -210% |

| General and Administrative Expenses ($) | | | | | |
|---|---|---|---|---|---|
| 16,926,198 | 20,106,551 | 19% | 28,066,228 | 43,363,019 | 55% |
| Total Operating Expenses ($) | | | | | |
| 44,416,239 | 47,596,592 | 7% | 78,177,331 | 93,474,122 | 20% |

100.    Below is a chart that displays each restated amount as a percentage of quarterly revenue:

| 2Q 2021 Reported | 2Q2021 Actual | 2Q2021 Revenue | 2Q2021 % Difference in Revenue | 3Q2021 Reported | 3Q2021 Actual | 3Q 2021 Revenue | 3Q2021 % Difference in Revenue |
|---|---|---|---|---|---|---|---|
| Net Income ($) | | | | | | | |
| 3,960,344 | 779,991 | 65,073,323 | 4.9% | 2,745,791 | (9,370,647) | 94,909,100 | 12.8% |
| General and Administrative Expenses ($) | | | | | | | |
| 9,119,532 | 12,299,885 | 65,073,323 | 4.9% | 11,140,030 | 23,256,468 | 94,909,100 | 12.8% |
| Total Operating Expenses ($) | | | | | | | |
| 24,650,520 | 27,830,873 | 65,073,323 | 4.9% | 33,761,092 | 45,877,530 | 94,909,100 | 12.8% |

101.    The adjustments in net income, general and administrative expenses, and total operating expenses accounted for approximately 5% of reported revenues for the second quarter of FY 2021, and 12.8% of reported revenues for the third quarter of FY 2021.

### 1.    False Metrics Pertaining to Celsius's Second Quarter in 2021

102.    The Class Period begins on August 12, 2021. On that day, Celsius released its results for the second quarter of 2021 in a Form 8-K. It reported net income of $3.9 million for the second quarter of FY 2021.

103.    This was false, because in fact, when Celsius accounted for its share-based compensation expenses properly, net income for the second quarter of FY 2021 was actually $779,991, a decline of 80%.

104.    In the same earnings release, Celsius reported net income of share of $0.05.

28

105.    This was false, because in fact, when Celsius accounted for its share-based compensation expenses properly, net income per share was actually $0.01, a decline of 80%.

106.    Celsius also filed with the SEC its Form 10-Q for the three month period ended June 30, 2021 on August 21, 2021.  That SEC filing included the following false metrics:

    a. Net income was reported as $3.9 million, but when its share based compensation was properly accounted for, this figure dropped to $779,991.

    b. Net income per share was reported as $0.05, but when its share based compensation was properly accounted for, this figure dropped to $0.01.

    c. General and administrative expenses were reported as $9.1 million, but when its share based compensation was properly accounted for, this figure rose to $12.3 million.

    d. Total operating expenses were reported as $24.7 million, but when its share based compensation was properly accounted for, this figure rose to $27.8 million.

107.    The Form 10-Q filed on August 21, 2021 also included false metrics for the six-month period ended June 30, 2021, as follows:

    a. Net income was reported as $4.5 million, but when its share based compensation was properly accounted for, this figure dropped to $1.4 million.

    b. Net income per share was reported as $0.06, but when its share based compensation was properly accounted for, this figure dropped to $0.02.

    c. General and administrative expenses were reported as $16.9 million, but when its share based compensation was properly accounted for, this figure rose to $20.1 million.

    d. Total operating expenses were reported as $44.4 million, but when its share based compensation was properly accounted for, this figure rose to $47.6 million.

108.    Celsius also held its second quarter earnings call for fiscal year end 2021 on August 12, 2021, during which Defendant and CFO Negron-Carballo stated (emphasis added):

General and administrative expenses for the three months ended June 30, 2021 were $9.1 million, an increase of $5.2 million or 133% from $3.9 million for the three months ended June 30, 2020. This increase was primarily attributable to stock option expense, which amounted to $4 million for the three months ended June 30, 2021, or an increase of $2.8 million, which accounts for 51.9% of the total increase in this area when compared to the prior year quarter. Management deems it very important to motivate employees by providing them ownership in the business in order to promote overperformance. Additionally employee cost for the three months ended June 30, 2021 reflect an increase of $670,000 or 61%, as investments in this area are also required to properly support our higher business volume and the commercial and operational areas of the business. Additionally, travel and other similar expenses are now being incurred.

