**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CITY OF ATLANTA POLICE
OFFICERS' PENSION PLAN and
CITY OF ATLANTA FIREFIGHTERS'
PENSION PLAN, Individually and On
Behalf of All Others Similarly Situated,

                         Plaintiff,

v.

CELSIUS HOLDINGS, INC., JOHN
FIELDLY, and EDWIN NEGRON-
CARBALLO,

                         Defendants.

Case No. 9:22-cv-80418 (DMM) (WDM)

The Honorable Donald M. Middlebrooks

The Honorable William D. Matthewman

CLASS ACTION

**LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

I.     PRELIMINARY STATEMENT ................................................................... 1

II.    FACTS ......................................................................................................... 2

     A.    CELSIUS'S BUSINESS AND EXECUTIVES ...................................... 2

     B.    CELSIUS VIOLATED ASC 718 TO BOOST PROFITS .................................... 3

     C.    CELSIUS'S FALSE FINANCIAL STATEMENTS ............................. 4

     D.    DEFENDANTS PROFIT DURING PERIOD OF FALSE REPORTING ............................... 5

     E.    THE TRUTH EMERGES AND INVESTORS SUFFER LOSSES ..................... 5

III.    ARGUMENT .............................................................................................. 6

     A.    THE COMPLAINT ALLEGES ACTIONABLE MISSTATEMENTS ........................ 6

          1.    GAAP Violations ............................................................ 6

          2.    Statements About Internal Controls ................................ 8

     B.    THE COMPLAINT PLEADS SCIENTER ...................................... 10

          1.    Defendants' Accounting Experience and the Simplicity of ASC 718 ....................................................................... 11

          2.    The Nature and Magnitude of the Fraud ........................ 14

          3.    Defendants' Motivations ................................................. 16

          4.    Fieldly's 10b5-1 Trading Plan and Class Period Sales ........................... 17

          5.    Confidential Witnesses Support a Strong Inference of Scienter ......................................................................... 19

IV.    CONCLUSION .......................................................................................... 20

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re AFC Enterprises, Inc. Sec. Litig.*,
    348 F. Supp. 2d 1363 (N.D. Ga. 2004) ...........................................................................14, 19

*Anderson v. Spirit AeroSystems Hldgs., Inc.*,
    105 F. Supp. 3d 1246 (D. Kan. 2015) ............................................................................10, 11

*In re ArthroCare Corp. Sec. Lit.*,
    726 F. Supp. 2d 696 (W.D. Tex. 2010).......................................................................... 7, 14-15

*In re Baan Co. Sec. Lit.*,
    103 F. Supp. 2d 1 (D.D.C. 2000) ..........................................................................................7

*Bryant v. Dupree*,
    252 F.3d 1161 (11th Cir. 2001) ..........................................................................................20

*Carpenters Health and Welfare Fund of Philadelphia v. Coca-Cola Co.*,
    No. 1:00-cv-02838-WBH, 2002 WL 34089163 (N.D. Ga. Aug. 20, 2002) ..........................16

*Carvelli v. Ocwen Financial Corp.*,
    934 F.3d 1307 (11th Cir. 2019) .........................................................................................8, 9

*In re Catalina Marketing Corp. Sec. Litig.*,
    390 F. Supp. 2d 1110 (M.D. Fla. 2005).............................................................................15

*Constr. Laborers Pension Tr. of Greater St. Louis v. Neurocrine Biosciences, Inc.*,
    No. 07CV1111-IEG-RBB, 2008 U.S. Dist. LEXIS 38899 (S.D. Cal. May 12,
    2008) ...............................................................................................................................18

*In re Eagle Building Techs., Inc. Sec. Litig.*,
    319 F. Supp. 2d 1318 (S.D. Fla. 2004) .............................................................................7, 10

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*,
    594 F.3d 783 (11th Cir. 2010) ............................................................................................12

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*,
    595 F. Supp. 2d 1253 (M.D. Fla. 2009).............................................................................13

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
    794 F.3d 297 (2d Cir. 2015)...............................................................................................18

*In re Fairway Grp. Hldg. Corp. Sec. Litig.*,
    2015 WL 249508 (S.D.N.Y. Jan. 20, 2015) ......................................................................18

*In re Faro Techs. Sec. Litig.*,
    534 F. Supp. 2d 1248 (M.D. Fla. 2007) ...................................................................8

*In re FirstEnergy Corp. Sec. Litig.*,
    316 F. Supp. 2d 581 (N.D. Ohio 2004) ...................................................................7

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
    270 F.3d 645 (11th Cir. 2001) ........................................................................16, 17

*In re Flowers Foods, Inc. Sec. Litig.*,
    2019 WL 1558558 (M.D. Ga. March 23, 2018) ...................................................12

*Fryman v. Atlas Fin. Holdings, Inc.*,
    No. 18-cv-01640, 2022 U.S. Dist. LEXIS 70597 (N.D. Ill. Apr. 18, 2022) ...........9

*Gross v. Medaphis Corp.*,
    977 F. Supp 1463 (N.D. Ga. 1997) .......................................................................7

*In re Grupo Televisa Sec. Litig.*,
    368 F. Supp. 3d 711 (S.D.N.Y. 2019) ...................................................................8

*In re Health Ins. Innovations Sec. Litig.*,
    2019 WL 3940842 (M.D. Fla. June 28, 2019) ................................................10, 17

*In re Home Loan Servicing Sols, Ltd. Sec. Lit.*,
    No, 16-cv-60165-WPD, 2016 WL 10592320 (S.D. Fla. June 6, 2016).................14

*Kin-Yip Chun v. Fluor Corp.*,
    No. 3:18-cv-01338, 2021 WL 1788626 (N.D. Tex. May 5, 2021) .........................19

*MAZ Partners LP v. First Choice Healthcare Sols., Inc.*,
    No. 619CV619ORL40LRH, 2020 WL 1072582 (M.D. Fla. Feb. 14, 2020)............9

*In re MicroStrategy Inc. Sec. Litig.*,
    115 F. Supp. 2d 620 (E.D. Va. 2000) ...................................................................14

