UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-80418-CV-DMM

CITY OF ATLANTA POLICE
OFFICERS' PENSION PLAN and
CITY OF ATLANTA FIREFIGHTERS'
PENSION PLAN, Individually and on behalf
of all others similarly situated,

          Plaintiffs,

          v.

CELSIUS HOLDINGS, INC.
JOHN FIELDLY, and
EDWIN NEGRON-CARBALLO.,

          Defendants.

_____/

## REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT (ECF No. 47)

Plaintiffs bring a two-count Amended Complaint alleging securities fraud. Count I alleges that all Defendants violated Section 10(b) of the Securities and Exchange Act of 1934 and SEC Rule 10b-5. Count II alleges that John Fieldly and Edwin Negron-Carballo ("the Individual Defendants") violated Section 20(a) of the Securities and Exchange Act. Factually, Plaintiffs allege that Defendants fraudulently accounted for stock options granted to former employees, which caused Defendant Celsius Holdings, Inc. ("Celsius" or "the Company"), to misstate its expenses and net income in SEC filings, resulting in an artificially inflated stock

price, which then financially damaged the Plaintiff Pension Plans. Plaintiffs also allege that the SEC filings misrepresented the adequacy of Celsius' internal controls.

Defendants move to dismiss all counts for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). They concede that Celsius' SEC reporting was inaccurate but allege that Plaintiffs have failed to adequately plead scienter. Defendants also allege that their statements about Celsius' internal controls are not actionable under the federal securities laws.

I have reviewed the Motion, the Response, and Defendants' Reply. I conducted an oral argument on December 13, 2022. I am fully advised and this matter is ripe for decision. For the following reasons, it is RECOMMENDED that the Motion to Dismiss be **GRANTED IN PART AND DENIED IN PART**.

## I.      LEGAL PRINCIPLES

On a Rule 12(b)(6) motion to dismiss, the Court views the well-pled factual allegations in the light most favorable to the plaintiff. *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016). With limited exceptions, the Court looks only to the allegations in the complaint, any documents appended to the complaint or incorporated by reference into it, and any judicially-noticed facts. *Reed v. Royal Caribbean Cruises Ltd.*, No. 20-CV-24979-RAR, 2022 WL 3027906, at *6 (S.D. Fla. Aug. 1, 2022).

A. *Rule 8(a)*

A pleading seeking relief in a civil action must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P.

8(a)(2). To satisfy this pleading requirement, a complaint must provide the defendant fair notice of plaintiff's claim and the grounds upon which it rests. *See Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (2002). While a claim "does not need detailed factual allegations," it must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal*, 556 U. S. 662, 678 (2009) (explaining that the Rule 8(a)(2) pleading standard "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation"). Nor can a claim rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557 (alteration in original)). Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the claim are true (even if doubtful in fact). *Twombly*, 550 U.S. at 555 (citations omitted).

The Supreme Court has emphasized that "[t]o survive a motion to dismiss a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly,* 550 U.S. at 570). In addition, "courts may infer from factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct that plaintiff would ask the court to infer." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (citing *Iqbal,* 556 U.S. at 682). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'"

3

*Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 557). When evaluating a motion to dismiss under Rule 12(b)(6):

> [A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Iqbal,* 556 U.S. at 679. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

B. *Rule 9(b)*

In addition to pleading a plausible claim for relief under Rule 8, a plaintiff alleging fraud must state "with particularity the circumstances constituting the fraud." Fed. R. Civ. P. 9(b). The Eleventh Circuit has interpreted this requirement to mean that the complaint must say (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud. *FindWhat Inv. Grp. v. FindWhat.com,* 658 F.3d 1282, 1296 (11th Cir. 2011).

C. *PSLRA*

The Private Securities Litigation Reform Act ("PSLRA") imposes an even higher pleading requirement on securities fraud claims. *See generally Carvelli v.*

4

*Ocwen Fin. Corp.,* 934 F.3d 1307, 1317–18 (11th Cir. 2019). It requires the plaintiff to set forth with particularity "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Further, the plaintiff must allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [*i.e.*, scienter]." 15 U.S.C. § 78u–4(b)(2)(A).

The required state of mind is an "intent to defraud or severe recklessness on the part of the defendant." *FindWhat*, 658 F.3d at 1299 (quoting *Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 594 F.3d 783, 790 (11th Cir. 2010)). A "strong inference" is one that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). "[T]he complaint must allege facts supporting a strong inference of scienter 'for each defendant with respect to each violation.'" *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008) (citing *Phillips v. Scientific–Atlanta, Inc.,* 374 F.3d 1015, 1016 (11th Cir. 2004)). "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been

aware of it." *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1282 n.18 (11th Cir. 1999) (quotation marks omitted).

In *Mizzaro,* the Eleventh Circuit gave further guidance on evaluating whether a "strong inference" of scienter exists:

> Because the strong-inference inquiry asks "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard," "courts must consider the complaint in its entirety," and "omissions and ambiguities count against inferring scienter." *Tellabs,* 551 U.S. at 2509, 2511. Moreover, the inquiry is "inherently comparative" because courts "must take into account plausible opposing inferences." *Id.* at 2510, 2509. *Tellabs* explained how to balance opposing inferences this way:
>
>> To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the "smoking-gun" genre, or even the "most plausible of competing inferences." ... Yet the inference of scienter must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations.
>
> *Id.* at 2510. "In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 2511.
>
> [This test] asks what a reasonable person *would* think, not what a reasonable person *could* think.

*Mizzaro*, 544 F.3d at 1238–39 (emphasis in original).

In sum, to survive a motion to dismiss in a securities fraud case, the plaintiff "must (in addition to pleading all of the other elements of a Section 10(b) claim) plead

'with particularity facts giving rise to a strong inference' that the defendants either intended to defraud investors or were severely reckless when they made the allegedly materially false or incomplete statements." *Mizzaro,* 544 F.3d at 1238. "If these PSLRA pleading requirements are not satisfied, the court 'shall' dismiss the complaint." *FindWhat*, 658 F.3d at 1296-97 (citing 15 U.S.C. § 78u–4(b)(3)(A)).

