UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA

                      CASE NO. 22-CV-80418-DMM

CITY OF ATLANTA POLICE
OFFICERS' PENSION PLAN, *et al.*,

                                        West Palm Beach, Florida
                Plaintiff(s),
                                        December 13, 2022
          vs.

CELSIUS HOLDINGS, INC.,

                Defendant(s).      Pages 1 – 64
------------------------------------------------------------

                        MOTION HEARING
           TRANSCRIBED FROM DIGITAL AUDIO RECORDING
          BEFORE THE HONORABLE BRUCE E. REINHART
               UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PLAINTIFF(S):  CAITLIN MOYNA, ESQ.
                       DANIEL L. BERGER, ESQ.
                       MICA COCCO, ESQ.
                       VINCENT PONTRELLO, ESQ.
                       GRANT & EISENHOFER, P.A.
                       485 Lexington Avenue
                       New York, NY 10017
                       (646) 722-8500
                       cmoyna@gelaw.com
                       dberger@gelaw.com
                       mcocco@gelaw.com
                       vpontrello@gelaw.com


                       JEFFREY REEVES, ESQ.
                       THE REEVES LAW FIRM, LLC
                       1100 Peachtree Street
                       Atlanta, GA 30309
                       (404) 795-6139

APPEARANCES (CONT'D)


FOR THE PLAINTIFF(S):   ROBERT D. KLAUSNER, ESQ.
                        KLAUSNER KAUFMAN JENSEN & LEVINSON, P.A.
                        10059 NW 1st Court
                        Plantation, FL 33324
                        (954) 916-1202
                        bob@robertdklausner.com


FOR THE DEFENDANT(S):   THEODORE J. SAWICKI, ESQ.
                        JASON R. OUTLAW, ESQ.
                        JOHN A. JORDAK, ESQ.
                        ALSTON & BIRD
                        1201 West Peachtree Street
                        Atlanta, GA 30309
                        (404) 881-7868
                        tod.sawicki@alston.com
                        jason.outlaw@alston.com
                        john.jordak@alston.com


                        JOSEPH G. TULLY, ESQ.
                        ALSTON & BIRD
                        90 Park Avenue
                        New York, NY 10016
                        (212) 210-9493
                        joe.tully@alston.com

TRANSCRIBED BY:         Joanne Mancari, RPR, CRR, CSR
                        Court Reporter
                        jemancari@gmail.com

Thereupon,

the following proceedings were held via Zoom videoconference:

THE COURT:  Good afternoon, everybody.

This is case No. 22 80418, City of Atlanta Police Officers' Pension Plan and City of Atlanta Firefighters' Pension Plan, *et al.* v. Celsius Holdings, Inc., John Fieldly, and Edwin Negron-Carballo.

May I have appearances, please.

Let me start with lead counsel for the plaintiffs or counsel for the plaintiffs today.

MS. MOYNA:  Thank you.  Good afternoon, your Honor. This is Caitlin Moynan for the plaintiffs, with Grant & Eisenhofer.  I will just mention, with me in the room are Mica Cocco and Vincent Pontrello, also from Grant & Eisenhofer.

THE COURT:  Good afternoon.

How about you, Ms. Moyna, you'll be speaking on behalf of the plaintiffs this afternoon?

MS. MOYNA:  That's correct, your Honor.

THE COURT:  All right.  Welcome.

Who do I have on behalf of the Celsius Holdings, Inc.?

MR. SAWICKI:  Good afternoon, your Honor.  My name is Todd Sawicki, with Alston & Bird.  Along with me on the cameras are Joe Tully, Jason Outlaw, and John Jordak.

Mr. Tully is going to be giving the argument this afternoon for the defendants.

THE COURT: Very good. Thank you very much. Good afternoon to all of you.

MS. MOYNA: Sorry to interrupt. I neglected to mention Daniel Berger, who is on the camera as well. I think he was going to introduce himself, but he is here for the plaintiffs as well.

THE COURT: Welcome. Welcome, Mr. Berger.

MR. BERGER: Thank you, your Honor. I appreciate that.

THE COURT: Mr. Tully, are you here on behalf of all three defendants or solely on behalf of Celsius Holdings? You are on mute.

MR. TULLY: All three defendants, your Honor.

THE COURT: Very good. All right.

Are there any other counsel on the call who want to make an appearance at this time?

MR. KLAUSNER: Robert Klausner. I am the liaison counsel for the plaintiffs.

THE COURT: Good afternoon, Mr. Klausner.

MR. KLAUSNER: Good afternoon, your Honor.

MR. REEVES: Good afternoon, your Honor. Jeffrey Reeves, cocounsel for the plaintiffs, with the Reeves Law Firm.

THE COURT: Mr. Reeves, good afternoon.

I know we had a member of the media who wanted to participate, which is fine, but I had to limit them to being on

the phone because under the regulations of the Administrative Office of the Courts, even allowing them to participate in a Zoom call would be considered having cameras in the courtroom, which we are not allowed to do.  They or any other member of the public who wanted to phone in were permitted to phone in.

I also want to identify for the parties, you will see the name Heather Kenny on the screen as well.  Ms. Kenny is my law clerk.  So she is properly here on the call.

Let's proceed to the matter at hand.  We are here today for oral argument on the motion to dismiss the amended complaint, which was referred to me by Judge Middlebrooks.

I did have a chance to review the amended complaint itself, at docket entry 44, the motion to dismiss, at docket entry 47, along with the set of attachments, the opposition at docket entry 48, and the reply -- I think it had some attachments as well -- and the reply, at docket entry 49.

Did the plaintiffs file any additional filings that I haven't referenced?

MS. MOYNA:  They have not, your Honor.

THE COURT:  Thank you.

Mr. Tully, on behalf of the defense, did the defense file any other filings that I haven't reviewed?

MR. TULLY:  No, your Honor.

THE COURT:  OK.  Great.

As I said, I have reviewed it.  So I'm generally

familiar with the arguments, and I have a couple of preliminary questions that I will get to in a second.

It seems to me the issue here is really the scienter question.  I think the defendants as much as admit that there were overstatements of income and net income and they're not, at least at this stage, arguing that the complaint, the amended complaint, doesn't adequately allege inaccurate statements and allege any of the other elements.

As I read it, Mr. Tully -- when you have a chance to speak, you can correct me if I'm wrong -- it seemed to me the real issue here was a sufficiently-pled allegation of scienter under the heightened pleading requirements of the PSLRA.

Before I get to that, the defendants in their motion did append seven items that are not attached to the complaint, obviously.  Ordinarily the court has some limitation on its ability to consider filings that are outside the four corners of the complaint.  The defendants cite to the case law here in the Eleventh Circuit that does allow the court to review matters that are either referenced or incorporated by reference into the complaint or are integral to the issues.

Let me first turn to Ms. Moynan.  I didn't notice in your response that you had objected to the court considering those, but I wanted to give you an opportunity, if you wanted to address that issue first, to address the issue whether you have an objection to the court considering the seven exhibits

that were appended to the motion.

MS. MOYNA:  Yes, Judge.  To the extent they were SEC public filings, we do not object to consideration of those.

THE COURT:  OK.  I think that would -- the only one I think in itself was an SEC filing -- you will have to tell me whether the proxy statement was.  I know the Form 10-K, the Form 8-K, the Form 4s were, and then there was the historical stock price from Yahoo Finance and a proxy statement.

Do you have objection to either of those, Ms. Moynan?

MS. MOYNA:  We don't have an objection to the historical stock price, no.

THE COURT:  OK.  You will have to educate me.  Is the proxy statement also filed with the SEC?

MS. MOYNA:  Yes, it is.

THE COURT:  All right.  So thank you.

So you don't object to me considering those. Understanding, you're not waiving your right to waive or you're waiving your right to argue that I should give them no weight, but you're not objecting to me considering them, is that correct?

MS. MOYNA:  Correct, your Honor.  Yes.

THE COURT:  Then a question, I guess, to Mr. Tully. Again, I understand, and I've looked at the cases, and under the PSLRA -- I always get the order wrong -- there is a heightened scienter pleading requirement, but you do agree that

I still have to view the pleadings in the amended complaint in the light most favorable to the plaintiff? Do you agree with that, Mr. Tully?

MR. TULLY: Well, I think you have to. With respect to scienter, there is a heightened pleading requirement that the plaintiffs have to plead specific allegations that would raise a strong inference of scienter.

THE COURT: Right.

