## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| CITY OF ATLANTA POLICE OFFICERS' PENSION PLAN and CITY OF ATLANTA FIREFIGHTERS' PENSION PLAN, Individually and On Behalf of All Others Similarly Situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>CELSIUS HOLDINGS, INC., JOHN FIELDLY, and EDWIN NEGRON-CARBALLO,<br><br>*Defendants*. | Case No. 9:22-cv-80418 (DMM) (WDM) |

## EXPERT REPORT OF FRANK C. TORCHIO

### May 18, 2023

## TABLE OF CONTENTS

I. INTRODUCTION AND SUMMARY OF OPINIONS.................................................................. 1

II. QUALIFICATIONS AND COMPENSATION ...................................................................... 6

III. MATERIALS REVIEWED ............................................................................................ 8

IV. BACKGROUND........................................................................................................... 8

V. EVENT STUDY METHODOLOGY ................................................................................. 9
    A.  Overview of Event Study Methodology ................................................................... 9
    B.  Market Model for Celsius ......................................................................................... 16
        i)    Proxies for Market and Industry ...................................................................... 16
        ii)   Time Period for Regression Analysis................................................................ 18

VI. MARKET EFFICIENCY FOR COMMON STOCK .......................................................... 20
    A.  The *Cammer* Factors for Market Efficiency.......................................................... 20
        i)    Weekly Trading Volume.................................................................................... 21
        ii)   Analyst Coverage.............................................................................................. 22
        iii)  Market Makers.................................................................................................. 24
        iv)  Form S-3 Eligibility ......................................................................................... 25
        v)   Cause-and-Effect Relationship......................................................................... 26
    B.  The *Krogman* and *Unger* Factors for Market Efficiency .................................. 32
        i)    Market Capitalization........................................................................................ 32
        ii)   Bid-Ask Spread................................................................................................. 34
        iii)  Public Float ....................................................................................................... 35
    C.  The *Polymedica* Factors for Market Efficiency.................................................... 35
        i)    Autocorrelation................................................................................................. 36
        ii)   Short Interest .................................................................................................... 37
        iii)  Put-Call Parity.................................................................................................. 38
    D.  Summary.................................................................................................................... 42

VII. CLASS-WIDE DAMAGES METHODOLOGY............................................................... 42
    A.  Overview.................................................................................................................... 42
    B.  Analysis of Information from Disclosures in Event Studies .................................. 44
        i)    Economic Correspondence ............................................................................... 45
        ii)   Direct and Foreseeable Consequences............................................................. 46
        iii)  Truth-on-the-Market ........................................................................................ 48
        iv)  Confounding Information.................................................................................. 49
        v)   Length of Event Window ................................................................................. 51
    C.  Techniques Used in Calculating Artificial Inflation............................................... 52
        i)    Methods of Calculating Artificial Inflation..................................................... 52

**ii)   Methods of Scaling Artificial Inflation** ........................................................ **54**

**VIII. HOW THE METHODOLOGY FOR CALCULATING CLASS-WIDE DAMAGES WOULD BE APPLIED IN THIS CASE** ........................................................ **55**

## I. INTRODUCTION AND SUMMARY OF OPINIONS

1.      I am the President of Forensic Economics, Inc. and have been retained in this Action by Lead Counsel, Grant & Eisenhofer P.A. ("Counsel").  For this Report, I have been asked to provide an opinion regarding the efficiency of the market for the common stock of Celsius Holdings, Inc. ("Celsius" or the "Company"), and I have also been asked to opine whether damages for Class members in this Action are measurable on a class-wide basis under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act").  It is my understanding that Class members include individuals and entities who purchased or otherwise acquired the publicly traded common stock of Celsius between August 12, 2021 and March 1, 2022, inclusive (the "Class Period").[1,2]

2.       I conclude, based on my experience in analyzing market efficiency and specific analyses of Celsius common stock, that the market for Celsius common stock was informationally efficient during the Class Period.

3.      The Efficient Market Hypothesis ("EMH") is conventionally divided into three categories by economists, each dealing with a different type of information:

   a) Weak-form – information contained in historic prices is fully reflected in current prices;

   b) Semi-strong form – publicly available information is fully reflected in current prices; and

---

[1] *See* Amended Complaint for Violations of the Federal Securities Laws, dated July 8, 2022 (the "Complaint"), ¶ 1.

[2] "Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest. " Complaint, ¶ 159.

c) Strong-form – all information, public and non-public, is fully reflected in current prices.[3]

4. A finding of market efficiency for a security generally means that the price of the security reflects all relevant, publicly available information or, in other words, that it satisfies the semi-strong form of the EMH. Similarly, for litigation purposes, courts in the United States have accepted the semi-strong form of the EMH as satisfying the reliance element of a securities claim.[4]

5. The factors or indicators economists use and I have used in preparing this Report to assess market efficiency are designed to directly or indirectly measure: i) the degree of information flow; ii) the level of transaction costs; or iii) the competition among investors.[5]

6. "Economists broadly agree that stock prices in developed markets generally do respond to information."[6] This tenet was also affirmed in the U.S. Supreme Court decision in *Halliburton II*.[7] Thus, because stocks in developed markets are generally informationally efficient,[8] economists can compare the structural factors of efficiency for a given stock with the same factors for the universe of stocks traded in a developed market, such as the NYSE or Nasdaq, as an objective measure of efficiency. Ranking of a specific stock against the universe

---

[3] *See* Edwin J. Elton, Martin J. Gruber, Stephen J. Brown, and William N. Goetzmann, <u>Modern Portfolio Theory and Investment Analysis</u>, Sixth Edition, John Wiley & Sons, Inc., 2003, p. 402.

[4] *See Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*") at 246.

[5] For a more detailed discussion of the EMH, *see* Section VI.

[6] *See Halliburton Co. v. Erica P. John Fund, Inc.,* Brief of Financial Economists as *Amici Curiae* in Support of Respondent (9th Cir. Court of Appeals), p. 12.

[7] *See Halliburton Co. v. Erica P. John Fund, Inc.*, U.S., 134 S. Ct. U.S. 2398 (2014) ("*Halliburton II*") at 2410.

[8] "The SSEMH [Semi-Strong Efficient Market Hypothesis] is a theory of *informational* efficiency and must be distinguished from theories of *fundamental* efficiency." *See Amgen, Inc., et al. v. Connecticut Retirement Plans and Trust Funds*, Brief of Financial Economists as *Amici Curiae* in Support of Respondent (9th Cir. Court of Appeals), p. 7.

of stocks in a well-developed market for structural factors provides an assessment of the "relative" degree of efficiency.[9]  As discussed in a well-regarded treatise on econometrics, the notion of relative efficiency may be a useful concept.[10]  Therefore, my analysis discussed below includes for each structural factor, an applicable comparison of Celsius to the norm from the universe of stocks on the NYSE or Nasdaq or to other norms identified from the relevant economic literature.

7.      Courts have approved many of the indicators or factors that economists look to in assessing market efficiency in ruling on the issue of market efficiency for a stock that is the subject of a securities litigation.  For example, the court in *Cammer* v. *Bloom*,[11] listed five factors to assess whether the market for a security is efficient.  Those five factors are: i) "average weekly trading volume during the class period"; ii) number of analysts following the stock during class period; iii) number of market makers for the stock; iv) whether the company was entitled to "file an S-3 statement in connection with public offerings"; and v) "empirical facts showing a cause-and-effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."

8.      Other courts have looked at additional factors bearing on the efficiency of a particular stock, including the Fifth Circuit, which adopted the use of three additional factors: i) the company's market capitalization; ii) the bid-ask spread; and iii) the stock's float,[12] as well

---

[9] The U.S. Supreme Court endorsed the concept that "market efficiency is a matter of degree," *see Halliburton II* at 2410.

[10] *See* John Y. Campbell, Andrew W. Lo, and A Craig MacKinlay, The Econometrics of Financial Markets, Princeton University Press, 1997, p. 24.

[11] *See Cammer* v. *Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) at 1286-87 ("*Cammer*").

[12] *See Krogman v. Sterritt*, 202 F.R.D. 467 (N.D.Tex. 2001) at 477-78 ("*Krogman*"); and *Unger v. Amedisys Inc.*, 401 F.3d 316 (5th Cir. 1992) at 323 ("*Unger*").

3

as the First Circuit, which approved of the consideration of: i) the presence of autocorrelation in stock-price returns; ii) constraints on short selling; and iii) violations of put-call parity.[13]

9.     No one factor can determine whether a market for a stock is or is not efficient.  In my experience, that determination is generally based on the preponderance of the economic evidence.

10.     Based on my experience and the financial-economic analysis I present below, the factors I considered are appropriate in determining market efficiency for Celsius common stock. **Table 1** below summarizes my findings for the factors analyzed.

---

[13] *See In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1 (1st Cir. 2005) at 18 ("*PolyMedica*").

**TABLE 1**
**SUMMARY OF MARKET EFFICIENCY FINDINGS FOR CELSIUS COMMON STOCK**

*Cammer*

| Factor | Name | Results | Supports Efficiency |
|---|---|---|---|
| 1 | Average Weekly Trading Volume | 6.5% of shares/out | Yes |
| 2 | Analyst Coverage | | |
| | - Buy-Sell-Hold Recommendations | 7 | Yes |
| | - Providing EPS Estimates | 6 | Yes |
| | News Coverage | Over 190 News Stories | Yes |
| | SEC Filings | Over 20 | Yes |
| 3 | Float (SEC Form S-3) | > $75 million | Yes |
| 4 | Market Makers | Over 100 brokers/market makers | Yes |
| 5 | Empirical Facts Showing Cause-and-Effect Relationship: | | |
| | - Market Model: Adjusted R-Squared | 25.78% | Yes |
| | - Analysis of News Days Versus Non-News Days | Statistically Significant Differences | Yes |
| | - Correlation Between Returns and Volume | Statistically Significant | Yes |

*Krogman/Unger*

| Factor | Name | Results | Supports Efficiency |
|---|---|---|---|
| 1 | Market Capitalization | $5.6 billion | Yes |
| | Institutional Ownership (Percent of Shares) | 50.64% | Yes |
| 2 | Bid-Ask Spread | 0.13% | Yes |
| 3 | Public Float (Market Capitalization) | $3.2 billion | Yes |

*PolyMedica*

| Factor | Name | Results | Supports Efficiency |
|---|---|---|---|
| 1 | Autocorrelation | | |
| | - Returns | None | Yes |
| | - Excess Returns | None | Yes |
| 2 | Short Interest - Days to Cover | 2.7 Days | Yes |
| 3 | Put-Call Parity | 0.05% Violations | Yes |

11.     Based on my experience and expertise, and the findings summarized in the table above (which are discussed in detail in the sections that follow), I conclude that the market for Celsius common stock was informationally efficient during the Class Period.

12.     Additionally, based on my experience and expertise, damages under Section 10(b) of the Exchange Act caused by the alleged Class Period omissions and misrepresentations in this

Action are measurable on a class-wide basis for Celsius common stock.  For investors in Celsius common stock, damages can be calculated using an out-of-pocket measure, which will reflect the artificial inflation (defined as the price less the true value) on the dates of purchase and sale of Celsius shares, where the true value incorporates the information that was alleged to have been omitted or misrepresented.[14]

13.     I reserve the right to amend my conclusions to reflect new information made available to me in the discovery process, information provided by other experts in the litigation, future rulings from the Court in this Action, other rulings binding on this Court, or any motions and trial proceedings.

## II.  QUALIFICATIONS AND COMPENSATION

14.     I am the President of Forensic Economics, Inc., located in Rochester, New York. I founded Forensic Economics, Inc. in 1989.  I have consulted on issues pertaining to financial valuations, regulatory economics, transfer pricing, financial-economic analysis, and analysis of the response of share prices to public information in securities fraud lawsuits for over 30 years. Forensic Economics, Inc. historically has been retained by both plaintiffs and defendants in litigation matters.

15.     I am also an Adjunct Professor and a former Executive Professor of finance at the Simon School of Business at the University of Rochester.  My courses cover topics including

---

[14] For damaged shares held through the end of the Class Period, the Private Securities Litigation Reform Act of 1995 ("PSLRA") places an upper limit on the maximum amount of recoverable damages, which is the difference between the purchase price paid and the mean trading price of the security for the 90-day period beginning on the day on which the information correcting the misrepresentations or omissions was fully disclosed.  A rolling average mean price is used for sales made within the 90-day period.  *See* 15 U.S.C. § 78u-4(e)(1).

market efficiency, event studies, damages in securities litigation, valuation of businesses and securities, and managerial economics.

16.     I have testified at trials, arbitrations, and depositions in U.S. federal district courts, in state courts including the Delaware Court of Chancery, Australian federal court, the United Kingdom, and in Switzerland.  I have submitted expert reports in numerous securities litigations matters in the United States, Australia, and Canada.

17.     I have co-authored an article with Professor Michael Barclay about trading models used for calculating damages in securities lawsuits.  The article is published in *Duke University School of Law's Law and Contemporary Problems* (Volume 64, Spring-Summer 2001).  I have authored a published article about the proper event study analysis in securities litigation, which was published in *The Journal of Corporation Law* (Volume 35:1, 2009).  I have also co-authored a paper about the effect of size premiums from the lack of liquidity, which was published in the *Journal of Business Valuation and Economic Loss Analysis* (Volume 9:1, 2014), as well as a paper titled "Benchmarking Market Efficiency Indicators for Securities Litigation," which was published in the *University of Illinois Law Review Online* (Volume 96, 2020).

18.     I hold an MBA in Finance and Economics (1982) from the University of Rochester's Simon Business School.  I was the 1991 Rosenthal Fellow at the University of Rochester for innovative developments in applying financial economic theory.  I have also been awarded the Chartered Financial Analyst (CFA®) designation and am a member of the CFA Institute.  My resume is attached as Exhibit 1.

19.     My compensation is based on the number of hours worked on this assignment, as well as out-of-pocket expenses.  My hourly rate is $650.  To assist me, I used employees of Forensic Economics, Inc. who worked under my supervision and at my direction for this

assignment.  Forensic Economics, Inc.'s hourly rates for those employees range from $200 to $375.

## III.  MATERIALS REVIEWED

20.     In the course of my assignment in this Action, I have reviewed numerous documents.  The attached Exhibit 2 is a comprehensive list of materials I considered in connection with this Report.  Specific documents and information relied upon in reaching my opinions are cited throughout this Report.

## IV.  BACKGROUND

21.     In its 10-K for fiscal year 2020, Celsius described itself as follows:

> We are engaged in the development, marketing, sale and distribution of functional calorie-burning fitness and lifestyle beverages under the Celsius® brand name. According to multiple clinical studies we funded, a single serving of Celsius® burns 100 to 140 calories by increasing a consumer's resting metabolism an average of 12% and providing sustained energy for up to a nine-hour period… We seek to combine nutritional science with mainstream beverages by using our proprietary thermogenic (calorie-burning) MetaPlus® formulation, while fostering the goal of healthier everyday refreshment by being as natural as possible without the artificial preservatives often found in many energy drinks and sodas.[15]

22.     Throughout the Class Period, the Company's common stock was listed on the Nasdaq Capital Market exchange under the symbol "CELH."[16]

---

[15] *See* Celsius Form 10-K filed with the SEC on March 11, 2021, p. 1.

[16] *See* Celsius Form 10-Q filed with the SEC on August 12, 2021, 2017, cover page, Form 10-Q, filed with the SEC on November 12, 2021, cover page, and Form 10-K filed with the SEC on March 16, 2022, cover page, p. 17.

23.     On March 1, 2022, at the end of the Class Period, Celsius had 74,908,845 shares of common stock outstanding, with a market capitalization of $4.7 billion.[17]  During the Class Period, the total trading volume was 142.2 million shares, and the average daily volume was 1.0 million shares.[18]

## V.  EVENT STUDY METHODOLOGY

### A.  Overview of Event Study Methodology

24.     As a general proposition, modern finance theory holds that the market price of a common stock reflects the discounted value of expected future cash flows to the stockholder.  In finance, the measure of annual profits used to compute a company's value is called cash flows or free cash flows.  A company's annual cash flow is essentially its annual accounting earnings adjusted for the timing of the receipt of cash from sales and the timing of cash payments for the company's costs.  Because accounting earnings are computed on an "accrual" basis, finance theory teaches that revenue and costs on an accrual basis should be converted to a cash basis before discounting to a present value.[19]  Discounting future cash flows refers to the financial concept that a dollar received today is worth more than a dollar received next year.  This is called the time value of money, which takes into account the "riskiness" of generating such cash flows.  Thus, when computing a company's present value, future years' cash flow profits are discounted to today's dollars.  This sum of future cash flows discounted to today's dollars is called a Discounted Cash Flow ("DCF") analysis.  For example, if a company (with no debt or excess

---

[17] *See* Celsius Form 10-K filed with the SEC on March 16, 2022, p. F-7.  Market capitalization based on the March 1, 2022 closing price of $62.80 per share (source: Bloomberg).

[18] Source: Bloomberg; Exhibit 3.

[19] *See* Robert W. Holthausen and Mark E. Zmijewski, Corporate Valuation: Theory, Evidence & Practice, First Edition, Cambridge Business Publishers, 2014, p. 257.

cash) has 10 million shares outstanding and its traded price is $15 per share, then the present value of the market expectation of future profits for that company is $150 million ($15 times 10 million).

25.     Valuation ratios (or valuation multiples) such as a price-earnings (P/E) ratio, are effectively one-period discounted cash flow analyses that reflect long-term growth in earnings/cash flow from the market.  A one-period DCF is sometimes referred to as the first year's cash flow divided by the capitalization rate, where the capitalization rate equals the difference between the discount rate and the long-term growth rate.  There is an intimate and mathematical connection between DCF analyses and market valuation multiples.[20]

26.     New information that causes the market to significantly alter its expectation of future cash flows or risk of obtaining those future cash flows will cause a prompt re-pricing of the security to reflect the new expectations.[21]  Since the publication in 1969 of a classic paper by Fama, Fisher, Jensen, and Roll, financial economists have used the event study methodology as a tool to measure the effect on market prices of new information relevant to a company's equity valuation.[22]  New information may include, for example, company press releases and SEC filings, earnings reports, dividend changes, stock splits, regulatory rulings, acquisition bids, asset sales,  ratings agency actions, and analyst reports.

---

[20] "Any market multiple can be converted into a capitalization rate and vice versa."  *See* Shannon P. Pratt, The Market Approach to Valuing Businesses, Second Edition, John Wiley & Sons, Inc., 2005, p. 23.

[21] *See* Eugene F. Fama, "Efficient Capital Markets: II," *Journal of Finance* 46(5), December 1991, 1575-1617; Robert Jennings and Laura Starks, "Information Content and the Speed of Stock Price Adjustments," *Journal of Accounting Research* 23(1), Spring 1985, 336-350.

[22] *See* Eugene F. Fama, Lawrence Fisher, Michael C. Jensen and Richard Roll, "The Adjustment of Stock Prices to New Information," *International Economic Review* 10(1), February 1969, 1-21.

27.     The event study methodology involves an empirical analysis that measures the effect of new information on the market prices of a company's publicly traded securities.  The metric used to measure the effect on a company's stock price from an event is called a "return," which is the percentage change in the market price of a company's shares over a specific time period such as one trading day.  When new information about the company is disclosed to the market, a "market model" is used to determine the component of the security return that would have been expected based on the return predicted by the market model, *i.e.*, from the movement in the market index and, possibly, an industry index.[23]  The remaining component of the security return (that which cannot be explained by the return predicted by the market model) is known as the "excess return" or "abnormal return."

28.     Market models are empirical models that follow the theoretical Capital Asset Pricing Model ("CAPM") explained in finance literature.[24]  The inference from the CAPM is that the returns for a given stock are correlated with the returns of the general market.  The sensitivity of the returns for a given stock to the general market is referred to as the stock's "beta," which I discuss more fully below.

29.     Thus, a market model describes the normal relation between the return on the company's security and the return on a broad-based market index, such as the S&P 500 Index, the Nasdaq Composite Index and possibly an industry index of stocks of companies that are similar to the company of interest, or an index of stocks of companies from which the company

---

[23] An industry index is generally composed of companies similar to the subject company and it is used to account for additional movements in the industry above and beyond those in the general market to ensure that the price movements analyzed are company specific.  More than one industry index can be included in the market model.

[24] *See*, for example, G. William Schwert, "Using Financial Data to Measure Effects of Regulation," *The Journal of Law and Economics* 24(1), 1981, 121-158.

of interest derives its revenues.  The indexes that are used in a market model are also called

"independent variables."[25]  Once a disclosure has been identified as a potential event related to

the wrongdoing, an event study analysis can measure the company-specific component of the

return on that event date.[26]  The company-specific component is the excess return discussed

above, which I explain more fully below.

30.      A market model is derived from linear regression analysis.[27]  In a linear

regression analysis, the company's returns are regressed against the returns of a market index

and industry index(es) (if applicable) to estimate the historical relation between the index

variables and the company returns.[28]

31.      **Figure 1** below shows graphically an example of a market model regression using

the S&P 500 Index as the independent variable.  The red line is a result of a regression analysis.

The red line in **Figure 1** represents the predicted returns of the company.  It shows the

relationship, or beta, between the daily movement in the share price and that for the general

market.

---

[25] A "variable" is a mathematical term that refers to a quantity that may change within the context of a mathematical problem.

[26] *See* David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Chapter 19 in Litigation Services Handbook: The Role of the Financial Expert, 3rd ed., ed. by Roman L. Weil, Michael J. Wagner and Peter B. Frank, Wiley, 2001, 19.2-3.

[27] *See* John Y. Campbell, Andrew W. Lo and A. Craig MacKinlay, The Econometrics of Financial Markets, Princeton University Press, 1997, p. 155.  "A **regression line** is a straight line that describes how a response variable *y* changes as an explanatory variable *x* changes.  We often use a regression line to **predict** the value of *y* for a given value of *x*."  *See* David S. Moore and George P. McCabe, Introduction to the Practice of Statistics, 4th ed., W. H. Freeman and Company, 2003, p. 135 (emphasis in original).

[28] The return on an industry index is generally measured "net-of-market" to minimize the effects of a statistical phenomenon called multicollinearity, in which two or more independent variables in a multiple regression model are highly correlated.  Net-of-market means that the return on the market index is subtracted from the return on the industry index before running the regression.

**FIGURE 1: ILLUSTRATION OF A MARKET MODEL REGRESSION**



32.     The regression analysis is represented by the generalized equation:

$$\text{Company Return} = \alpha + \beta \cdot \text{Market Return}.$$

33.     The slope of the regression line is the beta ($\beta$).  The market beta or slope of the regression line indicates the expected return caused by a 1% change in the market return.  The $\alpha$ is the constant term or intercept of the equation.  It represents the value of the regression line where the market return is zero.  It is called an intercept because it is the value where the regression line crosses or intercepts the Company Returns axis.

34.     The predicted return represents an estimate of a company's return based on the return for the market (and possibly industry) index on a given day.  For example, if a company's returns regressed against the market returns yields a regression with an intercept of 0.01% and a

market beta of 1.20, the expected or predicted return for this company when there is a 2% increase in the market index is 2.41% (= 0.01% + [1.20 * 2.0%]).

35.     For a market model with an industry index, predicted returns are equal to the intercept term from the regression plus: (i) the market beta multiplied by the return on the market; and (ii) the net-of-market industry beta multiplied by the net-of-market return on the industry.[29]

36.     After calculating predicted returns, excess returns are calculated on each day by subtracting the predicted return from the company's return on each day.  This represents the company-specific portion of the return on a given day.

37.     Event studies also assess the probability that an excess return was the result of new information disclosed in an event, and not due to random price movements (*i.e.*, due to chance).

38.     A statistically significant excess return at significance level ($\alpha$) of 5% means that the excess return could be due to chance only 5% of the time.  A statistically significant excess return at a significance level of 1% means that the excess return could be due to chance only 1% of the time.  Significance levels in statistics are closely related to confidence intervals.  For instance, a 5% significance level is equivalent to a 95% confidence interval and a 1% significance level is equivalent to 99% confidence interval (a confidence interval "C" equals 1 – $\alpha$).[30]

---

[29] Additional variables can be utilized if the analyst deems it necessary.

[30] *See* David S. Moore and George P. McCabe, <u>Introduction to the Practice of Statistics</u>, 4th ed., W. H. Freeman and Company, 2003, pp. 442-452.

14

39.     The statistical significance for each daily excess return is measured by the t-statistic, which is calculated as a day's excess return divided by the standard error of the regression:

t-statistic = Excess Return ÷ Standard Error of Regression.

40.     The standard error is the measure of normal volatility, which is one of the parameters obtained from the regression for a market model.

41.     A t-statistic greater than 1.96 in absolute value (either positive or negative) means that the excess return is significant at the 5% significance level; a t-statistic greater than 2.58 in absolute value means that the excess return is significant at the 1% significance level based on a sample size greater than approximately 250.  As is common in financial economics research, I use the 5% level of significance for my analyses and consider excess returns with a t-statistic greater than 1.96 in absolute value as statistically significant.

42.     Statistical significance can also be depicted graphically.  In **Figure 1** above, the dashed green lines represent 1.96 times the standard error of the regression away from the regression line.  The red diamonds indicate excess returns that are statistically significant because they are outside of the dashed lines.  This means that those excess returns have t-statistics greater than 1.96 (in absolute value).

43.     Not every news item is expected to generate a statistically significant return.  For example, if a news story, analyst report, or company disclosure only repeats information that was already fully known or merely confirms investors' existing expectations, no price reaction in the security would be expected.  A news story, analyst report, or company disclosure will cause a statistically significant return only when the information is new and unexpected, and when the

15

information materially changes the value of the security to investors.  Similarly, a disclosure that omits such material information would not be expected to change the price of the security.

44.     Event studies are most useful in determining the effects of new information on security prices under the following conditions: (i) there are well-defined public disclosures or announcements; (ii) the time that the news items reach the market is known; (iii) there is no reason to believe that the market fully anticipated the news items; and (iv) it is possible to isolate the effect of the news items from market, industry, and other issuer-specific factors simultaneously affecting the issuer's security prices.[31]

**B.  Market Model for Celsius**

### i)      *Proxies for Market and Industry*

45.     Throughout the Class Period, Celsius was listed on the Nasdaq Capital Market exchange, which is widely considered as a well-developed market.  In Celsius' 2021 Form 10-K filing, the Company compared its stock price performance to the S&P 500 market index and a self-constructed peer group index of comparable companies.[32]  I tested several market indices as a proxy for the market, including the S&P 500 Total Return Index (Bloomberg identifier: SPTR), the Nasdaq Composite Total Return Index (Bloomberg identifier: XCMP), the S&P Small Cap 600 Total Return Index (Bloomberg identifier: SPTRSMCP), and the Russell 2000 Total Return Index (Bloomberg identifier: RU20INTR).

