**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 9:22-cv-80418-MIDDLEBROOKS/MATTHEWMAN

| | |
|---|---|
| CITY OF ATLANTA POLICE OFFICERS' PENSION PLAN and CITY OF ATLANTA FIREFIGHTERS' PENSION PLAN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CELSIUS HOLDINGS, INC., JOHN FIELDLY, and EDWIN NEGRON-CARBALLO.<br><br>Defendants. | CLASS ACTION |

**MEMORANDUM OF LAW IN OPPOSITION TO LEAD PLAINTIFFS' MOTION FOR**
**CLASS CERTIFICATION**

**TABLE OF CONTENTS**

Page

I.  INTRODUCTION ........................................................................................................... 1

II. BACKGROUND ............................................................................................................ 2

    A.  Celsius's Rapid Growth and Edwin Negron-Carballo's Tenure............................ 2

    B.  The March 1, 2022 Restatement ........................................................................... 2

    C.  The Market Indisputably Did Not React Negatively to the Restatement ............... 3

    D.  Lead Plaintiffs Indisputably Did Not Rely on the Misstated Net Income Figures That Were The Subject of the Restatement ............................................... 4

    E.  Following the Restatement, Lead Plaintiffs' Added to Their Profitable Investment in Celsius............................................................................................. 5

    F.  Lead Plaintiffs and This Litigation ....................................................................... 5

III. RELEVANT STANDARDS FOR DECIDING THE MOTION FOR CLASS CERTIFICATION ......................................................................................................... 6

IV. ARGUMENT................................................................................................................. 7

    A.  The Restatement Had No Price Impact, Meaning Lead Plaintiffs Cannot Rely on the Presumption of Reliance and the Court Should Not Certify a Class ...................................................................................................................... 7

        1.  The Quantitative Evidence Reveals No Statistically Significant Price Impact and the Stock Price's Historic Indifference to Net Income........................................................................................................ 9

            i.  The Parties' Experts Agree That Celsius's Stock Had No Statistically Significant Reaction to the Restatement ................... 10

            ii.  Quantitative Evidence Also Reveals the Market's Indifference to Negative News About Celsius's Stock Price ....... 12

            iii.  If Celsius Traded in an Efficient Market, the Price Decline on March 3 Cannot Be Attributed to Restatement........................ 13

        2.  Qualitative Evidence and Common Sense Explain the Lack of Price Impact ...................................................................................... 16

    B.  Lead Plaintiffs Are Atypical ................................................................................ 19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Amchem Products, Inc. v. Windsor*,
   521 U.S. 591 (1997)..............................................................................................................6

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)..............................................................................................................8

*Beach v. Healthways, Inc.*,
   2009 U.S. Dist. LEXIS 92557 (M.D. Tenn. Oct. 5, 2009) .......................................................19

*Cammer v. Bloom*,
   711 F. Supp. 1264 (D.N.J. 1989) ..........................................................................................15

*Carpenters Pension Tr. Fund v. Allstate Corp. (In re Allstate Corp. Sec. Litig.)*,
   966 F.3d 595 (7th Cir. 2020) ............................................................................................v, 10

*Carriuolo v. Gen. Motors Co.*,
   823 F.3d 977 (11th Cir. 2016) ...............................................................................................6

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013)................................................................................................................6

*Cooper v. Southern Co.*,
   390 F.3d 695 (11th Cir. 2004) .............................................................................................19

*DFC Global Corp. v. Muirfield Value Partners, L.P.*,
   172 A.3d 346 (Del. 2017) ....................................................................................................15

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   309 F.R.D. 251 (N.D. Tex. 2015) .........................................................................................14

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011)..............................................................................................................8

*Gamco Investors, Inc. v. Vivendi, S.A.*,
   927 F. Supp. 2d 88 (S.D.N.Y. 2013)......................................................................................18

*George v. China Auto. Sys., Inc.*,
   2013 U.S. Dist. LEXIS 93698 (S.D.N.Y. 2013)......................................................................20

*Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*,
   141 S. Ct. 1951 (2021).......................................................................................................9, 18

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ........................................................................................................7, 8

*Henley v. Turner Broad. Sys., Inc.*,
267 F. Supp. 3d 1341 (N.D. Ga. 2017) .................................................................................20

*Home Sav. of Am. v. U.S.*,
57 Fed. Cl. 694 (2011) .........................................................................................................14

*Huff v. N.D. Cass Co. of Ala.*,
485 F.2d 710 (5th Cir. 1973) (en banc) .................................................................................7

*In re Finisar Corp. Sec. Litig.*,
2017 U.S. Dist. LEXIS 201150 (N.D. Cal. 2017) .......................................................11, 12, 14

*In re HealthSouth Corp. Sec. Litig.*,
257 F.R.D. 260 (N.D. Ala. 2009) ............................................................................................v

*In re Intuitive Surgical Sec. Litig.*,
2016 U.S. Dist. LEXIS 178148 (N.D. Cal. 2016) ............................................................12, 14

*In re PolyMedica Corp. Sec. Litig.*,
453 F.Supp. 2d 260 (D. Mass. 2006) .....................................................................................16

*In re Sci.-Atlanta, Inc. Sec. Lit.*,
571 F. Supp. 2d 1315 (N.D. Ga. 2007) ...................................................................................13

*In re Sci.-Atlanta, Inc. Sec. Lit.*,
754 F. Supp. 2d 1339 (N.D. Ga. 2010) ...................................................................................11

*In re Teco Energy Sec. Litig.*,
2006 U.S. Dist. LEXIS 18101 (M.D. Fla. Mar. 30, 2006) ......................................................16

*In re World Access, Inc.*,
310 F. Supp. 2d 1281 (N.D. Ga. Mar. 16, 2004) ......................................................................8