109.    This statement was false.  In fact, when Celsius accounted for expenses associated with its share-based compensation properly, general and administrative expenses for the three months ended June 30, 2021 were $12.3 million, not $9.1 million, an increase of 35%.  Similarly, when Celsius accounted for expenses associated with its share-based compensation properly, its stock option expenses were actually $7.18 million for the three months ended June 30, 2021 (and not $4 million, as reported), which was an increase of $5.98 million (and not $2.8 million, as reported).

110.    During the same earnings call, Defendant Negron-Carballo stated: "As a result of the above, the net income for the three months ended June 30, 2021 was $3.9 million or $0.05 per share on a weighted average of 73.2 million shares outstanding and dilutive earnings of $0.05 per share based on a fully diluted weighted average of 77.2 million shares outstanding."

111.    This statement was false. At this time, when Celsius accounted for expenses associated with its share-based compensation properly, net income for the three months ended June 30, 2021 was actually $779,991, not $3.9 million, and net income per share was actually $0.01, not $0.05.

112.    The Form 10-Q for the three months ended June 30, 2021, further reported how much Celsius had recognized in non-cash compensation expense for that period:

For the six months ended June 30, 2021 and 2020, the Company recognized approximately $4.0 million and $2.6 million, respectively, of non-cash compensation expense (included in general and administrative expense in the

30

accompanying consolidated statements of operations and comprehensive income) .
. . ."

113.    This statement was false.  At the time this statement was made, Celsius's non-cash

compensation expense for the six months ended June 30, 2021 was understated by $3.18 million

and therefore was actually $7.18 million.

114.    On August 19, 2021, Celsius held its annual shareholder meeting in Boca Raton

during which Defendant Fieldly stated:

> In addition, we continue to deliver gross profits of $48.8 million, up 88%. Margins
> as we indicated were impacted due to COVID constraints of importing of cans, raw
> materials. We've [sic] also have set a path forward as we continue to grow and scale
> as we continue to improve our gross profits. In addition, we delivered net income
> of $4.5 million and adjusted EBITDA through the period of 12.9, which is 139%
> increase.

115.    Also during the August 19, 2021 annual shareholder meeting, Defendant Negron-

Carballo stated:

> In terms of financial snapshot or some of the highlights, obviously in Q1, $65.1
> million of revenue, company record and then the break out between the different
> regions as well.  And obviously here, you can see in the U.S. with a 100 – almost a
> 160% growth, which from my standpoint is stellar.  We had some pretty good solid
> growth as well, international 25% mainly through Europe. Again, you see the good
> gross profit profile that we're having.  And then when you look at EBITDA for the
> quarter basically at $8 million, that translates to about 12% of revenue which is a
> fairly respectable.  And that's despite the fact that we had to book a couple of
> charges there to make sure that we have good reserves in terms of the fact that we
> server.  And then, obviously, that translates to about $4 million of net income or
> 4.5 for the year.

116.    The statements in paragraphs 114 and 115 were false because when Celsius

accounted for expenses associated with its share-based compensation properly, net income for the

six months ended June 30, 2021 was actually $1.37 million, not $4.5 million, a decline of 70%.

117.    During the 2021 Annual Shareholders' Meeting on August 19, 2021, management

gave a presentation highlighting key business results.  The presentation stated that for the six month

period ended June 30, 2021, Celsius had "net income of $4.5 million compared to a net income of

$2.1 million in the 2020 period."   The presentation also featured the following chart:

| Flash Financials $(000)'s | 2Q 2021 | 2Q 2020 | % Change | 6M FY 2021 | 6M FY 2020 | % Change |
|---|---|---|---|---|---|---|
| Revenue | $65.1 | $30.0 | 117% | $115.1 | $58.2 | 98% |
| N. America | $53.6 | $20.8 | 157% | $92.6 | $40.2 | 130% |
| International | $11.5 | $9.2 | 25% | $22.5 | $18.0 | 25% |
| Gross Margin % (GM ex. Freight) | 43.4% (51.8%) | 43.3% (50.5%) | 10 BPS (130 BPS) | 42.4% (50.8%) | 44.7% (51.9%) | -230 BPS (-110 BPS) |
| EBITDA* | $7.9 | $2.6 | 204% | $12.9 | $5.4 | 139% |
| Income | $4.0 | $1.6 | 150% | $4.5 | $2.1 | 114% |

118.    These statements issued in the management presentation were materially false.  Net income for the six month period ended June 30, 2021 was actually $1.4 million, not $4.5 million and net income for the second quarter of FY 2021 was actually $779,991, not $4.0 million, as displayed in the above chart.