*Mizzaro v. Home Depot, Inc.*,
    544 F. 3d 1230 (11th Cir. 2008) ...........................................................................20

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ..............................................................................18

*In re Petrobras Sec. Litig.*,
    116 F. Supp. 3d 368 (S.D.N.Y. 2015)....................................................................8

*In re Paincare Holdings Sec. Litig.*,
    541 F. Supp. 2d 1283, 1291 (M.D. Fla. 2008) ................................................10, 11

*In re Premiere Techs. Inc.*,
    No. 1:98-CV-1804-JOF, 2000 WL 33231639 (N.D. Ga. Dec. 8, 2000)....................................8

*Rehm v. Eagle Fin. Corp.*,
    954 F. Supp. 1246 (N.D. Ill. 1997) ...........................................................................................7

*Richard Thorpe & Darrel Weisheit v. Walter Invs. Mgt., Corp.*,
    111 F. Supp. 3d 1336 (S.D. Fla. 2015) ..............................................................................12, 18

*Schultz v. Applica Inc.*,
    488 F. Supp. 2d 1219 (S.D. Fla. 2007) ...................................................................................8

*Sheet Metal Workers Local 19 Pension Fund v. ProAssurance Corp.*,
    2021 WL 5866731 (N.D. Ala. Dec. 10, 2021) ..................................................................10, 12

*In re Smith Gardner Sec. Litig.*,
    214 F. Supp. 2d 1291 (S.D. Fla. 2002) ...................................................................................12

*Solomon v. Sprint Corp.*,
    No. 1:19-CV-05272 (MKV), 2022 WL 889897 (S.D.N.Y. Mar. 25, 2022) ............................8

*In re Sportsline.com Sec. Litig.*,
    366 F. Supp. 2d 1159 (S.D. Fla. 2004) ..................................................................................15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)................................................................................................................10

*Thompson v. RelationServe Media, Inc.*,
    610 F.3d 628 (11th Cir. 2010) ..............................................................................................10

*Tung v. Dycom Indus., Inc.*,
    454 F. Supp. 3d 1244 (S.D. Fla. 2020) ..................................................................................20

*Villella v. Chem. & Mining Co. of Chile Inc.*,
    No. 15 CIV. 2106 (ER), 2017 WL 1169629 (S.D.N.Y. Mar. 28, 2017)...................................9

Lead Plaintiffs City of Atlanta Police Officers' Pension Plan and City of Atlanta Firefighters' Pension Plan (together, "Plaintiffs") submit this memorandum of law in opposition to the motion to dismiss of Defendants Celsius Holdings, Inc. ("Celsius" or the "Company"), John Fieldly and Edwin Negron-Carballo (collectively, "Defendants"), ECF No. 47 ("Def. Br.").

## I.   PRELIMINARY STATEMENT

Celsius, an energy drink company, saw its revenues and stock price soar in early 2021. Celsius had compensated its employees liberally with share-based awards in the past, in an effort to minimize its compensation costs. When its stock price finally took off, the Company had to account for those share-based awards at current fair market values, which resulted in large compensation expenses. Departures of nine employees in the second and third quarters of 2021, at a time when Celsius stock was trading at all-time highs, exacerbated the situation. The accounting rule which Celsius had adopted – FASB's ASC 718 – required Defendants to accelerate the vesting schedules of those employees' share-based awards and treat them as expenses valued at the fair market value as of the date of departure. But employing this accounting rule properly would mean eviscerating the Company's closely-watched net income in the second quarter of 2021, and generating a large net loss for the third quarter of 2021. Investor enthusiasm and newfound confidence in the Company's profitability would be quashed.

Faced with this conundrum, Celsius's CEO, John Fieldly, and CFO and Principal Accounting Officer, Edwin Negron-Carballo, two long-time, hands-on Celsius executives and certified public accountants, determined to flout ASC 718's clear mandate, and instead delay the acceleration of these nine employees' share-based compensation. The effect of this decision was stark: rather than report net income of $778,991 ($0.01 per share) in the second quarter, the Company falsely reported an inflated net income of $3.96 million ($0.05 per share), a difference of over 80%. The third quarter effect was even more dramatic: a $9.37 million loss (($0.13) per

1

share) was transformed to positive net income of $2.75 million ($0.04 per share).  A host of other financial metrics were also inflated.  Meanwhile, Defendants personally profited, both through their incentive-based bonuses which were tied to the Company's financial metrics, and in the case of Fieldly, through his insider sales executed under the façade of a poorly timed trading plan.

Defendants strategically waited to disclose the truth until a time when the financial markets had softened due to increasing inflation and uncertainty arising from the war in Ukraine.  On March 1, 2022, Defendants announced that they would need to restate their financial statements for the second and third quarters of 2021, and admitted that their prior statements concerning the adequacy of Celsius's financial and disclosure controls were false.  Attempting to downplay their accounting ploy, Defendants shrugged their misstatements off as an "error in interpretation" of ASC 718.  However, ASC 718 is straightforward, and Defendants' extensive accounting experience, including prior experience with ASC 718, and daily control over Celsius's miniscule accounting department, render implausible the inference that this was a mere "error in interpretation."  Motives to boost Celsius's net income further underscore that Defendants' actions were deliberate.

## II.  FACTS

### A.  CELSIUS'S BUSINESS AND EXECUTIVES

Celsius develops, markets, and sells energy drinks, nutritional snacks and liquid supplements.  ¶¶1, 36.  Although Celsius was founded in 2004 and had its initial public offering in 2010, the Company has only recently become increasingly popular, competing with established brands such as Monster and Red Bull.  ¶¶36, 39.

The Individual Defendants are CEO John Fieldly ("Fieldly") and former CFO and Principal Accounting Officer, Edwin Negron-Carballo ("Negron-Carballo") (together, the "Individual Defendants").  ¶¶27–28.  Negron-Carballo oversaw a miniscule accounting department which had

2

only a few employees.  ¶¶7, 34.  It had been plagued with problems in the past including decisions to postpone payments to vendors in order to reduce or delay recognition of costs.  ¶¶33, 143.