A securities fraud plaintiff can rely on confidential sources, with the Court assessing the weight to be given to the evidence derived from those sources:

> We conclude that the weight to be afforded to allegations based on statements proffered by a confidential source depends on the particularity of the allegations made in each case, and confidentiality is one factor that courts may consider. Confidentiality, however, should not eviscerate the weight given if the complaint otherwise fully describes the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame.

*Mizzaro,* 544 F.3d at 1240.

A securities fraud claim can be based on a failure to comply with generally accepted accounting principles ("GAAP") if coupled with other evidence of intent. But, a mere GAAP violation standing alone is not sufficient:

> Without any additional evidence of scienter, a defendant's failure to follow GAAP or publication of inaccurate accounting figures, is insufficient to state a claim for securities fraud. *See In re Comshare,* 183 F.3d at 553; *In re SCB Computer Technology,* 149 F.Supp.2d 334, 346 (W.D.Tenn.2001). Violations of GAAP without more, may establish negligence, but can never establish scienter. *Reiger,* 117 F.Supp.2d at 1010. "[V]iolations of GAAP...provide evidence of scienter only when accompanied by *additional* facts and circumstances that raise an inference of fraudulent intent." *Id. See also Cheney v. Cyberguard Corp.,* 2000 WL 1140306, *11 (S.D.Fla.2000); *Malin v. Ivax Corp.,* 17 F.Supp.2d 1345, 1360 (S.D.Fla.1998)(allegations of defendants' motive and opportunity coupled with GAAP violations are insufficient to plead

> scienter under the PSLRA) . . . As Plaintiffs' point out, in some cases, courts have allowed circumstances surrounding GAAP violations to contribute to a strong inference of scienter. *See In re MicroStrategy, Inc. Sec. Litig.,* 115 F.Supp.2d 620 (E.D.Va.2000)("The mere *fact* that there was a restatement or a violation of GAAP, by itself, cannot give rise to a strong inference of scienter; the *nature* of such a restatement or violation, however, may ultimately do so . . . when the number, size, timing, nature, frequency, and context of the misapplication or restatement are taken into account."); *In re Adaptive Broadband Sec. Litig.,* 2002 WL 989478, 2002 U.S. Dist. LEXIS 5887 (N.D.Cal.2002)(corroborating GAAP violations with detailed evidence of the contemporaneous decision making behind the accounting errors showing that statements were known to be false at the time they were made to the SEC and the investing public set forth sufficient evidence of scienter) . . .
>
> In cases in which courts throughout the nation have allowed circumstances surrounding GAAP violations to contribute to a strong inference of scienter sufficient to withstand a motion to dismiss, several factors are often present. *In re SCB Computer Technology,* 149 F.Supp.2d 334 (W.D.Tenn.2001). First, the cases contain allegations of insider trading. *Id.* at 350–51. Second, the magnitude of the improperly recognized revenues is great. *Id.* at 351. Third, the GAAP violations relate to major balance sheet items based on contracts of tremendous magnitude and financial importance to the corporation. *Id.* Fourth, the contracts are contingent upon some future occurrence or consignment transactions in which the other party has no obligation to pay the corporation the amount recorded as revenue. *Id.* at 352. Fifth, the GAAP violation violates the corporation's internal policies. *Id.*

*In re Sportsline.com Sec. Litig.*, 366 F. Supp. 2d 1159, 1165–67 (S.D. Fla. 2004) (J. Middlebrooks) (brackets in original). "In certain circumstances, courts have held that allegations of violations of GAAP . . . coupled with allegations of ignoring 'red flags,' can be sufficient to state a claim of securities fraud." *Ziemba v. Cascade Intern., Inc.,* 256 F.3d 1194, 1209–10 (11th Cir. 2001) (citations omitted).

An inference of scienter can arise from stock sales by insiders if those transactions are suspicious or unusual. *Edward J. Goodman Life Income Trust*, 594

F.3d at 793 (citations omitted); *In re AFC Enterprises, Inc. Sec. Litig.,* 348 F. Supp. 2d 1363, 1373 (N.D. Ga. 2004).  Insider sales are suspicious if "the level of trading is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Edward J. Goodman Life Income Trust*, 594 F.3d at 793 (citations omitted).  "A stock sale may be deemed unusual when it is made at a time or in an amount that suggests that the seller is maximizing personal benefit from inside information." *In re AFC Enterprises, Inc. Sec. Litig.,* 348 F. Supp. 2d at 1373.

Statements of opinion generally cannot be the basis for a securities fraud claim because "liability attaches only in the case of an 'untrue statement of a material *fact*.'" *Carvelli*, 934 F.3d at 1326–27 (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,* 575 U.S. 175, 183 (2015) (quoting 15 U.S.C. § 77k(a)). There are two exceptions to this general rule.  First, "a statement of opinion that 'falsely describe[s] [the speaker's] own state of mind' is an untrue statement of fact—as to what the speaker actually believes." *Carvelli*, 934 F.3d at 1322 (citing *Omnicare*, 575 U.S. at 184) (brackets in original). Second, "when statements of opinion 'contain embedded statements of fact,' a speaker may be liable 'if the supporting fact she supplied were untrue.'" *Carvelli,* 934 F.3d at 1322 (citing *Omnicare*, 575 U.S. at 185-86).

9

## II.    FACTS[1]

Celsius was founded in 2004 and had its initial public stock offering in 2010. ¶36.[2]  Its fiscal year corresponds to the calendar year. ¶26. John Fieldly is a certified public accountant. He has been the Company's CEO since approximately 2018. ¶27. He was the Company's CFO for six years before that. *Id.*  Edwin Negron-Carballo is also a certified public accountant and has been the CFO and Principal Financial and Accounting Officer since 2018. ¶28; ECF No. 47-8 at 22.  Mr. Fieldly and Mr. Negron-Carballo's total compensation includes a discretionary bonus.  *Id.* at 24-25.  Among the factors considered in granting a bonus are financial metrics that include revenue, gross margin by dollar, gross margin by percentage, sales and marketing, operating expense, and adjusted EBITDA. ¶140; ECF No. 47-8 at 25.