MR. TULLY: And I think --

THE COURT: I will let you argue that in a second. I'm just asking to make sure, whatever facts they have pled, and it may be your argument is they haven't pled enough, but whatever facts they have pled, do you agree I still need to view those in the light most favorable to them at this stage?

MR. TULLY: I think the distinction I was trying to draw is it is not notice pleading, that the Reform Act has added the layer of heightened pleading requirements.

THE COURT: No, again, I agree with you, and I don't think Ms. Moyna is going to disagree with you. It says what it says. Their argument simply is whatever that higher level is, we've met it.

My question is, I, as the court, have to view whatever facts are pled. In a non-PSLRA case I would view them in the light most favorable to the plaintiff and then I would assess whether, viewing them in the light most favorable to the

plaintiff, the plaintiff jumped over the hurdle.

Now what your position is in this case is the hurdle is higher, but my question is simply, do you agree that I still need to view the evidence in that light in assessing whether they've jumped over the hurdle?

MR. TULLY:  For example, maybe Tellabs is a good way to frame it, that if there's an equally reasonable inference to be drawn from the facts alleged, I think your Honor has to consider it.

THE COURT:  OK.  I understand your position.  I will take that under advisement.

Thank you both for answering those couple of preliminary questions.

I guess there was one other.  Mr. Tully, you can address this in the course of your remarks if you want or you can address it up front.  That was the issue of the plaintiff actually citing to an expert's report in the complaint.  I have to tell you, I've never seen it before.

I understand your position is I can't consider it.  If you make a point of addressing that in the course of your remarks, I would be interested in any additional thoughts you have on that.

With that, let me turn to Mr. Tully.  It is your motion.  I will give you the first and last word to argue it as you see fit.

MR. TULLY:  OK.

THE COURT:  So please proceed.

MR. TULLY:  I will move the podium behind me, your Honor, if you don't mind.

THE COURT:  Of course.  Whatever.

MR. TULLY:  Just to answer your Honor's two preliminary -- I shifted somehow.

THE COURT:  That is all right.  I can hear you.

MR. TULLY:  That is OK.  I will go back to the seat, your Honor.  I don't know how that happened.

THE COURT:  It is OK.

MR. TULLY:  To answer your Honor's preliminary questions, we do dispute that they have alleged falsely with respect to the internal controls, and I will get to that, but I just wanted to flag that.

THE COURT:  OK.

MR. TULLY:  Then with respect to the reference to an expert in the amended complaint, they do less than attach a report.  All they do is include conclusory opinions from an unnamed expert, labeled an expert, but without any credentials to assess whether he should be considered an expert and without any type of Daubert analysis for your Honor to be able to make such an assessment.

We view his opinions are completely conclusory.  So under the Reform Act, again, we think they should not be

considered because he makes no specific allegations.

I can come to that later, because your Honor raised it, and I would be happy to answer more questions, but I thought it would be worthwhile, it was top of mind for both of us.

THE COURT:  Sure.  I guess there was one other factual question.

MR. TULLY:  Sure.

THE COURT:  Maybe you are in the position to answer. It was just confusing to me in looking through all this.

So your client has these stock option issues that have gone on for a number of years, have been accounted for in a particular way until the year in question here.

Is the position of the parties that something was done differently that year and that we all are in agreement that the prior X number of years were done correctly and that something was done wrong in this year, or is there an argument that it's always been done -- maybe I should ask this to Ms. Moynan -- that it's always been done incorrectly?

MS. MOYNA:  Your first instinct was correct, your Honor.  The plaintiffs' position is that this rule applied for at least 15 years at this company and it was always applied correctly in the five years.

THE COURT:  OK.

MS. MOYNA:  They applied it incorrectly in 2021.

THE COURT:  OK.  Thank you for clarifying that.

Mr. Tully, I apologize for interrupting you.  I will let you have the floor.

MR. TULLY:  Sure.  I think it is true that the plaintiffs allege in the amended complaint that the rule was applied correctly in the past, but they do so, as with all their allegations, make that just in a conclusory fashion.

So, for example, they don't say that in the past the company had a situation where individuals were going to depart full-time employment with the company but were going to continue under contractual services.  This is the explanation in an earnings call that the CEO gave, and that is in the amended complaint.  So they don't say there's been a past situation where a full-time employee is going to leave the employ of the company, continue under contractual services, providing services to the company, and the company approached it one way in the past and approached it a different way in the two quarters that are at issue here.  So they don't -- sorry, your Honor.

THE COURT:  I was going to say, so your position is something was different this year because we had contract -- we had contracted with these retired or former employees and we got it wrong.  That was a new thing this year?

MR. TULLY:  Well, I don't think it's -- it's the facts that are -- I don't want to say it is a new thing because the

complaint doesn't talk about, again, this situation having presented itself before with the contractual services being continued to be offered by people.

To be honest, because we are not at any discovery phase, of course, we have to take the complaint we were given, we haven't done a deep dive to see if this has ever happened before.

What we would say is that when you look at the transaction -- look at the rule, as the plaintiffs describe it, you look at the company's explanation as to why they got it wrong, you can see why the ambiguity arose, and I can walk your Honor through that if you think it is helpful, your Honor.

THE COURT:  It is your argument.  If you want to do it.  I think I understand it, but if you want to be double careful, I won't be offended if you explain to me something that I already know.

MR. TULLY:  Only because we were focusing on that. The thing that was -- it wasn't different, but that there was an ambiguity here is explained by comparing those two things.

THE COURT:  Understood.

So I want to phrase this correctly.  As I recall reading somewhere, the explanation that was given when the restatement of earnings was announced was that the company had -- that the company's interpretation of the GAAP regulation was wrong and had to be redone, and did the CEO say it was

because we have these employees that are on contract this year?

MR. TULLY:  Yes.  I will walk through, your Honor, just because I think it is helpful for everyone.

THE COURT:  Please.

MR. TULLY:  Yes.  Let's start with the way the plaintiffs describe the rule.  According to the plaintiffs, the guidance tells you that when an employee stopped working at Celsius, Celsius needed to make a determination about whether the original vesting conditions for that employee's stock award were capable of achievement.  If the investment conditions were achievable, Celsius had to recognize that expense in the quarter in which the employee ceased to work at Celsius.

Here, the vesting condition, original vesting condition, according to the complaint, was additional years of service.  So that last point, additional years of service, was the point that created the ambiguity, when you listen to the CEO's explanations, that which occurred during the earnings call we referenced earlier.

Mr. Fieldly, the CEO, explained that the former employees at issue would still continue providing services to the company under contracts.  Exactly what he said is:  "It was also -- it's a technical aspect there because some of them are still providing services through contractual services."

In other words, because the employees would continue to provide services to the company, Celsius originally

understood that the day of termination for those employees, at least under GAAP, had yet to occur.

THE COURT:  When you say created the ambiguity, the ambiguity was whether to accelerate the revenue because the employment had terminated as opposed to the term of employment was ongoing so therefore there was no need to accelerate yet.

MR. TULLY:  Exactly.  The vesting condition was original years of service.  These people were no longer full-time employees but they were going to be providing contractual services.  So the ambiguity became, do they have additional years of service.  If they do, we expense this non-cash expense over time.  If they do not, we have to expense it in this quarter.

I think in talking about this I realize there is an important point to make about these non-cash expenses.  They had been deferred over time and now they were being pulled forward into two quarters.  In other words, they were known or appeared in the financial statements before the change in treatment; they just got pulled forward to the current quarter in which the employee no longer worked for Celsius.  At least when the financials were restated.

That is in contrast to the cases that the plaintiffs rely on where there are things like a restatement for revenue, which is a core, obviously, purpose of the business, is to sell products and generate revenue for them.  Plaintiffs' cases, if

there is a surprise with respect to that, that is a whole different animal than these non-cash expenses that we have here.

I will take note that the complaint never disputes the truth of that explanation or it appears within the complaint, in the section that's titled The Truth is Revealed.  It's framed as a corrected disclosure.  It is only in the opposition brief that they take potshots at the explanation, but obviously that is inappropriate on a motion to dismiss.

THE COURT:  OK.

MR. TULLY:  I think, coming back to my argument, this case is, I think, a paradigm of what the Reform Act tries to prevent.  The Reform Act was enacted because Congress saw, and we put this in our briefing, that strike suits had a potential to chill disclosures, and also that they're premised on nothing more than bad news rather than any evidence of fraud.