46.     Because Celsius, through its subsidiaries, operates in the nutritional beverage industry, I tested industry indexes related to soft drinks and non-alcoholic beverages, including

---

[31] *See* David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Chapter 19 in <u>Litigation Services Handbook: The Role of the Financial Expert</u>, 3rd ed., ed. by Roman L. Weil, Michael J. Wagner and Peter B. Frank, Wiley, 2001, 19.2.

[32] *See*, Celsius Form 10-K filed with the SEC on March 16, 2022, p. 18.

the S&P 500 Soft Drinks and Non-Alcoholic Beverages Index (Bloomberg identifier S5SOFD) and an equal-weighted peer company industry index comprised of five companies which Celsius identified as peer companies in its 2021 10-K filing.[33]

47.    I ran market model regressions over the Class Period (139 trading days) and over the one-year period (252 trading days) prior to the Class Period.  Each of the market model test regressions include a potential market index or a potential market index and one of the potential industry indexes.[34]  In addition, I also ran market models that included one of the large cap market indexes (the S&P 500 or Nasdaq Composite) and one of the small cap market indexes (the S&P 600 or the Russell 2000).  To determine which market and industry proxies to use, I examined the R-squared (and adjusted R-squared) statistics, the t-statistics for the index coefficients, and the standard errors of the regressions.  The R-squared measures how well the variation in the independent variables (the market and the net-of-market industry index returns) explain the variation in the day-to-day stock price returns of Celsius.  The adjusted R-squared

---

[33] The five peer companies (Bloomberg tickers in parentheses) are: The Coca-Cola Company (KO US); PepsiCo Inc (PEP US); Keurig/Dr. Pepper Inc. (KDP US); Nestle SA (NSRGY US); and Monster Beverage Corp. (MNST US).  I note that Celsius identified "Nestlé" and "Waters North America, Inc." as separate competitors in its SEC Form 10-K filing, but my research did not identify a separate company for "Waters North America, Inc." and instead identified "Nestle Waters North America" as the regional waters brands of Nestle SA, which Nestle SA sold to One Rock Capital Partners (a private equity firm) in March 2021 (see www.nestle.com), thus I only include Nestle in my peer index using the ticker symbol "NSRGY US" for the Nestle SA ADR's traded in the U.S.  I also note that Celsius identified Hansen Natural Corp. and Monster Energy as separate competitors, but my research identified Monster Beverage Corp (MNST US) as the parent company for Monster Energy and that Hansen Natural Corp. changed its' name to Monster Beverage Corp. in 2012 (see Monster Beverage Corp. Form 10-K filed with the SEC on February 28, 2022, p. 4.)  I excluded certain peer companies included in Celsius' 2021 10-K filing from my equal-weighted peer index due to the fact that they are private companies (Vital Pharmaceuticals, Inc.and Red Bull Gmbh).  See Celsius Form 10-K filed with the SEC on March 11, 2021, p. 6.  Source: Bloomberg.

[34] For these tests, I do not use net-of-market industry indexes.  Given the linear nature of the net-of-market returns, it does not affect the resulting adjusted r-squared statistics or the standard error of the regressions, nor does it affect the coefficient for the industry variable.

makes an adjustment to the R-squared statistic to account for the number of independent variables in the model. The t-statistics on the index coefficients provide a measurement of whether there is a non-zero statistical relationship between the index and the security's returns. The standard error of the regression provides a measurement of the variability of the residual returns of the model (*i.e.*, the variability of the returns to the security that is not explained by the model).

48.     Based on my analysis, I chose a market model with the Nasdaq Composite and Russell 2000 market indexes for my rolling regression analysis (discussed below). This specification had a high adjusted R-squared amongst regressions with market indexes. In my analysis, I did not find that including an industry variable provided much useful explanatory information.[35]

### ii)     *Time Period for Regression Analysis*

49.     In the context of securities litigation, one approach to compute the market model regression is using stock prices during a time period before the beginning of a class period because it normally represents a period during which the returns are not affected by the alleged wrongdoing.[36] This approach minimizes the effect that the alleged misrepresentations have on the determination of a proper market model.

50.     There are circumstances, however, in which using returns during the class period may be preferred over pre-class period returns for computing a market model. This is because a

---

[35] For the rolling regressions, I net the Nasdaq Composite return from the Russell 2000 return.

[36] For example, Cornell and Morgan state: "When estimating Equation 1 [the market model regression], it is important to select a sample period during which the fraud does not affect the normal relation between the security, the market, and the industry." Bradford Cornell and R. Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," *UCLA Law Review* 37, 1990, 883-924, at 898 (footnote omitted).

market model is more reliable if the market/industry volatility and the beta parameters over the class period are relatively similar to, or stationary compared with, that over the regression estimation period (*i.e.*, the period over which the market model is computed).  Volatility means the variation of returns over a given time period.  Substantial differences between market and industry conditions during the class period and the conditions that existed before the class period can potentially result in market model results that are not representative of the underlying relationships between the company's stock and the market and the industry during the class period.  For the same reason, it may be preferable to use class period returns for computing a market model when the class period is long.

51.     In this case, I found that the volatility of Celsius changed over the time period (prior to the Class Period and over the Class Period) I used to estimate the test market models. Therefore, I used a technique called "rolling regressions."  In this technique, for each date in the Class Period, a market model is estimated for the prior 126 trading days (which is approximately six months).[37]  Because each excess return is measured relative to the 126 trading days prior to that excess return, the most recent volatility provides a better estimate of the statistical significance when volatility is not constant over time.

52.     As mentioned above, the adjusted R-squared measures how well the variation in the independent variable (returns for the Market Index) explain the variation in the day-to-day

---

[37] This technique has been used by experts for defendants, as well as plaintiffs, in securities litigation cases.  *See*, *e.g.*, Expert Report of Paul A. Gompers dated October 24, 2011, ¶¶ 27-28, in *Paul Luman v. Paul G. Anderson, et al. (FCStone)*, in U.S. District Court, Western District of Missouri, Western Division, No. 4:08-cv-00514-C-W-HFS; and Expert Report of Chad Coffman, CFA, *In Re NII Holdings In. Securities Litigation*, September 11, 2015, ¶¶ 51-52, Civ. No. 1:14-cv-00227-LMB-JFA, United States District Court, Eastern District of Virginia, Alexandria Division.

19

stock price returns of Celsius.[38]  For Celsius' rolling regression market models, the adjusted

R-squared is on average 25.78% during the Class Period, indicating that Celsius' common stock

prices reacted to new general market information over the Class Period, which provides support

for my opinion that Celsius' common stock traded in an efficient market during the Class Period.

Studies indicate that, on average, R-squared across large samples of stocks can range from

approximately 10% to 20%.  Thus, Celsius stock price incorporated market information

commensurate with traded U.S. stocks.

53.     Based on the results of the market models, Exhibit 4 shows the excess stock-price

returns and their statistical significance for the period August 12, 2021 through March 3, 2022,

which encompasses the Class Period.  The exhibit also presents Celsius' daily common stock

volume, prices, returns, and market returns.

## VI.  MARKET EFFICIENCY FOR COMMON STOCK

### A.  The *Cammer* Factors for Market Efficiency

54.     In *Cammer*, five factors were listed that indicate that a security is traded in an

efficient market: i) average weekly share turnover of more than 1%; ii) coverage of the company

by securities analysts; iii) the presence of market makers or arbitrageurs; iv) the eligibility of the

company to file a Form S-3 with the SEC; and v) evidence of the stock price reacting to material

information.  I discuss each of these five factors below.

---

[38] For a discussion of R-squared and how it relates to market efficiency, *see*, for example, Sudipto Dasgupta, Jie Gan, and Ning Gao, "Transparency, Price Informativeness, and Stock Return Synchronicity: Theory and Evidence," *Journal of Financial and Quantitative Analysis* 45(5), Oct. 2010, 1189-1220, pp. 1189-1190.

*i)*        ***Weekly Trading Volume***

55.        The first indication of an efficient market in *Cammer* is that the average trading volume per week exceeds one percent of shares outstanding.[39]  Trading volume is generally viewed as an indicator of market efficiency because high volume implies significant investor interest in the company and liquidity.  The more liquid is a market, the lower the costs of trading in the market.

56.        The average weekly trading volume for Celsius' common stock was 4.9 million shares during the Class Period.  The average weekly trading volume as a percent of shares outstanding over the Class Period was 6.50%.[40]  *See* Exhibit 3.

57.        In a published paper, for the commonly accepted factors of market efficiency, my co-authors and I ranked the stocks listed on the NYSE and NASDAQ exchanges ("NYSE/Nasdaq Universe"), two of the most open and well-developed markets in the world, from best to worst.[41]  This allows for the benchmarking of Celsius statistics relative to the stocks in the NYSE/Nasdaq Universe.  The weekly turnover of Celsius shares during the Class Period is between the 75th and 90th percentiles of the universe of NYSE/NASDAQ stocks during 2016-2018, meaning that the turnover of Celsius stock is better than at least 75% of stocks that traded in these well-developed markets.[42]

---

[39] The *Cammer* opinion states that weekly trading volume that represents two percent or more of the outstanding shares would justify a "strong presumption" of market efficiency; one percent would justify a "substantial presumption."  *See Cammer* at 1286.

[40] The partial first week and last week of the Class Period is excluded from the analysis.

[41] The details of the analysis are discussed in: Bharat Bhole, Sunita Surana, and Frank Torchio, "Benchmarking Market Efficiency Indicators for Securities Litigation," *University of Illinois Online Law Review* 96, 2020, 96-116 ("BST 2020").

[42] *See* BST 2020, Table 1 (p. 102).  For comparison to BST 2020, Table 1, I calculate daily average turnover for Celsius common stock of 1.30% as the average weekly trading volume as a percent of shares outstanding of 6.50% divided by 5.

58.     In my opinion, the Company's weekly trading volume provides support that Celsius' common stock traded in an efficient market during the Class Period.  In addition, Celsius' trading volume exceeds the benchmark of weekly volume of 2% of shares outstanding that has been considered to justify "a strong presumption" that the market for a security is efficient.[43]

### ii)     Analyst Coverage

59.     The second indication of an efficient market in *Cammer* is the number of securities analysts following and reporting on the stock.  Reports issued by analysts serve the purpose of disseminating publicly available information along with analysis and recommendations by the analysts to investors.  *Cammer* stated it would be "persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period."[44]  The greater the number of analysts, the more likely information about the company is "relied upon by investors."[45]

60.     According to Bloomberg data, there were between 4 and 8 research analysts providing Buy/Sell/Hold recommendations for Celsius during the Class Period, with an average of 7 analysts.  Further, between 4 and 7 research analysts during the Class Period, with an average of 6 analysts, were part of the Refinitiv I/B/E/S consensus EPS estimate for the current fiscal year.  *See* Exhibit 3.  Approximately 130 analyst reports were issued during the Class

---

[43] *See Cammer* at 1286 (citing Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988)).

[44] *See Cammer* at 1286 (footnote omitted).

[45] *See In re Xcelera.com Sec. Litig.*, 430 F.3d 503 (1st Cir. 2005) ("*Xcelera*") at 514.

Period by firms including: Argus Research, Credit Suisse, Jefferies, Ladenburg Thalmann & Co., Maxim Group, Roth Capital Partners, and UBS Equities.[46,47]

61.     Again, I benchmark Celsius statistics relative to the stocks in the NYSE/Nasdaq Universe.  On average, analyst coverage for the Company (based on Refinitiv I/B/E/S data) was between the 25th and 50th percentiles of the stocks in the NYSE/Nasdaq Universe during 2016-2018, meaning that Celsius' analyst coverage is better than at least 25% of stocks that trade in well-developed markets.[48]  Consequently, Celsius' analyst coverage is adequate and better than 25% of the stocks in the NYSE/Nasdaq Universe, which provides support for my opinion that Celsius common stock traded in an efficient market during the Class Period.

*Media Coverage[49]*

62.     During the approximately 7-month Class Period, over 190 news articles about Celsius appeared in a leading financial and trade publications, including Benzinga, Business Wire, Associated Press Newswires, Bloomberg News, Bloomberg First Word, Contify Retail News, Dow Jones Institutional News, Dow Jones Newswire, GlobeNewswire, Newsfile, PR Newswire, Public Company News and Documents,  Reuters News, and

---

[46] Based on reports provided by Counsel, or those available on either the Refinitiv or S&P Capital IQ databases.  Analyst reports in Refinitiv were searched for "Celsius" with "Primary Company" checked.  Analyst reports in S&P Capital IQ were searched for symbol "CELH" with "Primary Symbol Only" checked.

[47] The number of analyst reports also includes reports by quantitative firms such as: BuySellSignals, Price Target Research; Validea, SADIF Analytics Prime, S&P Global Compustat, ValuEngine, and Wright Reports.

[48] *See* BST 2020 at Table 2, p. 104.  What was earlier known as Thomson Reuters I/B/E/S is now known as Refinitiv I/B/E/S.

[49] In addition to analyst coverage, courts have recognized media coverage as an indicator of market efficiency.  *See Cheney v. Cyberguard Corp.*, 211 F.R.D 484 (S.D. Fla. 2003) ("*Cyberguard*") at 499.

TheFlyonthewall.com.[50,51]  According to the SEC Edgar database, additional information about Celsius was distributed through over 20 Company SEC filings.  These filings included, among others, Forms 8-K and 10-Q.

63.     The Company's analyst and media coverage provides support that Celsius common stock traded in an efficient market during the Class Period.

### iii)     Market Makers

64.     The third *Cammer* factor indicating market efficiency is the presence of market makers.[52]  Market makers provide liquidity to traders, which facilitates economically efficient trading and thus is an indicator of an efficient market.  For quote-driven markets like NASDAQ, the larger the number of intermediaries like market makers, the greater is the confidence of high liquidity.[53]

65.     Throughout the Class Period, Celsius was listed on the Nasdaq Capital Market under the symbol "CELH."   During the Class Period, there were approximately 100 brokers, [including designated market makers,] that acted as intermediaries to provide liquidity to investors.  *See* Exhibit 3.  Therefore, because Celsius was listed on NASDAQ and had many

---

[50] Based on searches in Bloomberg and Factiva during the Class Period.  For Factiva, I searched for the Company code "Celsius Holdings Inc." and included all sources in the search. For Bloomberg, I used the ticker symbol "CELH" and searched for sources Bloomberg News and Bloomberg First Word.  There were 130 articles from the Factiva search and 65 articles from the Bloomberg search for a total of 195 articles.

[51] I note that in *Cyberguard* there were 524 news articles issued over the approximately 21-month class period.  *See Cyberguard* at 499.

[52] The *Cammer* opinion states that: "The existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *See Cammer* at 1286-87.

[53] In addition, the presence of arbitrageurs can be investigated by analyzing the presence of institutional investors, the level of short interest and the arbitrage condition of put-call parity. I investigate these indicia later in this Report.

intermediaries who performed market maker activities, indicates an efficient market for Celsius' common stock.

### iv)       Form S-3 Eligibility

66.       The fourth indication of an efficient market in *Cammer* is the eligibility of the company to file a Form S-3 with the SEC.[54]  According to *Cammer*: "The 'public float' aspect of the Form S-3 requirements ensures that enough investors have in fact read the previously filed document…  It is this aspect of the Form S-3 requirements that calls into play the efficient market hypothesis."[55]

67.       At the time of the *Cammer* decision, the filing of a Form S-3 registration statement required firms to file periodic reports with the SEC under the Exchange Act of 1934 for three years prior to the Form S-3 filing and to have $150 million of stock held by non-affiliates (or $100 million of stock held by non-affiliates coupled with annual trading volume of 3 million shares per year).[56]  The SEC has since modified the requirements for filing a Form S-3. Among the current requirements for filing a Form S-3 registration statement are that a company has filed reports under the Exchange Act for 12 calendar months and has an aggregate market value of common equity held by non-affiliates of $75 million or more.[57]  The value of Celsius common stock held by non-affiliates (*i.e.*, public float) during the Class Period ranged between approximately $1.7 billion and $4.6 billion, far exceeding the $75 million threshold requirement. *See* Exhibit 3.  Celsius was also organized and operated under the laws of the United States

---

[54] *See Cammer* at 1287.

[55] *See Cammer* at 1285 and n.33.

[56] *See Cammer* at 1271.

[57] *See* SEC 1379, "Form S-3, Registration Statement under the Securities Act of 1933," General Instructions, updated January 2022, pp. 2-4.

during the Class Period, satisfying the organizational requirement.[58]  In addition, Celsius filed a Form S-3ASR on June 9, 2021, just prior to the beginning of the Class Period.[59]

68.    In my opinion, the Company's substantial public float, in accordance with the float requirement for filing a Form S-3ASR, provides support that Celsius common stock traded in an efficient market during the Class Period.

### v)    Cause-and-Effect Relationship

69.    The fifth factor for an efficient market adopted by *Cammer* is a "cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."[60]  Economists in academia and private practice have published scholarly research of large sample studies that present various tests and statistical methodologies that can provide probative economic evidence concerning the existence of a cause-and-effect relationship consistent with market efficiency.[61]

70.    Academic literature has relied on the results from event study analyses as support for the EMH for stocks considered together as a sample or group.[62]  Academic event studies rarely provide inferences about the efficiency of any individual stock, but rather such findings show that markets are overall efficient.  This is because the majority of academic studies involve large-sample event studies and not studies of an individual stock.  Consequently, the use of an

---

[58] Among the requirements for filing a Form S-3 registration statement during the Class Period were that a company be organized under the laws of the United States or its territories. *See* SEC 1379, "Form S-3, Registration Statement under the Securities Act of 1933," General Instructions, updated January 2022, p. 2.

[59] *See* Celsius Form S-3ASR filed with the SEC on June 9, 2021.

[60] *See Cammer* at 1287.

[61] *See* Eugene F. Fama, "Efficient Capital Markets: II," *The Journal of Finance* 46(5), December 1991, 1575-1617, p. 1602.

[62]  *See, for example*, Eugene F. Fama, "Efficient Capital Markets: II," *Journal of Finance* 46(5), December 1991, 1575-1617, p. 1602.

event study to analyze the price movements of an individual stock requires an understanding of how individual stocks respond to news, as opposed to the average response to a type of event for hundreds of stocks.

71.     Thus, in applying the fifth *Cammer* factor, it is relevant to test whether the stock returns are in response to important, unexpected news by analyzing whether the new, material, information is accompanied by statistically significant stock returns.  In the following sections, I conduct event study analyses for Celsius' common stock using the market models discussed above.

72.     Event study methodology is discussed more fully in Section V. to this Report.  Attached as Exhibit 4 is a table of Celsius' daily common stock volume, dividends, prices, and returns.  Exhibit 4 also contains relevant market returns, as well as excess returns calculated for the Company's common stock as described above in Section V. B.

### a)  *Reaction to Market-wide Information*

73.     As mentioned above, the adjusted R-squared measures how well the variation in the independent variables here (returns to the Nasdaq Composite and Russell 2000 market indexes) explain the variation in the day-to-day stock price returns of Celsius.[63]  For Celsius' rolling regression market models, the average adjusted R-squared is 25.78%, indicating that Celsius' common stock prices reacted to new general market information over the Class Period, which provides support that Celsius common stock traded in an efficient market during the Class

---

[63] For a discussion of R-squared and how it relates to market efficiency, *see*, for example, Sudipto Dasgupta, Jie Gan, and Ning Gao, "Transparency, Price Informativeness, and Stock Return Synchronicity: Theory and Evidence," *Journal of Financial and Quantitative Analysis* 45(5), Oct. 2010, 1189-1220, pp. 1189-1190.

Period.  Studies indicate that, on average, R-squared across large samples of stocks can range from 11% to 17%.[64]

> b)  *Event Study of "News" Days versus "Non-News" Days*

74.     A test of a cause-and-effect relationship that has been employed by financial economists evaluating market efficiency in securities litigation is a statistical comparison of stock-price movements for days during the relevant period on which firm-specific news was released to movements on days on which no such firm-specific news was released.  For this test of a cause-and-effect relationship, I determine an appropriate definition of a "news day."  To avoid making subjective decisions based on reading and attempting to "value" the actual news stories to determine "news days," I rely on a pre-set "objective" definition of "news day" – days with a Company-issued press release.[65,66]  I use this definition with the understanding that no single definition of "news days" will perfectly identify all the days that in fact have value-relevant news and that news about Celsius, like any other company, can and was disclosed by

---

[64] *See*, for example, Qi Chen, Itay Goldstein, and Wei Jiang, "Price Informativeness and Investment Sensitivity to Stock Price," *The Review of Financial Studies* 20(3), 2007, 619-650, pp. 630-632.  *See also* Steven S. Crawford, Darren T. Roulstone, and Eric C. So, "Analyst Initiations of Coverage and Stock Return Synchronicity," *The Accounting Review* 87(5), 2012, 1527-1553, p. 1537.

[65] Sources for Company-issued press releases, including press releases issued by Celsius: Factiva.  Excluded from "news days" are any press releases in which the Company simply disclosed the existence of a future event, such as the date on which earnings would be disclosed.  News released after the close of market are mapped to the following trading day.

[66] The Court in *Petrobras* noted, "However, evidence of directionality or the degree of fit between expected and observed moves in a market need not be substantial to allow a finding of market efficiency.  Such evidence goes to the accuracy of the price of a security, and the Supreme Court has explained that it is not the accuracy of a price as a reflection of underlying value but instead the sensitivity of the price to false statements that underlies the Basic presumption. …. Whether the market, upon receiving new information, moved in the precise way analysts or experts would expect it to move is not the key to unlocking Basic's presumption of reliance.  What is essential is evidence that, when the market received new information, it 'generally affect[ed]' the price."  *See In re: Petrobras Sec. Litig.*, 312 F.R.D. 354 (S.D.N.Y. 2016) at 370.

means other than through Company press releases.[67]  "Non-news days," for purposes of this

analysis, includes all days without a Company-issued press release.  I note that the term "non-

news days" is not meant to imply that there was no value-relevant news on any of these days,

and that it simply identifies the days that do not fit the definition of "news days" used for this

analysis.

75.      Exhibit 5 identifies the 16 dates of Company disclosures during the period

covering August 13, 2020 through March 1, 2022, which I identified as passing my pre-set

objective criteria of a "news day."[68]

*Test of Proportion of Statistically Significant Excess Returns*

76.      Of these 16 "news" days, 3 days (or 18.8%) were accompanied by statistically

significant stock-price movements at the 5% significance level.  Conversely, of the 374 "non-

news" days, only 11 (or 2.9%) were statistically significant at the 5% significance level,

indicating that Celsius stock was approximately 6.4 times (18.8% / 2.9%) more likely to react in

a statistically significant manner on days when the Company issued press releases containing

potentially value-relevant information than on days without.[69]

---

[67] The news might not have a valuation effect great enough to cause a stock-price reaction that is statistically significant at 5% level.  To illustrate this point, first note that an excess stock return must exceed 1.98 times the standard error of the market model to be significant at the 5% level.  1.98 is the t-statistic associated with a 5% p-value for my Market Model (with 126 observations and degrees of freedom of 123).  When using the average standard error from my rolling regression market models over the Class Period, this means that the daily excess return must be at least 7.22% (*i.e.*, the average standard error of 3.64% x 1.98) in this example to be significant at the 5% level.  Given that Celsius' average market capitalization during the Class Period was $5.577 billion (*see* Exhibit 3), a 7.22% excess return translates to a market value increase (or decrease) of roughly $402.5 million (*i.e.*, $5.577 billion x 7.22%).

[68] I extended the time period to include a year prior to the Class Period to increase the number of observations.

[69] Courts have accepted the test of proportions for analyzing cause-and-effect.  *See, e.g., In re Alstom SA Sec. Litig.*, 253 F.R.D. 266 (S.D.N.Y. 2008) at 280.

77.      I tested whether the proportion of statistically significant stock-price reactions on news days is statistically significantly different from the proportion on non-news days using Fisher's Exact Test.  With a p-value[70] of 1.57%, the Fisher's Exact Test shows that the difference in proportions is statistically significant at the 5% significance level.[71]  *See* Exhibit 6.

78.      Thus, because the proportion of statistically significant excess returns for news days is statistically greater than for non-news days, this analysis supports a finding of market efficiency for Celsius common stock.

*Test of Variance of Returns on News Days versus Non-News Days*

79.      If important, value-relevant information is disclosed on news days, one would expect greater volatility from news days relative to non-news days.  For example, Beaver *et al*. (2018) found a positive association between relative return variability at earnings announcements and the increase in information content disclosed concurrently with financial statement items.[72]

80.      I analyzed the volatility of Celsius stock price returns on the 16 news days.  To analyze whether the variance of the excess returns on the 16 news days is the same as the non-news days, I performed a standard F-test.[73]  As shown in Exhibit 7, the variance of the excess returns on the 16 Celsius news days is approximately 9.57 times greater than the variance for

---

[70] The level of statistical significance is often expressed as a *p*-value.  This a p-value of 0.05 is synonymous with a confidence interval of 95%.  *See*, for example, Jeffrey M. Wooldridge, Introductory Econometrics, A Modern Approach, 2nd ed., Thomson South-Western, 2003, p. 132.

[71] I also tested the difference in proportions using the standard z-test.  A z-statistic of 3.33 and a p-value of 0.09%, shows that the difference in proportions is statistically significant at the 1% significance level.  *See* Exhibit 6

[72] *See* William H. Beaver, Maureen F. McNichols, and Zach Z. Wang, "Increased Information Content of Earnings Announcements in the 21st Century: An Empirical Investigation," Working Paper, June 19, 2018.

[73] For a detailed discussion of the F-test, *see* David R. Anderson, Dennis J. Sweeney, and Thomas A. Williams, Statistics for Business and Economics, 9th ed., Thomson Learning, 2005, pp. 498-499.

non-news days (1.42%/0.15%).  With an F-statistic of 9.57 and a p-value less than 0.01, the difference of the variances is statistically significant at the 1% significance level.[74]

81.     Thus, the results of my analysis of the variance of excess returns for news days support a finding of market efficiency for Celsius common stock.

### c)   *Correlation Between Price Changes and Trading Volume*

82.     Economists have studied the empirical correlation between absolute stock returns and volume since 1970 for stocks and other securities traded in the United States and elsewhere.[75]  A strong, direct relationship is the widespread finding, and this evidence is generally interpreted as meaning that both volume and stock-price changes have common ties to the flow of new information about the security.  Thus, new important information about a company that is perceived by different investors as having differing valuation effects for the security will typically also cause greater than normal trading volume.

83.     Because of this, days with important news will tend to correspond with greater-than-normal trading volume as different investors alter positions in accordance with their differing valuation views.

84.     Thus, I check for this statistical correlation between Celsius' reported volume and stock-price changes using both the Company's absolute returns and absolute excess stock returns.  An "absolute return" means that each negative return is transformed into a positive return (*i.e.*, only the magnitude but not the direction of the return is considered).  Both returns are regressed on (the natural log of) Celsius' trading volume on a daily basis over the Class Period.