*Luczak v. Nat'l Bev. Corp.*,
548 F. Supp. 3d 1256 (S.D. Fla. 2021) ..........................................................................19, 20

*Meyer v. Greene*,
710 F.3d 1189 (11th Cir. 2013) ......................................................................................14, 16

*Mills v. Foremost Ins. Co.*,
511 F.3d 1300 (11th Cir. 2008) ..............................................................................................7

*Ohio Pub. Empls. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
2018 U.S. Dist. LEXIS 137229 (N.D. Ohio 2018) ..................................................................12

*Rutstein v. Avis Rent-A-Car Sys., Inc.*,
   211 F.3d 1228 (11th Cir. 2000) ................................................................................6

*Sanford v. MemberWorks, Inc.*,
   625 F.3d 550 (9th Cir. 2010) ..................................................................................20

*Townhouse Rest. of Oviedo, Inc. v. NuCO2, LLC*,
   2020 U.S. Dist. LEXIS 164284 (S.D. Fla. Sep. 9, 2020)........................................20

*Unger v. Amedisys Inc.*,
   401 F.3d 316 (5th Cir. 2005) ..................................................................................13

**RULES**

Fed. R. Civ. P. 23(a) ....................................................................................................2, 7, 19

Fed. R. Civ. P. 23(a)(2)….............................................................................................6

Fed. R. Civ. P. 23(b) ....................................................................................................6

Fed. R. Civ. P. 23(b)(3)...............................................................................................6

**OTHER AUTHORITIES**

Richard A. Brealey & Stewart C. Myers, PRINCIPLES OF CORPORATE FINANCE (McGraw-
   Hill 7th ed., 2003) ..................................................................................................14

Bradford Cornell, CORPORATE VALUATION (McGraw-Hill 1993) ................................19

**REQUEST FOR HEARING**

Pursuant to Local Rule 7.1(b)(2), Defendants respectfully request that the Court schedule an evidentiary hearing, to assist the Court in confirming that Lead Plaintiffs' claims are not properly subject to class certification.

"[T]he Supreme Court has made clear that factfinding as to whether common issues predominate," such as whether a lack of price impact undermines the presumption of reliance, "is not only proper but necessary at the class certification stage." *Carpenters Pension Tr. Fund v. Allstate Corp. (In re Allstate Corp. Sec. Litig.)*, 966 F.3d 595, 614 (7th Cir. 2020) (remanding for further fact finding on price impact). Celsius submits that the evidence is straightforward and undisputed that there is no price impact. In addition, the evidence that Lead Plaintiffs are inadequate is based on their own clear admissions. But the Court can and should hold an evidentiary hearing to satisfy itself further. District courts in this district routinely hold evidentiary hearings to consider the appropriateness of class certification. *See, e.g., In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 272 (N.D. Ala. 2009).

## I.   INTRODUCTION

Lead Plaintiffs' purported class of Celsius Holdings, Inc. ("Celsius" or the "Company") public shareholders cannot be certified because the record evidence indisputably establishes that the misstated quarterly net income for the second and third quarters of fiscal 2021—the gravamen of their securities fraud claim—had no impact on the price of Celsius stock.  The parties' respective experts agree that Celsius's stock exhibited no statistically significant reaction to the restatement of the misstated amounts.  To the contrary, Celsius's stock price actually increased during the first trading day after Celsius publicly announced the correction of the misstated net income on March 1, 2022 (the "Restatement").  (Ex. 1, March 1, 2022 Form 8-K at 1).  All of this is no surprise.  Investors care about the present value of the future cash flows generated by operations, not non-cash expenses that owe their existence to accounting theory and have no economic impact.  This conclusion is supported by the relevant academic literature, and, importantly, the stock market analysts covering Celsius at the time.  None of those analysts changed their valuation of the Company or their investment rating because of the Restatement.  Without price impact, Plaintiffs cannot rely on the so-called "fraud-on-the-market" theory and the presumption of reliance it provides.  With the presumption stripped away, a host of individualized reliance issues rise to the surface that doom Lead Plaintiffs' effort to certify the purported class.

Moreover, Lead Plaintiffs' bid to represent the purported class is gutted by the undisputed fact that they, and their investment adviser who made the relevant investment decisions, disavowed any reliance on the Company's misstated quarterly net income figures.  In fact, according to the investment adviser, the misstatement was a "who cares kind of issue" that had no effect on the Company's earnings quality or future cash flows.  (Ex. 2, DCM-Celsius-00003106; Ex. 3, Buck

Tr. 112:19-113:2; *see also* Tr. 107:14-108:1).  Further, Lead Plaintiffs purchased more Celsius stock after the misstatement was revealed.  This evidence of Lead Plaintiffs' indifference to the Restatement consequently exposes Lead Plaintiffs to unique defenses, making them atypical of the purported class they seek to represent and, thus, unable to satisfy an essential requirement of Rule 23(a).

Accordingly, Lead Plaintiffs' Motion for Class Certification should be denied.

## II.     BACKGROUND

### A.     Celsius's Rapid Growth and Edwin Negron-Carballo's Tenure

Celsius sells energy drinks and liquid supplements in U.S. markets and across the world. (Ex. 4, 2022 10-K at 1).  Edwin Negron-Carballo served as Celsius's Chief Financial Officer from July 26, 2018 to April 18, 2022.  (Ex. 5, Aug. 3, 2018 Form 8-K; Ex. 6, April 18, 2022 Form 8-K).  Mr. Negron-Carballo retired as CFO in April 2022, but to ensure a smooth transition of his duties remained a Celsius employee until the end of January 2023.  (Ex. 6 at 1).