## 2.    False Metrics Pertaining to Celsius's Third Quarter in 2021

119.    On November 11, 2021, Celsius released its results for the third quarter of 2021 in a Form 8-K.  It reported net income of $2.7 million for the third quarter of FY 2021.

120.    This was false, because in fact, when Celsius accounted for its share-based compensation expenses properly, net income for the third quarter of FY 2021 was actually a net loss of $9.4 million, a decline of 441%.

121.    In the same earnings release, Celsius reported net income per share of $0.04.

122.    This was false, because in fact, when Celsius accounted for its share-based compensation expenses properly, net income per share for the third quarter of 2021 was actually negative $0.13.

123.    Celsius also filed with the SEC its Form 10-Q for the three month period ended September 30, 2021 on November 11, 2021.  That SEC filing included the following false metrics:

    a.    Net income was reported as $2.7 million, but when its share based compensation was properly accounted for, this figure dropped to a net loss of $9.4 million.

  b. Net income per share was reported as $0.04, but when its share based compensation was properly accounted for, this figure dropped to negative $0.13.

  c. General and administrative expenses were reported as $11.1 million, but when its share based compensation was properly accounted for, this figure rose to $23.3 million.

  d. Total operating expenses were reported as $33.8 million, but when its share based compensation was properly accounted for, this figure rose to $45.9 million.

 124. The Form 10-Q filed on November 11, 2021 also included false metrics for the nine-month period ended September 30, 2021, as follow:

  a. Net income was reported as $7.3 million, but when its share based compensation was properly accounted for, this figure dropped to a net loss of $8.01 million.

  b. Net income per share was reported as $0.10, but when its share based compensation was properly accounted for, this figure dropped to negative $0.11.

  c. General and administrative expenses were reported as $28.07 million, but when its share based compensation was properly accounted for, this figure rose to $43.4 million.

  d. Total operating expenses were reported as $78.2 million, but when its share based compensation was properly accounted for, this figure rose to $93.5 million.

 125. On November 11, 2021, Celsius announced its third quarter 2021 financial results in a Form 8-K and an earnings call.  The press release stated: "[n]et [i]ncome of $2.7 million, down 44% from $4.8 million in the year ago quarter."  The press release also stated that for the nine months ended September 30, 2021, Celsius had "net income of $7.3 million compared to a net income of $6.9 million in the 2020 period."  The press release included the following tables[1]:

---

[1] The second table contains yellow highlighting to display the restated financial metrics.

| Flash Financials $(000)'s* | 3Q 2021 | 3Q 2020 | % Change | 9M FY 2021 | 9M FY 2020 | % Change |
|---|---|---|---|---|---|---|
| Revenue | $94.9 | $36.8 | 157% | $210.0 | $95.1 | 121% |
| N. America | $84.5 | $26.9 | 214% | $177.1 | $67.1 | 164% |
| International | $10.4 | $9.9 | 5% | $32.9 | $28.0 | 18% |
| Gross Margin % (Ex OB Freight) | 39.7% (48.6%) | 47.6% (53.7%) | -790 BPS (-510 BPS) | 41.2% (49.8%) | 45.8% (52.6%) | -460 BPS (-280 BPS) |
| EBITDA** | $10.1 | $6.7 | 51% | $22.8 | $12.0 | 90% |
| Income | $2.7 | $4.8 | -44% | $7.3 | $6.9 | 6% |

**Celsius Holdings, Inc. and Subsidiaries**
**Consolidated Statements of Operations and Comprehensive Income**
**(Unaudited)**