### B.    CELSIUS VIOLATED ASC 718 TO BOOST PROFITS

Celsius was facing intense pressure from analysts and investors to report positive, and increasing, net income per share.  ¶¶48, 49.  Although the Company's revenue appeared to be increasing, many analysts now looked to the Company's net income and net income per share as a better indication of its performance.  ¶¶50-53.  For example, on April 6, 2021, one week after Celsius released its first quarter earnings for FY 2021, Credit Suisse expressed concern about Celsius's profit margins.  ¶51.  Credit Suisse cautioned that "Celsius has operated at a loss for most of its recent history" and that it had only just "turned an operating profit for the first time in 2020 – a 6% margin vs. negative double-digits in previous years."  *Id.*

ASC 718 guides corporations on how to expense employee share-based compensation. ¶68.  Its overarching principle is to account for the fair value of employee awards as compensation expenses in the financial statements.  *Id*.  When employees depart a company before their shares have vested according to a pre-determined schedule, ASC 718 mandates that the vesting schedules be accelerated and the shares be expensed according to the fair market value of the stock as of the date of termination or retirement of an employee.  ¶9.

Nine employees departed the Company in 2021 prior to the vesting of their share-based compensation.  ¶70.  ASC 718-20-55-108 states that "if the entity believes that the original performance or service vesting condition is not probable of achievement at the date of modification, the cumulative cost related to the modified award, assuming vesting occurs under the modified performance or service vesting condition, is the modified award's fair value at the date of modification."  ¶70.  Here, the "original performance or service vesting condition" was no

longer "probable of achievement," requiring acceleration of the vesting schedules. Celsius was required to record the costs of the "modified award" at "fair value at the date of modification." *Id*.

The timing of these employees' departures could not have been worse for Celsius, from an expense-perspective. Its stock was trading at all-time highs. If Celsius had accelerated the vesting schedule of these employees' share-based compensation at the n-current fair market value, its expenses would have soared, and in turn driven down its net income. But Celsius's net income was in a precarious state: the Company was just beginning to please investors focused on net income by generating increases in net income, in line with its improved revenues. ¶¶43–47. Reporting paltry – or even worse, negative – net incomes would dampen the considerable investor enthusiasm that Defendants were enjoying. Thus, they decided not to accelerate these employees' vesting schedules. As detailed below, the decision to flout ASC 718 enabled Defendants to inflate net income in the second quarter of 2021 by 80%, and to report positive net income of $2.75 million in the third quarter, when in fact it had suffered a *net loss* of $9.37 million. *Id*.

C.   CELSIUS'S FALSE FINANCIAL STATEMENTS

Celsius's false statements during the Class Period fall broadly into two categories. First, its financial metrics were false in the second and third quarters of 2021, as summarized in paragraphs 97 through 131 of the Complaint. Second, Defendants made false statements concerning the adequacy of the Company's disclosure controls and procedures. ¶¶132–137.

On August 12, 2021, Celsius reported its financial results for the second quarter of FY 2021, touting a large increase in net income: $3.96 million as compared to $1.2 million in the same quarter of 2020. This news sent the Company's stock higher, increasing by 24% from $73.32 on August 12, 2021 to $96.24 on September 16, 2021. ¶44. Unfortunately, for the investors who cheered this news, the $3.96 million net income figure was false. ¶¶43, 103. In fact, Celsius's net income for the second quarter of FY 2021 was actually $779,991 – not $3.96 million – representing

4

a decline of 80%.  ¶¶91, 103.  Likewise, when Celsius announced net income of $2.7 million for the third quarter of 2021, the stock price increased.  Again, this figure was false: the net income for the third quarter was actually *negative* $9.4 million, once the stock-based compensation was properly accounted for.  ¶¶48, 85, 91, 98, 100, 120, 123, and 127.

The Individual Defendants signed these publicly filed statements and repeated the same false statements during analyst calls and investor presentations during the Class Period.  ¶97.  The Defendants also made false statements regarding the adequacy of the Company's disclosure controls and procedures in its Forms 10-Q and 8-K for the third quarter of FY 2021.  ¶¶135–137.

### D.     DEFENDANTS PROFIT DURING PERIOD OF FALSE REPORTING

On November 30, 2021, four months into the Class Period and shortly after Celsius released its false financial reporting for the third quarter of FY 2021, Fieldly executed a 10b5-1 trading plan and immediately sold 20,000 shares of Celsius common stock for gross proceeds of $1.5 million.  ¶¶55–57.  This was his first 10b5-1 trading plan in nine years with the Company. ¶57.  In addition, Fieldly and Negron-Carballo both profited handsomely through the award of significant performance bonuses, which were tied to, among other metrics, the Company's operating expense.  ¶¶140-141.

### E.     THE TRUTH EMERGES AND INVESTORS SUFFER LOSSES

After the market closed on March 1, 2022, Defendants took advantage of an overall market weakness caused by increasing inflation and widespread concerns about the war in Ukraine to disclose the truth about its hidden expenses associated with share-based compensation and false reporting during the second and third quarters of 2021.  ¶¶81–83.  Celsius disclosed that it could not timely file its 2021 annual report due to "staffing limitations, unanticipated delays and identified material errors in previous filing" and "that the calculation and expense of noncash share-based compensation, related to grants of stock options and restricted stock units awarded to

former employees and retired directors were materially understated for the [second and third quarters of FY 2021]." ¶83. Celsius management also concluded that there was a material weakness in the Company's internal controls over financial reporting. *Id*.

Specifically, Celsius's restatement significantly affected the Company's total operating expenses and net income. ¶85. In this regard, the Company's total operating expenses and net income for the second quarter of FY 2021 were misstated by $3,180,353 resulting in net income swinging from $3.6 million to just $779,991. ¶¶85, 91. Similarly, the Company's total operating expenses and net income for the third quarter of FY 2021 were misstated by $12,116,438 resulting in a change in net income from $2.75 million to a *loss of $9.37 million*. *Id*. Immediately following this announcement, Celsius's stock price fell to an intra-day low of $56.21 per share from a high of $65 per share on unusually heavy trading volume on March 2, 2022. ¶¶4, 89. During March 2, 2022 and March 3, 2022, the Company's stock price fell a total of $5.20, or 8.3%, on heavy trading volume to close at $57.60 per share on March 3, 2022. *Id*. On April 18, 2022, one month after the end of the class period, Celsius filed a Form 8-K with the SEC announcing that Defendant Negron-Carballo – the Company's CFO at all relevant times – would be resigning. ¶95.