Mr. Negron-Carballo oversaw a very small accounting department, which employed just a handful of people. ¶7. He took a very hands-on role in accounting — for example, personally signing checks to pay vendors — and was integrally involved in the day-to-day duties of the accounting department, including overseeing the

---

[1]These facts are taken from the Amended Complaint and the SEC filings attached to Defendants' Motion.  ECF Nos. 47-2 through 47-8.  Citing *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 (11th Cir. 1999), Defendants' Motion asserts that the Court could take judicial notice of these documents.   ECF No. 47 at 9 n.1. Plaintiffs responded to Defendants' Motion on the merits without objecting to the Court considering any of these documents. *See, e.g.,* ECF No. 48 at 24.  At oral argument, Plaintiffs' counsel confirmed that she did not object to me considering the exhibits appended to the motion.

[2] Unless otherwise noted, citations to paragraphs ("¶") are from the Amended Complaint, ECF No. 44.

Company's accounting policies and procedures and preparation of its SEC filings. ¶7. He admitted to purposely delaying paying the Company's bills on time in order to "increase cashflow." ¶33, 34.[3]

Since 2007, Celsius has compensated employees, in part, with noncash share-based compensation such as stock options and restricted stock units. ¶¶58-66.[4] For accounting purposes, Celsius recognized these stock options as "general and administrative expenses" on its income statements when they vested. ¶78. Stock options are granted pursuant to Celsius' Incentive Stock Plan, which made it a corporate policy to follow ASC Topic 718. ¶67.

ASC Topic 718, promulgated by the Financial Accounting Standards Board, provides corporations with guidance on how to properly recognize employee stock options as an expense on a corporate income statement. ¶68.  The value of the stock option is the fair market value of the corresponding number of shares on the date the option is granted.  If the options vest over time, the expense is recognized for each option when it vests.  If the stock options are modified to vest sooner, the expense is accelerated and must be recognized on the vesting date.  ¶¶ 69-71.  In particular, if the vesting date of an employee's stock options is modified to correspond with the

---

[3]Confidential sources who previously worked for the Company as recently as 2021 and 2022 are the bases for these factual allegations.  ¶¶30-35.

[4] As the Amended Complaint explains, different forms of noncash share-based compensation operate differently.  Those differences are not material to the issues raised in the Motion to Dismiss.  So, for ease of discussion in this Report, all forms of noncash compensation will collectively be called "stock options."

employee's date of retirement or termination, the compensation expense should be recognized on a company's income statement on the date of termination or retirement. ¶69. In years prior to 2021, Celsius had accelerated the vesting conditions for stock options of terminated employees and directors and "never experienced [an] accounting problem." ¶¶77, 149, 152.

In the second and third quarters of 2021, nine employees and members of the Board of Directors left Celsius. ¶¶ 8, 76.  According to Mr. Fieldly, "[s]ome of the[se] employees" contracted to continue to provide services to Celsius after their employment was terminated. ¶88.  Pursuant to Board resolutions or severance agreements, their stock options were modified to vest on their termination dates. ¶¶ 8, 76.  Under a proper application of ASC 718, the stock options should have been revalued to reflect their fair market value on the dates of modification. *Id.*, ¶87. And, that fair market value should have been recognized in full as a corporate expense on the dates of modification.  ¶77.

According to the Amended Complaint, during much of 2021, market analysts were "unimpressed by the Company's relatively disappointing net income and net income per share.  Celsius thus faced pressure from analysts and investors to keep its expenses low, and in turn, prop up its net income (profit) and net income (profit) per share."  ¶49. *See also* ¶¶50-54.

On August 12, 2021, Celsius announced its financial results for the second quarter of 2021 and reported those results to the SEC on Forms 10-Q and 8-K. ¶¶ 42, 98.  It reported revenue of $65 million compared to $30 million for the same quarter

in 2020. *Id.* It reported net income of $3.96 million as compared to $1.2 million in the same quarter in 2020. ¶43.

The August 12, 2021, Form 10-Q also said:

[O]ur President and Chief Executive Officer and our Chief Financial Officer have concluded that as of September 30, 2021, our disclosure controls and procedures were effective in that (a) we maintain records that in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets; (b) our records provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with authorizations of our management and board of directors.

¶132.

On November 11, 2021, Celsius announced its financial results for the third quarter of 2021 and reported those results to the SEC on Forms 10-Q and 8-K. ¶¶48, 98. It reported revenue of $94.9 million compared to $36.5 million for the same quarter in 2020. *Id.* It reported net income of $2.75 million, down from $4.75 million in the third quarter of 2020. ¶48.

The November 11, 2021, Form 10-Q also said that Mr. Fieldly and Mr. Negron-Carballo:

have concluded that as of June 30, 2021, our disclosure controls and procedures were effective in that (a) we maintain records that in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets; (b) our records provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only

13

in accordance with authorizations of our management and board of directors.

¶ 135.

Celsius did not recognize the nine former employees' accelerated stock options as expenses in the second or third quarters of 2021.  As a result of not recognizing these expenses, Celsius' general and administrative expenses were understated, so its net income and net income per share for the second and third quarters were overstated:

|  | Reported Net Income | Actual Net Income | Reported Net Income Per Share | Actual Net Income Per Share |
|---|---|---|---|---|
| **Second Quarter 2021** | $3,960,344 | $779,991 | $0.05 | $0.01 |
| **Third Quarter 2021** | $2,745,791 | ($9,370,647) | $0.04 | $(0.13) |

¶¶ 79, 98.

Even with the inflated income numbers, the price of Celsius stock dropped by approximately 20% (from $97.77 to $77.77) between November 11 and November 15, 2021.  The Amended Complaint attributes the drop in share price to the $2 million decrease Celsius had in net income from the same quarter in 2020, which was "disappointing" and caused investors to be "concern[ed]."   ¶48.

Previously, on June 14, 2021, Mr. Negron-Carballo and Mr. Fieldly each had sold 150,000 shares of Celsius stock for $62.50 per share, for gross proceeds of over $9 million each.  ECF Nos. 47-5, 47-7.  After the sales, Mr. Negron-Carballo held

14

7,614 shares of Celsius stock and Mr. Fieldly held 285,252 shares. *Id.* By November 11, 2021, Celsius stock was selling for $97.77 per share.  ¶48.

On November 20, 2021, Mr. Fieldly created a 10b5-1 trading plan. One month later, on December 27, 2021, he used this plan to sell 20,000 shares of Celsius stock for $75 per share.  ECF No. 47-6.  After that sale, he continued to hold 265,252 shares of Celsius stock.  *Id.*

Celsius used new auditors to prepare its 2021 end-of-year financial statements. ECF No. 47-2 at 35. While the audited financial statements were being prepared, it was determined that Celsius had not properly expensed the stock options for the nine former employees in the second and third quarters of 2021. ECF No. 47-3.  The Company's Audit Committee met with the old and new auditors on February 28, 2022, and concluded that the Company needed to restate its earnings. ECF No. 47-3.