This case, this strike suit is premised on just that -- the company's announcement of the change in GAAP treatment.

I think it is important to -- Judge Middlebrooks has dealt with this issue before.  We cite the case in our brief In Re Sportsline.com Securities Litigation, and Judge Middlebrooks, from his decision, held:  "Violations of GAAP without more may establish negligence but can never establish scienter."

Later he elaborates on that point saying:  "Without any additional evidence of scienter, defendants' failure to follow GAAP for publication of inaccurate accounting figures is insufficient to state the claim for securities fraud."

THE COURT:  Right.  So I think what your opponent points to, and I will have Ms. Moynan flesh this out, but if you want to address it -- again, you addressed it in your pleadings -- is, I count maybe half a dozen things they point to, which is what makes this different from kind of the mine-run negligent accounting mistake, is a need to maintain growth as a business development strategy, the fact that the CEO and the CFO here are CPAs in their own right and that the CFO manages the accounting department, and it's a pretty small accounting department, that there was, in their view, insider trading going on.  So there was a motivation to keep the stock price up.  There were cash bonuses at stake.  There was a motivation to keep revenue and profitability up.  That the magnitude of the overstatement makes it different from the average, and that there's a past history that they knew how to do it right, which suggests that they knew how to do it right.  So they must have known how to do it wrong.  And that the regulation is clear and easy to understand.

As I read their very lengthy complaint, that's what it really, to me, boiled down to.  Those were the facts that they were pointing to that differentiated this from what you

construe as a simple accounting mistake.

I know you addressed them in your pleading individually, but if you want to address them now globally or however, that is my response to what you're saying right now.

MR. TULLY:  Sure.

THE COURT:  I think they would agree with you, again, that they have to prove more than it was a simple accounting mistake, but those are the facts that they point to.

MR. TULLY:  I mean, those are certainly their allegations, but I think all of those cases or all of those types of allegations are addressed in cases we cite, starting with Judge Middlebrooks' decision in In Re Sportsline, where he says, and taking these -- not taking them all in order as you raised them, but the role of someone, a senior role within a public company and their access to information doesn't do it. You need to show that they had access to some information that contradicted their public statements.

Going also to the financial motives, starting with maybe the cash bonuses, this is just something that plaintiffs objectively got wrong, and it is the proxy that we talked about that demonstrates this.

The company filed a proxy in April of this year, meaning after the initial complaint was filed, after the restatement occurred, and that proxy demonstrates that the Compensation Committee benchmarked the cash bonuses using the

fiscal year 2021 annual statement, filed in March 2022, which included the restated results for two quarters.

We have a demonstrative that, if it is helpful for your Honor, we can show you, which shows the excerpted parts of that or has excerpts, screenshots of that proxy where the disclosures appear.  Otherwise, I could point your Honor to the page numbers.

THE COURT:  If you've got it handy and you want to show it to me, I'm happy to see it.

MR. TULLY:  Sure.  My colleague will share his screen, which should be able to --

THE COURT:  OK.  Great.  Which colleague?  You have a number of them on the call with you.

MR. OUTLAW:  Your Honor, Jason Outlaw here in Atlanta.

Joe, unfortunately, screen-sharing is disabled by the host.

THE COURT:  I can do that.  That is on me.

Hold on.

(Pause)

THE COURT:  Try it again now and see if that works.

MR. OUTLAW:  It did not.  Sorry.

THE COURT:  Hold on.  Now try it.  There we go.  All right.

MR. TULLY:  OK, your Honor.  So this shows, and it is blocked on my screen, the citation.

THE COURT:  That's fine.

MR. TULLY:  So this is the proxy that was filed April 21, 2022.  This is Exhibit G to my colleague, Mr. Sawicki's, declaration.

THE COURT:  Right.

MR. TULLY:  This is just the coverage page, for frame of reference.

If we go to the next slide, this shows -- sorry.  It is a little easier for me to read it on the screen.  I have it in front of me.

This includes an executive summary that summarizes the 2021 financial performance highlights.  We have highlighted a number of items here, but I think the most important one is the bullet point that begins "net income of $3.9 million in 2021."

That's the restated net income number.

You will see it gives -- it then, in a parenthetical phrase, it gives the restated amounts of non-share cash-based compensation, not the original figures.

If we go to the next slide, you will see the highlighted portion, and the page numbers of the actual filing with the court appear at the top here, just for your reference. That highlighted portion there explains that at the beginning of 2021 the Compensation Committee set benchmarks or targets for the executives.

Then the next slide, this shows you that the company

then set the bonuses using a 2021 target and the actual 2021 results, which, again, included the restated numbers for the two quarters.

So if anything, your Honor, and we talked about Tellabs and its instruction to draw reasonable inferences even if they're in the favor of the defendants, the fact the Compensation Committee here was aware of the GAAP error, aware of the restatement, and still provided what plaintiffs have termed a generous bonus I think negates an inference of scienter because it would not make sense for the Compensation Committee to do this if they thought there was any inkling that these individuals engaged in fraud.

So that is the bonuses. I think it's clear the plaintiffs either misunderstood or missed these disclosures that were in the proxy.

Now to the stock trade.

The complaint alleges that Mr. Fieldly was motivated to commit fraud because of a desire to cash out his Celsius stock at artificially inflated prices, but when you apply the three-factor test that courts in this Circuit consider, it's clear that there is nothing unusual or suspicious about Mr. Fieldly's trade and certainly no attempt to cash out a position.

The first factor examines whether all defendants sold stock during the class period, and Mr. Negron sold no stock.

In fact, his position declined over the class period.  That rebuts any inference that Mr. Negron was financially motivated to commit fraud here, especially when you consider his cash bonus was not based on the original numbers; they were based on the restated numbers.

Worth noting too, which we will mention Mr. Negron, his decision to retire has no bearing on scienter.  He continues with the company in an executive role to 2023 to help assure the transition to the new CFO who is currently at the company.  That also appears in the proxy, and it appeared in the 8-K that announced his retirement, which the plaintiffs, I believe, reference -- which is referenced in the plaintiffs' complaint.

The second factor examined the percentage of the individual's holdings that are sold in the class period.

This is, I think, particularly relevant to look at because the plaintiffs have drawn our attention to it, right. They say he's trying to cash out his position.  So you have to look at what he actually did.

In the one trade in the class period Mr. Fieldly sold 20,000 out of 285,252 shares that he held, 7 percent of his holdings.  That sale of a small percentage of Mr. Fieldly's total holdings is inconsistent with the plaintiffs' allegations that he was trying to cash out a position to take advantage of the alleged fraud.  Also, Mr. Fieldly also lost money on his

position during the class period.  This is stacking up to not be a very smart fraud the way it's been pled.

The third factor compares the stock sales that occurred -- sorry.  The third factor looks at the individual's trading history.

The complaint is completely silent on Mr. Fieldly's trading history.  I think that is particularly fatal because of the standard in this Circuit, that they have to show that the trades are somehow suspicious or unusual.

So what they have asked your Honor to do is to look at this one trade in a complete vacuum, which is not what the format allows.

It is clear why they didn't address it, because it didn't bolster their arguments; it under cut them.

Mr. Fieldly's largest transaction of fiscal year 2021 occurred two months prior to the start of the class period when he sold 35, 34 percent of his holdings.  I think it is 34.5 percent of his holdings.  Such a significant sale on the eve of the class period, when, according to plaintiffs, the benefits of the fraud were presumably set to begin, and one small sale during it, stands at odds with the type of trading that would reveal a financial motive, or certainly that would be suspicious or unusual.

With respect to the 10b5-1 plan that Mr. Fieldly adopted, the cases that plaintiff cite that reference such a

trading plan, the courts focus on two factors really.  One is, was the plan adopted on the immediate eve of a price drop or, two, in those cases courts looked at multiple sales during a class period that were suspiciously timed to the disclosures that the company made.

Here you have one trade, but plaintiffs never try to tie that trade to a specific disclosure, except for generally. If you look at the cases plaintiffs cite, the trade and the announcement are in close proximity together, and the fact that there's multiple creates a pattern, which I think is important for the holdings in those cases and something that we just don't have here.

We had mentioned the expert earlier, and I would just like to return to that for a second on the GAAP error.

Besides the fact that he doesn't want or decided not to associate his name or his credentials with the opinion that he rendered, if you look at the complaint, I think it is more important that he never made an assessment of Mr. Fieldly's explanation.  He never said if it was reasonable.  It is not even clear it was provided to him.