---

[74] I also performed a Brown-Forsythe test, which also showed that the difference of the variances is statistically significant at the 1% level.

[75] For a survey of the literature, *see* Jonathan M. Karpoff, "The Relation Between Price Changes and Trading Volume: A Survey," *Journal of Financial and Quantitative Analysis* 22(1), March 1987, 109-126.

85.     In both regressions, consistent with an efficient market, I find a strong, positive relationship between daily volume and the absolute value of Celsius' common stock price returns.  The t-statistics of 6.38 and 6.91, respectively, indicate that these two estimated coefficients are positive at greater than the 1% significance level.  *See* Exhibit 8.

86.     The results of my analysis of correlation between price changes and trading volume provide support for the finding that Celsius common stock traded in an efficient market during the Class Period.

87.     Based on the analyses discussed above, in my opinion, the fifth *Cammer* factor provides support for a finding of market efficiency for Celsius common stock.

## B.  The *Krogman* and *Unger* Factors for Market Efficiency

88.     In addition to the five *Cammer* factors discussed above, I analyzed three additional factors accepted by the courts in *Krogman* and *Unger* as providing evidence of an efficient market.  These additional factors include the: i) market capitalization of the company; ii) bid-ask spread of the stock; and iii) percentage of stock not held by insiders (the "float").[76]  I analyze these factors below.

### i)     *Market Capitalization*

89.     A large market capitalization is an indicator of market efficiency because there is a greater incentive for investors to collect and analyze information about large corporations.[77]  During the Class Period, Celsius' market capitalization ranged from approximately $3.0 billion to approximately $8.1 billion, with an average of $5.6 billion.  *See* Exhibit 3.

---

[76] *See Krogman* at 478; *Unger* at 323.

[77] *See Krogman* at 478.

90. Celsius' average market capitalization was between the 75th and 90th percentiles of the stocks in the NYSE/Nasdaq Universe during 2016-2018, meaning that Celsius' market capitalization is better than at least 75% of stocks that trade in well-developed markets.[78,79]

91. In my opinion, Celsius' market capitalization provides support for my opinion that Celsius common stock traded in an efficient market during the Class Period.

92. According to data from Refinitiv, institutions held approximately 50.6% of the Company's shares outstanding during the Class Period.[80] *See* Exhibit 3. Institutional ownership of a stock is typically associated with strong competition for generating returns from the stock. Generally, institutional investors have significant experience in evaluating investments and assessing the effect of new information on the future prospects of a traded company's stock. Indeed, several articles comment on the use of institutional holdings as a proxy for market efficiency. For example, a study by Barber et al. (1994) concludes that, in isolation, institutional holdings are a proxy for market efficiency.[81] Thomas and Cotter (2000) argue that the level of institutional investors' ownership in a company's stock is a proxy for market efficiency.[82]

93. Celsius' average institutional ownership as a percent of shares outstanding is between the 25th and 50th percentiles of the stocks in the NYSE/Nasdaq Universe during 2016-

---

[78] *See* BST 2020 at Table 5, p. 107.

[79] I note that the market capitalization in *Krogman* was at the 60th percentile of a sample group of NYSE, Nasdaq, and Amex stocks. *See Krogman* at 478.

[80] Institutional shareholding can be greater than shares outstanding or public float due to short interest.

[81] *See* Brad M. Barber, Paul A. Griffin, and Baruch Lev, "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *The Journal of Corporation Law* 19, Winter 1994, 285-312, p. 302.

[82] *See* Randall S. Thomas and James F. Cotter, "Measuring Securities Market Efficiency in the Regulatory Setting," *Law and Contemporary Problems* 63(3), Summer 2000, 105-122, p. 106.

2018, meaning that Celsius' institutional ownership is better than at least 25% of stocks that trade in well-developed markets and provides support for a finding that Celsius common stock traded in an efficient market during the Class Period.[83]

### ii) Bid-Ask Spread

94.     Bid-ask spreads are one component of the cost of trading financial securities. They provide a measure of the difference in price between the highest price that a buyer is willing to pay (bid) for the stock and the lowest price that a seller is willing to accept (ask).  Bid-ask spreads are an indication of market efficiency because the lower the bid-ask spreads, the lower the costs of trading.  Lower costs of trading reduce impediments to trade as new information enters the market.[84]

95.     The average bid-ask spread for Celsius common stock during the Class Period was 0.13%.  *See* Exhibit 3.

96.     Celsius' average bid-ask spread is between the 25th and 50th percentiles for stocks in the NYSE/Nasdaq Universe during 2016-2018 for this measure of efficiency, meaning that Celsius' average bid-ask spread was lower (better) than at least 50% of the stocks within the universe.[85]

97.     Based on this evidence, Celsius' average bid-ask spread of 0.13% was not a deterrent to investor trading activity in Celsius common stock and provides support for finding that Celsius common stock traded in an efficient market during the Class Period.

---

[83] *See* BST 2020 at Table 4, p. 106.

[84] The court in *Cyberguard* found that a bid-ask spread of 2.44% weighed in favor of market efficiency.  *See Cyberguard* at 501 (citing *Krogman).*

[85] *See* BST 2020 at Table 3, p. 105.

### iii)     *Public Float*

98.      The court in *Krogman* used the size of the public float as an indicator of market efficiency.[86]  Celsius' public float during the Class Period ranged from 42.1 million to 42.5 million shares, representing on average 56.7% of the Company's shares outstanding.[87]  *See* Exhibit 3.

99.      On a dollar basis, Celsius' float ranged from $1.7 billion to $4.6 billion, with an average of $3.2 billion during the Class Period.  *See* Exhibit 3.

100.      Celsius' average public float of $3.2 billion was at the 75th percentile of the market capitalization (which is greater than public float because public float excludes the value of shares held by insiders and affiliates) of stocks in the NYSE/Nasdaq Universe during 2016-2018, meaning that Celsius' public float is better than at least 75% of the market capitalization of stocks that trade in well-developed markets.[88]  Celsius' public float provides support for a finding that Celsius common stock traded in an efficient market during the Class Period.

### C.  The *Polymedica* Factors for Market Efficiency

101.      In addition to the factors discussed above, the court in *PolyMedica* considered several other factors as evidence of market inefficiency.  These factors include: i) the presence of serial correlation in PolyMedica's stock price returns; ii) constraints on short selling; and iii) violations of put-call parity.[89]  I analyze these factors below.

---

[86] *See Krogman* at 478.

[87] 56.7% represents the average public float of 42.4 million shares divided by the average shares outstanding of 74.8 million shares over the Class Period.

[88] *See* BST 2020 at Table 5, p. 107.

[89] *See PolyMedica* at 18.

### i) *Autocorrelation*

102. I conducted statistical tests to determine whether the returns for Celsius common stock exhibited "autocorrelation," which is also referred to as "serial correlation." Autocorrelation has been studied in the financial economics literature and accepted by the courts.[90]

103. Autocorrelation in a stock's returns means that tomorrow's stock price movement can be systematically predicted with a degree of statistical confidence based solely on the price movement today. This ability to predict stock price movements is a consequence of either of two problems. First, the market systematically overreacts to new information. A systematic overreaction allows investors to earn arbitrage profits by buying on days containing bad news (or selling short on the days containing good news) because there will be a reversal the next day (negative autocorrelation).

104. Second, the market takes excessive time to incorporate new information or systematically underreacts to new information. A systematic underreaction to news allows investors to earn arbitrage profits by buying on a day with good news and selling short on days containing bad news (positive autocorrelation).

105. The presence of statistically significant autocorrelation over short subperiods may mean that there were instances in which there were consecutive days for which important news

---

[90] The lack of autocorrelation generally corresponds to the theory of random walk. "The term 'random walk' is usually used loosely in the finance literature to characterize a price series where all subsequent price changes represent random departures from previous prices. Thus, changes in price will be unrelated to past price changes." *See* Burton G. Malkiel, "Efficient Market Hypothesis," in The New Palgrave: A Dictionary of Economics, Volume 2, E to J, ed. by John Eatwell, Murray Milgate and Peter Newman, The Macmillan Press Limited, 1998, pp. 120-123. *See also Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 506-07 (S.D. Tex. 2004); *In Re Polymedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260 ("*PolyMedica II*") at 276-77.

was disseminated.  Under these circumstances, statistically significant autocorrelation would not indicate that any arbitrage opportunity existed, but rather is a figment of consecutive news days.

106.    To test for autocorrelation, I first performed a regression analysis of Celsius' daily common stock returns on the returns from the previous day over the Class Period.  I found no statistically significant autocorrelation for Celsius' returns during the Class Period.[91]

107.    I also performed a regression analysis of Celsius' daily common stock excess returns on the excess return from the previous day over the Class Period.  I found no statistically significant autocorrelation for Celsius' excess returns, which means there is no statistical evidence of autocorrelation of Celsius' excess returns.[92]  *See* Exhibit 9.

108.    In my opinion, the lack of autocorrelation provides support for a finding that Celsius common stock traded in an efficient market during the Class Period.[93]

### ii)      *Short Interest*

109.    The presence of short sellers is another indication of investor activity.  Investor activity is a key component of a well-functioning efficient market.  The level of short interest for Celsius' common stock during the Class Period averaged 2.6 million shares, which is 3.5% of the Company's common shares outstanding.[94]  *See* Exhibit 3.

---

[91] The coefficient for Celsius' return from the previous day over the Class Period is 0.05 with a t-statistic of 0.59, which is not statistically significant at the 5% significance level. *See* Exhibit 9.

[92] The coefficient for Celsius' excess return from the previous day over the Class Period is -0.014 with a t-statistic of -0.17, which is not statistically significant at the 5% significance level. *See* Exhibit 9.

[93] I note that the court in *PolyMedica* found the presence of autocorrelation to be direct evidence of an inefficient market. *See PolyMedica II* at 276-77.

[94] Short interest ranged between 7.8% and 66% in *PolyMedica*. *See PolyMedica II* at 273.

110.    Celsius' average short interest as a percent of shares outstanding is between the 50th and 75th percentiles for securities in the NYSE/Nasdaq Universe during 2016-2018 for this measure of efficiency, meaning that Celsius' average short interest as a percent of shares outstanding was higher than 50% of the stocks within the universe.[95]

111.    I also examined the short interest coverage ratio, which indicates how many trading days it takes to cover a short position given the reported trading volume.  The short interest coverage ratio equals short interest divided by average daily trading volume.[96]  The average short interest coverage ratio for Celsius common stock was approximately 2.6 days during the Class Period.  *See* Exhibit 3.  This indicates that, on average, it would take short sellers approximately 2.6 trading days to cover their entire short position in Celsius common stock, assuming historical trading volume remained constant.

112.    The short interest coverage ratio is not, by itself, supportive of a finding for market efficiency, however, if short selling in Celsius stock were constrained during the Class Period, it would likely manifest itself as relative mispricing between the Company's common stock and traded options, which I discuss next.

### iii)    Put-Call Parity

113.    Options are a type of "derivative" financial security whose value is dependent on the value of another financial security or asset, which in the case of Celsius options is Celsius common stock.[97]  Therefore, to the extent that the Celsius common stock share price reflects all

---

[95] *See* BST 2020 at Table 6, p. 107.

[96] For each day, the average trading volume equals the average volume for the previous 20 trading days through the current day.

[97] A call option gives the holder the right, but not the obligation, to purchase the underlying security at a specific price (the "exercise price") on, or possibly before, a specific date (the "expiration date").  A put option gives the holder the right, but not the obligation, to sell the underlying security at the exercise price on, or possibly before, the expiration date.

publicly available information about the Company and adjusts rapidly to account for new, important and unanticipated information, it would be expected that prices for Celsius options would also reflect all publicly available information about the Company, and adjust rapidly to account for the new, important and unanticipated information. Several court rulings are consistent with this understanding in that they have considered the satisfaction of certain efficiency factors for common stock to be sufficient to demonstrate that the derivative options also trade in an efficient market.[98]

114. The relationship between the stock price and the option prices can also be empirically tested. In an efficient market, the various call and put options of a stock will be priced relative to one another (and the stock) so as to provide zero profits from arbitraging these securities against one another. Economists refer to this no-arbitrage state as put-call parity. Thus, if put-call parity holds and there are minimal violations, then this supports a finding of market efficiency.

115. Because in addition to trading the stock directly, arbitrageurs can also profit from perceived mispricing of the common stock by trading in call and put options on the common

---

[98] *See In re Enron Corp. Sec., Derivative & 'ERISA' Litig.*, 529 F. Supp. 2d 644 (S.D. Tex. 2006) at 754 ("The Court finds that Dr. Nye's evidence applying the *Cammer/Unger/Bell* factors to the stock, is sufficient to trigger the fraud-on-the-market presumption for Plaintiffs' § 10(b) claims based on the options."); *In re Merck & Co., Sec. Derivative & ERISA Litig.*, LEXIS 13511, (D.N.J. Jan. 30, 2013) at 60-61 ("Moreover, insofar as the alleged Rule 10b-5 violations are predicated on put or call options transactions, the trading of Merck stock on the efficient NYSE suffices to establish that the options also traded on an efficient market."); *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415 (S.D.N.Y. 2014) at 433-34 ("where a court finds the Market Efficiency Requirement satisfied, '[o]ption traders ... may use the fraud-on-the-market presumption of reliance absent special circumstances compelling a different result.' *In re Priceline.com Inc.*, 236 F.R.D. 89 (D.Conn. 2006)".).

stock, the test of the put-call parity relationship can also be considered a test of efficiency for common stock as was the case in *Polymedica*.[99]

116.    Put-call parity is a theoretical relation between call option prices, put option prices, and stock prices that should hold because a portfolio of put and call options plus risk-free bonds can be constructed to replicate the payoff from purchasing the underlying common stock. An American-style option (unlike European-style) can be exercised at any time during its life. For American-style options (such as Celsius'), the put-call parity relation implies an upper and lower bound on the value of the put and call option prices such that:

$$S - D - X \leq C - P \leq S - Xe^{-rt},$$

where $S$ denotes the current price of common stock, $D$ denotes the present value of future dividends, $X$ denotes the exercise price of the option, $C$ is the call option price, $P$ is the put option price, $r$ is the risk-free interest rate, and $t$ is the time to expiration of the options.[100]

117.    I conducted an empirical test to determine whether Celsius' common stock and exchange-traded options on Celsius' common stock violated put-call parity on any day during the Class Period.

118.    I obtained daily bid and ask data for options on Celsius' common stock from IVolatility.[101]  The IVolatility database includes daily open interest, volume, expiration date, exercise price, and bid and ask prices for each option.[102]

---

[99] *See PolyMedica* at 18.

[100] *See*, for example, John C. Hull, Options, Futures, and Other Derivatives, 6th ed., Pearson Prentice Hall, 2006, p. 219.  Celsius did not declare or distribute any dividends during the Class Period.  *See* Celsius SEC Form 10-K dated March 16, 2022, p. 16.  Therefore, the term $D$ in the equation is set to zero.

[101] Available at http://www.ivolatility.com.

[102] Open interest is the number of outstanding option contracts at a given point in time. In general, equity option contracts represent 100 shares of the underlying equity and option prices are quoted on a per-underlying share basis.

119.    For the risk-free interest rate, I use the U.S. Treasury constant maturity rate closest to days to expiration.[103,104]

120.    Both the upper and lower bounds were tested over pairs of options with valid bid and ask prices on days on which bid and ask quotes for Celsius' common stock were available. Because these bounds are derived from the economic assumption of no arbitrage, the lower bound was tested using the ask price for the call option, the bid price for the put option, and the bid price of the stock; the upper bound was tested using the bid price for the call option, the ask price for the put option, and the ask price of the stock.[105]

121.    I also checked for observations in which the bid price was greater than the ask price for the call option, put option, or common stock, or if both the ask price and the bid price for the call option or the put option were zero for a given pair of options, which I would exclude from the analysis.  These restrictions excluded no options out of 18,678 pairs.

122.    The results obtained from my analysis showed 9 (or 0.05%) violations of put-call parity out of the 18,678 valid option pairs during the Class Period (beginning on August 12, 2021).  Thus, Celsius' common stock and options exhibited adherence to put-call parity theory.

---

[103] Interest rate data is obtained from the Federal Reserve Board database available at https://www.federalreserve.gov/datadownload/Download.aspx?rel=H15&series=bf17364827e38 702b42a58cf8eaa3f78&filetype=csv&label=include&layout=seriescolumn&from=01/01/1999&to=04/30/2023.  The following cut-offs are used in assigning interest rates to time to maturity: 1-60 days, 1 month rate; 61-136 days, 3 month rate; 137-273 days, 6 month rate; 274-547 days, one year rate; and 548-913 days, two year rate.  I converted the interest rates to continuous compounding, $2 \times \ln(1+r/2)$, where $r$ is the interest rate based on semiannual compounding.

[104] The number of days to expiration is set as the expiration date less the trading date.  If the expiration date is a Saturday or Sunday, I further deduct the number of days to expiration by one or two, respectively.

[105] The lower bound is violated if $S^{bid} > C^{ask} - P^{bid} + D + X$; the upper bound is violated if $S^{ask} < C^{bid} - P^{ask} + Xe^{-rt}$.  As mentioned above, the term $D$ is zero in the case of Celsius.

This observation provides support for a finding that Celsius' common stock traded in efficient markets during the Class Period.[106]

## D.  Summary

123.    The preponderance of evidence from my analyses shows indicia of information flow, low costs of trading, and competition among investors.  The results of these analyses taken together form my opinion that Celsius' common stock traded in an informationally efficient market during the Class Period.

124.    Because the preponderance of all the evidence supports an efficient market, in my opinion the market for Celsius stock was efficient during the Class Period.

## VII.  CLASS-WIDE DAMAGES METHODOLOGY

## A.  Overview

125.    Damages under Section 10(b) of the Exchange Act and SEC Rule 10b-5 are generally based on an out-of-pocket measure – the difference between the artificial inflation on the date of purchase and the artificial inflation on the date of sale.[107]  Artificial inflation is defined as the difference between the actual stock price and the "true value" of the stock on each day in a class period, where the true value of the stock is its value after accounting for the effect of the disclosure failures.  Damages experts routinely provide economic evidence to assist the court or jury in determining whether or not certain misrepresented information is material and the amount of losses caused when such information is revealed to the market.

---

[106] I note that the court in *PolyMedica* determined that substantial violations of put-call parity were indicative of an inefficient market.  *See PolyMedica II* at 275.

[107] Damages are also limited by the 90-day look-back provision of the PSLRA.  *See* footnote 14.

126.    It is my understanding that, for Section 10(b) claims, plaintiffs are ultimately required to show a sufficient connection between the alleged misconduct and financial losses suffered by investors when the truth is revealed.  I refer to this as economic evidence of loss causation.  In general, losses that result from disclosure failures are manifested as this conduct is actually revealed through "curative" or "corrective" disclosures that eventually bring an alleged disclosure failure and/or its economic effects to light.

127.    I primarily rely on event study analysis as the basis of my opinions.  The focus of event studies in securities litigation is predominantly on disclosures that correct prior disclosure failures.  Negative price reactions from corrective disclosures can provide economic evidence of materiality and loss causation.[108]  The stock price change caused by a corrective disclosure is generally the best estimate of the change in the amount of artificial inflation present in the security on the date of the disclosure because the corrective disclosure removes artificial inflation from the market price of the stock.

128.    In addition to analysis of the disclosures that correct prior disclosure failures, event study analysis can also be used in certain circumstances to examine the stock price reaction on the date of an "affirmative misstatement."  An affirmative misstatement is a statement containing misleading information for which such information was unanticipated or unexpected by the market.  Only in circumstances for which there are affirmative misstatements can an event study analysis for the disclosure day provide useful economic evidence.

---

[108] *See* Mark Mitchell and Jeffrey Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer* 49, February 1994, 545-590; and David Tabak and Frederick Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Chapter 19 in Litigation Services Handbook: The Role of the Financial Expert, 3rd ed., ed. by Roman L. Weil, Michael Wagner, and Peter Frank, Wiley, 2001.

129.    On the other hand, for a statement that omits material information, as opposed to an affirmative misstatement, it is widely recognized and understood that a researcher would <u>not</u> expect to observe a price reaction.  By definition, an omitted fact is not disclosed to the market. An event study is designed to quantify the effect of <u>disclosed</u> information, not undisclosed information.[109]  Consequently, an event study is not used to assess disclosures that omit material information.[110]  While one would not expect a statement that omits material information to result in a positive price reaction, the omitted information, however, can still result in a significant negative price reaction when it is ultimately corrected.  Therefore, omitted information can cause the price of a security to be artificially inflated.

**B.  Analysis of Information from Disclosures in Event Studies**

130.    The first step in performing this part of the event study analysis is to identify disclosures that informed market investors of the alleged misconduct and its direct and foreseeable economic effects.  Then the results of the statistical analysis discussed above are used to determine whether the identified disclosures resulted in statistically significant stock price declines and to quantify the per-share losses caused by the revelation of alleged disclosure failures.

131.    There are several important factors, which I discuss below, that should be considered when identifying which disclosures are relevant in securities litigation.

---

[109]  *See* David Tabak and Frederick Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Chapter 19 in <u>Litigation Services Handbook: The Role of the Financial Expert</u>, 3rd ed., ed. by Roman L. Weil, Michael Wagner, and Peter Frank, Wiley, 2001(emphasis added).

[110] *See* Frank Torchio, "Proper Event Study Analysis in Securities Litigation," *The Journal of Corporation Law* 35(1), Fall 2009, 159-168.

### i)       *Economic Correspondence*

132.     As discussed above, in general, losses that result from disclosure failures are manifested as this conduct is revealed through the release of "curative" or "corrective" information that eventually brings the alleged disclosure failure and/or its economic effects to light.  If the new information disclosed has sufficient economic correspondence or equivalence to the information alleged to have been previously misrepresented and/or omitted, then the information is said to "correct," to some degree, the previous misrepresentation and/or omission.[111]

133.     Corrective information can emanate from issuers or from various other sources, including securities analysts, rating agencies, news media, regulators, whistleblowers, and activist shareholders.[112]  The market will generally react quickly to the release of new important information.  To measure the full effect of a disclosure of complex information will often require the inclusion of subsequent, related or follow-on disclosures, such as reports or statements by expert analysts and additional media reports.[113]

---

[111] *See* Bradford Cornell and R. Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," *UCLA Law Review* 37, June 1990, 883-924, at 894.

[112] This is consistent with court decisions in securities class action matters.  *See*, *e.g.*, *Norfolk County Retirement System v. Community Health Systems, Inc.*, 877 F.3d 687, 695 (6th Cir. 2017) ("Sometimes defendants reveal their own fraud via a 'corrective disclosure,' *i.e.*, a statement that reveals what the defendants themselves previously concealed.  But such admissions can be hard to come by, and courts have otherwise held that revelations can come from many sources, including whistleblowers, analysts, and newspaper reports."); *Public Employees' Retirement System of Mississippi v. Amedisys, Inc.*, 769 F.3d 313, 322 (5th Cir. 2014) ("A corrective disclosure can come from any source, and can 'take any form from which the market can absorb [the information] and react,' Matthew L. Fry, Pleading and Proving Loss Causation in Fraud-on-the-Market-Based Securities Suits Post-*Dura Pharmaceuticals*, 36 Sec. Reg. L.J. 31, 64-71 (2008), so long as it 'reveal[s] to the market the falsity' of the prior misstatements.  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 n. 4 (2d Cir. 2005).")

[113] This is consistent with court decisions in securities class action matters.  *See*, *e.g.*, *Public Employees' Retirement System of Mississippi v. Amedisys, Inc.*, 769 F.3d 313, 322 (5th

134. I refer to economic correspondence as the extent to which disclosures of economic information connect or correspond to the alleged misrepresentations (misstated or omitted information) or the reasonably foreseeable economic consequences of those misrepresentations and other activities that together constitute the alleged disclosure failure. Thus, economic correspondence means that the economic content and substance of the information disclosed accords with economic content and substance and the foreseeable economic effects of the alleged misrepresentations and related misconduct.

135. In securities litigation, it is rare to encounter language in a corrective disclosure that is identical to the language describing the alleged misrepresentations.[114]  A cursory comparison of the language in a corrective disclosure to that in a complaint may suggest that the corrective disclosure "over-corrects" (or sometimes "under-corrects") the disclosure failures.

### ii) *Direct and Foreseeable Consequences*

136. Direct and foreseeable consequences, as I apply the term in an economic context, refer to whether the ultimate effects or consequences of the alleged misrepresentations from a

---

Cir. 2014) ("Nor does the corrective disclosure have to be a single disclosure; rather, the truth can be gradually perceived in the marketplace through a series of partial disclosures. *Lormand*, 565 F.3d at 261.  'Thus besides a formal corrective disclosure by a defendant followed by a steep drop in the price of stock, the market may learn of possible fraud from a number of sources: *e.g.*, from whistleblowers, analysts' questioning financial results, resignations of CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals, etc.' *In re Enron Corp. Sec., Derivative & 'ERISA' Litig.*, No. MDL-1446, 2005 U.S. Dist. LEXIS 41240, 2005 WL 3504860 at *16 (S.D. Tex. 2005) (citations omitted).").

[114] This is consistent with court decisions in securities class action matters. *See*, *e.g.*, *In re Williams Securities Litigation - WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009) ("To be corrective, the disclosure need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company"); *Public Employees' Retirement System of Mississippi v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014) ("This Circuit has previously observed that the standard of 'relevance' in an evidentiary context is not a steep or difficult one to satisfy. *Lormand*, 565 F.3d at 256 n.20.  The test for 'relevant truth' simply means that the truth disclosed must make the existence of the actionable fraud more probable than it would be without that alleged fact, taken as true.").

corrective disclosure would have been reasonably anticipated or predictable from the given counterfactuals.  The literature discusses the concept of foreseeability within the fundamentals of loss causation for financial expert witnesses.[115]  There are some judges' opinions that allude to acceptance of foreseeability regarding consequential damages as a basis for losses from disclosure failures.[116]

137.    One common example of foreseeable consequences in securities litigation concerns the loss of management credibility or integrity because of disclosure failures.[117] Generally, top managers in publicly traded corporations are sophisticated and knowledgeable. Therefore, top managers could and would anticipate that if they fail to disclose important and relevant information to investors (for example, by overstating their firm's performance in its financial statements) and the disclosure failure is later discovered, the market could well reduce the firm's stock price because of perceived lack of credibility associated with the disclosure failure in addition to the direct effect from the true financial information hidden by the disclosure failure.  That is, the revelation that management withheld information, when discovered, can

---

[115] *See* Joshi, Madrid, Mulholland, "Causation Issues and Expert Testimony, The Fundamentals of Causation," Litigation Services Handbook: The Role of the Financial Expert, 5th Ed., ed. by Roman L. Weil, Daniel G. Lentz, and David P. Hoffman, p. 3.4.