In 2021, Celsius's revenues increased by 140%, and its stock price began growing rapidly. (Ex. 7, L. Allen Rpt. ¶ 12).  In parallel with the increased cash flow, Celsius's stock price surged from $49.54 on January 4, 2021 to a high of $108.07 on November 5, 2021. (Ex. 8, Table of CELH Stock Prices at 1, 6).  As its business operations expanded, Celsius switched from a small regional auditor to Ernst & Young in June 2021. (Ex. 9, June 3, 2021 Form 8-K).

### B.     The March 1, 2022 Restatement

After the trading markets closed on March 1, 2022, Celsius issued an SEC Form 8-K announcing the Restatement of the non-cash share-based compensation expense and, by extension, the net income reported in its unaudited consolidated financial statements for the second and third

2

quarters of 2021.  (Ex. 1 at 1).  The Form 8-K explained the reason for the Restatement.  Celsius and Ernst & Young had determined that, in the two quarters at issue, the non-cash expense for share-based compensation related to nine former employees and retired directors was understated. (*Id*. at 1-2).  The Form 8-K included the exact dollar amount of the restated non-cash expenses and of the impact on net income, as reflected in Exhibit 10.  (Ex. 10, Excerpt of March 1, 2022 Form 8-K).  Revenue and cash flow were not restated or impacted.  (Ex. 1 at 1-2).

### C.     The Market Indisputably Did Not React Negatively to the Restatement

March 2 was the first trading day after the Restatement, and, thus, the opportunity to observe whether the market would react to the Restatement.  The trading on March 2 pushed the stock price upward, from $62.80 to $64.82.  The market's reaction (or lack of reaction) was memorialized in analyst reports issued on March 2.  While some analysts mentioned the Restatement of non-cash expense and net income, not a single analyst adjusted its valuation or rating of Celsius based on those restated figures.  Some of the reports explained why.  For instance, one report said that "[r]ecognition of additional non-cash share-based compensation expense ***does not impact*** the company's cash, revenue, and other aspects of its operations or its business fundamentals." (Ex. 11, Maxim 3/2/2022 Rpt. at 2) (emphasis added).  Similarly, another report explained that "[o]f critical importance, the recognition of additional non-cash share-based compensation expense does not impact the company's cash, revenue, or other aspects of its operations or its business fundamentals."  (Ex. 12, B. Riley 3/2/2022 Rpt. at 1-2).  One of the reports issued March 2 did not even mention the Restatement.  (Ex. 13, Ladenburg 3/2/2022 Rpt.).

Celsius's stock price did fall on March 3, but there is no indication that this was related to the Restatement.  Neither the Amended Complaint nor Lead Plaintiffs' Motion allege that any

3

corrective disclosure took place after March 1, meaning, by March 3, the corrected financial information had been known to the market for well over a day. While seven analysts issued reports on March 2, *none* issued a report on March 3. (Ex. 7 ¶ 36). A search has similarly not revealed any news stories related to the Restatement published on March 3. (*Id.* ¶ 37).

On March 16, 2022, Celsius issued its 10-K, including the same restated dollar amounts initially disclosed on March 1. (Ex. 4 at F-26). Again, the restated non-cash expense and net income in the 10-K did not differ from the March 1 8-K. Once more, the price of Celsius's stock rose in response. (Ex. 8 at 9).

### D.   Lead Plaintiffs Indisputably Did Not Rely on the Misstated Net Income Figures That Were The Subject of the Restatement

Lead Plaintiffs' investment adviser viewed the Restatement as a non-event. In September 2021, Lead Plaintiffs engaged Driehaus Capital Management ("Driehaus") as their investment adviser for small-cap growth-stock investments in companies like Celsius. (Ex. 14, Light Tr. 31:21-23, 38:1-9; Ex. 15, Hullender Tr. 21:15-22). As investment adviser, Driehaus had full discretionary authority to make investment decisions for Lead Plaintiffs without prior consultation or authorization. (Ex. 14, Light Tr. 35:4-9; Ex. 15, Hullender Tr. 21:23-22:1). One of the first investments Driehaus made for Plaintiffs was Celsius, which was one of the best performing stocks in Driehaus's small-cap growth-stock portfolio. (Ex. 3, Buck Tr. 64:9-22). In reaction to the March 1, 2022 Restatement, Driehaus wrote: "Looks like 10-K related to calc of non-cash stock comp so that's kind of a who cares issue…" (Ex. 2). In deposition, Driehaus confirmed that "the error in calculation of non-cash stock compensation expense was not something that was important to [it] as an investor" and that Driehas "also…didn't think the rest of the market would perceive it to be a significant issue either." (Ex. 3, Buck Tr. 112:19-113:2; *see also* Tr. 107:14-108:1).

4

**E.     Following the Restatement, Lead Plaintiffs' Added to Their Profitable Investment in Celsius**

Driehaus's disregard for the Restatement is evident from the fact it increased Lead Plaintiffs' profitable investment in Celsius following the announcement.  Lead Plaintiffs, on Driehaus's advice, had initially purchased 19,397 shares in October 2021.  (Ex. 16, AP-00001707-1709, -1712).  After the Restatement, on March 8, 2022, they sold 272 shares, just 1.4% of the Lead Plaintiffs' total position in Celsius.  (Ex. 16, AP-00001709-1712).  After the Restatement they purchased additional shares on May 19, 2022 (2,734 shares), November 22, 2022 (1,162 shares), and December 8, 2022 (1,260 shares).  (Ex. 17, AP-00001703-04; Ex. 18, AF-00001719-20; Ex. 14, Light Tr. 60:12-15; Ex. 15, Hullender Tr. 28:3-29:4).  Celsius's stock price has more than doubled since March 2022.  Lead Plaintiffs have enjoyed the benefits of that growth.