| | For the three months ended September 30, | | For the nine months ended September 30, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| Revenue | $ 94,909,100 | $ 36,839,149 | $ 210,017,302 | $ 95,061,265 |
| Cost of revenue | 57,215,728 | 19,305,416 | 123,495,466 | 51,512,534 |
| Gross profit | 37,693,372 | 17,533,733 | 86,521,836 | 43,548,731 |
| | | | | |
| Selling and marketing expenses | 22,621,062 | 8,267,996 | 50,111,103 | 23,640,914 |
| General and administrative expenses | 11,140,030 | 4,752,428 | 28,066,228 | 13,178,593 |
| Total operating expenses | 33,761,092 | 13,020,424 | 78,177,331 | 36,819,507 |
| | | | | |
| **Income from operations** | 3,932,280 | 4,513,309 | 8,344,505 | 6,729,224 |
| | | | | |
| Other income (expense): | | | | |
| Interest income on note receivable | 76,473 | 78,690 | 239,586 | 268,709 |
| Interest expense on bonds | - | (144,021) | - | (391,458) |
| Interest on other obligations | (4,524) | (3,419) | (7,496) | (13,400) |
| Amortization of discount on bonds payable | - | (178,649) | - | (506,100) |
| Other miscellaneous expense | (97,038) | (62,817) | - | (27,614) |
| Gain on lease cancellations | - | - | - | 152,112 |
| Foreign exchange gain/(loss) | (327,581) | 550,510 | (451,217) | 646,515 |
| Total other income/(expense) | (352,670) | 240,294 | (219,127) | 128,764 |
| | | | | |
| **Net income before income taxes** | 3,579,610 | 4,753,603 | 8,125,378 | 6,857,988 |
| | | | | |
| Income tax expense | 833,819 | - | 833,819 | - |
| | | | | |
| **Net income** | 2,745,791 | 4,753,603 | 7,291,559 | 6,857,988 |
| Other comprehensive income: | | | | |
| Foreign currency translation gain/(loss) | 1,282,683 | 110,027 | 1,367,169 | (113,144) |
| **Comprehensive Income** | 4,028,474 | 4,863,630 | 8,658,728 | 6,744,844 |
| | | | | |
| Income per share: | | | | |
| Basic | $ 0.04 | $ 0.07 | $ 0.10 | $ 0.10 |
| Diluted | $ 0.03 | $ 0.06 | $ 0.09 | $ 0.09 |
| Weighted average shares outstanding: | | | | |
| Basic | 74,609,195 | 70,473,351 | 73,758,731 | 70,184,071 |
| Diluted | 78,473,866 | 74,848,239 | 77,782,459 | 73,524,209 |

126.  During its earnings call the third quarter of FY 2021 on November 11, 2021, Defendant Fieldly assured investors and analysts that Celsius's net income was solid.  Fieldly stated, in pertinent part:

Net income. As a result of the above, net income for the three months ended September 30, 2021 was $2.7 million or $0.04 per share based on a weighted average of 74.6 million shares outstanding and dilutive earnings of $0.04 per share based on a fully dilutive weighted average of 78.4 million shares outstanding. In comparison, for the three months ended September 30, 2020, the Company had net income of $4.8 million or $0.07 per share based on a weighted average of 70.4 million shares outstanding and a dilutive earnings per share of $0.06 based on a fully dilutive weighted average of 74.8 million shares outstanding.

127.    The statement set forth above was false because when Celsius accounted for its share-based compensation expenses properly, net income for the third quarter of FY 2021 was actually a <u>net loss</u> of $9.4 million, or ($0.13) per share.

128.    Also during Celsius's November 11, 2021 earnings call for its third quarter of FY 2021, Defendant Negron-Caballo stated during the opening remarks:

General and administrative expenses for the three months ended September 30, 2021 were $11.1 million, an increase of $6.4 million or 134% from $4.8 million for the three months ended September 30, 2020.  This increase was mainly related to stock option expense, which amounted to $5.8 million for the three months ended September 30, 2021, an increase of $3.7 million, which accounts for 50% of the total increase in this area when compared to the prior-year quarter. Management deems it very important to motivate employees by providing them ownership in the business in order to promote their overperformance.

Administrative expenses amounted to $2.6 million or an increase of $1.3 million or 97% when compared to the prior-year quarter.  This variance is mainly related to an increase in bad debt reserve of $200,000.  And increases in audit costs, legal expenses, insurance costs and office rent account for the majority of the remaining fluctuation of $1.1 million.  Depreciation and amortization increased by $200,000 when compared to the prior-year quarter.

Lastly, all other administrative expenses, which were mainly composed of research, development and quality control testing increased by $235,000 when compared to the second quarter of 2020.  As a percentage of revenue, general and administrative expenses were 11.7% in the third quarter of 2021, when compared to 12.9% for the prior-year quarter.  If we then exclude the non-operational stock option expense, general and administrative expenses for the 2021 quarter would amount to only 6% of revenues.

129.    This statement was false because Celsius's G&A expenses for the three months ended September 30, 2021 were actually $23.3 million, not $11.1 million, when it accounted for expenses associated with its share-based compensation properly.