## III.   ARGUMENT

### A.   PLAINTIFFS ALLEGE ACTIONABLE MISSTATEMENTS

#### 1.   GAAP Violations

Celsius issued an array of false financial metrics in the second and third quarters of 2021, including its general and administrative expenses, its total operating expenses, and the critical investor metrics of net income and net income per share. ¶¶97-131. These latter two metrics were overstated by indisputably material amounts during these quarters. ¶¶98-99, 103-105, 120-123.

Defendants do not argue that these statements were not false or material, nor could they.[1] Rather, they suggest that GAAP violations are only actionable in rare circumstances. Def. Br. at 10. That is incorrect. GAAP violations routinely form the basis of securities fraud actions. *See Gross v. Medaphis Corp.*, 977 F. Supp 1463 (N.D. Ga. 1997) (holding that plaintiffs pled fraud where the defendants improperly recognized income in violation of GAAP); *see also In re ArthroCare Corp. Sec. Lit.*, 726 F. Supp. 2d 696 (W.D. Tex. 2010) (denying the motion to dismiss where the magnitude and duration of the GAAP violations combined with the simplicity of the accounting issues involved significantly contributed to a finding of scienter on the part of the individual defendants); *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246 (N.D. Ill. 1997) (sustaining allegations that defendants knew of or recklessly disregarded the GAAP violations); *In re Baan Co. Sec. Lit.*, 103 F. Supp. 2d 1 (D.D.C. 2000) (denying the motion to dismiss where defendants' GAAP violations, combined with other factors such as the individual defendants' high level positions, involvement in the company's operations, and access to information supported a strong inference of recklessness or knowledge on the part of each defendant); *In re Eagle Building Techs., Inc. Sec. Litig.*, 319 F. Supp. 2d 1318, 1331 (S.D. Fla. 2004) ("[c]ontext plays a role in determining whether a plaintiff has alleged the requisite level of scienter. . . [w]hen the [] GAAP violations are combined with the magnitude of the fraud or red flags . . ." scienter is alleged).

Defendants fixate on a purported lack of "red flags" to suggest that Plaintiffs' GAAP violations are not actionable. Def. Br. at 10. They posit that such red flags must include whistleblower concerns or analyst warnings. *Id.* But this is an improper attempt to raise the pleading standard for GAAP violations. In fact, the "red flags" are ordinary scienter allegations

---

[1] Because the very nature of a restatement is to "correct an error in a previously-issued financial statement" a restatement in and of itself satisfies the falsity element. *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 594–95 (N.D. Ohio 2004).

present in nearly every securities fraud action.  For example, in *Schultz v. Applica Inc.*, 488 F. Supp. 2d 1219, 1225 (S.D. Fla. 2007), the "red flags" the court found convincing are similar to those present here, including: "allegations of insider trading," "the magnitude" of the error, and whether the violations related to major balance sheet items.  As shown in Section VIII, the Complaint pleads scienter.

### 2.    Statements About Internal Controls

Defendants also misled investors about the adequacy of Celsius's internal controls.  ¶¶132–137.  These too are actionable.  *See In re Faro Techs. Sec. Litig.*, 534 F. Supp. 2d 1248, 1263 (M.D. Fla. 2007) (holding that statements pertaining to the adequacy of internal controls were actionable securities fraud);[2] *In re Premiere Techs. Inc.*, No. 1:98-CV-1804-JOF, 2000 WL 33231639, at *14 (N.D. Ga. Dec. 8, 2000) (stating that several courts have recognized that "false or misleading statements or omissions concerning material facts about management or internal operations may be actionable.").

Defendants argue that these false statements concern "what the Individual Defendants concluded" and are therefore statements of opinion.  Def. Br. at 18.[3]  This argument is meritless

---

[2]  Other district courts have similarly held that statements pertaining to the adequacy or effectiveness of internal controls can be actionable. *See, e.g.*, *In re Grupo Televisa Sec. Litig.*, 368 F. Supp. 3d 711, 720 (S.D.N.Y. 2019) ("Misstatements made in its certifications concerning the design and efficacy of internal controls are actionable); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 380–81 (S.D.N.Y. 2015) ("the Company's management was professing its opinion that the company's internal controls were effective, that same management was well aware of the extensive corruption in the Company's procurement activities . . . are sufficient to infer that the Company disbelieved the alleged statements at the time they were made"); *Solomon v. Sprint Corp.*, No. 1:19-CV-05272 (MKV), 2022 WL 889897, at *7 (S.D.N.Y. Mar. 25, 2022) ("The law is clear that when a company states that its internal controls are effective and that assurance turns out to be wrong, the original statement is an actionable misleading statement.").

[3]  Defendants cite *Carvelli* to try to bolster their argument that statements about the effectiveness of internal controls are nonactionable opinion statements.  *Carvelli* is readily distinguishable from the present case. In *Carvelli*, plaintiffs failed to allege either that defendants genuinely held the stated opinions or that the statements contained embedded false statements of fact. 934 F.3d at

and based on inapposite or out-of-circuit case law. *Carvelli v. Ocwen Financial Corporation*, 934 F.3d 1307, 1315 (11th Cir. 2019) did not involve statements concerning the adequacy of a company's internal controls, but instead had to do with statements concerning the company's "risk and compliance infrastructure." *Fryman v. Atlas Fin. Holdings, Inc.*, No. 18-cv-01640, 2022 U.S. Dist. LEXIS 70597, at *47 (N.D. Ill. Apr. 18, 2022) involved opinion statements, but the court found them actionable under *Omnicare* because a reasonable investor would find that the defendants did not hold the stated opinions. Similarly, in *Villella v. Chem. & Mining Co. of Chile Inc.*, No. 15 CIV. 2106 (ER), 2017 WL 1169629, at *10 (S.D.N.Y. Mar. 28, 2017) the district court found that the internal control statements were actionable statements of opinion because defendant "knew or should have known that the statements were false when made."