On March 1, 2022, Celsius filed a Form 8-K with the SEC disclosing these errors and reporting that it would have to restate the financial statements for the second and third quarters of 2021. ¶84, ECF No. 47-3.  The Form 8-K also said, "The Company's management has concluded that as a result of a breakdown in the design of controls over modifications to their share-based compensation that a material weakness exists in the Company's internal controls over financial reporting."  ECF No. 47-3 at 3.

That same day, Celsius held an earnings call. ¶86.  During that call, Mr. Fieldly disclosed the accounting error and said, "This was an error of interpretation

15

of a Class III modification rule, technical rule, which resulted in an immediate mark-to-market adjustments for the prior periods' stock grants as non-cash expense." *Id.*

In a separate earnings call on March 1, Mr. Fieldly explained that the accounting error occurred because there was "a technical aspect there because some of [the former employees] are still providing services through contractual services. So there was just a technicality. That was an error in interpretation there on those stock awards. So it was definitely an oversight and a correction that was noted." ¶88.

Immediately after the restatement was announced, Celsius' stock price began to fall and closed at $57.60 per share on March 3, 2022. ¶89. Between March 1 and March 8, 2022, the Company's stock price plummeted 26%, from $62.80 on March 1, 2022, to just $46.61 on March 8, 2022. ¶93.

Celsius formally restated its 2021 financial statements in a Form 10-K filed with the SEC on March 16, 2022. ¶¶ 90-92; ECF No. 47-2 at 59. The Form 10-K also explained that stock options for former Board members and employees had not been properly recognized as an expense in the second and third quarters. ¶94. The 10-K stated, "The Company modified awards for nine grantees resulting in approximately $19.3 million in incremental compensation cost during the year ended December 31, 2021." *Id;* ECF No. 47-2 at 57. Thus, it appears that Celsius had to restate the accelerated stock options for all nine employees who left the Company in 2021, even though only "some" of them stayed on to perform contractual services. ¶88.

On April 18, 2022, Celsius filed a Form 8-K with the SEC announcing that Mr. Negron-Carballo would be resigning from his role as CFO, and that he would

16

"continue to serve Celsius in an executive capacity to ensure a smooth transition until he begins his retirement on January 31, 2023."  ¶95.  At that time, Mr. Negron-Carballo was approximately 60 years old. ECF No. 47-8 at 22.

## III.   DISCUSSION

Defendants move to dismiss on the grounds that (1) the Amended Complaint lacks sufficient allegations to raise a strong inference of scienter, and (2) their SEC filings about internal controls are not actionable misstatements.

A. *Scienter*

Plaintiffs summarize their position as follows:

> The Complaint alleges that the following facts which, analyzed collectively, evidence scienter: (1) Defendants' extensive accounting experience, their direct involvement in the decision to violate a simple rule, and past conduct of delaying costs, ¶¶11, 15, 146; (2) the magnitude of the effect that the Restatement had on the Company's reported profits, ¶¶98-101; (3) Defendants' incentive to prop up the Company's profitability, both to satisfy investors and to boost their personal income through performance bonuses, ¶¶43-47, 140-141; (4) Defendant Fieldly's decision to enter into a 10b5-1 trading plan during the Class Period, ¶139; and (5) corroborating confidential witness statements, ¶¶30-35. These facts have satisfied scienter in the context of a GAAP violation.

ECF No. 48 at 16.  In their Response to the Motion, Plaintiffs also claim the existence of certain "red flags" which they allege support a strong inference of scienter including insider trading, the magnitude of the error, and the fact that the violations related to major balance sheet items.  ECF No. 48 at 13 (citing *Schultz v. Applica Inc.*, 488 F. Supp. 2d 1219, 1225 (S.D. Fla. 2007)).

1.  <u>Prior application of ASC 718</u>

The Amended Complaint alleges the Company had applied ASC 718 since 2006 without error.  ¶¶ 149, 152.[5] Defendants do not disagree with this fact, nor do they contest that ASC 718 was wrongly applied in compiling the original 2021 financial statements.  They argue that any errors were made in good faith.  In their motion to dismiss, Defendants explain that the Company:

> understated the non-cash expense of share-based compensation associated with some former employees and directors in the second and third quarters . . . [and that] the error in applying ASC 718 at least in part arose from the fact that *some* of the former employees and retired directors at issue would continue to provide services to Celsius under contracts past the date of their termination or retirement . . .  In other words, in light of their service obligations, the Company originally understood the date of termination for the relevant employees and directors had not yet occurred under the Company's interpretation of ACS 718. That, in turn, meant the Company could continue to recognize the expense of their share-based compensation over time and until their services to the Company ceased. The restatement corrected this misinterpretation of GAAP.

ECF No. 47 at 10-11 (emphasis added).  *See also id.* at 16-17.[6]  In their Response to the Motion, Plaintiffs argue:

> this necessarily means that at least "some" of the departed employees were providing no such [continued] services, and there could not possibly have been an ambiguity in the application of ASC 718 . . . Defendants do not elaborate on how many of the nine employees fall into this category . . . Moreover, Defendants do not assert that any were still employed by the Company, as would plainly be required to ignore ASC

---

[5] Plaintiffs cite paragraph 152 of the Amended Complaint for the proposition, "No outside accounting firm was involved in the decision to mis-apply ASC 718." ECF No. 48 at 16.  That fact is not alleged in paragraph 152.

[6]

> 718's mandate to accelerate the vesting schedule of their stock-based compensation. Thus any "contractual services" they were offering could not have confused the question of accelerating their share-based compensation.

ECF No. 48 at 18-19. The sole well-pled allegation of the reason why ASC 718 was wrongly applied is Paragraph 88 of the Amended Complaint, which quotes Mr. Fieldly telling an analyst on March 1, 2022, that there was "a technical aspect there because *some* of [the former employees] are still providing services through contractual services." ¶88 (emphasis added).