I think that's important because it makes his opinion worthless, because you can have in a simple rule, but the world is complex.  If there is a different set of facts that make the rule create an ambiguity, the expert would have had to assess those, which he didn't.

The same thing with respect to the Deloitte quote. They quote from Deloitte, but it is not clear where that quote came from, who at Deloitte made it, what their position was. Regardless, though, if you look at that quote, it only says that the rule had been simplified. It doesn't say it is unequivocal. It doesn't say this is the last alert we'll be issuing about this rule because now there's no reason to ever try to make it clearer. It just says that the governing body tried to make it simpler and it reported that news.

I think also -- I'm not sure if your Honor mentioned this -- but the confidential witnesses, I'd like to just address those very briefly, if I could, because plaintiffs also suggest those are somehow helpful for your Honor's scienter analysis.

In this Circuit courts look at three things with respect to confidential witnesses. One is the particularity of the allegations; two is the foundation of the witness' allegations, including what position they had, their proximity to defraud; and third is the relevant time frame.

It is that last one of those that I want to focus on first because there is something peculiar about the way the plaintiffs alleged facts about these four witnesses.

There are four confidential witnesses, and for three of them the plaintiffs provide the month and date that the individual ceased working at Celsius. Those time frames, at

least in part, overlap with the class period.

For one witness, the last witness, CW3 -- that is how it is labeled in the amended complaint, and this is the witness who most of the statements are attributed to.  The complaint states only that the individual separated from Celsius in 2021. It does not allege what month the individual left the company.

Because plaintiffs elected to omit this material information, it's impossible to know whether CW3 worked at Celsius during the class period.  If CW3 did not work at Celsius during the class period, when the fraud is alleged to have occurred, his or her recollections of the company have no relevance.

Regardless, the recollections of CW3 and the other witnesses have no bearing on the alleged fraud because they tell us nothing about the foundation of their knowledge and lack any particular allegations.  For example, no allegations about any accounting experience they have, whether they worked in the Celsius accounting department, nothing from the witnesses on how the company applied ASC 718 in the past or during the class period.

What they do offer, the confidential witnesses, CW3 and one other, say that Mr. Negron delayed paying invoices to manage cash flow, but that has no bearing on this fraud that the plaintiffs have alleged here or any other.

For example, if someone neglects to skip a credit card

payment to save (inaudible) in a given month and pays it in a later period, paying interest or not, we don't suspect they have a proclivity to commit fraud.  And that's just one of the many absurd premises that plaintiffs ask this court to accept.

There's another one, which is that Mr. Negron and Mr. Fieldly decided to risk their careers and commit fraud in the middle of 2021 at the same time they decided to part ways with a regional accounting firm and take on Ernst & Young, one of the most sophisticated accounting firms in the world, as their auditor.  That just doesn't make sense.

I do want to turn to falsity, but I also wanted to reference the magnitude of the fraud.

I think one thing we point to in the brief, the Eleventh Circuit has said that you have to look at revenue rather than comparing it to net income.  When you do that here, it's about 5 percent of annual revenue, is the adjustment.

Also, in the cases the opposition cites, where magnitude was considered, they all involved fabrications of sales for revenue.  Judge Middlebrooks -- there is a reason why those cases, I think it is important that those cases are focused on sales and revenue, is that is the core business activity of that organization -- selling products, getting revenues from it.  It is not like we have here, a non-cash accounting loss or accounting entry.

Judge Middlebrooks realized this, and it is part of

his decision in In Re Sportsline.  Judge Middlebrooks concluded that accounting for non-cash compensation expenses does not concern a business's core business activity.

I can quote.  It is at page 1170.

"The GAAP violations primarily concern the accounting firm employee's stock option plan, not part of Sportsline's core business activity."

Celsius' core business activity is selling energy drinks and collecting payment in exchange for those drinks.  It is not the accounting entries for non-cash employee expenses. I think Judge Middlebrooks, that is what gets the core of his statement there.

I can go to --

THE COURT:  If you are done with that part of it, I do want you to address falsity before you conclude.

MR. TULLY:  Sure.

THE COURT:  But if you haven't concluded that part of it, again, I want to give you as much time as you need.

MR. TULLY:  I appreciate that, your Honor.

I would say, if we are going to leave that, I will quickly say that plaintiffs said that GAAP violations routinely form the basis of security fraud actions.  They may form the basis of the actions, but they are routinely, or they rarely survive dismissal.

I think in our papers we show that they had to cast

back some 50 years to find a case in this district where a court actually allowed the claim to survive dismissal.

They also reference in the complaint that the GAAP rules include helpful examples, but they don't allege that any of those helpful examples include someone providing contractual services following the end of their full employment with the company.

One last thing.  I promise.

Some parts of the complaint and in the briefing they talk about internal policies being violated, but they create another tautology where they say, well, the company had a policy to use GAAP.  The fact that they violated that policy bolsters the fact that there was also a GAAP violation.

If you look at cases that actually considered a violation of a company policy, and there's Schultz v. Applica, Inc. is a Southern District of Florida case included in the briefing that did, you see there, one, it involved revenue, sales, and, two, the policy was the way that the company would recognize sales.  Because obviously how you recognize products can be a complicated issue.  So they had an internal policy on revenue recognition that was also violated independent of the GAAP violation.

Just turning to falsity, your Honor, the allegations about falsity or with respect to the internal controls focus on the conclusions or, sorry, the company's disclosures in two

quarters of fiscal year 2021 when the company referenced its internal controls and conclusions the individual defendants had reached with respect to them.

THE COURT:  All right.  That's the Dodd-Frank-required certification by the CEO and CFO, am I right?

MR. TULLY:  It's in the quarterly filings, your Honor.

THE COURT:  Right.  I have some recollection from the distant past when I was a practicing lawyer that was a Dodd-Frank or Sarbanes-Oxley requirement, that the CEO and CFO personally certify certain aspects of annual financial reporting.

MR. TULLY:  That's right.

THE COURT:  So maybe it has to do with nothing, but --

MR. TULLY:  That is correct, your Honor.

THE COURT:  All right.

MR. TULLY:  Again, similar to the GAAP allegations, they base the entire claims about the falsity of internal controls is that the company at a later time identified weaknesses in those internal controls.  But applying the Omnicare analysis requires us to look at two things.

Omnicare tells us that an opinion statement can only be false if either the opinion falsely describes a defendant's state of mind or it contains an embedded false statement in fact.

Plaintiffs allege nothing to suggest that in the

second and third quarters of fiscal year 2021 the individual defendants subjectively viewed the internal controls as anything but effective.

As to the second point, the complaint does not allege that the individual defendant's conclusions about internal controls contain false statements of fact.  For example, the disclosures say that the individual defendants reached their conclusions after review of the controls.  The complaint does not say such a review never took place.

As Omnicare says, the fact an opinion turned out to be wrong does not create a securities fraud claim.

Your Honor, I think -- sorry.

THE COURT:  Stick with me on that, because I am trying to follow along.

I'm looking at the complaint.  Paragraph 132 is where, I think, they quote the alleged false statement.  Am I looking at the right thing there, Mr. Tully?  Is that the alleged false statement relating to internal controls, 132?

It says:  "Our president and CEO and our chief financial officer have concluded that as June 30th "-- so this would be for the second quarter -- "our disclosure controls and procedures were effective in that, A, we maintain records," etc.

MR. TULLY:  That's correct, your Honor.

THE COURT:  I'm sorry.  Where does it reflect that

this was based upon them having reviewed the controls or not having reviewed the controls?  Is that in the complaint or is that in the actual document that you have appended to your --

MR. TULLY:  That's correct, your Honor.  It is in the document that we appended.

THE COURT:  So it's not in the complaint.  The qualifying language you're pointing to is not in the complaint.

MR. TULLY:  Correct.

THE COURT:  OK.  Understood.

Your position, I guess, is that what is in paragraph 132 is completely consistent with someone who honestly believed what they were saying was true and then they found out later from their auditors that they were wrong and so they went back and they fixed it.

MR. TULLY:  Exactly, your Honor, and obviously in a lot of those instances it focuses on the basis for the opinion, and that was my point of referencing the review.

THE COURT:  Got it.  OK.  Got it.

MR. TULLY:  I can turn the floor over, your Honor.

THE COURT:  I will give you the last word after I hear from Ms. Moynan because it is your burden on the motion to dismiss.