[116] *See Garnatz v. Stifel, Nicolaus & Co.*, 559 F.2d 1357, 1361 (8th Cir. 1977); *DCD Programs v. Michael W. Leighton, et al.*, 90 F.3d 1442, 1449 (9th Cir. 1996); and *The Ambassador Hotel Company, Ltd. v. Wei-Chuan Investment, et al.*, 189 F. 3d 1017, 1030 (9th Cir. 1999).

[117] Some argue that damages should not include any stock losses attributable to a diminution in management credibility that results from the disclosure failures.  This view is based principally on a legal theory that a stock loss from diminished management credibility, even if directly caused by the disclosure failures, is a form of "collateral damage" and that collateral damages should not be included in a damage award to harmed shareholders.  *See* Frederick Dunbar and Arun Sen, "Counterfactual Keys to Causation and Damages in Shareholder Class Actions," *Wisconsin Law Review*, 2009, 199-242; Bradford Cornell and James Rutten, "Collateral Damage and Securities Litigation," *Utah Law Review* 3, 2009, 717-747.

have significant negative effects on the stock in excess of <u>the direct effect</u> from the revelation of previously undisclosed information itself.

138.    In my view, this approach is appropriate and proper to answer the question of what losses were caused by the disclosure failures in securities cases.

### iii)    Truth-on-the-Market

139.    "Truth-on-the-market" means that the information identified in a specific disclosure that corrects the alleged misrepresentations has already been fully disclosed and, therefore, is already in the total mix of publicly available information and incorporated in the company's market price.[118]  If the information that corrects the misrepresentations and/or omissions has already been fully disclosed so that the market price has already adjusted to this news, then the same news cannot later cause any stock-price changes, all else held equal.

140.    An economic analysis of truth-on-the-market requires that "new" information must be analyzed, not only with regard to the specific language and economic content of a disclosure but, in context of the disclosure.[119]  The economic context is comprised of the relevant facts and circumstances that surround the disclosure, which allows the researcher to determine the likely interpretation of the disclosure by the market.

141.    For example, a disclosure by a securities analyst speculating that there will be a takeover of Company A by Company B may contain similar language as a subsequent announcement made by Company A itself two days later when it officially announces the acquisition.  The fact that the company made the second announcement, however, may allow the

---

[118] *See* Daniel Fischel, "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *The Business Lawyer* 38, November 1982, 1-20.

[119] *See* Lucy Chang, "The Truth-on-the-Market Defense and its Relevance in SEC Enforcement Actions," *Law and Contemporary Problems* 76(3/4), 2013, 341-365, at 348-349.

market to place significantly more weight on the same news content. Thus, despite the prior disclosure by the securities analyst, the market price would still react to the company's disclosure made two days later. Therefore, it would be incorrect to conclude that the securities analyst's disclosure constituted truth-on-the-market regarding the subsequent takeover announcement. While the content of the two disclosures may be similar, the economic context is certainly not.

142. Similarly, if a company previously disclosed that its financial results may be adversely affected by declining commodity prices but misleads the market regarding the true extent of its financial exposure to declining commodity prices, then it may be incorrect to conclude that the prior disclosure of potential risk exposure constitutes truth-on-the-market. The misstatement can still cause the stock price to be artificially inflated (or deflated) because the degree of economic exposure was withheld.

143. Therefore, economic analysis of truth-on-the-market requires an analysis of the content, context, and source of disclosures so the researcher may correctly determine the interpretation by the market of the disclosure.

### iv) *Confounding Information*

144. Confounding information refers to other information that affects the valuation of a stock that enters the market in the event window and is unrelated to the alleged disclosure failure or its foreseeable economic consequences. Such news can have a simultaneous, "confounding" effect on the stock's price.

145. It is important to understand that the multi-factor market model is designed to account for, and "net out" from the subject company's stock returns, the effects of simultaneous movements in the market and possibly industry indices, so that the excess return should be largely free of any confounding macro-economic and industry-specific news on that day. This

49

presumes, however, that the company's disclosure did not substantially affect the prices of firms in the industry.  If the company's disclosure was of such importance that it affected the prices for firms in its industry, then the industry return should not be used to compute a predicted return for that event.  To do so would artificially mask the true effect of the information on the company's price.  This is sometimes referred to as a "contagion" effect.

146.    If the analyst believes that confounding information outside of market-wide and industry-specific influences may still be present, there are several analyses that may shed light on the potential magnitude of any confounding firm-specific information.

147.    First, one should attempt to determine whether or not the confounding information is sufficiently material, *i.e.*, whether it would be expected to significantly change the security's price when it is disclosed.  If it is found to be immaterial, then such confounding information should not affect the conclusion.  Often, the analyst can analyze contemporaneous commentary by analysts and the media to help gauge the importance to investors of the information related to the disclosure failure relative to the potentially confounding information.  Sometimes the confounding information has economic implications that can be potentially measured or quantified independently of the subject company's stock returns.

148.    Second, one should determine if the confounding information was previously disclosed in full or in part to the investing public.  If it has already been disclosed and fully incorporated into the stock price, then such confounding information is unlikely to have caused any stock-price changes measured on the day of the corrective disclosure.

149.    Third, if confounding information is disclosed at a different time of day than the corrective disclosure, intraday price movements can sometimes be used to differentiate the price responses to each piece of information.

150.     Fourth, financial analysis such as discounted cash flow or price-earnings ratio analyses can be used to differentiate the price responses to each piece of information.

151.     Although this is not meant to be an exhaustive list, the aforementioned techniques include some of the ways researchers can attempt to deal with confounding news.  If confounding news is present and material, then the researcher must attempt to exclude the effect of the confounding news so that it is not included in the quantification of investor losses and artificial inflation.

### v)        *Length of Event Window*

152.     The length of the event window used to measure the full effect on the stock price of new information is often an important consideration.  It is common to use windows of one or two days depending on the information that is being disclosed.  But a window of more than two days can also be appropriate in certain circumstances.  The determination of the appropriate length of an event window is dependent on case-specific circumstances such as the complexity of the disclosure, the extent of its distribution and dissemination among the investing public, whether or not the defendants are denying or otherwise influencing the market's interpretations of the event, as well as the degree to which additional information from securities analysts and other commentators is forthcoming in subsequent hours or days.

153.     If a particular material disclosure continues to generate analyst commentary and additional news stories beyond the first event day and the cumulative excess return is statistically significant in active trading, then the analyst should consider lengthening the event window to include the effects of this continued market response.  Otherwise, improperly excluding a day with a significant negative excess return can understate damages, and improperly excluding a day with a significant positive excess return can overstate damages.

51

## C. Techniques Used in Calculating Artificial Inflation

154.    In general, losses per share caused by disclosures of alleged misrepresentations and omissions are translated into artificial inflation per share for each day of a class period. Thus, artificial inflation is generally computed by first starting with the losses measured from the declines in the stock price over the event window used for each identified corrective disclosure, which generally occur toward the end of a class period.  As discussed previously, corrective disclosures are relevant disclosures that reveal or partially reveal the disclosure failures to the market.  Artificial inflation for each day is then determined by working backward from the dates of the measured losses from identified corrective disclosures to the beginning of the class period.[120]

### i)        Methods of Calculating Artificial Inflation

155.    There are several different ways or methods to translate the computed losses per share into a computation of artificial inflation per share.  Among the commonly used methods are the "constant dollar" (sometimes called the "constant ribbon") method and the "constant percentage" method.[121]

156.    Under a constant dollar method, the "dollar per share" measure of losses from each correction of a disclosure failure is applied to all days preceding that corrective disclosure. This approach is better understood by the following example.

---

[120] *See* Bradford Cornell and R. Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," *UCLA Law Review* 37, June 1990, 883-924; David Tabak and Chudozie Okongwu, "Inflation Methodologies in Securities Fraud Cases: Theory and Practice," NERA White Paper, July 2002; David Tabak, "Loss Causation And Damages in Shareholder Class Actions: When It Takes Two Steps To Tango," NERA White Paper, May 2004; David Tabak, "Inflation and Damages in a Post-*Dura* World," NERA White Paper, September 2007.

[121] *See, e.g.*, David Tabak and Chudozie Okongwu, "Inflation Methodologies in Securities Fraud Cases: Theory and Practice," NERA White Paper, July 2002.

157.     Assume that the class period is one year ending December 30, 2007.  Further assume that there are two corrective disclosures – one impacting the market price on December 14, 2007 and the other impacting the market price on December 31, 2007.  The loss per share as measured by the excess price decline on December 14, 2007 is $2.00, and on December 31, 2007 the loss per share is $5.00.  Starting from the end of the class period and working backward, the artificial inflation is $5.00 per share until December 14, 2007 when the artificial inflation becomes $7.00 per share (or the sum of $2.00 and $5.00) on days prior to December 14, 2007.  The economic logic is that just before December 14, 2007, all the inflation, as measured by the total losses of $7.00 per share, is still in the stock price.  After the December 14, 2007 disclosure, the market price now reflects that $2.00 (of the total $7.00 artificial inflation) has come out of the stock price and hence inflation goes from $7.00 to $5.00 starting on December 14, 2007.  Starting on December 31, 2007, the inflation is zero because the remaining $5.00 of inflation has now come out of the stock price.

158.     Using the constant dollar approach, and continuing to work backward from December 14, 2007, artificial inflation will equal a constant $7.00 per share on each day going back to January 1, 2007, the first day of the class period.

159.     The constant percentage method is similar but instead of using the dollar losses, it uses the measured losses as a <u>percentage</u> of the price before a corrective disclosure.  This percentage is multiplied by the prices on each day in the class period that precedes the date of the corrective disclosure.  Under the constant percentage method, the dollar amount of artificial inflation will generally change on a daily basis with the changes in the stock price.  For circumstances in which the stock price is generally declining prior to a corrective disclosure, the

53

constant percentage approach will yield higher artificial inflation than the constant dollar method.

160.    The choice between the constant dollar method and the constant percentage method is dependent on case-specific factors relating to the disclosure failure but, based on the 2005 U.S. Supreme Court decision in *Dura Pharmaceuticals, Inc. v. Broudo*, artificial inflation from the percentage method cannot exceed the cumulative amount of dollar per share declines over the corrective disclosures (*i.e.*, cannot exceed the constant dollar artificial inflation measure) in computing Section 10(b) damages.[122]

### ii)    *Methods of Scaling Artificial Inflation*

161.    There can be circumstances for which it is appropriate and necessary to adjust the artificial inflation that is measured by share losses from the corrective disclosures. This can occur when economic conditions are substantially different at the time of the corrective disclosures relative to the economic conditions that existed during a class period, or if the financial impact of the wrongdoing became greater over time.[123]  In such circumstances, inflation can be scaled by some reasonable parameter to better reflect the economic reality.

162.    Scaling methods for artificial inflation generally start with the same dollar losses used for the constant dollar approach (or constant percentage) but then those measured losses are scaled or indexed to a selected economic or accounting variable.  Examples of scaling using

---

[122] *Dura Pharm. v. Broudo*, 544 U.S. 336 125 S. Ct. (2005).  The *Williams* decision ruled that the use of the percentage approach violated *Dura* because it resulted in artificial inflation that exceeded the per share losses caused when the misrepresentations were corrected.  *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195 (N.D. Okla. 2007).

[123] *See* Nicolas I. Crew, Kevin L. Gold, and Marnie A. Moore, "Federal Securities Acts and Areas of Expert Analysis," in Litigation Services Handbook: The Role of the Financial Expert, Fifth Edition, ed. by Roman L. Weil, Daniel G. Lentz, and David P. Hoffman, Wiley, 2012, 24.13.

accounting variables can be seen in cases involving earnings overstatements in which the amount of overstated earnings increase over the class period.  In these situations, inflation can be scaled to the amount of overstated earnings.[124]  Examples of scaling using economic variables include changing expectations about the likelihood of outcomes as in the case of misrepresentations concerning a possible merger.  In these situations, inflation can be scaled to the probabilities of such an outcome at various times during the relevant period.

163.    One can also scale artificial inflation to economic variables such as industry metrics or bond yields to reflect changes in the broader economy.[125]  Scaling inflation is designed to provide a reasonable and objective approach to account for factors that may have affected the degree of inflation during a class period.

## VIII.  HOW THE METHODOLOGY FOR CALCULATING CLASS-WIDE DAMAGES WOULD BE APPLIED IN THIS CASE

164.    If a class is certified by the court, I could, if requested, calculate damages on a class-wide basis by applying the principles and methodologies discussed in Section VII. above.

165.    A primary aspect of that analysis would be analyzing Defendants' alleged misstatements and omissions as well as any public disclosures that ultimately apprised the market of facts that were previously misstated or concealed.

---

[124] *See*, for example, *In re California Micro Devices Sec. Litig.*, 965 F. Supp. 1327 (N.D. Cal. 1997), and *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235, 256 (D.N.J. 2000).

[125] Declaration of Frank C. Torchio for Settlement Purposes, *In re Countrywide Fin. Corp. Sec. Litig.*, Lead Case No. CV 07-05295 MRP (MANx) (C.D. Cal. June 29, 2010).

166.    Plaintiffs allege the Defendants misrepresented its general and administrative expenses and total operating expenses for the second and third quarters of 2021, which "materially overstated its net income and its net income per share for those quarters."[126]

167.    The allegations state that:

> … By virtue of their [Defendants] 1receipt of information reflecting the true facts regarding Celsius, their control over Celsius's false statements which made them privy to confidential proprietary information concerning Celsius, participated in the fraudulent scheme designed to hide the true financial nature of Celsius for the first nine months of FY 2021 and deceive the public into believing that Celsius was attaining record high revenues, when in actuality, it reported a net loss of $9.4 million for its third quarter of FY 2021.[127]

168.    Plaintiffs allege that these previous false or misleading public statements by Defendants were corrected between March 1-3, 2022.

169.    I would use event study analysis of the corrective disclosures in this case to determine whether the information disclosed in the corrective disclosures did alert the market of previously undisclosed new, material information.  A corrective disclosure refers to an identified event in a securities matter wherein the information conveyed in that disclosure has sufficient economic correspondence or connection to the information that is alleged to have been misrepresented.  If there is a material share price loss that results from such an identified corrective disclosure, then there may be evidence of loss causation.

170.    In securities litigation, it is rare to encounter language in a corrective disclosure that is identical to the misrepresentations alleged in a statement of claim.  Thus, it is necessary for the expert to assess whether the market's interpretation of the allegedly corrective

---

[126] Complaint, ¶ 97.
[127] Complaint, ¶ 138.

information in an event is economically equivalent to the information alleged to have been misrepresented.

171.    After assessing loss causation, I would then calculate inflation per share during the Class Period, as well as class-wide damages per share (assuming Plaintiff will prevail on liability at trial) based on the per-share inflation and applying PSLRA limitations.

172.    It is my opinion that such an analysis applying the principles and methodologies discussed in Section VII.  above can be done reliably for Celsius.

I certify that, to the best of my knowledge and belief:

–   the statements of fact contained in this Report are true and correct;

–   the reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions, and conclusions;

–   I have no present or prospective interest in the parties to this case, and I have no personal interest or bias with respect to the parties involved;

–   I have made all the inquiries that I believe are desirable and appropriate and that no matters of significance that I regard as relevant have, to my knowledge, been withheld from the Court; and

–   my compensation is not contingent on an action or event resulting from the analyses, opinions, or conclusions in, or the use of, this Report.

5/18/23
Date

Frank C. Torchio

58

**Exhibit 1**                                                                       May 2023


## FRANK C. TORCHIO, CFA


| Business Address: | School Address: | Home Address: |
|---|---|---|
| Forensic Economics, Inc. | Simon Business School | 68 Knollwood Drive |
| 95 Allens Creek Road | University of Rochester | Rochester, NY 14618 |
| Building 2, Suite 303 | Carol Simon Hall | (585) 249-9455 |
| Rochester, NY 14618 | Rochester, NY 14627 | |
| (585) 385-7440 | (585) 275-3914 | |
| frank@forensiceconomics.com | frank.torchio@simon.rochester.edu | |

### Employment and Education

9/97-present   **Simon Business School**, University of Rochester, Rochester, NY.  Adjunct Professor and Former Executive Professor of Finance.

8/89-present   **Forensic Economics, Inc.** (incorporated in 1993), Rochester, NY. President.  Consulting in financial valuations and financial-economic analysis in securities litigation and business disputes.

6/82-8/89   **Rochester Gas and Electric Corporation**, Rochester, NY.

6/88-8/89   Vice President for Utilicom, an RG&E venture subsidiary.

4/87-6/88   Economist - Strategic Planning Department.

6/82-3/87   Financial Analyst - Treasury Department.

9/80-12/81   **M.B.A., Economics and Finance**, Simon Business School, University of Rochester, Rochester, NY.

9/78-8/80   **Insurance Services Office**, New York, NY. Statistician - Commercial Lines.

9/74-5/78   **B.A., Mathematics**, Niagara University, Niagara Falls, NY.

### Publications

"Benchmarking Market Efficiency Indicators for Securities Litigation," with Bharat Bhole and Sunita Surana, 2020 University of Illinois Law Review Online 96, May 4, 2020.

"Effect of Liquidity on Size Premium and its Implications for Financial Valuations," with Sunita Surana, *The Journal of Business Valuation and Economic Loss Analysis*, Vol. 9, Issue 1, Jan 2014.

"Event Study Analysis in Securities Litigation and the Bonferroni Correction," Working Paper, 2010.

"Proper Event Study Analysis in Securities Litigation," *The Journal of Corporation Law*, 35:1, 2009, pp.159-168.

"The Circularity of Life in Securities Class Actions," Working Paper, 2008.

"A Comparison of Trading Models Used for Calculating Aggregate Damages in Securities Litigation," with Michael Barclay, *Law and Contemporary Problems: Complex Litigation at the Millennium*, Vol. 64, Nos. 2 & 3, Spring/Summer 2001.

"University of Rochester's Endowment Fund Review," with Gregg A. Jarrell, University of Rochester Simon School Working Paper, 11/93.

"The Longer-Term Relation Between Accounting Performance and Stock Returns," with Gregg A. Jarrell, Working Paper - Bradley Policy Research Center, 8/92.

"Proper Transfer Pricing Aids Success," with Gregg A. Jarrell, *Rochester Business Journal*, 7/30/90.

"Calculating Proper Transfer Prices," with Gregg A. Jarrell, *Public Utilities Fortnightly*, 1/1/91.

## Awards and Designations

Awarded the Chartered Financial Analyst (CFA)® designation by the CFA Institute (2002).

The Richard L. Rosenthal Fellowship at the University of Rochester (1991).

William E. Simon Graduate School of Business Administration Alumni Service Award (1992).

## Activities

Panelist for "Arguing Damages in Securities Litigation," The Advocates' Society, April 6, 2022.

Speaker at the Securities Litigation: The Public and Private Enforcement of Securities Law course, University of Toronto Faculty of Law, October 15, 2019 and February 10, 2022.

Presenter on Class Actions – Expert Event Study Evidence in Shareholder Class Actions at Judicial Education Seminar, Adelaide, Australia, March 23, 2018.

Speaker and Panelist on Damages at DRRT's 9th Annual European Global Investor Protection Conference, Frankfurt, Germany, February 6, 2017.

Speaker and Panelist on Damages at DRRT's 8th Annual European Global Investor Protection Conference, Frankfurt, Germany, February 1, 2016.

Panelist on the Market Efficiency segment of the 2015 Winter Bench and Bar Conference (Feb. 14-21, 2015) sponsored by the *Federal Bar Council*.

Participant at Roundtable Discussion at Duke University Law School composed of 30 judges, academics, practitioners, and policy makers designed to examine the future landscape of corporate and securities law private and public enforcement in the aftermath of recent U.S. Supreme Court and Delaware decisions, September 26, 2014.

Presenter for "Business Litigation and Regulatory Agency Review in the Era of the Roberts Court" for Institute for Law & Economic Policy, April 4, 2014.

Panelist for "Fraud on the Market" for the Federal Bar Council, February 25, 2014.

Speaker at 1st DRRT Conference on securities class actions around the world for institutional investors, Oct. 28-29, 2013

Chairperson and speaker on Transfer Pricing Economics at the International Institute of Manufacturing.

Former adjunct faculty for economics and finance at Rochester Institute of Technology Graduate School of Business.

Member of the National Association of Forensic Economics.

Volunteer for entertaining at nursing homes and senior citizen communities to raise funds for the American Cancer Society.

### **Expert Testimony and Expert Consulting Experience (Last Four Years)**

Joint Expert Report of John Holzwarth and Frank C. Torchio in <u>Excel Texel Pty Ltd v. Quintis Ltd</u> in the Federal Court of Australia, New South Wales District Registry, General Division, No. NSD1983/2017 (October 14, 2022).

Deposition of Frank C. Torchio in <u>Nykredit Portefølje Administration A/S, Oklahoma Firefighters Pension and Retirement System, Oklahoma Law Enforcement Retirement System, Oklahoma Police Pension and Retirement System, Oklahoma City Employee Retirement System, Police and Fire Retirement System of the City of Detroit v. ProPetro Holding Corp., Dale Redman, Jeffrey Smith, Ian Denholm, and Spencer D. Armour III</u>, in the United States District Court for the Western District of Texas, Midland/Odessa Division, Civil Action No. MO:19-CV-217-DC (July 12, 2022).

Expert Report of Frank C. Torchio in <u>Tarique Plummer v. Nuvei Corporation et al.</u> before the Superior Court of Justice, Province of Quebec, District of Montreal, File No. 500-06-001173-216 (June 30, 2022).

Expert Report of Frank C. Torchio in <u>Steven Holchman and Tarique Plummer v. Lightspeed Commerce Inc., et al. et al.</u> before the Superior Court of Justice, Province of Quebec, District of Montreal, File No. 500-06-001164-215 (June 17, 2022).

3

Expert Report of Frank C. Torchio in <u>California State Teachers Retirement System et al. vs. Vivendi SE</u> in the International Chamber of the Paris Court of Appeal, RG Numbers 21/19200, RG 22/01623 and RG22/01711 (June 15, 2022).

Testimony of Frank C. Torchio in <u>Pedro Ramirez, Jr., Individually and on Behalf of All Others Similarly Situated v. Exxon Mobil Corporation et al.</u> in the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:16-CV-3111-K (June 7, 2022).

Expert Report of Frank C. Torchio in <u>Nykredit Portefølje Administration A/S, Oklahoma Firefighters Pension and Retirement System, Oklahoma Law Enforcement Retirement System, Oklahoma Police Pension and Retirement System, Oklahoma City Employee Retirement System, Police and Fire Retirement System of the City of Detroit v. ProPetro Holding Corp., Dale Redman, Jeffrey Smith, Ian Denholm, and Spencer D. Armour III</u>, in the United States District Court for the Western District of Texas, Midland/Odessa Division, Civil Action No. MO:19-CV-217-DC (May 27, 2022).

Affidavit of Frank C. Torchio in re: <u>Renren Inc. Derivative Litigation</u>, in the Supreme Court of the State of New York, County of New York, Index No. 653594/2018 (March 2, 2022).

Affidavit of Frank C. Torchio in re: <u>Howard Green, et al. v. Canadian Imperial Bank of Commerce, et al.</u>, in Ontario Superior Court of Justice, Court File No: CV-08-359335 (December 28, 2021).

Trial Testimony of Frank C. Torchio in <u>Daniel Kleeberg, Lisa Stein, and Aubrey Hays v. Lester Eber, Alexbay, LLC f/k/a Lester Eber, LLC., Elliot W. Gumaer, Wendy Eber, et al.</u> in the United States District Court for the Southern District of New York, Civil Action No. 16-CV-9517(LAK) (KDP) (September 22, 2021).

Declaration of Frank C. Torchio in <u>Daniel Kleeberg, Lisa Stein, and Aubrey Hays v. Lester Eber, Alexbay, LLC f/k/a Lester Eber, LLC., Elliot W. Gumaer, Wendy Eber, et al.</u> in the United States District Court for the Southern District of New York, Civil Action No. 16-CV-9517(LAK) (KDP) (September 6, 2021).

Expert Reply Report of Frank C. Torchio in re: <u>BofI Holdings, Inc. Securities Litigation</u>, in the United States District Court for the Southern District of California, Case No. 3:15-cv-02324-GPC-KSC (July 23, 2021).

Deposition of Frank C. Torchio in re: <u>BofI Holdings, Inc. Securities Litigation</u>, in the United States District Court for the Southern District of California, Case No. 3:15-cv-02324-GPC-KSC (June 18, 2021).

Expert Report of Frank C. Torchio in re: <u>BofI Holdings, Inc. Securities Litigation</u>, in the United States District Court for the Southern District of California, Case No. 3:15-cv-02324-GPC-KSC (May 28, 2021).

Expert Reply Report of Frank C. Torchio in re: <u>Howard Green, et al. v. Canadian Imperial Bank of Commerce, et al.</u>, in Ontario Superior Court of Justice, Court File No: CV-08-359335 (May 21, 2021).

Expert Report of Frank C. Torchio in re: <u>Howard Green, et al. v. Canadian Imperial Bank of Commerce, et al.</u>, in Ontario Superior Court of Justice, Court File No: CV-08-359335 (October 6, 2020).

Expert Report of Frank C. Torchio in <u>Allianz Global Investors, et al. v. Toshiba Corporation</u> in the Tokyo District Court, Civil Affairs 8, No. 2016 (Wa) No. 20446 Damages Claim Case (August 27, 2020).

Joint Report of Share Price Inflation/Valuation Experts in <u>Mastoris & Another v DSHE Holdings Limited (receivers and managers appointed) (in liquidation) & Others</u>, Supreme Court of New South Wales Proceedings No. 52431 of 2018 and <u>Findlay & Another v DSHE Holdings Limited (receivers and managers appointed) (in liquidation) & Others</u>, Supreme Court of New South Wales Proceedings No. 294069 of 2017 (June 19, 2020).

Expert Report of Frank C. Torchio in <u>Excel Texel Pty LTD V. Quintis LTD</u> in the Federal Court of Australia, New South Wales District Registry, General Division, No. NSD1983/2017 (June 12, 2020).

Expert Response Report of Frank C. Torchio in <u>Mastoris & Another v DSHE Holdings Limited (receivers and managers appointed) (in liquidation) & Others</u>, Supreme Court of New South Wales Proceedings No. 52431 of 2018 and <u>Findlay & Another v DSHE Holdings Limited (receivers and managers appointed) (in liquidation) & Others</u>, Supreme Court of New South Wales Proceedings No. 294069 of 2017 (April 16, 2020).

Expert Response Report of Frank C. Torchio in <u>Mastoris & Another v DSHE Holdings Limited (receivers and managers appointed) (in liquidation) & Others</u>, Supreme Court of New South Wales Proceedings No. 52431 of 2018 and <u>Findlay & Another v DSHE Holdings Limited (receivers and managers appointed) (in liquidation) & Others</u>, Supreme Court of New South Wales Proceedings No. 294069 of 2017 (December 19, 2019).