Lead Plaintiffs' purchase of Celsius stock following the Restatement provides another insight, erasing any doubt that net income and non-cash expense were irrelevant to Driehaus's investment decisions.  The purchases made in November and December 2022 were made shortly after Celsius announced a quarterly net loss of $186.5 million, the result of another expense that would not affect future cash flows.  (Ex. 19, Nov. 9, 2022 Form 8-K at 4; Ex. 7 ¶ 51).  In explaining those purchases, Driehaus made clear that the Company's net income (or loss) and non-cash expenses were irrelevant to the quality of Celsius's earnings, business prospects, and stock value.  (Ex. 3, Buck Tr. 138:16-139:6).

**F.     Lead Plaintiffs and This Litigation**

The same day that Celsius filed its Form 10-K including the restated financials, plaintiffs lawyers were already filing suit against Celsius.  (Dkt. No. 1).  On May 16, 2022, Lead Plaintiffs moved to be appointed class representatives for this action.  (Dkt. No. 33).  The Court appointed

them as class representatives on June 6, 2022. (Dkt. No. 41). Defendants moved to dismiss, which the Court granted in part and denied in part. (Dkt. No. 55, 62). On May 18, 2023, Lead Plaintiffs moved to certify a class of all persons who "purchased or otherwise acquired Celsius common stock on the open market between August 12, 2021 and March 1, 2022." (Dkt. No. 95-7).

### III. RELEVANT STANDARDS FOR DECIDING THE MOTION FOR CLASS CERTIFICATION

A class action may be maintained only when it satisfies the elements of Federal Rule of Civil Procedure 23(a) and at least one of the requirements of Rule 23(b). *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1233 (11th Cir. 2000). Lead Plaintiffs bear the burden to show that these requirements are met. *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 981 (11th Cir. 2016). All else being equal, the presumption is against class certification because class actions are an exception to our constitutional tradition of individual litigation. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

Rule 23(a) requires Lead Plaintiffs to prove, among other things: (i) there are questions of law or fact common to the class, and (ii) the claims or defenses of the representative parties are typical of the claims or defenses of the class. Fed. R. Civ. P. 23(a). Lead Plaintiffs moved to certify a class on the basis of Rule 23(b)(3), which involves an analysis similar to the commonality analysis of Rule 23(a) and allows for certification only when a court finds "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). "The predominance requirement…is 'far more demanding' than the commonality requirement found in Rule 23(a)(2)…" *Carriuolo*, 823 F.3d at 985 (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997)).

6

The Court may hold an evidentiary hearing to determine whether a class action is appropriate. *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1309 (11th Cir. 2008) ("[A] preliminary evidentiary hearing may be appropriate or essential as a part of the vital management role which the trial judge must exercise in class actions to assure that they are both meaningful and manageable") (quoting *Huff v. N.D. Cass Co. of Ala.*, 485 F.2d 710, 713 (5th Cir. 1973) (en banc)).

## IV.     ARGUMENT

The Court should not certify the class for two reasons. *First*, common issues will not predominate because the lack of any price impact denies Lead Plaintiffs the benefit of any presumption about the market's reliance on the alleged misstatements, requiring the Court to determine the actual reliance of each class member. *Second*, Lead Plaintiffs are atypical of the purported class because they affirmatively did not rely on the very misstatements on which their class claim is predicated, and, further, they made substantial investments in Celsius's stock after the Restatement.

### A.     The Restatement Had No Price Impact, Meaning Lead Plaintiffs Cannot Rely on the Presumption of Reliance and the Court Should Not Certify a Class

The lack of any evidence supporting a price impact provides a sufficient basis to deny class certification here. The Supreme Court has described price impact as "an essential precondition for any Rule 10b-5 class action." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 282 (2014) ("*Halliburton II*"). The importance of price impact arises from interplay of the commonality and predominance requirements of Rule 23 with the elements of securities fraud. "Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action," and, for securities fraud claims, this means a consideration of the element of reliance. *Erica P. John Fund, Inc. v. Halliburton Co.*,

563 U.S. 804, 809-10 (2011) ("*Halliburton I*") (internal quotation marks omitted).  And "[w]hether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Id.* at 810.

To satisfy the reliance requirement on a class-wide basis, Lead Plaintiffs need the benefit of a presumption recognized by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988).  *Basic* "held that investors could satisfy [the] reliance requirement by invoking a presumption that the price of stock traded in an efficient market reflects all public, material information—including material misrepresentations." *Halliburton II*, 573 U.S. at 263; *see Basic*, 485 U.S. at 247 (1988).  "This presumption, deemed fraud-on-the-market, is based on the hypothesis that in a modern and efficient securities market, the market price of the stock incorporates all available public information." *In re World Access, Inc.*, 310 F. Supp. 2d 1281, 1291 (N.D. Ga. Mar. 16, 2004).  "The fundamental premise…is that an investor presumptively relies on a misrepresentation so long as it was reflected in the market price at the time of his transaction." *Halliburton II*, 573 U.S. at 278 (citation omitted).  But *Basic* instructed that this was merely a presumption that a defendant could rebut: "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff…will be sufficient to rebut the presumption of reliance." *Basic*, 485 U.S. at 248; *see also Halliburton II*, 573 U.S. at 279-81.

For this reason, the Supreme Court made it clear that courts should consider "a defendant's direct, more salient evidence showing that the alleged misrepresentation did not actually affect the stock's market price." *Halliburton II*, 573 U.S. at 282.  Evidence in this category includes

"qualitative as well as quantitative" evidence and "a good dose of common sense." *Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 141 S. Ct. 1951, 1960 (2021).