130.    The same day, the Company filed its quarterly report on Form 10-Q for the three month period ended September 30, 2021, affirming the previously reported financial results. The 10-Q provided, in relevant part: "For the nine months ended September 30, 2021 and 2020, the Company recognized approximately $13.4 million and $4.7 million, respectively, of non-cash compensation expense (included in general and administrative expense in the accompanying consolidated statements of operations and comprehensive income) . . . ."

131.    The statement above was materially false because non-cash compensation expense for the nine months ended September 30, 2021 was actually $15.3 million, when Celsius accounted for its share-based compensation expenses properly. This statement is also materially false because net income for the nine months ended September 30, 2021 was actually a net loss of $8.01 million and net income per share was actually negative $0.11.

### B.    Celsius's Statements About the Adequacy of Its Disclosure Controls Were False

132.    Throughout the Class Period, Defendants made false statements to investors regarding the adequacy of the Company's disclosure controls and procedures.  In its Form 10-Q for the second quarter of 2021, the Company disclosed that:

> [O]ur President and Chief Executive Officer and our Chief Financial Officer have concluded that as of June 30, 2021, our disclosure controls and procedures were effective in that (a) we maintain records that in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets; (b) our records provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with authorizations of our management and board of directors.

133.    This statement was false because, as Defendants would later reveal in a Form 8-K issued on March 1, 2022, "the Company's previously issued unaudited consolidated financial statements for the period ended June 30, 2021 and September 30, 2021, should no longer be relied upon and are to be restated in order to reflect the appropriate accounting for the share based compensation awards modifications."

134.    The Company also reported in the same Form 8-K: "As a result of the breakdown in the design of controls over modifications to their share-based compensation . . . a material weakness exists in the Company's internal controls over financial reporting."

135.    Further, Celsius's 10-Q for the three months ended September 30, 2021, stated that Defendants Fieldly and Negron-Carballo "conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures . . . to ensure that information required to be disclosed by us in the reports filed or submitted by us under the Exchange Act is recorded, processed, summarized and reported."  In so doing, the Individual Defendants:

> concluded that as of September 30, 2021, our disclosure controls and procedures were effective in that (a) we maintain records that in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets; (b) our records provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with authorizations of our management and board of directors . . .

136.    This statement was false because, as Defendants would later reveal in a Form 8-K filed on March 1, 2022, "the Company's previously issued unaudited consolidated financial statements for the period ended June 30, 2021 and September 30, 2021, should no longer be relied upon and are to be restated in order to reflect the appropriate accounting for the share based compensation awards modifications."

137.    The Company also reported in the same Form 8-K: "As a result of the breakdown in the design of controls over modifications to their share-based compensation . . . a material weakness exists in the Company's internal controls over financial reporting."

## VIII.    ADDITIONAL SCIENTER ALLEGATIONS

138.    As alleged herein, the Individual Defendants acted with scienter in that they knew, or recklessly disregarded the fact that public documents and statements issued or disseminated in the name of the Company were materially false; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations

of the federal securities laws.  These Individual Defendants personally signed the Forms 10-Q and 8-K which contained the false metrics alleged herein.  By virtue of their receipt of information reflecting the true facts regarding Celsius, their control over Celsius's false statements which made them privy to confidential proprietary information concerning Celsius, participated in the fraudulent scheme designed to hide the true financial nature of Celsius for the first nine months of FY 2021 and deceive the public into believing that Celsius was attaining record high revenues, when in actuality, it reported a net loss of $9.4 million for its third quarter of FY 2021.

### A.   Motive and Opportunity

139.   Defendant Fieldly was motivated to issue false statements throughout the Class Period in order to give himself the opportunity to cash out on his 10b5-1 trading plan and sell his personally-held shares of Celsius common stock at artificially inflated prices. According to Form 4s filed with the SEC, Defendant Fieldly executed a Rule 10b5-1 plan on November 30, 2021, which is a written plan for trading securities designed in accordance with Rule 10b5-1(c) of the Securities Exchange Act of 1934.  10b5-1 plans are used by insiders as affirmative defenses against allegations that they traded company stock while in possession of material non-public information. That Defendant Fieldly initiated the 10b5-1 plan, nine years after he joined the Company, and four months into the Class Period while he was already in possession of material, non-public information concerning Celsius's improper expensing of share-based compensation is highly unusual and suspicious. Immediately following execution of his 10b5-1 plan, Fieldly sold 20,000 shares of Celsius common stock on December 27, 2021 for gross proceeds of $1.5 million.  That Fieldly did not undergo a sufficient cooling off period between executing the plan and transacting under the plan is also highly suspicious.