Assuming that the statements concerning internal controls are opinions, *Omnicare* instructs that they are actionable where (1) the opinion is not subjectively held by the defendant; or (2) the opinion contains an embedded false statement of fact. *Omnicare*, 135 S. Ct at 1326. An opinion statement is actionable under Section 10(b) if it "conflicts with what a reasonable investor would take from the statement itself." *MAZ Partners LP v. First Choice Healthcare Sols., Inc.*, No. 619CV619ORL40LRH, 2020 WL 1072582, at *5, n.5 (M.D. Fla. Feb. 14, 2020). The Complaint alleges that Defendants did not subjectively believe that their accounting controls were adequate. Not only was the accounting department deficient, but Negron-Carballo purposely delayed paying the Company's bills to "increase cashflow," and the decision to flout ASC 718 was done intentionally to boost revenues. ¶¶33, 143. Thus, Defendants could not have actually held an opinion that Celsius's internal controls were adequate. Alternatively, the statements are also

---

1323. Here, the Complaint clearly pleads that Defendants Fieldly and Negron-Carballo did not genuinely believe that these statements were true at the time they were made. *See generally* ¶19.

actionable because they are embedded with false statements of verifiable fact including specific

dates and assurances that transactions comply with GAAP. *See Sheet Metal Workers Local 19*

*Pension Fund v. ProAssurance Corp.*, 2021 WL 5866731, at \*15 (N.D. Ala. Dec. 10, 2021)

(opinion with a factual representation couched within it was actionable as securities fraud).

      **B.**    **THE COMPLAINT PLEADS SCIENTER**

      Scienter requires a plaintiff to "state with particularity facts giving rise to a strong inference

that the defendant acted with the required state of mind." *Thompson v. RelationServe Media, Inc.*,

610 F.3d 628, 633 (11th Cir. 2010) (citing 15 U.S.C. § 78u-4(b)(2)).  Recklessness may satisfy

scienter. *Thompson*, 610 F.3d at 634. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308,

319 (2007) governs the scienter pleading standard.  After first instructing courts to "accept all

factual allegations in the complaint as true," *Tellabs*, 551 U.S. at 322, *Tellabs* requires courts to

"consider the complaint in its entirety," i.e., examine "whether *all* of the facts alleged, taken

collectively, give rise to a strong inference of scienter, not whether any individual allegation,

scrutinized in isolation, meets this standard." *Id.* at 322-323; *see also In re Eagle Building Techs.*,

319 F. Supp. 2d at 1326 (requiring "consideration of each individual factor as well as the context

as a whole").  "[F]ar from perfect" allegations suffice.  *In re Health Ins. Innovations Sec. Litig.*,

2019 WL 3940842, at \*27 (M.D. Fla. June 28, 2019).

      *Tellabs* also instructs courts to account for "plausible opposing inferences." *Id.*  A scienter

inference need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of

competing inferences.'" *Tellabs*, 551 U.S. at 324.  "A tie goes to the plaintiff." *Anderson v. Spirit*

*AeroSystems Hldgs., Inc.*, 105 F. Supp. 3d 1246, 1262 (D. Kan. 2015); *see also In re Paincare*

*Holdings Sec. Litig.*, 541 F. Supp. 2d 1283, 1291 (M.D. Fla. 2008) (scienter pled where inference

of scienter equaled the competing inference).

10

The Complaint alleges that the following facts which, analyzed collectively, evidence scienter: (1) Defendants' extensive accounting experience, their direct involvement in the decision to violate a simple rule, and past conduct of delaying costs, ¶¶11, 15, 146; (2) the magnitude of the effect that the Restatement had on the Company's reported profits, ¶¶98–101; (3) Defendants' incentive to prop up the Company's profitability, both to satisfy investors and to boost their personal income through performance bonuses, ¶¶43–47, 140–141; (4) Defendant Fieldly's decision to enter into a 10b5-1 trading plan during the Class Period, ¶139; and (5) corroborating confidential witness statements, ¶¶30–35.  These facts have satisfied scienter in the context of a GAAP violation.  *See Paincare*, 541 F. Supp. 2d at 1291-92 (finding scienter on similar facts).

### 1.    Defendants' Accounting Experience and the Simplicity of ASC 718

Defendants' extensive experience as accountants, coupled with their direct and exclusive involvement in violating a simple accounting rule they had applied without prior incident, and proclivities for manipulating expenses, allow for the inference that they purposefully, or at least recklessly, misapplied ASC 718 in order to boost the Company's profitability.  Both Fieldly and Negron-Carballo were certified public accountants.  ¶146.  Fieldly had previously served as the Company's CFO, and Negron-Carballo was the current CFO as well as the Principal Accounting Officer.  *Id*.  They previously applied ASC 718 without error.  ¶149.  Negron-Carballo was a very hands-on manager overseeing an accounting department of just a few employees.  ¶147.  No outside accounting firm was involved in the decision to mis-apply ASC 718.  ¶152.  Negron-Carballo had purposefully delayed paying vendors in order to keep expenses low, exhibiting a predisposition to boost profits at all costs.  ¶33, 143.  The only plausible inference is that Negron-Carballo and Fieldly acted deliberately, or at least recklessly, in mis-accounting for nine former employees' stock-based compensation.