Combining the following facts creates a strong inference of scienter. When employees had left before 2021 and had their stock options modified, Celsius properly recognized the compensation as a current expense. Nine employee and Board members left Celsius in 2021. All had their stock options modified to vest in 2021. Some continued to provide services after leaving the company. Some did not. None had their stock option compensation recognized as an expense on Celsius' financial statements. [7]

Celsisus' alleged misunderstanding of how to apply ASC 718 to former employees who continued to provide services does not explain why Celsius did not recognize the compensation expense in 2021 for departing employees who did not

---

[7] Notably, neither the Motion to Dismiss nor the Amended Complaint allege that 2021 was the first year when former employees with stock options continued to provide services to Celsius under non-employment contracts. At oral argument, defense counsel could not confirm whether in previous years Celsius had ever retained terminated employees to perform contract services, saying, "we haven't done a deep dive to see if this has ever happened before."

continue to provide services.  The current record shows no benign explanation for why these employees were treated differently from similarly-situated employees who left before 2021. So, in the absence of any contrary explanation — at least for the former employees who did not continue providing services to Celsius — there exists an inference that the stock option compensation intentionally was not recognized.

In sum, there are troubling inconsistencies in the way Defendants treated the accelerated stock options of former employees in 2021 versus previous years, and in Defendants' 2021 decision to lump together dissimilar employees (former and contract) and not account for any of their accelerated awards in a timely manner.  As discussed below, this inconsistency creates an inference of scienter for the Company and for Mr. Negron-Carballo; however, that same inference does not exist for Mr. Fieldly because there is insufficient evidence that he was aware of how ASC 718 was being applied.

2.  Accounting Experience/Direct Involvement/Simplicity of Rule

The mere fact that the Individual Defendants had accounting backgrounds does not, alone, suggest that they intentionally or recklessly caused the Company's financial statements to be inaccurate.

The allegations against Mr. Fieldly do not rise above the level of speculation. Mr. Fieldly ceased to be the CFO in 2018.  The Amended Complaint does not allege facts plausibly showing that Mr. Fieldly was involved in preparing the financial statements for fiscal year 2021, let alone that he had knowledge of how the Company was accounting for particular stock options. Without knowing how the accounting

rules were being applied, he cannot have known that they were being applied wrongly. For these reasons, even viewing the evidence in the light most favorable to Plaintiffs, the Amended Complaint does not plausibly allege that Mr. Fieldly knew the earnings statements were false.

Mr. Negron-Carballo is in a different position. The Amended Complaint alleges that he was the Company's Principal Financial and Accounting Officer overseeing a small accounting department. ¶¶ 7, 34, 146-47. It further alleges that Mr. Negron-Carballo was a hands-on manager. ¶147. The Amended Complaint also alleges that the accounting department was understaffed and followed "very loose accounting processes and procedures." ¶34. These facts imply that Mr. Negron-Carballo would have been aware of how the Company was accounting for the stock options and that he approved of that procedure.

The Amended Complaint does not allege direct evidence that Mr. Negron-Carballo knew that the stock option accounting was wrong. As discussed above, however, an inference of scienter arises from the fact that ASC 718 was applied differently to former employees in 2021 than it had to similarly-situated employees in the past. Because the record implies that Mr. Negron-Carballo knew how ASC 718 was being applied, it therefore can be inferred that he knew it was being applied incorrectly, and that he did so with scienter.

The Amended Complaint argues that ASC 718 is clear and unambiguous. *See, e.g., In re Sportsline.com Sec. Litig.*, 366 F. Supp. 2d 1159, 1168 (S.D. Fla. 2004) ("Plaintiffs argue that because Defendants' GAAP violations were of simple

accounting rules and therefore incredibly obvious, an inference of scienter can be made."). The simplicity of an accounting rule can be relevant in assessing scienter.

Before reaching the merits of this argument, I first must address the Plaintiffs' proffered expert evidence. In support of its argument, the Amended Complaint says, "Lead Plaintiff's accounting expert advised that the accounting community considers its guidance to be unequivocal with regard to expensing share-based compensation on income statements." ¶ 6. And:

> Lead Plaintiff consulted an accounting expert in connection with preparing this Amended Complaint, who advised that the accounting guidance set forth in ASC 718, including the guidance set forth above pertaining to accelerated vesting schedules for terminated or retired employees, is unequivocal with respect to the modification of stock options and RSUs. In particular, ASC 718 makes plain that when a grantor terminates an employee, the acceleration of vesting requires the additional compensation expense to be recorded using the fair value of the stock option or RSU as of the date of the modification.

¶75. The Amended Complaint does not attach an expert report, nor does it describe the expert's qualifications.

This kind of evidence is not entitled to the assumption of truth so it cannot be considered. *See Iqbal,* 556 U.S. at 679. First, "opinions cannot substitute for facts under the PSLRA." *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006) (affirming district court's refusal to consider an expert's opinion attached to a securities fraud complaint). Second, expert testimony is considered unreliable and not competent for court proceedings unless (1) the expert is qualified to render the relevant opinion, (2) the opinion is grounded in a reliable methodology, and (3) the testimony will be helpful to the finder of fact. *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).   The Amended Complaint's factual allegations about the unidentified expert witness fail to meet any of these requirements.[8]

The Amended Complaint also says, "According to Deloitte, FASB's amendments to ASC Topic 718 . . . 'simplifie[d] the accounting for share-based payment arrangements with nonemployees.'  In fact, the 'ASU was issued as part of the FASB's simplification initiative, which is intended to reduce the cost and complexity of current U.S. GAAP while maintaining or enhancing the usefulness of the related financial statement information.'"  ¶74.  The Amended Complaint does not allege that Deloitte provided accounting services to the Company or that the Defendants were aware of Deloitte's position on ASC 718.  It therefore does not create any relevant inference about Defendants' state of mind.  To the extent it is offered to show that ASC 718 can be easily understood, it is improper opinion evidence.

Turning to the merits, I cannot conclude that ASC 718 is clear and unambiguous. The Amended Complaint does not quote or append the entirety of ASC 718.  It quotes only (1) ASC 718-20-55-108 (¶70), and (2) another uncited portion of ASC 718.  ¶72.  It also describes (without providing the original text) (1) the content of ASC 718-20-55-121 (¶73) and (2) the definition of a Type III modification. ¶76.