All right.  Thank you.  I will give you a chance to have the final word.

Ms. Moynan, you have been very patient in waiting and

so I will give you the floor as well.  So take the argument in whatever order or sequencing that you would like.

Let me just see if I had any preliminary questions I wanted to ask you before you do that.  No, I don't think I do.

Let me just allow you to organize your remarks however you would like to organize them.

MS. MOYNA:  Perfect.  Thank you, your Honor.  I really appreciate the opportunity to appear before you this afternoon.

Mr. Tully did raise a number of questions that I have responses to, but if it is OK with your Honor, I would just like to address them in the course that I sort of have.

THE COURT:  Yes.

MS. MOYNA:  Perfect.  All right.

So before we get into sort of the specific scienter facts, which actually your Honor sort of summarized them very well at the beginning before Mr. Tully spoke, I think it is important to recognize the backdrop and sort of the pressures that were on Mr. Fieldly and Mr. Negron.  I have been calling him Negron-Carballo.  I don't know if he just goes by Mr. Negron or we can just call him the CFO maybe for this argument.

The fact is that investors and analysts were really hyper-focused on the company's net income.  This was an extremely important metric to them.

What you have here is a company whose revenues were

rising astronomically.  By all accounts in the revenue column they were doing fantastic.  In the first quarter of 2021, the revenues were 50 million.  This was a massive increase from the revenues of the same quarter in 2020 for 28 million.  So almost double the revenues.

However, in that same quarter -- we are talking about the first quarter of 2021 -- the net income, which is the profits really, barely ticked up.  They went from 546,000 to 585,000.  So you're seeing these revenues are growing, but they're obviously costing the company a lot of money, and investors and analysts took notice of this.  They said, that's great that the revenues are doing so well, but where are the profits, why aren't the profits going up.

So we cite to a few analyst reports in the complaint.  For example, Credit Suisse in April of 2021 specifically called out that Celsius' SG&A expenses appear high even for a company of this size and at this stage of growth, and it noted that Celsius had only just turned an operating profit.

So this was something that was very important to the CEO, the CFO, and to investors.

So in terms of some of the remarks that Mr. Tully made, for example, I think he said that net income is -- he said revenue is the key metric, but really what this has to do with is net income, and this was really a core metric for analysts and investors.

THE COURT:  Let me pause you there for a second. Assume that's all true, that it was important to the analysts and the investors, why should I draw an inference that the CEO and the CFO know that and care about that?  Maybe it is self-evident to everybody in the public stock world, but what do I look to in the complaint that says, well, the CEO and the CFO knew what the analysts from Morgan Stanley or Jeffries or whatever was saying?  If they don't know that this is what the market's concerned about, I don't see how I draw an inference that they would have a motive to commit fraud.

MS. MOYNA:  So these were discussed during analysts' reports, and we do cite in paragraph 52:  On May 21, 2021, Yahoo Finance held an interview with John Fieldly.

THE COURT:  OK.

MS. MOYNA:  And an analyst voiced concerns about the expenses were climbing very high, this was negatively affecting the company's margins.

Here.

THE COURT:  OK.

MS. MOYNA:  Here he said:  "John, in the first quarter, you know, just looking at the margins, margins did take a hit.  And you call that higher input costs."

Then they talk about a can shortage that the industry was experiencing and that this was affecting costs.

THE COURT:  Right.

MS. MOYNA: So I think, at a minimum, you can draw the inference that the CEO and the CFO knew that the market was concerned about net income.

THE COURT: OK.

MS. MOYNA: So you get to the second quarter of 2021 and, again, the revenues were very impressive. The revenues had climbed to 65 million for the second quarter, and that was more than double in the same quarter in 2020, where they only had revenues of 30 million. So you have a doubling of revenues.

Then you look at, OK, what is the net income going to be for the quarter. Well, if you calculate the net income correctly, accounting for the stock-based compensation correctly, the net income is only $780,000. In the same quarter of 2020, the prior year, it was 1.2 million. So that was a significant decline from 2020.

The company did not want to have to report a decline, declining revenue to investors, and to the Street when it was experiencing such great growth and enthusiasm, it didn't want to quash that momentum.

So it turns out one of the biggest expenses for the second quarter in 2021 was associated with the termination of the nine employees and the resulting acceleration of the vesting schedules of their stock-based compensation. If you ignore that you have to expense that stock-based compensation

in the second quarter of 2021, the net income would be 3.96 million, which would be almost three times or more than three times the prior year's net income.

So they had a choice.  We can ignore the stock-based compensation and the fact that we have to expense it this quarter or we can account for it.  So what did they do?  They chose to ignore the stock-based compensation.  They reported the higher 3.96 million in net income.

Basically the same story was repeated for the same quarter of 2021, but even more dramatically.  The numbers were even more dramatic.  You have revenues were up to $95 million. If you account for the stock-based compensation appropriately, the net income was negative 9 million.  But if you ignore the stock-based compensation expenses, the net income which they reported was 2.75 million.

So we think an inference can be drawn that they had a choice of how to account for the stock-based compensation in those two quarters and they chose to ignore it because they didn't want to quash the momentum and the enthusiasm that investors and analysts had been showing for the company, and specifically with regard to net income it was important.

So with this fact --

THE COURT:  Let me pause you there because I am going to forget my question if I don't ask it now.

Again, that requires me to find that if they were

aware -- your argument is, look, they had to find some way to save revenue, right, to save expenses, to get rid of expenses, and they knew this was there and so they grabbed hold of this.

Again, point me to where in the complaint I can find that they knew that this was out there and it wasn't just an honest mistake that they said, well, we've always done it this way, we'll do it this way. Because you have alleged in paragraph 149 that is how they always did it. They always deferred it into the future.

MS. MOYNA: OK.

THE COURT: Tie that together for me.

MS. MOYNA: Right. So I think your question is -- and Mr. Tully said we didn't allege that we had the specific situation where you have some employees who leave the company and their stock grant is accelerated but they're still providing services to the company.

THE COURT: Right.

MS. MOYNA: So I think you can infer that fact from the fact that this company had been -- we do have facts in the complaint that the company compensated its employees through stock. That was one of its preferred methods of compensating employees. They had been using this rule since 2006. The CEO was the former CFO who had been the CFO since 2012. You can certainly draw the inference that at some point in those years somebody left the company and this situation presented itself.

I just want to explain -- Mr. Tully did explain the rule, but I think it is helpful, if your Honor would indulge me and allow me to explain sort of in my words.  Sometimes it gets a little muddled when it is in writing.  It is pretty simple.

Basically, when the company compensates employees through stock over a vesting schedule, it has to expense that. It is an expense to the company.  How does it die an expense? On the date that it gives the grant, it figures out what the stock is worth based on the trading price and it then is allowed to amortize it over whatever the vesting schedule is.

Now, when a person leaves, either through a resignation or a termination, which is the way that these nine employees left, the company might decide, you know what, you're leaving but we are going to accelerate your stock so you can take it with you.  Well, the accounting rule at issue here treats that as a new grant of stock.  So it essentially terminates the prior grant of stock and it treats it as a new grant.  So you have to value the stock on the date of modification, not the date that you last provide services to the company, the date that you decide to accelerate the vesting schedule.

Here, the decision to accelerate the vesting schedule was made pursuant to board resolutions and severance agreements.  So they had date certain, and also the CEO, especially with the board resolutions, would have known

certainly that the stock was being accelerated, the vesting schedules were being accelerated.

So now you are allowed to then recognize the expense over the remaining term.  Let's say somebody is going to stay on for an additional three months.  You can recognize the expense over those three months, but you have to value it as of the date of the modification.  In this case severance agreement or a board resolution.  So it is quite straightforward.

Now, I don't know if that answers your question about --

THE COURT:  Well, you explained to me how the grant works and that there is an acceleration of the recognition of the expense into the current year.  I mean, you said presumably in the prior nine years somebody left the company and they were familiar with how to do this.  Is that alleged in the complaint anywhere, that in the prior nine years somebody left the company and they actually had to apply the GAAP rule to this specific fact pattern?

MS. MOYNA:  We don't have a specific example of that alleged in the complaint.  Again, I think it is a fact that could be inferred, but we don't have a specific example.

THE COURT:  Inferred from what?

MS. MOYNA:  From the fact that the company providing compensation in stock was one of its preferred methods of compensating its employees.

THE COURT:  I understand that, but, for example, does the complaint allege how many employees had left in a prior eight or nine years?