Affidavit of Frank C. Torchio in: <u>Wendy Earle et al. v. CannTrust Holdings Inc. et al.</u>, in the Superior Court of Justice, Ontario, Canada, Court File No. 19-000625181-00CP (October 11, 2019).

Trial Testimony of Frank C. Torchio in <u>Larry Crowley v WorleyParsons Limited ACN 096 090 158</u> in the Federal Court of Australia, New South Wales District Registry, General Division, Case No. NSD 1292 of 2015 (September 19-20, 2019).

Deposition of Frank C. Torchio in <u>Daniel Kleeberg, Lisa Stein, and Aubrey Hays v. Lester Eber, Alexbay, LLC f/k/a Lester Eber, LLC., Elliot W. Gumaer, Wendy Eber, et al.</u> in the United States District Court for the Southern District of New York, Civil Action No. 16-CV-9517(LAK) (KDP) (August 23, 2019).

Expert Reply Report of Frank C. Torchio in <u>Tajdin Abdulla v. Canadian Solar Inc., Shawn Xiaohua Qu, and Arthur Chien</u> in the Superior Court of Justice, Ontario, Canada, Court File No. C-710-10 (August 19, 2019).

5

Joint Report of the Economic Experts in <u>Larry Crowley v WorleyParsons Limited ACN 096 090 158</u> in the Federal Court of Australia, New South Wales District Registry, General Division, Case No. NSD 1292 of 2015 (August 4, 2019).

Joint Report of the Economic Experts in <u>Larry Crowley v WorleyParsons Limited ACN 096 090 158</u> in the Federal Court of Australia, New South Wales District Registry, General Division, Case No. NSD 1292 of 2015 (July 26, 2019).

Expert Report of Frank C. Torchio in <u>Clime Capital Limited v. UGL Pty Limited</u> in the Federal Court of Australia, Victoria Registry, No. VID 1390/2017 (June 28, 2019).

Expert Report of Frank C. Torchio in <u>Daniel Kleeberg, Lisa Stein, and Aubrey Hays v. Lester Eber, Alexbay, LLC f/k/a Lester Eber, LLC., Elliot W. Gumaer, Wendy Eber, et al.</u> in the United States District Court for the Southern District of New York, Civil Action No. 16-CV-9517(LAK) (KDP) (June 28, 2019).

Expert Report of Frank C. Torchio in <u>Mastoris & Another v DSHE Holdings Limited (receivers and managers appointed) (in liquidation) & Others</u>, Supreme Court of New South Wales Proceedings No. 52431 of 2018 and <u>Findlay & Another v DSHE Holdings Limited (receivers and managers appointed) (in liquidation) & Others</u>, Supreme Court of New South Wales Proceedings No. 294069 of 2017 (June 23, 2019).

Expert Report of Frank C. Torchio in <u>Tajdin Abdulla v. Canadian Solar Inc., Shawn Xiaohua Qu, and Arthur Chien</u> in the Superior Court of Justice, Ontario, Canada, Court File No. C-710-10 (May 27, 2019).

6

**Exhibit 2**
**Materials Reviewed**

Amended Complaint for Violations of the Federal Securities Laws, dated July 8, 2022.

Celsius SEC filings for the period August 2021 to March 2022.

Daily reported composite volume and prices for Celsius common stock (Bloomberg ticker "CELH US") for the period January 2020 to March 2022.  Source: Bloomberg.

Daily index levels for the following indexes for the period January 2020 to March 2022 (Bloomberg identifier in parenthesis): S&P 500 Total Return Index (Bloomberg identifier: SPTR); Russell 2000 Total Return Index (Bloomberg identifier: RU20INTR); Nasdaq Composite Total Return Index (Bloomberg identifier: XCMP), S&P 600 Total Return Index (Bloomberg identifier: SPTRSMCP); and S&P 500 Soft Drinks and Non-Alcoholic Beverages Index (Bloomberg identifier S5SOFD).   Source: Bloomberg.

Daily total returns for the following peer companies for the period January 2020 to March 2022 (Bloomberg identifier in parentheses): The Coca-Cola Company (KO US); PepsiCo Inc (PEP US); Keurig/Dr. Pepper Inc. (KDP US); Nestle SA (NSRGY US); and Monster Beverage Corp. (MNST US).  Source: Bloomberg.

Daily data on options on Celsius common stock for the period August 2021 to March 2022. Source: iVolatility.

Interest rate data obtained from the Federal Reserve Board database (available at https://www.federalreserve.gov/datadownload/Download.aspx?rel=H15&series=bf17364827e38702b42a 58cf8eaa3f78&filetype=csv&label=include&layout=seriescolumn&from=01/01/1999&to=04/30/2023).

Number of analysts making recommendations for Celsius common stock for the period August 2021 to March 2022.  Source: Bloomberg.

Number of analysts providing EPS estimates for current fiscal year for Celsius for the period August 2021 to March 2022.  Source: Refinitiv IBES estimates via S&P Capital IQ.

Number of brokers for Celsius common stock for the period August 2021 to March 2022. Source: Bloomberg.

Number of market makers for Celsius common stock for the period August 2021 to March 2022. Source: CRSP.

Short interest for Celsius common stock for the period August 2021 to March 2022.  Source: Bloomberg.

Quarterly institutional ownership of Celsius common stock for the period March 2017 to March 2020.  Source: Refinitiv.

**Exhibit 2**
**Materials Reviewed**

Shares of Celsius common stock held by insiders and affiliates for the period August 2021 to March 2022.  Source: Refinitiv.

Shares outstanding for Celsius common stock for the period August 2021 to March 2022.  Source: SEC filings.

News stories regarding Celsius during the period August 2021 to March 2022.  Source: Bloomberg and Factiva.

Analyst reports/list of reports regarding Celsius during the period August 2021 to March 2022.  Sources: Thomson Eikon and Capital IQ electronic databases.

**Academic literature, treatises, or articles relied on:**

David R. Anderson, Dennis J. Sweeney, and Thomas A. Williams, Statistics for Business and Economics, 9th ed., Thomson Learning, 2005.

Brad M. Barber, Paul A. Griffin, and Baruch Lev, "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *The Journal of Corporation Law* 19, Winter 1994, 285-312.

William H. Beaver, Maureen F. McNichols, and Zach Z. Wang, "Increased Information Content of Earnings Announcements in the 21st Century: An Empirical Investigation," Working Paper, June 19, 2018.

Bharat Bhole, Sunita Surana, and Frank Torchio, "Benchmarking Market Efficiency Indicators for Securities Litigation," *University of Illinois Online Law Review* 96, 2020.

John Y. Campbell, Andrew W. Lo and A. Craig MacKinlay, The Econometrics of Financial Markets, Princeton University Press, 1997.

Lucy Chang, "The Truth-on-the-Market Defense and its Relevance in SEC Enforcement Actions," *Law and Contemporary Problems* 76(3/4), 2013, 341-365.

Qi Chen, Itay Goldstein, and Wei Jiang, "Price Informativeness and Investment Sensitivity to Stock Price," *The Review of Financial Studies* 20(3), 2007, 619-650.

Bradford Cornell and R. Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," *UCLA Law Review* 37, 1990, 883-924.

Bradford Cornell and James Rutten, "Collateral Damage and Securities Litigation," *Utah Law Review* 3, 2009, 717-747.

Steven S. Crawford, Darren T. Roulstone, and Eric C. So, "Analyst Initiations of Coverage and Stock Return Synchronicity," *The Accounting Review* 87(5), 2012, 1527-1553.

Nicolas I. Crew, Kevin L. Gold, and Marnie A. Moore, "Federal Securities Acts and Areas of Expert Analysis," in Litigation Services Handbook: The Role of the Financial Expert, Fifth Edition, ed. by Roman L. Weil, Daniel G. Lentz, and David P. Hoffman, Wiley, 2012.

Sudipto Dasgupta, Jie Gan, and Ning Gao, "Transparency, Price Informativeness, and Stock Return Synchronicity: Theory and Evidence," *Journal of Financial and Quantitative Analysis* 45(5), Oct. 2010, 1189-1220.

Frederick Dunbar and Arun Sen, "Counterfactual Keys to Causation and Damages in Shareholder Class Actions," *Wisconsin Law Review* 2009(2), 2009, 199-242.

FORENSIC ECONOMICS, INC.

**Exhibit 2**
**Materials Reviewed**

Edwin J. Elton, Martin J. Gruber, Stephen J. Brown, and William N. Goetzmann, <u>Modern Portfolio Theory and Investment Analysis</u>, 6th ed., John Wiley & Sons, Inc., 2003.

Eugene F. Fama, "Efficient Capital Markets: II," *Journal of Finance* 46(5), December 1991, 1575-1617.

Eugene F. Fama, Lawrence Fisher, Michael C. Jensen and Richard Roll, "The Adjustment of Stock Prices to New Information," *International Economic Review* 10(1), February 1969, 1-21.

Daniel Fischel, "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *The Business Lawyer* 38(1), November 1982, 1-20.

Robert W. Holthausen and Mark E. Zmijewski, <u>Corporate Valuation: Theory, Evidence & Practice</u>, First Edition, Cambridge Business Publishers, 2014.

J. C. Hull, <u>Options, Futures, and Other Derivatives</u>, Sixth Edition, Prentice Hall: New Jersey, 2006.

Robert Jennings and Laura Starks, "Information Content and the Speed of Stock Price Adjustments," *Journal of Accounting Research* 23(1), Spring 1985, 336-350.

Joshi, Madrid, Mulholland, "Causation Issues and Expert Testimony, The Fundamentals of Causation," <u>Litigation Services Handbook: The Role of the Financial Expert</u>, 5th Ed., ed. by Roman L. Weil, Daniel G. Lentz, and David P. Hoffman.

Jonathan M. Karpoff, "The Relation Between Price Changes and Trading Volume: A Survey," *Journal of Financial and Quantitative Analysis* 22(1), March 1987, 109-126.

Burton G. Malkiel, "Efficient Market Hypothesis," in <u>The New Palgrave: A Dictionary of Economics</u>, Volume 2, E to J, ed. by John Eatwell, Murray Milgate and Peter Newman, The Macmillan Press Limited, 1998.

Mark Mitchell and Jeffrey Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer* 49, February 1994, 545-590.

David S. Moore and George P. McCabe, <u>Introduction to the Practice of Statistics</u>, 4th ed., W. H. Freeman and Company, 2003.

Shannon P. Pratt, <u>The Market Approach to Valuing Businesses</u>, Second Edition, John Wiley & Sons, Inc., 2005.

G. William Schwert, "Using Financial Data to Measure Effects of Regulation," *The Journal of Law and Economics* 24(1), 1981, 121-158.

David Tabak, "Loss Causation And Damages in Shareholder Class Actions: When It Takes Two Steps To Tango," NERA White Paper, May 2004.

David Tabak, "Inflation and Damages in a Post-*Dura* World," NERA White Paper, September 2007.

David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Chapter 19 in <u>Litigation Services Handbook: The Role of the Financial Expert</u>, 3rd ed., ed. by Roman L. Weil, Michael J. Wagner, and Peter B. Frank, Wiley, 2001.

David Tabak and Chudozie Okongwu, "Inflation Methodologies in Securities Fraud Cases: Theory and Practice," NERA White Paper, July 2002.

Randall S. Thomas and James F. Cotter, "Measuring Securities Market Efficiency in the Regulatory Setting," *Law and Contemporary Problems* 63(3), Summer 2000, 105-122.

**Exhibit 2**
**Materials Reviewed**

Frank Torchio, "Proper Event Study Analysis in Securities Litigation," *The Journal of Corporation Law* 35(1), 2009, 159-168.

Jeffrey M. Wooldridge, Introductory Econometrics, A Modern Approach, 2nd ed., Thomson South-Western, 2003.

**Court opinions and reports:**

*Amgen, Inc., et al. v. Connecticut Retirement Plans and Trust Funds*, Brief of Financial Economists as *Amici Curiae* in Support of Respondent (9th Cir. Court of Appeals).

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

*Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

*Cheney v. Cyberguard Corp.*, 211 F.R.D 484 (S.D. Fla. 2003).

*DCD Programs v. Michael W. Leighton, et al.*, 90 F.3d 1442 (9th Cir. 1996).

*Dura Pharm. v. Broudo*, 544 U.S. 336, 125 S. Ct. 1627 (2005).

*In re Enron Corp. Sec., Derivative & 'ERISA' Litig.*,, 529 F. Supp. 2d 644 (S.D. Tex. 2006).

*Garnatz v. Stifel, Nicolaus & Co.*, 559 F.2d 1357 (8th Cir. 1977).

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 134 S. Ct. 2398 (2014).

*Halliburton Co. v. Erica P. John Fund, Inc.*, Brief of Financial Economists as *Amici Curiae* in Support of Respondent (9th Cir. Court of Appeals), February 5, 2014.

*In re Alstom SA Sec. Litig.*, 253 F.R.D. 266 (S.D.N.Y. 2008).

*In re California Micro Devices Sec. Litig.*, 965 F. Supp. 1327 (N.D. Cal. 1997).

*In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235 (D.N.J. 2000).

Declaration of Frank C. Torchio for Settlement Purposes, *In re Countrywide Fin. Corp. Sec. Litig.*, Lead Case No. CV 07-05295 MRP (MANx) (C.D. Cal. June 29, 2010).

*In re Merck & Co., Sec. Derivative & ERISA Litig.*, LEXIS 13511, (D.N.J. Jan. 30, 2013).

*In re: Petrobras Sec. Litig.*, 312 F.R.D. 354 (S.D.N.Y. 2016).

*In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1 (1st Cir. 2005).

*In Re Polymedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260.

*In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195 (N.D. Okla. 2007).

*In re Williams Securities Litigation - WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009).

*In re Xcelera.com Sec. Litig.*, 430 F.3d 503 (1st Cir. 2005).

*Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).

*Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491 (S.D. Tex. 2004).

*McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415 (S.D.N.Y. 2014).

*Norfolk County Retirement System v. Community Health Systems, Inc.*, 877 F.3d 687 (6th Cir. 2017).

*Public Employees' Retirement System of Mississippi v. Amedisys, Inc.*, 769 F.3d 313 (5th Cir. 2014).

*The Ambassador Hotel Company, Ltd. v. Wei-Chuan Investment, et al.*, 189 F. 3d 1017 (9th Cir. 1999).

*Unger v. Amedisys Inc.*, 401 F.3d 316 (5th Cir. 2005).

Expert Report of Paul A. Gompers dated October 24, 2011, ¶¶ 27-28, in *Paul Luman v. Paul G. Anderson, et al. (FCStone)*, in U.S. District Court, Western District of Missouri, Western Division, No. 4:08-cv-00514-C-W-HFS.

Expert Report of Chad Coffman, CFA, *In Re NII Holdings In. Securities Litigation*,

**Exhibit 2**
**Materials Reviewed**

September 11, 2015, ¶¶ 51-52, Civ. No. 1:14-cv-00227-LMB-JFA, United States District Court, Eastern District of Virginia, Alexandria Division.

**Miscellaneous:**

Monster Beverage Corp. Form 10-K filed with the SEC on February 28, 2022.

Nestle Press Releases dated February 17, 2021 and March 31, 2021, available at nestle.com.

SEC 1379, "Form S-3, Registration Statement under the Securities Act of 1933," General Instructions, updated January 2022.

All other materials cited in the text of the Report and Exhibits.

**Exhibit 3**
**Market Efficiency Statistics for Celsius Holdings, Inc. Common Stock**

| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] | [12] | [13] | [14] | [15] | [16] | [17] | [18] | [19] | [20] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Daily Volume | Weekly Volume | Weekly Volume / Shares Outstanding | Weekly Volume / Float | Analyst Coverage (Bloomberg) | Analyst Coverage (IBES) | Brokers/ Market Makers | Shares Outstanding | Insider Holdings | Public Float | Price | Market Capitalization of Equity | Market Capitalization of Public Float | Bid-Ask Spread | Institutional Holdings | Institutional Holdings as a % of Shares Outstanding | Short Interest | Short Interest as a % of Shares Outstanding | Short Interest Ratio (Days) |
| 8/12/2021 | 2,085,205 | --- | --- | --- | 4 | 4 | 101 | 74,482,303 | 32,387,947 | 42,094,356 | $73.32 | $5,461,042,456 | $3,086,358,182 | 0.14% | 35,792,904 | 48.06% | 2,108,457 | 2.83% | 2.55 |
| 8/13/2021 | 1,207,439 | n/a | --- | --- | 4 | 4 | 101 | 74,482,303 | 32,387,947 | 42,094,356 | $72.63 | $5,409,649,667 | $3,057,313,076 | 0.11% | 35,792,904 | 48.06% | 2,337,273 | 3.14% | 2.76 |
| 8/16/2021 | 564,569 | --- | --- | --- | 4 | 4 | 101 | 74,482,303 | 32,387,947 | 42,094,356 | $72.39 | $5,391,773,914 | $3,047,210,431 | 0.26% | 35,792,904 | 48.06% | 2,337,273 | 3.14% | 2.79 |
| 8/17/2021 | 1,480,025 | --- | --- | --- | 4 | 4 | 101 | 74,482,303 | 32,387,947 | 42,094,356 | $65.84 | $4,903,914,830 | $2,771,492,399 | 0.02% | 35,792,904 | 48.06% | 2,337,273 | 3.14% | 2.65 |
| 8/18/2021 | 803,457 | --- | --- | --- | 4 | 4 | 101 | 74,482,303 | 32,387,947 | 42,094,356 | $67.84 | $5,052,879,436 | $2,855,681,111 | 0.01% | 35,792,904 | 48.06% | 2,337,273 | 3.14% | 2.61 |
| 8/19/2021 | 777,205 | --- | --- | --- | 4 | 4 | 101 | 74,482,303 | 32,387,947 | 42,094,356 | $65.89 | $4,907,638,945 | $2,773,597,117 | 0.17% | 35,792,904 | 48.06% | 2,337,273 | 3.14% | 2.57 |
| 8/20/2021 | 683,329 | 4,308,585 | 5.78% | 10.24% | 4 | 4 | 101 | 74,482,303 | 32,387,947 | 42,094,356 | $65.99 | $4,915,087,175 | $2,777,806,552 | 0.12% | 35,792,904 | 48.06% | 2,337,273 | 3.14% | 2.58 |
| 8/23/2021 | 1,013,778 | --- | --- | --- | 5 | 4 | 101 | 74,482,303 | 32,387,947 | 42,094,356 | $70.55 | $5,254,726,477 | $2,969,756,816 | 0.07% | 35,792,904 | 48.06% | 2,337,273 | 3.14% | 2.51 |
| 8/24/2021 | 906,231 | --- | --- | --- | 5 | 4 | 101 | 74,482,303 | 32,387,947 | 42,094,356 | $72.36 | $5,389,539,445 | $3,045,947,600 | 0.12% | 35,792,904 | 48.06% | 2,337,273 | 3.14% | 2.51 |
| 8/25/2021 | 806,213 | --- | --- | --- | 5 | 4 | 101 | 74,482,303 | 32,387,947 | 42,094,356 | $73.42 | $5,468,490,686 | $3,090,567,618 | 0.12% | 35,792,904 | 48.06% | 2,337,273 | 3.14% | 2.47 |
| 8/26/2021 | 674,289 | --- | --- | --- | 5 | 4 | 101 | 74,482,303 | 32,387,947 | 42,094,356 | $72.57 | $5,405,180,729 | $3,054,787,415 | 0.12% | 35,792,904 | 48.06% | 2,337,273 | 3.14% | 2.51 |
| 8/27/2021 | 1,128,412 | 4,528,923 | 6.08% | 10.76% | 5 | 4 | 101 | 74,482,303 | 32,387,947 | 42,094,356 | $75.56 | $5,627,882,815 | $3,180,649,539 | 0.03% | 35,792,904 | 48.06% | 2,337,273 | 3.14% | 2.44 |
| 8/30/2021 | 1,082,635 | --- | --- | --- | 5 | 4 | 101 | 74,482,303 | 32,387,947 | 42,094,356 | $79.61 | $5,929,536,142 | $3,351,131,681 | 0.10% | 35,792,904 | 48.06% | 2,337,273 | 3.14% | 2.40 |
| 8/31/2021 | 1,204,493 | --- | --- | --- | 5 | 4 | 101 | 74,482,303 | 32,387,947 | 42,094,356 | $81.76 | $6,089,673,093 | $3,441,634,547 | 0.05% | 35,806,294 | 48.07% | 2,521,550 | 3.39% | 2.54 |
| 9/1/2021 | 963,534 | --- | --- | --- | 5 | 5 | 101 | 74,482,303 | 32,387,947 | 42,094,356 | $84.10 | $6,263,961,682 | $3,540,135,340 | 0.08% | 35,806,294 | 48.07% | 2,521,550 | 3.39% | 2.53 |
| 9/2/2021 | 993,368 | --- | --- | --- | 5 | 5 | 101 | 74,482,303 | 32,387,947 | 42,094,356 | $85.76 | $6,387,602,305 | $3,610,011,971 | 0.06% | 35,806,294 | 48.07% | 2,521,550 | 3.39% | 2.51 |
| 9/3/2021 | 847,715 | 5,091,745 | 6.84% | 12.10% | 5 | 5 | 101 | 74,482,303 | 32,387,947 | 42,094,356 | $87.42 | $6,511,242,928 | $3,679,888,602 | 0.17% | 35,806,294 | 48.07% | 2,521,550 | 3.39% | 2.56 |
| 9/7/2021 | 992,191 | --- | --- | --- | 5 | 5 | 101 | 74,482,303 | 32,387,947 | 42,094,356 | $85.85 | $6,394,305,713 | $3,613,800,463 | 0.09% | 35,806,294 | 48.07% | 2,521,550 | 3.39% | 2.50 |
| 9/8/2021 | 820,460 | --- | --- | --- | 5 | 5 | 101 | 74,482,303 | 32,387,947 | 42,094,356 | $87.60 | $6,524,649,743 | $3,687,465,586 | 0.16% | 35,806,294 | 48.07% | 2,521,550 | 3.39% | 2.52 |
| 9/9/2021 | 762,618 | --- | --- | --- | 5 | 5 | 101 | 74,482,303 | 32,387,947 | 42,094,356 | $87.64 | $6,527,629,035 | $3,689,149,360 | 0.18% | 35,806,294 | 48.07% | 2,521,550 | 3.39% | 2.55 |
| 9/10/2021 | 1,148,560 | 3,723,829 | 5.00% | 8.85% | 5 | 5 | 101 | 74,482,303 | 32,387,947 | 42,094,356 | $91.45 | $6,811,406,609 | $3,849,528,856 | 0.16% | 35,806,294 | 48.07% | 2,521,550 | 3.39% | 2.67 |
| 9/13/2021 | 826,581 | --- | --- | --- | 5 | 5 | 101 | 74,482,303 | 32,387,947 | 42,094,356 | $86.95 | $6,476,236,246 | $3,660,104,254 | 0.15% | 35,806,294 | 48.07% | 2,521,550 | 3.39% | 2.73 |
| 9/14/2021 | 918,021 | --- | --- | --- | 5 | 5 | 101 | 74,482,303 | 32,387,947 | 42,094,356 | $89.00 | $6,628,924,967 | $3,746,397,684 | 0.15% | 35,806,294 | 48.07% | 2,521,550 | 3.39% | 2.68 |
| 9/15/2021 | 895,346 | --- | --- | --- | 5 | 5 | 101 | 74,482,303 | 32,387,947 | 42,094,356 | $90.90 | $6,770,441,343 | $3,826,376,960 | 0.10% | 35,806,294 | 48.07% | 2,480,764 | 3.33% | 2.72 |
| 9/16/2021 | 1,506,416 | --- | --- | --- | 6 | 5 | 101 | 74,482,303 | 32,387,947 | 42,094,356 | $96.24 | $7,168,176,841 | $4,051,160,821 | 0.12% | 35,806,294 | 48.07% | 2,480,764 | 3.33% | 2.62 |
| 9/17/2021 | 3,671,020 | 7,817,384 | 10.50% | 18.57% | 6 | 5 | 101 | 74,482,303 | 32,387,947 | 42,094,356 | $93.28 | $6,947,709,224 | $3,926,561,528 | 0.03% | 35,806,294 | 48.07% | 2,480,764 | 3.33% | 2.27 |
| 9/20/2021 | 1,144,518 | --- | --- | --- | 6 | 5 | 101 | 74,745,924 | 32,387,947 | 42,357,977 | $89.67 | $6,702,467,005 | $3,798,239,798 | 0.12% | 35,806,294 | 47.90% | 2,480,764 | 3.32% | 2.22 |
| 9/21/2021 | 1,028,192 | --- | --- | --- | 6 | 5 | 101 | 74,745,924 | 32,387,947 | 42,357,977 | $91.63 | $6,848,969,016 | $3,881,261,433 | 0.09% | 35,806,294 | 47.90% | 2,480,764 | 3.32% | 2.22 |
| 9/22/2021 | 627,455 | --- | --- | --- | 6 | 5 | 101 | 74,745,924 | 32,387,947 | 42,357,977 | $93.90 | $7,018,642,264 | $3,977,414,040 | 0.15% | 35,806,294 | 47.90% | 2,480,764 | 3.32% | 2.25 |
| 9/23/2021 | 760,505 | --- | --- | --- | 6 | 5 | 101 | 74,745,924 | 32,387,947 | 42,357,977 | $96.98 | $7,248,859,710 | $4,107,876,609 | 0.16% | 35,806,294 | 47.90% | 2,480,764 | 3.32% | 2.26 |
| 9/24/2021 | 1,057,603 | 4,618,273 | 6.18% | 10.90% | 6 | 5 | 101 | 74,745,924 | 32,387,947 | 42,357,977 | $98.65 | $7,373,685,403 | $4,178,614,431 | 0.07% | 35,806,294 | 47.90% | 2,480,764 | 3.32% | 2.22 |
| 9/27/2021 | 1,409,804 | --- | --- | --- | 6 | 5 | 101 | 74,745,924 | 32,387,947 | 42,357,977 | $92.26 | $6,896,058,948 | $3,907,946,958 | 0.08% | 35,806,294 | 47.90% | 2,480,764 | 3.32% | 2.19 |
| 9/28/2021 | 1,146,817 | --- | --- | --- | 6 | 5 | 101 | 74,745,924 | 32,387,947 | 42,357,977 | $90.71 | $6,780,202,766 | $3,842,292,094 | 0.17% | 35,806,294 | 47.90% | 2,480,764 | 3.32% | 2.18 |
| 9/29/2021 | 794,407 | --- | --- | --- | 6 | 5 | 101 | 74,745,924 | 32,387,947 | 42,357,977 | $90.58 | $6,770,485,796 | $3,836,785,557 | 0.09% | 35,806,294 | 47.90% | 2,480,764 | 3.32% | 2.22 |
| 9/30/2021 | 1,332,455 | --- | --- | --- | 6 | 5 | 101 | 74,745,924 | 32,387,947 | 42,357,977 | $90.09 | $6,733,860,293 | $3,816,030,148 | 0.20% | 39,133,800 | 52.36% | 2,841,138 | 3.80% | 2.50 |
| 10/1/2021 | 992,464 | 5,675,947 | 7.59% | 13.40% | 6 | 5 | 101 | 74,745,924 | 32,387,947 | 42,357,977 | $94.19 | $7,040,318,582 | $3,989,697,854 | 0.16% | 39,133,800 | 52.36% | 2,841,138 | 3.80% | 2.51 |
| 10/4/2021 | 835,974 | --- | --- | --- | 6 | 5 | 101 | 74,745,924 | 32,387,947 | 42,357,977 | $90.62 | $6,773,475,633 | $3,838,479,876 | 0.15% | 39,133,800 | 52.36% | 2,841,138 | 3.80% | 2.51 |
| 10/5/2021 | 566,627 | --- | --- | --- | 6 | 5 | 101 | 74,745,924 | 32,387,947 | 42,357,977 | $94.92 | $7,094,883,106 | $4,020,619,177 | 0.15% | 39,133,800 | 52.36% | 2,841,138 | 3.80% | 2.55 |
| 10/6/2021 | 594,571 | --- | --- | --- | 6 | 5 | 101 | 74,745,924 | 32,387,947 | 42,357,977 | $94.46 | $7,060,499,981 | $4,001,134,507 | 0.12% | 39,133,800 | 52.36% | 2,841,138 | 3.80% | 2.58 |
| 10/7/2021 | 1,015,940 | --- | --- | --- | 6 | 5 | 101 | 74,745,924 | 32,387,947 | 42,357,977 | $97.62 | $7,296,697,101 | $4,134,985,715 | 0.12% | 39,133,800 | 52.36% | 2,841,138 | 3.80% | 2.55 |
| 10/8/2021 | 558,290 | 3,571,402 | 4.78% | 8.43% | 6 | 5 | 101 | 74,745,924 | 32,387,947 | 42,357,977 | $94.10 | $7,033,591,448 | $3,985,885,636 | 0.20% | 39,133,800 | 52.36% | 2,841,138 | 3.80% | 2.62 |
| 10/11/2021 | 470,476 | --- | --- | --- | 6 | 5 | 101 | 74,745,924 | 32,387,947 | 42,357,977 | $94.65 | $7,074,701,707 | $4,009,182,523 | 0.19% | 39,133,800 | 52.36% | 2,841,138 | 3.80% | 2.66 |
| 10/12/2021 | 617,119 | --- | --- | --- | 6 | 5 | 101 | 74,745,924 | 32,387,947 | 42,357,977 | $97.22 | $7,266,798,731 | $4,118,042,524 | 0.09% | 39,133,800 | 52.36% | 2,841,138 | 3.80% | 2.70 |
| 10/13/2021 | 625,926 | --- | --- | --- | 6 | 5 | 101 | 74,745,924 | 32,387,947 | 42,357,977 | $95.54 | $7,141,225,579 | $4,046,881,123 | 0.08% | 39,133,800 | 52.36% | 2,841,138 | 3.80% | 2.74 |
| 10/14/2021 | 963,345 | --- | --- | --- | 6 | 5 | 101 | 74,745,924 | 32,387,947 | 42,357,977 | $92.50 | $6,913,997,970 | $3,918,112,873 | 0.18% | 39,133,800 | 52.36% | 2,841,138 | 3.80% | 2.81 |
| 10/15/2021 | 1,491,608 | 4,168,474 | 5.58% | 9.84% | 6 | 5 | 101 | 74,745,924 | 32,387,947 | 42,357,977 | $88.91 | $6,645,660,103 | $3,766,047,735 | 0.07% | 39,133,800 | 52.36% | 2,833,281 | 3.79% | 3.14 |
| 10/18/2021 | 663,570 | --- | --- | --- | 6 | 5 | 101 | 74,745,924 | 32,387,947 | 42,357,977 | $93.02 | $6,952,865,850 | $3,940,139,021 | 0.11% | 39,133,800 | 52.36% | 2,833,281 | 3.79% | 3.23 |
| 10/19/2021 | 647,035 | --- | --- | --- | 6 | 5 | 101 | 74,745,924 | 32,387,947 | 42,357,977 | $94.55 | $7,067,227,114 | $4,004,946,725 | 0.06% | 39,133,800 | 52.36% | 2,833,281 | 3.79% | 3.30 |
| 10/20/2021 | 622,851 | --- | --- | --- | 6 | 5 | 101 | 74,745,924 | 32,387,947 | 42,357,977 | $93.92 | $7,020,137,182 | $3,978,261,200 | 0.15% | 39,133,800 | 52.36% | 2,833,281 | 3.79% | 3.30 |
| 10/21/2021 | 331,843 | --- | --- | --- | 6 | 5 | 101 | 74,745,924 | 32,387,947 | 42,357,977 | $95.31 | $7,124,034,016 | $4,037,138,788 | 0.21% | 39,133,800 | 52.36% | 2,833,281 | 3.79% | 3.39 |
| 10/22/2021 | 436,967 | 2,702,266 | 3.62% | 6.38% | 6 | 5 | 101 | 74,745,924 | 32,387,947 | 42,357,977 | $94.29 | $7,047,793,174 | $3,993,933,651 | 0.24% | 39,133,800 | 52.36% | 2,833,281 | 3.79% | 3.52 |
| 10/25/2021 | 1,351,682 | --- | --- | --- | 6 | 5 | 101 | 74,745,924 | 32,387,947 | 42,357,977 | $99.96 | $7,471,602,563 | $4,234,103,381 | 0.13% | 39,133,800 | 52.36% | 2,833,281 | 3.79% | 3.53 |
| 10/26/2021 | 722,617 | --- | --- | --- | 6 | 5 | 101 | 74,745,924 | 32,387,947 | 42,357,977 | $98.92 | $7,393,866,802 | $4,190,051,085 | 0.11% | 39,133,800 | 52.36% | 2,833,281 | 3.79% | 3.62 |
| 10/27/2021 | 464,585 | --- | --- | --- | 6 | 5 | 101 | 74,745,924 | 32,387,947 | 42,357,977 | $95.51 | $7,138,983,201 | $4,045,610,383 | 0.12% | 39,133,800 | 52.36% | 2,833,281 | 3.79% | 3.70 |
| 10/28/2021 | 425,307 | --- | --- | --- | 6 | 5 | 101 | 74,745,924 | 32,387,947 | 42,357,977 | $97.74 | $7,305,666,612 | $4,140,068,672 | 0.12% | 39,133,800 | 52.36% | 2,833,281 | 3.79% | 3.94 |
| 10/29/2021 | 550,156 | 3,514,347 | 4.70% | 8.30% | 6 | 5 | 101 | 74,745,924 | 32,387,947 | 42,357,977 | $96.52 | $7,214,476,584 | $4,088,391,940 | 0.15% | 39,133,800 | 52.36% | 2,520,269 | 3.37% | 3.61 |
| 11/1/2021 | 1,120,835 | --- | --- | --- | 6 | 5 | 101 | 74,745,924 | 32,396,197 | 42,349,727 | $101.40 | $7,579,236,694 | $4,294,262,318 | 0.08% | 39,150,197 | 52.38% | 2,520,269 | 3.37% | 3.54 |
| 11/2/2021 | 914,194 | --- | --- | --- | 6 | 5 | 101 | 74,745,924 | 32,396,197 | 42,349,727 | $101.15 | $7,560,550,213 | $4,283,674,886 | 0.23% | 39,150,197 | 52.38% | 2,520,269 | 3.37% | 3.46 |
| 11/3/2021 | 908,195 | --- | --- | --- | 6 | 5 | 101 | 74,745,924 | 32,396,197 | 42,349,727 | $104.85 | $7,837,110,131 | $4,440,368,876 | 0.10% | 39,150,197 | 52.38% | 2,520,269 | 3.37% | 3.38 |
| 11/4/2021 | 499,674 | --- | --- | --- | 6 | 5 | 101 | 74,745,924 | 32,396,197 | 42,349,727 | $103.95 | $7,769,838,800 | $4,402,254,122 | 0.21% | 39,150,197 | 52.38% | 2,520,269 | 3.37% | 3.50 |
| 11/5/2021 | 761,283 | 4,204,181 | 5.62% | 9.93% | 6 | 5 | 101 | 74,745,924 | 32,396,197 | 42,349,727 | $108.07 | $8,077,792,007 | $4,576,734,997 | 0.07% | 39,150,197 | 52.38% | 2,520,269 | 3.37% | 3.45 |
| 11/8/2021 | 605,335 | --- | --- | --- | 6 | 5 | 101 | 74,745,924 | 32,396,197 | 42,349,727 | $103.95 | $7,769,838,800 | $4,402,254,122 | 0.17% | 39,150,197 | 52.38% | 2,520,269 | 3.37% | 3.42 |
| 11/9/2021 | 751,012 | --- | --- | --- | 6 | 5 | 101 | 74,745,924 | 32,396,197 | 42,349,727 | $101.51 | $7,587,458,745 | $4,298,920,788 | 0.08% | 39,150,197 | 52.38% | 2,520,269 | 3.37% | 3.39 |