Here, all of the evidence in the record, plus common sense, weigh heavily in Defendants' favor.  The undisputed quantitative evidence establishes that there was no price drop on the first trading day after the Restatement (the only date relevant in the analysis), a fact consistent with the demonstrated indifference of Celsius's stock price to changes in net income.  The qualitative evidence in the record confirms that the Restatement had no relevance in the investment decisions of the stock analysts following the Company and of Lead Plaintiffs' own adviser, all of whom valued Celsius based on metrics like revenue and cash flow and not a one-time non-cash expense item—an approach consistent with financial scholarship and common sense.   Defendants thus meet their burden of persuasion to show no price impact.  *Id*. at 1963.[1]

### 1.     *The Quantitative Evidence Reveals No Statistically Significant Price Impact and the Stock Price's Historic Indifference to Net Income*

The parties' experts agree that Celsius's stock price exhibited no statistically significant price movement on the first trading day after the Restatement, March 2.  This lack of a reaction makes sense when one looks at the stock price's historic indifference to other negative announcements about Celsius's net income.  Confronted with strong quantitative evidence that the Restatement had no price impact, Lead Plaintiffs will likely point to a price drop on March 3, but

---

[1] While defendants hold the burden to rebut price impact in an efficient market, the Supreme Court has said the burden is "unlikely to make much difference on the ground." *Id.* at 1963.  The "district court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact. The defendant's burden of persuasion will have bite only when the court finds the evidence in equipoise—a situation that should rarely arise." *Id*.

this theory contradicts the conclusion of their expert that Celsius's stock traded in an efficient market, which digested news within minutes of its announcement.

>    **i.      *The Parties' Experts Agree That Celsius's Stock Had No Statistically Significant Reaction to the Restatement***

To evaluate (the lack of) price impact here, the Court should look to the effect the Restatement—as an alleged corrective statement—had on Celsius's stock price on the first trading day following the Restatement, March 2.  The Restatement on March 1 corrected the previously incorrect statements, so one would expect the price to decline on March 2 as a result.[2]  To the contrary, it did not (it rose $2.02 per share).  The parties' experts agree that no statistically significant price drop occurred on March 2 in reaction to the Restatement.  In this context, a lack of statistical significance means the price change on March 2 fell within the range of normal expected daily variation in stock prices, based on historic price movements.  (Ex. 7 ¶ 23).

Taking the analysis of the respective experts in turn, Defendants' expert, Lucy Allen, performed an event study to determine whether Celsius's stock price exhibited any price impact on March 2.  (*Id*. ¶¶ 29-31).  The event study isolates the portion of Celsius's stock movement on March 2 that was not attributable to factors in the market at large or in Celsius's industry.  To control for market factors, Ms. Allen analyzed the price movements of over 3,000 companies listed on the NASDAQ, and controlled for industry factors by analyzing the price movements of Celsius's peer companies.  (*Id*. ¶ 30).  These adjustments controlled for the possibility that

---

[2] Courts indicate that the "best way to determine the impact of a false statement is to observe what happens when the truth is finally disclosed and use that to work backward" *Carpenters Pension Tr. Fund v. Allstate Corp. (In re Allstate Corp. Sec. Litig.)*, 966 F.3d 595, 613 (7th Cir. 2020). Neither expert found statistically significant price increases following any of the alleged misrepresentations.  (Ex. 7 ¶ 19 n.22).

Celsius's stock, as a growth company, would be more volatile than the market-at-large. (*Id*. ¶¶ 23, 30). Ms. Allen found that, even after adjusting for market and industry factors, Celsius's stock price experienced no statistically significant price impact. (*Id*. ¶¶ 3, 30). Ms. Allen's analysis did reveal that Celsius's stock price ***rose*** more than expected on March 2, 2022, an excess return of 1.42% (although not to a statistically significant degree). (*Id*. ¶ 30). This finding unequivocally shows the lack of price impact caused by the Restatement.

Lead Plaintiffs' expert, Frank Torchio, agrees; he also observed no statistically significant price impact on March 2. His analysis appears in Exhibit 4 to his report. In that exhibit, he laid out the price of Celsius's stock on a daily basis, and then used a market return to determine whether Celsius's stock price rose more or less than expected on a given day (called an excess return) using the Russell 2000 Total Return Index and Nasdaq Total Return Index.[3] (Dkt, No. 95-3 at Ex. 4). He then ran a statistical examination to determine whether he could be statistically certain that the excess return was truly positive or negative. (*Id*. ¶ 47). If the excess return was statistically significant, using a p-test, Mr. Torchio put an asterisk next to that day's entry on Exhibit 4. After comparing Celsius's returns on March 2, 2022, to the broader market, Mr. Torchio found that Celsius's excess return was negative 1.77%, but that finding was not statistically significant (or even close to it). (*Id*. at Ex. 4). The lack of statistical significance means Mr. Torchio cannot be statistically certain whether Celsius's stock increased more or less than expected on March 2. The

---

[3] Unlike Ms. Allen, Mr. Torchio did not compare Celsius's returns with an index of its competitors. (*Id*. ¶ 48). Ms. Allen's use of such an index is an accepted practice. *See In re Sci.-Atlanta, Inc. Sec. Lit.*, 754 F. Supp. 2d 1339, 1377-78 (N.D. Ga. 2010); *In re Finisar Corp. Sec. Litig.*, 2017 U.S. Dist. LEXIS 201150, at *18 (N.D. Cal. Dec. 5, 2017).

lack of statistical significance means the excess return was not outside the range of normal expected daily variation. In other words, he found no evidence of price impact.

When experts conclude that there is no statistically significant evidence that a misstatement affected a company's stock price, district courts across the country have held that class certification is inappropriate. *See, e.g., Ohio Pub. Empls. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 U.S. Dist. LEXIS 137229, at *34-35, *48-49 (N.D. Ohio Aug. 14, 2018); *In re Finisar Corp. Sec. Litig.*, 2017 U.S. Dist. LEXIS 201150, at *27 (N.D. Cal. Dec. 5, 2017). For example, in *In re Moody's Corp. Sec. Litig.*, the Southern District of New York concluded that defendants' demonstration of "no statistically significant change in [the company's] value when any alleged misrepresentation was made" would "rebut the presumption [of reliance]." *See* 274 F.R.D. 480, 492-93 (S.D.N.Y. 2011) (declining to certify class because there was no corrective disclosure with statistically significant price drop during the class period). The Northern District of California has gone further, concluding that defendants rebutted price impact for one corrective disclosure because it was only significant at the 90% level, not the standard 95% level. *In re Intuitive Surgical Sec. Litig.*, 2016 U.S. Dist. LEXIS 178148, *45-46 (N.D. Cal. Dec. 22, 2016). Likewise, Mr. Torchio's March 2 finding had no statistical significance at all.