140.   Defendants' motive to carry out the fraudulent accounting scheme is further evidenced by Celsius's incentive compensation system for its executives.  According to the Company's proxy statement for FY 2022, Defendants Fieldly and Negron-Carballo were compensated with annual cash bonus incentives in FY 2021.  These cash bonuses give executives

"the opportunity to earn cash awards based on the degree to which the company achieves a predetermined performance measure[] for the year."  The Company's compensation committee looked to the following performance measures in determining the amount of the bonus to award Defendants Fieldly and Negron-Carballo: "revenue, gross margin $, gross margin %, sales & marketing, operating expense, adjusted EBITDA, and individual performance goals . . ."  In other words, the executives' performance bonuses are directly contingent on the Company's profit margins, among other things.  Thus, in order to optimize their annual cash bonus for FY 2021, the Individual Defendants were motivated to inflate the Company's financial metrics in FY 2021.

141.    Further, Celsius executives' cash bonuses comprise a substantial portion of their total annual earnings, demonstrating that they possessed the motive and opportunity to do everything in their power to optimize their performance bonuses.  For instance, according to a proxy statement filed on April 21, 2022, for FY 2021, Defendant Fieldly's salary was $500,000 and his bonus was $280,000.  For FY 2021, Defendant Negron-Carballo's salary was $300,000 and his bonus was $110,700.

142.    The Individual Defendants also had the opportunity to commit fraud because each of them prepared, reviewed, signed and approved the false SEC filings, press releases, and conference call statements.

**B.    Negron-Carballo's History of Paying Vendors Late to Increase Cash Flow**

143.    According to CW3, Celsius frequently failed to pay vendors on time as a strategy to increase the Company's cash flow.  In particular, CW3 stated that during an annual sales meeting in approximately 2019 or 2020, Defendant and CFO Negron-Carballo stated that he purposely delayed paying the Company's bills on a routine basis "because it increases cashflow" for Celsius.  CW3 stated that CEO Fieldly was present during this meeting as well as other sales executives at the vice president level and above.  According to CW3, checks that the Company paid out to vendors had to be signed by CFO Negron-Carballo, but the checks would linger on his desk as he pursued his strategy of delaying payments to vendors to increase cashflow. CW4 also reported that

Negron boasted of "dragging his feet on paying people Celsius owes money to" including vendors and customers.

144.     Negron-Carballo's history of making late payments to vendors in order to increase cash flow shows he was willing employ improper means to meet cash and other financial targets.

**C.     Defendants' Positions and the Small Size of the Celsius Accounting Department**

145.     Although its staff had grown in recent years, Celsius employed only 225 employees during the Class Period.  The vast majority of these employees work in sales.

146.     Celsius lists only two executive officers in its SEC filings:  Individual Defendants Fieldly and Negron-Carballo.  Each of these officers have significant experience in accounting. Both are certified public accountants.  Fieldly was previously the Company's CFO for six years, and Negron-Carballo is the current CFO.   Negron-Carballo also holds the title of Principal Accounting Officer.

147.     According to CW3, Celsius had a very small accounting team during the Class Period, with only a handful of employees performing all functions.  Furthermore, Negron-Carballo was a very hands-on overseer of the accounting team.  He personally signed all checks that went to vendors, after he had delayed them.  He also handled an error in connection with CW3's stock-based compensation upon CW3's termination from the Company.

148.     Negron-Carballo and Fieldly would have negotiated the termination and retirement packages with employees and directors, and would therefore have been aware that the vesting schedule was accelerated.  As certified public accountants, they knew that they would have to recognize the fair value of those vested shares in the quarters that the employee's relationship with the Company concluded.

**D.     The Rudimentary Nature of GAAP Principle ASC 718**

149.     That Celsius was unable to comply with very basic GAAP principles for calculating share-based compensation – an accounting process the Company had no problems complying with

for more than one decade prior – further supports a strong inference of scienter as to the Company and to the Individual Defendants.

150. The crux of ASC 718 is merely that share-based compensation expenses should be recorded using the fair value of the option or RSU as of the date of the modification. Typically, options or RSUs are provided to employees over a vesting schedule. Assume that 600 RSUs are provided over a three-year vesting schedule. The Company would recognize expenses of 200 RSUs per year at the fair market value of the stock as of the date of recognition. Here, in connection with the termination and resignation of nine employees, the Company accelerated the vesting schedule for the share-based compensation granted to these employees. The value of their share-based compensation was to be evaluated as of the date of they were recognized. But the Company did not do that.