11

Defendants have no answer to the majority of these facts. While they argue that their positions as senior executives do not support an inference of scienter, Def. Br. at 17-18, they oversimplify certain of Plaintiffs' allegations and ignore others. The Complaint does not merely allege conclusions that Fieldly and Negron-Carballo "must have known" about the accounting violations. Rather, it details Defendants' experience as certified public accountants and proper past application of ASC 718. ¶¶146, 149–152. The Complaint also points to Celsius's small accounting department and Negron-Carballo's hands-on management style, and prior efforts to minimize expenses. ¶32–34.[4] Indeed, Defendants' own explanation that the accounting mistake involved an "error in interpretation," underscores that Fieldly and Negron-Carballo *did,* in fact, know how ASC 718 was being applied.[5]

Plaintiffs explain that ASC 718 is facially straightforward; not capable of misinterpretation. ¶¶67–73. A plain reading of ASC 718, as well as FASB's example, which matches exactly the situation here, ¶73, are confirmed by both the venerable accounting firm Deloitte, ¶74, as well as a consultation with Plaintiffs' accounting expert, ¶75. Defendants were not confused about how to apply ASC 718. Rather, they sought to avoid taking a large expense associated with the acceleration of its former employees' stock awards in light of Celsius's rising stock price.

Defendants rely on *Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 594 F.3d 783, 792 (11th Cir. 2010) to argue that this Court should ignore allegations concerning the simplicity

---

[4] Such allegations are probative of scienter. *In re Flowers Foods, Inc. Sec. Litig.*, 2019 WL 1558558, at *14 (M.D. Ga. March 23, 2018) ("scienter can be inferred when a defendant's position and responsibilities establish other particular facts probative of scienter"); *Richard Thorpe & Darrel Weisheit v. Walter Invs. Mgt., Corp.*, 111 F. Supp. 3d 1336, 1360-61 (S.D. Fla. 2015) (finding defendant's position probative of scienter in light of other facts pled); *Sheet Metal Workers Local 19 Pension Fund v. ProAssurance Corp.*, 2021 WL 5866731, at *22 (N.D. Ala. Dec. 10, 2021) (finding scienter pled as to individuals based on their relevant experience).

[5] *In re Smith Gardner Securities Litigation*, 214 F. Supp. 2d 1291 (S.D. Fla. 2002), which Defendants rely on, did not involve executives with significant accounting backgrounds.

of ASC 718. Def. Br. at 11.  *Jabil*, however, is inapposite.  The relevant accounting principle was *widely* misinterpreted, and had been further complicated by new SEC guidance.  *Edward J. Goodman Life Income Trust v. Jabil Cir., Inc.*, 595 F. Supp. 2d, 1253, 1284-85 (M.D. Fla. 2009). In contrast, the accounting principle at issue here – ASC 718 – is accompanied by clarifying examples and is regarded as unequivocal in the accounting community. ¶73.[6]  Further, *Jabil* did not include the following facts present here: a CFO and Principal Accounting Officer with prior experience applying ASC 718 and prior experience manipulating expenses, overseeing a small accounting department of one, and making this decision absent outside-auditor involvement.

Defendants next argue that "applying ASC 718 to the awards involved a certain amount of subjectivity," which, they claim, rebuts scienter.  Def. Br. at 11-12.  But nothing in their explanation points to any level of subjectivity.  They assert that "some" of the nine former employees were "still providing services through contractual services," which somehow caused confusion.  Plaintiffs dispute the truth of this statement, and this question of fact cannot be resolved on a motion to dismiss.  Further, this necessarily means that at least "some" of the departed employees were providing *no* such services, and there could not possibly have been an ambiguity in the application of ASC 718.  Further, Defendants do not elaborate on how many of the nine employees fall into this category or what effect the acceleration of their stock-based compensation had on the overall restatement.  Moreover, Defendants do not assert that any were still **employed** by the Company, as would plainly be required to ignore ASC 718's mandate to accelerate the

---

[6] Defendants invite the Court to reject the "opinions of the cited so-called expert" that ASC 718 is unequivocal with regard to expensing share-based compensation on income statements.  However, Plaintiffs' consultation with an accounting expert served merely to corroborate the statement by Deloitte and the facial reading of ASC 718.

vesting schedule of their stock-based compensation.  Thus any "contractual services" they were offering could not have confused the question of accelerating their share-based compensation.

Finally, Negron-Carballo resigned in April 2021, shortly after the truth was revealed.  ¶¶17, 95.  His role at the "epicenter" of Celsius's miniscule accounting department and this abrupt departure contribute to an inference of scienter.  *See In re Home Loan Servicing Sols, Ltd. Sec. Lit.*, No, 16-cv-60165-WPD, 2016 WL 10592320, at *7 (S.D. Fla. June 6, 2016) (scienter established to defendant who was at the epicenter of the business and was forced to resign).

### 2.      The Nature and Magnitude of the Fraud

The nature and magnitude of Celsius's Restatement support a compelling inference of scienter.  "Where the number, size, timing, nature, frequency, and context of the GAAP violations or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter."  *In re AFC Enterprises, Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1372 (N.D. Ga. 2004).  "Common sense and logic dictate that the greater the magnitude of a restatement or violation of GAAP, the more likely it is that such a restatement or violation was made consciously or recklessly."  *In re MicroStrategy Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 636 (E.D. Va. 2000)  (holding that the magnitude of the GAAP errors and restatements amounted to a "night-and-day difference with regard to [the Company's] representations of profitability—as to compel an inference that fraud or recklessness was afoot.").

Here, the nature and magnitude of the restatement supports an inference of scienter.  First, the metrics which Celsius overstated – net income and net income per share – were critical to investors and analysts who were laser focused on the Company's profitability following a period of costly revenue growth.  ¶¶43–47.  Courts view overstated income, specifically, as probative of scienter.  *In re AtrhroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 721-22 (W.D. Tex. 2010)

14

("Many courts have held significant overstatements of revenue or income 'tend to support the conclusion that defendants acted with scienter.'") (collecting cases) (citation omitted).