---

[8] I am mindful that *Daubert* and the Federal Rules of Evidence do not apply at this stage.  But, they inform whether assertions in a complaint are entitled to the assumption of truth.

These limited snippets are not enough to meet Plaintiffs' burden of showing that ASC is so clear that it should create an inference of scienter.

Finally, Plaintiffs argue that an inference of scienter necessarily arises from the fact that Negron-Carballo resigned shortly after the earning restatement.  ECF No. 48 at 19.  In support of this argument, Plaintiffs cite to *In re Home Loan Servicing Sols., Ltd. Sec. Litig.*, *In re Home Loan Servicing Sols., Ltd. Sec. Litig.*, No. 16-CV-60165-WPD, 2016 WL 10592320, at *7 (S.D. Fla. June 6, 2016) (J. Dimitrouleas).  There, the Court inferred scienter from multiple facts including that the defendant "was at the epicenter of all of the Ocwen-Related Companies, that he was forced to resign, that regulatory documents indicate that he engaged in improper transactions with Altisource, that he had significant holdings in several Ocwen-companies, and that the magnitude and duration of the wrongdoing described in the Amended Complaint was substantial."

The Amended Complaint does not allege that Negron-Carballo was forced to resign, nor does it allege other misconduct similar to what existed in *In Re: Home Loan Servicing.*  Moreover, it does not allege facts connecting the resignation to the earnings restatement.  *See In re Sportsline.com Sec. Litig.,* 366 F. Supp. 2d at 1172 (no inference of scienter where complaint failed to plead any connection between employee resignations and the accounting errors that led to restatement of financial statements).  The Amended Complaint does not allege that members of the Board (other than Mr. Fieldly) were complicit in a securities fraud.  The Audit Committee acted promptly and responsibly when it learned about the accounting problem.  These

facts suggest that Mr. Negron-Carballo's relationship with Celsius would have been fully terminated if the Company's Board believed he had engaged in wrongful behavior. It was not. He remains affiliated with Celsius in an executive capacity through February 2023.

Viewed in the light most favorable to Plaintiffs, the timing of Negron-Carballo's resignation suggests it was connected to the earnings restatement. But, there is an equal (and unrebutted) inference that he resigned because of an embarrassing and expensive good-faith error, not because he had engaged in a fraud. Therefore, this factor does not weigh in favor of a finding of scienter.

### 3. Past conduct of delaying costs

Plaintiffs rely on confidential witnesses to allege that Mr. Negron-Carballo and the accounting department had a history of delaying payment of bills "to keep costs low and elevate cash flows." ECF No. 48 at 24. From this evidence, they infer "Defendants . . . were accustomed to going to great lengths to manipulate the Company's books to keep costs low and boost profits." *Id.* at 24-25. This conduct could be consistent with an improper intent to delay recognizing expenses resulting from the terminated employees' stock options. Nevertheless, it could equally be construed as consistent with non-fraudulent intent. Deferring a payment to improve cashflow and liquidity could be a viable strategy for managing corporate finances. And, there is no allegation that unpaid bills were not accurately reflected as payables

25

(i.e. liabilities) in the Company's internal records and on its financial statements that were available to investors.[9]  This factor is, at best, neutral in showing scienter.

    4.  <u>Magnitude, Timing, and Context of the Restatement</u>

Plaintiffs argue, "[T]he metrics which Celsius overstated — net income and net income per share — were critical to investors and analysts who were laser focused on the Company's profitability following a period of costly revenue growth."  ECF No. 48 at 19 (citing ¶¶ 43-47).  The Amended Complaint alleges that the effect of the accounting misstatement was to conceal a cumulative net loss of $8.01 million for the second and third quarters of fiscal year 2021.  *Id.* at 20 (citing ¶¶ 79, 124, 131).  The restatement of earnings reduced net income for the second quarter of 2021 by 80%, from $3.96 million to $799,991.  For the third quarter of 2021, the restatement converted a $2.75 million positive net income into a $9.4 million *negative* net income.

Defendants respond that the proper metric is total revenue, not net income.  ECF No. 49 at 9.  They note that the Eleventh Circuit has cautioned against using net income to measure the magnitude of an accounting error:

> Because net income can vary so widely period to period, using it as a baseline for comparison provides the court no real standard on which to judge the significance of the accounting error.

*Edward J. Goodman Life Income Trust*, 594 F.3d at 792.  It is also notable that the "losses" reflected by the restatement were not cashflow losses; the Company

---

[9] The parties dispute whether the Court should consider the evidence on this factor from the confidential witnesses.  Because I would discount this factor even if I accepted the confidential witness evidence, I do not resolve whether that evidence is properly considered.

recognized additional expenses for the second and third quarters of 2021 based on the value of the stock options, but the Company did not have to pay for the stock options. Nevertheless, here, the misstatement of net income could imply improper intent because the Amended Complaint alleges the market had a "laser focus" on that particular metric as indicative of the Company's future financial performance. ¶¶ 43-45, 48-54.

Citing to *Sportsline,* Plaintiffs next argue that scienter can be inferred because misapplying ASC 718 violated the Company's internal accounting policies, which were to accurately apply ASC 718. This argument is unpersuasive. Presumably, all companies have policies to comply with GAAP principles. Plaintiffs' argument would convert every innocent accounting mistake into an indicator of scienter, and caselaw makes clear that this inference is improper. Cases that have inferred scienter from violations of internal policies have relied on policies requiring something other than mere compliance with GAAP. *See, e.g, In re MicroStrategy, Inc. Sec. Litig.,* 115 F. Supp. 2d 620, 624 (E.D. Va. 2000) (company violated its own revenue recognition policies, not just GAAP principles).

Finally, Defendants argue that the timing of the restatement creates an inference of good faith and negates other inferences of scienter. ECF No. 47 at 18-19. Plaintiffs respond that this argument ignores that the income restatement occurred "during a period of overall market weakness." ECF No. 48 at 20. Whatever the state of the markets, it appears that the Company acted promptly when it found out about the problem. The error first came to light in January or February 2022 when the

auditors were preparing the end-of-year financial statements.  The Audit Committee met on February 28 and announced the restatement the next day.  This course of conduct implies that the Company acted in good faith and without an intent to conceal or defraud when the error was brought to its attention.  But, it is not relevant to Mr. Negron-Carballo's state of mind at the time the accounting decision was made.