MS. MOYNA:  It does not, your Honor.

THE COURT:  So what if it is only one or zero?  As far as I know it's zero, isn't it?

For purposes of this motion, am I not left with an allegation that nobody had ever left the company before?  What do you have that I can draw contrary to that conclusion?  If I can't draw that conclusion, how do I get to where you want me to get to, which is they knew this rule and they purposely chose to not comply with this rule?

MS. MOYNA:  Well, your Honor, we can certainly provide additional facts in an amended complaint if you think those facts are necessary to draw the inferences.

THE COURT:  Again, I'm not saying they are conclusive. I'm just trying to understand -- it is a long complaint.  I read it several times, but it is a lot to digest.  So if I missed it, I just want to make sure.  If I missed it, I missed it.

There is also, I guess, a reasonable inference the other way, which is over this period of time a company of this size is going to have people leaving, and so maybe there is an inference there.

MS. MOYNA:  I think that is the inference.  Again, as

Tellabs instructs, which I know your Honor is aware, if inferences are equal to each other, then sort of the tie goes to the plaintiff. So if you think the inferences are equal, then you would have to draw the inference in our favor, actually.

THE COURT: Understood. Understood.

I think I get back to the question I was asking Mr. Tully at the beginning, which is, I do have to view the evidence in the light most -- I believe I have to view the evidence in the light most favorable to the plaintiff at the margin. I am not weighing the evidence, but just looking at the individual facts, I have to look at the individual evidence in the light most favorable to the plaintiff.

Do you agree?

MS. MOYNA: Yes, your Honor.

THE COURT: I thought you might.

MS. MOYNA: I think a very strong inference can be drawn that the CFO personally was responsible for the quarterly report. So we are not just resting on he must have known because of his senior role and he was the CFO and had access to this information. This was a very small company with a minuscule accounting department. We have confidential witnesses that explain there were only a few employees in the accounting department; they had very loose processes and procedures. The CFO personally approved payments to vendors.

So I think the inference can certainly be drawn that he was the one who made the decision not to account for -- not to expense the stock-based compensation in the second and third quarters.

There is one other fact I would like to draw your attention to, and this has to do with what sort of you were ending with with Mr. Tully, which was the company explained that its internal controls were defective.

On May 10, 2022, and this is in paragraph 96 of the complaint, the company gave more specific reasons for why the internal controls were defective.  Specifically it said: "Management did not design and maintain: sufficient user access controls to ensure appropriate segregation of duties and adequately restrict user and privileged access to financial applications."

So to me, this reads that there was sort of one person who was in charge of everything in the accounting department, and that must have been Mr. Negron-Carballo.  He was the one who was calculating the expenses.  He was the one in charge of figuring out what the expenses were for the stock-based compensation, he was the one who figured out the impact on net income, and he was the one who decided what disclosures to make to investors.

So I think reading what the company tells us is the reason for why the internal controls were defective, certainly

an inference can be drawn that he was the one who made the decision and that he knew the effect it would have on the net income. So we're not just resting on he must have known this because of his high-ranking position.

We also have an allegation from one of our confidential witnesses that he had a history of making late payments to vendors. This wasn't to suggest that there was anything fraudulent about the late payments to vendors, but it does show that he was also focused on the costs associated with the revenue and keeping the costs down.

THE COURT: Isn't it equal inference there kind of what Mr. Tully argued, which is it's cash-flow driven. You sort of prioritize at the end of the month what bills you want to pay and how much cash you want to have on hand. If some vendor is willing to wait an extra -- when I was a practicing lawyer, I can tell you my clients all practiced this. They waited to pay until the very -- all the lawyers on the phone are laughing but they all know it is true. Every client in America does that. They want to wait to pay until the very last possible moment until you offer them a discount on their bill and then they are willing to accelerate payment. That didn't go to necessarily their revenue or income or expense side; it went more to cash flow.

Does that matter to my analysis? Maybe that is a big windup to the question. Does it matter? If he is doing the

same thing for just a maximized cash flow, is that consistent with your position anyway or is it different?

MS. MOYNA:  Well, I mean, the allegation we have in paragraph 34 is --

THE COURT:  "CW3 attributed the anemic accounting department to the individual defendants' desire to keep costs low, so that it could elevate cash flow."

Again, stock options are a way to maintain cash flow. Maybe that is still consistent with your theory that they had a motive to understate -- to under-recognize the revenue stream. I just wanted to clarify if you think it is.

MS. MOYNA:  The point is that he was focused on costs. He was trying to keep costs low.  This was something that they were aware of.

Now I want to talk about the explanation that Mr. Fieldly gave for the inappropriate accounting.  I think it is important because the defendants are really sort of hanging their hat on this, as far as I can tell.  They're saying it was an honest mistake, we didn't interpret the rule correctly.

So here's what he said.  Here's what Mr. Fieldly said. He said:  "In regards to some of the employees" --

THE COURT:  I'm sorry.  Can you point me to what you are reading from so I can follow along with you.

MS. MOYNA:  Let me find the paragraph.  I think it is paragraph 88.

THE COURT:  All right.  Thank you.

MS. MOYNA:  Yes.

THE COURT:  Yes.  OK.  Thank you.  I'm with you.

MS. MOYNA:  It is the top of page 24 in the complaint.

THE COURT:  Thank you.

MS. MOYNA:  He says:  "In regards to some of the employees, it was also -- it's a technical aspect there because some of them are still providing services through contractual services."

So just looking at that sentence, there were nine employees that resigned or were terminated, and even if this is true that there was some confusion about how to apply ASC 718, it only applied to some of the employees.  I don't know how many that is.  They don't tell me.  But it is not nine of them.  I would draw the inference it's fewer than four of them.

So what about the other, say, five, six, seven, eight, nine?  There was no confusion about those.  Why wouldn't they have accounted for those correctly.

Then he goes on and he says:  "So there was just a technicality.  That was an error in interpretation there on those stock awards."  Then he says:  "So it was definitely an oversight."

Now, I'm confused because on the one hand he's saying it is an error in interpretation and then he's saying it is an oversight.  To me, those are not the same thing.  An error in

interpretation sounds like you studied the situation, you tried to figure out the result, you came to the wrong conclusion, whereas an oversight sounds like you just forgot.

So I don't really -- I think an inference can be drawn, and it is true we did not argue extensively in the complaint what inferences can be drawn from this explanation, but certainly I think there is a compelling inference that this explanation is just not to be believed.  It is not true.

So I think with regard to defendant Fieldly and his scienter, certainly providing false explanations is a factor which weighs in favor of scienter.

THE COURT:  OK.

MS. MOYNA:  So if I continue with the scienter facts, and your Honor ticked them off in the beginning, the magnitude of the fraud here cannot be understated.  I mean, here we have net income was overstated fivefold in the second quarter, and a loss, a $9.4 million loss, was transformed into a $2.75 million gain in net income.  Certainly there are a host of cases where much smaller overstatements have been viewed as evidence of scienter.

Now I wanted to mention, because Mr. Tully talked about the Sportsline case, and that was a Judge Middlebrooks case where he found scienter was not alleged, but there the overstatement was, I think it was 15 percent in one quarter and something like 6 percent, 6.4 percent in the other quarter.  So

the magnitude of the misstatements there was much, much smaller, and that did factor into his analysis to grant the motion to dismiss.

I will also point the court to another opinion by Judge Middlebrooks.  I apologize.  It was the In Re Sierra Injection Securities Litigation case.  This is a 2005 Judge Middlebrooks opinion.  That case involved overstatement of earnings and it had to do with a mischaracterization of pension obligations.

There the court found that scienter was properly alleged in part because the errors were too obvious to ignore.

THE COURT:  At the end of the day we all sit here and we talk about these different scienter factors.  What we're really talking about is just classic circumstantial evidence, right.  What would you look at for which one could draw an inference that they had a motive to -- you have to sort of be able to end these sentences, right.  They had a motive to defraud because their compensation was based upon the stock price.  They were going to sell their own shares.

All right.  If you can fill out that sentence, maybe there is an inference.  How much weight that inference gets is a harder question.  To me, all these different factors are just specific examples of the larger issue of circumstantial evidence.  So depending on the facts of any particular case, yes, generally speaking, if someone commits a really big fraud,

it looks like they had a motive to do it as opposed to a little one, but not in every case.