**Exhibit 3**
**Market Efficiency Statistics for Celsius Holdings, Inc. Common Stock**

| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] | [12] | [13] | [14] | [15] | [16] | [17] | [18] | [19] | [20] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Daily Volume | Weekly Volume | Weekly Volume / Shares Outstanding | Weekly Volume / Float | Analyst Coverage (Bloomberg) | Analyst Coverage (IBES) | Brokers/ Market Makers | Shares Outstanding | Insider Holdings | Public Float | Price | Market Capitalization of Equity | Market Capitalization of Public Float | Bid-Ask Spread | Institutional Holdings | Institutional Holdings as a % of Shares Outstanding | Short Interest | Short Interest as a % of Shares Outstanding | Short Interest Ratio (Days) |
| 11/10/2021 | 1,217,362 | --- | --- | --- | 6 | 5 | 101 | 74,745,924 | 32,396,197 | 42,349,727 | $93.89 | $7,017,894,804 | $3,976,215,868 | 0.47% | 39,150,197 | 52.38% | 2,520,269 | 3.37% | 3.26 |
| 11/11/2021 | 2,045,006 | --- | --- | --- | 6 | 5 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $97.71 | $7,310,182,444 | $4,144,750,035 | 0.08% | 39,150,197 | 52.33% | 2,520,269 | 3.37% | 3.05 |
| 11/12/2021 | 3,678,591 | 8,297,306 | 11.09% | 19.56% | 6 | 5 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $83.35 | $6,235,837,752 | $3,535,614,732 | 0.01% | 39,150,197 | 52.33% | 2,520,269 | 3.37% | 2.69 |
| 11/15/2021 | 3,217,126 | --- | --- | --- | 7 | 5 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $77.77 | $5,818,369,549 | $3,298,917,309 | 0.19% | 39,150,197 | 52.33% | 2,641,759 | 3.53% | 2.48 |
| 11/16/2021 | 1,833,980 | --- | --- | --- | 7 | 5 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $79.52 | $5,949,295,957 | $3,373,150,371 | 0.05% | 39,150,197 | 52.33% | 2,641,759 | 3.53% | 2.35 |
| 11/17/2021 | 1,731,537 | --- | --- | --- | 7 | 5 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $77.02 | $5,762,258,232 | $3,267,103,139 | 0.01% | 39,150,197 | 52.33% | 2,641,759 | 3.53% | 2.24 |
| 11/18/2021 | 937,674 | --- | --- | --- | 7 | 6 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $77.00 | $5,760,761,930 | $3,266,254,761 | 0.12% | 39,150,197 | 52.33% | 2,641,759 | 3.53% | 2.19 |
| 11/19/2021 | 1,259,880 | 8,980,197 | 12.00% | 21.17% | 7 | 6 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $72.84 | $5,449,531,156 | $3,089,792,166 | 0.21% | 39,150,197 | 52.33% | 2,641,759 | 3.53% | 2.11 |
| 11/22/2021 | 1,143,093 | --- | --- | --- | 7 | 6 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $73.44 | $5,494,420,210 | $3,115,243,502 | 0.07% | 39,150,197 | 52.33% | 2,641,759 | 3.53% | 2.13 |
| 11/23/2021 | 947,938 | --- | --- | --- | 7 | 6 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $71.60 | $5,356,760,444 | $3,037,192,739 | 0.11% | 39,150,197 | 52.33% | 2,641,759 | 3.53% | 2.11 |
| 11/24/2021 | 918,114 | --- | --- | --- | 7 | 6 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $73.29 | $5,483,197,946 | $3,108,880,668 | 0.10% | 39,150,197 | 52.33% | 2,641,759 | 3.53% | 2.07 |
| 11/26/2021 | 800,577 | 3,809,722 | 5.09% | 8.98% | 7 | 6 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $71.38 | $5,340,301,124 | $3,027,860,582 | 0.22% | 39,150,197 | 52.33% | 2,641,759 | 3.53% | 2.04 |
| 11/29/2021 | 898,093 | --- | --- | --- | 7 | 6 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $70.78 | $5,295,412,070 | $3,002,409,247 | 0.04% | 39,150,197 | 52.33% | 2,641,759 | 3.53% | 2.02 |
| 11/30/2021 | 1,099,053 | --- | --- | --- | 7 | 6 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $68.41 | $5,118,100,307 | $2,901,876,470 | 0.16% | 39,229,170 | 52.43% | 2,639,091 | 3.53% | 2.02 |
| 12/1/2021 | 1,711,289 | --- | --- | --- | 7 | 6 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $62.91 | $4,706,617,312 | $2,668,572,559 | 0.02% | 39,229,170 | 52.43% | 2,639,091 | 3.53% | 1.96 |
| 12/2/2021 | 1,106,450 | --- | --- | --- | 8 | 6 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $65.52 | $4,901,884,697 | $2,779,285,869 | 0.05% | 39,229,170 | 52.43% | 2,639,091 | 3.53% | 1.94 |
| 12/3/2021 | 1,114,121 | 5,929,006 | 7.92% | 13.98% | 8 | 6 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $63.05 | $4,717,091,425 | $2,674,511,204 | 0.05% | 39,229,170 | 52.43% | 2,639,091 | 3.53% | 1.90 |
| 12/6/2021 | 1,115,811 | --- | --- | --- | 8 | 7 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $64.79 | $4,847,269,681 | $2,748,320,077 | 0.05% | 39,229,170 | 52.43% | 2,639,091 | 3.53% | 1.88 |
| 12/7/2021 | 904,739 | --- | --- | --- | 8 | 7 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $68.58 | $5,130,818,872 | $2,909,087,682 | 0.17% | 39,229,170 | 52.43% | 2,639,091 | 3.53% | 1.86 |
| 12/8/2021 | 715,420 | --- | --- | --- | 8 | 7 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $71.86 | $5,376,212,367 | $3,048,221,651 | 0.18% | 39,229,170 | 52.43% | 2,639,091 | 3.53% | 1.86 |
| 12/9/2021 | 847,230 | --- | --- | --- | 8 | 7 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $67.13 | $5,022,336,992 | $2,847,580,287 | 0.16% | 39,229,170 | 52.43% | 2,639,091 | 3.53% | 1.88 |
| 12/10/2021 | 548,138 | 4,131,338 | 5.52% | 9.74% | 8 | 7 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $66.29 | $4,959,492,316 | $2,811,948,417 | 0.14% | 39,229,170 | 52.43% | 2,639,091 | 3.53% | 1.99 |
| 12/13/2021 | 698,478 | --- | --- | --- | 8 | 7 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $63.39 | $4,742,528,555 | $2,688,933,627 | 0.05% | 39,229,170 | 52.43% | 2,639,091 | 3.53% | 2.24 |
| 12/14/2021 | 697,683 | --- | --- | --- | 8 | 7 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $62.76 | $4,695,395,048 | $2,662,209,725 | 0.18% | 39,229,170 | 52.43% | 2,639,091 | 3.53% | 2.51 |
| 12/15/2021 | 745,214 | --- | --- | --- | 8 | 7 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $64.93 | $4,857,743,794 | $2,754,258,722 | 0.08% | 39,229,170 | 52.43% | 2,266,958 | 3.03% | 2.27 |
| 12/16/2021 | 1,171,626 | --- | --- | --- | 8 | 7 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $63.71 | $4,766,469,384 | $2,702,507,673 | 0.16% | 39,229,170 | 52.43% | 2,266,958 | 3.03% | 2.34 |
| 12/17/2021 | 1,162,931 | 4,475,932 | 5.98% | 10.55% | 8 | 7 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $68.00 | $5,087,426,120 | $2,884,484,724 | 0.18% | 39,229,170 | 52.43% | 2,266,958 | 3.03% | 2.31 |
| 12/20/2021 | 584,967 | --- | --- | --- | 8 | 7 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $65.92 | $4,931,810,733 | $2,796,253,427 | 0.17% | 39,229,170 | 52.43% | 2,266,958 | 3.03% | 2.39 |
| 12/21/2021 | 670,637 | --- | --- | --- | 8 | 7 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $70.33 | $5,261,745,280 | $2,983,320,745 | 0.11% | 39,229,170 | 52.43% | 2,266,958 | 3.03% | 2.46 |
| 12/22/2021 | 449,036 | --- | --- | --- | 8 | 7 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $70.89 | $5,303,641,730 | $3,007,075,325 | 0.17% | 39,229,170 | 52.43% | 2,266,958 | 3.03% | 2.52 |
| 12/23/2021 | 650,106 | 2,354,746 | 3.15% | 5.55% | 8 | 7 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $74.60 | $5,581,205,714 | $3,164,449,418 | 0.08% | 39,229,170 | 52.43% | 2,266,958 | 3.03% | 2.56 |
| 12/27/2021 | 605,030 | --- | --- | --- | 8 | 7 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $75.10 | $5,618,613,259 | $3,185,658,864 | 0.11% | 39,229,170 | 52.43% | 2,266,958 | 3.03% | 2.59 |
| 12/28/2021 | 560,974 | --- | --- | --- | 8 | 7 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $73.55 | $5,502,649,870 | $3,119,909,580 | 0.15% | 39,229,170 | 52.43% | 2,266,958 | 3.03% | 2.64 |
| 12/29/2021 | 384,964 | --- | --- | --- | 8 | 7 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $73.11 | $5,469,731,230 | $3,101,245,267 | 0.16% | 39,229,170 | 52.43% | 2,266,958 | 3.03% | 2.76 |
| 12/30/2021 | 457,747 | --- | --- | --- | 8 | 7 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $73.52 | $5,500,405,417 | $3,118,637,013 | 0.19% | 39,229,170 | 52.43% | 2,266,958 | 3.03% | 2.98 |
| 12/31/2021 | 1,089,218 | 3,097,933 | 4.14% | 7.30% | 8 | 7 | 101 | 74,908,845 | 32,456,505 | 42,452,340 | $74.57 | $5,585,952,572 | $3,165,670,994 | 0.13% | 39,526,507 | 52.77% | 2,299,809 | 3.07% | 3.03 |
| 1/3/2022 | 552,208 | --- | --- | --- | 8 | 7 | 101 | 74,908,845 | 32,456,505 | 42,452,340 | $75.09 | $5,624,905,171 | $3,187,746,211 | 0.24% | 39,526,507 | 52.77% | 2,299,809 | 3.07% | 3.15 |
| 1/4/2022 | 913,865 | --- | --- | --- | 8 | 7 | 101 | 74,908,845 | 32,456,505 | 42,452,340 | $69.00 | $5,168,710,305 | $2,929,211,460 | 0.15% | 39,526,507 | 52.77% | 2,299,809 | 3.07% | 3.19 |
| 1/5/2022 | 717,805 | --- | --- | --- | 8 | 7 | 101 | 74,908,845 | 32,456,505 | 42,452,340 | $63.67 | $4,769,446,161 | $2,702,940,488 | 0.27% | 39,526,507 | 52.77% | 2,299,809 | 3.07% | 3.23 |
| 1/6/2022 | 877,244 | --- | --- | --- | 8 | 7 | 101 | 74,908,845 | 32,456,505 | 42,452,340 | $61.52 | $4,608,392,144 | $2,611,667,957 | 0.18% | 39,526,507 | 52.77% | 2,299,809 | 3.07% | 3.20 |
| 1/7/2022 | 1,735,263 | 4,796,385 | 6.40% | 11.30% | 8 | 7 | 101 | 74,908,845 | 32,456,505 | 42,452,340 | $54.60 | $4,090,022,937 | $2,317,897,764 | 0.07% | 39,526,507 | 52.77% | 2,299,809 | 3.07% | 3.01 |
| 1/10/2022 | 3,319,685 | --- | --- | --- | 8 | 7 | 101 | 74,908,845 | 32,456,505 | 42,452,340 | $49.71 | $3,723,718,685 | $2,110,305,821 | 0.02% | 39,526,507 | 52.77% | 2,299,809 | 3.07% | 2.55 |
| 1/11/2022 | 1,680,578 | --- | --- | --- | 8 | 7 | 101 | 74,908,845 | 32,456,505 | 42,452,340 | $54.31 | $4,068,299,372 | $2,305,586,585 | 0.07% | 39,526,507 | 52.77% | 2,299,809 | 3.07% | 2.42 |
| 1/12/2022 | 905,383 | --- | --- | --- | 8 | 7 | 101 | 74,908,845 | 32,456,505 | 42,452,340 | $52.12 | $3,904,249,001 | $2,212,615,961 | 0.25% | 39,526,507 | 52.77% | 2,299,809 | 3.07% | 2.39 |
| 1/13/2022 | 567,255 | --- | --- | --- | 8 | 7 | 101 | 74,908,845 | 32,456,505 | 42,452,340 | $50.24 | $3,763,420,373 | $2,132,805,562 | 0.18% | 39,526,507 | 52.77% | 2,299,809 | 3.07% | 2.41 |
| 1/14/2022 | 1,019,024 | 7,491,925 | 10.00% | 17.65% | 8 | 7 | 101 | 74,908,845 | 32,456,505 | 42,452,340 | $49.34 | $3,696,002,412 | $2,094,598,456 | 0.12% | 39,526,507 | 52.77% | 2,679,000 | 3.58% | 2.83 |
| 1/18/2022 | 1,143,626 | --- | --- | --- | 8 | 7 | 101 | 74,908,845 | 32,456,505 | 42,452,340 | $47.52 | $3,559,668,314 | $2,017,335,197 | 0.13% | 39,526,507 | 52.77% | 2,679,000 | 3.58% | 2.84 |
| 1/19/2022 | 960,810 | --- | --- | --- | 8 | 7 | 101 | 74,908,845 | 32,456,505 | 42,452,340 | $45.09 | $3,377,639,821 | $1,914,176,011 | 0.11% | 39,526,507 | 52.77% | 2,679,000 | 3.58% | 2.78 |
| 1/20/2022 | 1,069,716 | --- | --- | --- | 8 | 7 | 101 | 74,908,845 | 32,456,505 | 42,452,340 | $43.67 | $3,271,269,261 | $1,853,893,688 | 0.14% | 39,526,507 | 52.77% | 2,679,000 | 3.58% | 2.73 |
| 1/21/2022 | 1,237,623 | 4,411,775 | 5.89% | 10.39% | 8 | 7 | 101 | 74,908,845 | 32,456,505 | 42,452,340 | $43.92 | $3,289,996,472 | $1,864,506,773 | 0.14% | 39,526,507 | 52.77% | 2,679,000 | 3.58% | 2.62 |
| 1/24/2022 | 1,900,315 | --- | --- | --- | 8 | 7 | 101 | 74,908,845 | 32,456,505 | 42,452,340 | $46.98 | $3,519,217,538 | $1,994,410,933 | 0.13% | 39,526,507 | 52.77% | 2,679,000 | 3.58% | 2.47 |
| 1/25/2022 | 1,040,193 | --- | --- | --- | 8 | 7 | 101 | 74,908,845 | 32,456,505 | 42,452,340 | $44.17 | $3,308,723,684 | $1,875,119,858 | 0.07% | 39,526,507 | 52.77% | 2,679,000 | 3.58% | 2.42 |
| 1/26/2022 | 1,099,868 | --- | --- | --- | 8 | 7 | 101 | 74,908,845 | 32,456,505 | 42,452,340 | $42.37 | $3,173,887,763 | $1,798,705,646 | 0.12% | 39,526,507 | 52.77% | 2,679,000 | 3.58% | 2.36 |
| 1/27/2022 | 977,371 | --- | --- | --- | 8 | 7 | 101 | 74,908,845 | 32,456,505 | 42,452,340 | $40.49 | $3,033,059,134 | $1,718,895,247 | 0.10% | 39,526,507 | 52.77% | 2,679,000 | 3.58% | 2.30 |
| 1/28/2022 | 1,600,858 | 6,618,605 | 8.84% | 15.59% | 8 | 7 | 101 | 74,908,845 | 32,456,505 | 42,452,340 | $45.05 | $3,374,643,467 | $1,912,477,917 | 0.04% | 39,526,507 | 52.77% | 2,679,000 | 3.58% | 2.20 |
| 1/31/2022 | 921,679 | --- | --- | --- | 8 | 7 | 104 | 74,908,845 | 32,413,884 | 42,494,961 | $47.73 | $3,575,399,172 | $2,028,284,489 | 0.17% | 35,586,208 | 47.51% | 2,589,057 | 3.46% | 2.14 |
| 2/1/2022 | 972,840 | --- | --- | --- | 8 | 7 | 104 | 74,908,845 | 32,413,884 | 42,494,961 | $50.17 | $3,758,176,754 | $2,131,972,193 | 0.20% | 35,586,208 | 47.51% | 2,589,057 | 3.46% | 2.10 |
| 2/2/2022 | 1,012,854 | --- | --- | --- | 8 | 7 | 104 | 74,908,845 | 32,413,884 | 42,494,961 | $49.95 | $3,741,696,808 | $2,122,623,302 | 0.02% | 35,586,208 | 47.51% | 2,589,057 | 3.46% | 2.09 |
| 2/3/2022 | 869,123 | --- | --- | --- | 8 | 7 | 104 | 74,908,845 | 32,413,884 | 42,494,961 | $46.99 | $3,519,966,627 | $1,996,838,217 | 0.09% | 35,586,208 | 47.51% | 2,589,057 | 3.46% | 2.08 |
| 2/4/2022 | 852,099 | 4,628,595 | 6.18% | 10.89% | 8 | 7 | 104 | 74,908,845 | 32,413,884 | 42,494,961 | $48.92 | $3,664,540,697 | $2,078,853,492 | 0.16% | 35,586,208 | 47.51% | 2,589,057 | 3.46% | 2.08 |
| 2/7/2022 | 694,558 | --- | --- | --- | 8 | 7 | 104 | 74,908,845 | 32,413,884 | 42,494,961 | $49.98 | $3,743,944,073 | $2,123,898,151 | 0.10% | 35,586,208 | 47.51% | 2,589,057 | 3.46% | 2.17 |
| 2/8/2022 | 786,124 | --- | --- | --- | 8 | 7 | 104 | 74,908,845 | 32,413,884 | 42,494,961 | $53.55 | $4,011,368,650 | $2,275,605,162 | 0.15% | 35,586,208 | 47.51% | 2,589,057 | 3.46% | 2.43 |
| 2/9/2022 | 892,815 | --- | --- | --- | 8 | 7 | 104 | 74,908,845 | 32,413,884 | 42,494,961 | $57.49 | $4,306,509,499 | $2,443,035,308 | 0.14% | 35,586,208 | 47.51% | 2,589,057 | 3.46% | 2.52 |