### ii.     *Quantitative Evidence Also Reveals the Market's Indifference to Negative News About Celsius's Stock Price*

The quantitative evidence also reveals the market's indifference to bad news about Celsius's net income. If Lead Plaintiffs' price impact theory were correct, one would expect the market to react to other announcements of Celsius's net income. But Celsius stock price never did. Two examples demonstrate this: *First,* in Celsius's earnings announcement on November 11, 2021, it announced (as Lead Plaintiffs characterized it) "disappointing net income." (Dkt. 95-

12

3 ¶ 48).  But Mr. Torchio concluded that Celsius's stock had a positive return on the first trading day after the announcement, November 11, 2021 (the announcement was made before the market opened).  (Ex. 20, Nov. 11, 2021 Press Release; Dkt. No. 95-3, Ex. 4).  And no analysts commented on the November 11, 2021 net income announcement.[4]  *Second*, Celsius's November 9, 2022 earnings announcement (made after the market closed) disclosed a $180 million accounting loss, mostly due to distributor expenses that would not affect future cash flows.  (Ex. 22, Nov. 9, 2022 Press Release; Ex. 7 ¶¶ 51-52).  But Celsius's stock price did not respond negatively.  (Ex. 7 ¶ 50).  Instead, price opened the next day up almost $14. (Ex. 8 at 13).

### iii.  *If Celsius Traded in an Efficient Market, the Price Decline on March 3 Cannot Be Attributed to Restatement*

In a futile attempt to reconcile their claim based on Celsius's March 1 Restatement with (i) the parties' experts' consensus that no statistically significant price impact occurred on March 2 and (ii) the further quantitative evidence concerning the market's indifference to changes in net income, Plaintiff may argue that a price decline on March 3—two days after the Restatement— indicates that the Restatement had a price impact.  Such an argument would run afoul of the efficient market hypothesis and the fraud-on-the-market theory.

"To avail themselves of the fraud-on-the-market theory's presumption, [Lead Plaintiffs] must show that…the defendant's shares were traded in an efficient market."  *In re Sci.-Atlanta, Inc. Sec. Lit.*, 571 F. Supp. 2d 1315, 1337 (N.D. Ga. 2007)); *Unger v. Amedisys Inc.*, 401 F.3d 316, 322 (5th Cir. 2005) ("Absent an efficient market, individual reliance by each plaintiff must be proven, and the proposed class will fail the predominance requirement.")  The efficient market

---

[4] Celsius's stock price did fall on the second day, November 12, but only due to the announcement of a government investigation.  (Ex. 21, Nov. 12, 2021 Form 10-Q at 23).

13

hypothesis posits that prices react to earnings announcements within minutes—not over a period of days. *See Meyer v. Greene*, 710 F.3d 1189, 1198-99 (11th Cir. 2013) ("The efficient market theory, however, is a Delphic sword: it cuts both ways…A plaintiff in the Investors' situation must take the bitter with the sweet…")  One economic study found that the market reacts to a news announcement within **five to ten minutes**. *See* Richard A. Brealey & Stewart C. Myers, PRINCIPLES OF CORPORATE FINANCE 351-53 (McGraw-Hill 7th ed. 2003) (discussing a study by James M. Patel and Mark M. Wolfson).[5]

Unsurprisingly given this scholarship, district courts usually look at the price reaction on the day of a corrective disclosure, not a multi-day period.  For instance, when *Halliburton* was remanded back to the district court, "[t]he Court [found] that in this case, the use of a two-day window is inappropriate to measure price impact in an efficient market" because "[a]n efficient market is said to digest or impound news into the stock price in a matter of minutes." *Erica P. John Fund, Inc. v. Halliburton Co*., 309 F.R.D. 251, 269-70 (N.D. Tex. 2015); *see also Finisar Corp.*, 2017 U.S. Dist. LEXIS 201150, *26; *Intuitive*, 2016 U.S. Dist. LEXIS 178148, at *44.

Lead Plaintiffs' own expert agreed that Celsius's stock would not react to the Restatement over multiple days.  Mr. Torchio explained in his report that a reaction to news should continue beyond the first day only if the information "continues to generate analyst commentary and additional news stories beyond the first event day." (Dkt. 95-3 ¶ 153).  But there was no news or analyst commentary about the Restatement that would have driven a two-day reaction. Mr. Torchio confirmed that Celsius's stock price did not react over multiple days quantitatively,

---

[5] Federal courts have identified this as a "leading textbook on the principles of corporate finance." *See Home Sav. of Am. v. U.S.*, 57 Fed. Cl. 694, 709 (2011).

as well when he tested to confirm that Celsius's stock price did not exhibit "autocorrelation." (*Id*. ¶¶ 106-07).  Autocorrelation occurs when tomorrow's stock return can be predicted based upon what the stock does today, which can occur when certain market reactions are observed—when a stock overreacts to news or reacts too slowly. (*Id*. ¶¶ 102-04).  Mr. Torchio conducted tests to check for both type of reactions and found that neither existed.  (*Id*. ¶ 106-07).  In other words, he determined that Celsius's stock reacted quickly to news, in line with the expectations of the efficient market theory.  (*Id*.).