151. Both Defendants Fieldly and Negron-Carballo, the former and current CFO of Celsius, and both certified public accountants, possessed sufficient knowledge and expertise to understand this basic accounting principle regarding share-based compensation expenses.

152. Further, the GAAP and accounting violations alleged herein specifically relate to expensing share-based compensation such as ISOs and RSUs. Expensing for share-based compensation has been a longstanding practice at Celsius since 2006, when the Company first implemented its very first stock option incentive plan. The Company never experienced issues calculating share-based compensation in the past. Employees and directors had retired for years, and thus, RSU and ISO awards were modified, yet Celsius never experienced a similar accounting problem. Defendants have had more than one decade to fully digest the very basic accounting guidance set forth in ASC 718.

**E.    The SEC Investigation**

153. On January 8, 2021, Celsius received a letter from the SEC Division of Enforcement requesting a production of documents related to a non-public fact-finding inquiry by the SEC to assess whether the Company had violated the federal securities laws. Thereafter, on

41

August 20, 2021, the SEC subpoenaed Celsius for a production of documents in connection with a possible violation of the federal securities.

154.    Celsius disclosed the SEC investigation to investors in its September 30, 2021 10-Q filed with the SEC.

155.    As of the date of filing this Amended Complaint, it is unclear of the nature of the potential SEC violations, which Defendants have refused to disclose to investors.

156.    In fact, during Celsius's fourth quarter earnings call for fiscal year 2021, Mark Stiefel Astrachan, an analyst from Stifel, Nicolaus & Company, Incorporated, asked Defendant Negron-Carballo whether the share-based compensation issue was at all related to the SEC's ongoing investigation.  Defendant Negron-Carballo declined to answer whether the nature of the SEC's investigation involves Celsius's stock-based compensation issue.

157.    Further, on November 17, 2021, Celsius participated in the Jeffries West Coast Consumer Conference during which Jeffries analyst Kevin Grundy asked: "I did want to give you the opportunity, John, to address some of the market's concerns around the subpoena that the company received on August 20th from the SEC for production of documents in relation to potential violations of federal securities laws. What if anything, can you tell us about that? Defendant Fieldly replied: "Yeah, Kevin, we did receive a subpoena from the SEC, a general inquiry.  The company is fully cooperating.  It is confidential, so we are not able to talk about specifics of it unfortunately, but I can assure you the company is fully cooperating."

158.    According to Celsius's most recent filings, the SEC's investigation into Celsius is ongoing and Celsius appears to be cooperating with the SEC.

**IX.    CLASS ACTION ALLEGATIONS**

159.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Celsius common stock between August 12, 2021 and March 1, 2022, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants,

the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

160.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Celsius's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Celsius shares were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by Celsius or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

161.   Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

162.   Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

163.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and prospects of Celsius;

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

164.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## X.    UNDISCLOSED ADVERSE FACTS

165.    The market for Celsius's common stock was open, well-developed and efficient at all relevant times. As a result of these materially false statements, Celsius's common stock traded at artificially inflated prices during the Class Period. Lead Plaintiff and other members of the Class purchased or otherwise acquired Celsius's common stock relying upon the integrity of the market price of the Company's securities and market information relating to Celsius, and have been damaged thereby.

166.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Celsius's common stock, by publicly issuing false statements. The statements were materially false because they failed to disclose material adverse information and/or misrepresented the truth about Celsius's business, operations, and prospects as alleged herein.

167.    At all relevant times, the material misrepresentations particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false statements about Celsius's financial well-being and prospects. These material misstatements had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false statements during the Class Period resulted in Lead

Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## XI.    LOSS CAUSATION

168.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class.

169.    During the Class Period, Lead Plaintiff and the Class purchased Celsius common stock at artificially inflated prices and were damaged thereby. The price of the Company's common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## XII.    PRESUMPTION OF RELIANCE

170.    The market for Celsius's common stock was open, well-developed and efficient at all relevant times. As a result of the materially false statements, Celsius's common stock traded at artificially inflated prices during the Class Period. On November 5, 2021, the Company's share price closed at a Class Period high of $108.07 per share. Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's common stock relying upon the integrity of the market price of Celsius's common stock and market information relating to Celsius, and have been damaged thereby.