Second, the magnitude of the restatement supports a finding of scienter. The misapplication of ASC 718 hid *a cumulative net loss of $8.01 million* for the second and third quarters of fiscal year 2021. ¶¶79, 124, 131. The Complaint alleges that the falsely reported net income for the second quarter of FY 2021 was $3.96 million and the restated net income was $799,991, accounting for an 80% decrease in net income. ¶¶10, 91, 98, 103. The Complaint further alleges that the fraud transformed a loss of $9.4 million in the third quarter of 2021 into positive net income $2.75 million, a difference of *441%*. ¶¶98, 120. The large differential between the falsely reported and restated net incomes for these two quarters raises a strong inference of scienter. *See In re Catalina Marketing Corp. Sec. Litig.*, 390 F. Supp. 2d 1110, 1114 (M.D. Fla. 2005) (finding that overstated net income of just 43% was great in magnitude and thus sufficient to raise an inference of scienter). In contrast, *Sportsline.com*, on which Defendants rely, involved errors of only 15.8% and 6.4%.

In addition, because Celsius adopted ASC 718 as its standard accounting practice for expensing stock options and RSUs, the falsely reported financial metrics were attained by virtue of Celsius violating its own accounting policies. ¶67. Where a "GAAP violation violates the corporation's internal policies" such supports a "strong inference of scienter sufficient to withstand a motion to dismiss." *In re Sportsline.com Sec. Litig.*, 366 F. Supp. 2d 1159, 1166 (S.D. Fla. 2004).

Defendants' response is to praise themselves for "promptly and appropriately notif[ying] investors" of the Restatement which, they argue, militates against any inference of scienter to be drawn from the Restatement. Def. Br. at 1, 13. Both of these arguments are unconvincing and they ignore the timing of the Restatement: during a period of overall market weakness. Based on

the magnitude and nature of the Restatement taken in tandem with the GAAP violations, and additional red flags discussed below, an inference of scienter is more compelling than these non-fraudulent inferences Defendants have cobbled together.

### 3.      Defendants' Motivations

Defendants were personally motivated to boost the Company's profitability.  As Celsius grew in 2020 and 2021, investors turned their attention away from increasing revenues, and looked to metrics that evidenced the Company's profitability.  ¶¶40-54.  Once Celsius was able to string together a few quarters of positive net income, its stock price began to rise.  But this had the collateral effect of raising Celsius's expenses associated with its share-based compensation.  Thus, when faced with having to accelerate the vesting schedules of nine former employees' stock awards in 2021, which would greatly reduce net income for the second and third quarters of 2021, Fieldly and Negron-Carballo elected to delay the acceleration of the stock awards.

The decision boosted the personal bottom lines of Fieldly and Negron-Carballo as well, who were rewarded with handsome performance bonuses, which included cash bonuses and stock awards, in 2021.  *See Carpenters Health and Welfare Fund of Philadelphia v. Coca-Cola Co.*, No. 1:00-cv-02838-WBH, 2002 WL 34089163, at *15 (N.D. Ga. Aug. 20, 2002) (holding that the Individual Defendants had motive and opportunity to commit fraud insofar as their compensation scheme gave them direct economic motivation to commit fraud); *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 661 (11th Cir. 2001) (holding that the magnitude of the CEO's compensation package, together with the timing coincidence of an overstatement of earnings of earnings at the right time to benefit the CEO provide an unusual, heightened showing of motive to commit fraud).  Specifically, Defendant Fieldly received more than $12.2 million in incentive

compensation for FY 2021 even though his base salary was only $500,000.[7]  ¶141.  Defendant

Negron-Caraballo received nearly $2.7 million in compensation for FY 2021 even though his base

salary was only $300,000.  *Id*.  Thus, Defendant Fieldly received more than 24 times his base

salary and Defendant Negron-Caraballo received nearly 9 times his base salary.

Individual Defendants' bonus awards took into account the Company's operating

expenses, which were restated.  *Id*.  Although Defendants contend that EBITDA and revenue were

unaffected by the restated financials (Def. Br. at 16-17), they do not – and cannot – dispute the

fact that the restated financials significantly affected the remaining metrics considered by the

committee in determining the executive bonuses.  If the Company had correctly reported its

operating expenses and net income, the Individual Defendants would have likely forfeited a

significant portion of their performance-based bonus incentives.  *Id*.  Thus, their incentive

packages support a strong inference of scienter.

### 4.      Fieldly's 10b5-1 Trading Plan and Class Period Sales

The Complaint alleges that Fieldly initiated a 10b5-1 trading plan four months into the

Class Period in an attempt to shield his future trades from allegations of insider trading, ¶¶16, 27,

56, 139; that he sold 20,000 shares of Celsius common stock for proceeds of $1.5 million,

accounting for approximately 7% of his total holdings during the Class Period, ¶¶27, 57, 139; that

he did not undergo a sufficient cooling period between his sale of stock and initiating the plan,

¶139; and finally, that he had never completed any sales of stock under a trading plan prior to the

class period.  *See* ¶¶16, 27, 56-57, 139.  Stock sales transacted under a 10b5-1 trading plan that

was entered into during the class period support an inference of scienter.  *In re Health Ins.*

---

[7] Defendant Fieldly received $12.2 million in total compensation for FY 2021 where the Company misstated its net income by $12.1 million in the third quarter alone.

*Innovations*, 2019 WL 3940842, at *25 (citation omitted). "Trading plans are not a cognizable defense to scienter allegations on a motion to dismiss a securities fraud complaint where they were adopted during the class period." *Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d at 1378 (citation omitted). "When executives enter into a trading plan during the Class Period and the Complaint sufficiently alleges that the purpose of the plan was to take advantage of an inflated stock price, the plan provides no defense to scienter allegations." *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015).