   5.  <u>Incentive to falsify profitability</u>

   The Amended Complaint alleges that Defendants had several motives to falsify the Company's profitability.  First, it alleges the Individual Defendants' 2021 bonus compensation was affected by the Company's financial performance.  ¶140 (compensation committee considered revenue, gross margin, sales and marketing, operating expense, adjusted EBITDA, and individual performance goals).  These bonuses made up a substantial portion of the Individual Defendants' overall fiscal year 2021 compensation.  ¶141 (Fieldly's bonus was 35% of overall compensation; Negron-Carballo's was 27%).[10]   Defendants argue that the bonuses were not extraordinary and were based on many other factors in addition to net income.  ECF No. 47 at 21-22. At best, particularly given that financial performance was only one part of the bonus decision, the Individual Defendants' bonus compensation arrangement creates a weak inference of scienter,. *Edward J. Goodman Life Income*

---

[10] Paragraph 141 alleges that Mr. Fieldly earned $500,000 in salary and $280,000 in bonus, and that Mr. Negron-Carballo earned $300,000 in salary and $110,700 in bonus.  Nevertheless, Plaintiff's Response cites this paragraph for the proposition that "Defendant Fieldly received more than $12.2 million in incentive compensation for FY 2021 [and] Defendant Negron-Carballo received nearly $2.7 million in compensation for FY 2021."

*Tr. v. Jabil Circuit, Inc.,* 595 F. Supp. 2d 1253, 1275 (M.D. Fla. 2009), *aff'd,* 594 F.3d 783 (11th Cir. 2010) ("Receipt of a standard incentive-based bonus has limited probative value for scienter.").  Additionally, both Mr. Fieldly and Mr. Negron-Carballo had sold over $9 million in stock a few months earlier, which would suggest they had a lesser motive to falsely inflate their bonuses.

Second, the Amended Complaint alleges that Mr. Fieldly was motivated to artificially inflate the Company's earnings to pump up the stock price so that he could sell shares in his 10b5-1 plan for a higher profit.  ¶139.  Specifically, it alleges he created the plan on November 30, 2021, which was nine years after he joined the Company and four months after the Company mis-stated its earnings on June 30, 2021. *Id.*; ¶ 56.  One month later, on December 27, 2021, Mr. Fieldly sold 20,000 shares of Company stock for $1.5 million. ¶¶ 57, 139.  The Amended Complaint alleges that Mr. Fieldly made this sale using nonpublic and material information about the Company's inaccurate accounting for share-based compensation payments. ¶27.  It asserts that the timing of this transaction is "highly suspicious." ¶¶56, 139.

Defendants argue that the Court should resolve this issue by applying the three-part test from *Druskin v. Answerthink, Inc.*:

> Whether insider trading will support an inference that defendants engaged in securities fraud "turns upon (1) the percentage of holdings sold by a defendant, (2) the number of defendants who sold stock, and (3) the difference between stock sales during the relevant time period and prior activity."

299 F. Supp. 2d 1307, 1336 (S.D. Fla. 2004) (J. Gold) (citation omitted).  The parties agree that Mr. Fieldly conducted one stock sale through the 10b5-1 plan, involving

approximately 7% of his holdings.  The Amended Complaint does not allege that Mr. Negron-Carballo conducted any stock sales during the relevant time period.  Mr. Fieldly sold 150,000 of his 435,252 shares in June 2021.  ECF No. 47-7.  This sale comprised 34.5% of his holdings, and predated the June 30, 2021, inaccurate earnings report.  Plaintiffs respond that the June 2021 transaction is distinguishable because it was part of a public offering and that sales during public offerings are generally not considered suspicious.  ECF No. 48 at 24.

Plaintiffs' argument ignores that the relevant question is not whether the June 14, 2021, transaction was itself suspicious.  The question is whether the December 27, 2021, transaction implies scienter when viewed in the context of the June sale and Mr. Fieldly's overall holdings.  In other words, is there a strong inference that Mr. Fieldly sold shares in December 2021 to take advantage of insider information.

Before answering that question, three other facts are notable.  First, as discussed above, the Amended Complaint does not plausibly allege that Mr. Fieldly knew that the June 30 earning statement was inaccurate; the Amended Complaint simply does not plausibly allege that Mr. Fieldly had non-public material information about the stock option expenses.  Second, when he sold the 20,000 shares in December 2021, Mr. Fieldly continued to hold over 265,000 shares.  The value of these shares went down substantially after the earnings restatement.  Third, he had recently cashed out over $9 million in stock.

Taking all of these facts into account, Mr. Fieldly's stock sales in December 2021 do not imply that he acted with intent to artificially inflate the stock price.

6. Conclusion

Considered collectively, the factors cited by Plaintiffs do not demonstrate a strong inference of scienter or severe recklessness by Mr. Fieldly. The PSLRA sets a high standard for pleading securities fraud, particularly the evidence of scienter. A plaintiff's allegations must compel a conclusion of fraudulent intent, to the exclusion of other opposing reasonable inferences. Here, the Amended Complaint sets forth a factual narrative that *could* support a finding of Mr. Fieldly's scienter. But, that narrative requires Mr. Fieldly having been aware of how the Company was applying ASC 718 when it prepared its Forms 10Q. As discussed above, the record does not make this showing. Nor does it exclude other equally-plausible contrary conclusions. For this reason, the Company's inaccurate financial statements for the second and third quarters of 2021 cannot be a basis for Mr. Fieldly's liability under Section 10(b), Rule 10b-5, or Section 20(a).

The same cannot be said of Mr. Negron-Carballo. The inference of Mr. Negron-Carballo's scienter is cogent and compelling, in large part because at this stage there is no other equally plausible nonculpable explanation for why he would treat the nine departing employees, all of whom were not similarly situated in terms of their continued service to Celsius, the same for accounting purposes. To the extent other factors do not support a finding of scienter, they undercut that inference. On balance, however, the inference of scienter arising from the inconsistent application of ASC 718 outweighs the countervailing factors.