I think we all agree what the factors are.  What I was mostly interested in, Ms. Moynan -- I'm certainly going to let you continue arguing the individual factors if you want to -- is I wanted to make sure I ticked them all off because your complaint is long.  I'm not saying that is a problem, but I was trying to extract from what are the specific facts that I need to look at.  So I just want to make sure I get them all.

MS. MOYNA:  You did.  I mean, I think one of the facts that may not have been ticked off, because it wasn't maybe highlighted as much in our complaint, was the fact that we don't believe the explanation that Mr. Fieldly gave.

THE COURT:  In paragraph 88.

MS. MOYNA:  Yes, and also the fact that there was no segregation of duties, which the company admitted.  So there is really no inference that can be drawn other than the CFO made this decision to misaccount for the stock-based compensation.

THE COURT:  OK.

MS. MOYNA:  I will just note, with regards to the false statements, and I believe they are the stock certifications that you were looking at towards the end.

THE COURT:  Right.

MS. MOYNA:  In terms of whether or not those are actionable under Omnicare, the fact that the -- the reason that

the company gave for the internal controls being defective was that there was no segregation of duties.  That is a verifiable fact that the defendants could have undertaken.  So we think the statements are actionable because there are verifiable facts, vetted facts that were false in those opinions, assuming that they are opinions.  And certainly with regard to these other scienter facts that pertain to the financial statements, they would pertain as well to the stock certifications.

THE COURT:  That is paragraphs 132 through 137, I think, of your complaint is the discussion of the internal controls and the representations about the internal controls.

MS. MOYNA:  That's right.  Those are where the false statements occurred, and paragraph 96 is where they correct those false statements.

THE COURT:  Right.  But what you are asserting is the falsity, the actionable statements are not the correction; it is the original stock certification in the quarterly statements, or is it both?

MS. MOYNA:  Absolutely.  I just wanted to sort of complete the picture for you.

THE COURT:  So you're asserting, just to be clear, you're asserting there were two misrepresentations about internal controls, one in each of the quarterly statement 10-Qs, and that is when I say paragraphs 132 through 137.

MS. MOYNA:  That's right, yes.

THE COURT:  OK.  And the evidence that they were inaccurate is that they corrected later in what they said about them.

MS. MOYNA:  Yes.

THE COURT:  OK.

MS. MOYNA:  Correct.

THE COURT:  OK.  Understood.  Understood.

Do you want to address the expert issue for me?  I mean, how much weight can I really give to an expert who is not really identified, I don't know their credentials.  I mean, I can certainly look at the rule myself, and the Judge Middlebrooks can certainly look at the rule itself and decide whether we think it's clear.  So what is the relevance, if any, that I need to give and can give to the expert?

MS. MOYNA:  Again, this is a complaint.  This isn't a Daubert motion.  It is an allegation that we have that supports our reading of the rule, which is that it is clear.  We consulted an expert.  The expert confirmed, yes, this rule is clear, there is really no room for interpretation.

Again, certainly if your Honor would like more facts about the expert --

THE COURT:  It is not what I would like.  What Rule 8 says is the complaint is supposed to be a plain, short I think is in there too, but nobody ever listens to that, short, plain statement of the facts upon which you're entitled to relief,

and it is not the evidence that supports those facts. You can just say it. The rule is clear. Or he was in charge and there were only three people who worked there. You don't have to tell me how you know that. I have to accept that as true for these purposes.

So I have never had this situation where somebody actually cites to the underlying evidence but not in a way that would be admissible at any point in the future. So is that really a fact? Is it entitled to, as they say in Iqbal and Twombly, the assumption of truth? I don't know. That is what I am putting to you.

MS. MOYNA: I mean, yes, I would say yes, because, as your Honor points out, you have to accept our facts as true. Whether or not you want to draw inferences from them is a different story, but you have to --

THE COURT: I have to accept the well-pled facts as true, but if someone said to me, look, I threw darts against the wall and it hit that number, therefore that number must be true, I don't have to accept that.

You said we have an unnamed expert. We won't tell you who he is, we don't tell you what his background is, we don't know who he is or what he does, but he says it's pretty clear. That, to me, under Iqbal and Twombly is not entitled to the assumption of truth. That is the equivalent of a conclusory, unsupported statement. There is no reason for me to believe

that to be true or not true because I don't know the basis for it.

If you had just written a line that said, the rule is clear and unambiguous, that is not a fact, that is a conclusion that the court can draw. So the fact that you now say a person says, so I don't think that changes that into a fact that is entitled to the assumption of truth under Iqbal and Twombly, but I'll hear you on them.

MS. MOYNA: Well, it is an accounting expert. You don't have any reason not to believe that we consulted an accountant who came to this conclusion.

THE COURT: OK. Again, I understand that is your argument. I don't think you're going to win on that. I'm not sure it matters. To my ultimate conclusion, I am not sure that that opinion matters. Because, as I said, I can read the rule and I can conclude whether it's clear or not clear.

MS. MOYNA: Well, I mean, the only thing --

THE COURT: I think I am allowed to do that at the motion to dismiss stage, I'm allowed to read it and draw whatever inferences need to be drawn.

MS. MOYNA: I mean, the only thing I'll add is that in terms of getting into the minds of defendants, they were both CPAs. So to the extent that this might be confusing to a layperson, it allows for the inference that accountants do not find this confusing. But I agree with your Honor, I don't

think the rule is confusing on its face.  I am not an accountant.

THE COURT:  I understand.  I understand.

By the way, I get in the complaint you have alleged that Mr. Negron-Carballo, the CFO, was continuing to be engaged in accounting and sort of financial management of the company.  Does it allege also that Mr. Fieldly had been the CFO previously?  Was that alleged?

MS. MOYNA:  That's correct, yes, from 2012 to 2018.

THE COURT:  That is what is alleged, 2012 to 2018.  Because I was going to say, I have an engineering degree from college, but I don't remember any of it.  So the fact that Mr. Fieldly may have a CPA in and of itself didn't move the ball for me.  But the fact that he was the CFO until 2018 I think puts it in a different construct.  Thank you for clarifying that fact for me.

Anything else that you wanted to address?

MS. MOYNA:  Unless your Honor has questions for me, that's it.

THE COURT:  No, you've been very helpful and you've answered my questions.  I very much understand your arguments.

I think I'm presented sort of a two very different perspectives on what are really not that contested facts.  It is just what inferences to draw.  I understand your argument very clearly.  I understand Mr. Tully's.  I want to give him a

chance to respond because I told him I would and I did have one additional question for him.

Unless you have anything else, Ms. Moynan, I thank you very much for your time.

MS. MOYNA:  Thank you, your Honor.

THE COURT:  Mr. Tully, back to you.

MR. TULLY:  Yes.

THE COURT:  Again, I wanted to put one other question to you.  Going back to part of your presentation.  I don't think Ms. Moynan hit on this.  One of the things you pointed me to was the fact that the Compensation Committee after all was said and done still gave nice bonuses to the two defendants. Could their bonuses have been even higher if the company had been more profitable?  Is there anywhere in the record that I could find whether the board, the Compensation Committee, took profitability into account in deciding what their bonuses should be?

MR. TULLY:  I think in the text we highlighted it shows, and also more broadly in the proxy, it shows how the company derived or the Compensation Committee derived the bonuses.

I do think, before maybe I address the hypothetical, just to return to the fact that the Compensation Committee based the bonuses on the restated numbers, not the original numbers.  So the numbers that had been published.

THE COURT:  I'm aware of that.  What I'm trying to explore -- this is the plaintiffs' theory.  The plaintiffs' theory was if the numbers had never been restated and nobody knew the better, they would have gotten bigger bonuses than what they got.

I'm just trying to figure out, is that true or is there at least any evidence in the record to determine if that theory, that inference, should be drawn?  There was no cap on their bonus, was there?  Theoretically, if the company was wildly profitable, they could have gotten higher bonuses, couldn't they?

MR. TULLY:  I think there is another instance where they fail the Reform Act standards because in a conclusory fashion they say they got substantial bonuses based on the understatement of expenses, but they have to show that these bonuses were extraordinary.

It is similar to when we looked at Mr. Fieldly's one trade that they haven't given you any context to know whether this bonus was out of step with others that had been provided in the past or to other employees, and similarly the bonus targets, which again are in the proxy, show there are a host of qualitative and quantitative factors that are considered.

THE COURT:  But does the proxy indicate that one of those factors is profitability?

MR. TULLY:  It does.