**Exhibit 3**
**Market Efficiency Statistics for Celsius Holdings, Inc. Common Stock**

| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] | [12] | [13] | [14] | [15] | [16] | [17] | [18] | [19] | [20] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Daily Volume | Weekly Volume | Weekly Volume / Shares Outstanding | Weekly Volume / Float | Analyst Coverage (Bloomberg) | Analyst Coverage (IBES) | Brokers/ Market Makers | Shares Outstanding | Insider Holdings | Public Float | Price | Market Capitalization of Equity | Market Capitalization of Public Float | Bid-Ask Spread | Institutional Holdings | Institutional Holdings as a % of Shares Outstanding | Short Interest | Short Interest as a % of Shares Outstanding | Short Interest Ratio (Days) |
| 2/10/2022 | 1,251,054 | --- | --- | --- | 8 | 7 | 104 | 74,908,845 | 32,413,884 | 42,494,961 | $57.60 | $4,314,749,472 | $2,447,709,754 | 0.14% | 35,586,208 | 47.51% | 2,589,057 | 3.46% | 2.48 |
| 2/11/2022 | 711,745 | 4,336,296 | 5.79% | 10.20% | 8 | 7 | 104 | 74,908,845 | 32,413,884 | 42,494,961 | $56.85 | $4,258,567,838 | $2,415,838,533 | 0.23% | 35,586,208 | 47.51% | 2,589,057 | 3.46% | 2.46 |
| 2/14/2022 | 660,079 | --- | --- | --- | 8 | 7 | 104 | 74,908,845 | 32,413,884 | 42,494,961 | $57.57 | $4,312,502,207 | $2,446,434,905 | 0.16% | 35,586,208 | 47.51% | 2,589,057 | 3.46% | 2.51 |
| 2/15/2022 | 831,698 | --- | --- | --- | 8 | 7 | 104 | 74,908,845 | 32,413,884 | 42,494,961 | $62.11 | $4,652,588,363 | $2,639,362,028 | 0.08% | 35,586,208 | 47.51% | 2,999,037 | 4.00% | 2.95 |
| 2/16/2022 | 551,662 | --- | --- | --- | 8 | 7 | 104 | 74,908,845 | 32,413,884 | 42,494,961 | $59.92 | $4,488,537,992 | $2,546,298,063 | 0.12% | 35,586,208 | 47.51% | 2,999,037 | 4.00% | 3.01 |
| 2/17/2022 | 639,403 | --- | --- | --- | 8 | 7 | 104 | 74,908,845 | 32,413,884 | 42,494,961 | $56.37 | $4,222,611,593 | $2,395,440,952 | 0.07% | 35,586,208 | 47.51% | 2,999,037 | 4.00% | 3.08 |
| 2/18/2022 | 1,244,147 | 3,926,989 | 5.24% | 9.24% | 8 | 7 | 104 | 74,908,845 | 32,413,884 | 42,494,961 | $51.63 | $3,867,543,667 | $2,194,014,836 | 0.14% | 35,586,208 | 47.51% | 2,999,037 | 4.00% | 3.07 |
| 2/22/2022 | 1,072,558 | --- | --- | --- | 8 | 7 | 104 | 74,908,845 | 32,413,884 | 42,494,961 | $55.95 | $4,191,149,878 | $2,377,593,068 | 0.14% | 35,586,208 | 47.51% | 2,999,037 | 4.00% | 3.21 |
| 2/23/2022 | 1,486,958 | --- | --- | --- | 8 | 7 | 104 | 74,908,845 | 32,413,884 | 42,494,961 | $55.56 | $4,161,935,428 | $2,361,020,033 | 0.20% | 35,586,208 | 47.51% | 2,999,037 | 4.00% | 3.14 |
| 2/24/2022 | 1,168,854 | --- | --- | --- | 8 | 7 | 104 | 74,908,845 | 32,413,884 | 42,494,961 | $60.88 | $4,560,450,484 | $2,587,093,226 | 0.20% | 35,586,208 | 47.51% | 2,999,037 | 4.00% | 3.12 |
| 2/25/2022 | 1,118,360 | 4,846,730 | 6.47% | 11.41% | 8 | 7 | 104 | 74,908,845 | 32,413,884 | 42,494,961 | $63.76 | $4,776,187,957 | $2,709,478,713 | 0.11% | 35,586,208 | 47.51% | 2,999,037 | 4.00% | 3.10 |
| 2/28/2022 | 915,785 | --- | --- | --- | 8 | 7 | 104 | 74,908,845 | 32,413,884 | 42,494,961 | $63.89 | $4,785,926,107 | $2,715,003,058 | 0.22% | 35,701,400 | 47.66% | 3,154,216 | 4.21% | 3.38 |
| 3/1/2022 | 1,894,349 | n/a | --- | --- | 8 | 7 | 104 | 74,908,845 | 32,413,884 | 42,494,961 | $62.80 | $4,704,275,466 | $2,668,683,551 | 0.30% | 35,701,400 | 47.66% | 3,154,216 | 4.21% | 3.21 |

*Class Period (August 12, 20121 to March 1, 2022)*

| | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] | [12] | [13] | [14] | [15] | [16] | [17] | [18] | [19] | [20] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 142,161,614 | 136,058,836 | | | | | | | | | | | | | | | | | |
| Maximum | 3,678,591 | 8,980,197 | 12.00% | 21.17% | 8 | 7 | 104 | 74,908,845 | 32,456,505 | 42,494,961 | $108.07 | $8,077,792,007 | $4,576,734,997 | 0.47% | 39,526,507 | 52.77% | 3,154,216 | 4.21% | 3.94 |
| Average | 1,022,745 | 4,859,244 | 6.50% | 11.47% | 7 | 6 | 101 | 74,761,588 | 32,404,223 | 42,357,365 | $74.61 | $5,576,662,799 | $3,159,270,101 | 0.13% | 37,858,274 | 50.64% | 2,582,162 | 3.45% | 2.64 |
| Median | 914,194 | 4,443,854 | 5.94% | 10.47% | 7 | 6 | 101 | 74,815,090 | 32,396,197 | 42,418,893 | $73.11 | $5,461,042,456 | $3,089,792,166 | 0.12% | 39,133,800 | 52.36% | 2,589,057 | 3.46% | 2.55 |
| Minimum | 331,843 | 2,354,746 | 3.15% | 5.55% | 4 | 4 | 101 | 74,482,303 | 32,387,947 | 42,094,356 | $40.49 | $3,033,059,134 | $1,718,895,247 | 0.01% | 35,586,208 | 47.51% | 2,108,457 | 2.83% | 1.86 |

**Notes:**

[1] Trading Date.
[2] Reported daily U.S. composite volume.  Source Bloomberg.
[3] Weekly volume is sum of volume during the week.  The first and last weeks of the Class Period are excluded because they are partial weeks.
[4] = [3] / [8].  The first and last week of the Class Period are excluded because they are partial weeks.
[5] = [3] / [10].
[6] Number of analysts providing recommendations for Celsius.  For days where data was not available, the last available day's data was used.  Source: Bloomberg.
[7] Number of analysts providing EPS estimates for current fiscal year for the security.  Source: IBES estimates via S&P Capital IQ.
[8] Number of brokers/market makers providing liquidity.  Source: Bloomberg.
[9] Shares outstanding.  Source: Celsius SEC filings.
[10] Insider holdings is equal to the shares held by executives and directors of Celsius.  Insiders also include individuals identified as strategic entities (which are 5% or greater shareholders). Source: Refinitiv.
[11] = [9] - [10].
[12] Closing U.S. composite share price.  Source: Bloomberg.
[13] = [9] x [12].
[14] = [11] x [12].
[15] The percent bid-ask spread was calculated as (i) the closing ask quote less the closing bid quote divided by (ii) the average of the bid and ask quotes.  Source: Bloomberg.
[16] Institutional holdings.  Source: Refinitiv.
[17] = [16] / [9].
[18] Short interest for Celsius shares traded in the U.S.  Source: Bloomberg.
[19] = [18] / [9].
[20] = [18] / rolling average volume for 20 trading days through the current day from [2].

**Exhibit 4**
**Celsius Holdings, Inc. Common Stock Data**

| | [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] | [12] | [13] | [14] | [15] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Nasdaq Total Return Index | Russell 2000 Total Return Index | | Coefficient | | | | | | | Excess Price Change |
| Date | Celsius Volume | Celsius Price | Celsius Return | | | Intercept | Nasdaq Index | Russell 2000 (Net of Nasdaq) | Predicted Return | Excess Return | Standard Error | t-statistic | p-Value | |
| 8/12/2021 | 2,085,205 | $73.32 | -5.77% | 0.35% | -0.27% | 0.003 | 1.864 | 1.080 | 0.27% | -6.04% | 4.60% | -1.31 | 19.16% | -$4.70 |
| 8/13/2021 | 1,207,439 | $72.63 | -0.94% | 0.05% | -0.92% | 0.002 | 1.848 | 1.110 | -0.79% | -0.15% | 4.61% | -0.03 | 97.40% | -$0.11 |
| 8/16/2021 | 564,569 | $72.39 | -0.33% | -0.19% | -0.88% | 0.002 | 1.859 | 1.105 | -0.88% | 0.55% | 4.59% | 0.12 | 90.48% | $0.40 |
| 8/17/2021 | 1,480,025 | $65.84 | -9.05% | -0.93% | -1.19% | 0.002 | 1.863 | 1.107 | -1.79% | -7.26% | 4.59% | -1.58 | 11.66% | -$5.25 |
| 8/18/2021 | 803,457 | $67.84 | 3.04% | -0.87% | -0.84% | 0.002 | 1.893 | 1.119 | -1.42% | 4.45% | 4.62% | 0.96 | 33.75% | $2.93 |
| 8/19/2021 | 777,205 | $65.89 | -2.87% | 0.12% | -1.21% | 0.002 | 1.876 | 1.129 | -1.06% | -1.81% | 4.64% | -0.39 | 69.65% | -$1.23 |
| 8/20/2021 | 683,329 | $65.99 | 0.15% | 1.19% | 1.65% | 0.002 | 1.876 | 1.134 | 2.96% | -2.81% | 4.64% | -0.61 | 54.62% | -$1.85 |
| 8/23/2021 | 1,013,778 | $70.55 | 6.91% | 1.55% | 1.88% | 0.002 | 1.896 | 1.081 | 3.45% | 3.46% | 4.64% | 0.75 | 45.71% | $2.29 |
| 8/24/2021 | 906,231 | $72.36 | 2.57% | 0.52% | 1.02% | 0.002 | 1.899 | 1.076 | 1.76% | 0.80% | 4.60% | 0.17 | 86.22% | $0.56 |
| 8/25/2021 | 806,213 | $73.42 | 1.46% | 0.15% | 0.38% | 0.002 | 1.890 | 1.058 | 0.75% | 0.72% | 4.60% | 0.16 | 87.68% | $0.52 |
| 8/26/2021 | 674,289 | $72.57 | -1.16% | -0.64% | -1.13% | 0.002 | 1.986 | 1.077 | -1.60% | 0.44% | 4.59% | 0.10 | 92.39% | $0.32 |
| 8/27/2021 | 1,128,412 | $75.56 | 4.12% | 1.23% | 2.85% | 0.002 | 1.975 | 1.085 | 4.37% | -0.24% | 4.58% | -0.05 | 95.74% | -$0.18 |
| 8/30/2021 | 1,082,635 | $79.61 | 5.36% | 0.90% | -0.48% | 0.002 | 1.901 | 1.058 | 0.40% | 4.96% | 4.57% | 1.09 | 27.95% | $3.75 |
| 8/31/2021 | 1,204,493 | $81.76 | 2.70% | -0.04% | 0.35% | 0.002 | 1.937 | 1.014 | 0.50% | 2.20% | 4.59% | 0.48 | 63.21% | $1.75 |
| 9/1/2021 | 963,534 | $84.10 | 2.86% | 0.33% | 0.59% | 0.003 | 1.809 | 1.097 | 1.14% | 1.72% | 4.55% | 0.38 | 70.67% | $1.40 |
| 9/2/2021 | 993,368 | $85.76 | 1.97% | 0.15% | 0.75% | 0.003 | 1.740 | 1.076 | 1.22% | 0.75% | 4.54% | 0.17 | 86.90% | $0.63 |
| 9/3/2021 | 847,715 | $87.42 | 1.94% | 0.21% | -0.52% | 0.004 | 1.810 | 1.120 | -0.07% | 2.00% | 4.51% | 0.44 | 65.77% | $1.72 |
| 9/7/2021 | 992,191 | $85.85 | -1.80% | 0.07% | -0.72% | 0.003 | 1.943 | 0.942 | -0.32% | -1.48% | 4.47% | -0.33 | 74.14% | -$1.29 |
| 9/8/2021 | 820,460 | $87.60 | 2.04% | -0.57% | -1.13% | 0.003 | 1.852 | 0.990 | -1.35% | 3.38% | 4.46% | 0.76 | 44.93% | $2.91 |
| 9/9/2021 | 762,618 | $87.64 | 0.05% | -0.24% | -0.02% | 0.003 | 1.829 | 0.988 | 0.08% | -0.04% | 4.47% | -0.01 | 99.36% | -$0.03 |
| 9/10/2021 | 1,148,560 | $91.45 | 4.35% | -0.87% | -0.96% | 0.004 | 2.454 | 0.981 | -1.78% | 6.13% | 3.73% | 1.64 | 10.29% | $5.37 |
| 9/13/2021 | 826,581 | $86.95 | -4.92% | -0.07% | 0.60% | 0.005 | 2.365 | 1.042 | 1.08% | -6.00% | 3.74% | -1.60 | 11.11% | -$5.49 |
| 9/14/2021 | 918,021 | $89.00 | 2.36% | -0.44% | -1.35% | 0.005 | 2.325 | 1.028 | -1.50% | 3.86% | 3.75% | 1.03 | 30.54% | $3.35 |
| 9/15/2021 | 895,346 | $90.90 | 2.13% | 0.82% | 1.11% | 0.005 | 2.305 | 0.964 | 2.68% | -0.54% | 3.76% | -0.14 | 88.54% | -$0.48 |
| 9/16/2021 | 1,506,416 | $96.24 | 5.87% | 0.14% | -0.06% | 0.005 | 2.287 | 0.942 | 0.58% | 5.29% | 3.74% | 1.42 | 15.93% | $4.81 |
| 9/17/2021 | 3,671,020 | $93.28 | -3.08% | -0.91% | 0.18% | 0.005 | 2.202 | 0.944 | -0.44% | -2.64% | 3.76% | -0.70 | 48.41% | -$2.54 |
| 9/20/2021 | 1,144,518 | $89.67 | -3.87% | -2.19% | -2.44% | 0.005 | 2.235 | 0.916 | -4.62% | 0.75% | 3.76% | 0.20 | 84.29% | $0.70 |
| 9/21/2021 | 1,028,192 | $91.63 | 2.19% | 0.23% | 0.18% | 0.005 | 2.173 | 0.988 | 0.95% | 1.23% | 3.75% | 0.33 | 74.28% | $1.11 |
| 9/22/2021 | 627,455 | $93.90 | 2.48% | 1.02% | 1.48% | 0.005 | 2.212 | 1.059 | 3.24% | -0.76% | 3.74% | -0.20 | 83.92% | -$0.70 |
| 9/23/2021 | 760,505 | $96.98 | 3.28% | 1.04% | 1.83% | 0.005 | 2.108 | 1.043 | 3.54% | -0.26% | 3.72% | -0.07 | 94.34% | -$0.25 |
| 9/24/2021 | 1,057,603 | $98.65 | 1.72% | -0.03% | -0.48% | 0.005 | 2.106 | 1.048 | -0.01% | 1.73% | 3.72% | 0.46 | 64.28% | $1.68 |
| 9/27/2021 | 1,409,804 | $92.26 | -6.48% | -0.52% | 1.47% | 0.006 | 2.188 | 1.088 | 1.62% | -8.10% | 3.67% | -2.21 | 2.92% * | -$7.99 |
| 9/28/2021 | 1,146,817 | $90.71 | -1.68% | -2.83% | -2.24% | 0.005 | 2.245 | 0.936 | -5.30% | 3.62% | 3.74% | 0.97 | 33.51% | $3.34 |
| 9/29/2021 | 794,407 | $90.58 | -0.14% | -0.23% | -0.17% | 0.005 | 2.145 | 0.841 | 0.05% | -0.19% | 3.72% | -0.05 | 95.89% | -$0.17 |
| 9/30/2021 | 1,332,455 | $90.09 | -0.54% | -0.44% | -0.93% | 0.005 | 2.122 | 0.846 | -0.87% | 0.33% | 3.72% | 0.09 | 93.04% | $0.29 |
| 10/1/2021 | 992,464 | $94.19 | 4.55% | 0.82% | 1.69% | 0.005 | 2.135 | 0.843 | 2.97% | 1.58% | 3.72% | 0.42 | 67.17% | $1.42 |
| 10/4/2021 | 835,974 | $90.62 | -3.79% | -2.13% | -1.08% | 0.005 | 2.120 | 0.880 | -3.10% | -0.69% | 3.71% | -0.19 | 85.23% | -$0.65 |
| 10/5/2021 | 566,627 | $94.92 | 4.75% | 1.26% | 0.49% | 0.005 | 2.136 | 0.874 | 2.49% | 2.25% | 3.71% | 0.61 | 54.58% | $2.04 |
| 10/6/2021 | 594,571 | $94.46 | -0.48% | 0.47% | -0.60% | 0.005 | 2.161 | 0.854 | 0.60% | -1.09% | 3.72% | -0.29 | 77.08% | -$1.03 |
| 10/7/2021 | 1,015,940 | $97.62 | 3.35% | 1.05% | 1.59% | 0.005 | 2.129 | 0.868 | 3.17% | 0.17% | 3.71% | 0.05 | 96.28% | $0.16 |
| 10/8/2021 | 558,290 | $94.10 | -3.61% | -0.51% | -0.75% | 0.005 | 2.144 | 0.855 | -0.81% | -2.80% | 3.70% | -0.76 | 45.07% | -$2.73 |
| 10/11/2021 | 470,476 | $94.65 | 0.58% | -0.64% | -0.56% | 0.004 | 2.189 | 0.866 | -0.92% | 1.50% | 3.66% | 0.41 | 68.19% | $1.41 |

**Exhibit 4**
**Celsius Holdings, Inc. Common Stock Data**

| | [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] Coefficient | [9] | [10] | [11] | [12] | [13] | [14] | [15] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Celsius Volume | Celsius Price | Celsius Return | Nasdaq Total Return Index | Russell 2000 Total Return Index | Intercept | Nasdaq Index | Russell 2000 (Net of Nasdaq) | Predicted Return | Excess Return | Standard Error | t-statistic | p-Value | Excess Price Change |
| 10/12/2021 | 617,119 | $97.22 | 2.72% | -0.14% | 0.62% | 0.004 | 2.203 | 0.833 | 0.76% | 1.95% | 3.65% | 0.53 | 59.41% | $1.85 |
| 10/13/2021 | 625,926 | $95.54 | -1.73% | 0.73% | 0.35% | 0.004 | 2.224 | 0.800 | 1.75% | -3.48% | 3.65% | -0.95 | 34.16% | -$3.39 |
| 10/14/2021 | 963,345 | $92.50 | -3.18% | 1.73% | 1.44% | 0.004 | 2.197 | 0.816 | 3.97% | -7.16% | 3.66% | -1.95 | 5.29% | -$6.84 |
| 10/15/2021 | 1,491,608 | $88.91 | -3.88% | 0.50% | -0.37% | 0.003 | 2.077 | 0.832 | 0.66% | -4.54% | 3.71% | -1.22 | 22.38% | -$4.20 |
| 10/18/2021 | 663,570 | $93.02 | 4.62% | 0.84% | 0.10% | 0.003 | 2.019 | 0.859 | 1.40% | 3.22% | 3.72% | 0.87 | 38.77% | $2.87 |
| 10/19/2021 | 647,035 | $94.55 | 1.64% | 0.71% | 0.36% | 0.004 | 2.034 | 0.824 | 1.53% | 0.11% | 3.73% | 0.03 | 97.63% | $0.10 |
| 10/20/2021 | 622,851 | $93.92 | -0.67% | -0.05% | 0.61% | 0.004 | 2.022 | 0.807 | 0.80% | -1.47% | 3.73% | -0.39 | 69.45% | -$1.39 |
| 10/21/2021 | 331,843 | $95.31 | 1.48% | 0.62% | 0.28% | 0.004 | 2.017 | 0.800 | 1.35% | 0.13% | 3.73% | 0.04 | 97.13% | $0.13 |
| 10/22/2021 | 436,967 | $94.29 | -1.07% | -0.82% | -0.21% | 0.004 | 2.005 | 0.795 | -0.81% | -0.26% | 3.73% | -0.07 | 94.45% | -$0.25 |
| 10/25/2021 | 1,351,682 | $99.96 | 6.01% | 0.91% | 0.93% | 0.003 | 1.953 | 0.764 | 2.10% | 3.92% | 3.69% | 1.06 | 28.99% | $3.69 |
| 10/26/2021 | 722,617 | $98.92 | -1.04% | 0.06% | -0.72% | 0.004 | 1.974 | 0.790 | -0.13% | -0.91% | 3.69% | -0.25 | 80.60% | -$0.91 |
| 10/27/2021 | 464,585 | $95.51 | -3.45% | 0.00% | -1.90% | 0.004 | 1.970 | 0.806 | -1.16% | -2.29% | 3.69% | -0.62 | 53.64% | -$2.26 |
| 10/28/2021 | 425,307 | $97.74 | 2.33% | 1.40% | 2.02% | 0.004 | 1.986 | 0.803 | 3.69% | -1.36% | 3.61% | -0.38 | 70.76% | -$1.30 |
| 10/29/2021 | 550,156 | $96.52 | -1.25% | 0.33% | -0.03% | 0.004 | 1.992 | 0.803 | 0.76% | -2.00% | 3.61% | -0.56 | 57.98% | -$1.96 |
| 11/1/2021 | 1,120,835 | $101.40 | 5.06% | 0.63% | 2.66% | 0.004 | 1.978 | 0.830 | 3.31% | 1.74% | 3.61% | 0.48 | 62.99% | $1.68 |
| 11/2/2021 | 914,194 | $101.15 | -0.25% | 0.35% | 0.16% | 0.004 | 1.909 | 0.896 | 0.93% | -1.18% | 3.60% | -0.33 | 74.33% | -$1.20 |
| 11/3/2021 | 908,195 | $104.85 | 3.66% | 1.04% | 1.80% | 0.004 | 1.900 | 0.899 | 3.10% | 0.56% | 3.60% | 0.16 | 87.61% | $0.57 |
| 11/4/2021 | 499,674 | $103.95 | -0.86% | 0.82% | -0.07% | 0.005 | 1.920 | 0.887 | 1.27% | -2.13% | 3.57% | -0.60 | 55.22% | -$2.23 |
| 11/5/2021 | 761,283 | $108.07 | 3.96% | 0.21% | 1.45% | 0.005 | 1.938 | 0.929 | 2.06% | 1.90% | 3.55% | 0.53 | 59.41% | $1.97 |
| 11/8/2021 | 605,335 | $103.95 | -3.81% | 0.07% | 0.24% | 0.005 | 1.969 | 0.956 | 0.80% | -4.61% | 3.56% | -1.30 | 19.69% | -$4.99 |
| 11/9/2021 | 751,012 | $101.51 | -2.35% | -0.60% | -0.62% | 0.004 | 1.981 | 0.949 | -0.76% | -1.58% | 3.57% | -0.44 | 65.79% | -$1.65 |
| 11/10/2021 | 1,217,362 | $93.89 | -7.51% | -1.66% | -1.55% | 0.004 | 1.993 | 0.949 | -2.77% | -4.74% | 3.57% | -1.33 | 18.72% | -$4.81 |
| 11/11/2021 | 2,045,006 | $97.71 | 4.07% | 0.52% | 0.82% | 0.003 | 2.026 | 0.838 | 1.61% | 2.46% | 3.50% | 0.70 | 48.39% | $2.31 |
| 11/12/2021 | 3,678,591 | $83.35 | -14.70% | 1.00% | 0.13% | 0.003 | 2.051 | 0.850 | 1.64% | -16.33% | 3.50% | -4.66 | 0.00% ** | -$15.96 |
| 11/15/2021 | 3,217,126 | $77.77 | -6.69% | -0.04% | -0.44% | 0.002 | 1.885 | 0.978 | -0.25% | -6.45% | 3.79% | -1.70 | 9.16% | -$5.37 |
| 11/16/2021 | 1,833,980 | $79.52 | 2.25% | 0.76% | 0.17% | 0.002 | 1.884 | 0.999 | 1.03% | 1.22% | 3.83% | 0.32 | 75.10% | $0.95 |
| 11/17/2021 | 1,731,537 | $77.02 | -3.14% | -0.31% | -1.16% | 0.002 | 1.898 | 1.005 | -1.26% | -1.88% | 3.83% | -0.49 | 62.44% | -$1.50 |
| 11/18/2021 | 937,674 | $77.00 | -0.03% | 0.46% | -0.56% | 0.001 | 1.816 | 1.069 | -0.11% | 0.08% | 3.81% | 0.02 | 98.32% | $0.06 |
| 11/19/2021 | 1,259,880 | $72.84 | -5.40% | 0.40% | -0.86% | 0.001 | 1.853 | 1.023 | -0.45% | -4.95% | 3.79% | -1.31 | 19.35% | -$3.82 |
| 11/22/2021 | 1,143,093 | $73.44 | 0.82% | -1.26% | -0.50% | 0.000 | 1.759 | 1.122 | -1.32% | 2.14% | 3.79% | 0.56 | 57.31% | $1.56 |
| 11/23/2021 | 947,938 | $71.60 | -2.51% | -0.50% | -0.15% | 0.001 | 1.718 | 1.131 | -0.38% | -2.12% | 3.79% | -0.56 | 57.69% | -$1.56 |
| 11/24/2021 | 918,114 | $73.29 | 2.36% | 0.45% | 0.16% | 0.001 | 1.738 | 1.127 | 0.51% | 1.85% | 3.80% | 0.49 | 62.79% | $1.32 |
| 11/26/2021 | 800,577 | $71.38 | -2.61% | -2.23% | -3.66% | 0.001 | 1.747 | 1.107 | -5.42% | 2.81% | 3.80% | 0.74 | 46.08% | $2.06 |
| 11/29/2021 | 898,093 | $70.78 | -0.84% | 1.88% | -0.17% | 0.001 | 1.665 | 1.064 | 1.04% | -1.88% | 3.81% | -0.49 | 62.18% | -$1.34 |
| 11/30/2021 | 1,099,053 | $68.41 | -3.35% | -1.55% | -1.91% | 0.001 | 1.628 | 1.099 | -2.83% | -0.52% | 3.81% | -0.14 | 89.23% | -$0.37 |
| 12/1/2021 | 1,711,289 | $62.91 | -8.04% | -1.82% | -2.34% | 0.000 | 1.629 | 1.082 | -3.57% | -4.47% | 3.57% | -1.25 | 21.27% | -$3.06 |
| 12/2/2021 | 1,106,450 | $65.52 | 4.15% | 0.84% | 2.75% | -0.001 | 1.696 | 1.112 | 3.49% | 0.66% | 3.59% | 0.18 | 85.50% | $0.41 |
| 12/3/2021 | 1,114,121 | $63.05 | -3.77% | -1.92% | -2.13% | -0.001 | 1.622 | 1.181 | -3.44% | -0.33% | 3.56% | -0.09 | 92.67% | -$0.21 |
| 12/6/2021 | 1,115,811 | $64.79 | 2.76% | 0.93% | 2.05% | -0.001 | 1.615 | 1.147 | 2.67% | 0.09% | 3.55% | 0.02 | 98.07% | $0.05 |
| 12/7/2021 | 904,739 | $68.58 | 5.85% | 3.03% | 2.28% | 0.000 | 1.648 | 1.264 | 4.06% | 1.79% | 3.35% | 0.54 | 59.30% | $1.16 |
| 12/8/2021 | 715,420 | $71.86 | 4.78% | 0.64% | 0.80% | 0.000 | 1.703 | 1.260 | 1.29% | 3.49% | 3.35% | 1.04 | 29.89% | $2.40 |
| 12/9/2021 | 847,230 | $67.13 | -6.58% | -1.70% | -2.26% | 0.001 | 1.819 | 1.061 | -3.57% | -3.01% | 3.09% | -0.97 | 33.17% | -$2.16 |