The fallacy of Lead Plaintiffs' attempt to reconcile the theory of their claim with the efficient market hypothesis is revealed by their attempt to use the well-accepted *Cammer* factors, derived from an oft-cited District of New Jersey case, which are used to determine whether a market for a particular security is efficient.  *Cammer v. Bloom*, 711 F. Supp. 1264, 1287 (D.N.J. 1989).  In their own analysis, however, Lead Plaintiffs are unable to establish a critical *Cammer* factor.  As noted above, it is well-accepted that "economic theory predicts that investor value is derived from cash flow."  Bradford Cornell, CORPORATE VALUATION 104 (McGraw-Hill 1993).[6] Thus, "if market prices reflected some other measure of income, such as accounting earnings rather than cash flow, that would be evidence that the market was inefficient."  *Cammer*, 711 F. Supp. at 1287.  A price impact attributed to the non-cash accounting issue in the Restatement would undermine the critical fifth *Cammer* factor: "cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."  *Cammer*, 711 F. Supp. at 1287.  While not necessarily decisive, courts view this fifth factor—the "cause-

---

[6] Courts recognize that Professor Cornell's textbook contains the "important developments in corporate finance and economics."  *DFC Global Corp. v. Muirfield Value Partners, L.P.*, 172 A.3d 346, 365 n. 96 (Del. 2017).

and-effect factor"—as the "most important" and "the essence of an efficient market."  *See In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 266 (D. Mass. 2006).

Moreover, Ms. Allen's report explained other reasons why Lead Plaintiffs have failed to carry their burden on the critical cause-and-effect factor—Lead Plaintiffs' experts cause-and-effect test was conducted improperly and did not actually test market efficiency.  (Ex. 7 ¶¶ 61-65).

In sum, Defendants concur with Lead Plaintiffs that the market for Celsius's stock during the relevant period was efficient.  But Lead Plaintiffs cannot argue that in an efficient market the Restatement had a price impact without undermining their ability to show reliance on a class-wide basis.  *Meyer*, 710 F.3d at 1198-99.  If Lead Plaintiffs contend that the market did not fully absorb the news of the Restatement on March 2, they necessarily fail to carry their burden of demonstrating that the market for Celsius's stock is efficient, cannot rely on a presumption of reliance, and class certification is inappropriate.

### 2. Qualitative Evidence and Common Sense Explain the Lack of Price Impact

The qualitative evidence also weighs heavily against class certification here.  The analyst reports issued immediately after the Restatement demonstrate that investors did not value Celsius on its non-cash expenses and net income and, instead, relied on other metrics tied to revenue and cash flows, none of which Celsius restated.[7]  This was consistent with the views of Lead Plaintiffs' own investment adviser and the scholarship concerning the valuation of public companies.

---

[7] Courts have used analyst reports to determine what information is important to the market in valuing a stock and determine what caused a price movement. *See In re Teco Energy Sec. Litig.*, 2006 U.S. Dist. LEXIS 18101, at *19-20 (M.D. Fla. Mar. 30, 2006) (dismissing complaint in part because analyst reports did not reference any misstatements or omissions as the reason they changed their outlook).

Focusing first on the analyst reports, they undermine a pillar of Lead Plaintiffs' claims—that net income was a "key metric" for Celsius's investors.  (Dkt. No. 44 ¶ 2).  For example, the March 2 report of one analyst, Lanenburg Thalmann, never mentioned the Restatement.  (Ex. 13). More broadly, as reflected in the table included in the report of Defendants' expert, Ms. Allen, none of the analysts changed their valuation of Celsius or their buy, sell, or hold ratings based on the newly disclosed information about Celsius's non-cash share-based compensation expense or its restated net income figures conveyed through the Restatement.  (Ex. 7 ¶ 32).[8]  One of the reports, issued by B. Riley, explains why the Restatement did not affect the price targets or buy recommendations: "**Of critical importance, the recognition of additional non-cash share-based compensation expense does not impact the company's cash, revenue, or other aspects of its operations or its business fundamentals**" (emphasis original).  (Ex. 12 at 2).

The analyst reports not only demonstrate the market's rejection of net income as a relevant metric for valuing Celsius, but they also demonstrate what metrics the market did care about.  As reflected in the table in Ms. Allen's report, analysts valued Celsius using revenue multiples, adjusted EBITDA multiples, and discounted cash flows: metrics that are not affected by non-cash stock-based compensation.  (Ex. 7 ¶¶ 47-48).  For instance, in its March 2 report, B. Riley set a $115 price target for Celsius's stock using a multiple of annual sales—a metric built on revenue Celsius receives for selling its product, not metrics driven by accounting theory, such as non-cash expense and its contribution to net income.  (Ex. 12 at 2).  Similarly, Ladenburg Thalmann valued

---

[8] Two analysts did lower their price targets, but for reasons wholly unrelated to the Restatement: Jeffries lowered their price target due to "lower market multiple," and B. Riley lowered due to "multiple market contraction."  (Ex. 23, Jeffries 3/2/2022 Rpt. at 1; Ex. 12 at 1, 2).

Celsius's stock using a multiple of the ratio derived from comparing enterprise value to revenue. (Ex. 13 at 2). No analysts valued Celsius using net income.  (Ex. 7 ¶ 47).