171.    During the Class Period, the artificial inflation of Celsius's shares was caused by the material misrepresentations particularized in this Complaint causing the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false statements about Celsius's business, prospects, and operations. These material misstatements created an unrealistically positive assessment of Celsius and its business, operations, and prospects, thus causing the price of the Company's common stock to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false statements

during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's common stock at such artificially inflated prices, and each of them has been damaged as a result.

172.   At all relevant times, the market for Celsius's common stock was an efficient market for the following reasons, among others:

(a)   Celsius shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)   As a regulated issuer, Celsius filed periodic public reports with the SEC and/or the NASDAQ;

(c)   Celsius regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)   Celsius was followed by common stock analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

173.   As a result of the foregoing, the market for Celsius's common stock promptly digested current information regarding Celsius from all publicly available sources and reflected such information in Celsius's share price. Under these circumstances, all purchasers of Celsius's common stock during the Class Period suffered similar injury through their purchase of Celsius's common stock at artificially inflated prices and a presumption of reliance applies.

## XIII.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

174.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Amended

46

Complaint. The statements alleged to be false herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false, and/or the forward-looking statement was authorized or approved by an executive officer of Celsius who knew that the statement was false when made.

## XIV.   CAUSES OF ACTION

**COUNT I**
**For Violations of Section 10(b) of the Exchange Act and**
**SEC Rule 10b-5 Against All Defendants**

175.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

176.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause Lead Plaintiff and other members of the Class to purchase Celsius's common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

177.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Celsius's common stock in violation of Section

10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

178.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Celsius's financial well-being and prospects, as specified herein.

179.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Celsius's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts about Celsius and its business operations and future prospects, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

180.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were the CEO and CFO of the Company during the Class Period and had complete control over the Company's public statements and filings; (ii) the Individual Defendants were privy to, and in fact personally directed the creation and reporting of the Company's public filings, including its financial metrics; and (iii) each of Individual Defendants was aware of the Company's dissemination of false information to the investing public which they knew and/or recklessly disregarded was materially false.

181.    The Individual Defendants had actual knowledge of the misrepresentations of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. The Individual Defendants knowingly and/or recklessly made material misrepresentations for the purpose and effect of concealing Celsius's financial well-being and prospects from the investing public and

supporting the artificially inflated price of its common stock. As demonstrated by the Individual Defendants' misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false.

182.    As a result of the dissemination of the materially false information, as set forth above, the market price of Celsius's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's common stock were artificially inflated, and relying directly or indirectly on the false statements made by the Defendants, or upon the integrity of the market in which the common stock trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired Celsius's common stock during the Class Period at artificially high prices and were damaged thereby.

183.    At the time of said misrepresentations, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Celsius was experiencing, which were not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their Celsius common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

184.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

185.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## COUNT II
### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

186.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

187.    The Individual Defendants were controlling persons of Celsius within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as CEO and CFO of the Company, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be false prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

188.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the common stock violations as alleged herein, and exercised the same.

189.    As set forth above, Celsius and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts as alleged in this Complaint.  By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XV.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

(a)      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)      Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)      Such other and further relief as the Court may deem just and proper.

## XVI.   JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

Dated: July 8, 2022                    Respectfully Submitted,


/s/ *Daniel L. Berger*
Daniel L. Berger (admitted pro hac vice)
Caitlin M. Moyna (admitted pro hac vice)
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, NY 10017
Tel.: (646) 722-8500
Fax: (646) 722-8501
Email: dberger@gelaw.com
Email: cmoyna@gelaw.com

*Lead Counsel for City of Atlanta Police Officers' Pension Plan and City of Atlanta Firefighters' Pension Plan*

/s/ *Robert D. Klausner*
Robert D. Klausner
KLAUSNER KAUFMAN JENSEN &
LEVINSON
7080 NW 4th Street
Plantation, FL 33317
Tel.: (954) 916-1202
Fax: (954) 916-1232
Email: bob@robertdklausner.com

*Liaison Counsel for City of Atlanta Police Officers' Pension Plan and City of Atlanta Firefighters' Pension Plan*

/s/ *Jeffrey Reeves*
Jeffrey Reeves
(pro hac vice admission pending)
THE REEVES LAW FIRM, LLC
1100 Peachtree Street
Suite 250
Atlanta, GA 30309
Tel.: (404) 795-6139
Fax: (888) 209-5048
Email: jeff@reeveslawfirmpc.com

*Additional Counsel for City of Atlanta Police Officers' Pension Plan and City of Atlanta Firefighters' Pension Plan*