Further, Fieldly's stock sales were suspicious in amount and timing. Here, the Complaint alleges that Fieldly sold 7% of his stockholdings during the Class Period. Scienter has been attributed to defendants who sold *less than* 7% of their holdings during a class period, and no bright-line test exists.[8] *See In re Fairway Grp. Holding Corp. Sec. Litig.*, 2015 WL 249508, at *13–14 (S.D.N.Y. Jan. 20, 2015) (scienter adequately pled where defendant sold 8% of holdings); *see also Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226 (9th Cir. 2004) (finding that stock sales that accounted for 2.1% and 7% of defendants' respective holdings sufficiently supported an inference of scienter when considered in tandem with other factors such as trading history and the timing of the stock sales). Fieldly's trading plan was also unusual in timing; in particular, this was his first 10b5-1 trading plan. ¶¶56, 139. That Fieldly worked at Celsius in an executive capacity for nearly a decade and not once elected to sell his Celsius

---

[8] Defendants rely on *Constr. Laborers Pension Tr. of Greater St. Louis v. Neurocrine Biosciences, Inc.,* No. 07CV1111-IEG-RBB, 2008 U.S. Dist. LEXIS 38899, at *24 (S.D. Cal. May 12, 2008). Def. Br. at 16. That case is distinguishable. There, the defendant's 6.2% class period sales were far less than he had sold in the *two years* leading up to the class period, and no 10b5-1 trading plan was involved. In contrast, here, Fieldly engaged in only a one-time pre-Class Period sale which was made in connection with Celsius's public offering and is thus irrelevant to scienter.

common stock under a 10b5-1 trading plan disproves Defendants' contention that the Complaint is silent as to Fieldly's trading history, and creates an inference of scienter.

Defendants point to the 34.5% of total stockholdings Fieldly sold in June 2021 as overshadowing his Class Period sales.  Def. Br. at 14-15.  This argument fails because Fieldly's June 2021 stock sale was part of a public offering. ECF No. 47-2, Ex. A to Sawicki Declaration (Celsius 2021 Form 10-K), at F-19.  Courts have noted that public offering sales are not considered suspicious.  *See In re AFC Enters., Inc.*, 348 F. Supp. at 1373 ("It is not uncommon or otherwise suspicious to sell stock in association with a public offering.").  Likewise, because "the sale of stock is often the point of the offering," *id.*, these sales cannot negate scienter.[9]

### 5.   Confidential Witnesses Support a Strong Inference of Scienter

The Complaint alleges information obtained from confidential witnesses that support an inference of scienter.  In particular, CW3, a former Celsius executive, described the accounting department as exceedingly small with "very loose accounting processes and procedures" in place.  ¶34.  CW3 explained that Defendant Negron-Carballo and his accounting department had previously pursued strategies of delaying payments to keep costs low and elevate cash flow.  ¶33.  CW4 corroborated these allegations, describing Defendant Negron-Carballo's tendency to "drag[] his feet on paying people Celsius owes money to," including vendors and customers, because "it saves interest on the money."  ¶35.  CW2 also explained that the Company, overall, was very small.  ¶31.  These allegations support an inference that (1) Defendants were personally involved

---

[9] Defendants also argue Fieldly's insider trading is not indicative of scienter because Negron-Carballo did not sell stock during the Class Period. Def. Br. at 14.  But there exists no requirement that *all* named defendants engage in insider trading in order to infer scienter.  *Kin-Yip Chun v. Fluor Corp.*, No. 3:18-cv-01338, 2021 WL 1788626, at *6 (N.D. Tex. May 5, 2021) (court inferred scienter where 3 out of 8 individual defendants engaged in insider trading).

in the decision to flout ASC 718, and (2) were accustomed to going to great lengths to manipulate the Company's books to keep costs low and boost profits.

Defendants' arguments that the confidential witness statements are not substantive or accounting-based, Def. Br. at 18, fail. Allegations made with particularity are afforded significant weight. *Mizzaro v. Home Depot, Inc.*, 544 F. 3d 1230, 1240 (11th Cir. 2008); *Tung v. Dycom Indus., Inc.*, 454 F. Supp. 3d 1244, 1252, 1258 (S.D. Fla. 2020) (denying motion to dismiss based on allegations attributed to confidential witnesses). Confidentiality "should not eviscerate the weight given if the complaint otherwise fully describes the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame." *Mizzaro*, 544 F.3d at 1240. The Complaint satisfies this standard. Specifically, it details each witness's position, proximity to the alleged fraud, and dates of employment.[10] And because the confidential witnesses gave information concerning the small size of the accounting department and Negron-Carballo's previous efforts to reduce costs through delayed payments, their knowledge is relevant and the allegations attributed to them support a compelling inference that the Individual Defendants acted with scienter. ¶¶33–34, 143.

## IV.    CONCLUSION

For the reasons set forth above, the Court should deny Defendants' Motion to Dismiss in its entirety. However, should the Court grant any or all of Defendants' Motion, Plaintiffs respectfully ask this Court allow them to replead their claims. *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) (a plaintiff is generally "given at least one chance to amend the complaint").

---

[10] *See* ¶30 (CW1 was Head of Sales from April 2018 to February 2022, worked directly with both Individual Defendants and was part of the "leadership team"); ¶31 (CW2 was Regional Sales Manager from January 2020 through March 2022); ¶32 (CW3 was an executive for many years until formally separating from the Company in 2021); and ¶35 (CW4 was an employee of the Company from 2015 to March 2022 and was most recently a director of sales).

Dated: August 26, 2022

/s/ *Daniel L. Berger*
Daniel L. Berger (admitted pro hac vice)
Caitlin M. Moyna (admitted pro hac vice)
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, NY 10017
Tel.: (646) 722-8500
Fax: (646) 722-8501
Email: dberger@gelaw.com
Email: cmoyna@gelaw.com

*Lead Counsel for City of Atlanta Police Officers' Pension Plan and City of Atlanta Firefighters' Pension Plan*

/s/ *Robert D. Klausner*
Robert D. Klausner
KLAUSNER KAUFMAN JENSEN & LEVINSON
7080 NW 4th Street
Plantation, FL 33317
Tel.: (954) 916-1202
Fax: (954) 916-1232
Email: bob@robertdklausner.com

*Liaison Counsel for City of Atlanta Police Officers' Pension Plan and City of Atlanta Firefighters' Pension Plan*

/s/ *Jeffrey Reeves*
Jeffrey Reeves
(pro hac vice admission pending)
THE REEVES LAW FIRM, LLC
1100 Peachtree Street
Suite 250
Atlanta, GA 30309
Tel.: (404) 795-6139
Fax: (888) 209-5048
Email: jeff@reeveslawfirmpc.com

*Additional Counsel for City of Atlanta Police Officers' Pension Plan and City of Atlanta Firefighters' Pension Plan*

21