31

Mr. Negron-Carballo's scienter is imputable to Celsius. "Courts have uniformly held that acts of a corporate officer that are intended to benefit a corporation to the detriment of outsiders are properly imputed to the corporation." *In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d 1350, 1361 (S.D. Fla. 2005) (J. Middlebrooks) (citing *In re Sunbeam Sec. Litig.,* 89 F. Supp. 2d 1326, 1340 (S.D. Fla. 1999). "Similarly, knowledge of individuals who exercise substantial control over a corporation's affairs is properly imputable to the corporation." *Id.* (citing *American Standard Credit, Inc. v. National Cement Co.,* 643 F.2d 248, 270–71 & n. 16 (5th Cir. 1981)). Here, assuming that Mr. Negron-Carballo intentionally omitted the expense of the departing employees' stock options from the Company's financial statements, it is reasonable to infer that this omission was intended to benefit Celsius by artificially inflating its stock price. Accordingly, the claim against Celsius should be allowed to proceed.

### B. Statements About Internal Controls

The Amended Complaint alleges that the Defendants made false and misleading statements in SEC reporting documents:

In its Form 10-Q for the second quarter of 2021, Celsius said:

[O]ur President and Chief Executive Officer and our Chief Financial Officer have concluded that as of June 30, 2021, our disclosure controls and procedures were effective in that (a) we maintain records that in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets; (b) our records provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only

in accordance with authorizations of our management and board of directors.

¶132. It alleges that an identical statement (except for a change in the date) was made in the Form 10-Q for the third quarter of 2021. ¶135.

The Amended Complaint alleges these statements were false because the Company filed a form 8-K on March 1, 2022, saying that its June 30, 2021, and September 30, 2021, financial statements had not accurately accounted for "share based compensation awards modifications," (¶¶ 133, 136) and that "As a result of the breakdown in the design of controls over modifications to their share-based compensation . . . a material weakness exists in the Company's internal controls over financial reporting." ¶¶ 134, 137 (ellipses in original).

The statements in the Forms 10-Q are statements about the Defendants' subjective state of mind. Plaintiffs therefore bear the burden of showing either (1) the Defendants did not believe the statements in the Forms 10-Q were true, or (2) there is an embedded false statement in the Forms 10-Q.

To properly conduct that analysis, the Court must first, carefully examine what statements were made in the Forms 10-Q. That examination shows that they were statements about the completeness and accuracy of the Company's internal records and the handling of Company assets. The Forms 10-Q said the records fairly and accurately reflected the transactions and disposition of the Company's assets. The Amended Complaint does not dispute that fact. They also said that the Company's "receipts and expenditures are being made only in accordance with authorizations of

33

our management and board of directors." The Amended Complaint does not dispute that fact. And, finally, the Forms 10-Q said that the Company's "records provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles." This last statement appears to be the gravamen of the Plaintiffs' fraud claim. The Company is saying that its business transactions *are recorded* in a way that would permit someone to prepare financial statements that comply with GAAP. The Amended Complaint does not dispute the representation in the Forms 10-Q that the Company's records were sufficient to prepare GAAP-compliant financial statements. Instead, it says that the Company's financial statements were false because the Company improperly applied GAAP principles to its (undisputedly-accurate) records.[11] In short, the Forms 10-Q do not say that the financial statements are GAAP-compliant.

With that background, the Amended Complaint fails to allege that the Forms 10-K were actionable false statements. First, for the reasons just discussed, they are not false. Second, even assuming they were false, the factual allegations in the Amended Complaint do not demonstrate that the Defendants knew the statements were false when made.

Plaintiffs' entire factual argument on this issue is:

---

[11] For example, the Amended Complaint does not argue that the Company improperly recorded what stock options had been given to each former employee or when those employees left the company or what post-separation consulting services they were providing.

> The Complaint alleges that Defendants did not subjectively believe that their accounting controls were adequate. Not only was the accounting department deficient, but Negron-Carballo purposely delayed paying the Company's bills to "increase cashflow," and the decision to flout ASC 718 was done intentionally to boost revenues. ¶¶33, 143. Thus Defendants could not have actually held an opinion that Celsius' internal controls were adequate. Alternatively, the statements are also actionable because they are embedded with false statements of verifiable fact including specific dates and assurances that transactions comply with GAAP.

ECF No. 48 at 14-15. The cited portions of the Amended Complaint allege (based on a confidential witness) that Negron-Carballo purposely delayed paying bills to increase cashflow. ¶¶33, 143. Even accepting that fact as true, it does not create a strong inference that Negron-Carballo knew that a statement in the Form 10-K about the Company's recordkeeping was false. And, the Form 10-K does not say that the Company's records comply with GAAP; it says the records are sufficient to support GAAP-compliant financial reporting. Third, as discussed above, there is no embedded statement that the stock option transactions comply with GAAP principles.

For these reasons, the statements about internal controls in the Forms 10-Q cannot be a basis for liability under Section 10(b), Rule 10b-5, or Section 20(a).

## IV. LEAVE TO AMEND

At the end of their Response, Plaintiffs say, "[S]hould the Court grant any or all of Defendants' Motion, Plaintiffs respectfully ask this Court to allow them to replead their claims." ECF No. 48 at 25. Plaintiffs have not followed the proper procedure to seek leave to file a Second Amended Complaint. "Where a request for leave to file an amended complaint simply is imbedded within an opposition

memorandum, the issue has not been raised properly." *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1222 (11th Cir. 1999) *quoted in Rosenberg v. Gould*, 554 F.3d 962, 967 (11th Cir. 2009). Plaintiffs' remedy is to file a separate motion for leave to file a Second Amended Complaint that appends the proposed amended pleading. *See* S.D. Fla. Local Rule 15.1.

## REPORT AND RECOMMENDATION

Accordingly, this Court RECOMMENDS that the District Court GRANT the Defendants' Motion to Dismiss the Amended Complaint as to Mr. Fieldly and DENY the Motion as to Mr. Negron-Carballo and Celsius.

## NOTICE OF RIGHT TO OBJECT

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Donald M. Middlebrooks, United States District Court Judge for the Southern District of Florida, within **FOURTEEN (14) CALENDAR DAYS** of being served with a copy of this Report and Recommendation. Failure to timely file objections shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016).

**If counsel do not intend to file objections, they shall file a notice advising the District Court within FIVE CALENDAR DAYS of this Report and Recommendation.**

**DONE AND SUBMITTED** in Chambers this 13th day of February, 2023, at

West Palm Beach in the Southern District of Florida.

_____
BRUCE REINHART
UNITED STATES MAGISTRATE JUDGE