THE COURT: OK. I understand your argument is that under the Reform Act that may not matter, that may not move the needle. That was a fact I was curious to see if that was in the record. That's all.

MR. TULLY: Yes. It is, your Honor.

THE COURT: I understand. That was, I think, the only specific question I had made a note I wanted to ask you, but I will allow you to respond to Ms. Moynan, to the extent you want to.

MR. TULLY: Sure. I talked about it in the opening about Judge Middlebrooks' focus on core business activity as being relevant, if the restatement involves a core business activity. I think plaintiffs' counsel drew your attention to the analyst meeting that the company had. I guess it was Yahoo facilitated it or they interviewed the CEO, Mr. Fieldly. If you look at the questions that an analyst asked during that, he's asking about can costs and your input costs. He's looking at cash expenses, the core business expenses of what this company does. He does not ask about accounting losses, non-cash expenses. I think there is a real distinction to be drawn there.

THE COURT: I mean, isn't that the flip side of the questions I was asking her about cash flow. What you are saying is, look, this is an expense, it is an expense on paper that we have to now recognize the cost of these stock options,

but dollars didn't flow out the door, right.  When you buy cans, dollars go out the doors.  Is that your argument, basically, that that's the distinction?

MR. TULLY:  I think this is alleged in the complaint. They have a company like this that is high growth.  Their big costs are production costs and marketing.  Those are expenses where cash has to go out the door.  I'm sure analysts are concerned about that.  I think you can draw an inference that they are not as concerned about non-cash expenses which are the result of accounting entries.

THE COURT:  OK.

MR. TULLY:  I think your Honor asked about, well, how do I know that they have applied this rule in the past, and I think the plaintiffs are flipping the Reform Act.  They're saying, well, we're making a conclusory allegation that they have applied it in the past and you can draw specific inferences that help to bolster that conclusory allegation, but that is not how it works.  That flips the standard that the Reform Act requires.

I think they talk about the fact that the CEO approved vendor invoices.  What vendor invoices?  The one that is material, an amount that he may have.  I don't know how that is indicative of the fact that he must have known this accounting entry was done incorrectly.

I think that is also something that Judge Middlebrooks

addressed in Sportsline. If I can quote from it, it is from page 1172. The judge said: "While plaintiffs have pled the defendants were privy to all company internal information, they have not pled that defendants were privy to specific information that revealed the inaccurate nature of the misstatements."

Similarly, I think they have kind of leaned into the point we were trying to make about Omnicare. Just because an opinion turns out to be wrong does not create a securities fraud claim. If duties are not segregated, you may think, well -- you may think your controls are effective and then a situation presents itself and you realize, oh, we needed to better segregate responsibilities. But the fact that you draw that conclusion at a later date doesn't mean those statements, those opinions, weren't earnestly held when they were made.

I think plaintiffs have all but admitted that they did not allege that Fieldly's explanation was false in the amended complaint. I think they're trying to create a material omission case on the fly during argument and to revise, to supplement allegations they made in the amended complaint, including -- I think they might have mentioned twice a further amendment of the complaint. They're attacking allegations that appear -- sorry. They're supplementing allegations that appear on the face of the complaint already. They tried to, plaintiffs' counsel tried to walk you through individual words

used in Mr. Fieldly's explanation and draw an inference that those somehow were false.  That is something they could have done in the amended complaint.

We talked before, too, about the issue of whether the rule was simple.  In the Goodman decision, the Eleventh Circuit decision we cite, the court there ruled that a determination on whether a rule, a GAAP rule is simple or not is a conclusion of law that the court did not necessarily have to accept and it could reject.

I think the Reform Act is impacted here too because it gets -- and the court mentions this as to why it considered it something that it didn't have to accept as a matter of fact that was a conclusion of law.  The Reform Act requires plaintiffs to allege specific facts that show severe recklessness.  Motive and opportunity are not enough.  You have to have severe recklessness.

So a simple statement that this rule is -- sorry.  A short statement that this rule is simple, the Reform Act requires more before a court would draw a conclusion of law that that was reckless to not follow.

THE COURT:  OK.  All right.  Thank you.  I don't have any further questions.

Well, let me just address this one issue.  I meant to look at these cases before we came in here and I got busy with other stuff.

There are some recent decisions in our court about asking for leave to amend in your response to the motion to dismiss and whether you have to file a separate motion for leave and all that.  So put aside procedurally how we would get there, if we got there.

Mr. Tully -- and I didn't ask Ms. Moyna and I'm going to give her a chance to have the last word on this -- they did ask if for some reason I recommend to Judge Middlebrooks that the complaint be dismissed that they be given leave to file, I guess it would be a second amended complaint.  I know you oppose it, but let me give you a fulsome opportunity to address that.

MR. TULLY:  Yes.  I think I touched on probably some of the stronger arguments, which is there's nothing new.  They're not coming to your Honor and saying we now have additional facts.  They're just turning the framing of certain statements now or maybe cutting and pasting Mr. Fieldly's explanation from the section that says the truth is revealed to the section that deals with the lists of allegedly misleading statements.  So I don't think further amendment is appropriate here.  It would prejudice my client.

THE COURT:  OK.  I understand.  All right.  Thank you.

Ms. Moyna -- thank you, Mr. Tully -- I didn't give you a chance to argue that issue and I did want to give you an opportunity if you'd like to expand upon that.

MS. MOYNA:  Yes.  I just want to point out one thing. We are not alleging that Mr. Fieldly's explanation was an actionable false statement.  We're alleging it as evidence of scienter because it doesn't make sense.

In any event, in terms of amending a complaint, we think the complaint satisfies the PSLRA as is.  But to the extent that there are details that are missing that the court determines would be important to reaching a conclusion where scienter is satisfied, we could certainly fill in those gaps and amend the complaint accordingly.

THE COURT:  I guess that really is the ultimate -- let me ask you just procedurally, because your motion says it hasn't been amended before, but this is an amended complaint. I also know leadership counsel was appointed after the initial complaint was filed.

Does that one count or not count?  Did you have an agreement with each other that this would sort of be the first real complaint?

MS. MOYNA:  There's no agreement, your Honor, but in my experience in these types of actions, you're right that leadership -- we did not have a chance to work on the first complaint at all.  So this would sort of really be our first amendment, and certainly with regard to our clients, they had no input whatsoever into the first complaint.  It is not uncommon for there to be another amendment.  Yes.

THE COURT:  Trust me, I just lived through two-and-a-half years of the Zantac MDL with Judge Rosenberg where the first complaints were, I think, 2,000 and plus pages.

MS. MOYNA:  Oh, my gosh.

THE COURT:  Yes.  Then they had to be amended.  So they were now 4,000 plus pages.

MS. MOYNA:  You won't get that from us, I promise that.

THE COURT:  Like I said, Rule 8 does have the word "short" in it, but nobody ever seems to read that word.

Let me ask you this, Ms. Moyna.  We kid around. Really the standard for whether to grant leave is whether a further amendment would be futile.  What I hear you saying is you believe, in good faith you believe there may be additional facts that if the court determined this complaint was deficient that there would be additional facts that you could plead to possibly plug those holes.

MS. MOYNA:  Correct.

THE COURT:  Am I hearing you correctly?

MS. MOYNA:  Yes.

THE COURT:  OK.  I'm not sure.  It may be, and obviously I haven't decided yet, it may be that the right procedure is, if the court is inclined to grant the motion, is to grant the motion without prejudice to the plaintiffs seeking leave, and then the right procedure is you file a motion for

leave, you attach the proposed amended complaint, and then Judge Middlebrooks can look at it and say you haven't really added any facts or the facts you've added don't really get you materially closer, and he can decide that.

Let me first decide whether I am granting or denying the motion before I decide what the remedy would be if in the hypothetical I granted the motion.

All right.  I want to thank the parties.  It's been really helpful to me in understanding the issues.  Very well argued on both sides.  Thank you for answering my questions.

I'll take it under advisement.

I will try and get a report and recommendation out as fast as I can.  But thank you, everybody.  If I don't see you all beforehand, have a happy holiday season and be healthy.  Be well, everybody.

MR. TULLY:  Thank you, your Honor.

MS. MOYNA:  Thank you, your Honor.

(Adjourned)

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription to the best of my ability of the digital audio recording in the above-entitled matter.

February 8, 2023        s/ Joanne Mancari
                        Joanne Mancari, RPR, CRR, CSR
                        Court Reporter
                        jemancari@gmail.com