**Exhibit 4**
**Celsius Holdings, Inc. Common Stock Data**

| | [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] Coefficient | [9] | [10] | [11] | [12] | [13] | [14] | [15] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Celsius Volume | Celsius Price | Celsius Return | Nasdaq Total Return Index | Russell 2000 Total Return Index | Intercept | Nasdaq Index | Russell 2000 (Net of Nasdaq) | Predicted Return | Excess Return | Standard Error | t-statistic | p-Value | Excess Price Change |
| 12/10/2021 | 548,138 | $66.29 | -1.25% | 0.73% | -0.38% | 0.001 | 1.866 | 1.059 | 0.26% | -1.51% | 3.09% | -0.49 | 62.65% | -$1.01 |
| 12/13/2021 | 698,478 | $63.39 | -4.37% | -1.39% | -1.41% | 0.001 | 1.850 | 1.085 | -2.54% | -1.83% | 3.09% | -0.59 | 55.55% | -$1.21 |
| 12/14/2021 | 697,683 | $62.76 | -0.99% | -1.13% | -0.93% | 0.000 | 1.875 | 1.084 | -1.87% | 0.87% | 3.10% | 0.28 | 77.90% | $0.55 |
| 12/15/2021 | 745,214 | $64.93 | 3.46% | 2.15% | 1.65% | 0.001 | 1.862 | 1.088 | 3.52% | -0.06% | 3.10% | -0.02 | 98.49% | -$0.04 |
| 12/16/2021 | 1,171,626 | $63.71 | -1.88% | -2.47% | -1.94% | 0.000 | 1.838 | 1.156 | -3.89% | 2.01% | 3.09% | 0.65 | 51.57% | $1.31 |
| 12/17/2021 | 1,162,931 | $68.00 | 6.73% | -0.07% | 1.00% | 0.000 | 1.832 | 1.226 | 1.21% | 5.52% | 3.07% | 1.80 | 7.41% | $3.52 |
| 12/20/2021 | 584,967 | $65.92 | -3.06% | -1.24% | -1.57% | 0.001 | 1.828 | 1.299 | -2.61% | -0.45% | 3.10% | -0.14 | 88.59% | -$0.30 |
| 12/21/2021 | 670,637 | $70.33 | 6.69% | 2.41% | 2.95% | 0.001 | 1.823 | 1.304 | 5.16% | 1.53% | 3.10% | 0.49 | 62.31% | $1.01 |
| 12/22/2021 | 449,036 | $70.89 | 0.80% | 1.18% | 0.86% | 0.001 | 1.852 | 1.313 | 1.84% | -1.04% | 3.10% | -0.34 | 73.81% | -$0.73 |
| 12/23/2021 | 650,106 | $74.60 | 5.23% | 0.85% | 0.89% | 0.000 | 1.831 | 1.297 | 1.65% | 3.58% | 3.10% | 1.16 | 24.96% | $2.54 |
| 12/27/2021 | 605,030 | $75.10 | 0.67% | 1.39% | 0.89% | 0.001 | 1.852 | 1.305 | 2.00% | -1.33% | 3.11% | -0.43 | 66.96% | -$0.99 |
| 12/28/2021 | 560,974 | $73.55 | -2.06% | -0.56% | -0.66% | 0.001 | 1.824 | 1.344 | -1.10% | -0.97% | 3.11% | -0.31 | 75.61% | -$0.73 |
| 12/29/2021 | 384,964 | $73.11 | -0.60% | -0.10% | 0.13% | 0.000 | 1.827 | 1.357 | 0.16% | -0.76% | 3.11% | -0.25 | 80.68% | -$0.56 |
| 12/30/2021 | 457,747 | $73.52 | 0.56% | -0.15% | 0.01% | 0.000 | 1.832 | 1.347 | -0.05% | 0.61% | 3.10% | 0.20 | 84.55% | $0.44 |
| 12/31/2021 | 1,089,218 | $74.57 | 1.43% | -0.61% | -0.15% | 0.001 | 1.834 | 1.400 | -0.41% | 1.84% | 3.06% | 0.60 | 54.97% | $1.35 |
| 1/3/2022 | 552,208 | $75.09 | 0.70% | 1.20% | 1.22% | 0.001 | 1.821 | 1.422 | 2.29% | -1.59% | 3.07% | -0.52 | 60.42% | -$1.19 |
| 1/4/2022 | 913,865 | $69.00 | -8.11% | -1.32% | -0.16% | 0.001 | 1.805 | 1.467 | -0.63% | -7.48% | 3.06% | -2.45 | 1.59% * | -$5.62 |
| 1/5/2022 | 717,805 | $63.67 | -7.72% | -3.34% | -3.30% | 0.000 | 1.882 | 1.329 | -6.23% | -1.50% | 3.12% | -0.48 | 63.27% | -$1.03 |
| 1/6/2022 | 877,244 | $61.52 | -3.38% | -0.13% | 0.57% | 0.000 | 1.933 | 1.335 | 0.65% | -4.03% | 3.11% | -1.29 | 19.86% | -$2.56 |
| 1/7/2022 | 1,735,263 | $54.60 | -11.25% | -0.96% | -1.20% | 0.000 | 1.955 | 1.338 | -2.24% | -9.00% | 3.13% | -2.88 | 0.47% ** | -$5.54 |
| 1/10/2022 | 3,319,685 | $49.71 | -8.96% | 0.05% | -0.40% | -0.001 | 2.019 | 1.362 | -0.62% | -8.33% | 3.23% | -2.58 | 1.10% * | -$4.55 |
| 1/11/2022 | 1,680,578 | $54.31 | 9.25% | 1.41% | 1.05% | -0.002 | 2.030 | 1.469 | 2.14% | 7.12% | 3.30% | 2.16 | 3.29% * | $3.54 |
| 1/12/2022 | 905,383 | $52.12 | -4.03% | 0.23% | -0.82% | -0.001 | 2.082 | 1.323 | -1.00% | -3.03% | 3.31% | -0.92 | 36.13% | -$1.65 |
| 1/13/2022 | 567,255 | $50.24 | -3.61% | -2.51% | -0.76% | -0.001 | 2.067 | 1.368 | -2.90% | -0.71% | 3.31% | -0.21 | 83.06% | -$0.37 |
| 1/14/2022 | 1,019,024 | $49.34 | -1.79% | 0.59% | 0.14% | -0.001 | 2.081 | 1.356 | 0.50% | -2.30% | 3.31% | -0.69 | 48.93% | -$1.15 |
| 1/18/2022 | 1,143,626 | $47.52 | -3.69% | -2.60% | -3.06% | -0.002 | 2.108 | 1.395 | -6.29% | 2.60% | 3.29% | 0.79 | 43.14% | $1.28 |
| 1/19/2022 | 960,810 | $45.09 | -5.11% | -1.15% | -1.59% | -0.001 | 2.060 | 1.372 | -3.12% | -1.99% | 3.30% | -0.60 | 54.78% | -$0.95 |
| 1/20/2022 | 1,069,716 | $43.67 | -3.15% | -1.30% | -1.88% | -0.001 | 2.089 | 1.408 | -3.67% | 0.52% | 3.30% | 0.16 | 87.47% | $0.24 |
| 1/21/2022 | 1,237,623 | $43.92 | 0.57% | -2.72% | -1.78% | -0.002 | 2.083 | 1.434 | -4.47% | 5.04% | 3.30% | 1.53 | 12.90% | $2.20 |
| 1/24/2022 | 1,900,315 | $46.98 | 6.97% | 0.63% | 2.29% | -0.001 | 2.015 | 1.472 | 3.62% | 3.35% | 3.33% | 1.01 | 31.60% | $1.47 |
| 1/25/2022 | 1,040,193 | $44.17 | -5.98% | -2.28% | -1.45% | -0.001 | 2.033 | 1.538 | -3.44% | -2.54% | 3.33% | -0.76 | 44.76% | -$1.19 |
| 1/26/2022 | 1,099,868 | $42.37 | -4.08% | 0.02% | -1.38% | -0.001 | 2.067 | 1.517 | -2.18% | -1.90% | 3.34% | -0.57 | 57.14% | -$0.84 |
| 1/27/2022 | 977,371 | $40.49 | -4.44% | -1.40% | -2.28% | -0.001 | 2.063 | 1.539 | -4.38% | -0.06% | 3.34% | -0.02 | 98.54% | -$0.03 |
| 1/28/2022 | 1,600,858 | $45.05 | 11.26% | 3.14% | 1.93% | -0.001 | 2.061 | 1.525 | 4.48% | 6.78% | 3.34% | 2.03 | 4.45% * | $2.74 |
| 1/31/2022 | 921,679 | $47.73 | 5.95% | 3.41% | 3.05% | -0.001 | 2.178 | 1.452 | 6.81% | -0.86% | 3.39% | -0.25 | 79.98% | -$0.39 |
| 2/1/2022 | 972,840 | $50.17 | 5.11% | 0.75% | 1.10% | -0.001 | 2.163 | 1.462 | 2.02% | 3.09% | 3.39% | 0.91 | 36.38% | $1.47 |
| 2/2/2022 | 1,012,854 | $49.95 | -0.44% | 0.50% | -1.03% | -0.001 | 2.168 | 1.483 | -1.29% | 0.85% | 3.39% | 0.25 | 80.20% | $0.43 |
| 2/3/2022 | 869,123 | $46.99 | -5.93% | -3.73% | -1.89% | -0.001 | 2.171 | 1.508 | -5.45% | -0.48% | 3.38% | -0.14 | 88.80% | -$0.24 |
| 2/4/2022 | 852,099 | $48.92 | 4.11% | 1.60% | 0.57% | -0.001 | 2.171 | 1.480 | 1.82% | 2.29% | 3.38% | 0.68 | 50.03% | $1.07 |
| 2/7/2022 | 694,558 | $49.98 | 2.17% | -0.58% | 0.51% | -0.001 | 2.186 | 1.461 | 0.21% | 1.95% | 3.39% | 0.58 | 56.52% | $0.96 |
| 2/8/2022 | 786,124 | $53.55 | 7.14% | 1.28% | 1.63% | -0.001 | 2.185 | 1.505 | 3.21% | 3.93% | 3.38% | 1.16 | 24.73% | $1.97 |
| 2/9/2022 | 892,815 | $57.49 | 7.36% | 2.09% | 1.87% | -0.001 | 2.214 | 1.530 | 4.20% | 3.15% | 3.40% | 0.93 | 35.58% | $1.69 |

**Exhibit 4**
**Celsius Holdings, Inc. Common Stock Data**

| | [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] | [12] | [13] | [14] | [15] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Coefficient | | | | | | | |
| Date | Celsius Volume | Celsius Price | Celsius Return | Nasdaq Total Return Index | Russell 2000 Total Return Index | Intercept | Nasdaq Index | Russell 2000 (Net of Nasdaq) | Predicted Return | Excess Return | Standard Error | t-statistic | p-Value | Excess Price Change |
| 2/10/2022 | 1,251,054 | $57.60 | 0.19% | -2.10% | -1.54% | -0.001 | 2.246 | 1.528 | -3.93% | 4.12% | 3.41% | 1.21 | 23.00% | $2.37 |
| 2/11/2022 | 711,745 | $56.85 | -1.30% | -2.78% | -1.02% | 0.000 | 2.212 | 1.508 | -3.48% | 2.18% | 3.40% | 0.64 | 52.27% | $1.25 |
| 2/14/2022 | 660,079 | $57.57 | 1.27% | 0.00% | -0.45% | 0.000 | 2.191 | 1.549 | -0.67% | 1.94% | 3.40% | 0.57 | 57.00% | $1.10 |
| 2/15/2022 | 831,698 | $62.11 | 7.89% | 2.53% | 2.76% | 0.000 | 2.192 | 1.548 | 5.93% | 1.96% | 3.40% | 0.58 | 56.61% | $1.13 |
| 2/16/2022 | 551,662 | $59.92 | -3.53% | -0.09% | 0.14% | 0.001 | 2.185 | 1.531 | 0.25% | -3.78% | 3.36% | -1.13 | 26.23% | -$2.35 |
| 2/17/2022 | 639,403 | $56.37 | -5.92% | -2.88% | -2.46% | 0.000 | 2.204 | 1.526 | -5.67% | -0.26% | 3.34% | -0.08 | 93.92% | -$0.15 |
| 2/18/2022 | 1,244,147 | $51.63 | -8.41% | -1.23% | -0.92% | 0.000 | 2.205 | 1.508 | -2.21% | -6.20% | 3.34% | -1.86 | 6.59% | -$3.50 |
| 2/22/2022 | 1,072,558 | $55.95 | 8.37% | -1.23% | -1.45% | 0.000 | 2.256 | 1.523 | -3.09% | 11.46% | 3.38% | 3.40 | 0.09% ** | $5.92 |
| 2/23/2022 | 1,486,958 | $55.56 | -0.70% | -2.57% | -1.82% | 0.001 | 2.167 | 1.446 | -4.41% | 3.71% | 3.52% | 1.06 | 29.33% | $2.08 |
| 2/24/2022 | 1,168,854 | $60.88 | 9.58% | 3.36% | 2.68% | 0.001 | 2.129 | 1.458 | 6.25% | 3.32% | 3.53% | 0.94 | 34.89% | $1.85 |
| 2/25/2022 | 1,118,360 | $63.76 | 4.73% | 1.64% | 2.26% | 0.001 | 2.173 | 1.449 | 4.59% | 0.14% | 3.54% | 0.04 | 96.82% | $0.09 |
| 2/28/2022 | 915,785 | $63.89 | 0.20% | 0.42% | 0.36% | 0.001 | 2.176 | 1.457 | 0.94% | -0.74% | 3.54% | -0.21 | 83.53% | -$0.47 |
| 3/1/2022 | 1,894,349 | $62.80 | -1.71% | -1.59% | -1.93% | 0.001 | 2.184 | 1.482 | -3.85% | 2.15% | 3.54% | 0.61 | 54.58% | $1.37 |
| 3/2/2022 | 2,338,784 | $64.82 | 3.22% | 1.63% | 2.51% | 0.001 | 2.162 | 1.553 | 4.98% | -1.77% | 3.51% | -0.50 | 61.63% | -$1.11 |
| 3/3/2022 | 976,631 | $57.60 | -11.14% | -1.55% | -1.27% | 0.001 | 2.162 | 1.553 | -2.82% | -8.32% | 3.51% | -2.37 | 1.95% * | -$5.39 |

**Notes:**
[1] Trading day.
[2] Reported daily U.S. composite volume.  Source Bloomberg.
[3] Closing U.S. composite share price.  Source: Bloomberg.
[4] ={ [3]  / [3] on previous trading day} - 1.
[5] Daily return for the Nasdaq Composite Total Return Index (Bloomberg ticker: XCMP).  Source: Bloomberg.
[6] Daily return for the Russell 2000 Total Return Index (Bloomberg ticker: RU20INTR).  Source: Bloomberg.
[7] The intercept from each 126-day rolling regression.
[8] The coefficient for the XCMP total return index from each 126-day rolling regression.
[9] The coefficient for the RU20INTR total return index from each 126-day rolling regression.
[10] = [7] + {[8] x [5]} + {[9] x ([6] - [5])}.
[11] = [4] - [10].
[12] The standard error from each 126-day rolling regression.
[13] = [11] / [12].
[14] Two-tailed p-value associated with the t-statistic in [13].  ** denotes p-value is less than or equal to 1% and * denotes p-value is less than or equal to 5%.
[15] = [11] x prior [3].

**Exhibit 5**
**News Days for Celsius Common Stock**
**August 13, 2020 to March 1,2022**

| Release Date | Release Time | Impact Date | Headline | Source |
|---|---|---|---|---|
| 8/20/2020 | 8:30:00 AM | 8/20/2020 | Celsius Holdings Announces Strategic Investment of $22 Million | PR Newswire |
| 8/20/2020 | 9:41:00 AM | 8/20/2020 | Celsius Holdings Announces Strategic Investment of $22 Million | PR Newswire |
| 9/17/2020 | 8:30:00 AM | 9/17/2020 | Celsius Converting Over 1,100 National Retail Chain Locations to Direct Store Delivery (DSD) Distribution Network | PR Newswire |
| 10/29/2020 | 8:30:00 AM | 10/29/2020 | Celsius Announces New Kiwi Guava Lime Flavor of On-The-Go Powdered Sticks | PR Newswire |
| 11/12/2020 | 8:31:00 AM | 11/12/2020 | Celsius Delivers Record Third Quarter Revenue of $36.8M, up 80% | PR Newswire |
| 1/6/2021 | 9:10:00 AM | 1/6/2021 | Celsius Set to Join S&P SmallCap 600(R) Index | PR Newswire |
| 2/23/2021 | 8:30:00 AM | 2/23/2021 | Alexandre Ruberti Appointed to Celsius Holdings Board of Directors | PR Newswire |
| 3/11/2021 | 8:30:00 AM | 3/11/2021 | Celsius Holdings, Inc. Reports Record Fourth Quarter and Full Year 2020 Financial Results | PR Newswire |
| 5/13/2021 | 8:25:00 AM | 5/13/2021 | Celsius Holdings, Inc. Reports Record First Quarter 2021 Financial Results | PR Newswire |
| 6/3/2021 | 7:45:00 AM | 6/3/2021 | Celsius Holdings, Inc. Selects Ernst and Young (EY) as its Independent Registered Public Accounting Firm | PR Newswire |
| 6/9/2021 | 4:12:00 PM | 6/10/2021 | Celsius Holdings Announces Proposed Public Offering of Common Stock | PR Newswire |
| 6/9/2021 | 9:02:00 PM | 6/10/2021 | Celsius Announces Pricing of Public Offering of Common Stock | PR Newswire |
| 7/22/2021 | 8:00:00 AM | 7/22/2021 | Celsius Announces Launch of Newest VIBE Line, "Tropical Vibe" | PR Newswire |
| 7/22/2021 | 10:43:00 AM | 7/22/2021 | CORRECTION -- Celsius Announces Launch of Newest VIBE Line, "Tropical Vibe" | PR Newswire |
| 8/3/2021 | 8:30:00 AM | 8/3/2021 | Celsius Announces Appointment of Marcus Sandifer as Corporate Secretary | PR Newswire |
| 8/12/2021 | 8:30:00 AM | 8/12/2021 | Celsius Holdings, Inc. Reports Record Second Quarter 2021 Financial Results | PR Newswire |
| 8/20/2021 | 8:30:00 AM | 8/20/2021 | Celsius Holdings, Inc. Announces New Board Members in Conjunction With Board Succession and Refreshment Policy | PR Newswire |
| 8/20/2021 | 8:35:00 AM | 8/20/2021 | Celsius Announces Inaugural Environmental, Social and Governance (ESG) Report | PR Newswire |
| 10/5/2021 | 8:30:00 AM | 10/5/2021 | Celsius to Exhibit at Annual NACS Show in Chicago, October 6-8th, 2021 | PR Newswire |
| 11/11/2021 | 8:30:00 AM | 11/11/2021 | Celsius Holdings, Inc. Reports Record Third Quarter 2021 Financial Results | PR Newswire |

**Notes:**

Company press releases issued by Celsius.  News released after market close (4:00 pm) is matched to the following trading day as impact date.

I exclude press releases that simply disclosed the existence of a future event, such as the date on which earnings would be disclosed or participation in investor conference.

Source of Press Releases: Factiva.

FORENSIC ECONOMICS, INC.

**Exhibit 6**
**Comparison of Proportion of Days with Statistically Significant Excess Returns for Celsius Common Stock**
**on News Days vs. Non-News Days**
**August 13, 2020 to March 1, 2022**

| [1] | [2]<br>News Days | [3] = [2] / [1] | [4] | [5]<br>Non-News Days | [6] = [5] / [4] | [7]<br>Difference Between News and Non-News Days | [8] | [9] |
|---|---|---|---|---|---|---|---|---|
| Num. of<br>Days | Num. of<br>Stat. Sig.<br>Days | Proportion<br>Stat. Sig.<br>Days | Num. of<br>Days | Num. of<br>Stat. Sig.<br>Days | Proportion<br>Stat. Sig.<br>Days | Fisher's<br>Exact Test<br>p-Value | Z-Test<br>z-stat | p-Value |
| 16 | 3 | 18.8% | 374 | 11 | 2.9% | 1.57%  * | 3.33 | 0.087%  ** |

**Notes:**

A news day is defined as the impact date after the Company issued a press release.  See Exhibit 4 for statistically significant days and
Exhibit 5 for news days.

[1] Number of news days during the period August 13, 2020 to March 1, 2022.

[2] Number of trading days in [1] that are associated with statistically significant excess stock returns at the 5% significant level.

[3] Proportion of statistically significant trading days in [1].

[4] Number of trading days that are not news days during the period August 13, 2020 to March 1, 2022.

[5] Number of trading days in [4] that are associated with statistically significant excess stock returns at the 5% significant level.

[6] Proportion of statistically significant trading days in [4].

[7] Two-sided p-value of the Fisher's Exact test.  ** denotes statistically significant at the 1% level; * denotes statistically significant at the 5% level.

[8] = ([3] - [6]) / sqrt{p(1-p)(1/[1] + 1/[4])}, where p = ([2] + [5])/([1] + [4]).

[9] Two-sided p-value of the z-test.  ** denotes statistically significant at the 1% level; * denotes statistically significant at the 5% level.

**Exhibit 7**
**Statistical Tests for Difference of Variance in Excess Returns on**
**News and Non-News Days for Celsius Common Stock**
**August 13, 2020 to March 1, 2022**

| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] |
|---|---|---|---|---|---|---|---|
| *News* | | *Non-News* | | F-Test | | Brown-Forsythe | |
| Variance | Obs | Variance | Obs | Statistic | p-value | Statistic | p-value |
| 1.42% | 16 | 0.15% | 374 | 9.57 | <0.01% ** | 39.68 | <0.01% ** |

**Notes:**

A news day is defined as the impact date after the Company issued a press release.

*See* Exhibit 5 for news days.  *See* Exhibit 4 for daily Celsius stock data.

[1] The variance of the excess returns on news days.

[2] The number of news days.

[3] The variance of the excess returns on non-news days.

[4] The number of non-news days.

[5] F-statistic is equal to [1] / [3].

[6] p-value associated with the F-statistic in [5].

[7] Brown-Forsythe test statistic (F value).

[8] p-value associated with the Brown-Forsythe test statistic in [7].

** denotes significance at the 1% level.

**Exhibit 8**

**Regression Results of Celsius Holdings Inc. Common Stock Returns on Trading Volume**

| Regression Results for Absolute Return on the Natural Log of Trading Volume | | |
|---|---|---|
| Intercept (t-statistic) | -0.382 | (-5.82) |
| Coefficient on Natural Log of Trading Volume (t-statistic) | 0.030 | (6.38) |
| Adjusted R-Squared | 22.32% | |
| Standard Error | 2.40% | |
| F-Statistic | 40.64 | |
| Observations (August 12, 2021 to March 1, 2022) | 139 | |

| Regression Results for Absolute Excess Return on the Natural Log of Trading Volume | | |
|---|---|---|
| Intercept (t-statistic) | -0.376 | (-6.47) |
| Coefficient on Natural Log of Trading Volume (t-statistic) | 0.029 | (6.91) |
| Adjusted R-Squared | 25.32% | |
| Standard Error | 2.13% | |
| F-Statistic | 47.79 | |
| Observations (August 12, 2021 to March 1, 2022) | 139 | |

**Note:**

See Exhibit 4 for daily returns and volume data.

FORENSIC ECONOMICS, INC.

**Exhibit 9**

**Results of Tests for Autocorrelation in Daily Celsius Holdings Inc. Common Stock**

*Class Period (August 12, 2021 to March 1, 2022)*

| Test of Previous Day Returns over the Class Period | |
| --- | --- |
| Dependent Variable | Daily Celsius Returns |
| | |
| Intercept (t-statistic) | 0.000   (-0.13) |
| Coefficient on Celsius Previous Day Returns (t-statistic) | 0.050   (0.59) |
| | |
| Observations (August 12, 2021 to March 1, 2022) | 139 |
| Standard Error | 4.57% |
| Adjusted R-Squared | -0.48% |

| Test of Previous Day Excess Returns over the Class Period | |
| --- | --- |
| Dependent Variable | Daily Celsius Excess Returns |
| | |
| Intercept (t-statistic) | -0.001   (-0.38) |
| Coefficient on Celsius Previous Day Excess Returns (t-statistic) | -0.014   (-0.17) |
| | |
| Observations (August 12, 2021 to March 1, 2022) | 139 |
| Standard Error | 3.58% |
| Adjusted R-Squared | -0.71% |

**Note:**

See Exhibit 4 for returns and excess returns.

FORENSIC ECONOMICS, INC.