The analysts' approach to valuation was shared by Lead Plaintiffs' investment adviser, Driehaus.  Lead Plaintiffs bought Celsius's stock based entirely on Driehaus's guidance. (Ex. 14, Light Tr. 35:4-9; Ex. 15, Hullender Tr. 21:23-22:1).  Driehaus affirmatively disavowed that the Restatement had any bearing on its analysis or investment decisions, indicating it was a "who cares issue." (Ex. 3, Buck Tr. 112:7-113:2).  Lead Plaintiffs cannot now argue that the Restatement had a price impact when their own investment adviser—the entity responsible for their purchase of Celsius's stock—expressly disclaimed any interest in Celsius's non-cash share-based compensation expenses.  And, more broadly, Driehaus disclaimed reliance on net income as a metric relevant to valuation, admitting that the negative news about net income in November 2022 did not affect its opinion of Celsius's stock.  (Ex. 3, Buck Tr. 139:18-23).  Courts have found that the presumption of reliance is rebutted by such evidence. *See Gamco Invs., Inc. v. Vivendi, S.A.,* 927 F. Supp. 2d 88, 103-04 (S.D.N.Y. 2013) ("[A] plaintiff's willingness to trade at the same price, even knowing of the fraud, is one way that the presumption may be rebutted…"), *aff'd*, 838 F.3d 214 (2d Cir. 2016).

The scholarship concerning the valuation of public companies—and the "good dose of common sense" that the law permits the Court to apply, *Goldman Sachs*, 141 S. Ct. at 1960— suggests a restatement of non-cash expenses should produce no price impact, exactly conforming with the facts here.  A leading valuation textbook explains the emphasis on cash: "The argument that '***only cash matters***' has more than theoretical backing; it is also supported by ***extensive research***." CORPORATE VALUATION, *supra* at 108 (emphasis added).  "[D]irect tests of the relation

between value and various measures of income, including cash flow and accounting earnings …overwhelmingly support the view that ***corporate value is based on cash flow***.  When cash flow and earnings diverge, changes in value are associated with changes in cash flow, not changes in earnings." *Id*.  Confirming this, analysts covering Celsius focused on activities that could affect cash flow—such as Celsius's increasing penetration into retail stores—rather than non-cash accounting expenses.  (Ex. 12 at 2).

### B. Lead Plaintiffs Are Atypical

To certify a class, Lead Plaintiff must show that the "claims and defenses…are typical of the claims or defenses of the class" and that they "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).  "Typicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large." *Cooper v. Southern Co.*, 390 F.3d 695, 713 (11th Cir. 2004).  Here, no sufficient nexus exists because the evidence establishes that the Restatement played no role in Lead Plaintiffs' investment decisions and that Lead Plaintiff continued investing in Celsius following the Restatement, creating unique defenses to Lead Plaintiffs' claims. *See Luczak v. Nat'l Bev. Corp.*, 548 F. Supp. 3d 1256, 1265 (S.D. Fla. 2021) (declining class certification because plaintiff sold all its shares before the corrective disclosure and, thus, was subject to unique defense); *Beach v. Healthways, Inc.*, 2009 U.S. Dist. LEXIS 92557, at *9-10 (M.D. Tenn. Oct. 5, 2009) (class representative subject to unique defenses because of inside information it received).

Lead Plaintiffs are not just subject to the defense that the Restatement was not really a factor—they have ***admitted*** that it was not a factor.  Lead Plaintiffs' investment adviser—who had complete discretion to purchase Celsius's stock for Lead Plaintiffs—agreed that an "error in

19

calculation of non-cash stock compensation expense was not something that was important to [it] as an investor." (Ex. 3, Buck Tr. 112:19-113:2; *see also* Tr. 107:14-108:1). Should the case proceed, Lead Plaintiffs' individual admissions would destroy the required nexus between it and the class. *See Townhouse Rest. of Oviedo, Inc. v. NuCO2, LLC,* 2020 U.S. Dist. LEXIS 164284, at *38 (S.D. Fla. Sept. 9, 2020) (requiring a "sufficient nexus" between the named representative and the class); *Henley v. Turner Broad. Sys., Inc.*, 267 F. Supp. 3d 1341, 1357 (N.D. Ga. 2017) ("When a named plaintiff has no cognizable claim for relief, she cannot represent others who may have such a claim, and her bid to serve as a class representative must fail.") (quoting *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 560 (9th Cir. 2010)).

Moreover, Lead Plaintiffs continued to purchase Celsius stock after the Restatement. Over three purchases each, they bought over 5,000 shares after the Restatement. (Ex. 17 at AP-00001703; Ex. 18 at AF-00001719). "A named plaintiff who has engaged in a post-disclosure purchase is subject to the defense that the alleged misstatements or omissions were really not a factor in the purchasing decision but rather that other investment considerations drove the decision." *George v. China Auto. Sys., Inc*., 2013 U.S. Dist. LEXIS 93698, at *18 (S.D.N.Y. July 3, 2013); *see also Luczak*, 548 F. Supp. 3d at 1268 (finding atypicality in part due to additional conclusion

For the foregoing reasons and the reasons set forth in the Opposition, Defendants respectfully submit that the Court should deny Lead Plaintiffs' Motion for Class Certification.

Date: June 15, 2023

Respectfully submitted,

*/s/ Theodore J. Sawicki*

Theodore J. Sawicki (Fla. Bar No: 656526)
tod.sawicki@alston.com
Joseph G. Tully, *pro hac vice*
joe.tully@alston.com
Jason R. Outlaw, *pro hac vice*
jason.outlaw@alston.com
Matthew LaGrone, *pro hac vice*
matt.lagrone@alston.com
Oyinkansola Y. Muraina, *pro hac vice*
oyinkan.muraina@alston.com
**ALSTON & BIRD**
1201 West Peachtree Street, Suite 4900
Atlanta, Georgia 30309-3424
Telephone: (404) 881-7000
Facsimile: (404) 881-7777

*Attorneys for Defendants Celsius Holdings, Inc. and Edwin Negron-Carballo.*

21

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 15, 2023, I caused the foregoing to be filed electronically with the Court's Case Management/Electronic Filing System ("CM/ECF"). Notice of this filing was sent to all parties of record by operation of the Notice of Electronic Filing System, and the parties to this action may access the filing through CM/ECF.

*/s/ Theodore J. Sawicki*
Theodore J. Sawicki