# Exhibit 3

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 2 of 209
30(B)(6) Driehaus Capital                                    June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

22-CV-80418 (DMM) (WDM)

CITY OF ATLANTA POLICE OFFICERS,

PENSION PLAN and CITY OF ATLANTA

FIREFIGHTERS' PENSION PLAN,

Individually and On Behalf of All

Others Similarly Situated,

                    Plaintiffs,

v.

CELSIUS HOLDINGS, INC. JOHN

FIELDLY, and EDWIN NEGRON-

CARBALLO,

                    Defendant

Virtual Videotape Deposition of

Michael Buck

June 12, 2023

At 10:00 a.m.

Reported by LeShaunda Cass-Byrd, CSR, RPR

800.808.4958                                              770.343.9696

APPEARANCES OF COUNSEL:

Lead Counsel for City of Atlanta Police
Officers' Pension Plan and City of Atlanta
Firefighters' Pension Plan
        CAITLIN M. MOYNA, Esq.
        MICA COCCO, Esq.
        Grant & Eisenhofer P.A.
        485 Lexington Avenue
        New York, New York 10017

On behalf of Defendants:
        TODD J. SAWICKI, Esq.
        JASON OUTLAW, Esq.
        Alston & Bird
        One Atlantic Center
        1201 West Peachtree Street
        Suite 4900
        Atlanta, Georgia 30309-3424

On behalf of City of Atlanta:
        JEFFREY REEVES, Esq.
        Reeves Law Firm
        1100 Peachtree Street
        Suite 250
        Atlanta, Georgia 30309
        Jeff@reeveslawfirmpc.com

Also Present:

        Janet McWilliams
        General Counsel at Driehaus Capital Management
        Jonathan Miller, Videographer

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 4 of 209
30(B)(6) Driehaus Capital                                    June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

                                                        Page 3

                    EXAMINATION OF MICHAEL BUCK

    By Mr. Sawicki                                            9

    By Ms. Moyna                                            146

                    DEPOSITION EXHIBITS

    EXHIBIT    DESCRIPTION                                 PAGE

    Exhibit 2  Investment Advisory Agreement between

               Driehaus and the City of Atlanta

               Defined Benefit Pension Plan Investment

               Board                                        46

    Exhibit 3  Part 2A of Driehaus's Form ADV, dated

               September 8, 2021                            31

    Exhibit 4  Advent Report                                76

    Exhibit 5  Northern Trust reports provided

               From the City of Atlanta Pension

               Funds                                        74

    Exhibit 11 Advent Report for the Firefighters'

               Pension Plan, Purchases of Sales

               Of Celsius Stock                             81

    Exhibit 12 Celsius Holdings Daily Stock Price

               January 2021 - December 2022

    Exhibit 16 Notice of Deposition                         12

    Exhibit 17 Microsoft PowerPoint presentation

               Re: Driehaus Small Cap Growth

               Strategy                                     17

Case 9:22-cv-80418-DMM Document 100-4 Entered on FLSD Docket 06/15/2023 Page 5 of 209
30(B)(6) Driehaus Capital                                June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 4

Exhibit 18 Printout of one of the Microsoft
Team's chat with Michael Buck and
Jeff James on June 24, 2021                54

Exhibit 19 E-mail exchange on July 15th, 2021,
Between Michael Buck and colleagues
At Driehaus                               58

Exhibit 20 July 27th, 2021 chat with Mr. Buck
And Mr. James about Celsius               60

Exhibit 21 Morning Notes                             62

Exhibit 22 September 7, 2021 E-mail Chain from
Mike Buck forwarding information
From Celsius to Jeff James                64

Exhibit 23 September 21, 2021 Microsoft Teams
Chat exchange between Mike Buck
And Jeff James                            65

Exhibit 24 Letter from the City of Atlanta
Pension Board to LMCG Investments
September 30, 2021                         67

Exhibit 25 Bloomberg Daily Stock Prices

Exhibit 26 Line Graph Charting Daily Stock Prices
That are listed in Exhibit 25             83

Exhibit 27 E-mail from Sarah Greene of Driehaus,
To people at Marquette Associates
Attaching Driehaus performance Update  83

Page 5

Exhibit 28 Copy of an SEC Filing for Celsius

Dated November 12 of 2021                    86

Exhibit 29 Celsius Holdings November 11, 2021,

Press Release Announcing Third

Quarter 2021 financial results

For the company that was in

Driehaus's file                               88

Exhibit 30 E-mail from Ms. Greene at Driehaus

To people at Marquette, enclosing

Monthly Performance Updates                  94

Exhibit 31 Sarah Greene's January 11, 2022

E-mail to Marquette, attaching

Driehaus Performance update for

Atlanta Fire and Police Pension Funds

For month ending December 31, 2021        97

Exhibit 32 E-mail from Michael Buck to a number

Of people at Driehaus, January 7th,

2022                                          98

Exhibit 33 Transcript Summary Interview conducted

Interactive Marketing Manager at

Pepin Distributing Company                  102

Exhibit 34 Celsius Holdings 8-K dated March 1,

2022                                         104

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 7 of
30(B)(6) Driehaus Capital                                    June 12, 2023
209
City of Atlanta Police Officers' Pension Plan v. C

Page 6

Exhibit 35 Celsius Press Release Re:  Preliminary
           And Unaudited Fourth Quarter of
           Fiscal Year 2021 results in
           Driehaus's File                                106

Exhibit 36 E-mail from Michael Buck to Jeff
           James, March 1, 2022                           110

Exhibit 37 Bloomberg, B. Riley Lowers Celsius
           Holdings' Price Target to $115
           From $130 Lowers Multiple Reflecting
           Market Multiple Contraction, Keeps     113

Exhibit 38 B. Riley analyst report dated
           Wednesday, March 2, 2022 for Celsius  114

Exhibit 39 Printout of Microsoft Teams Chat
           Between Michael Buck and Jeff James
           On March 2, 2022                                116

Exhibit 40  March 8, 2022 Microsoft Teams Chat    118

Exhibit 41 Microsoft Teams Chat between Michael
           Buck and others at Driehaus, March
           8th, 2022                                       121

Exhibit 42 Class Action Complaint filed March
           16th, 2022                                      123

Exhibit 43 Press Release issued by Clarence Law
           Firm Re: Class Action being filed
           Against Celsius                                 124

Exhibit 44 Compilation of Morning News          125

Exhibit 45 E-mail from Michael Buck with notes
To Jeff James on May 11, 2022, Re:
Celsius's March MarQ '22                    128

Exhibit 46 September 9, 2022 e-mail from Sarah
Greene at Driehaus to folks at
Marquette Associates                        130

Exhibit 47 Microsoft Teams chat between Michael
Buck and Jeff James on October 18,
2022                                        132

Exhibit 48 SEC Filing by Celsius Holdings, dated
November 9, 2022                            134

Exhibit 49 Celsius Holdings Third Quarter 2022
Financial Results Press Release             135

Exhibit 50 Microsoft Teams Chat Exchange with
Jeff James on December 2, 2022              139

Exhibit 51 E-mail chain to Michael Buck on
December 7th, 2022 from Alex
Plastaras at Morgan Stanley                 141

Exhibit 52 Microsoft Teams Chat Exchanged
Between Michael Buck and Mr. James
Dated December 8th, 2022                     142

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 9 of
30(B)(6) Driehaus Capital                                              June 12, 2023
209
City of Atlanta Police Officers' Pension Plan v. C

Page 8

THE VIDEOGRAPHER:  We are on the record June 12, 2023, at approximately 10:16 a.m. Eastern Time.  This will be the 30(b)(6) videotaped deposition of Driehaus Capital.  The corporate representative today will be Michael Buck.

Will counsel please identify themselves, who they represent for the record, beginning with the taking attorney.

MR. SAWICKI:  Good morning.  This is Todd Sawicki with Alston & Bird, representing the defendants in this case.  And sitting with me is my law partner Jason Outlaw, and my associate off screen who is doing the exhibit share is (Audio Distortion) Marina.

MS. MOYNA:  Morning.  This is Caitlin Moyna from Grant & Eisenhofer, we're for the plaintiffs

MS. COCCO:  Good morning.  This is Mica Cocco from Grant & Eisenhofer for the plaintiffs.

MR. REEVES:  Good morning.  This is Jeffrey Reeves from the Reeves law firm for the plaintiffs.

Page 9

THE VIDEOGRAPHER:  Would the court reporter please swear in the witness.

MICHAEL BUCK,

EXAMINATION

BY MR. SAWICKI:

Q.     Good morning, Mr. Buck.  Thank you for making time for us.  I'm the attorney for the defendants in this securities class action case, representing Celsius Holdings and its former CFO, Edwin Negron-Carballo.

As indicated by the Veritext tech person, you are here in a representative capacity as a -- as a representative witness for your firm Driehaus Capital.

Do you have an understanding of -- of what that means?

A.     That I represent our firm today.

Q.     Generally speaking, your obligation -- your testimony is not just based on your personal knowledge, but based on what is reasonably available to the firm as a whole.  So, for example, even if you didn't actually do or see something, under these rules, you hopefully made some effort, some reasonable effort to find out the answer and -- and be able to speak with some knowledge and authority about these topics, whether you were personally involved or not.

Case 9:22-cv-80418-DMM  Document 100-4  Entered on FLSD Docket 06/15/2023  Page 11 of
30(B)(6) Driehaus Capital                                      June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 10

Is that consistent with what you understand you're doing?

A.    Yes.

Q.    Have you ever given a deposition before, whether it be in a representative capacity or in an individual capacity?

A.    No.

Q.    Have you ever testified in court before?

A.    No.

Q.    So as you noticed, the court reporter just swore you in, so the testimony that you're giving and that's being recorded on the video and taken down by the court reporter is equivalent, the same thing as if we were in court.  So you're under oath and sworn to tell the truth, and you are here to respond to my questions, and then when I'm done, counsel for questions for -- from questions from the plaintiffs.

So just a couple of ground rules to keep things running smoothly.  Please wait until I finish my question before you answer, that'll give the court reporter time to take down what I've said and what you've said, so we're not talking over each other.

Please respond audibly.  Just shaking your head or grunting, usually is not helpful or sufficient, so please try to do your best to say yes

or no in response to the questions.

If you don't understand what I'm asking you, please ask me to rephrase the question.  If you don't, then I'll assume that you do understand and that you're able to answer to the best of your ability.  Okay?

A.    Okay.

Q.    And if you need to take a break at any time, just let me know and we can -- we can make that happen in short order.

So, Mr. Buck, did you -- what did you do to prepare for the deposition today?

A.    We reviewed the requests that were sent in to us, and along with some colleagues of mine, we compiled a set of e-mails, instant messages that pertained to Celsius.  We pulled the research and other documents acted -- accessed through Fact Set regarding your company.  And then pulled up any documents that I put together regarding the company.  And then I did a quick review of our trade history in the security.

Q.    Okay.  Besides for pulling together the documents and -- and looking at them, during the course of that exercise, did you speak with any of your colleagues about the substance of trading and --

Case 9:22-cv-80418-DMM  Document 100-4  Entered on FLSD Docket 06/15/2023  Page 13 of
30(B)(6) Driehaus Capital                                    June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 12

and Celsius of the company?

A.    In preparation for this meeting?

Q.    Yes.

A.    Yes.  Yeah.  We -- I spoke with my colleague Jeff James, who's our lead portfolio manager and our general counsel Janet, who's here.

Q.    Okay.  Besides for Mr. James and Ms. McWilliams, did you speak with or meet with anybody else?

A.    No.

Q.    Did you get any e-mailed questions or communications from any of the lawyers for the plaintiffs in this case in relation to this deposition?

A.    No.

MR. SAWICKI:  Can you pull up Exhibit 16, which is the notice of deposition.

(Defendants' Exhibit 16 was marked for identification.)

BY MR. SAWICKI:

Q.    All right.  Mr. Buck, I hope you can see on the screen the subpoena to testify in a deposition in this case.

Is that the document that you reviewed in

Page 13

conducting the exercise to gather documents and get yourselves ready for this deposition?

A.    Correct.  Yes.

Q.    And as you go through the document, we list a number of different categories or topics that we asked you to be prepared to talk about.

Did you look through that list of topics?

A.    Yes.

Q.    And do you feel like you're reasonably prepared to talk about the information that Driehaus has on those topics?

A.    I am.

Q.    Great.

MR. SAWICKI:  All right.  We can take that down.

BY MR. SAWICKI:

Q.    Before we get into the documents, Mr. Buck, let me -- let me get some sense of your background and experience as an investing adviser.

Could you share with us your educational background?

A.    Sure.  I attended Northwestern University from 1995 to 2000.  I got a degree in economics and cello performance, two degrees.  I worked one year at Deloitte Consulting, after which I joined Driehaus

30(B)(6) Driehaus Capital                                    June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 14

Capital Management in February of 2002.

I began as a generalist working alongside with Jeff James, and then was promoted to assistant portfolio manager and covering our consumer discretionary/consumer staple centers.  And then most recently, was promoted to portfolio manager.

Q.     And when was that promotion to portfolio manager?

A.     I believe it was 2021.

Q.     Okay.  So if you remember from the documents, Driehaus was engaged as investment adviser for the plaintiffs, the City of Atlanta Police and Fire Pension Funds in or around September of 2021.

Do you remember whether you were promoted to portfolio manager before or after that engagement?

A.     I do not remember.

Q.     In any event, at the time you -- that the City of Atlanta became a client, you had been a portfolio manager in the investment adviser space for almost 20 years, 19 years?

A.     That's right.

Q.     And did you have someone supervising you in 2021 in your role as portfolio manager?

A.     Jeff James is my direct supervisor.

Q.     Could you explain to us how you work with

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 16 of
30(B)(6) Driehaus Capital                                    June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 15

Mr. James to reach investment decisions?

A.    Sure.  So as the primary analyst covering the consumer discretionary/consumer staples and financial sectors, I'll be responsible for reviewing those sectors for investment ideas that align with our investment philosophy.  I'll do the research on them and prevent -- present recommendations to Jeff, the two of us will discuss them, and ultimately, he is the final decision-maker on any investment decision that we -- we make.

Q.    I have seen several different types of documents in your production.  They include some e-mails.  Also include some chat, electronic chat exchanges.  Can you explain what the chat documents are?

A.    The chat documents come from Microsoft Teams, and we use that to send messages internally.

Q.    And are they accessible to you and Mr. James whether you're in the office or not?

A.    Yes.

Q.    And do they show up on your phone as well as your computer, is that the way the Teams system works?

A.    Yes.

Q.    Besides for your e-mail and chat

Page 16

communications, do you also interact in person with Mr. James?

A.      Yes.

Q.      In making investment decisions?

A.      Yes.

Q.      Besides for Mr. James, do you interact with anybody else at Driehaus in deciding whether to invest, how much to invest, when to sale, and when to buy?

A.      Yes.  We have a team of eight people.  So me, Jeff, and then there is six other analysts covering other sectors.  And then we have inhouse traders who will execute our orders.

Q.      And those six or eight other people covering other sectors, do they have input into the recommendations you are making for investments in the sector you're responsible for.

A.      No.

Q.      Okay.  Do the traders have any input or responsibility to weigh in on investment decisions that you're recommending be made for the sector you're responsible for?

A.      No.

Q.      Is it fair to say then that it's -- the investment decisions for your sector are made by you

Page 17

and James in consultation with each other?

    A.    Yes.

    Q.    Let me show you another document.  This is

doing to be marked as Exhibit Number 17?

            (Defendants' Exhibit 17 was marked

    for identification.)

BY MR. SAWICKI:

    Q.    All right Mr. -- Mr. Buck, this is a

multi-page document.  It looks to be some sort of

Microsoft PowerPoint presentation that describes the

Driehaus Small Cap Growth strategy.  And if you look

at the top of the second page of the document, it's

dated September 30th of 2022.  Do you see that there?

    A.    I don't see the date.

    Q.    On the upper right of the second page?

    A.    Oh, there it is.  I am sorry.  It was

obscured by the video.  Yes, I see it.

    Q.    And as we go through these documents, you

will notice that on the bottom of each page, we put a

label on there reflecting where the document or what

entity or person produced the document and what page

it is.  Do you see at the bottom right there, the DCM

Celsius, that is our mark, Mr. Buck, but it reflects

that we got these documents from Driehaus Capital

Management, and then we just labeled them in number

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 19 of
30(B)(6) Driehaus Capital                                    June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 18

order for the ones we got.  So if you see a document that is labeled with the DCM prefix that is a document that we got from you.  Okay?

A.      Okay.

Q.      So as I indicated and you will see from other documents, you started working for the City of Atlanta fire and police pension funds in about September 2021.  You gave us this document, which is a 2022 document.  Nonetheless, does this Exhibit Number 17 fairly summarize the Driehaus Small Cap Growth strategy as was implemented in 2021 and 2022?

A.      Yes.

Q.      And can you explain how the -- what the Driehaus Small Cap Growth strategy is.  How does it fit into the business that you do?

A.      The strategies is one of three domestic U.S. growth equity strategies that we implement on our team, and then beyond that, Driehaus has three other teams that manage their own different investment strategies.

Q.      Do the investment decisions that you and Mr. James make, are they part of the small cap growth strategy?

A.      Yes.

Q.      Do -- do those investment decisions also

30(B)(6) Driehaus Capital                                    June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 19

become part of any other strategies that Driehaus is implementing?

A.    At times, we will own the same security in one or two of the other domestic U.S. growth strategies.

Q.    Okay.  You listed three domestic growth strategies.  Do you have investment decision responsibility for all three, or just one?

A.    All three.

Q.    The same for Mr. James?

A.    That is right.

Q.    Besides for those three, do you have investment decision responsibility or input for any other strategies that Driehaus offers or employs?

A.    No.

Q.    Let's turn to the third page of Exhibit Number 17.  This is a slide entitled Overview, and it describes four strategies.  Microcap Growth, Small Cap Growth, Small/Mid Cap Growth and Life Sciences.  Is it your testimony that you and Mr. James are responsible for the first three listed on this page, the microcap growth, small cap and small/mid cap?

A.    Yes.

Q.    Okay.  Underneath that listing of those strategies, the first bullet says, "The team focuses

Page 20

on investing in U.S. traded stocks of companies,

experiencing positive fundamental change with market

capitalizations of between 100 million and 15

billion."

What does Driehaus mean when it says the

companies they are investing in are experienced --

experiencing positive fundamental change?

A.    So we look for companies that are seeing

something improving, whether it's introducing a new

product, or potentially a new management team that is

implementing, a new operating strategy, or it could be

an acquisition or a new contract, something that is

catalyzing an inflexion point in their business that

could lead into an acceleration in revenue and

earnings growth.

Q.    Turning to the next page of Exhibit Number

17, the top left-hand box describes the team.  And

then it says, "Experience lead portfolio manager,

inception date 2006."  Who is what referring to?

A.    Jeff James.

Q.    Then to the right, the box under Alignment

and Incentivization it says, "Skin in the game.

Portfolio management team has the majority of their

liquid net worth invested in the strategies."

The reference to portfolio management team,

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 22 of
30(B)(6) Driehaus Capital                                        June 12, 2023
209
City of Atlanta Police Officers' Pension Plan v. C

Page 21

does that include you?

A.    It does.

Q.    So this seems to indicate that you personally are investing in the same stocks that you are recommending for your investment advisory clients?

A.    It means that we are invested in our strategy, so we do not own these stocks outside of our investment strategies, but we own them as part of being invested alongside our clients.

Q.    Could you explain that in more detail, does that mean -- well, let's talk about -- let's see. Let's come back to this exhibit.

Let's go to the page 5.  Underneath your pictures -- by the way, who is Mr. Vijayan, CFA?

A.    He is the assistant portfolio manager, and he is also the senior analyst covering all of our technology holdings.

Q.    So while he is listed here, does he have any responsibility or input regarding the investment decisions you and Mr. James are making in your sector of the consumer space?

A.    No.

Q.    Underneath your pictures, there is a reference to investment vehicles, and that is separately managed account and mutual fund.  What is a

Page 22

separately managed account?

A.    It's an account that any of our clients could open with us, subject to certain minimum size requirements, and then they would be managed separately, but would be buying and selling the same securities that we had invested across other SMAs or mutual funds.  So it's a different vehicle.

Q.    And Driehaus has it's own set of mutual funds, including a small cap growth mutual fund?

A.    Yes.  Each of the three U.S. growth strategies that we have discussed, each one has its own mutual fund vehicle.

Q.    Okay.

A.    And actually, the small cap strategy has two share classes.

Q.    And do you personally invest in the same strategy as your separate account clients through these mutual funds?

A.    I do.

Q.    Okay.  And is the same true for Mr. James?

A.    Yes.

Q.    And do I understand correctly, that the mutual funds and the separate accounts for the small cap growth strategy, generally speaking, are the same investments being made at the same time?

Page 23

A.       Yes.

Q.       So when you make a recommendation and Mr. James approves the recommendation to buy or sale a particular stock today in the small cap growth strategy, orders to buy that stock are being made in both, the separate accounts, in the small cap strategy bucket, as well as the small cap growth strategy mutual fund, correct?

A.       Yes.

Q.       Before we leave this page, on the -- on the left-hand side under Investment Style, your slide says, "Growth Equity Investment Approach."  What does that mean?

A.       That means that we are typically investing in companies that in -- outperform and outgrow their competition in their industries and sector of peers and that we are benchmarked against a growth index.

Q.       The benchmark is reflected below that, the Russell 2000 growth index?

A.       That is right.

Q.       At the bottom of the next page of this slide, an additional listing your team members, there is a -- excuse me, we can go down to the bottom of page 6, please.  At the bottom right, there it says, "Teams Only Focus Alpha Generation."  What does that

Page 24

mean?

A.     It means that our primary focus is to outperform our benchmark.

Q.     I don't -- what is the reference to alpha then?

A.     Alpha refers to the degree of outperformance.  It's a measures of outperformance.

Q.     On the top of the next page, page 7 of this slide deck, you write that, "Driehaus believes stock prices are driven by earnings growth over a long-term."

What do you mean by that?

A.     So underpinning our investment approach is the belief that over the very long term as a company's earnings grow, their stock price will track that, and the two will be very highly correlated.

Q.     When you say "long-term" in this context, what does Driehaus mean?

A.     2-plus years.

Q.     Underneath that phrase you write, or Driehaus writes, "Companies with superior business models growth potential and quality management teams generate superior long-term shareholder returns."

When you say "growth potential," what does that mean?

Case 9:22-cv-80418-DMM  Document 100-4  Entered on FLSD Docket 06/15/2023  Page 26 of
30(B)(6)  Driehaus Capital                                            June 12, 2023
209
City of Atlanta Police Officers' Pension Plan v. C

Page 25

A.      That means that a company has the opportunity to meaningfully expand the size of their business.  So if it is a new product that there is a large addressable market for that product and that they are only penetrating a small portion of that opportunity.

Q.      Okay.  Does a company have to be making money in order to be a potentially attractive investment prospect for this strategy?

A.      No.

Q.      So during the period of time you've implemented this small growth strategy, the companies you've invested in, some have been making money, and some have not -- some have been losing money, correct?

A.      Yes.  That's right.

Q.      And -- and notwithstanding the fact that some of the companies have been losing money, you've identified other factors or reasons why you think those companies have growth potential, correct?

A.      Yes.

Q.      And what are those -- what are those reasons, generally speaking?

A.      So if the company is losing money, we may find it still attractive.  If there are other metrics that we feel are going to be the primary drivers of

the company stock price, it could just simply be sales growth, or it could be their earnings trajectory is moving from significant losses to more modest losses, and we have that line of site to profitability in the future.

Or there could be companies that have no revenue earnings, such as development stage BioTech companies where the catalyst for the stock price are going to be clinical investment milestones.

Q.    Can we go down to page 16 of this exhibit, Number 17.  This is a slide in Exhibit 17 that's entitled "Portfolio Construction."

Mr. Buck, can you explain what -- what Driehaus means by "portfolio construction" and how it decides the position -- the size of each position in a portfolio?

A.    Sure.  When we refer to a portfolio construction, we're talking about how we allocate the portfolio amongst the various securities that we've identified as being attractive.  And on this slide, you'll see it's based on convictions.  So that means that the company, if we have high conviction and belief in a company's stock price potentially outperforming, we might give it a much higher rating than one where we think the investment case is less

probable or -- or lower conviction.

And it's also, portfolio construction roles are referred to the sector exposures. So how much of the portfolio we might put in technology stocks versus financials, versus other sectors. And then also, it will refer to the way we construct the portfolio to take into account various risk factor exposures.

Q. So if you start with -- in a -- with a portfolio of 100 different stocks, each weigh in 1 percent, as you well know over time, the values of each of those stocks are going to change as the market goes up and down.

Do you, from time to time, make decisions to rebalance a portfolio to bring it back to that more even 1 percent balance, or how does that work? Explain that, please.

A. Yeah. So if a company's stock price appreciates meaningfully, we will typically evaluate it and our desire to continue to maintain that position on its own merits rather than in -- like, in terms of is it -- if the weighting outside is relative to other stocks in the portfolio, we are more interested in the individual potential for that stock.

So if it has appreciated a lot and it's closer to our outside case or we feel like the good

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 29 of 30(B)(6) Driehaus Capital                                    June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 28

news is baked in, that might cause us to trim the position.

Q.   And do you monitor the performance of each of the stocks in your portfolio on a -- on a daily or weekly basis?

A.   Yes.

Q.   And do you make those evaluations and decisions about whether to rebalance on a likewise frequent basis, daily, weekly, monthly?

A.   Yes.

Q.   And do you, from time to time, make decisions to sell a part of a position in one of the stocks you own, based solely on the allocation percentage, as opposed to the particular stock's performance or any of the other characteristics you normally evaluate?

A.   Would you mind repeating the question?

Q.   Yeah.  Forgive me, that was not very good.

When you make allocation decisions, do you do so occasionally, for reasons related to the relative value of the position of the portfolio, as opposed to the stock's own fundamental characteristics?

A.   It's -- yeah.  The -- it's possible that we would do that.

Case 9:22-cv-80418-DMM  Document 100-4  Entered on FLSD Docket 06/15/2023  Page 30 of
30(B)(6) Driehaus Capital                                June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 29

Q.    And does this slide overall, fairly characterize your primary considerations in constructing and maintaining allocations within your small cap growth strategy portfolio?

A.    Yes.

Q.    Okay.

MR. SAWICKI:  Let's go on to page 20 of this exhibit, please.

BY MR. SAWICKI:

Q.    Mr. -- Mr. Buck, on this page 20 of Exhibit 17, this describes the performance review of the small cap growth strategy, and it highlights Mr. James's performance as portfolio manager over a period of time, evidently in comparison to the Russell 2000 Growth Index.

Do you see that?

A.    I do.

Q.    And it seems to indicate that as compared to the Russell 2000 Growth Index, the Driehaus small cap growth strategy has outperformed that index over, for example, the ten-year period, 17.1 percent versus 8.81 percent.

Am I reading that correctly?

A.    Yes.

Q.    Is this -- is this performance

Case 9:22-cv-80418-DMM  Document 100-4  Entered on FLSD Docket 06/15/2023  Page 31 of
30(B)(6) Driehaus Capital                                    June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 30

presentation, is this what is generally known as -- as benchmarking?

A.      I think the -- the -- I guess the -- I would say the spread between the benchmark and our strategy, that's when -- in your prior question, you asked about alpha, I would call that alpha. Benchmarking is more, what are we comparing ourselves to.

Q.      Okay.  So benchmarking is, you're comparing yourself to the Russell 2000 Growth Index?

A.      Yes.

Q.      And you're -- you're out-performance of that index, is that what you call alpha?

A.      That's right.

Q.      And is -- is the comparison of the small growth Driehaus small cap growth strategy with the Russell 2000 Growth Index, to your understanding, is that how Driehaus is evaluated as compared with its competitors in the investment advisory space?

A.      It's one of the primary things that we get evaluated on, yes.

Q.      And is -- during this period of time, the ten years leading up to 2000 -- to 2021 to 2022, where has Driehaus fallen in the rankings of among your competitors in this case?

Page 31

A.      I'd have to refer to our marketing
materials, but we're within the top third, at least.

Q.      Okay.

MR. SAWICKI:  Let's go on to the next
document, it will be Exhibit Number 18.

BY MR. SAWICKI:

Q.      Mr. Buck, do you know what a Form ADV is?

A.      Yes.

Q.      And are you familiar with Driehaus's form
ADV?

A.      I have not reviewed it, but I am familiar
that we file them.

Q.      Excuse me, this was already marked in
another deposition, Mr. Buck, as Exhibit Number 3.  So
it's not going to be 18.  It's going to be Number 3.

(Defendants' Exhibit 3 was marked for
identification.)

BY MR. SAWICKI:

Q.      Mr. Buck, can you confirm that this Exhibit
Number 3 is a true and correct copy of Part 2A of
Driehaus's Form ADV, dated as of September 8, 2021?

A.      I've never seen this before, but it looks
legitimate.

Q.      If you notice, this particular document was
provided to us by the plaintiffs, the City of Atlanta

Case 9:22-cv-80418-DMM  Document 100-4  Entered on FLSD Docket 06/15/2023  Page 33 of
30(B)(6) Driehaus Capital                                    June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 32

Police Department Pension Funds, that's reflected by the AP stamp at the bottom.

Does Driehaus share its form ADV with its investment advisory clients as a matter of course?

A.     I don't know.

Q.     Do you understand that the form ADV is a document that Driehaus is required to be filed with the SEC, the U.S. Securities and Exchange Commission?

A.     Yes.

Q.     And you understand that the SEC is a federal agency that's responsible for regulating Driehaus's investment advisory business, correct?

A.     Yes.

Q.     And do you understand that Driehaus is obligated to fully and accurately describe its investment advisory business in this form ADV for the benefit of the SEC and its regulatory purposes, but also for Driehaus's investment advisory clients?

A.     Yes.

Q.     On page 4 of this Exhibit Number 3, in the second paragraph, the ADV provides, "As of December 31, 2020, we managed 12,462,000,000, et cetera, of client assets on a discretionary basis."

What does that mean?

A.     I believe that means that we are actively

Case 9:22-cv-80418-DMM Document 100-4 Entered on FLSD Docket 06/15/2023 Page 34 of
30(B)(6) Driehaus Capital                    June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 33

managing these assets, and we have the discretion to
buy and sell securities for them.

Q.    The paragraph, then, it goes on to describe
a "diverse group of U.S. and non-U.S. clients,
including corporate pension plans, public plans,
endowments, foundations, et cetera."

To your understanding, is -- are the City
of Atlanta Police and Fire Pension Funds, are those
public plans within the meaning of this description
here for the types of clients you work for?

A.    Yes.

Q.    Let's go to the top of the next page,
page 5.  This first paragraph reads, "Our separate
account clients generally follow a model portfolio for
each strategy that invests in the same securities as
other investors in the same investment strategy."

So first off, can you confirm that the City
of Atlanta Police and Fire Pension Funds were separate
account clients of Driehaus in 2021 and 2022?

A.    Yes.

Q.    And so does this sentence mean that the
City of Atlanta Fire and Police Pension Funds are
investing in the same securities as other Driehaus
clients who have signed up for the small cap growth
strategy?

Page 34

A.    Yes.

Q.    And this paragraph goes on to describe that some separate account clients may impose investor -- certain investment restrictions, which may cause a little bit different investment portfolio to result.

Where would we find those restrictions?

A.    Some clients have restrictions on any companies that may be involved in defense, referring to businesses who are tobacco or coal, or there's all kinds of different restrictions certain clients might have.

Q.    And how are those restrictions communicated to Driehaus?

A.    To our client relationship management team.

Q.    For the City of Atlanta Fire and Pension Funds who -- who was on Driehaus's client relation management team?

A.    David McElroy and Tom Seftenberg..

Q.    Do they have any investment decision responsibility for this -- the plans, investments with Driehaus?

A.    No.

Q.    Did -- did you or Driehaus search for documents reflecting communications between those gentlemen in their client relation role in the City of

Page 35

Atlanta during this relevant period?

A.     I don't know.

Q.     Do you know whether those client relations people, in fact, had any communications with the City of Atlanta Fire and Police Pension Funds during their relevant period, 2021 and 2022?

A.     I don't know for certain, but I would imagine they did.

Q.     Okay.  John, I just want to put a little marker here.  We may ask you to go back and just check for some of those communications because I don't think I saw those in the -- in the production.  Unless you tell me that you did already search for them.

MS. McWILLIAMS:  I'm not completely sure, Todd.  So let me double check, looking, for any communications between Tom Seftenberg and David McElroy, including and get back to you.

MR. SAWICKI:  Yes, thank you.

BY MR. SAWICKI:

Q.     Let's go to page 11 of this Exhibit 3.  Mr. Buck, this is the section of the form ADV where Driehaus describes its methods of analysis and investment strategies.  Under the heading Methods of Analysis, this says that, "Driehaus utilizes a variety

Page 36

of analysis methods and investment strategies.  We employ fundamental macro and technical research methods, including various resources such as corporate data, stock prices, and volume data, third-party research, SEC filings, company press releases, management conference calls, meetings and proprietary research."

Did you use all of these methods of analysis in deciding to make investments on behalf of City of Atlanta pension funds during the relevant period?

A.     Yes.

Q.     Did you use all six of those methods in evaluating whether to make an investment on behalf of the plaintiffs in Celsius during the relevant period?

A.     Yes.

Q.     To your understanding, Mr. Buck, do most other investment advisors use these same methods and techniques in making investment decisions for their clients?

A.     Yes.

Q.     In the documents that Driehaus produced, does -- does that set of documents for the plaintiffs investment in Celsius, does that reflect all of the documentation showing these methods of analysis that

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 38 of
30(B)(6) Driehaus Capital                                    June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 37

you use?

A.     We may not have incorporated the SEC filings.  But I think much of their content would have been duplicated elsewhere.

Q.     Okay.  So as we will see as we go through the deposition, you had in the documents produced by Driehaus, press releases.  You had references to or notes related to analyst reports.  You had stock price information.  You had references to some management calls.  Is that the -- is what was produced to us the sum total of those categories of investment analysis methods?

A.     Yes.

Q.     With respect to the method you used -- you list here at the end, proprietary research, what does that mean?

A.     It refers to any documents that we assemble ourselves.

Q.     Like sort of like?

A.     Written reports.

Q.     That you make yourselves?

A.     Yes.  So I think that would have been included in any of the Word documents that you would have seen amongst the materials that we shared.

Q.     Okay.  The phrase third-party research,

does that reflect -- does that relate to the reports of other analysts in the market who are following Celsius securities during this relevant period?

A.     Yes.  That would be part of it, and then there would also be research or expert interviews and transcripts from companies that knew -- that assemble interviews or transcripts of those sorts.

Q.     Okay.  So besides for the SEC filings, is it fair to say that the set of documents that Driehaus produced regarding its investment decisions on Celsius in 2021 and 2022 are contained in the documents that Driehaus produced to us?

A.     Yes.

Q.     Over on the next page of this Exhibit Number 3, page 12, the first full paragraph starting our process, take a moment to read that, and I will ask you a couple of questions just about that paragraph.

A.     Okay.  Okay.

Q.     So this is a paragraph that describes how you go from, or how Driehaus goes from the universe of stocks that you might invest in to some that you want to more -- that you want to focus more directly and substantially on?

A.     Yes.

Q.    In the third sentence of this paragraph, Driehaus writes, "For each of these companies, an investment thesis is formed that is based on the sustainability of the company's growth and potential inefficiencies in market expectations."

Did Driehaus develop an investment thesis for Celsius?

A.    Yes.

Q.    What was that, or when was that -- when was that investment thesis developed?

A.    I first started looking at the company and doing research in early 2020 and developed the thesis over that time.

Q.    And what is the thesis?  What was the thesis?

A.    Yes.  It was that the company was generating meaningful market share gains in the energy drink category and had the opportunity ahead of them to gain significant distribution, especially as there was a disruption among some of the competitors that would open the door up to Celsius taking market share, and that that potential for growth was not reflected in consensus expectation for revenue growth.

Q.    For purposes of this investment thesis that you developed, was it important to you and Driehaus

Page 40

whether Celsius was making money at that time?

A.    No.

Q.    Okay.  Did that investment thesis remain your investment, or Driehaus's investment thesis throughout 2021 and '22, 2022, which is the period that we are talking about here?

A.    Yes.  Those thesis remains primarily unchanged.

Q.    And did Mr. James agree with that thesis?

A.    Yes.

Q.    Did you -- did Mr. James develop that thesis with you, or did you develop it and present it to him as a recommendation?

A.    It was more me developing the thesis and presenting it to him.

Q.    Did he have any disagreement or input in changing or refining that thesis, or do you generally agree with it?

A.    Generally agree with it.

Q.    Let's go over to page 14 of this Exhibit 3. In the middle of the page of this page 14 of Exhibit 3, there is a heading called Growth Stock Risk.  Do you see that one?

A.    I do.

Q.    Could you read that, and then tell me when

Page 41

you're ready.

A.    Read it.

Q.    So the -- we started the deposition by talking about the small cap growth strategy, and there are various references to growth stocks in your ADV and elsewhere in the documents.  Did Driehaus consider Celsius to be a growth stock?

A.    Yes.

Q.    And is this summary description a fair summary of what Driehaus believes a growth stock is and what risks it presents?

A.    Yes.

Q.    In the third line of this description of growth stock risk, Driehaus writes, "Because investors believe they have more growth potential."

Does growth potential -- what does growth potential mean?

A.    Growth potential refers to the opportunity to meaningfully increase the size of the company's business.

Q.    And then it says, "This potential may or may not be realized."

What does what mean?

A.    That sometimes forecasts for meaningful growth don't end up being accurate, and the company

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 43 of
30(B)(6) Driehaus Capital                          June 12, 2023
209
City of Atlanta Police Officers' Pension Plan v. C

Page 42

doesn't grow.

Q.      So does the reference to growth potential mean that the company you're looking at may not be making money currently, or may not be forecast to make money in the near future, but over the long term, it is hoped or expected that it would be making money?

A.      That is typically an expectation, yes.

Q.      So what would you say are the classic characteristics of a growth stock?

A.      I would say the revenue growth would be 15, 20 percent or higher with expanding margins, growth margins, operating margins, and then earnings growth at a rate faster than revenue growth.

Q.      And when you say earnings growth, what does that mean?

A.      Net income, and the rate at which it grows on a per share basis.

Q.      Is net income always a relevant characteristic to your investment evaluation?

A.      No.

Q.      So does it depend on a particular circumstance or a particular company?

A.      It does.

Q.      And with respect to a particular circumstance or company, might you decide it remains a

30(B)(6) Driehaus Capital                    June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 43

good growth stock investment without regard to whether

it's net income is increasing or decreasing or

changing over time?

     A.     Yes.

     Q.     Go to page 20 of this Exhibit Number 3.

This section of the form ADV, Mr. Buck, discusses

brokerage practices.  It begins by saying that you

were given discretionary authority by our clients.  We

will talk about that in a second in relation to

another document.

          In the third paragraph it says, "It is our

practice when feasible to aggregate or bunch orders in

a single transaction or multiple transactions for the

accounts of numerous clients to facilitate best

execution."

          Do you see that sentence?

     A.     I do.

     Q.     What does that mean?

     A.     That means that we won't buy in separate

transactions for each of the separate accounts or just

a mutual fund, we will bundle them all together in a

single trade or multiple trades, and then the shares

get allocated at the end of the day amongst the

different accounts, based on their AUM or base on

their asset level.

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 45 of
30(B)(6) Driehaus Capital                    June 12, 2023
209
City of Atlanta Police Officers' Pension Plan v. C

Page 44

Q.      About how many -- in 2021, 2022,

approximately how many separate account clients in the

small growth cap strategy did Driehaus have?

A.      I am not sure.

Q.      Is it more than 100 or less than 100?

A.      Less than 100.

Q.      More than 20?

A.      I don't think so.  But I'm not sure.

Q.      Okay.  So just for purposes of my question,

let's assume that it's about 20.  Could you explain

how this bunching or aggregating orders relates, say,

for a decision to purchase a company stock for the

small cap growth strategy?

A.      Sure.  So if we decide to buy -- invest in

a company let's, for example, we will invest 1 percent

of the strategy in that stock, that would mean 1

percent across all of the different accounts.  They

would -- our trade support team would calculate the

number of shares required to buy, and our traders

would go and look to execute that number of shares in

the market.  And then at the end of the day, those

shares would be allocated amongst the different

accounts.

Q.      So if we had -- if you had 20 separate

account clients for this small cap growth strategy on

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 46 of
30(B)(6) Driehaus Capital                            June 12, 2023
209
City of Atlanta Police Officers' Pension Plan v. C

Page 45

a particular day and 1 percent of separate account client A's portfolio is 5 shares of this company stock, 1 percent of client B's is 10 shares, you would go through the exercise of adding all of those shares up for all 20 clients and make one purchase in that company on that day.

A.      It would be one order, but that order might be executed across several different venues, meaning with different brokers or -- or trading platforms.

Q.      But the purpose of the order is to buy 372 shares of stock, if that is the sum total of 1 percent of your 20 separate account clients, right?

A.      Yes.

Q.      Setting aside a particular investment restrictions that a client may have, are there -- are you aware of any instance where the purchaser sale of Celsius stock in the City of Atlanta Fire and Police Pension Plan's accounts was done other than on an aggregated or bunch order basis?

A.      Yes.  It would have happened when they opened their account, because we already owned -- we already invested -- invested in Celsius, and so when they opened their account, there was an initial purchase of the shares to get their account in line with our model portfolios.

Page 46

Q.    Okay.  And other than that initial purchase during the period '21 and 20 -- 2021 to 2022, did -- were there any other instances where Celsius purchasers sales for the City of Atlanta funds was made other than on an aggregate or bunch order basis?

A.    Not that I know of.

MR. SAWICKI:  I think what I'd like to do is just -- let me do one more document, if that's okay with everybody, and then we'll take a comfort break.

BY MR. SAWICKI:

Q.    Is that all right, Mr. Buck?

A.    Sure.

MR. SAWICKI:  Let's -- and we can please pull up Exhibit Number 2, please.

(Defendants' Exhibit 2 was marked for identification.)

BY MR. SAWICKI:

Q.    And, Mr. Buck, can you adjust your camera on your laptop to make it a little more straight on to your face instead of looking up so much?

Yeah, that's better.  That's better.

A.    Good, perfect.

Q.    All right.  Mr. Buck, on the screen is Exhibit Number 2, which is a copy of the investment

Page 47

advisory agreement between Driehaus and the City of Atlanta Defined Benefit Pension Plan Investment Board.

Do you recognize this Exhibit Number 2 as a true and correct copy of that agreement?

A.    I've never read this before, so -- but it looks accurate.

Q.    Is this something that -- is this an agreement Driehaus has formed or the clients formed?

A.    I don't know.

Q.    The first sentence underneath the heading of this agreement reads, "The client, on behalf of the City of Atlanta Police Officers' Pension Plan and the City of Atlanta Firefighters' Pension Plan hereby employees Driehaus."

Based on -- on that statement in this agreement, did you understand that Driehaus's client was the -- the so described investment board that was acting on behalf of both the police and the firefighters pension plans?

A.    Yes.

Q.    So in -- in other words, you had one client investing for two different accounts?

A.    Yes.

Q.    And is this agreement where you would expect to find any investment restrictions that were

Page 48

being imposed by the investment board with respect to limitations on what Driehaus could invest in with those accounts?

A.      I don't know.

Q.      On the second page, paragraph number 3, at the top of this Exhibit Number 2 is the paragraph entitled "Investment Advisory Powers."  This paragraph reads that "Driehaus is authorized to act for the client with respect to the acquisition, retention, management and disposition of such assets the client may designate to the account."

And the account is the investment boards -- or the -- strike that.

The account is the City of Atlanta Police and Firefighters Pension Funds account with Driehaus, right?

A.      Yes.

Q.      And each of the plans had its own account with Driehaus, right?

A.      Yes.

Q.      And those were two separate accounts, and they were -- they were invested in accordance with how Driehaus invests its separate account clients, as we've seen in these documents, correct?

A.      Yes.

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 50 of
30(B)(6) Driehaus Capital                                    June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 49

Q.      The -- this paragraph goes on to read,
"Subject to written instructions, directions of the
client, the provision of this agreement and all
schedules hereto, the client" -- that's the Atlanta
investment board -- "hereby grants Driehaus full and
unrestricted power and discretion to supervise and
direct the investment and reinvestment of the assets
in the account, and to place orders for the execution
of securities transactions as Driehaus deems
appropriate without prior consultation with or
notification to the client."

Did you understand that Driehaus had this
authority to invest the pension plan's money without
getting the prior consultation or notification to the
investment board?

A.      Yes.

Q.      And did you understand that to be in -- in
discretionary authority?  Is that what that type of
authority is generally described in this space?

A.      Yes.

Q.      And do you understand, Mr. Buck, that with
that discretionary authority, comes the duty under the
SEC rules, and this agreement to act in the best
interest of the clients, that is the pension plans?

A.      Yes.

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 51 of
30(B)(6) Driehaus Capital                          June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 50

Q.    And in other words, to -- by entering into this agreement, Driehaus became a fiduciary for the pension plan's assets held in these Driehaus accounts, correct?

A.    I -- I think so.  I'm not sure if we're -- I know there's different fiduciary standards and things in our industry, but I'm not totally on top of all that.

Q.    Okay.  And did you understand that Driehaus had this -- these authorities and responsibilities from the time the pension board signed up as a client, throughout the period that Driehaus has acted as investment adviser?

A.    Yes.

Q.    Does -- do the -- does the pension board, investment board remain a client of Driehaus today?

A.    Yes.

Q.    Has there been any change in that client relationship between the time of the signing of this agreement and today?

A.    I don't think so.

Q.    The next paragraph, Paragraph 4 of this exhibit, Exhibit Number 2, refers or states that "The client's specific investment objectives are set forth on the schedule of investment objectives and

restrictions attached as Schedule A."  And I guess first, before we get to Schedule A, let's go over to the -- the fifth or sixth page of the signature lines -- or signature pages.

Can you confirm, Mr. Buck, that -- that Driehaus entered into this agreement with the City of Atlanta Pension Investment Board on or about September 23, 2021?

A.     Yes.

Q.     And so that's when Driehaus started providing investment advisory services to the board, that date and not before?

A.     Yes.

Q.     The next page after the signature blocks is Schedule A, and this Schedule A is entitled "Small Cap Growth Strategy Account."

Does this statement of investment objectives accurately -- or is this consistent with Driehaus's small cap growth strategy that we've been talking about in this deposition today?

A.     I -- I have not read this Schedule A, but I would imagine that it is consistent.

Q.     And are you aware of any document from or by the City of Atlanta Pension Investment Board that is additional to or different from this Schedule A

Case 9:22-cv-80418-DMM  Document 100-4  Entered on FLSD Docket 06/15/2023  Page 53 of
30(B)(6) Driehaus Capital                    June 12, 2023
209
City of Atlanta Police Officers' Pension Plan v. C

Page 52

concerning any restrictions or different account

investment objectives that the client was imposing on

Driehaus with respect to these -- this investment

account?

A.    No.

Q.    Now, just so everybody is on the same page,

on the last page of this Exhibit Number 2, is

Schedule B to the investment adviser agreement, and

this describes the -- the fees or the way Driehaus is

charging fees for its investment advisory services for

this account, right?

A.    Yes.

Q.    And these fees are charged in accordance

with what Schedule B describes, based on a percentage

of the amount of money in the City of Atlanta Pension

Fund's accounts with Driehaus, correct?

A.    Correct.

Q.    And so over time, if and as the City of

Atlanta Pension of funds accounts grows, Driehaus

makes more money by application of the percentage

reflected on this page to the account values in their

accounts, right?

A.    Yes.

Q.    So Driehaus does better when its clients do

better, is that basically the idea?

A.      Yes.

MR. SAWICKI:  Let stop here for a break and we'll pick up in about ten minutes, 11:40.

THE VIDEOGRAPHER:  The time is 11:33. We're off the record.

(Recess taken.)

THE VIDEOGRAPHER:  The time is 11:40. We're back on the record.

MR. SAWICKI:  Thank you.

BY MR. SAWICKI:

Q.      Mr. Buck, with respect to the last Exhibit Number 2, we had identified that -- that Driehaus signed up City of Atlanta plaintiffs as a -- as clients in September of 2021.  And from your prior testimony, I think you said that you'd identified Celsius as a growth stock investment opportunity back in 2020.

Prior to September 2021, when the City of Atlanta became clients, was Driehaus investing its separate account clients and its mutual fund in Celsius stock?

A.      Yes.  In the microcap and small cap strategies, we were invested.

Q.      Okay.  And it was -- you made that

Page 54

investment decision based on the investment thesis

that you described before we took a break, right?

A.     Yes.

MR. SAWICKI:   Let's look at next

marked Exhibit Number 18.

(Defendants' Exhibit 18 was marked

for identification.)

BY MR. SAWICKI:

Q.     Mr. Buck, can you identify Exhibit

Number 18 as a copy of one of the printout -- a

printout of one of the Microsoft team's chat that you

had with your colleague Jeff James on June 24, 2021?

A.     Yes.

Q.     And is this a typical example of the sort

of chat communication that you and Mr. James would

engage in and talking about investments and making

investment decisions?

A.     Yes.

Q.     So on this June 24, 2021, chat, you

write -- and by the way, just so we're clear, the way

these messages are printed on this printout page, is

they're in chronological order from top to bottom.  So

the first message, the earliest message is on top, and

then Mr. James responds and then sends a further

response, correct?

Case 9:22-cv-80418-DMM  Document 100-4  Entered on FLSD Docket 06/15/2023  Page 56 of
30(B)(6) Driehaus Capital                                    June 12, 2023
209
City of Atlanta Police Officers' Pension Plan v. C

Page 55

A.      Yes.

Q.      So on this Exhibit Number 18, you write on June 24th, in -- in the afternoon -- oh, and -- and also, by the way, the timestamp above your name in this message, that's UTC time, which is Universal Coordinated Time.  In other words, Greenwich Mean Time.  That's the time in London, England.

Does that make sense to you?

A.      Yeah.

Q.      And so Chicago time, where you are and where you were when you were doing these chats in 2021, that would be six hours earlier in the day from the time in London at that time -- at that day, right?

A.      Okay.  Yes.

Q.      So that would be sometime in this time stamp of your first message 4:19 p.m. UTC time is 10:19 in the morning Chicago time just to level set where we are.  Okay?

A.      Okay.

Q.      So that morning on June 24th, you write to Mr. James, "CELH," that by the way, is the ticker symbol for Celsius holding stock, correct?

A.      Yes.

Q.      And in your chat, you recommend that, "You can trim a little in micro if we need cash since it

will be coming out of bench and it's had nice move since secondary pricing.  Also comfortable doing nothing."

By that chat, you are suggesting to Mr. James that you could trim a little Celsius position.  That means that you can sell some of the Celsius stock, right?

A.     Yes.

Q.     And what was -- what was the purpose or the basis for the investment recommendation to sell some Celsius stock in the microcap strategy portfolio on that date?

A.     Based on the message, it was that we may need to raise cash for other investment ideas, and that the stock has appreciated meaningfully, since it priced a secondary.  And that the index, so in this case since we are talking about the microcap strategy, the index or the benchmark that we are trying to outperform is the Russell microcap growth index, it was a large weighting at that time in that index, and at the end of June, the index rebalances, and so that weighting in the microcap index was going to come way down, I think to zero, and so our -- the net weighting, in terms of our position relative to the index, that weighting size would increase materially.

Page 57

Q.    So none of those reasons, needing more cash for the portfolio, your reference to the weighting and the index that you're benchmarking against, and it's stock price performance, none of those had anything to do with whether the company was making money at that time, right?

A.    Yes.

Q.    And in response to your recommendation, Mr. James says, "I lean towards doing nothing as it has classic growth characteristics but acknowledging the exchange in that it is a spaz stock."

So based on the basis for -- excuse me, strike that?

In view of the reasons you gave Mr. James for suggesting that you might trim a little Celsius stock on June 24th, his preference was to do nothing, right?

A.    Yes, that is correct.

Q.    And the same as your -- the basis for your recommendation being needing cash, references to the benchmarking and all of those other reasons, his decision or his response to you was based not on whether the company was making money or not at that time, but because it had classic growth characteristics, correct?

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 59 of
30(B)(6) Driehaus Capital                                              June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C
209

Page 58

A.      Yes.

Q.      Let's go to the next Exhibit Number 19.

(Defendants' Exhibit 19 was marked for identification.)

BY MR. SAWICKI:

Q.      Do you have that?

A.      Yes.

Q.      Mr. Buck, do you recognize Exhibit Number 19 as a true and correct copy of an e-mail exchange on July 15th, 2021, that you were involved in with some of your colleagues at Driehaus?

A.      Yes.

Q.      And if you go to the second page, unlike the Microsoft Teams chat, these e-mail printouts are kind of done in reverse order, so the oldest and the first message in the e-mail chain is at the bottom of the document rather than the top, right?

A.      Yes.

Q.      So the first e-mail here is from Carrie O'Donnell on July 14th.  Carrie is a director of marketing and corporate development at Driehaus; isn't that right?

A.      Yes.

Q.      And she is asking you for authorization or information for one of her marketing pieces that she

Page 59

was preparing in July of 2021, correct?

A.    Yes.

Q.    And you responded to her with information about the top two contributors, the bottom two contractors, largest outright buy and largest outright sell.  What is the top two contributors reference to?

A.    The two stocks that contributed the most to our returns for that period of time.

Q.    And can you tell from this e-mail what period of time we are talking about?

A.    If you scroll up and I can see the subject, I can probably tell you.  No.  So we -- I'm not sure for this e-mail.  It might have been for the quarter ending July or June 2021, or it could have been for the month of June.  We do these monthly and quarterly.

Q.    So your e-mail confirms that during the period of time, whenever it was, up to the end of June 2021 one of the top contributors to the performance of Driehaus's small cap growth strategy was Celsius holdings, right?

A.    Yes.

Q.    In other words, that that is one of the best investments that Driehaus had made for its clients in this period of time?

A.    Yes.

Page 60

Q.    And that investment was based on the investment thesis that you described earlier, and then your analysis of the company's performance and prospects in the market and so forth in the time leading up to July 2021, correct?

A.    Yes.

Q.    And in the paragraph that relates specifically to Celsius, you describe the reasons you think that, or Driehaus thinks that Celsius was one of its best performing investments, correct?

A.    Yes.

Q.    Let's go to the next document, Number 20.

(Defendants' Exhibit 20 was marked for identification.)

BY MR. SAWICKI:

Q.    Mr. Buck, can you identify Exhibit Number 20 as a true and correct copy of your July 27th, 2021, chat with Mr. James about Celsius?

A.    Yes.

Q.    And this -- this message simply is from you to Mr. James, CELH, NLSN continues to be bigly, and I take it that bigly is an investment term?  Just so we are clear, what does bigly mean?

A.    It's a positive adjective that it is doing very well, their business is strong.

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 62 of
30(B)(6) Driehaus Capital                                           June 12, 2023
209
City of Atlanta Police Officers' Pension Plan v. C

Page 61

Q.    And can you tell me what the acronym NLSN refers to?

A.    Yeah, that refers to Nielson scanner data, so it shows you what the retail sales performance of the company's products are at Wal-Mart, Target and other large retail chains.

Q.    Okay.  And beneath your message, it looks like you clipped a little table of some sort, YOY sales growth, that means year over year sales growth?

A.    Yes.

Q.    And the table compares the sales growth of energy drinks, including coffee and tea, the sales growth of that whole group to Celsius, right?

A.    Yes.

Q.    And it shows for the 4 months, 5 months that we are talking about that Celsius is grown -- sales growth has been a lot higher than energy drinks as a whole?

A.    Yes.

Q.    And this metric of sales growth has nothing to do with whether Celsius was making money at that time, right?

A.    Yes.

Q.    All right.  Let's go to the next Exhibit 21.

Case 9:22-cv-80418-DMM  Document 100-4  Entered on FLSD Docket 06/15/2023  Page 63 of
30(B)(6)209 Driehaus Capital                                    June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 62

(Defendants' Exhibit 21 was marked

for identification.)

BY MR. SAWICKI:

Q.      Mr. Buck, Exhibit Number 21, could you

explain what this is?

A.      Yep.  This is our morning notes.  So every

morning, each sector analyst reviews the news flow for

the companies in which we are invested and publishes a

morning note that will encompass all of the companies

that we had news that we find somewhat important that

day.  That gets published into our internal research

notes database and gets compiled into a document that

then the rest of the team can view.

So this morning, there was an earnings

report, it looks like, from Celsius, and this was my

brief summary of that earnings report.

Q.      Okay.  And the -- the morning note begins

with the company's ticker symbol, and then it has an

arrow up.  Does that arrow up mean anything?

A.      No.  That is just -- it allows our system

to process that stock.  You have to put an arrow after

it.

Q.      Okay.  And so in this morning note, you

listed, excuse me, certain of the information that

Celsius provided, but not all of the information that

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 64 of
30(B)(6) Driehaus Capital                    June 12, 2023
209
City of Atlanta Police Officers' Pension Plan v. C

Page 63

was provided by Celsius on that day, right?

A.    Yes.

Q.    And I take it that you focussed on the things that you thought were most important, or the things that you generally look at?

A.    Yes.

Q.    And do I understand that it was your practice and Driehaus's practice to make these notes every time that something of significance came up related to one of the companies that you're invested in, in the small cap growth strategy?

A.    Yes.

Q.    And so then this was one of the data points or sources of information that provided your -- the basis for your analysis of whether to make -- strike that.

So this note evidences one source of information that Driehaus used to make investment decisions?

A.    Yes.

Q.    And it became part of its methodology or analysis base, right?

A.    Yes.

Q.    Let's go to the next Exhibit Number 22; is that right?

30(B)(6) Driehaus Capital                                June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 64

(Defendants' Exhibit 22 was marked for identification.)

BY MR. SAWICKI:

Q.      Mr. Buck, do you recognize this as an e-mail chain where you're forwarding some information from Celsius to your colleague Jeff James on September 7, 2021?

A.      Yes.

Q.      And Celsius forwarded to you a CNBC -- CNBC press release or something describing stocks of the decade in September of 2021, what is that a reference to?

A.      They were highlighting the top performing stocks over the last 10 years.

Q.      And it reflects that Celsius is the second best performing stock of the 10 years, leading up to September 2021, right?

A.      Right.

Q.      And that total return is based solely on the price of the stock increasing over that period of time?

A.      Yes.

Q.      And if you go to the second page of the document under the big -- yeah, under that graph there, the second paragraph reads, "Energy drink maker

Page 65

Celsius holdings is up 31,452.2 percent in a decade. The company now sells it's beverages as 82,000 U.S. locations at places like Kroger, CVS, Rite Aid and SpeedWay.

In your estimation, Mr. Buck, does this paragraph accurately comprise the main reason that Celsius has -- its stock price has increased so dramatically over the previous 10 years?

A.     No, it doesn't really explain why the stock has appreciated.

Q.     At this point in time -- strike that.

At this point in time, why did you believe the stock had appreciated so dramatically?

A.     Because their sales growth had accelerated meaningfully, and they had gained a lot of new distribution, relative to where they were at the beginning of those 10 years.

Q.     Anything else?

A.     I think those are the two primary things.

Q.     Okay.

MR. SAWICKI:  So -- all right.  Let's do one more.  Exhibit 23.

(Defendants' Exhibit 23 was marked for identification.)

BY MR. SAWICKI:

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 67 of
30(B)(6) Driehaus Capital
209
June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 66

Q.      Mr. -- Mr. Buck, can you confirm that Exhibit Number 23 is a true and correct copy of a Microsoft Teams chat exchange between you and Jeff James on September 21, 2021?

A.      Yes.

Q.      And in this chat, you provide information to Mr. James concerning Celsius cranking out strong scanner data below.  And the scanner data that you've reflected in the table that you plopped in here are dollar sales, year-over-year sales growth and dollar -- dollar share, correct?

A.      Yes.

Q.      And this is the same sort of comparators between Celsius Holdings' performance on sales growth, dollar sales, et cetera, with the energy drink category?

A.      Yes.

Q.      And it shows that Celsius has dramatically outperformed the energy drink category as a whole by -- on these metrics, right?

A.      Yes.

Q.      And these metrics have nothing to do with whether Celsius was making money at that time, correct?

A.      Yes.

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 68 of
30(B)(6) Driehaus Capital                    June 12, 2023
209
City of Atlanta Police Officers' Pension Plan v. C

Page 67

MR. SAWICKI:  This one's Exhibit 24;

is that right?

BY MR. SAWICKI:

    Q.    Let me show you Exhibit 24, Mr. Buck.

        (Defendants' Exhibit 24 was marked

for identification.)

BY MR. SAWICKI:

    Q.    Mr. Buck, this is Exhibit Number 24.  Take
a look at it and tell me if you've seen it before.
I -- I kind of doubt you have, but I want to use it to
set -- set the stage a little bit, in any event.

    A.    Okay.  I have not seen this before.

    Q.    Okay.  I'll represent to you that this is a
copy of a letter that the City of Atlanta Pension
Board sent to LMC -- LMCG Investments on September 30,
2021.

        Do you know who LMCG Investments is, or
was?

    A.    No.

    Q.    Okay.  I'll represent to you that LMCG was
an investment advisor for the City of Atlanta Pension
Funds in the small growth -- small cap growth strategy
part of its portfolio prior to Driehaus.  Okay?

    A.    Okay.

    Q.    And this letter reflects that effective

Page 68

September 27, 2021, LMCG Investments has been

terminated of its investment management services as it

pertains to small growth, small cap growth accounts,

et cetera.

Does that jive with your memory that

Driehaus became the City of Atlanta Pension Fund's

investment advisors for small cap growth right around

the end of September 2021?

A.     Yes.

Q.     The letter at the bottom is copied to

Jesus Jimenez at Marquette Associates.

Do you know who Marquette Associates is, or

was?

A.     Yes.

Q.     What are they?

A.     The consultant that advises various pension

funds and other investors on the selection of

investment managers.

Q.     Does Driehaus -- or in 2021, did Driehaus

have any sort of contractual relationship with

Marquette?

A.     I don't know.

Q.     Does -- did Driehaus, did it provide

services to Marquette?

A.     I don't know.

Page 69

Q.      Did it pay any money to Marquette?

A.      I don't know.

Q.      Did Driehaus interact with Marquette as part of Driehaus's efforts to market and gain clients?

A.      Yes.

Q.      How did it do that?

A.      Marquette would have been present typically, in any sales or marketing meetings with clients that they represent and we were meeting with. They would have also recommended us as a potential investment option to certain clients.

Q.      Do you know the basis on which they, Marquette would recommend Driehaus to certain of its clients?

A.      Yes.  They do a lot of research on our investment team and our capabilities and our track record, and if they determine that we are an attractive manager for one of their clients, they'll recommend.

Q.      Did Driehaus make any -- how did the opportunity to become an investment advisor for the City of Atlanta Pension Funds come to Driehaus's attention?

A.      I don't know.

Q.      Did Driehaus make any presentations to the

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 71 of
30(B)(6) Driehaus Capital                                   June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 70

City of Atlanta Pension Investment Board before being

selected as investment advisor in September '21?

    A.      There were definitely meetings.  I don't

know if there was a formal presentation to the board.

    Q.      Do you know who on behalf of Driehaus

participated in those meetings?

    A.      It would have been Jeff James and

David McElroy.

    Q.      Do you know how many meetings there were?

    A.      I don't.

    Q.      Do you know what was communicated during

those meetings in terms of Driehaus's track record,

investment strategy, or top performing stocks?

    A.      No, I do not.

    Q.      Do you know whether -- whether Driehaus

prepared a response to a request for proposal or RFP

in connection with its effort to get hired by the City

of Atlanta?

    A.      I do not.  We do that typically, for most

clients, so I wouldn't be surprised if we did, but I

don't know specifically.

    Q.      Did -- strike that.

            Do you know whether Marquette provided

Driehaus with any information or input as to the

nature of the investment strategy, the particular

Page 71

types of stocks or any other aspect of the pension fund's hopes and desires for its investments as part of this process?

A.    No.   Marquette would not have had any influence over the investment process or strategy.

Q.    So is it fair to say that to your understanding, Marquette simply performs its own analysis of your capabilities and track record and makes recommendations to clients such as City of Atlanta, based on its -- that analysis?

A.    Yes.

Q.    Does Marquette drill own into the particular stocks that make up a -- an investment portfolio, investment strategy portfolio that Driehaus does, or simply look at the overall performance of the portfolio?

A.    I don't know.

Q.    Do you know whether Driehaus -- strike that.

Do you know whether Marquette makes any of its own analysis of any of the stocks that Driehaus has put its clients in for these various strategies?

A.    I don't know.

Q.    Have you ever communicated with Marquette during this time frame about anything?

Page 72

A.      I believe I would have, but I am not sure.

Q.      Can you give me any sense for the sorts of topics or information you had discussed with Marquette?  You would have discussed with Marquette?

A.      Yeah, when Marquette would have been doing their diligence on us, or potentially doing update calls, we would have been speaking to them about the performance of the strategy, how we construct our portfolios, the investment philosophy and process.

Q.      Okay.

COURT REPORTER:  Counsel, can we go off the record for a second.  Something is going on with my software.

THE VIDEOGRAPHER:  The time is 12:15.
We are off the record.

(Off the Record, Technical difficulties.)

THE VIDEOGRAPHER:  The time is 12:19.
We're back on the record.

MR. SAWICKI:  Thank you.

BY MR. SAWICKI:

Q.      Mr. Buck, just to help me understand some logistics and mechanics, if you don't mind, I'm looking at Exhibit 24 in the middle, where it talks about certain Northern Trust accounts, and then the

Page 73

services of Vertas Brokerage Consulting to oversee the transition of the portfolio.

Q.    Do you have an understanding of -- of those mechanics and logistics concerning the transfer of a portfolio from one investment advisor here, LMCG to Driehaus?

A.    Yes.  I have some understanding of it.

Q.    Could you explain that, please?

A.    So Northern Trust would have been where the investments that LMCG was making on behalf of the City of Atlanta, where those investments were held, and then Vertas Brokerage would've been the one taking that portfolio and -- that was created by LMCG and making the buys and sells necessary to bring it in line with the -- the Driehaus investment strategy.

Q.    Okay.  So do -- did Driehaus provide Vertas Brokerage Consulting with the list of the stocks that it had in its small growth, small cap growth strategy and the percentages of the portfolio that were in each of those stocks and asked Vertas to automatically liquidate the City of Atlanta's portfolio from the LMCG portfolio and put it into the Driehaus small cap growth strategy stocks?

A.    Yes.  We would typically provide a transition portfolio manager with that list of

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 75 of
209
30(B)(6) Driehaus Capital                               June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 74

securities in weightings.

Q.    And so that's -- that's an example, that's the example in this case of a new client of Driehaus being put into a set of stocks that's -- well, strike that.  Never mind.

MR. SAWICKI:  All right.  Let's go to the next document, which is Exhibit 5.

(Defendants' Exhibit 5 was marked for identification.)

BY MR. SAWICKI:

Q.    Mr. Buck, this Exhibit Number 5 is a copy of Northern Trust reports provided from the City of Atlanta Pension Funds, reflecting transactions and Celsius stock, the first couple of pages at least.

Does this refresh your memory that on October the 1st, the trade date, either Driehaus or maybe Vertas, on behalf of Driehaus, caused the Atlanta -- City of Atlanta Pension Fund money to be invested in 9876 shares of Celsius?

A.    Yes.

Q.    This would have been the Atlanta police fund.

And then the second page is a page related to the Atlanta Fire Pension Fund account, and it likewise shows that on October 1st, Driehaus or

Page 75

Vertas, on Driehaus's behalf, caused the Atlanta Fire Fund to be invested in 9,188 shares of Celsius stock?

A.     Yes.

Q.     And that is part of this automatic process that you described or transitioning from the former investment advisor to Driehaus, correct?

A.     Yes.

Q.     And Driehaus's decision to cause the investment, the -- the monies of the Atlanta pension funds be invested in Celsius was based on the fact that you had identified Celsius as a good growth stock potential in 2020, and you watched it perform throughout 2020 and 2021, and it was a top contributor to the performance of Driehaus's portfolio in 2021, and your investment thesis remained viable, as best you can tell, based on all the work you were doing, right?

A.     Yes.

Q.     And the City of Atlanta had no input on that specific decision, that is the decision to invest in Driehaus.

So it was solely Driehaus' decision, correct?

A.     Yes.

MR. SAWICKI:  Exhibit 4.

(Defendants' Exhibit 4 was marked for identification.)

BY MR. SAWICKI:

Q.    Mr. Buck, this Exhibit Number 4 is an Advent Report.

Do you recognize who or what Advent is?

A.    Advent, I believe, is our accounting system.

Q.    Okay.  So it's a -- is that a Driehaus internal system?

A.    Yep, yes.

Q.    Does this particular report basically show the purchase and sales of Celsius stock in the Atlanta Police pension plans account during 2021 and 2022?

A.    Yes.

Q.    And so on the first page at the top, it's all the purchases in that period of time that were made in Atlanta funds -- Atlanta Police Officers' funds account in Celsius, right?

A.    Yes.

Q.    So some of these dates will become important as we go through the rest of the documents, and because we are logistically, you know, we are remote and pulling up documents, try to keep in your mind as best you can, these purchases so we can relate

them to what is happening later on in the case.

So the first purchase -- we saw the first purchase in the last exhibit of the 9,000 some odd shares on October the 1st.  This reflects some additional purchases of Celsius on October 8th.

Do you see that at the top?

A.    Yes.

Q.    And is that -- can you tell whether that is part of the initial transition of the portfolio from LMCG to Celsius, or is that another -- was that a program purchase, that is a purchase for the portfolio that the City of Atlanta was a part of?

A.    I don't remember for certain, but the trade is so small in terms of the quantity, relative to the initial purchase, I'm guessing it was more just to rebalance the portfolio to get it in line.

Q.    Okay.  So we have that first set of purchases in October of 2021, okay?  This report reflects that the next purchase that Driehaus caused to be made in the Atlanta police account was May 19th of 2022, right?

A.    Yes.

Q.    And then there is another purchase in November 2022, and then a few purchases on December 8 th, 2022.  Okay?

Page 78

A.      Yes.

Q.      Try to keep in the back of your mind as we go through the rest of the documents.  So we basically have four different times in the relevant period when Driehaus sided to buy Celsius for the City of Atlanta's police officers account, October 2021, May 19th, 2022, November '22, and December '22.  Okay?

A.      Okay.

Q.      If you go on down at the bottom of the first page and onto the second page, it reflects various dates on which some portion of the Celsius holdings of the Atlanta Police funds were sold, right?

A.      Yes.

Q.      And we will talk about some of those in more detail.  But I take it some of those were based on some things that were happening, specifically with respect to Celsius, and some were done for rebalancing the portfolio purposes; is that a fair summary?

A.      When looking through the sales, I didn't see any that were done for rebalancing purposes. Those would only have happened if there were inflows or outflows from that account.

Q.      Could you explain that a little more, what you mean by that?

A.      Yeah, if money was added to either of the

pension accounts or taken out of either of the pension accounts, there would have been some automated purchases or sales to maintain that portfolio in line with the model strategy.  And in looking through these purchases and sales ahead of this deposition today, I didn't see anything that was automated in that sense. Everything was driven by Jeff and I.

Q.     All right.  I'm glad -- I'm glad you mentioned that.  I just want to get a little more clarity about that.

That is one type of rebalancing.  I guess to be more clear, my question was more directed to Driehaus's decisions to evaluate the portion of a portfolio that was invested in Celsius stock and change that percentage in accordance with the overall investment guidelines that we looked at in one of the earlier documents.  Do you know what I mean?

A.     Yes.

Q.     What do you call that?

A.     That would be to our everyday trading, that is what we do.

Q.     But I'm focussed on the times when you make those trades, not because of anything happening with Celsius stock, but rather in reaction to either its increase in stock price or decrease in stock price to

Page 80

get in line with the rest of the portfolio?

A.    Yeah.  I guess there is -- were not -- I'm not explaining myself well enough there.  We -- when we are talking about getting a stock in line with the rest of the portfolio, that is what I -- that is what we talk about when we say rebalancing.  Meaning for whatever reason that weighting in the particular account and the particular stock gets out of line with what our model portfolio is.  Every other trade that we make is based on some compilation of stock specific or industry or market based factors.

Q.    So are there any -- we talked about rebalancing for new money coming in, that is separate.

A.    Yeah.

Q.    You use the word weighting, just in this last answer you gave me.  Are there any trades based on this weighting idea, weighting within the portfolio that are done without regard to what is happening with Celsius stock, just to get the weighting right?

A.    No.  And the only circumstance would be if the size of the business -- the position in portfolio became large enough where it would actually be above certain guidelines that we communicate with our clients, like over 3 percent of the portfolio or something like that.

Page 81

Q.    Okay.  I think I understand now.  And as best we can tell and based on your review of this particular stock trading history that didn't happen here with regard to Celsius stock, right?

A.    Right.  Yes.

Q.    Okay.  And just so the record is clear, take a look at Exhibit Number 11?

(Defendants' Exhibit 11 was marked for identification.)

BY MR. SAWICKI:

Q.    As you see, when it comes up, this is another Advent Report, but this is for the firefighters' pension plan, purchases of sales of Celsius stock during the relevant period.

Okay.  Just for really for your benefit, Mr. Buck, I'm showing you Exhibit Number 11, which is the Advent report on this Atlanta fire pension fund account.  And as can you see, it shows that you're making the purchases of Celsius holding stock for the Atlanta fire account on the same days and in the same relative amounts as you were doing in the Atlanta police fund.  Does that make sense to you?

A.    Yes.

Q.    So the next exhibit I want to show you, and I don't think we are going to use it, but just in case

Page 82

we need it, do you recognize Bloomberg as an
authoritative source for public company stock daily
stock prices?

A.      Yes.

Q.      The closing price each day?

A.      Yes.

Q.      And is that -- is the Bloomberg something
that you refer to in doing your work as an investment
advisor for this purpose or for that information?

A.      Our team uses FactSet.

        (Reporter Clarification.)

A.      We use FactSet, F-A-C-T-S-E-T.

Q.      And is it your understanding that FactSet
and Bloomberg gather the same information as to daily
stock prices of Celsius stock?

A.      Yes.

Q.      So they are interchangeable sources of this
information?

A.      Yes.

Q.      And both equally reliable?

A.      Yes.

Q.      So this is a -- this is a summary that was
prepared by one of my assistants, so I will represent
to you that it is -- comes directly from Bloomberg,
and it lists the daily closing price of Celsius

Page 83

holding stock on all of the trading days from January

4th, 2021 through December 30th, 2022.  Okay?

A.     Yes.

Q.     And then the next exhibit.

(Defendants' Exhibit 26 was marked

for identification.)

BY MR. SAWICKI:

Q.     Mr. Buck, I will represent to you that this

Exhibit 26 is simply a line graph that charts the

daily stock prices that are listed in Exhibit Number

25 from Bloomberg over this same period of time,

showing how the stock price moved over time.  Is that

something that you're familiar with generally?

A.     Yes.

Q.     Is this sort of chart a line chart or graph

that you might use or refer to in doing your

investment advisory work?

A.     Yes.

Q.     Let's go to the next exhibit.

(Defendants' Exhibit 27 was marked

for identification.)

BY MR. SAWICKI:

Q.     Mr. Buck, do you recognize Exhibit Number

27 as an e-mail from Sarah Greene of Driehaus, to

people at Marquette Associates, and attaching a

Case 9:22-cv-80418-DMM  Document 100-4  Entered on FLSD Docket 06/15/2023  Page 85 of
30(B)(6) Driehaus Capital 209                                     June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 84

Driehaus performance update?

A.    I have not seen this before.

Q.    You identify Tom Seftenberg as relationship management person.  Is it your understanding that as part of Driehaus's normal activities, that it would provide a monthly performance update to Marquette for the Atlanta police and fire funds accounts?

A.    Yes.

Q.    And if you go to the second page of the -- this Exhibit 27, does this month-end summary of Driehaus's investments for the Atlanta fire pension plan, does that look familiar to you?

A.    No.  I have not seen this before.

Q.    Okay.  This page of the month end summary shows a pie chart with various colors, and then immediately below that, it has the top 10 holdings.  I take it that this list is the top 10 holdings of stocks in the Atlanta fire pension plans separate account managed by Driehaus as of 10/31/21, right?

A.    Yes.

Q.    One of those top 10 holdings is Celsius holdings, right?

A.    Yes.

Q.    And as of 10/31/21, the stock had lost just a little bit of value, $9,749 from the time of

Case 9:22-cv-80418-DMM Document 100-4 Entered on FLSD Docket 06/15/2023 Page 86 of 209
30(B)(6) Driehaus Capital                                    June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 85

purchase in earlier October through the end of the month, right?

A.    Yes.

Q.    And turning to the next page, this page shows a month end summary for the Atlanta police funds account.  And it likewise shows that Celsius holdings was a top 10 holdings for the Atlanta police funds account as of October 31, 2021, and that position had experienced a small loss, a $10,000 loss, between when it was purchased in early October and the end of the October month, right?

A.    Yes.

Q.    Besides for well -- strike that.

Besides for this exhibit, which came from Driehaus, and it appears to reflect performance update to Marquette Associates, are you aware of any other report or communication that is prepared by Driehaus and sent to Marquette regarding the investments of the Atlanta police and fire funds?

A.    I don't know.

Q.    Are you aware of whether there were any other communications from Driehaus to -- directly to the City of Atlanta pension board, or the fire firefighters funds or the police fund concerning Driehaus's investments for the Atlanta police and fire

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 87 of
30(B)(6) Driehaus Capital                                    June 12, 2023
209
City of Atlanta Police Officers' Pension Plan v. C

Page 86

funds during this period of time?

A.    I don't know.

Q.    Do you know if from the October 2021 when Driehaus started investing the Atlanta pension funds money in this small cap growth strategy through December 31, 2022, do you know if Driehaus ever communicated directly with the pension funds about any aspect of the investments?

A.    I don't know.

Q.    Do you know if the Atlanta pension funds ever communicated directly with Driehaus about any of the investments in the pension funds accounts?

A.    I don't know.

MR. SAWICKI:  If it's okay with the group, I'd like to go maybe 15 minutes further, get through a couple more documents and then take a lunch break.

Does that suit?

THE WITNESS:  Yes.

MR. SAWICKI:  Okay.  Let's look at the next exhibit, please.

(Defendants' Exhibit 28 was marked for identification.)

BY MR. SAWICKI:

Q.    Mr. -- Mr. Buck, I represent to you that

30(B)(6) Driehaus Capital                                   June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 87

this Exhibit 28 is a printed out copy of an SEC filing

for Celsius that was dated November 12 of 2021.  And

related to form 8-K that the company filed.

                Is this the sort of SEC filing that you're

familiar with in your investment advisory work?

        A.      Yes.

        Q.      And is part of the information that you

access and use in making investment -- investment

decisions on behalf of your clients?

        A.      Yes.

        Q.      And are you -- when you make an investment

in a stock like Celsius, do you have some sort of

system or setup that allows -- that alerts you to

these filing, SEC filings like automatically?

        A.      Yes.

        Q.      Okay.  So during the period of time,

October 2021, when you first purchased Celsius stock

for the Atlanta Police and Fire Funds through

December 31, 2022, did Driehaus -- was Driehaus

alerted to, and did it have access to all of the

company's SEC filings?

        A.      Yes.

        Q.      Okay.  And you use that as part of its

work?

        A.      Yes.

Page 88

Q.     This -- this form 8-K announces Celsius

issuance of a press release releasing credential

results for the third quarter and announcing a

conference call with management, and it attaches a

November 11, 2021 press release, right?

A.     Yes.

MR. SAWICKI:  And let's go to the

next exhibit.

(Defendants' Exhibit 29 was marked

for identification.)

BY MR. SAWICKI:

Q.     If you scroll down to the bottom, this is

Exhibit Number 29.  Mr. Buck, you'll see the reference

to the DCM labels that we've included.  So I'll

represent to you that this -- this document came from

the -- the DCM documents that were produced to us.

Do you recognize this as a copy of the

Celsius Holdings November 11, 2021, press release

announcing third quarter 2021 financial results for

the company that was in Driehaus's file?

A.     Yes.

Q.     And was it Driehaus's practice to get and

keep and review these Celsius press releases as part

of its investment advisory work?

A.     Yes.

Page 89

MR. SAWICKI:  All right.  And if we -- we have to come back to the beginning for the moment, if we could jump to the last page of this exhibit.  Scroll up just a little bit.

BY MR. SAWICKI:

Q.    So if you look -- and I'm trying to do this as efficiently as possible.

MR. SAWICKI:  Go up to the previous page, the previous page before that.

BY MR. SAWICKI:

Q.    If you see there, this -- this would be the page that labeled 2494 at the bottom.  I'll represent to you that's the last page of Celsius's press release on November 11, 2021.  And then following that are two, it looks like, Word document pages.  And they were produced right after the press release.

Can you explain what these two pages are?

A.    Those would have been my notes from the quarterly earnings report, and then a meeting that I had with the company on December 16th.

Q.    So was it your practice, then, to access the company's press release, review and analyze it and make some notes of the things that you thought were important as part of your effort to keep track of the

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 91 of
30(B)(6) Driehaus Capital                                    June 12, 2023
209
City of Atlanta Police Officers' Pension Plan v. C

Page 90

Celsius stock investment?

A.    Yes.  So this would have been notes from that press release, but also the earnings conference call.

Q.    Okay.  And was it your practice, then, to participate in the earnings conference calls for various investments that you had in the small cap growth strategy?

A.    Yes.

Q.    And is this the sort of information that you would use in making investment decisions for the Atlanta Fire and Police Funds.

A.    Yes.

Q.    So the section above on this page, 2495, above where it's -- it has notes about the meeting of December 16, 2021, this top part on the first page reflects the notes of the things that you thought were notable or important that were in the November 11, 2021 press release, right?

A.    Yes.  The press release and the conference call.

Q.    So the things that -- yeah.  And I'm -- put the conference call aside for the moment and just focus on the press release part.

So the things that you thought were

Page 91

important in evaluating Celsius as an investment, it included its revenue numbers, first bullet; GM, which is gross margin, right?

A.    Yes.

Q.    EBITDA, which is 10.1 versus 8.6.  And we'll come back to that in a minute.

EPS, is that earnings per share?

A.    Yes.

Q.    And that particular entry shows that earnings per share went down versus what was expected or estimated, or it was service less than what was expected or estimated, right?

A.    Yes.

Q.    So that's not as good -- that's not as good, that's worse than everybody expected, correct?

A.    Yes.  That's right.

Q.    And then another important thing that you -- or thing that you thought was important was the inventory, the cash distribution DSD.

What is DSD?

A.    Direct store delivery.  It's a distribution network that services retail doors around the country.

Q.    Okay.  Then adding can suppliers, venue notes, scale can help offset cost increases.

What does that mean?

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 93 of
30(B)(6) Driehaus Capital                                                 June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C
209

Page 92

A.      That as the company grows, that some of the pressures from particularly higher aluminum costs would be offset by just a larger revenue base.

Q.      Then you write, "Pricing under evaluation." What does that mean?

A.      It means the management indicated that they were considering raising prices.

Q.      That's prices of their products, right? That's not prices of the stock or anything else?

A.      Yes.

Q.      And then protein bar is another product they would come out with, I guess?

A.      Yes.

Q.      All right.  So just looking at your notes -- well, strike that.

Okay.  Let's talk about that -- that EBITDA number.  Go back to the previous page, 2494.  That's the --

MR. SAWICKI:  Can you blow that up?

Yeah, thank you.

BY MR. SAWICKI:

Q.      That's the last page of the press release and it's entitled "Reconciliation of Non-GAAP Financial Measures."

What's your understanding, Mr. Buck, of

what this page is trying to depict?

A.     It's the company's presentation of how they would reconcile net income, which is GAAP accounting measure to an adjusted earnings metric that is non-GAAP adjusted EBITDA that they would communicate to investors that they believe is more reflective of the underlying performance of the business.

Q.     Okay.  And is the non-GAAP adjusted EBITDA something that you consider important in evaluating the merit of this Celsius investment?

A.     Yes.

Q.     And is that because -- well, tell me why that's a -- that's an important metric?

A.     Because GAAP net income can include a lot of nonoperational items that will impact that number that can make it less reflective and less useful for how the business is performing.

Q.     And is how the business performing -- is performing, is that the key question that you're focussed on in deciding whether to buy or sell Celsius stock?

A.     Yes.

Q.     So on this page, this reconciliation of non-GAAP financial measures page, it starts with the net income figure, and according to this press

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 95 of
30(B)(6) Driehaus Capital                                          June 12, 2023
209
City of Atlanta Police Officers' Pension Plan v. C

Page 94

release, the company's net income went down from 2020 to 2021, right?

A.      Yes.

Q.      And -- but if you add back or deduct certain items, it reaches this non-GAAP adjusted EBITDA number, which shows that the EBITDA went up from 2020 to '21, correct?

A.      Yes.

Q.      And are the things being add -- added back to or deducted from net income the sort of nonoperating expenses that are intentionally being excluded in order to get a truer picture of the company's operating performance?

A.      Yes.

Q.      And -- and so these are the -- the sort of things that are not important to you in evaluating Celsius as investment in terms of its growth potential as part of this growth strategy, right?

A.      We -- we don't ignore them, but yes, they are less important.

Q.      Okay.

MR. SAWICKI:  I guess let's do one more and then we can stop.  What number is this, 30?

(Defendants' Exhibit 30 was marked

Page 95

for identification.)

BY MR. SAWICKI:

Q.      Mr. Buck, Exhibit Number 30 is another e-mail from Ms. Greene at Driehaus to the people at Marquette, enclosing another one of those monthly performance updates, like we saw a couple of exhibits ago.  This is for the month ended November 30, 2021. So it's the very next month from what we just looked at.

On the second page, it shows the top ten holdings for the Atlanta Fire Pension Fund account as of November 30, 2021, and it shows that Celsius Holdings was a top ten 10 holding and you still more than 9,000 thousand shares in the Atlanta Fire account, but the value of those shares had dropped dramatically in that one month.

Do you remember we looked at the October 31, loss was 9 or 10,000 dollar range and here we are at the end of one month later, and the stock was down, the stock position was down $272,000.

Do you remember that?

A.      Yes, this looks accurate.

Q.      And if we turn over to the next page, just for completeness, on the -- for the Atlanta's Police Pension Funds account, the Celsius remained at top ten

holding, 10,000 shares still in the -- in the account, and that position had gone down 292,000, almost $300,000 in one month, right?

A.    Yes.

Q.    And so as part of your work as the investment advisor for this, for these accounts and this strategy, you certainly were aware that Celsius's stock price had gone down quite a bit in that month, right?

A.    Yes.

Q.    But you -- despite that, you affirmatively decided not to sell any Celsius Holdings stock in these accounts, correct?

A.    Yes.

Q.    And we saw that the company's net income had gone down in the third quarter, as reflected in that press release, and in spite of that metric having gone down, you decided not to sell any Celsius stock in these accounts, right?

A.    Yes.

Q.    And the reason is because you analyzed and believed that Celsius stock retained it's growth potential, or its growth characteristics as a valid investment for this portfolio, right?

A.    Yes.  And we felt that the execution of the

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 98 of
30(B)(6) Driehaus Capital                                    June 12, 2023
209
City of Atlanta Police Officers' Pension Plan v. C

Page 97

business strategy and plan were intact.

Q.   All right.  I guess it's 1:00.  Let's stop there.

BY MR. SAWICKI:  How long would you all like to take for lunch?

THE VIDEOGRAPHER:  The time is 1:04 and we are off the record.

(Recess taken.)

THE VIDEOGRAPHER:  The time is 1:34 and we are back on the record.

BY MR. SAWICKI:

Q.   Thank you.  Mr. Buck, are you ready to go again?

A.   Yes.

Q.   And you understand that you're still under oath, right?

A.   Yes.

Q.   The next thing I want to do is show you Exhibit 31, just so we can get it in our record.

(Defendants' Exhibit 31 was marked for identification.)

BY MR. SAWICKI:

Q.   Can you confirm for me, Mr. Buck, that this is a copy of Sarah Greene's January 11, 2022 e-mail to Marquette, attaching the Driehaus performance update

30(B)(6) Driehaus Capital                                    June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 98

for Atlanta fire and police pension funds for the month ending December 31, 2021?

A.      Yes.

Q.      Let's look at the next Exhibit Number 32.

(Defendants' Exhibit 32 was marked for identification.)

BY MR. SAWICKI:

Q.      Mr. Buck, do you recognize Exhibit Number 32 as a copy of your e-mail to a number of people at Driehaus, January 7th, 2022, it looks like in the afternoon or the evening.  And it looks like -- does it -- do you understand correctly, that it looks like it pastes into the e-mail, a chat you had with Jeff James and another fellow earlier in the day?

A.      Yes.  This is a Teams message, yes.

Q.      Okay.  So I will represent to you, and we can go back to Exhibit Number 4 and Number 11 if you want, but this January 7th, 2022, this is a day which Celsius -- some part of Celsius stock position in the Atlanta fire and police pension accounts was sold. And so I would like you to take a moment to look at this, maybe go down to the chart or the -- yeah, the chart that Damian Gaj has put in there, and go on and explain to me what you understand happened that caused the company to -- that caused you to sell the stock on

this date?

    A.      So this particular message chain is from our trade support team, so Damian is part of that, and then their responsibility is to make sure all you have in the accounts are invested in the appropriate way in line with our model accounts.  The ones that are highlighted, I believe, are separate accounts that had certain investment restrictions against owning any stocks that was involved in the production or the sale of alcohol, and in lieu of owning any of those stocks that we may have owned in the model portfolio, we have had them own an additional portion of Celsius instead. So when you see us refer to Celsius as a replacement stock, that is what we are talking about there.

            So the ones that he highlighted needed to be adjusted because of the use of Celsius as a replacement stock for a different position or a company that we invested in that manufactured or sold alcohol.

    Q.      Okay.  I didn't actually see.  Maybe I missed it in your production, but taking my representation that -- that Driehaus sold a part -- a small part of the funds position in Celsius on this same day, do you have a memory as to why you were selling in the Atlanta police and fire accounts and

Page 100

then suggesting Celsius as a replacement, that is to add to these other accounts for the reasons that you just said?

A.    So we were selling for Atlanta and the model portfolios, but then this particular message chain referred specifically to the use of that as a replacement stock for other accounts.  We have some religious accounts that -- and because we were selling in the model portfolio, we needed to make a specific adjustment in that Celsius doc that was unique to those accounts, and that is what this chain refers to.  So I don't think this message explains why we were transacting in Celsius that day for Atlanta or for the model portfolio.

Q.    And I understand all of that, and I am just asking you if you remember why you were selling Celsius in the model portfolio that particular day?

A.    Yes.  So this was early 2022, at the time the market was starting to adjust to the prospect for higher interest rates, and what we observed in our investments and across the market was that companies that -- or stocks that had done well in the prior year, in particular, ones that had high multiples, high valuations and were rapidly growing were getting aggressively sold, and that -- that dynamic of higher

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 102 of
30(B)(6) Driehaus Capital                                    June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 101

interest rates potentially impacting the valuations
recorded to those companies in a negative way was
likely to continue, and we felt like we needed to make
an adjustment in our exposure to stocks of that type
and that would put Celsius in that category.

Q.    Okay.  And that rationale, that analysis
and rationale had nothing to do with whether Celsius
was making money at that particular time, right?

A.    Yes.

Q.    And --

A.    Well, actually, let me amend that because
companies that had low amounts of profitability were
seeing outsized declines in their stock prices at that
time.  So in that sense, it did have something to do
with the level of profitability that Celsius had, but
I would say it was more due to the multiple, the
valuation rather than necessarily the level of
earnings.

Q.    And also, if you recall of a few exhibits
ago, we were looking at the quarter-end press release
of Celsius that was issued in November 2021, right?

A.    Right.

Q.    And so here, we are just a month and a half
later, and at the time you decided you made this sale
decision, as you just described, you did not have any

Page 102

new or additional information about Celsius's
profitability or net income or anything like that, you
decided to sell for these other reasons?

A.      Yes.

Q.      Okay.  Let's go to the next exhibit.

(Defendants' Exhibit 33 was marked
for identification.)

BY MR. SAWICKI:

Q.      Mr. Buck, can you identify Exhibit Number
33, please?

A.      Yes.  This is a summary that I made of a
transcript of an interview conducted by an investment
manager with this unnamed industry expert who is the
interactive marketing manager at Pepin Distributing
Company and we get access to these transcripts through
a paid relationship we have with Tegus, T-E-G-U-S,
which makes these expert interview transcripts
available on a wide basis.

Q.      So this is an example of one of the sources
of information that you use and rely on in making
investment decisions for Celsius stock, right?

A.      Yes.

Q.      And the -- this summary -- was it in this
summary where you intended to highlight the things
that you thought were important about Celsius's

Page 103

business and it's performance during this period of time?

A.    Yes.

Q.    And the things that you focussed on were -- well, you -- I guess by way of background, is this particular distributing company had been distributing Celsius for about 3 years; is that what you are saying?

A.    Yes.

Q.    And then it says it's doubled every year. Does that refer to the amount of sales going through that distributor?

A.    Yes.

Q.    What does Better For You category Growing Faster refer to?

A.    The Better For You category would be in the products that perhaps have less or zero sugar or no calories and is perceived as being better for the consumer.

Q.    Okay.  Next is, "Haven't seen any price increase but would expect one soon."  I take it that refers to the price of the product?

A.    Yes.

Q.    "Supply issues across the business having been getting better."  And then it says, "CELH is top

grower in their energy portfolio."

What does that refer to?

A.     That means Celsius is outperforming the rest of their energy products that they are selling.

Q.     Okay.  And none of these, none of the factors relevant to Celsius that are listed here have anything to do with whether Celsius was making money at this time, right, they are focussed on sales growth and price of the product, et cetera?

A.     Yes.

Q.     What is the next exhibit, 34.

(Defendants' Exhibit 34 was marked for identification.)

BY MR. SAWICKI:

Q.     Exhibit Number 34, Mr. Buck, is the Celsius holdings 8-K dated March 1, 2022.  And so just to confirm, this is the same sort of SEC filing information that you use and rely on in doing your work?

A.     Yes.

Q.     And this 8-K attaches a press release, but on the second page, it describes that the company was releasing preliminary and unaudited financial results for the fourth quarter and full year in December 31, 2021.  It announces it's hosting a management

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 106 of
30(B)(6) Driehaus Capital                                          June 12, 2023
209
City of Atlanta Police Officers' Pension Plan v. C

Page 105

conference call, and then it goes on to describe, or

explain that it needed more time too file it's 10-K

for the year.

Do you see that reference?

A.    Yes.

Q.    In the second paragraph under the internet

website address thing, it begins with the paragraph,

"In addition, as more fully described in the linked

PDF in connection with the preparation of 2021, the

company determined that the calculation and expense of

noncash share based compensation, et cetera, were

materially understated for the periods ending June 30

and September 30, and did not comply with U.S. GAAP.

In order to correct this noncash share based

compensation during these periods, the company is

recognizing additional noncash share based

compensation expense."

And it says -- the last sentence says, "The

recognition of additional noncash share based

compensation expense does not impact the company's

cash, revenue, other aspects of its operations or it's

business fundamentals."

Do you remember seeing this disclosure on

or around March 1, 2022 when it was made?

A.    Yes.

Page 106

Q.      And let's go to the next exhibit.

(Defendants' Exhibit 35 was marked

for identification.)

BY MR. SAWICKI:

Q.      Mr. Buck, can you confirm that Exhibit

Number 35, Exhibit Number 35 is a copy of the Celsius

press release concerning preliminary and unaudited

fourth quarter of fiscal year 2021 results that was in

Driehaus's file?

A.      Yes.

Q.      And this exhibit, if you go to the last

page of Exhibit 35, does this exhibit also include

your one page of notes summarizing various aspects of

the -- the press release?

A.      Yes.

Q.      The first thing you write in your notes is

that, "GM miss not that big and should not be

surprising given widespread issues with cans and

recent MNST report showing same head wind."

Just to be clear, Mr. Buck, GM refers to

gross margin?

A.      Yes.

Q.      And the gross margin miss, in essence,

means that the company's costs were higher than

anticipated for that period of time?

Page 107

A.    Yes.

Q.    And MN -- MNST is a reference to Monster Energy Drink Company?

A.    Yes.

Q.    So is it -- it's a reference to the fact that another company in this space is experiencing the same kind of issues, right?

A.    Yes.

Q.    Your next sentence reads, "Rev outlook very pos."

Do I take it to mean that this is a reference to revenue outlook is very positive?

A.    Yes.

Q.    You then write, "Accounting issue looked purely technical and not a read on earnings quality."

Mr. Buck, is that reference to the accounting issue, a reference to the noncash share base compensation expense issue disclosed in the -- in the press release?

A.    Yes.

Q.    What do you mean when you say that it looks purely technical?

A.    That it does not impact their cash-to-noncash accounting issue, and it does not reflect any change in view of the health of the

Page 108

underlying business or the level of earnings.

Q.    Okay.  And then you go on to say, "And not a read-on earnings quality."

Is that a reference to the fact that this accounting issue, in your view, did not have any impact on the -- Celsius's, the quality of Celsius's earnings and its prospects for continuing to grow?

A.    Yes.  And in our business, when we talk about earnings quality, often we're talking about if there are aggressive accounting assumptions or practices being employed to make the business look more profitable than it really is.  And in my assessment, this was not an indication that something like that was occurring at Celsius.

Q.    As you've done before, you then go on to bullet point, certain of the key metrics that you were focussed on and other things, right?  Revenue gross margin, EBITDA, EBS?

A.    Yes.

Q.    And as before, the EBITDA number, 10.9 million, that's the number that you pulled off from the previous page of financial tables.  This is DCM 2271.  Let me ask the question again since we got interrupted by the slow technology here.

The EBITDA number of 10.9 million from your

notes on the last page of this Exhibit 35, you took that number from this page 8 of the press release, Bates stamp 2271, correct?

A.    Yes.

Q.    And this is the same non-GAAP adjusted EBITDA presentation that the company had shown in the prior press release we looked at, correct?

A.    Yes.

Q.    And one of the things that the company does in making this non-GAAP adjusted EBITDA calculation is to remove or take out the stock base compensation expense that -- that's part of its financial information, right?

A.    Yes.

Q.    So if you remember, when we talked about the first press release that had this table, you indicated that these Income Tax Benefit, Depreciation, Stock-Based Compensation, those are not things that you ignore, but -- well, strike that.

You testified earlier that those are not things you ignore, right?

A.    Yes.

Q.    They are things that you look at and decide whether or not they're important to your investment decision, right?

30(B)(6) Driehaus Capital                    June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 110

A.     Yes.

Q.     And per your notes on the -- on the next page, you looked at this and you decided that this information, this accounting issue was not important to your investment decision whether to buy, sell or hold Celsius stock at this time, correct?

A.     Yes.

MR. SAWICKI:  Go to the next one, 36.

(Defendants' Exhibit 36 was marked for identification.)

BY MR. SAWICKI:

Q.     To provide you --

MR. SAWICKI:  Oh, thank you.  Thank you.

BY MR. SAWICKI:

Q.     Mr. Buck, as you get into in this next Exhibit 36, I'll represent to you and ask if you can recall that this press release we were just looking at in Exhibit 35, that was issued by the company after trading hours on March the 1st, 2022.

Does that ring a bell with you?  Make sense to you?

A.     Yes.

Q.     And so even though it was issued or released after the market closed on March the 1st,

30(B)(6) Driehaus Capital                                    June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 111

this is the sort of information that you keep on top of, and if it comes out, you'll look at it even though the market is closed for the day, correct?

A.     Yes.

Q.     And so can you confirm that Exhibit Number 36 is an e-mail -- or excuse me -- a Microsoft Teams chat printout between and you Mr. James on March 1, 2022, later in the evening?

A.     Yes.

Q.     And this -- in this chat, you are making reference to the press release that you had already seen and reviewed and analyzed, correct?

A.     Yes.

Q.     And Mr. James starts the chat by saying, CELH Bros RPAY reports, CELH top and bottom lines looked strong.  I assume it's down to GM gross" -- or "GM percent and delayed 10-K."

So, in fact, as reflected in this message, Mr. James himself was looking at the press release, too, right?

A.     Yes.

Q.     And you respond to him pretty quickly after he makes his assumption about why CELH went down.  You say, "Yeah.  Yes, I think that's right.  GM weakness" -- that's gross margin weakness, correct?

Page 112

A.      Yes.

Q.      -- "should have been widely anticipated and somewhat transitory (cycling through highest cost imported aluminum cans this Q and in first half '22)," right?

A.      Yes.

Q.      And then in response to his assumption about the delay 10-K, you write, "Looks like 10-K related to calc" -- that's calculation, correct?

A.      Yes.

Q.      -- "of noncash stock column."

So that's the noncash share base compensation expense we've been referring to in this case, correct?

A.      Yes.

Q.      And you concluded that sentence by saying "So that's kind of a 'who cares' issue," correct?

A.      Yes.

Q.      And what you meant by that is that the calculation or the error in calculation of noncash stock compensation expense was not something that was important to you as an investor in deciding whether to buy, sell or hold Celsius stock at that time, correct?

A.      Yes.  And also, it would be my -- based on my experience, an indication that I didn't think the

rest of the market would perceive it to be a significant issue either.

Q.     All right.

        MR. SAWICKI:  Let's go to the next one, Number 37.

        (Defendants' Exhibit 37 was marked for identification.)

BY MR. SAWICKI:

Q.     Mr. Buck, I'll -- I'll represent to you that -- that Exhibit Number 37 is a printout from Bloomberg, this financial information source that you regularly access and rely on, right?

A.     Yes.

Q.     And this reflects that an announcement -- and this is made in the -- in the morning of March 2, 2022, the very next day from the day we were talking about, that B. Riley is providing some information or a report.

        Do you know who B. Riley is?

A.     Yes.

Q.     Who are they?

A.     They are a brokerage and research provider that has provided equity coverage on Celsius and other companies.

Q.     And is it -- another word for research

Case 9:22-cv-80418-DMM  Document 100-4  Entered on FLSD Docket 06/15/2023  Page 115 of
30(B)(6) Driehaus Capital                                    June 12, 2023
209
City of Atlanta Police Officers' Pension Plan v. C

Page 114

provider, is that -- are they also known in the -- in

the market and in your business as analysts?

A.    Yes.

Q.    So this is an analyst report from B. Riley

being issued on Celsius's announcement the day before,

correct?

A.    Yes.

Q.    And is this one of the analyst reports that

you rely on in making investment decisions regarding

Celsius during this time?

A.    It may have been.

Q.    And why do you say it may have been?

A.    I can't recall if I opened and read this

particular report or not, but it would have been a --

Q.    Did you have --

A.    -- log that we provided, so.

Q.    Okay.  Do you -- do you remember whether

you had a subscription or access to B. Riley so you

could have -- whether or not you did, you could have

if you wanted to, read and review the report.

A.    Yes.

Q.    Let me show you the next exhibit, 38.

(Defendants' Exhibit 38 was marked

for identification.)

BY MR. SAWICKI:

Page 115

Q.    Mr. Buck, I'll represent to you that this is a printout of the B. Riley analyst report dated Wednesday, March 2, 2022 for Celsius.  Take a moment just to -- to look at it there.

Does looking at this Exhibit 38 refresh your memory that you did have access -- that you did review this B. Riley report at or about the time it was issued on March 2?

A.    I can't recall.  I read thousands of these kind of reports, of course.  So I don't know if I read this one.

Q.    All right.  Let's skip on to the very top of page 2 of the B. Riley analyst report.

And the very first bullet at the top of that page reads, B. Riley writes, "Of critical importance, the recognition of additional noncash share base compensation expense does not impact the company's cash, revenue or other aspects of its operations or its business fundamentals," right?

A.    Yes.

Q.    And that's, in fact, parroting what the company said in its press release providing information about this particular accounting issue, correct?

A.    Yes.

Q.    And do you take -- as an investor professional in this space, do you take this reference as B. Riley's analysis that this noncash share base compensation accounting issue was not important or should not be considered to be an important factor in deciding whether to invest in the company?

A.    I would take it into consideration, but we would develop our own opinion.

Q.    Okay.  But that -- and that wasn't exactly my question.

Do you take it as B. Riley's analysis that this particular issue was not important for an investor in deciding whether to invest in the company?

A.    Yes.  I would interpret this the same way, yep.

Q.    And reviewing such an analysis report and making such an interpretation, that's part of the analysis and information gathering that you do in making your own decision, correct?

A.    Yes.

MR. SAWICKI:  Let's go to the next exhibit.

(Defendants' Exhibit 39 was marked for identification.)

BY MR. SAWICKI:

Case 9:22-cv-80418-DMM  Document 100-4  Entered on FLSD Docket 06/15/2023  Page 118 of 209
30(B)(6) Driehaus Capital                                    June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 117

Q.      Mr. Buck, do you recognize Exhibit

Number 39 as a printout of Microsoft Teams chat

between you and Jeff James on March 2, 2022, about

Celsius and some other stocks?

A.      Yes.

Q.      And at the beginning of the -- of the chat

exchange, you write, "FRPT pulling back, et cetera.

MGPI could be an add, et cetera."  And then with

regard to Celsius, CELH, you right -- wrote, "I had

accidentally sold as replacement stock for some

accounts.  Things are strong on the rev side."

That's revenue, right?

A.      Yes.

Q.      "GM will improve over the next few

quarters."

That is gross margin, correct?

A.      Yes.

Q.      And then you write, "I would be okay buying

it back for those accounts, open paren, I think is

replacement for NAPA, close paren"; right?

A.      Yes.

Q.      So on the heels of the company's March 1,

2022 press release, and based on your analysis of it

and your notes and you decided not with respect to

specifically Cel- -- City of Atlanta it looks like,

but with respect to your small cap growth strategy, you decided that you wanted to buy more and not sell more, right?

A.     Yes.  For those specific accounts that we are using it as a replacement for NAPA which is a producer of alcoholic beverages.

Q.     Okay.  And a couple of entries a little further down Jeff James responds, "I'm on board with all four of these."  So he is agreeing with you that you should use Celsius as a replacement stock in those accounts along with the other onces that you're recommending, right?

A.     Yes.

Q.     And he was agreeing with you, notwithstanding whatever was said in the March 1, 2022, press release, correct?

A.     Yes.

        (Defendants' Exhibit 40 was marked
     for identification.)

BY MR. SAWICKI:

Q.     Mr. Buck, can you confirm that Exhibit Number 40 is a true and correct a copy of a March 8, 2022 Microsoft Teams chat among several folks at Driehaus?

A.     Yes.

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 120 of 209
30(B)(6) Driehaus Capital                              June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 119

Q.      On the second page of this exhibit, before the table that's inserted there, there is a Mr. Gaj reference, "Also want to bring CELH to your attention."

Do you see that?

A.      I do, yes.

Q.      Now, I realize that the table, as we've recreated it here, is super hard to read and really small, so what I have done on the next page, the last page of the exhibit, is I have had it blown up so we can read it a little more easily.  So that would become the third page of this Exhibit Number 40.  Can you -- can you read that blown up version of the table?

A.      Yes, I can.

Q.      Looking at that table and then the chat exchange on the previous page, can you explain what was going on with Celsius stock on that date, March 8, 2022?

A.      Yeah.  I think we were reducing the position across all of our accounts, and then the exchange we had with Damian here was to be sure that the accounts for which Celsius was being used as a replacement for a different stock were imbalanced or in line with where they needed to be to make sure they

Page 120

reflected the underlying Celsius position and the exposure of the other accounts had to NAPA.

Q.     And this is now a week after the Celsius March 1, press release.  Do you remember the reasons why you were deciding -- determined to sell Celsius in some of the accounts on this date?

A.     Yeah.  On that day, the trigger for looking to sell the stock was technical weakness, so part of our investment approach involves the use of price and volume patterns and what we were seeing in the way this stock was trading prompted us to look to reduce the position.

Q.     And so that technical analysis focusses on the price of the stock and the number of shares of the stock that are being traded in the market each day?

A.     Yes.

Q.     And that information changes rapidly, and can change dramatically from day-to-day, right?

A.     Yes.

Q.     And those changes in a publically traded market like the market Celsius was trading in, would react to information very quickly, if not immediately, right?

A.     Yes, they can.

Q.     So you would not expect that price and

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 122 of
30(B)(6) Driehaus Capital                                    June 12, 2023
209
City of Atlanta Police Officers' Pension Plan v. C

Page 121

volume of the stock to be changing, based on what was

in the press release a week before, would you?

A.    Typically, no, but sometimes the market can

take a long time to digest the information.

Q.    Okay.  Let's go to the next exhibit.

(Defendants' Exhibit 41 was marked

for identification.)

BY MR. SAWICKI:

Q.    Okay.  So I will represent to you,

Mr. Buck, and we can go back and look at it if we need

to, but Exhibit 40, the exhibit that we were just

looking at, the March 8th, 2022 Microsoft Teams chat

is time stamped 4:12 p.m. UTC.  And this Exhibit 41 is

time stamped 4:53 p.m. UTC.  So it's after the chat of

Exhibit 40, correct?

Do you agree?

A.    Yes.

Q.    For the record, can you confirm that 41 is

a true and correct copy of the Microsoft Teams chat

between you and others at Driehaus on March 8th, 2022?

A.    Yes.

Q.    So after we saw the exchange of Exhibit 40,

Jeff James weighs in on this chat Exhibit 41 and says,

"Jason, please hold off on CELH for now."

So is what he is saying there is do not

Page 122

sell Celsius for now?

A.     Yes.  So we entered in an order earlier in the day to sell it, and Jason is to, or Jeff, the portfolio manager, is telling Jason, who is one of our traders, to hold off on selling any additional stock, or to not complete the order that we had put in.

Q.     Okay.  And Mr. James gave his reasons for doing that, right?

A.     Yes.

Q.     And what were his reasons?

A.     So we had seen additional scanner data from Nielsen that indicated their sales at retail were continuing to be very robust, and that we felt like the stock price was down too much to continue selling in light of the strong scanner data that we were observing.

Q.     And so this scanner data is new information, that is information that became available to the market and you after March 1st press release 2022?

A.     Yes.

Q.     And so Jeff was making the decision not to sell Celsius stock, based on this new information, and notwithstanding whatever information was provided -- whatever negative information was provided in the

Page 123

March 1, company press release, correct?

        A.      Yes.

        Q.      Let's go to the next.

                (Defendants' Exhibit 42 was marked

          for identification.)

BY MR. SAWICKI:

        Q.      Mr. Buck, Exhibit Number 42, I will

represent to you, is a copy of the class action

complaint that was filed in this case on March 16th,

2022.  Have you ever seen this before the original

complaint?

        A.      No.

        Q.      Did you know that it was filed.  Did you

know in March, mid March 2022, that such a class

action complaint has been filed alleging securities

fraud against Celsius?

        A.      I would have seen a lot of the press

releases put out by various law firms that were

indicating that they were seeking to file a class

action lawsuit, but I did not know at that time that

such a lawsuit was actually filed.

        Q.      Okay.  So is it -- do you remember

whether -- whenever you learned about this class

action lawsuit do you remember whether you read and

analyzed it or evaluated it?

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 125 of
30(B)(6) Driehaus Capital                               June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 124

A.      I did not read or evaluate it.

Q.      Is it your practice to read and evaluate class action complaints alleging securities fraud against the companies you're invested in?

A.      Very rarely.

Q.      Why is that?

A.      Because they typically are not material to our investment thesis, and it's typically based on information that occurred quite some time ago.

Q.      Okay.  Any other reasons why you do not consider them important?

A.      No.

Q.      Let's go to the next one.

        (Defendants' Exhibit 43 was marked
      for identification.)

BY MR. SAWICKI:

Q.      Mr. Buck, I will represent to you that Exhibit Number 43 is a copy of a press release issued by Clarence Law Firm concerning class action Exhibit 42 being filed against Celsius.  Is this the sort of press release that you would become aware of as part of your normal monitoring activities as investment advisor for these accounts?

A.      Yes.

Q.      You indicated that you rarely read the

Page 125

complaints.  Do you also -- do you read the -- these press releases as a matter of practice?

A.     No.  Typically, we do not.

Q.     Okay.  So this press release does provide some detail explaining that they are accusing the company of having committed securities fraud by virtue of misstating the noncash share based compensation expense that I focussed your attention on during the course of this deposition.

Do you see that?

A.     Yes.

Q.     So you would agree that by virtue of this press release investors in the market were made aware of these allegation of fraudulent accounting and securities fraud, correct?

A.     Yes.

Q.     And I take it that this information had no impact on your evaluation of Celsius and your decision whether to buy sell or hold Celsius in March of 2022?

A.     Yes.

Q.     Let's go to the next one.  Mr. Buck, can you identify and explain Exhibit 42, please -- 44 please?

(Defendants' Exhibit 44 was marked for identification.)

Case 9:22-cv-80418-DMM  Document 100-4  Entered on FLSD Docket 06/15/2023  Page 127 of 209
30(B)(6) Driehaus Capital                                          June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 126

THE WITNESS:  Yes.  This is a printout of the compilation of morning news items that I described earlier.  So this was the finished document that anyone on our team would have received that summarizes the news that I thought was noteworthy that morning for the stocks that we own and some of the stocks that we had.

BY MR. SAWICKI:

Q.    And in the second box down on the left side, there is a reference to Celsius's ticker symbol, right?

A.    Yes.

Q.    And that is where the information that you gleaned from whatever was available about Celsius would be found?

A.    Yes.

Q.    And what you wrote with respect to Celsius is that, "Maxim u/g CELH to buy"; right?

A.    Yes.

Q.    What does that mean?

A.    So Maxim, similar to B. Riley is another third-party research provider with an analyst that covers the company, and that analyst on that day updated their rating on Celsius stock to buy.

Page 127

Q.      Is that sort of information important or relevant to you in deciding or evaluating the Celsius stock as an investment for this portfolio?

A.      Yes.

Q.      So the -- what is the date of this Exhibit Number 44 summary report?

A.      I don't know what date that --

Q.      Let me -- let me get there.  I think it's reflected on the bottom of the first page.

A.      Okay.  May 11th.

Q.      May 11, 2022.  So this is two months after the -- a little more than two months after the March 1, 2022 press release, and almost exactly two months after the announcement of this class action lawsuit alleging securities fraud against Celsius, right?

A.      Yes.

Q.      So as far as you know, there was no additional or new information about this non-share -- noncash share base compensation expense issue that was made available to the market, right?

A.      Not that I recall.  I don't know.

Q.      So without being able to point to any new or additional information, the recommendation by Maxim to upgrade, it's -- it's recommendation on this stock

Page 128

to a buy, do you take that to mean that the -- the

Maxim did not consider the noncash share base expense

compensation that should be important?

       A.    It's a reasonable assumption, yeah.

       Q.    And did you agree with that?

       A.    Yeah.

            MR. SAWICKI:  Next exhibit, please.

            (Defendants' Exhibit 45 was marked

         for identification.)

BY MR. SAWICKI:

       Q.    Mr. Buck, can you identify Exhibit

Number 45 as a copy of your e-mail with notes to

Jeff James on May 11, 2022, concerning Celsius's March

MarQ '22?

       A.    Yes.  So this would have been their first

quarter of 2022 earnings, and this was -- these were

my notes from that earnings report.

       Q.    Okay.  So the -- the March 1, 2022 press

release that we were looking at before, that provided

information about the fourth quarter of 2021 and the

full year of 2021 for Celsius, correct?

       A.    Yes.

       Q.    So apparently, this May 11 date is a date

that Celsius provided information about its first

quarter of 2022, the first three months of 2022

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 130 of
30(B)(6) Driehaus Capital                           June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

209

Page 129

financial performance, correct?

A.      Yes.

Q.      And Exhibit 45 reflects your notes based on your review of that information about first quarter 2022 results, correct?

A.      Yes.

Q.      And those notes reflect the things that you thought were important in evaluating whether to buy, sell or hold Celsius for your portfolios, correct?

A.      Yes.

Q.      And there is no reference in those notes to the noncash share base compensation, is there?

A.      Correct.

Q.      And we can go back if you want, but Exhibits 4 and 11, I showed you earlier reflect that within the next few trading days, I think it's May 19, 2022, Driehaus caused the Atlanta Fire and Police Pension accounts to buy more stock in Celsius.

Does that sound familiar to you?

A.      Yes, that's right.

Q.      And what do you remember the reasons for that decision to buy more stock in Celsius on that date were?

A.      So the company had recently presented at a Goldman Sachs investor conference, so that commentary

Page 130

that they made there, we interpreted positively.  The

technical pattern of the stock, so getting back to the

price and the volume that we were observing in the

market, we interpreted that more positively.  And then

the Nielsen scanner data showed continued strong

growth of Celsius at their retail customers.

Q.    Do you remember any other reasons besides

those that you've described just now that supported

your decision to buy more Celsius stock at this time?

A.    No.

MR. SAWICKI:  Let's go to the next

exhibit.

(Defendants' Exhibit 46 was marked

for identification.)

BY MR. SAWICKI:

Q.    Mr. Buck, can you confirm that Exhibit

Number 46 is the September 9, 2022 e-mail from

Sarah Greene at Driehaus to folks at Marquette

Associates, attaching the Driehaus performance

update --

A.    Yes.

Q.    -- for Atlanta Police and Fire accounts for

the month ended August 31, 2022?

A.    Yes.

Q.    So if we turn over to the second or third

Page 131

page of this exhibit, the page with the pie chart.

Let me ask this, then:  Evidently, for everybody's

benefit, it looks like we have a little technical

glitch.  We didn't include all the pages of this

performance update report.  It's just a couple pages

longer.  It's -- the Bates numbers are DCM Celsius

00002048 and 2049.  It's the very next pages in the

production.  I don't want to have to postpone, you

know, my progress here.

        MR. SAWICKI:  Would it be acceptable

to the group if we provide you with copies

of the whole thing and just make it part of

the record or would you want me to go back

and find it, show it and do it the old

fashion way?

        MS. MOYNA:  I'm not sure what you're

suggesting.  I mean, isn't there a way just

to have it up on someone's screen and show

the screen or something like that so that

we can see it?

        MR. SAWICKI:  Yeah, I think we can do

that.  Just a minute.

        Let's do this, I just have a few more

documents to go through, and then maybe we

take a break and during that break, maybe

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 133 of
30(B)(6)   Driehaus Capital                                    June 12, 2023
209
City of Atlanta Police Officers' Pension Plan v. C

Page 132

Lincoln can find the missing pages from this and we'll do the -- come back and do that again.

All right.  We'll come back to Number 46.  Let's go on to 47.

(Defendants' Exhibit 47 was marked for identification.)

BY MR. SAWICKI:

Q.    Mr. Buck, can you confirm that Exhibit Number 47 is a copy of -- or a printout of the Microsoft Teams chat between you and Jeff James on October 18, 2022?

A.    Yes.

Q.    And in this Microsoft Teams chat exchange, you begin by saying, "CELH" -- that's a reference to Celsius, correct?

A.    Yes.

Q.    -- "I'm inclined to trim to less than a 100 basis points weight."

That means that you're inclined to sell some of the Celsius stock in the portfolios?

A.    Yes.

Q.    And the reason you give is "Scanner data keeps slowing (as expected) and PEP transition will likely create some noise when it reports."

30(B)(6) Driehaus Capital                                    June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 133

Scanner data is the -- is the Nielsen sales scanner data we talked about before, right?

A.    Yes.

Q.    What is PEP transition referring to?

A.    So a couple of months prior, Celsius had signed an exclusive distribution agreement with Pepsi, and PEP is Pepsi's ticker symbol.

Q.    Okay.

A.    And that transition from Celsius's prior distribution partners to Pepsi was excepted to take place over the subsequent months.

Q.    And that would -- you thought that would -- might cause disruption or slow things -- slow sales down a little bit while that transition was in play?

A.    Yes.

Q.    Okay.  And then if we go down, Jeff James has some responsive comments, and then the second to the last chat entry on this page 1, Jeff James says, "I prefer to keep it.  The technicals are okay.  PEP is still upside after transition.  Market share is 4 percent, could double.  IDK" -- I presume that means I don't know.

A.    Yes.

Q.    -- "scanner data come out today."

So from this chat exchange, do you take it

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 135 of
30(B)(6) Driehaus Capital                                    June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 134

that Mr. James did not want to sell Celsius stock at this time?

A.    Yes.

Q.    And what he wrote here were the reasons that he did not want to sell it?

A.    Yes.

Q.    And those reasons -- so the reasons that he gives in this chat exchange have nothing to do with whether -- whether Celsius was making money at this time or how much money it was making, but rather on these prospects for greater sales, correct?

A.    Yes.

MR. SAWICKI:  Let's do the next one.

(Defendants' Exhibit 48 was marked for identification.)

BY MR. SAWICKI:

Q.    Mr. Buck, can you confirm that Number 48 is a printout of the SEC filing by Celsius Holdings, dated November -- where is it -- November 9, 2022?

A.    Yes.

Q.    And it references its issuance or disclosure of its preliminary financial results for the third quarter ended September 30, '22 -- 2022, and it attaches a press release, correct?

A.    Yes.

Page 135

MR. SAWICKI:  The next exhibit.

(Defendants' Exhibit 49 was marked

for identification.)

BY MR. SAWICKI:

Q.    Mr. Buck, do you recognize Exhibit

Number 49 as a copy of the Celsius Holdings Third

Quarter 2022 Financial Results Press Release that was

in Driehaus's file?

A.    Yes.

MR. SAWICKI:  Can you scroll to the

bottom of that page?  And then go to these

two bullets here.

BY MR. SAWICKI:

Q.    Forgive -- forgive me, but it looks like we

have an unfortunate sticker placement there.  I want

to focus on the -- the bullet point or paragraph

that's at the very bottom left, part of which is under

that sticker.  And then over to the -- the next bullet

underneath the -- the bar graph.

I'll substitute in a -- in a copy that

where the -- the sticker's in a better place, but let

me represent to you that -- that left-hand paragraph

on the bottom reads, "Net loss an attributable to

common shareholders totaled $186.5 million or $2.46

per diluted share, compared to a loss of 9.4 million

Page 136

or 13 cents per diluted share in a year ago quarter."

That reference to net loss, Mr. Buck, that's a reference to the net income figure that is a GAAP -- is the GAAP measure for -- for income of a company that we've seen in other places in the -- in the financial reports, right?

A.    Yes.

Q.    And so this press release is reporting that the company experienced a rather sizable net loss for the quarter, $186 million.  That's -- that's many times higher than the -- than the effect of the noncash share base compensation expense that's the subject of this lawsuit, right?

A.    Yes.

Q.    And so this -- and then going over to the right-hand side, that bullet point underneath the bar graph, it says, "Third quarter 2022 financial results were negatively impacted by 155 million point" -- "155.4 million expense in sales and marketing related to a termination expense of prior distributors recognized," right?

A.    Yes.

Q.    So is the $155 million, is that a cash item or a noncash item?

A.    I would think it's a noncash item.

30(B)(6) Driehaus Capital                          June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 137

Q.      Okay.  And if we go to the last page of the press release, which is 20 -- 2504, I think.  No, 2503, excuse me.  The second to the last page.  Bates number 2503.

So this is the same presentation by the company of its non-GAAP adjusted EBITDA for the quarter and the year, or the quarter.  Excuse me, in nine months.  Do you see that Mr. Buck?

A.      Yes.

Q.      And in this particular presentation, Celsius is backing out the distributor termination expense of $155.4 million, right?

A.      Yes.

Q.      And once you do that, this presentation shows that Celsius's non-GAAP adjusted EBITDA more than doubled in 2022 from what it had been in the three months ending 2021, correct?

A.      Yes.

Q.      And if we go back two pages, can you identify a few pages of notes prepared by you or someone at Driehaus related to this press release?

A.      Yes.  Those are my notes.

Q.      So the first page of the notes on Bates labeled 2505, do I take it that the top half of the page relates to your notes concerning information in

the press release?

A.    Yes.

Q.    And as you go down further where it says, "per IRI 1W data ending 10/23," are those notes referring to a different source of information than the press release?

A.    I believe so, yeah.  I'm not sure where I pasted that from.

Q.    Okay.  And then can you confirm that the notes below that under the heading, "MS Conference Pres 12/7/22," that those are notes related so some other kind of conference, not the press release?

A.    Yes.  That's right.  They were presenting at a Morgan Stanley conference.

Q.    And so back up to the top half of this first page of your notes on page 2505, like is your practice you wrote down the things that you considered important that you gleaned from the company's press release, correct?

A.    Yes.

Q.    And in those notes, you don't make any reference whatsoever to the net loss due to the distributor termination expense, do you?

A.    Yes.

Q.    And the only place where that substantial

loss would show up insofar as these notes are concerned would be in connection with the earnings per share number, right?

A.      Yes.

Q.      Because that net loss would flow into the earnings per share calculation that each company does for these purposes, correct?

A.      Yes.

Q.      And you have a note related to EPS but you don't even bother to reference what the actual EPS or earnings per share for the quarter were for the company, did you?

A.      Right.  I don't think at the time that I had a good calculation for what I would have called adjusted earnings per share where it would have adjusted out the various items that -- that were already adjusted out of the EBITDA calculation.

Q.      Okay.  And that is because the information about that nonrecurring noncash expense and its impact on net income was not important to you in making investment decisions concerning Celsius stock, correct?

A.      Yes.

Q.      The next exhibit.

        (Defendants' Exhibit 50 was marked

Page 140

for identification.)

BY MR. SAWICKI:

Q.      Mr. Buck, can you confirm that number 50 is a copy, a printout of your Microsoft Teams chat exchange with Jeff James on December 2, 2022?

A.      Yes.

Q.      So this would be a couple of weeks after the company's press release regarding the third quarter and the substantial net loss, right?

A.      Yes.

Q.      And you -- on December 2, 2022, you note to Mr. James that, "A new high for CELH just below the blue box.  We can add when we find cash."  Right?

A.      Yes.

Q.      And what you are referring to is that on December 2 -- December 2, 2022, the stock price for Celsius had reached a new all time high, correct?

A.      Yes.

Q.      And it did that in spite of the fact that just two weeks before, the company reported a net loss of $155 million or more related to this distributorship termination expense, right?

A.      Yes.

Q.      So it was not only you who didn't care about that net loss disclosure but evidently also the

Page 141

market did not care about that net loss disclosure, did it?

A.    I would agree with that.

Q.    The next exhibit.

(Defendants' Exhibit 51 was marked for identification.)

BY MR. SAWICKI:

Q.    Okay.  Mr. Buck, can you confirm that Exhibit Number 51 is a copy of an e-mail chain that starts with an e-mail to you on December 7th, 2022 from Alex Plastaras at Morgan Stanley, which you then forwarded to Jeff James, your colleague, right?

A.    Yes.

Q.    And the e-mail from the Morgan Stanley guy is basically a summary of their analysis of where the company stood and what its prospects were based on its work, correct?

A.    Yes.  Based on the presentation given by Celsius management at their conference.

Q.    Okay.  So as best you remember, Celsius was invited to or presented at a Morgan Stanley conference, and then Morgan Stanley reported on what they learned and what they gleaned from that presentation, right?

A.    Yes.

Page 142

Q.      And without belaboring the details, do you recall whether Morgan Stanley's takeaways were positive or negative?

A.      They struck me as positive.

Q.      And is this the sort of information that you access and analyze and evaluate in deciding whether to make investment decisions?

A.      Yes.

Q.      And, in fact, you caused, or Driehaus bought more Celsius stock for small cap growth strategy and these plaintiff's accounts the very next day, December 8th, 2022, correct?

A.      Yes.

Q.      Let's look at what is 52.

        (Defendants' Exhibit 52 was marked for identification.)

BY MR. SAWICKI:

Q.      Mr. Buck, can you confirm that Exhibit Number 52 is a Microsoft Teams chat exchanged between you and Mr. James dated December 8th, 2022?

A.      Yes.

Q.      And on the second page, one, two, three, the fourth entry down from you, December 8th, 2022 at 3:00 p.m. UTC.  Do you see that one?

A.      Yes.

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 144 of
30(B)(6) 209 Driehaus Capital                                June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 143

Q.      You write, "Very bullish notes on CELH from their MS conference presentation"; is that correct?

A.      Yes.

Q.      "I can forward e-mail recap if you want to read it."  The e-mail recap you're referring to there is the e-mail recap that we looked at as Exhibit 51, right?

A.      Yes.

Q.      And in response, two entries down, Jeff James says, "cool, please forward.  CELH, I'm up for adding.  Our weights are just over 1 percent," correct?

A.      Yes.

Q.      And what he is saying there is that he is approving Driehaus's purchase of additional shares of Celsius stock, based on the latest information about the company?

A.      Yes.

        MR. SAWICKI:  I don't have anymore exhibits, and if -- what I would suggest is why don't we take a 10-minute break so hopefully I can correct my Exhibit 46 problem and then I can pass the witness.

        THE VIDEOGRAPHER:  The time is 2:58 and we are off the record.

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 145 of
30(B)(6) Driehaus Capital                                    June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 144

(Recess taken.)

THE VIDEOGRAPHER:  The time is 3:11 and we are back on the record.

BY MR. SAWICKI:

Q.    Thank you.  Just to clean up logistics here, Mr. Buck.  Exhibit 46 we've now corrected it, and I need you to confirm for me that it's a copy of the e-mail transmission from Ms. Greene at Driehaus to the Marquette folks attaching the Driehaus performance update for the month ended August 31, 2022 for both the Atlanta fire and the Atlanta police accounts?

A.    Yes.

Q.    Is that correct?

A.    Yes.

Q.    And with respect to both accounts, there are substantially, the same as we've established.  As of August 31, 2022 Celsius remained a top 10 holding, right?

A.    Yes.

Q.    And it's stock price fortunes reversed themselves quite dramatically, as you recall, through the end of 2021 that position was down more than $200 thousand, right?

A.    Yes.  I do remember that.

Q.    And this report shows that it is now a

Page 145

positive $84,000 dollars for -- for this particular account, this is Atlanta -- this is Atlanta police?

A.      Yes.

Q.      Okay.  So this stock price increase occurred at least in part, after the March 1, 2022, press release by the company about the noncash share based compensation expense, correct?

A.      Yes.

MR. SAWICKI:  Those are all of the questions that I have for now.  I will pass the witness.  But just for the record, just to be clear, genally I don't think it will be problem but just to be safe I think I should hold this deposition open pending receipt of the communication documents between Driehaus and the police department or the investment board that we talked about earlier that you may go back and look for.

MS. MCWILLIAMS:  I haven't had time to look for anything, Todd, it might take --

MR. SAWICKI:  No.  No.  I didn't suggest that you should or were supposed to.  It's just that I'll give you plenty of

Page 146

opportunity to look for that stuff and if you find more, send it to us, and if there is something interesting in there I would just like the opportunity to get Mr. Buck back on camera here and ask a few more questions related only to that new stuff.

MS. MCWILLIAMS:  Of course.  That makes sense.  That is fine with us.  And I just also would like to let you know, Mike does have a meeting coming up in an hour and 15 minutes.  If he needs to reschedule that if we are getting close to that time, could you let us know.

MR. SAWICKI:  Yes.  Okay.  I'm done.

MS. MOYNA:  Okay.  Great, thanks.

EXAMINATION

BY MS. MOYNA:

Q.    Hi, Mr. Buck.  My name is Caitlin Moyna and I represent your clients, the City of Atlanta police and fire pension funds in this action.  I just have a few questions for you, I certainly won't take an hour and 15 minutes.  It will be much shorter than that actually.

So I'm going to go back to a few things that we talked about earlier today.  You know, we

talked a lot about some of the reasons why you decided

that Celsius was a compelling investment for small

growth cap funds.  And some of those reasons had to do

with some of it's financial metrics; is that correct?

A.     Yes.

Q.     So it's safe to say that you review a

company's financial metrics when you are establishing

an investment thesis on a particular company?

A.     Yes.

Q.     And then also, you consider a company's

financial metrics when you're determining whether the

investment thesis is actually supported by the

company's performance; is that right?

A.     Yes.

Q.     So when you hear a company recording its

financial metrics on an analyst call or you're reading

it in a press release, you assume that those financial

metrics are true and accurate; is that correct?

A.     Yes.

Q.     So when a company reports a metric like

revenues, for example, you don't second guess that the

revenues that a company is reporting are accurate; is

that right?

A.     Yes.

Q.     So is it safe to say that it is important

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 149 of
30(B)(6) Driehaus Capital                              June 12, 2023
209
City of Atlanta Police Officers' Pension Plan v. C

Page 148

for companies to get their financial metrics correct?

A.      Yes.

Q.      And is that true across the board, that a company should get all of its reported financial metrics correct?

A.      Yes.

Q.      So even if you place more importance on one metric over another, for example, if you think revenues happen to be more important than profits for a particular company, you still think it's important that the company would report profits accurately; is that right?

A.      Yes.

Q.      And that would also be true for net income metrics, you think it's important that a company would report accurate net income?

A.      Yes.

Q.      And net income per share?

A.      Yes.

Q.      When Celsius reported its financial metrics in this second and third quarters of 2021, you believed they were accurate, correct?

A.      Yes.

Q.      You had no reason to think that those --
those when metrics were -- were not correct; is that

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 150 of
30(B)(6) Driehaus Capital                              June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C
209

Page 149

right?

A.     Yes.

Q.     Okay.  Would you invest the funds of Driehaus's clients and companies if you thought you could not believe that the financial metrics were accurate?

A.     No, I would not invest if I did not believe that they would be accurate.

Q.     Okay.  Would you invest the funds of Driehaus's clients and company if you knew that it was reporting false financial metrics?

A.     No.

Q.     Or if you knew that a company was deliberately misleading investors about its financial metrics?

A.     No.

Q.     Or would you invest funds in a company if you thought a company was being extremely reckless in misleading investors about its financial metrics?

A.     No.

Q.     Okay.  I think you said earlier when we were talking about the disclosure on March 1, 2022, about Celsius's improper accounting for share base compensation for some its employees, I think you said that in your assessment at the time, you did not think

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 151 of
30(B)(6) Driehaus Capital                               June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 150

that this was a situation where a company was engaging
in, quote, "Aggressive accounting practices to make
the company look more profitable than it actually
was."

Do you remember saying that?

A.     Yes.

Q.     Okay.  But if this were a situation where a
company was engaging in aggressive accounting
practices to make itself look more profitable, would
that have been more important to know?

A.     I think it would depend on the measure of
profitability that was being inflated or at -- at
issue.

Q.     So I mean, we just -- I think you just said
that you would not invest in a company if you knew
that it was misleading investors, correct?

A.     Yes.

Q.     Do you think that a company that engages in
aggressive accounting practices to make itself look
more profitable than it is, is misleading investors?

MR. SAWICKI:  Object to the form.

MS. MOYNA:  On what basis?

MR. SAWICKI:  It's vague, and it's a
question that calls for speculation without
adequate predicate or foundation.

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 152 of
30(B)(6) Driehaus Capital
209
City of Atlanta Police Officers' Pension Plan v. C
June 12, 2023

Page 151

MS. MOYNA:  Well, he testified that
he would not invest in a company if it knew
it was -- and I'm talking about companies,
general.  If he knew that companies were
deliberately misleading investors.

MR. SAWICKI:  It's an incomplete --

MS. MOYNA:  So I'm asking him -- I'm
asking if he thinks that a company that is
engaging in aggressive accounting practices
to make itself look more profitable, does
he think, in his opinion, that company is
misleading investors.

MR. SAWICKI:  Object to the form.
It's a vague and incomplete hypothetical.

BY MS. MOYNA:

Q.    Do you understand my question?

A.    Me?  Yeah, I think I do.

Q.    Okay.  Okay.  Can you answer the question.

A.    Could you say the question again?

Q.    Okay.  Do you think that a company that is
engaging in aggressive accounting practices to -- to
make itself look more profitable is misleading
investors?

MR. SAWICKI:  Object to the form.

THE WITNESS:  Yeah, it could be.

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 153 of
30(B)(6) Driehaus Capital                                    June 12, 2023
209
City of Atlanta Police Officers' Pension Plan v. C

Page 152

MS. MOYNA:  Okay.  That's all --
those are all my questions.

MR. SAWICKI:  I don't have anything
else.  Subject to my reservation of rights,
I think we're concluded.

MS. MOYNA:  Great.

THE WITNESS:  Thank you very much.

THE VIDEOGRAPHER:  This conclude --
this concludes the videotape deposition.
The time is 3:21 p.m. Eastern.  We're off
the record.

MR. SAWICKI:  Tomorrow expedite.

MS. MOYNA:  Expedited for tomorrow.

MR. REEVES:  No copy.

MR. SAWICKI:  No rough.  Just
tomorrow final.

(Deposition adjourned at 3:22 p.m.)

Page 153

REPORTER'S CERTIFICATE

I, LESHAUNDA CASS-BYRD, CSR No. B-2291, RPR,

Registered Professional Reporter, certify that the

foregoing proceedings were taken before me at the time

and place therein set forth, at which time the witness

was put under oath by me;

That the testimony of the witness, the questions

propounded, and all objections and statements made at

the time of the examination were recorded

stenographically by me and were thereafter

transcribed;

That the foregoing is a true and correct

transcript of my shorthand notes to taken.

I further certify that I am not a relative or employee

of any attorney or the parties, nor financially

interested in the action.

I declare under penalty of perjury under the laws

of North Carolina that the foregoing is true and

correct.

Dated this June 12, 2023.

LESHAUNDA CASS-BYRD, CCR-B-2291, RPR

30(B)(6) Driehaus Capital                                    June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 154

ERRATA SHEET FOR THE TRANSCRIPT OF:

Dep. Date:

Deponent:

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page 155

WITNESS SIGNATURE:_____

State of _____

County of _____

Subscribed and sworn to before me this _____ day of

_____, 2023.


                    _____

                              Notary Public

My Commission expires_____

(Seal)

Page 156

J U R A T

I,                   , do hereby certify under penalty of

perjury that I have read the foregoing transcript of

my deposition taken on;_____that I have made

such corrections as appear noted herein in ink,

initialed by me; that my testimony as contained

herein, as corrected, is true and correct.

Dated this ____ day of _____, 2023, at

_____,

_____

SIGNATURE OF WITNESS

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 158 of 209
30(B)(6) Driehaus Capital                                    June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

Page 157

Caitlin M. Moyna

cmoyna@gelaw.com

                          6/13/2023

RE:    City Of Atlanta Police Officers' Pension Plan v.

      6/12/2023, 30(B)(6) - Driehaus Capital (#5937203)

      The above-referenced transcript is available for

review.

      Within the applicable timeframe, the witness should

read the testimony to verify its accuracy. If there are

any changes, the witness should note those with the

reason, on the attached Errata Sheet.

      The witness should sign the Acknowledgment of

Deponent and Errata and return to the deposing attorney.

Copies should be sent to all counsel, and to Veritext at

cs-southeast@veritext.com.


 Return completed errata within 30 days from

receipt of testimony.

   If the witness fails to do so within the time

allotted, the transcript may be used as if signed.


                    Yours,

                    Veritext Legal Solutions

**[& - 200]**

Page 1

| **&** | | | |
|---|---|---|---|
| **&**  2:5,9 8:11,18 8:21 | **10017**  2:6 | **124**  6:24 | **18**  4:1 7:8 31:5 31:15 54:5,6 54:10 55:2 132:12 |
| **0** | **102**  5:21 | **125**  6:25 | **186**  136:10 |
| **00002048**  131:7 | **104**  5:23 | **128**  7:3 | **186.5**  135:24 |
| **1** | **106**  6:4 | **12:15**  72:14 | **19**  4:4 14:20 58:2,3,9 129:16 |

**&**

**&**  2:5,9 8:11,18 8:21

**0**

**00002048**  131:7

**1**

**1**  5:22 6:6 27:10,15 44:15 44:16 45:1,3 45:12 104:16 105:24 111:8 117:22 118:15 120:4 123:1 127:13 128:18 133:18 143:11 145:5 149:22

**10**  45:3 64:14 64:16 65:8,17 84:16,17,21 85:7 95:13 105:2 111:17 112:8,8 143:21 144:17

**10,000**  85:9 95:18 96:1

**10.1**  91:5

**10.9**  108:21,25

**10/23**  138:4

**10/31/21**  84:19 84:24

**100**  20:3 27:9 44:5,5,6 132:19

**10017**  2:6

**102**  5:21

**104**  5:23

**106**  6:4

**10:00**  1:17

**10:16**  8:3

**10:19**  55:17

**11**  3:16 5:3,11 7:2 35:21 81:7 81:8,16 88:5 88:18 89:15 90:18 97:24 98:17 127:11 128:13,23 129:15

**110**  6:6

**1100**  2:14

**113**  6:10

**114**  6:12

**115**  6:8

**116**  6:15

**118**  6:16

**11:33**  53:5

**11:40**  53:4,8

**11th**  127:10

**12**  1:17 3:19,21 5:2 8:2 38:15 87:2 153:20

**12,462,000,0...**  32:22

**12/7/22**  138:11

**1201**  2:10

**121**  6:19

**123**  6:21

**124**  6:24

**125**  6:25

**128**  7:3

**12:15**  72:14

**12:19**  72:18

**13**  136:1

**130**  6:9 7:6

**132**  7:9

**134**  7:11

**135**  7:13

**139**  7:15

**14**  40:20,21

**141**  7:18

**142**  7:21

**146**  3:3

**14th**  58:20

**15**  20:3 42:10 86:15 146:11 146:22

**155**  136:18,23 140:21

**155.4**  136:19 137:12

**15th**  4:4 58:10

**16**  3:21 12:17 12:19 26:10 90:16

**16th**  6:21 89:21 123:9

**17**  3:22,24 17:4 17:5 18:10 19:17 20:17 26:11,11 29:11

**17.1**  29:21

**18**  4:1 7:8 31:5 31:15 54:5,6 54:10 55:2 132:12

**186**  136:10

**186.5**  135:24

**19**  4:4 14:20 58:2,3,9 129:16

**1995**  13:23

**19th**  77:20 78:7

**1:00**  97:2

**1st**  74:16,25 77:4 110:20,25 122:19

**1w**  138:4

**2**

**2**  3:6 6:12,15 7:15 24:19 46:15,16,25 47:3 48:6 50:23 52:7 53:13 113:15 115:3,8,13 117:3 140:5,11 140:16,16

**2.46**  135:24

**20**  4:7 14:20 29:7,10 42:11 43:5 44:7,10 44:24 45:5,12 46:2 60:12,13 60:17 137:2

**200**  144:22

**[2000 - 31]**

Page 2

**2000**  13:23 23:19 29:15,19 30:10,17,23
**2002**  14:1
**2006**  20:19
**2020**  32:22 39:12 53:18 75:12,13 94:1 94:7
**2021**  3:11,20 4:3,4,7,10,13 4:18 5:2,3,5,15 6:3 14:9,13,23 18:8,11 30:23 31:21 33:19 35:6 38:11 40:5 44:1 46:2 51:8 53:15,19 54:12,19 55:12 58:10 59:1,14 59:18 60:5,17 64:7,11,17 66:4 67:16 68:1,8,19 75:13,14 76:14 77:18 78:6 83:2 85:8 86:3 87:2,17 88:5 88:18,19 89:15 90:16,19 94:2 95:7,12 98:2 101:21 104:25 105:9 106:8 128:20,21 137:17 144:22

148:21
**2022**  3:20 5:11 5:18,23 6:6,12 6:15,16,19,21 7:2,4,9,11,12 7:15,17,21 17:13 18:9,11 30:23 33:19 35:6 38:11 40:5 44:1 46:2 76:14 77:21,24 77:25 78:7 83:2 86:6 87:19 97:24 98:10,18 100:18 104:16 105:24 110:20 111:8 113:16 115:3 117:3,23 118:16,23 119:19 121:12 121:20 122:20 123:10,14 125:19 127:11 127:13 128:13 128:16,18,25 128:25 129:5 129:17 130:17 130:23 132:12 134:19,23 135:7 136:17 137:16 140:5 140:11,16 141:10 142:12 142:20,23

144:10,17 145:5 149:22
**2023**  1:17 8:2 153:20 155:6 156:8
**2049**  131:7
**21**  4:9,13 46:2 61:25 62:1,4 66:4 70:2 94:7
**21591**  153:22
**22**  1:3 4:10 7:3 40:5 63:24 64:1 78:7,7 112:4 128:14 134:23
**2271**  108:23 109:3
**2291**  153:2,23
**23**  4:13 51:8 65:22,23 66:2
**24**  4:3,16 54:12 54:19 67:1,4,5 67:8 72:24
**2494**  89:13 92:17
**2495**  90:14
**24th**  55:3,20 57:16
**25**  4:19,21 83:11
**250**  2:14
**2503**  137:3,4
**2504**  137:2
**2505**  137:24 138:16

**26**  4:20 83:5,9
**27**  4:22 68:1 83:20,24 84:10
**272,000**  95:20
**27th**  4:7 60:17
**28**  5:1 86:22 87:1
**29**  5:3 88:9,13
**292,000**  96:2
**2a**  3:10 31:20

**3**

**3**  3:10 31:14,15 31:16,20 32:20 35:21 38:15 40:20,22 43:5 48:5 80:24 103:7
**30**  4:18 5:8 8:4 67:15 94:24,25 95:3,7,12 105:12,13 134:23 157:5 157:17
**300,000**  96:3
**30309**  2:15
**30309-3424**  2:11
**30th**  17:13 83:2
**31**  3:11 5:11,15 32:22 85:8 86:6 87:19 95:18 97:19,20 98:2 104:24 130:23 144:10 144:17

Case 9:22-cv-80418-DMM Document 100-4 Entered on FLSD Docket 06/15/2023 Page 161 of 209
30(B)(6) Driehaus Capital
City of Atlanta Police Officers' Pension Plan v. C
June 12, 2023

**[31,452.2 - acceptable]**

**31,452.2** 65:1
**32** 5:16 98:4,5
  98:9
**33** 5:19 102:6
  102:10
**34** 5:22 104:11
  104:12,15
**35** 6:1 106:2,6
  106:6,12 109:1
  110:19
**36** 6:5 110:8,9
  110:17 111:6
**37** 6:7 113:5,6
  113:10
**372** 45:11
**38** 6:11 114:22
  114:23 115:5
**39** 6:13 116:23
  117:2
**3:00** 142:24
**3:21** 152:10
**3:22** 152:17

**4**

**4** 3:12 32:20
  50:22 61:15
  75:25 76:1,4
  98:17 129:15
  133:21
**40** 6:16 118:18
  118:22 119:12
  121:11,15,22
**41** 6:17 121:6
  121:13,18,23
**42** 6:20 123:4,7
  124:20 125:22

**43** 6:22 124:14
  124:18
**44** 6:25 125:22
  125:24 127:6
**45** 7:1 128:8,12
  129:3
**46** 3:9 7:4
  130:13,17
  132:5 143:22
  144:6
**47** 7:7 132:5,6
  132:10
**48** 7:10 134:14
  134:17
**485** 2:5
**49** 7:12 135:2,6
**4900** 2:10
**4:12** 121:13
**4:19** 55:16
**4:53** 121:14
**4th** 83:2

**5**

**5** 3:13 21:13
  33:13 45:2
  61:15 74:7,8
  74:11
**50** 7:14 139:25
  140:3
**51** 7:16 141:5,9
  143:6
**52** 7:19 142:14
  142:15,19
**54** 4:3
**58** 4:6

**5937203** 157:5

**6**

**6** 8:4 23:24
  157:5
**6/12/2023**
  157:5
**6/13/2023**
  157:3
**60** 4:8
**62** 4:9
**64** 4:12
**65** 4:15
**67** 4:18

**7**

**7** 4:10 24:8
  64:7
**74** 3:15
**76** 3:12
**7th** 5:17 7:17
  98:10,18
  141:10

**8**

**8** 3:11 5:22
  6:16 31:21
  77:24 87:3
  88:1 104:16,21
  109:2 118:22
  119:18
**8.6.** 91:5
**8.81** 29:22
**80418** 1:3
**81** 3:18
**82,000** 65:2

**83** 4:21,24
**84,000** 145:1
**86** 5:2
**88** 5:7
**8th** 6:19 7:21
  77:5 121:12,20
  142:12,20,23

**9**

**9** 3:2 7:4,11
  95:18 130:17
  134:19
**9,000** 77:3
  95:14
**9,188** 75:2
**9,749** 84:25
**9.4** 135:25
**94** 5:10
**97** 5:15
**98** 5:18
**9876** 74:19

**a**

**a.m.** 1:17 8:3
**ability** 11:6
**able** 9:23 11:5
  127:23
**above** 55:4
  80:22 90:14,15
  157:6
**accelerated**
  65:14
**acceleration**
  20:14
**acceptable**
  131:10

**[access - advisor]**                                    Page 4

**access** 87:8,20
89:22 102:15
113:12 114:18
115:6 142:6
**accessed** 11:17
**accessible**
15:18
**accidentally**
117:10
**accordance**
48:22 52:13
79:15
**account** 21:25
22:1,2,17 27:7
33:14,19 34:3
44:2,25 45:1
45:12,21,23,24
48:11,12,14,15
48:18,23 49:8
51:16 52:1,4
52:11,21 53:21
74:24 76:14,19
77:20 78:6,22
80:8 81:18,20
84:19 85:6,8
95:11,15,25
96:1 145:2
**accounting**
76:7 93:3
107:14,17,24
108:5,10 110:4
115:23 116:4
125:14 149:23
150:2,8,19
151:9,21

**accounts** 22:23
23:6 43:14,20
43:24 44:17,23
45:18 47:22
48:3,21 50:3
52:16,19,22
68:3 72:25
79:1,2 84:7
86:12 96:6,13
96:19 98:20
99:5,6,7,25
100:2,7,8,11
117:11,19
118:4,11
119:21,23
120:2,6 124:23
129:18 130:22
142:11 144:11
144:15
**accuracy** 157:9
**accurate** 41:25
47:6 95:22
147:18,22
148:16,22
149:6,8
**accurately**
32:15 51:18
65:6 148:11
**accusing** 125:5
**acknowledging**
57:10
**acknowledg...**
157:12
**acquisition**
20:12 48:9

**acronym** 61:1
**act** 48:8 49:23
**acted** 11:17
50:12
**acting** 47:18
**action** 6:20,23
9:8 123:8,15
123:20,24
124:3,19
127:14 146:20
153:16
**actively** 32:25
**activities** 84:5
124:22
**actual** 139:10
**actually** 9:21
22:14 80:22
99:20 101:11
123:21 146:23
147:12 150:3
**add** 94:4,9
100:2 117:8
140:13
**added** 78:25
94:9
**adding** 45:4
91:23 143:11
**addition** 105:8
**additional**
23:22 51:25
77:5 99:12
102:1 105:16
105:19 115:16
122:5,11
127:19,24

143:15
**address** 105:7
**addressable**
25:4
**adequate**
150:25
**adjective** 60:24
**adjourned**
152:17
**adjust** 46:19
100:19
**adjusted** 93:4,5
93:8 94:5
99:16 109:5,10
137:6,15
139:15,16,17
**adjustment**
100:10 101:4
**adv** 3:10 31:7
31:10,21 32:3
32:6,16,21
35:22 41:5
43:6
**advent** 3:12,16
76:5,6,7 81:12
81:17
**adviser** 13:19
14:11,19 50:13
52:8
**advises** 68:16
**advisor** 67:21
69:21 70:2
73:5 75:6 82:9
96:6 124:23

Case 9:22-cv-80418-DMM Document 100-4 Entered on FLSD Docket 06/15/2023 Page 163 of 209
30(B)(6) Driehaus Capital June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

**[advisors - appropriate]** Page 5

| | | | |
|---|---|---|---|
| **advisors** 36:18 68:7 | **agreement** 3:6 47:1,4,8,11,16 | **alpha** 23:25 24:4,6 30:6,6 | **announces** 88:1 104:25 |
| **advisory** 3:6 21:5 30:19 32:4,12,16,18 47:1 48:7 51:11 52:10 83:17 87:5 88:24 | 47:24 49:3,23 50:2,20 51:6 52:8 133:6 | 30:13 | **announcing** 5:4 88:3,19 |
| | **ahead** 39:18 79:5 | **alston** 2:9 8:11 | **answer** 9:23 10:20 11:5 80:16 151:18 |
| | **aid** 65:3 | **aluminum** 92:2 112:4 | |
| **affirmatively** 96:11 | **alcohol** 99:10 99:19 | **amend** 101:11 | **anticipated** 106:25 112:2 |
| **afternoon** 55:3 98:11 | **alcoholic** 118:6 | **amount** 52:15 103:11 | **anybody** 12:9 16:7 |
| | **alerted** 87:20 | **amounts** 81:21 101:12 | |
| **agency** 32:11 | **alerts** 87:13 | **analysis** 35:23 35:25 36:1,9 | **anymore** 143:19 |
| **aggregate** 43:12 46:5 | **alex** 7:17 141:11 | 36:25 37:11 60:3 63:15,22 | **ap** 32:2 |
| **aggregated** 45:19 | **align** 15:5 | 71:8,10,21 101:6 116:3,11 | **apparently** 128:23 |
| **aggregating** 44:11 | **alignment** 20:21 | 116:16,18 117:23 120:13 | **appear** 156:5 |
| **aggressive** 108:10 150:2,8 150:19 151:9 151:21 | **allegation** 125:14 | 141:15 | **appearances** 2:1 |
| | **alleging** 123:15 124:3 127:15 | **analyst** 6:11 15:2 21:16 | **appears** 85:15 |
| | **allocate** 26:18 | 37:8 62:7 114:4,8 115:2 | **applicable** 157:8 |
| **aggressively** 100:25 | **allocated** 43:23 44:22 | 115:13 126:23 126:24 147:16 | **application** 52:20 |
| **ago** 95:7 101:20 124:9 136:1 | **allocation** 28:13,19 | **analysts** 16:11 38:2 114:2 | **appreciated** 27:24 56:15 65:10,13 |
| | **allocations** 29:3 | **analyze** 89:23 142:6 | **appreciates** 27:18 |
| **agree** 40:9,18 40:19 121:16 125:12 128:5 141:3 | **allotted** 157:20 | **analyzed** 96:21 111:12 123:25 | **approach** 23:12 24:13 120:9 |
| | **allows** 62:20 87:13 | **announcement** 113:14 114:5 | **appropriate** 49:10 99:5 |
| **agreeing** 118:9 118:14 | **alongside** 14:2 21:9 | 127:14 | |

**[approves - back]**

Page 6

approves 23:3
approving
  143:15
approximately
  8:2 44:2
arrow 62:19,19
  62:21
aside 45:14
  90:23
asked 13:6 30:6
  73:20
asking 11:2
  58:24 100:16
  151:7,8
aspect 71:1
  86:8
aspects 105:21
  106:13 115:18
assemble 37:17
  38:6
assessment
  108:13 149:25
asset 43:25
assets 32:23
  33:1 48:10
  49:7 50:3
assistant 14:3
  21:15
assistants
  82:23
associate 8:14
associates 4:23
  7:6 68:11,12
  83:25 85:16
  130:19

assume 11:4
  44:10 111:16
  147:17
assumption
  111:23 112:7
  128:4
assumptions
  108:10
atlanta 1:4,5
  2:2,2,11,12,15
  3:7,14 4:16
  5:14 14:12,18
  18:7 31:25
  33:8,18,22
  34:15 35:1,5
  36:10 45:17
  46:4 47:2,12
  47:13 48:14
  49:4 51:7,24
  52:15,19 53:14
  53:20 67:14,21
  68:6 69:22
  70:1,18 71:10
  73:11 74:13,18
  74:18,21,24
  75:1,9,19
  76:13,18,18
  77:12,20 78:12
  81:17,20,21
  84:7,11,18
  85:5,7,19,23,25
  86:4,10 87:18
  90:12 95:11,14
  98:1,20 99:25
  100:4,13

117:25 129:17
130:22 144:11
144:11 145:2,2
146:19 157:4
atlanta's 73:21
  78:6 95:24
atlantic 2:9
attached 51:1
  157:11
attaches 88:4
  104:21 134:24
attaching 4:24
  5:12 83:25
  97:25 130:19
  144:9
attended 13:22
attention 69:23
  119:4 125:8
attorney 8:9
  9:7 153:15
  157:13
attractive 25:8
  25:24 26:20
  69:18
attributable
  135:23
audibly 10:23
audio 8:15
august 130:23
  144:10,17
aum 43:24
authoritative
  82:2
authorities
  50:10

authority 9:24
  43:8 49:13,18
  49:19,22
authorization
  58:24
authorized
  48:8
automated
  79:2,6
automatic 75:4
automatically
  73:20 87:14
available 9:19
  102:18 122:18
  126:15 127:21
  157:6
avenue 2:5
aware 45:16
  51:23 85:16,21
  96:7 124:21
  125:13

**b**

b 6:7,11 8:4
  52:8,14 113:17
  113:19 114:4
  114:18 115:2,7
  115:13,15
  116:3,11
  126:22 153:2
  153:23 157:5
b's 45:3
back 21:12
  27:14 35:10,18
  53:9,17 72:19
  78:2 89:2 91:6

**[back - bottom]**                                                    Page 7

92:17 94:4,9
97:10 98:17
117:7,19
121:10 129:14
130:2 131:13
132:2,4 137:19
138:15 144:3
145:18 146:5
146:24
**background**
13:18,21 103:5
**backing** 137:11
**baked** 28:1
**balance** 27:15
**bar** 92:11
135:19 136:16
**base** 43:24
63:22 92:3
107:18 109:11
112:12 115:17
116:3 127:20
128:2 129:12
136:12 149:23
**based** 9:18,19
26:21 28:13
39:3 43:24
47:15 52:14
54:1 56:13
57:12,22 60:1
64:19 71:10
75:10,16 78:15
80:10,11,16
81:2 105:11,14
105:16,19
109:18 112:24

117:23 121:1
122:23 124:8
125:7 129:3
141:16,18
143:16 145:7
**basically** 52:25
76:12 78:3
141:15
**basis** 28:5,9
32:23 42:17
45:19 46:5
56:10 57:12,19
63:15 69:12
102:18 132:19
150:22
**bates** 109:3
131:6 137:3,23
**began** 14:2
**beginning** 8:9
65:17 89:2
117:6
**begins** 43:7
62:17 105:7
**behalf** 1:7 2:7
2:12 36:9,14
47:11,18 70:5
73:10 74:17
75:1 87:9
**belaboring**
142:1
**belief** 24:14
26:23
**believe** 14:9
32:25 41:15
65:12 72:1

76:7 93:6 99:7
138:7 149:5,7
**believed** 96:22
148:22
**believes** 24:9
41:10
**bell** 110:21
**bench** 56:1
**benchmark**
23:18 24:3
30:4 56:18
**benchmarked**
23:17
**benchmarking**
30:2,7,9 57:3
57:21
**beneath** 61:7
**benefit** 3:8
32:17 47:2
81:15 109:17
131:3
**best** 10:25 11:5
43:14 49:23
59:23 60:10
64:16 75:15
76:25 81:2
141:20
**better** 46:22,22
52:24,25
103:14,16,18
103:25 135:21
**beverages** 65:2
118:6
**beyond** 18:18

**big** 64:24
106:17
**bigly** 60:21,22
60:23
**billion** 20:4
**biotech** 26:7
**bird** 2:9 8:11
**bit** 34:5 67:11
84:25 89:5
96:8 133:14
**blocks** 51:14
**bloomberg**
4:19 6:7 82:1,7
82:14,24 83:11
113:11
**blow** 92:19
**blown** 119:10
119:13
**blue** 140:13
**board** 3:9 4:17
47:2,17 48:1
49:5,15 50:11
50:15,16 51:7
51:11,24 67:15
70:1,4 85:23
118:8 145:17
148:3
**boards** 48:12
**bother** 139:10
**bottom** 17:19
17:22 23:21,23
23:24 32:2
54:22 58:16
59:4 68:10
78:9 88:12

**[bottom - carballo]**

Page 8

89:13 111:15
127:9 135:11
135:17,23
**bought** 142:10
**box** 20:17,21
126:10 140:13
**break** 11:8
46:10 53:3
54:2 86:17
131:25,25
143:21
**brief** 62:16
**bring** 27:14
73:14 119:3
**brokerage** 43:7
73:1,12,17
113:22
**brokers** 45:9
**bros** 111:15
**buck** 1:16 3:1
4:2,5,7,11,14
5:16 6:5,14,18
7:1,8,16,20 8:6
9:3,6 11:11
12:22 13:17
17:8,23 26:13
29:10 31:7,14
31:19 35:22
36:17 43:6
46:12,19,24
49:21 51:5
53:12 54:9
58:8 60:16
62:4 64:4 65:5
66:1 67:4,8

72:22 74:11
76:4 81:16
83:8,23 86:25
88:13 92:25
95:3 97:12,23
98:8 102:9
104:15 106:5
106:20 107:16
110:16 113:9
115:1 117:1
118:21 121:10
123:7 124:17
125:21 128:11
130:16 132:9
134:17 135:5
136:2 137:8
140:3 141:8
142:18 144:6
146:4,18
**bucket** 23:7
**bullet** 19:25
91:2 108:16
115:14 135:16
135:18 136:16
**bullets** 135:12
**bullish** 143:1
**bunch** 43:12
45:19 46:5
**bunching** 44:11
**bundle** 43:21
**business** 18:15
20:13 24:21
25:3 32:12,16
41:20 60:25
80:21 93:7,17

93:18 97:1
103:1,24
105:22 108:1,8
108:11 114:2
115:19
**businesses** 34:9
**buy** 16:9 23:3,5
33:2 43:19
44:14,19 45:10
59:5 78:5
93:20 110:5
112:23 118:2
125:19 126:19
126:25 128:1
129:8,18,22
130:9
**buying** 22:5
117:18
**buys** 73:14
**byrd** 1:20
153:2,23

**c**

**c** 82:12
**caitlin** 2:4 8:18
146:18 157:1
**calc** 112:9
**calculate** 44:18
**calculation**
105:10 109:10
112:9,20,20
139:6,14,17
**call** 30:6,13
79:19 88:4
90:4,21,23
105:1 147:16

**called** 40:22
139:14
**calls** 36:6 37:10
72:7 90:6
150:24
**calories** 103:18
**camera** 46:19
146:5
**cans** 106:18
112:4
**cap** 3:23 17:11
18:10,14,22
19:18,19,22,22
22:9,14,24
23:4,6,7 29:4
29:12,20 30:16
33:24 41:4
44:3,13,25
51:15,19 53:23
59:19 63:11
67:22 68:3,7
73:18,22 86:5
90:7 118:1
142:10 147:3
**capabilities**
69:16 71:8
**capacity** 9:12
10:5,6
**capital** 2:18 8:5
9:13 14:1
17:24 157:5
**capitalizations**
20:3
**carballo** 1:13
9:10

**[care - change]**

Page 9

**care** 140:24
141:1
**cares** 112:17
**carolina** 153:18
**carrie** 58:19,20
**case** 8:12 9:8
12:13,24 26:25
27:25 30:25
56:17 74:3
77:1 81:25
112:14 123:9
**cash** 55:25
56:14 57:1,20
91:19 105:21
107:24 115:18
136:23 140:13
**cass** 1:20 153:2
153:23
**catalyst** 26:8
**catalyzing**
20:13
**categories** 13:5
37:11
**category** 39:18
66:16,19 101:5
103:14,16
**cause** 28:1 34:4
75:8 133:13
**caused** 74:17
75:1 77:19
98:24,25
129:17 142:9
**ccr** 153:23
**cel** 117:25

**celh** 55:21
60:21 103:25
111:15,15,23
117:9 119:3
121:24 126:19
132:15 140:12
143:1,10
**cello** 13:24
**celsius** 1:11
3:18,19 4:8,12
5:1,3,22 6:1,7
6:12,24 7:10
7:12 9:9 11:16
12:1 17:23
36:15,24 38:3
38:10 39:7,21
40:1 41:7
45:17,22 46:3
53:17,22 55:22
56:5,7,11
57:15 59:19
60:8,9,18
61:13,16,21
62:15,25 63:1
64:6,9,15 65:1
65:7 66:7,14
66:18,23 74:14
74:19 75:2,10
75:11 76:13,19
77:5,10 78:5
78:11,17 79:14
79:24 80:19
81:4,14,19
82:15,25 84:21
85:6 87:2,12

87:17 88:1,18
88:23 90:1
91:1 93:10,20
94:17 95:12,25
96:12,18,22
98:19,19 99:12
99:13,16,23
100:1,10,13,17
101:5,7,15,21
102:21 103:7
104:3,6,7,15
106:6 108:14
110:6 112:23
113:23 114:10
115:3 117:4,9
118:10 119:18
119:23 120:1,3
120:5,21 122:1
122:23 123:16
124:20 125:18
125:19 126:15
126:18,25
127:2,15
128:21,24
129:9,18,22
130:6,9 131:6
132:16,21
133:5 134:1,9
134:18 135:6
137:11 139:21
140:17 141:19
141:20 142:10
143:16 144:17
147:2 148:20

**celsius's** 7:3
89:14 96:7
102:1,25 108:6
108:6 114:5
126:11 128:13
133:9 137:15
149:23
**center** 2:9
**centers** 14:5
**cents** 136:1
**certain** 22:3
34:4,10 35:7
62:24 69:11,13
72:25 77:13
80:23 94:5
99:8 108:16
**certainly** 96:7
146:21
**certificate**
153:1
**certify** 153:3,14
156:2
**cetera** 32:23
33:6 66:15
68:4 104:9
105:11 117:7,8
**cfa** 21:14
**cfo** 9:9
**chain** 4:10 7:16
58:16 64:5
99:2 100:6,11
141:9
**chains** 61:6
**change** 20:2,7
27:11 50:18

**[change - comes]**                                        Page 10

79:15 107:25
120:18 154:4,6
154:7,9,10,12
154:13,15,16
154:18,19,21
**changes** 120:17
120:20 157:10
**changing** 40:17
43:3 121:1
**characteristic**
42:19
**characteristics**
28:15,23 42:9
57:10,25 96:23
**characterize**
29:2
**charged** 52:13
**charging** 52:10
**chart** 83:15,15
84:15 98:22,23
131:1
**charting** 4:20
**charts** 83:9
**chat** 4:2,7,14
6:13,16,17 7:7
7:14,19 15:13
15:13,14,16,25
54:11,15,19
55:24 56:4
58:14 60:18
66:3,6 98:13
111:7,10,14
117:2,6 118:23
119:16 121:12
121:14,19,23

132:11,14
133:18,25
134:8 140:4
142:19
**chats** 55:11
**check** 35:10,15
**chicago** 55:10
55:17
**chronological**
54:22
**circumstance**
42:22,25 80:20
**city** 1:4,5 2:2,2
2:12 3:7,14
4:16 14:12,18
18:6 31:25
33:7,17,22
34:15,25 35:4
36:10 45:17
46:4 47:1,12
47:13 48:14
51:6,24 52:15
52:18 53:14,19
67:14,21 68:6
69:22 70:1,17
71:9 73:10,21
74:12,18 75:19
77:12 78:5
85:23 117:25
146:19 157:4
**clarence** 6:22
124:19
**clarification**
82:11

**clarity** 79:10
**class** 6:20,23
9:8 123:8,14
123:19,23
124:3,19
127:14
**classes** 22:15
**classic** 42:8
57:10,24
**clean** 144:5
**clear** 54:20
60:23 79:12
81:6 106:20
145:12
**client** 14:18
32:23 34:14,16
34:25 35:3
45:2,3,15
47:11,16,21
48:9,10 49:3,4
49:11 50:11,16
50:18 52:2
74:3
**client's** 50:24
**clients** 21:5,9
22:2,17 32:4
32:18 33:4,10
33:14,19,24
34:3,7,10
36:20 43:8,14
44:2,25 45:5
45:12 47:8
48:23 49:24
52:24 53:15,20
53:21 59:24

69:4,9,11,14,18
70:20 71:9,22
80:24 87:9
146:19 149:4
149:10
**clinical** 26:9
**clipped** 61:8
**close** 117:20
146:12
**closed** 110:25
111:3
**closer** 27:25
**closing** 82:5,25
**cmoyna** 157:2
**cnbc** 64:9,9
**coal** 34:9
**cocco** 2:4 8:20
8:21
**coffee** 61:12
**colleague** 12:5
54:12 64:6
141:12
**colleagues** 4:5
11:14,25 58:11
**colors** 84:15
**column** 112:11
**come** 15:16
21:12 56:22
69:22 89:2
91:6 92:12
132:2,4 133:24
**comes** 49:22
81:11 82:24
111:2

## [comfort - conducted]

**comfort** 46:10
**comfortable**
  56:2
**coming** 56:1
  80:13 146:10
**commentary**
  129:25
**comments**
  133:17
**commission**
  32:8 155:10
**committed**
  125:6
**common**
  135:24
**communicate**
  80:23 93:5
**communicated**
  34:12 70:11
  71:24 86:7,11
**communication**
  54:15 85:17
  145:15
**communicati...**
  12:12 16:1
  34:24 35:4,11
  35:16 85:22
**companies** 20:1
  20:6,8 23:15
  24:21 25:12,17
  25:19 26:6,8
  34:8 38:6 39:2
  62:8,9 63:10
  100:21 101:2
  101:12 113:24

124:4 148:1
149:4 151:3,4
**company** 5:6
  5:21 11:18,19
  12:1 25:1,7,23
  26:1,22 36:5
  39:11,16 41:25
  42:3,22,25
  44:12,15 45:2
  45:6 57:5,23
  65:2 82:2 87:3
  88:20 89:21
  92:1 98:25
  99:18 102:15
  103:6 104:22
  105:10,15
  107:3,6 109:6
  109:9 110:19
  115:22 116:6
  116:13 123:1
  125:6 126:24
  129:24 136:5,9
  137:6 139:6,12
  140:20 141:16
  143:17 145:6
  147:8,15,20,22
  148:4,10,11,15
  149:10,13,17
  149:18 150:1,3
  150:8,15,18
  151:2,8,11,20
**company's**
  24:14 26:23
  27:17 39:4
  41:19 60:3

61:5 62:18
87:21 89:23
93:2 94:1,13
96:15 105:20
106:24 115:18
117:22 138:18
140:8 147:7,10
147:13
**comparators**
  66:13
**compared**
  29:18 30:18
  135:25
**compares**
  61:11
**comparing**
  30:7,9
**comparison**
  29:14 30:15
**compelling**
  147:2
**compensation**
  105:11,15,17
  105:20 107:18
  109:11,18
  112:13,21
  115:17 116:4
  125:7 127:20
  128:3 129:12
  136:12 145:7
  149:24
**competition**
  23:16
**competitors**
  30:19,25 39:20

**compilation**
  6:25 80:10
  126:2
**compiled** 11:15
  62:12
**complaint** 6:20
  123:9,11,15
**complaints**
  124:3 125:1
**complete** 122:6
**completed**
  157:17
**completely**
  35:14
**completeness**
  95:24
**comply** 105:13
**comprise** 65:6
**computer**
  15:22
**concerned**
  139:2
**concerning**
  52:1 66:7 73:4
  85:24 106:7
  124:19 128:13
  137:25 139:21
**conclude** 152:8
**concluded**
  112:16 152:5
**concludes**
  152:9
**conducted** 5:19
  102:12

Case 9:22-cv-80418-DMM Document 100-4 Entered on FLSD Docket 06/15/2023 Page 170 of
30(B)(6) Driehaus Capital                                    June 12, 2023
209
City of Atlanta Police Officers' Pension Plan v. C

**[conducting - correct]**                                    Page 12

| | | | |
|---|---|---|---|
| **conducting** 13:1 | **considering** 92:7 | **contractors** 59:5 | **corporate** 8:5 33:5 36:3 58:21 |
| **conference** 36:6 88:4 90:3 90:6,20,23 105:1 129:25 138:10,12,14 141:19,22 143:2 | **consistent** 10:1 51:18,22 | **contractual** 68:20 | **correct** 13:3 23:8 25:14,19 31:20 32:12 47:4 48:24 50:4 52:16,17 54:25 55:22 57:18,25 58:9 59:1 60:5,10 60:17 66:2,11 66:24 75:6,23 91:15 94:7 96:13 105:14 109:3,7 110:6 111:3,12,25 112:9,14,17,23 114:6 115:24 116:19 117:16 118:16,22 121:15,19 123:1 125:15 128:21 129:1,5 129:9,13 132:16 134:11 134:24 137:17 138:19 139:7 139:22 140:17 141:17 142:12 143:2,12,22 144:13 145:7 147:4,18 148:1 148:5,22,25 150:16 153:12 |
| | **construct** 27:6 72:8 | **contributed** 59:7 | |
| | **constructing** 29:3 | **contributor** 75:13 | |
| | **construction** 26:12,14,18 27:2 | **contributors** 59:4,6,18 | |
| **confirm** 31:19 33:17 51:5 66:1 97:23 104:17 106:5 111:5 118:21 121:18 130:16 132:9 134:17 138:9 140:3 141:8 142:18 144:7 | **consultant** 68:16 | **conviction** 26:22 27:1 | |
| | **consultation** 17:1 49:10,14 | **convictions** 26:21 | |
| | **consulting** 13:25 73:1,17 | **cool** 143:10 | |
| | **consumer** 14:4 14:5 15:3,3 21:21 103:19 | **coordinated** 55:6 | |
| **confirms** 59:16 | **contained** 38:11 156:6 | **copied** 68:10 | |
| **connection** 70:17 105:9 139:2 | **content** 37:3 | **copies** 131:11 157:14 | |
| | **context** 24:17 | **copy** 5:1 31:20 46:25 47:4 54:10 58:9 60:17 66:2 67:14 74:11 87:1 88:17 97:24 98:9 106:6 118:22 121:19 123:8 124:18 128:12 132:10 135:6 135:20 140:4 141:9 144:7 152:14 | |
| **consensus** 39:23 | **continue** 27:19 101:3 122:14 | | |
| **consider** 41:6 93:9 124:11 128:2 147:10 | **continued** 130:5 | | |
| | **continues** 60:21 | | |
| **consideration** 116:7 | **continuing** 108:7 122:13 | | |
| **considerations** 29:2 | **contract** 20:12 | | |
| **considered** 116:5 138:17 | **contraction** 6:10 | | |

[correct - decisions]

153:19 156:7
**corrected** 144:6
156:7
**corrections**
156:5
**correctly** 22:22
29:23 98:12
**correlated**
24:16
**cost** 91:24
112:3
**costs** 92:2
106:24
**counsel** 2:1,2
2:18 8:7 10:16
12:6 72:11
157:14
**country** 91:22
**county** 155:4
**couple** 10:18
38:17 74:14
86:16 95:6
118:7 131:5
133:5 140:7
**course** 11:24
32:4 115:10
125:9 146:7
**court** 1:1 9:1
10:8,10,13,14
10:20 72:11
**coverage**
113:23
**covering** 14:4
15:2 16:12,15
21:16

**covers** 126:24
**cranking** 66:7
**create** 132:25
**created** 73:13
**credential** 88:2
**critical** 115:15
**cs** 157:15
**csr** 1:20 153:2
**currently** 42:4
**customers**
130:6
**cv** 1:3
**cvs** 65:3
**cycling** 112:3

**d**

**daily** 3:19 4:19
4:20 28:4,9
82:2,14,25
83:10
**damian** 98:23
99:3 119:22
**data** 36:4,4
61:3 63:13
66:8,8 122:11
122:15,17
130:5 132:23
133:1,2,24
138:4
**database** 62:12
**date** 17:14
20:19 51:12
56:12 74:16
99:1 119:18
120:6 127:5,7
128:23,23

129:23 154:2
**dated** 3:10 5:2
5:22 6:11 7:10
7:21 17:13
31:21 87:2
104:16 115:2
134:19 142:20
153:20 156:8
**dates** 76:21
78:11
**david** 34:18
35:17 70:8
**day** 43:23
44:21 45:1,6
55:12,13 62:11
63:1 82:5
98:14,18 99:24
100:13,17
111:3 113:16
113:16 114:5
120:7,15,18,18
122:3 126:24
142:12 155:5
156:8
**days** 81:20 83:1
129:16 157:17
**dcm** 17:22 18:2
88:14,16
108:23 131:6
**decade** 64:11
65:1
**december** 3:20
5:15 7:15,17
7:21 32:22
77:24 78:7

83:2 86:6
87:19 89:21
90:16 98:2
104:24 140:5
140:11,16,16
141:10 142:12
142:20,23
**decide** 42:25
44:14 109:23
**decided** 96:12
96:18 101:24
102:3 110:3
117:24 118:2
147:1
**decides** 26:15
**deciding** 16:7
36:9 93:20
112:22 116:6
116:13 120:5
127:2 142:6
**decision** 15:9,9
19:7,13 34:19
44:12 54:1
57:22 75:8,20
75:20,22
101:25 109:25
110:5 116:19
122:22 125:18
129:22 130:9
**decisions** 15:1
16:4,20,25
18:21,25 21:20
27:13 28:8,12
28:19 36:19
38:10 54:17

[decisions - disclosure]                                            Page 14

63:19 79:13
87:9 90:11
102:21 114:9
139:21 142:7
**deck** 24:9
**declare** 153:17
**declines** 101:13
**decrease** 79:25
**decreasing**
43:2
**deduct** 94:4
**deducted** 94:10
**deems** 49:9
**defendant** 1:14
**defendants** 2:7
8:12 9:8 12:19
17:5 31:16
46:16 54:6
58:3 60:13
62:1 64:1
65:23 67:5
74:8 76:1 81:8
83:5,20 86:22
88:9 94:25
97:20 98:5
102:6 104:12
106:2 110:9
113:6 114:23
116:23 118:18
121:6 123:4
124:14 125:24
128:8 130:13
132:6 134:14
135:2 139:25
141:5 142:15

**defense** 34:8
**defined** 3:8
47:2
**definitely** 70:3
**degree** 13:23
24:6
**degrees** 13:24
**delay** 112:8
**delayed** 111:17
**deliberately**
149:14 151:5
**delivery** 91:21
**deloitte** 13:25
**dep** 154:2
**department**
32:1 145:16
**depend** 42:21
150:11
**depict** 93:1
**deponent** 154:3
157:13
**deposing**
157:13
**deposition** 1:16
3:4,21 8:4 10:4
11:12 12:14,18
12:23 13:2
31:14 37:6
41:3 51:20
79:5 125:9
145:14 152:9
152:17 156:4
**depreciation**
109:17

**describe** 32:15
33:3 34:2 60:8
105:1
**described**
47:17 49:19
54:2 60:2 75:5
101:25 105:8
126:3 130:8
**describes** 17:10
19:18 20:17
29:11 35:23
38:20 52:9,14
104:22
**describing**
64:10
**description** 3:5
33:9 41:9,13
**designate** 48:11
**desire** 27:19
**desires** 71:2
**despite** 96:11
**detail** 21:10
78:15 125:5
**details** 142:1
**determine**
69:17
**determined**
105:10 120:5
**determining**
147:11
**develop** 39:6
40:11,12 116:8
**developed**
39:10,12,25

**developing**
40:14
**development**
26:7 58:21
**different** 13:5
15:11 18:19
22:7 27:9 34:5
34:10 43:24
44:17,22 45:8
45:9 47:22
50:6 51:25
52:1 78:4
99:17 119:24
138:5
**difficulties**
72:17
**digest** 121:4
**diligence** 72:6
**diluted** 135:25
136:1
**direct** 14:24
49:7 91:21
**directed** 79:12
**directions** 49:2
**directly** 38:23
82:24 85:22
86:7,11
**director** 58:20
**disagreement**
40:16
**disclosed**
107:18
**disclosure**
105:23 134:22
140:25 141:1

Case 9:22-cv-80418-DMM Document 100-4 Entered on FLSD Docket 06/15/2023 Page 173 of
30(B)(6) Driehaus Capital 209 June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

**[disclosure - driehaus's]** Page 15

149:22
**discretion** 33:1
49:6
**discretionary**
14:5 15:3
32:23 43:8
49:18,22
**discuss** 15:8
**discussed** 22:11
72:3,4
**discusses** 43:6
**disposition**
48:10
**disruption**
39:20 133:13
**distortion** 8:16
**distributing**
5:21 102:14
103:6,6
**distribution**
39:19 65:16
91:19,21 133:6
133:10
**distributor**
103:12 137:11
138:23
**distributors**
136:20
**distributorship**
140:22
**district** 1:1,2
**diverse** 33:4
**dmm** 1:3
**doc** 100:10

**document**
12:25 13:4
17:3,9,12,20,21
18:1,2,8,9 31:5
31:24 32:7
43:10 46:9
51:23 58:17
60:12 62:12
64:24 74:7
88:15 89:16
126:4
**documentation**
36:25
**documents**
11:17,19,23
13:1,17 14:11
15:12,14,16
17:18,24 18:6
34:24 36:22,23
37:6,17,23
38:9,11 41:6
48:24 76:22,24
78:3 79:17
86:17 88:16
131:24 145:15
**doing** 8:15 10:2
17:4 39:12
55:11 56:2
57:9 60:24
72:5,6 75:16
81:21 82:8
83:16 104:18
122:8
**dollar** 66:10,11
66:11,15 95:18

**dollars** 145:1
**domestic** 18:16
19:4,6
**door** 39:21
**doors** 91:22
**double** 35:15
133:21
**doubled** 103:10
137:16
**doubt** 67:10
**dramatically**
65:8,13 66:18
95:16 120:18
144:21
**driehaus** 2:18
3:7,23 4:6,22
4:24 5:8,13,17
6:18 7:5 8:4
9:13 13:10,25
14:11 16:7
17:11,24 18:10
18:14,18 19:1
19:14 20:5
22:8 24:9,18
24:21 26:14
29:19 30:16,18
30:24 32:3,7
32:14 33:19,23
34:13,21,23
35:23,25 36:22
37:7 38:9,12
38:21 39:2,6
39:25 41:6,10
41:14 44:3
47:1,8,14 48:2

48:8,15,19,23
49:5,9,12 50:2
50:3,9,12,16
51:6,10 52:3,9
52:16,19,24
53:13,20 58:11
58:21 59:23
60:9 63:18
67:23 68:6,19
68:19,23 69:3
69:13,20,25
70:5,15,24
71:14,18,21
73:6,15,16,22
74:3,16,17,25
75:6,21,22
76:9 77:19
78:5 83:24
84:1,19 85:15
85:17,22 86:4
86:6,11 87:19
87:19 95:4
97:25 98:10
99:22 118:24
121:20 129:17
130:18,19
137:21 142:9
144:8,9 145:16
157:5
**driehaus's** 3:10
5:7 6:4 31:9,21
32:12,18 34:16
40:4 47:16
51:19 59:19
63:8 69:4,22

**[driehaus's - especially]**                    Page 16

70:12 75:1,8
75:14 79:13
84:5,11 85:25
88:20,22 106:9
135:8 143:15
149:4,10
**drill**  71:12
**drink**  39:18
64:25 66:15,19
107:3
**drinks**  61:12,17
**driven**  24:10
79:7
**drivers**  25:25
**dropped**  95:15
**dsd**  91:19,20
**due**  101:16
138:22
**duplicated**  37:4
**duty**  49:22
**dynamic**
100:25

**e**

**e**  4:4,10,22 5:8
5:12,16 6:5 7:1
7:4,16 11:15
12:11 15:13,25
58:9,14,16,19
59:9,13,16
64:5 82:12
83:24 95:4
97:24 98:9,13
102:16 111:6
128:12 130:17
141:9,10,14

143:4,5,6
144:8
**earlier**  55:12
60:2 79:17
85:1 98:14
109:20 122:2
126:3 129:15
145:18 146:25
149:21
**earliest**  54:23
**early**  39:12
85:10 100:18
**earnings**  20:15
24:10,15 26:2
26:7 42:12,14
62:14,16 89:20
90:3,6 91:7,10
93:4 101:18
107:15 108:1,3
108:7,9 128:16
128:17 139:2,6
139:11,15
**easily**  119:11
**eastern**  8:3
152:10
**ebitda**  91:5
92:16 93:5,8
94:6,6 108:18
108:20,25
109:6,10 137:6
137:15 139:17
**ebs**  108:18
**economics**
13:23

**educational**
13:20
**edwin**  1:12
9:10
**effect**  136:11
**effective**  67:25
**efficiently**  89:8
**effort**  9:22,23
70:17 89:25
**efforts**  69:4
**eight**  16:10,14
**eisenhofer**  2:5
8:18,21
**either**  74:16
78:25 79:1,24
113:2
**electronic**
15:13
**employ**  36:2
**employed**
108:11
**employee**
153:14
**employees**
47:14 149:24
**employs**  19:14
**enclosing**  5:9
95:5
**encompass**
62:9
**ended**  95:7
130:23 134:23
144:10
**endowments**
33:6

**energy**  39:17
61:12,17 64:25
66:15,19 104:1
104:4 107:3
**engage**  54:16
**engaged**  14:11
**engagement**
14:15
**engages**  150:18
**engaging**  150:1
150:8 151:9,21
**england**  55:7
**entered**  51:6
122:2
**entering**  50:1
**entitled**  19:17
26:12 48:7
51:15 92:23
**entity**  17:21
**entries**  118:7
143:9
**entry**  91:9
133:18 142:23
**eps**  91:7 139:9
139:10
**equally**  82:20
**equity**  18:17
23:12 113:23
**equivalent**
10:13
**errata**  154:1
157:11,13,17
**error**  112:20
**especially**
39:19

**[esq - exhibit]** Page 17

esq 2:4,4,8,8,13
essence 106:23
established 144:16
establishing 147:7
estimated 91:11,12
estimation 65:5
et 32:23 33:6 66:15 68:4 104:9 105:11 117:7,8
evaluate 27:18 28:16 79:13 124:1,2 142:6
evaluated 30:18,21 123:25
evaluating 36:14 91:1 93:9 94:16 127:2 129:8
evaluation 42:19 92:4 125:18
evaluations 28:7
evening 98:11 111:8
event 14:17 67:11
everybody 46:9 52:6 91:15

everybody's 131:2
everyday 79:20
evidences 63:17
evidently 29:14 131:2 140:25
exactly 116:9 127:13
examination 3:1 9:4 146:16 153:9
example 9:20 29:21 44:15 54:14 74:2,3 102:19 147:21 148:8
excepted 133:10
exchange 4:4 4:14 7:14 32:8 57:11 58:9 66:3 117:7 119:17,22 121:22 132:14 133:25 134:8 140:5
exchanged 7:19 142:19
exchanges 15:14
excluded 94:12
exclusive 133:6
excuse 23:23 31:13 57:12

62:24 111:6 137:3,7
execute 16:13 44:20
executed 45:8
execution 43:15 49:8 96:25
exercise 11:24 13:1 45:4
exhibit 3:5,6,10 3:12,13,16,19 3:21,22 4:1,4,7 4:9,10,13,16,19 4:20,21,22 5:1 5:3,8,11,16,19 5:22 6:1,5,7,11 6:13,16,17,20 6:22,25 7:1,4,7 7:10,12,14,16 7:19 8:15 12:17,19 17:4 17:5 18:9 19:16 20:16 21:12 26:10,11 29:8,11 31:5 31:14,16,19 32:20 35:21 38:14 40:20,21 43:5 46:15,16 46:25 47:3 48:6 50:23,23 52:7 53:12 54:5,6,9 55:2 58:2,3,8 60:13

60:16 61:24 62:1,4 63:24 64:1 65:22,23 66:2 67:1,4,5,8 72:24 74:7,8 74:11 75:25 76:1,4 77:3 81:7,8,16,24 83:4,5,9,10,19 83:20,23 84:10 85:14 86:21,22 87:1 88:8,9,13 89:4 94:25 95:3 97:19,20 98:4,5,8,17 102:5,6,9 104:11,12,15 106:1,2,5,6,11 106:12,12 109:1 110:9,17 110:19 111:5 113:6,10 114:22,23 115:5 116:22 116:23 117:1 118:18,21 119:1,10,12 121:5,6,11,11 121:13,15,22 121:23 123:4,7 124:14,18,19 125:22,24 127:5 128:7,8 128:11 129:3 130:12,13,16

**[exhibit - financial]**

131:1 132:6,9 134:14 135:1,2 135:5 139:24 139:25 141:4,5 141:9 142:15 142:18 143:6 143:22 144:6

**exhibits** 3:4 95:6 101:19 129:15 143:20

**expand** 25:2

**expanding** 42:11

**expect** 47:25 103:21 120:25

**expectation** 39:23 42:7

**expectations** 39:5

**expected** 42:6 91:10,12,15 132:24

**expedite** 152:12

**expedited** 152:13

**expense** 105:10 105:17,20 107:18 109:12 112:13,21 115:17 125:8 127:20 128:2 136:12,19,20 137:12 138:23 139:19 140:22

145:7

**expenses** 94:11

**experience** 13:19 20:18 112:25

**experienced** 20:6 85:9 136:9

**experiencing** 20:2,7 107:6

**expert** 38:5 102:13,17

**expires** 155:10

**explain** 14:25 15:14 18:13 21:10 26:13 27:16 44:10 62:5 65:9 73:8 78:23 89:18 98:24 105:2 119:17 125:22

**explaining** 80:3 125:5

**explains** 100:12

**exposure** 101:4 120:2

**exposures** 27:3 27:7

**extremely** 149:18

**f**

**f** 82:12

**face** 46:21

**facilitate** 43:14

**fact** 11:17 25:16 35:4 75:10 107:5 108:4 111:18 115:21 140:19 142:9

**factor** 27:7 116:5

**factors** 25:18 80:11 104:6

**factset** 82:10,12 82:13

**fails** 157:19

**fair** 16:24 38:9 41:9 71:6 78:18

**fairly** 18:10 29:1

**fallen** 30:24

**false** 149:11

**familiar** 31:9 31:11 83:13 84:12 87:5 129:19

**far** 127:18

**fashion** 131:15

**faster** 42:13 103:15

**feasible** 43:12

**february** 14:1

**federal** 32:11

**feel** 13:9 25:25 27:25

**fees** 52:9,10,13

**fellow** 98:14

**felt** 96:25 101:3 122:13

**fiduciary** 50:2 50:6

**fieldly** 1:12

**fifth** 51:3

**figure** 93:25 136:3

**file** 5:7 6:4 31:12 88:20 105:2 106:9 123:19 135:8

**filed** 6:20,23 32:7 87:3 123:9,13,15,21 124:20

**filing** 5:1 7:10 87:1,4,14 104:17 134:18

**filings** 36:5 37:3 38:8 87:14,21

**final** 15:9 152:16

**financial** 5:5 7:13 15:4 88:19 92:24 93:24 104:23 108:22 109:12 113:11 129:1 134:22 135:7 136:6,17 147:4 147:7,11,16,17 148:1,4,20

**[financial - funds]**                                      Page 19

149:5,11,14,19
**financially** 153:15
**financials** 27:5
**find** 9:23 25:24 34:6 47:25 62:10 131:14 132:1 140:13 146:2
**fine** 146:8
**finish** 10:19
**finished** 126:4
**fire** 5:14 14:13 18:7 33:8,18 33:22 34:15 35:5 45:17 74:24 75:1 81:17,20 84:7 84:11,18 85:19 85:23,25 87:18 90:12 95:11,14 98:1,20 99:25 129:17 130:22 144:11 146:20
**firefighters** 3:16 47:13,19 48:15 81:13 85:24
**firefighters'** 1:6 2:3
**firm** 2:13 6:23 8:24 9:13,16 9:20 124:19
**firms** 123:18

**first** 19:21,25 33:13,17 38:15 39:11 47:10 51:2 54:23 55:16 58:16,19 74:14 76:16 77:2,2,17 78:10 87:17 90:16 91:2 106:16 109:16 112:4 115:14 127:9 128:15 128:24,25 129:4 137:23 138:16
**fiscal** 6:3 106:8
**fit** 18:15
**florida** 1:2
**flow** 62:7 139:5
**focus** 23:25 24:2 38:23 90:24 135:16
**focuses** 19:25
**focussed** 63:3 79:22 93:20 103:4 104:8 108:17 125:8
**focusses** 120:13
**folks** 7:5 118:23 130:18 144:9
**follow** 33:14
**following** 38:2 89:15

**forecast** 42:4
**forecasts** 41:24
**foregoing** 153:4,12,18 156:3
**forgive** 28:18 135:14,14
**form** 3:10 31:7 31:9,21 32:3,6 32:16 35:22 43:6 87:3 88:1 150:21 151:13 151:24
**formal** 70:4
**formed** 39:3 47:8,8
**former** 9:9 75:5
**forth** 50:24 60:4 153:5
**fortunes** 144:20
**forward** 143:4 143:10
**forwarded** 64:9 141:12
**forwarding** 4:11 64:5
**found** 126:16
**foundation** 150:25
**foundations** 33:6
**four** 19:18 78:4 118:9

**fourth** 6:2 104:24 106:8 128:20 142:23
**frame** 71:25
**fraud** 123:16 124:3 125:6,15 127:15
**fraudulent** 125:14
**frequent** 28:9
**frpt** 117:7
**full** 38:15 49:5 104:24 128:21
**fully** 32:15 105:8
**fund** 21:25 22:9,12 23:8 43:21 53:21 74:18,22,24 75:2 81:17,22 85:24 95:11
**fund's** 52:16 68:6 71:2
**fundamental** 20:2,7 28:22 36:2
**fundamentals** 105:22 115:19
**funds** 3:15 5:14 14:13 18:7 22:7,9,18,23 32:1 33:8,18 33:22 34:16 35:5 36:10 46:4 48:15

**[funds - group]**

52:19 67:22 68:17 69:22 74:13 75:10 76:18,19 78:12 84:7 85:5,7,19 85:24 86:1,4,7 86:10,12 87:18 90:12 95:25 98:1 99:23 146:20 147:3 149:3,9,17

**further** 54:24 86:16 118:8 138:3 153:14

**future** 26:5 42:5

**g**

**g** 102:16 126:19

**gaap** 92:23 93:3,5,8,14,24 94:5 105:13 109:5,10 136:4 136:4 137:6,15

**gain** 39:19 69:4

**gained** 65:15

**gains** 39:17

**gaj** 98:23 119:2

**game** 20:22

**gather** 13:1 82:14

**gathering** 116:18

**gelaw.com** 157:2

**genally** 145:12

**general** 2:18 12:6 151:4

**generalist** 14:2

**generally** 9:17 22:24 25:22 30:1 33:14 40:17,19 49:19 63:5 83:13

**generate** 24:23

**generating** 39:17

**generation** 23:25

**gentlemen** 34:25

**georgia** 2:11,15

**getting** 49:14 80:4 100:24 103:25 130:2 146:12

**give** 10:20 26:24 72:2 132:23 145:25

**given** 10:4 43:8 106:18 141:18

**gives** 134:8

**giving** 10:11

**glad** 79:8,8

**gleaned** 126:15 138:18 141:23

**glitch** 131:4

**gm** 91:2 106:17 106:20 111:16 111:17,24

117:14

**go** 13:4 17:18 21:13 23:23 26:10 29:7 31:4 33:12 35:10,21 37:5 38:21 40:20 43:5 44:20 45:4 51:2 58:2 58:13 60:12 61:24 63:24 64:23 72:11 74:6 76:22 78:3,9 83:19 84:9 86:15 88:7 89:9 92:17 97:12 98:17,22,23 102:5 106:1,11 108:2,15 110:8 113:4 116:21 121:5,10 123:3 124:13 125:21 129:14 130:11 131:13,24 132:5 133:16 135:11 137:1 137:19 138:3 145:18 146:24

**goes** 27:12 33:3 34:2 38:21 49:1 105:1

**going** 25:25 26:9 27:11 31:15,15 56:22

72:13 81:25 103:11 119:18 136:15 146:24

**goldman** 129:25

**good** 8:10,20 8:23 9:6 27:25 28:18 43:1 46:23 75:11 91:14,15 139:14

**grant** 2:5 8:18 8:21

**grants** 49:5

**graph** 4:20 64:24 83:9,15 135:19 136:17

**great** 13:13 146:15 152:6

**greater** 134:11

**greene** 4:22 5:8 7:5 83:24 95:4 130:18 144:8

**greene's** 5:11 97:24

**greenwich** 55:6

**gross** 91:3 106:21,23 108:17 111:16 111:25 117:16

**ground** 10:18

**group** 33:4 61:13 86:15 131:11

**[grow - identification]**

**grow** 24:15
42:1 108:7
**grower** 104:1
**growing** 100:24
103:14
**grown** 61:16
**grows** 42:16
52:19 92:1
**growth** 3:23
17:11 18:10,14
18:17,22 19:4
19:6,18,19,19
19:22 20:15
22:9,10,24
23:4,7,12,17,19
24:10,22,24
25:12,19 26:2
29:4,12,15,19
29:20 30:10,16
30:16,17 33:24
39:4,22,23
40:22 41:4,5,7
41:10,14,15,16
41:16,18,25
42:2,9,10,11,12
42:13,14 43:1
44:3,13,25
51:16,19 53:17
56:19 57:10,24
59:19 61:9,9
61:11,13,17,20
63:11 65:14
66:10,14 67:22
67:22 68:3,3,7
73:18,18,23

75:11 86:5
90:8 94:17,18
96:22,23 104:8
118:1 130:6
142:10 147:3
**grunting** 10:24
**guess** 30:3 51:1
79:11 80:2
92:12 94:22
97:2 103:5
147:21
**guessing** 77:15
**guidelines**
79:16 80:23
**guy** 141:14

**h**

**half** 101:23
112:4 137:24
138:15
**hand** 20:17
23:11 135:22
136:16
**happen** 11:10
81:3 148:9
**happened**
45:20 78:21
98:24
**happening** 77:1
78:16 79:23
80:18
**hard** 119:8
**head** 10:24
106:19
**heading** 35:24
40:22 47:10

138:10
**health** 107:25
**hear** 147:15
**heels** 117:22
**held** 50:3 73:11
**help** 72:22
91:24
**helpful** 10:24
**hereto** 49:4
**hi** 146:18
**high** 26:22
100:23,24
140:12,17
**higher** 26:24
42:11 61:17
92:2 100:20,25
106:24 136:11
**highest** 112:3
**highlight**
102:24
**highlighted**
99:7,15
**highlighting**
64:13
**highlights**
29:12
**highly** 24:16
**hired** 70:17
**history** 11:20
81:3
**hold** 110:6
112:23 121:24
122:5 125:19
129:9 145:14

**holding** 55:22
81:19 83:1
95:13 96:1
144:17
**holdings** 1:11
3:19 5:3,22 6:8
7:10,12 9:9
21:17 59:20
65:1 66:14
78:12 84:16,17
84:21,22 85:6
85:7 88:18
95:11,13 96:12
104:16 134:18
135:6
**hope** 12:22
**hoped** 42:6
**hopefully** 9:22
143:22
**hopes** 71:2
**hosting** 104:25
**hour** 146:10,21
**hours** 55:12
110:20
**hypothetical**
151:14

**i**

**idea** 52:25
80:17
**ideas** 15:5
56:14
**identification**
12:20 17:6
31:17 46:17
54:7 58:4

**[identification - influence]**                        Page 22

60:14 62:2
64:2 65:24
67:6 74:9 76:2
81:9 83:6,21
86:23 88:10
95:1 97:21
98:6 102:7
104:13 106:3
110:10 113:7
114:24 116:24
118:19 121:7
123:5 124:15
125:25 128:9
130:14 132:7
134:15 135:3
140:1 141:6
142:16
**identified**
25:18 26:20
53:13,16 75:11
**identify** 8:7
54:9 60:16
84:3 102:9
125:22 128:11
137:20
**idk** 133:21
**ignore** 94:19
109:19,21
**imagine** 35:8
51:22
**imbalanced**
119:24
**immediately**
84:16 120:22

**impact** 93:15
105:20 107:23
108:6 115:17
125:18 139:19
**impacted**
136:18
**impacting**
101:1
**implement**
18:17
**implemented**
18:11 25:12
**implementing**
19:2 20:11
**importance**
115:16 148:7
**important**
39:25 62:10
63:4 76:22
89:25 90:18
91:1,17,18
93:9,13 94:16
94:20 102:25
109:24 110:4
112:22 116:4,5
116:12 124:11
127:1 128:3
129:8 138:18
139:20 147:25
148:9,10,15
150:10
**imported** 112:4
**impose** 34:3
**imposed** 48:1

**imposing** 52:2
**improper**
149:23
**improve**
117:14
**improving** 20:9
**incentivization**
20:22
**inception** 20:19
**inclined** 132:18
132:20
**include** 15:12
15:13 21:1
93:14 106:12
131:4
**included** 37:23
88:14 91:2
**including** 22:9
33:5 35:17
36:3 61:12
**income** 42:16
42:18 43:2
93:3,14,25
94:1,10 96:15
102:2 109:17
136:3,4 139:20
148:14,16,18
**incomplete**
151:6,14
**incorporated**
37:2
**increase** 41:19
56:25 79:25
103:21 145:4

**increased** 65:7
**increases** 91:24
**increasing** 43:2
64:20
**index** 23:17,19
29:15,19,20
30:10,13,17
56:16,18,19,20
56:21,22,25
57:3
**indicate** 21:3
29:18
**indicated** 9:11
18:5 92:6
109:17 122:12
124:25
**indicating**
123:19
**indication**
108:13 112:25
**individual** 10:6
27:23
**individually**
1:7
**industries**
23:16
**industry** 50:7
80:11 102:13
**inefficiencies**
39:5
**inflated** 150:12
**inflexion** 20:13
**inflows** 78:21
**influence** 71:5

**information**
4:11 13:10
37:9 58:25
59:3 62:24,25
63:14,18 64:5
66:6 70:24
72:3 82:9,14
82:18 87:7
90:10 102:1,20
104:18 109:13
110:4 111:1
113:11,17
115:23 116:18
120:17,22
121:4 122:18
122:18,23,24
122:25 124:9
125:17 126:14
127:1,19,24
128:20,24
129:4 137:25
138:5 139:18
142:5 143:16
**inhouse** 16:12
**initial** 45:23
46:1 77:9,15
**initialed** 156:6
**ink** 156:5
**input** 16:15,19
19:13 21:19
40:16 70:24
75:19
**inserted** 119:2
**insofar** 139:1

**instance** 45:16
**instances** 46:3
**instant** 11:15
**instructions**
49:2
**intact** 97:1
**intended**
102:24
**intentionally**
94:11
**interact** 16:1,6
69:3
**interactive**
5:20 102:14
**interchangea...**
82:17
**interest** 49:24
100:20 101:1
**interested**
27:23 153:16
**interesting**
146:3
**internal** 62:11
76:10
**internally**
15:17
**internet** 105:6
**interpret**
116:14
**interpretation**
116:17
**interpreted**
130:1,4
**interrupted**
108:24

**interview** 5:19
102:12,17
**interviews** 38:5
38:7
**introducing**
20:9
**inventory**
91:19
**invest** 16:8,8
22:16 38:22
44:14,15 48:2
49:13 75:20
116:6,13 149:3
149:7,9,17
150:15 151:2
**invested** 20:24
21:6,9 22:6
25:13 45:22,22
48:22 53:24
62:8 63:10
74:19 75:2,10
79:14 99:5,18
124:4
**investing** 13:19
20:1,6 21:4
23:14 33:23
47:22 53:20
86:4
**investment** 3:6
3:8 14:11,19
15:1,5,6,9 16:4
16:20,25 18:19
18:21,25 19:7
19:13 21:5,8
21:19,24 23:11

23:12 24:13
25:9 26:9,25
30:19 32:4,12
32:16,18 33:16
34:4,5,19
35:24 36:1,14
36:18,19,24
37:11 38:10
39:3,6,10,24
40:3,4,4 42:19
43:1 45:14
46:25 47:2,17
47:25 48:1,7
48:12 49:5,7
49:15 50:13,16
50:24,25 51:7
51:11,17,24
52:2,3,8,10
53:17 54:1,1
54:17 56:10,14
60:1,2,22
63:18 67:21
68:2,7,18
69:11,16,21
70:1,2,13,25
71:5,13,14
72:9 73:5,15
75:6,9,15
79:16 82:8
83:17 87:5,8,8
87:11 88:24
90:1,11 91:1
93:10 94:17
96:6,24 99:8
102:12,21

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 182 of
30(B)(6) Driehaus Capital                                              June 12, 2023
209
City of Atlanta Police Officers' Pension Plan v. C

**[investment - knew]**                                                   Page 24

109:24 110:5 114:9 120:9 124:8,22 127:3 139:21 142:7 145:17 147:2,8 147:12

**investments** 4:17 16:16 22:25 34:20 36:9 54:16 59:23 60:10 67:15,17 68:1 71:2 73:10,11 84:11 85:18,25 86:8,12 90:7 100:21

**investor** 34:3 112:22 116:1 116:13 129:25

**investors** 33:16 41:14 68:17 93:6 125:13 149:14,19 150:16,20 151:5,12,23

**invests** 33:15 48:23

**invited** 141:21

**involved** 9:25 34:8 58:10 99:9

**involves** 120:9

**iri** 138:4

**issuance** 88:2 134:21

**issue** 107:14,17 107:18,24 108:5 110:4 112:17 113:2 115:23 116:4 116:12 127:20 150:13

**issued** 6:22 101:21 110:19 110:24 114:5 115:8 124:18

**issues** 103:24 106:18 107:7

**item** 136:23,24 136:25

**items** 93:15 94:5 126:3 139:16

**j**

**j** 2:8 156:1

**james** 4:3,8,12 4:15 6:6,14 7:2 7:8,15,20 12:5 12:7 14:3,24 15:1,19 16:2,6 17:1 18:22 19:10,20 20:20 21:20 22:20 23:3 40:9,11 54:12,15,24 55:21 56:5 57:9,14 60:18 60:21 64:6 66:4,7 70:7 98:14 111:7,14

111:19 117:3 118:8 121:23 122:7 128:13 132:11 133:16 133:18 134:1 140:5,12 141:12 142:20 143:10

**james's** 29:13

**janet** 2:17 12:6

**january** 3:20 5:11,17 83:1 97:24 98:10,18

**jason** 2:8 8:14 121:24 122:3,4

**jeff** 2:15 4:3,12 4:15 6:5,14 7:2 7:8,15 12:5 14:3,24 15:7 16:11 20:20 54:12 64:6 66:4 70:7 79:7 98:13 117:3 118:8 121:23 122:3,22 128:13 132:11 133:16,18 140:5 141:12 143:9

**jeffrey** 2:13 8:24

**jesus** 68:11

**jimenez** 68:11

**jive** 68:5

**john** 1:11 35:9

**joined** 13:25

**jonathan** 2:19

**july** 4:4,7 58:10 58:20 59:1,14 60:5,17

**jump** 89:3

**june** 1:17 4:3 8:2 54:12,19 55:3,20 56:21 57:16 59:14,15 59:17 105:12 153:20

**k**

**k** 5:22 87:3 88:1 104:16,21 105:2 111:17 112:8,8

**keep** 10:18 76:24 78:2 88:23 89:25 111:1 133:19

**keeps** 6:10 132:24

**key** 93:19 108:16

**kind** 58:15 67:10 107:7 112:17 115:10 138:12

**kinds** 34:10

**knew** 38:6 149:10,13 150:15 151:2,4

**[know - look]** Page 25

| | | | |
|---|---|---|---|
| **know** 11:9 27:10 31:7 32:5 35:2,3,7 46:6 47:9 48:4 50:6 67:17 68:12,22,25 69:2,12,24 70:4,5,9,11,15 70:21,23 71:17 71:18,20,23 76:23 79:17 85:20 86:2,3,6 86:9,10,13 113:19 115:10 123:13,14,20 127:7,18,22 131:9 133:22 146:9,13,25 150:10 **knowledge** 9:19,24 **known** 30:1 114:1 **kroger** 65:3 | **larger** 92:3 **largest** 59:5,5 **latest** 143:16 **law** 2:13 6:22 8:13,24 123:18 124:19 **laws** 153:17 **lawsuit** 123:20 123:21,24 127:15 136:13 **lawyers** 12:12 **lead** 2:2 12:5 20:14,18 **leading** 30:23 60:5 64:16 **lean** 57:9 **learned** 123:23 141:23 **leave** 23:10 **left** 20:17 23:11 126:10 135:17 135:22 **legal** 157:23 | **life** 19:19 **light** 122:15 **likely** 101:3 132:25 **likewise** 28:8 74:25 85:6 **limitations** 48:2 **lincoln** 132:1 **line** 4:20 26:4 41:13 45:24 73:15 77:16 79:3 80:1,4,8 83:9,15 99:6 119:25 154:4,7 154:10,13,16 154:19 **lines** 51:4 111:15 **linked** 105:8 **liquid** 20:24 **liquidate** 73:21 **list** 13:4,7 37:15 73:17,25 84:17 **listed** 4:21 19:6 19:21 21:18 62:24 83:10 104:6 | 61:8 67:11 78:23 79:9 84:25 89:5 118:7 119:11 127:12 131:3 133:14 **lmc** 67:15 **lmcg** 4:17 67:15,17,20 68:1 73:5,10 73:13,22 77:10 **locations** 65:3 **log** 114:16 **logistically** 76:23 **logistics** 72:23 73:4 144:5 **london** 55:7,13 **long** 24:11,14 24:17,23 42:5 97:4 121:4 **longer** 131:6 **look** 13:7 17:11 |

| | | | |
|---|---|---|---|
| **l** | **legitimate** 31:23 | **listing** 19:24 23:22 | 20:8 44:20 54:4 63:5 67:9 |
| **label** 17:20 **labeled** 17:25 18:2 89:13 137:24 **labels** 88:14 **laptop** 46:20 **large** 25:4 56:20 61:6 80:22 | **leshaunda** 1:20 153:2,23 **letter** 4:16 67:14,25 68:10 **level** 43:25 55:17 101:15 101:17 108:1 **lexington** 2:5 **lieu** 99:10 | **lists** 82:25 **little** 34:5 35:9 46:20 55:25 56:5 57:15 | 71:15 81:7 84:12 86:20 89:7 98:4,21 108:11 109:23 111:2 115:4 120:11 121:10 142:14 145:18 145:21 146:1 150:3,9,19 151:10,22 |

**[looked - march]** Page 26

**looked** 79:16 95:8,17 107:14 109:7 110:3 111:16 143:6

**looking** 11:23 35:16 39:11 42:3 46:21 72:24 78:19 79:4 92:14 101:20 110:18 111:19 115:5 119:16 120:7 121:12 128:19

**looks** 17:9 31:22 47:6 61:7 62:15 89:16 95:22 98:10,11,12 107:21 112:8 117:25 131:3 135:14

**losing** 25:14,17 25:23

**loss** 85:9,9 95:18 135:23 135:25 136:2,9 138:22 139:1,5 140:9,20,25 141:1

**losses** 26:3,3

**lost** 84:24

**lot** 27:24 61:17 65:15 69:15 93:14 123:17 147:1

**low** 101:12

**lower** 27:1

**lowers** 6:7,9

**lunch** 86:17 97:5

**m**

**m** 2:4 157:1

**macro** 36:2

**made** 9:22 16:21,25 22:25 23:5 46:5 53:25 59:23 76:18 77:20 101:24 102:11 105:24 113:15 125:13 127:21 130:1 153:8 156:4

**mail** 4:4,10,22 5:8,12,16 6:5 7:1,4,16 15:25 58:9,14,16,19 59:9,13,16 64:5 83:24 95:4 97:24 98:9,13 111:6 128:12 130:17 141:9,10,14 143:4,5,6 144:8

**mailed** 12:11

**mails** 11:15 15:13

**main** 65:6

**maintain** 27:19 79:3

**maintaining** 29:3

**majority** 20:23

**make** 11:9 15:10 18:22 23:2 27:13 28:7,11,19 36:9,14 37:21 42:4 45:5 46:20 55:8 63:8,15,18 69:20,25 71:13 79:22 80:10 81:22 87:11 89:24 93:16 99:4 100:9 101:3 108:11 110:21 119:25 131:12 138:21 142:7 150:2,9 150:19 151:10 151:22

**maker** 15:9 64:25

**makes** 52:20 71:9,20 102:17 111:23 146:8

**making** 9:7 16:4,16 21:20 25:7,13 36:19 40:1 42:4,6 54:16 57:5,23 61:21 66:23

73:10,14 81:19 87:8 90:11 101:8 102:20 104:7 109:10 111:10 114:9 116:17,19 122:22 134:9 134:10 139:20

**manage** 18:19

**managed** 21:25 22:1,4 32:22 84:19

**management** 2:18 14:1 17:25 20:10,23 20:25 24:22 34:14,17 36:6 37:9 48:10 68:2 84:4 88:4 92:6 104:25 141:19

**manager** 5:20 12:5 14:4,6,8 14:15,19,23 20:18 21:15 29:13 69:18 73:25 102:13 102:14 122:4

**managers** 68:18

**managing** 33:1

**manufactured** 99:18

**march** 5:22 6:6 6:12,15,16,18

**[march - merit]**                                                    Page 27

6:20 7:3 104:16 105:24 110:20,25 111:8 113:15 115:3,8 117:3 117:22 118:15 118:22 119:18 120:4 121:12 121:20 122:19 123:1,9,14,14 125:19 127:13 128:13,18 145:5 149:22

**margin** 91:3 106:21,23 108:18 111:25 117:16

**margins** 42:11 42:12,12

**marina** 8:16

**mark** 17:23

**marked** 12:19 17:4,5 31:13 31:16 46:16 54:5,6 58:3 60:13 62:1 64:1 65:23 67:5 74:8 76:1 81:8 83:5,20 86:22 88:9 94:25 97:20 98:5 102:6 104:12 106:2 110:9 113:6 114:23 116:23

118:18 121:6 123:4 124:14 125:24 128:8 130:13 132:6 134:14 135:2 139:25 141:5 142:15

**marker** 35:10

**market** 6:10 20:2 25:4 27:11 38:2 39:5,17,21 44:21 60:4 69:4 80:11 100:19,21 110:25 111:3 113:1 114:2 120:15,21,21 121:3 122:19 125:13 127:21 130:4 133:20 141:1

**marketing** 5:20 31:1 58:21,25 69:8 102:14 136:19

**marq** 7:3 128:14

**marquette** 4:23 5:9,12 7:6 68:11,12,21,24 69:1,3,7,13 70:23 71:4,7 71:12,20,24 72:4,4,5 83:25

84:6 85:16,18 95:5 97:25 130:18 144:9

**mart** 61:5

**material** 124:7

**materially** 56:25 105:12

**materials** 31:2 37:24

**matter** 32:4 125:2

**maxim** 126:19 126:22 127:24 128:2

**mcelroy** 34:18 35:17 70:8

**mcwilliams** 2:17 12:8 35:14 145:20 146:7

**mean** 20:5 21:11 23:13 24:1,12,18,25 32:24 33:21 37:16 41:17,23 42:3,15 43:18 44:16 55:6 60:23 62:19 78:24 79:17 91:25 92:5 107:11,21 126:21 128:1 131:17 150:14

**meaning** 33:9 45:8 80:6

**meaningful** 39:17 41:24

**meaningfully** 25:2 27:18 41:19 56:15 65:15

**means** 9:15 21:6 23:14 24:2 25:1 26:14,21 32:25 43:19 56:6 61:9 92:6 104:3 106:24 132:20 133:21

**meant** 112:19

**measure** 93:4 136:4 150:11

**measures** 24:7 92:24 93:24

**mechanics** 72:23 73:4

**meet** 12:8

**meeting** 12:2 69:9 89:20 90:15 146:10

**meetings** 36:6 69:8 70:3,6,9 70:12

**members** 23:22

**memory** 68:5 74:15 99:24 115:6

**mentioned** 79:9

**merit** 93:10

**[merits - moyna]** Page 28

| | | | |
|---|---|---|---|
| **merits** 27:20 | **microcap** 19:18 | **minutes** 53:4 | **monitor** 28:3 |
| **message** 54:23 | 19:21 53:23 | 86:15 146:11 | **monitoring** |
| 54:23 55:5,16 | 56:11,17,19,22 | 146:22 | 124:22 |
| 56:13 58:16 | **microsoft** 3:22 | **misleading** | **monster** 107:2 |
| 60:20 61:7 | 4:1,13 6:13,16 | 149:14,19 | **month** 5:15 |
| 98:15 99:2 | 6:17 7:7,14,19 | 150:16,20 | 59:15 84:10,14 |
| 100:5,12 | 15:16 17:10 | 151:5,12,22 | 85:2,5,11 95:7 |
| 111:18 | 54:11 58:14 | **missed** 99:21 | 95:8,16,19 |
| **messages** 11:15 | 66:3 111:6 | **missing** 132:1 | 96:3,8 98:2 |
| 15:17 54:21 | 117:2 118:23 | **misstating** | 101:23 130:23 |
| **method** 37:14 | 121:12,19 | 125:7 | 144:10 |
| **methodology** | 132:11,14 | **mn** 107:2 | **monthly** 5:10 |
| 63:21 | 140:4 142:19 | **mnst** 106:19 | 28:9 59:15 |
| **methods** 35:23 | **mid** 19:19,22 | 107:2 | 84:6 95:5 |
| 35:24 36:1,3,8 | 123:14 | **model** 33:14 | **months** 61:15 |
| 36:13,18,25 | **middle** 40:21 | 45:25 79:4 | 61:15 127:11 |
| 37:12 | 72:24 | 80:9 99:6,11 | 127:12,14 |
| **metric** 61:20 | **mike** 4:11,14 | 100:5,9,14,17 | 128:25 133:5 |
| 93:4,13 96:17 | 146:9 | **models** 24:22 | 133:11 137:8 |
| 147:20 148:8 | **milestones** 26:9 | **modest** 26:3 | 137:17 |
| **metrics** 25:24 | **miller** 2:19 | **moment** 38:16 | **morgan** 7:18 |
| 66:20,22 | **million** 20:3 | 89:3 90:23 | 138:14 141:11 |
| 108:16 147:4,7 | 108:21,25 | 98:21 115:3 | 141:14,21,22 |
| 147:11,16,18 | 135:24,25 | **money** 25:8,13 | 142:2 |
| 148:1,5,15,20 | 136:10,18,19 | 25:14,17,23 | **morning** 4:9 |
| 148:25 149:5 | 136:23 137:12 | 40:1 42:4,5,6 | 6:25 8:10,17 |
| 149:11,15,19 | 140:21 | 49:13 52:15,20 | 8:20,23 9:6 |
| **mgpi** 117:8 | **mind** 28:17 | 57:5,23 61:21 | 55:17,20 62:6 |
| **mica** 2:4 8:21 | 72:23 74:5 | 66:23 69:1 | 62:7,9,14,17,23 |
| **michael** 1:16 | 76:25 78:2 | 74:18 78:25 | 113:15 126:2,7 |
| 3:1 4:2,5 5:16 | **mine** 11:14 | 80:13 86:5 | **move** 56:1 |
| 6:5,14,17 7:1,7 | **minimum** 22:3 | 101:8 104:7 | **moved** 83:12 |
| 7:16,20 8:6 9:3 | **minute** 91:6 | 134:9,10 | **moving** 26:3 |
| **micro** 55:25 | 131:22 143:21 | **monies** 75:9 | **moyna** 2:4 3:3 |
| | | | 8:17,18 131:16 |

**[moyna - november]**

146:15,17,18
150:22 151:1,7
151:15 152:1,6
152:13 157:1
**multi** 17:9
**multiple** 6:9,10
43:13,22
101:16
**multiples**
100:23
**mutual** 21:25
22:7,8,9,12,18
22:23 23:8
43:21 53:21

**n**

**name** 55:4
146:18
**napa** 117:20
118:5 120:2
**nature** 70:25
**near** 42:5
**necessarily**
101:17
**necessary**
73:14
**need** 11:8 55:25
56:14 82:1
121:10 144:7
**needed** 99:15
100:9 101:3
105:2 119:25
**needing** 57:1
57:20
**needs** 146:11

**negative** 101:2
122:25 142:3
**negatively**
136:18
**negron** 1:12
9:10
**net** 20:24 42:16
42:18 43:2
56:23 93:3,14
93:25 94:1,10
96:15 102:2
135:23 136:2,3
136:9 138:22
139:5,20 140:9
140:20,25
141:1 148:14
148:16,18
**network** 91:22
**never** 31:22
47:5 74:5
**new** 2:6,6 20:9
20:10,11,12
25:3 65:15
74:3 80:13
102:1 122:17
122:23 127:19
127:23 140:12
140:17 146:6
**news** 6:25 28:1
62:7,10 126:2
126:6
**nice** 56:1
**nielsen** 122:12
130:5 133:1

**nielson** 61:3
**nine** 137:8
**nlsn** 60:21 61:1
**noise** 132:25
**non** 33:4 92:23
93:5,8,24 94:5
109:5,10
127:19 137:6
137:15
**noncash** 105:11
105:14,16,19
107:17,24
112:11,12,20
115:16 116:3
125:7 127:20
128:2 129:12
136:12,24,25
139:19 145:6
**nonoperating**
94:11
**nonoperational**
93:15
**nonrecurring**
139:19
**normal** 84:5
124:22
**normally** 28:16
**north** 153:18
**northern** 3:13
72:25 73:9
74:12
**northwestern**
13:22
**notable** 90:18

**notary** 155:9
**note** 62:9,17,23
63:17 139:9
140:11 157:10
**noted** 156:5
**notes** 4:9 7:1
37:8 62:6,12
63:8 89:19,24
90:2,15,17
91:24 92:15
106:13,16
109:1 110:2
117:24 128:12
128:17 129:3,7
129:11 137:20
137:22,23,25
138:4,10,11,16
138:21 139:1
143:1 153:13
**noteworthy**
126:7
**notice** 3:21
12:17 17:19
31:24
**noticed** 10:10
**notification**
49:11,14
**notwithstandi...**
25:16 118:15
122:24
**november** 5:2,3
7:11 77:24
78:7 87:2 88:5
88:18 89:15
90:18 95:7,12

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 188 of
30(B)(6) Driehaus Capital                                    June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C
209

**[november - operations]**                                    Page 30

101:21 134:19 134:19

**number** 5:16 13:5 17:4,25 18:9 19:17 20:16 26:11 31:5,14,15,20 32:20 38:15 43:5 44:19,20 46:15,25 47:3 48:5,6 50:23 52:7 53:13 54:5,10 55:2 58:2,8 60:12 60:16 62:4 63:24 66:2 67:8 74:11 76:4 81:7,16 83:10,23 88:13 92:17 93:15 94:6,23 95:3 98:4,8,9,17,17 102:9 104:15 106:6,6 108:20 108:21,25 109:2 111:6 113:5,10 117:2 118:22 119:12 120:14 123:7 124:18 127:6 128:12 130:17 132:5,10 134:17 135:6 137:4 139:3 140:3 141:9

142:19

**numbers** 91:2 131:6

**numerous** 43:14

**o**

**o'donnell** 58:20
**oath** 10:14 97:16 153:6
**object** 150:21 151:13,24
**objections** 153:8
**objectives** 50:24,25 51:18 52:2
**obligated** 32:15
**obligation** 9:17
**obscured** 17:17
**observed** 100:20
**observing** 122:16 130:3
**occasionally** 28:20
**occurred** 124:9 145:5
**occurring** 108:14
**october** 7:8 74:16,25 77:4 77:5,18 78:6 85:1,8,10,11 86:3 87:17 95:18 132:12

**odd** 77:3
**offers** 19:14
**office** 15:19
**officers** 1:4 47:12 76:18 78:6 157:4
**officers'** 2:2
**offset** 91:24 92:3
**oh** 17:16 55:3 110:13
**okay** 11:6,7,22 12:7 14:10 16:19 18:3,4 19:6,24 22:13 22:20 25:7 29:6 30:9 31:3 35:9 37:5,25 38:8,19,19 40:3 44:9 46:1 46:9 50:9 53:25 55:14,18 55:19 61:7 62:17,23 65:20 67:12,13,20,23 67:24 72:10 73:16 76:9 77:17,18,25 78:7,8 81:1,6 81:15 83:2 84:14 86:14,20 87:16,23 90:5 91:23 92:16 93:8 94:21 98:16 99:20

101:6 102:5 103:20 104:5 108:2 114:17 116:9 117:18 118:7 121:5,9 122:7 123:22 124:10 125:4 127:10 128:18 133:8,16,19 137:1 138:9 139:18 141:8 141:20 145:4 146:14,15 149:3,9,21 150:7 151:18 151:18,20 152:1
**old** 131:14
**oldest** 58:15
**once** 137:14
**onces** 118:11
**one's** 67:1
**ones** 18:1 99:6 99:15 100:23
**open** 22:3 39:21 117:19 145:14
**opened** 45:21 45:23 114:13
**operating** 20:11 42:12 94:13
**operations** 105:21 115:19

**[opinion - particular]** Page 31

| | | | |
|---|---|---|---|
| **opinion** 116:8 151:11 | **outside** 21:7 27:21,25 | 74:23,23 76:16 78:10,10 84:9 | **paren** 117:19 117:20 |
| **opportunity** 25:2,6 39:18 41:18 53:17 69:21 146:1,4 | **outsized** 101:13 | 84:14 85:4,4 | **parroting** 115:21 |
| | **overall** 29:1 71:15 79:15 | 89:4,10,10,13 89:14 90:14,16 | **part** 3:10 18:22 19:1 21:8 |
| | **oversee** 73:1 | 92:17,22 93:1 | 28:12 31:20 |
| **opposed** 28:14 28:22 | **overview** 19:17 | 93:23,24 95:10 95:23 104:22 | 38:4 63:21 67:23 69:4 |
| **option** 69:11 | **own** 18:19 19:3 21:7,8 22:8,12 | 106:12,13 | 71:2 75:4 77:9 |
| **order** 11:10 18:1 25:8 45:7 45:7,10,19 46:5 54:22 58:15 94:12 105:14 122:2,6 | 27:20 28:13,22 48:18 71:7,12 71:21 99:12 116:8,19 126:8 | 108:22 109:1,2 110:3 115:13 115:15 119:1,9 119:10,12,17 127:9 131:1,1 133:18 135:11 | 77:12 84:5 87:7,23 88:23 89:25 90:16,24 94:18 96:5 98:19 99:3,22 99:23 109:12 |
| | **owned** 45:21 99:11 | 137:1,3,23,25 138:16,16 | 116:17 120:8 124:21 131:12 |
| **orders** 16:13 23:5 43:12 44:11 49:8 | **owning** 99:8,10 | 142:22 154:4,7 154:10,13,16 154:19 | 135:17 145:5 |
| | **p** | | **participate** 90:6 |
| **original** 123:10 | **p.a.** 2:5 | **pages** 51:4 74:14 89:16,18 | **participated** 70:6 |
| **outflows** 78:22 | **p.m.** 55:16 121:13,14 142:24 152:10 152:17 | 131:4,5,7 132:1 137:19 137:20 | **particular** 23:4 28:14 31:24 42:21,22,24 |
| **outgrow** 23:15 | | | 45:1,14 70:25 |
| **outlaw** 2:8 8:14 | **page** 3:5 17:9 17:12,15,19,21 19:16,21 20:16 21:13 23:10,21 23:24 24:8,8 26:10 29:7,10 32:20 33:12,13 35:21 38:14,15 40:20,21,21 43:5 48:5 51:3 51:14 52:6,7 52:21 54:21 58:13 64:23 | **paid** 102:16 | 71:13 76:12 |
| **outlook** 107:9 107:12 | | **paragraph** 32:21 33:3,13 34:2 38:15,18 38:20 39:1 43:11 48:5,6,7 49:1 50:22,22 60:7 64:25 65:6 105:6,7 135:16,22 | 80:7,8 81:3 91:9 99:2 100:5,17,23 101:8 103:6 114:14 115:23 116:12 137:10 145:1 147:8 |
| **outperform** 23:15 24:3 56:19 | | | |
| **outperforman...** 24:7,7 | | | |
| **outperformed** 29:20 66:19 | | | |
| **outperforming** 26:24 104:3 | | | |
| **outright** 59:5,5 | | | |

**[particular - places]**                                    Page 32

148:10
**particularly**
  92:2
**parties** 153:15
**partner** 8:13
**partners**
  133:10
**party** 36:4
  37:25 126:23
**pass** 143:23
  145:10
**pasted** 138:8
**pastes** 98:13
**pattern** 130:2
**patterns**
  120:10
**pay** 69:1
**pdf** 105:9
**peachtree** 2:10
  2:14
**peers** 23:16
**penalty** 153:17
  156:2
**pending** 145:14
**penetrating**
  25:5
**pension** 1:5,6
  2:2,3 3:8,14,17
  4:17 5:14
  14:13 18:7
  32:1 33:5,8,18
  33:22 34:15
  35:5 36:10
  45:18 47:2,12
  47:13,19 48:15

49:13,24 50:3
50:11,15 51:7
51:24 52:15,19
67:14,21 68:6
68:16 69:22
70:1 71:1
74:13,18,24
75:9 76:14
79:1,1 81:13
81:17 84:11,18
85:23 86:4,7
86:10,12 95:11
95:25 98:1,20
129:18 146:20
157:4
**people** 4:23 5:9
  5:17 16:10,14
  35:4 83:25
  95:4 98:9
**pep** 132:24
  133:4,7,19
**pepin** 5:21
  102:14
**pepsi** 133:6,10
**pepsi's** 133:7
**perceive** 113:1
**perceived**
  103:18
**percent** 27:10
  27:15 29:21,22
  42:11 44:15,17
  45:1,3,12 65:1
  80:24 111:17
  133:21 143:11

**percentage**
  28:14 52:14,20
  79:15
**percentages**
  73:19
**perfect** 46:23
**perform** 75:12
**performance**
  4:24 5:10,13
  13:24 28:3,15
  29:11,13,25
  30:12 57:4
  59:18 60:3
  61:4 66:14
  71:15 72:8
  75:14 84:1,6
  85:15 93:7
  94:13 95:6
  97:25 103:1
  129:1 130:19
  131:5 144:9
  147:13
**performing**
  60:10 64:13,16
  70:13 93:17,18
  93:19
**performs** 71:7
**period** 25:11
  29:14,21 30:22
  35:1,6 36:11
  36:15 38:3
  40:5 46:2
  50:12 59:8,10
  59:17,24 64:20
  76:17 78:4

81:14 83:11
86:1 87:16
103:1 106:25
**periods** 105:12
  105:15
**perjury** 153:17
  156:3
**person** 9:11
  16:1 17:21
  84:4
**personal** 9:18
**personally** 9:25
  21:4 22:16
**pertained**
  11:16
**pertains** 68:3
**philosophy**
  15:6 72:9
**phone** 15:21
**phrase** 24:20
  37:25
**pick** 53:3
**picture** 94:12
**pictures** 21:14
  21:23
**pie** 84:15 131:1
**pieces** 58:25
**place** 49:8
  133:11 135:21
  138:25 148:7
  153:5
**placement**
  135:15
**places** 65:3
  136:5

**[plaintiff's - preliminary]** Page 33

**plaintiff's**
142:11
**plaintiffs** 1:9
8:19,22,25
10:17 12:13
14:12 31:25
36:15,23 53:14
**plan** 1:5,6 2:2,3
3:8,17 47:2,12
47:13 81:13
84:12 97:1
157:4
**plan's** 45:18
49:13 50:3
**plans** 33:5,5,9
34:20 47:19
48:18 49:24
76:14 84:18
**plastaras** 7:18
141:11
**platforms** 45:9
**play** 133:14
**please** 8:7 9:2
10:19,23,25
11:3 23:24
27:16 29:8
46:15,15 73:8
86:21 102:10
121:24 125:22
125:23 128:7
143:10
**plenty** 145:25
**plopped** 66:9
**plus** 24:19

**point** 20:13
65:11,12
108:16 127:23
135:16 136:16
136:18
**points** 63:13
132:19
**police** 1:4 2:2
5:14 14:12
18:7 32:1 33:8
33:18,22 35:5
45:17 47:12,18
48:14 74:21
76:14,18 77:20
78:6,12 81:22
84:7 85:5,7,19
85:24,25 87:18
90:12 95:24
98:1,20 99:25
129:17 130:22
144:11 145:2
145:16 146:19
157:4
**portfolio** 12:5
14:4,6,7,15,19
14:23 20:18,23
20:25 21:15
26:12,14,16,17
26:19 27:2,4,6
27:9,14,22
28:4,21 29:4
29:13 33:14
34:5 45:2
56:11 57:2
67:23 71:14,14

71:16 73:2,5
73:13,19,21,22
73:25 75:14
77:9,11,16
78:18 79:3,14
80:1,5,9,17,21
80:24 96:24
99:11 100:9,14
100:17 104:1
122:4 127:3
**portfolios**
45:25 72:9
100:5 129:9
132:21
**portion** 25:5
78:11 79:13
99:12
**pos** 107:10
**position** 26:15
26:15 27:20
28:2,12,21
56:6,24 80:21
85:8 95:20
96:2 98:19
99:17,23
119:21 120:1
120:12 144:22
**positive** 20:2,7
60:24 107:12
142:3,4 145:1
**positively**
130:1,4
**possible** 28:24
89:8

**postpone** 131:8
**potential** 24:22
24:24 25:19
27:23 39:4,22
41:15,16,17,18
41:21 42:2
69:10 75:12
94:17 96:23
**potentially**
20:10 25:8
26:23 72:6
101:1
**power** 49:6
**powerpoint**
3:22 17:10
**powers** 48:7
**practice** 43:12
63:8,8 88:22
89:22 90:5
124:2 125:2
138:17
**practices** 43:7
108:11 150:2,9
150:19 151:9
151:21
**predicate**
150:25
**prefer** 133:19
**preference**
57:16
**prefix** 18:2
**preliminary**
6:1 104:23
106:7 134:22

**[preparation - promotion]** Page 34

**preparation**
12:2 105:9
**prepare** 11:12
**prepared** 13:6
13:10 70:16
82:23 85:17
137:20
**preparing** 59:1
**pres** 138:11
**present** 2:16
15:7 40:12
69:7
**presentation**
3:22 17:10
30:1 70:4 93:2
109:6 137:5,10
137:14 141:18
141:24 143:2
**presentations**
69:25
**presented**
129:24 141:21
**presenting**
40:15 138:13
**presents** 41:11
**press** 5:4 6:1,22
7:13 36:5 37:7
64:10 88:2,5
88:18,23 89:14
89:17,23 90:3
90:19,20,24
92:22 93:25
96:17 101:20
104:21 106:7
106:14 107:19

109:2,7,16
110:18 111:11
111:19 115:22
117:23 118:16
120:4 121:2
122:19 123:1
123:17 124:18
124:21 125:2,4
125:13 127:13
128:18 134:24
135:7 136:8
137:2,21 138:1
138:6,12,18
140:8 145:6
147:17
**pressures** 92:2
**presume**
133:21
**pretty** 111:22
**prevent** 15:7
**previous** 65:8
89:9,10 92:17
108:22 119:17
**price** 3:19 6:8
24:15 26:1,8
26:23 27:17
37:8 57:4
64:20 65:7
79:25,25 82:5
82:25 83:12
96:8 103:20,22
104:9 120:9,14
120:25 122:14
130:3 140:16
144:20 145:4

**priced** 56:16
**prices** 4:19,20
24:10 36:4
82:3,15 83:10
92:7,8,9
101:13
**pricing** 56:2
92:4
**primarily** 40:7
**primary** 15:2
24:2 25:25
29:2 30:20
65:19
**printed** 54:21
87:1
**printout** 4:1
6:13 54:10,11
54:21 111:7
113:10 115:2
117:2 126:2
132:10 134:18
140:4
**printouts** 58:14
**prior** 30:5
49:10,14 53:15
53:19 67:23
100:22 109:7
133:5,9 136:20
**probable** 27:1
**probably** 59:12
**problem**
143:23 145:13
**proceedings**
153:4

**process** 38:16
62:21 71:3,5
72:9 75:4
**produced**
17:21 36:22
37:6,10 38:10
38:12 88:16
89:17
**producer** 118:6
**product** 20:10
25:3,4 92:11
103:22 104:9
**production**
15:12 35:12
99:9,21 131:8
**products** 61:5
92:8 103:17
104:4
**professional**
116:2 153:3
**profitability**
26:4 101:12,15
102:2 150:12
**profitable**
108:12 150:3,9
150:20 151:10
151:22
**profits** 148:9
148:11
**program** 77:11
**progress** 131:9
**promoted** 14:3
14:6,14
**promotion** 14:7

**[prompted - react]**                                    Page 35

**prompted**
120:11
**proposal** 70:16
**propounded**
153:8
**proprietary**
36:6 37:15
**prospect** 25:9
100:19
**prospects** 60:4
108:7 134:11
141:16
**protein** 92:11
**provide** 66:6
68:23 73:16,24
84:6 110:12
125:4 131:11
**provided** 3:13
31:25 62:25
63:1,14 70:23
74:12 113:23
114:16 122:24
122:25 128:19
128:24
**provider**
113:22 114:1
126:23
**provides** 32:21
**providing**
51:11 113:17
115:22
**provision** 49:3
**public** 33:5,9
82:2 155:9

**publically**
120:20
**published**
62:11
**publishes** 62:8
**pull** 12:16
46:15
**pulled** 11:16,18
108:21
**pulling** 11:22
76:24 117:7
**purchase** 44:12
45:5,24 46:1
76:13 77:2,3
77:11,11,15,19
77:23 85:1
143:15
**purchased**
85:10 87:17
**purchaser**
45:16
**purchasers**
46:4
**purchases** 3:17
76:17,25 77:5
77:18,24 79:3
79:5 81:13,19
**purely** 107:15
107:22
**purpose** 45:10
56:9 82:9
**purposes** 32:17
39:24 44:9
78:18,20 139:7

**put** 11:19 17:19
27:4 35:9
62:21 71:22
73:22 74:4
90:22 98:23
101:5 122:6
123:18 153:6

**q**

**quality** 24:22
107:15 108:3,6
108:9
**quantity** 77:14
**quarter** 5:5 6:2
7:12 59:13
88:3,19 96:16
101:20 104:24
106:8 128:16
128:20,25
129:4 134:23
135:7 136:1,10
136:17 137:7,7
139:11 140:9
**quarterly**
59:15 89:20
**quarters**
117:15 148:21
**question** 10:20
11:3 28:17
30:5 44:9
79:12 93:19
108:23 116:10
150:24 151:16
151:18,19
**questions** 10:16
10:17,17 11:1

12:11 38:17
145:10 146:6
146:21 152:2
153:7
**quick** 11:20
**quickly** 111:22
120:22
**quite** 96:8
124:9 144:21
**quote** 150:2

**r**

**r** 156:1
**raise** 56:14
**raising** 92:7
**range** 95:18
**rankings** 30:24
**rapidly** 100:24
120:17
**rarely** 124:5,25
**rate** 42:13,16
**rates** 100:20
101:1
**rather** 27:20
58:17 79:24
101:17 134:10
136:9
**rating** 26:24
126:25
**rationale** 101:6
101:7
**reach** 15:1
**reached** 140:17
**reaches** 94:5
**react** 120:22

**reaction** 79:24
**read** 38:16
  40:25 41:2
  47:5 49:1
  51:21 107:15
  108:3 114:13
  114:20 115:9
  115:10 119:8
  119:11,13
  123:24 124:1,2
  124:25 125:1
  143:5 156:3
  157:9
**reading** 29:23
  147:16
**reads** 33:13
  47:11 48:8
  64:25 107:9
  115:15 135:23
**ready** 13:2 41:1
  97:12
**realize** 119:7
**realized** 41:22
**really** 65:9
  81:15 108:12
  119:8
**reason** 65:6
  80:7 96:21
  132:23 148:24
  154:6,9,12,15
  154:18,21
  157:11
**reasonable**
  9:22 128:4

**reasonably**
  9:19 13:9
**reasons** 25:18
  25:22 28:20
  57:1,14,21
  60:8 100:2
  102:3 120:4
  122:7,10
  124:10 129:21
  130:7 134:4,7
  134:7 147:1,3
**rebalance**
  27:14 28:8
  77:16
**rebalances**
  56:21
**rebalancing**
  78:17,20 79:11
  80:6,13
**recall** 101:19
  110:18 114:13
  115:9 127:22
  142:2 144:21
**recap** 143:4,5,6
**receipt** 145:15
  157:18
**received** 126:5
**recent** 106:19
**recently** 14:6
  129:24
**recess** 53:7
  97:8 144:1
**reckless** 149:18
**recognition**
  105:19 115:16

**recognize** 47:3
  58:8 64:4 76:6
  82:1 83:23
  88:17 98:8
  117:1 135:5
**recognized**
  136:21
**recognizing**
  105:16
**recommend**
  55:24 69:13,19
**recommendat...**
  23:2,3 40:13
  56:10 57:8,20
  127:24,25
**recommendat...**
  15:7 16:16
  71:9
**recommended**
  69:10
**recommending**
  16:21 21:5
  118:12
**reconcile** 93:3
**reconciliation**
  92:23 93:23
**record** 8:2,9
  53:6,9 69:17
  70:12 71:8
  72:12,15,16,19
  81:6 97:7,10
  97:19 121:18
  131:13 143:25
  144:3 145:11
  152:11

**recorded** 10:12
  101:2 153:9
**recording**
  147:15
**recreated** 119:8
**reduce** 120:11
**reducing**
  119:20
**reeves** 2:13,13
  8:23,24,24
  152:14
**reeveslawfir...**
  2:15
**refer** 26:17
  27:6 31:1 82:8
  83:16 99:13
  103:11,15
  104:2
**reference** 20:25
  21:24 24:4
  42:2 57:2 59:6
  64:11 88:13
  105:4 107:2,5
  107:12,16,17
  108:4 111:11
  116:2 119:3
  126:11 129:11
  132:15 136:2,3
  138:22 139:10
**referenced**
  157:6
**references** 37:7
  37:9 41:5
  57:20 134:21

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 195 of
30(B)(6) Driehaus Capital
209
June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

**[referred - report]**

Page 37

**referred** 27:3
100:6
**referring** 20:19
34:8 112:13
133:4 138:5
140:15 143:5
**refers** 24:6
37:17 41:18
50:23 61:2,3
100:11 103:22
106:20
**refining** 40:17
**reflect** 36:24
38:1 85:15
107:25 129:7
129:15
**reflected** 23:18
32:1 39:22
52:21 66:9
96:16 111:18
120:1 127:9
**reflecting** 6:9
17:20 34:24
74:13
**reflective** 93:6
93:16
**reflects** 17:23
64:15 67:25
77:4,19 78:10
90:17 113:14
129:3
**refresh** 74:15
115:5
**regard** 43:1
80:18 81:4

117:9
**regarding**
11:18,19 21:19
38:10 85:18
114:9 140:8
**registered**
153:3
**regularly**
113:12
**regulating**
32:11
**regulatory**
32:17
**reinvestment**
49:7
**relate** 38:1
76:25
**related** 28:20
37:8 63:10
74:23 87:3
112:9 136:19
137:21 138:11
139:9 140:21
146:6
**relates** 44:11
60:7 137:25
**relation** 12:13
34:16,25 43:9
**relations** 35:3
**relationship**
34:14 50:19
68:20 84:3
102:16
**relative** 27:21
28:21 56:24

65:16 77:14
81:21 153:14
**release** 5:4 6:1
6:22 7:13
64:10 88:2,5
88:18 89:14,17
89:23 90:3,19
90:20,24 92:22
94:1 96:17
101:20 104:21
106:7,14
107:19 109:2,7
109:16 110:18
111:11,19
115:22 117:23
118:16 120:4
121:2 122:19
123:1 124:18
124:21 125:4
125:13 127:13
128:19 134:24
135:7 136:8
137:2,21 138:1
138:6,12,19
140:8 145:6
147:17
**released** 110:25
**releases** 36:5
37:7 88:23
123:18 125:2
**releasing** 88:2
104:23
**relevant** 35:1,6
36:10,15 38:3
42:18 78:4

81:14 104:6
127:2
**reliable** 82:20
**religious** 100:8
**rely** 102:20
104:18 113:12
114:9
**remain** 40:3
50:16
**remained** 75:15
95:25 144:17
**remains** 40:7
42:25
**remember**
14:10,14,16
77:13 95:17,21
100:16 105:23
109:15 114:17
120:4 123:22
123:24 129:21
130:7 141:20
144:24 150:5
**remote** 76:24
**remove** 109:11
**repeating**
28:17
**rephrase** 11:3
**replacement**
99:13,17 100:1
100:7 117:10
117:20 118:5
118:10 119:24
**report** 3:12,16
6:11 62:15,16
76:5,12 77:18

**[report - right]**

81:12,17 85:17
89:20 106:19
113:18 114:4
114:14,20
115:2,7,13
116:16 127:6
128:17 131:5
144:25 148:11
148:16
**reported** 1:20
140:20 141:22
148:4,20
**reporter** 9:2
10:10,13,21
72:11 82:11
153:3
**reporter's**
153:1
**reporting**
136:8 147:22
149:11
**reports** 3:13
37:8,20 38:1
74:12 111:15
114:8 115:10
132:25 136:6
147:20
**represent** 8:8
9:16 67:13,20
69:9 82:23
83:8 86:25
88:15 89:13
98:16 110:17
113:9 115:1
121:9 123:8

124:17 135:22
146:19
**representation**
99:22
**representative**
8:5 9:12,13
10:5
**representing**
8:12 9:9
**request** 70:16
**requests** 11:13
**required** 32:7
44:19
**requirements**
22:4
**reschedule**
146:11
**research** 11:16
15:6 36:2,5,7
37:15,25 38:5
39:12 62:11
69:15 113:22
113:25 126:23
**reservation**
152:4
**resources** 36:3
**respect** 37:14
42:24 48:1,9
52:3 53:12
78:17 117:24
118:1 126:18
144:15
**respond** 10:15
10:23 111:22

**responded** 59:3
**responds** 54:24
118:8
**response** 11:1
54:25 57:8,22
70:16 112:7
143:9
**responsibilities**
50:10
**responsibility**
16:20 19:8,13
21:19 34:20
99:4
**responsible**
15:4 16:17,22
19:20 32:11
**responsive**
133:17
**rest** 62:13
76:22 78:3
80:1,5 104:4
113:1
**restrictions**
34:4,6,7,10,12
45:15 47:25
51:1 52:1 99:8
**result** 34:5
**results** 5:5 6:3
7:13 88:3,19
104:23 106:8
129:5 134:22
135:7 136:17
**retail** 61:4,6
91:22 122:12
130:6

**retained** 96:22
**retention** 48:9
**return** 64:19
157:13,17
**returns** 24:23
59:8
**rev** 107:9
117:11
**revenue** 20:14
26:7 39:23
42:10,13 91:2
92:3 105:21
107:12 108:17
115:18 117:12
**revenues**
147:21,22
148:9
**reverse** 58:15
**reversed**
144:20
**review** 11:20
29:11 81:2
88:23 89:23
114:20 115:7
129:4 147:6
157:7
**reviewed** 11:13
12:25 31:11
111:12
**reviewing** 15:4
116:16
**reviews** 62:7
**rfp** 70:16
**right** 12:22
13:14 14:21

**[right - sawicki]**

Page 39

17:8,15,22
19:11 20:21
23:20,24 25:15
30:14 45:12
46:12,24 48:16
48:19 52:11,22
54:2 55:13
56:7 57:6,17
58:17,22 59:20
61:13,22,24
63:1,22,25
64:17,18 65:21
66:20 67:2
68:7 74:6
75:17 76:19
77:21 78:12
79:8 80:19
81:4,5 84:19
84:22 85:2,11
88:5 89:1,17
90:19 91:3,12
91:16 92:8,14
94:2,18 96:3,9
96:19,24 97:2
97:16 101:8,21
101:22 102:21
104:8 107:7
108:17 109:13
109:21,25
111:20,24
112:5 113:3,12
115:12,19
117:9,12,20
118:3,12
120:18,23

122:8 126:12
126:19 127:16
127:21 129:20
132:4 133:2
136:6,13,16,21
137:12 138:13
139:3,13 140:9
140:13,22
141:12,24
143:7 144:18
144:23 147:13
147:23 148:12
149:1
**rights** 152:4
**riley** 6:7,11
113:17,19
114:4,18 115:2
115:7,13,15
126:22
**riley's** 116:3,11
**ring** 110:21
**risk** 27:7 40:22
41:14
**risks** 41:11
**rite** 65:3
**robust** 122:13
**role** 14:23
34:25
**roles** 27:2
**rough** 152:15
**rpay** 111:15
**rpr** 1:20 153:2
153:23
**rules** 9:22
10:18 49:23

**running** 10:19
**russell** 23:19
29:14,19 30:10
30:17 56:19

---

**s**

**s** 82:12 102:16
**sachs** 129:25
**safe** 145:13
147:6,25
**sale** 16:8 23:3
45:16 99:9
101:24
**sales** 3:17 26:1
46:4 61:4,9,9
61:11,12,17,20
65:14 66:10,10
66:14,15 69:8
76:13 78:19
79:3,5 81:13
103:11 104:8
122:12 133:1
133:13 134:11
136:19
**sarah** 4:22 5:11
7:4 83:24
97:24 130:18
**saw** 35:12 77:2
95:6 96:15
121:22
**sawicki** 2:8 3:2
8:10,11 9:5
12:16,21 13:14
13:16 17:7
29:7,9 31:4,6
31:18 35:19,20

46:7,11,14,18
53:2,10,11
54:4,8 58:5
60:15 62:3
64:3 65:21,25
67:1,3,7 72:20
72:21 74:6,10
75:25 76:3
81:10 83:7,22
86:14,20,24
88:7,11 89:1,6
89:9,11 92:19
92:21 94:22
95:2 97:4,11
97:22 98:7
102:8 104:14
106:4 110:8,11
110:13,15
113:4,8 114:25
116:21,25
118:20 121:8
123:6 124:16
126:9 128:7,10
130:11,15
131:10,21
132:8 134:13
134:16 135:1,4
135:10,13
140:2 141:7
142:17 143:19
144:4 145:9,23
146:14 150:21
150:23 151:6
151:13,24
152:3,12,15

Case 9:22-cv-80418-DMM Document 100-4 Entered on FLSD Docket 06/15/2023 Page 198 of
30(B)(6) Driehaus Capital 209 June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C

**[saying - separate]**                                           Page 40

saying 43:7
103:8 111:14
112:16 121:25
132:15 143:14
150:5
says 19:25 20:5
20:18,22 23:12
23:24 35:25
41:21 43:11
57:9 103:10,25
105:18,18
121:23 133:18
136:17 138:3
143:10
scale 91:24
scanner 61:3
66:8,8 122:11
122:15,17
130:5 132:23
133:1,2,24
schedule 50:25
51:1,2,15,15,21
51:25 52:8,14
schedules 49:4
sciences 19:19
screen 8:14
12:23 46:24
131:18,19
scroll 59:11
88:12 89:4
135:10
seal 155:11
search 34:23
35:13

sec 5:1 7:10
32:8,10,17
36:5 37:2 38:8
49:23 87:1,4
87:14,21
104:17 134:18
second 17:12
17:15 32:21
43:9 48:5
58:13 64:15,23
64:25 72:12
74:23 78:10
84:9 95:10
104:22 105:6
119:1 126:10
130:25 133:17
137:3 142:22
147:21 148:21
secondary 56:2
56:16
section 35:22
43:6 90:14
sector 16:17,21
16:25 21:20
23:16 27:3
62:7
sectors 15:4,5
16:12,15 27:5
securities 9:8
22:6 26:19
32:8 33:2,15
33:23 38:3
49:9 74:1
123:15 124:3
125:6,15

127:15
security 11:21
19:3
see 9:21 12:22
17:13,14,17,22
18:1,5 21:11
26:21 29:16
37:5 40:23
43:16 59:11
77:6 78:20
79:6 81:11,18
88:13 89:12
99:13,20 105:4
119:5 125:10
131:20 137:8
142:24
seeing 20:8
101:13 105:23
120:10
seeking 123:19
seems 21:3
29:18
seen 15:11
31:22 37:24
48:24 67:9,12
84:2,13 103:20
111:12 122:11
123:10,17
136:5
seftenberg
34:18 35:17
84:3
selected 70:2
selection 68:17

sell 28:12 33:2
56:6,10 59:6
93:20 96:12,18
98:25 102:3
110:5 112:23
118:2 120:5,8
122:1,3,23
125:19 129:9
132:20 134:1,5
selling 22:5
99:25 100:4,8
100:16 104:4
122:5,14
sells 65:2 73:14
send 15:17
146:2
sends 54:24
senior 21:16
sense 13:18
55:8 72:2 79:6
81:22 101:14
110:21 146:8
sent 11:13
67:15 85:18
157:14
sentence 33:21
39:1 43:16
47:10 105:18
107:9 112:16
separate 22:17
22:23 23:6
33:13,18 34:3
43:19,20 44:2
44:24 45:1,12
48:21,23 53:21

**[separate - small]**                                              Page 41

80:13 84:18
99:7
**separately**
  21:25 22:1,5
**september**  3:11
  4:10,13,18 7:4
  14:13 17:13
  18:8 31:21
  51:8 53:15,19
  64:7,11,17
  66:4 67:15
  68:1,8 70:2
  105:13 130:17
  134:23
**service**  91:11
**services**  51:11
  52:10 68:2,24
  73:1 91:22
**set**  11:15,17
  22:8 36:23
  38:9 50:24
  55:17 67:11,11
  74:4 77:17
  153:5
**setting**  45:14
**setup**  87:13
**several**  15:11
  45:8 118:23
**shaking**  10:23
**share**  8:15
  13:20 22:15
  32:3 39:17,21
  42:17 66:11
  91:7,10 105:11
  105:14,16,19

107:17 112:12
115:17 116:3
125:7 127:19
127:20 128:2
129:12 133:20
135:25 136:1
136:12 139:3,6
139:11,15
145:6 148:18
149:23
**shared**  37:24
**shareholder**
  24:23
**shareholders**
  135:24
**shares**  43:22
  44:19,20,22
  45:2,3,4,11,24
  74:19 75:2
  77:4 95:14,15
  96:1 120:14
  143:15
**sheet**  154:1
  157:11
**short**  11:10
**shorter**  146:22
**shorthand**
  153:13
**show**  15:21
  17:3 67:4
  76:12 81:24
  97:18 114:22
  131:14,18
  139:1

**showed**  129:15
  130:5
**showing**  36:25
  81:16 83:12
  106:19
**shown**  109:6
**shows**  61:4,15
  66:18 74:25
  81:18 84:15
  85:5,6 91:9
  94:6 95:10,12
  137:15 144:25
**side**  23:11
  117:11 126:11
  136:16
**sided**  78:5
**sign**  157:12
**signature**  51:3
  51:4,14 153:22
  155:1 156:13
**signed**  33:24
  50:11 53:14
  133:6 157:20
**significance**
  63:9
**significant**  26:3
  39:19 113:2
**signing**  50:19
**similar**  126:22
**similarly**  1:8
**simply**  26:1
  60:20 71:7,15
  83:9
**single**  43:13,22

**site**  26:4
**sitting**  8:13
**situated**  1:8
**situation**  150:1
  150:7
**six**  16:11,14
  36:13 55:12
**sixth**  51:3
**sizable**  136:9
**size**  22:3 25:2
  26:15 41:19
  56:25 80:21
**skin**  20:22
**skip**  115:12
**slide**  19:17
  23:11,22 24:9
  26:11,20 29:1
**slow**  108:24
  133:13,13
**slowing**  132:24
**small**  3:23
  17:11 18:10,14
  18:22 19:18,19
  19:22,22 22:9
  22:14,23 23:4
  23:6,7 25:5,12
  29:4,12,19
  30:15,16 33:24
  41:4 44:3,13
  44:25 51:15,19
  53:23 59:19
  63:11 67:22,22
  68:3,3,7 73:18
  73:18,22 77:14
  85:9 86:5 90:7

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 200 of
30(B)(6) Driehaus Capital                                        June 12, 2023
City of Atlanta Police Officers' Pension Plan v. C
209

**[small - stock]**                                      Page 42

| | | | |
|---|---|---|---|
| 99:23 118:1 119:9 142:10 147:2 | **southeast** 157:15 | **stanley** 7:18 138:14 141:11 141:14,21,22 | 53:17,22 55:22 56:7,11,15 |
| **smas** 22:6 | **southern** 1:2 | **stanley's** 142:2 | 57:4,11,16 |
| **smoothly** 10:19 | **space** 14:19 21:21 30:19 49:19 107:6 116:2 | **staple** 14:5 | 62:21 64:16,20 65:7,9,13 |
| **software** 72:13 | | **staples** 15:3 | 74:14 75:2,11 |
| **sold** 78:12 98:20 99:18,22 100:25 117:10 | | **start** 27:8 | 76:13 79:14,24 79:25,25 80:4 80:8,10,19 |
| | **spaz** 57:11 | **started** 18:6 39:11 41:3 51:10 86:4 | 81:3,4,14,19 82:2,3,15,15 83:1,10,12 |
| **solely** 28:13 64:19 75:22 | **speak** 9:24 11:24 12:8 | **starting** 38:15 100:19 | 84:24 87:12,17 90:1 92:9 |
| **solutions** 157:23 | **speaking** 9:17 22:24 25:22 72:7 | **starts** 93:24 111:14 141:10 | 93:21 95:19,20 96:8,12,18,22 |
| **someone's** 131:18 | **specific** 50:24 75:20 80:10 100:9 118:4 | **state** 155:3 | 98:19,25 99:14 99:17 100:7 |
| **somewhat** 62:10 112:3 | | **statement** 47:15 51:17 | 101:13 102:21 109:11,18 |
| **soon** 103:21 | **specifically** 60:8 70:21 78:16 100:6 117:25 | **statements** 153:8 | 110:6 112:11 112:21,23 |
| **sorry** 17:16 | | **states** 1:1 50:23 | 117:10 118:10 119:18,24 |
| **sort** 17:9 37:19 54:14 61:8 66:13 68:20 83:15 87:4,12 90:10 94:10,15 104:17 111:1 124:20 127:1 142:5 | **speculation** 150:24 | **stenographic...** 153:10 | 120:8,11,14,15 121:1 122:5,14 122:23 126:25 127:3,25 129:18,22 130:2,9 132:21 134:1 139:21 140:16 142:10 143:16 144:20 145:4 |
| | **speedway** 65:4 | **sticker** 135:15 135:18 | |
| | **spite** 96:17 140:19 | **sticker's** 135:21 | |
| | **spoke** 12:4 | **stock** 3:18,19 4:19,20 23:4,5 24:9,15 26:1,8 26:23 27:17,23 36:4 37:8 40:22 41:7,10 41:14 42:9 43:1 44:12,16 45:3,11,17 | |
| | **spread** 30:4 | | |
| **sorts** 38:7 72:2 | **stage** 26:7 67:11 | | |
| **sound** 129:19 | **stamp** 32:2 55:16 109:3 | | |
| **source** 63:17 82:2 113:11 138:5 | | | |
| **sources** 63:14 82:17 102:19 | **stamped** 121:13,14 | | |
| | **standards** 50:6 | | |

**[stock's - symbol]** Page 43

| | | | |
|---|---|---|---|
| **stock's** 28:14 28:22 | 44:3,13,16,25 51:16,19 56:11 56:17 59:19 63:11 67:22 70:13,25 71:5 71:14 72:8 73:15,18,23 79:4 86:5 90:8 94:18 96:7 97:1 118:1 142:11 | **subsequent** 133:11 | **superior** 24:21 24:23 |
| **stocks** 20:1 21:4,7 27:4,9 27:11,22 28:4 28:13 38:22 41:5 59:7 64:10,14 70:13 71:1,13,21 73:17,20,23 74:4 84:18 99:9,10 100:22 101:4 117:4 126:7,8 | | **substance** 11:25 | **supervise** 49:6 |
| | | **substantial** 138:25 140:9 | **supervising** 14:22 |
| | | **substantially** 38:24 144:16 | **supervisor** 14:24 |
| | | **substitute** 135:20 | **suppliers** 91:23 |
| | | **sufficient** 10:25 | **supply** 103:24 |
| | | **sugar** 103:17 | **support** 44:18 99:3 |
| **stood** 141:16 | **street** 2:10,14 | **suggest** 143:20 145:24 | **supported** 130:8 147:12 |
| **stop** 53:2 94:23 97:2 | **strike** 48:13 57:13 63:15 65:11 70:22 71:18 74:4 85:13 92:15 109:19 | **suggesting** 56:4 57:15 100:1 131:17 | **supposed** 145:24 |
| **store** 91:21 | | **suit** 86:18 | **sure** 13:22 15:2 26:17 35:15 44:4,8,14 46:13 50:5 59:12 72:1 99:4 119:22,25 131:16 138:7 |
| **straight** 46:20 | | **suite** 2:10,14 | |
| **strategies** 18:16,17,20 19:1,5,7,14,18 19:25 20:24 21:8 22:11 35:24 36:1 53:24 71:22 | **strong** 60:25 66:7 111:16 117:11 122:15 130:5 | **sum** 37:11 45:11 | |
| | | **summarize** 18:10 | |
| | **struck** 142:4 | **summarizes** 126:6 | **surprised** 70:20 |
| | **stuff** 146:1,6 | | **surprising** 106:18 |
| | **style** 23:11 | **summarizing** 106:13 | **sustainability** 39:4 |
| **strategy** 3:24 17:11 18:11,14 18:23 20:11 21:7 22:14,17 22:24 23:5,6,7 25:9,12 29:4 29:12,20 30:5 30:16 33:15,16 33:25 41:4 | **subject** 22:3 49:2 59:11 136:13 152:4 | **summary** 5:19 41:9,10 62:16 78:18 82:22 84:10,14 85:5 102:11,23,24 127:6 141:15 | **swear** 9:2 |
| | **subpoena** 12:23 | | **swore** 10:11 |
| | **subscribed** 155:5 | | **sworn** 10:14 155:5 |
| | **subscription** 114:18 | **super** 119:8 | **symbol** 55:22 62:18 126:11 133:7 |

**[system - things]**

**system** 15:22 62:20 76:8,10 87:13

**t**

**t** 82:12,12 102:16 156:1
**table** 61:8,11 66:9 109:16 119:2,7,14,16
**tables** 108:22
**take** 10:21 11:8 13:14 27:7 38:16 46:10 60:22 63:3 67:8 78:15 81:7 84:17 86:17 97:5 98:21 103:21 107:11 109:11 115:3 116:1,2 116:7,11 121:4 125:17 128:1 131:25 133:10 133:25 137:24 143:21 145:22 146:21
**takeaways** 142:2
**taken** 10:12 53:7 79:1 97:8 144:1 153:4,13 156:4
**talk** 13:6,10 21:11 43:9 78:14 80:6

92:16 108:8
**talked** 80:12 109:15 133:2 145:17 146:25 147:1
**talking** 10:22 26:18 40:6 41:4 51:20 54:16 56:17 59:10 61:16 80:4 99:14 108:9 113:16 149:22 151:3
**talks** 72:24
**target** 6:8 61:5
**tax** 109:17
**tea** 61:12
**team** 16:10 18:18 19:25 20:10,17,23,25 23:22 34:14,17 44:18 62:13 69:16 82:10 99:3 126:5
**team's** 4:2 54:11
**teams** 4:13 6:13 6:16,17 7:7,14 7:19 15:17,22 18:19 23:25 24:22 58:14 66:3 98:15 111:7 117:2 118:23 121:12 121:19 132:11

132:14 140:4 142:19
**tech** 9:11
**technical** 36:2 72:16 107:15 107:22 120:8 120:13 130:2 131:3
**technicals** 133:19
**techniques** 36:19
**technology** 21:17 27:4 108:24
**tegus** 102:16
**tell** 10:15 35:13 40:25 59:9,12 61:1 67:9 75:16 77:8 81:2 93:12
**telling** 122:4
**ten** 29:21 30:23 53:3 95:10,13 95:25
**term** 24:11,14 24:17,23 42:5 60:22
**terminated** 68:2
**termination** 136:20 137:11 138:23 140:22
**terms** 27:21 56:24 70:12

77:14 94:17
**testified** 10:8 109:20 151:1
**testify** 12:23
**testimony** 9:18 10:11 19:20 53:16 153:7 156:6 157:9,18
**th** 77:25
**thank** 9:6 35:19 53:10 72:20 92:20 97:12 110:13,13 144:5 152:7
**thanks** 146:15
**thesis** 39:3,6,10 39:12,14,15,24 40:3,4,7,9,12 40:14,17 54:1 60:2 75:15 124:8 147:8,12
**thing** 10:13 91:17,18 97:18 105:7 106:16 131:12
**things** 10:19 30:20 50:7 63:4,5 65:19 78:16 89:24 90:17,22,25 94:9,16 102:24 103:4 108:17 109:9,18,21,23 117:11 129:7 133:13 138:17

**[things - traders]** Page 45

146:24

**think** 25:18
26:25 30:3
35:11 37:3,22
44:8 46:7 50:5
50:21 53:16
56:23 60:9
65:19 81:1,25
100:12 111:24
112:25 117:19
119:20 127:8
129:16 131:21
136:25 137:2
139:13 145:12
145:13 148:8
148:10,15,24
149:21,24,25
150:11,14,18
151:11,17,20
152:5

**thinks** 60:9
151:8

**third** 5:4 7:12
19:16 31:2
36:4 37:25
39:1 41:13
43:11 88:3,19
96:16 119:12
126:23 130:25
134:23 135:6
136:17 140:8
148:21

**thought** 63:4
89:24 90:17,25
91:18 102:25

126:6 129:8
133:12 149:4
149:18

**thousand** 95:14
144:23

**thousands**
115:9

**three** 18:16,18
19:6,8,9,12,21
22:10 128:25
137:17 142:22

**ticker** 55:21
62:18 126:11
133:7

**time** 8:3 9:7
10:21 11:9
14:17 22:25
25:11 27:10,13
27:13 28:11,11
29:14 30:22
39:13 40:1
43:3 50:11,19
52:18 53:5,8
55:5,6,7,7,10
55:13,13,15,16
55:17 56:20
57:6,24 59:8
59:10,17,24
60:4 61:22
63:9 64:21
65:11,12 66:23
71:25 72:14,18
76:17 83:11,12
84:25 86:1
87:16 97:6,9

100:18 101:8
101:14,24
103:2 104:8
105:2 106:25
110:6 112:23
114:10 115:7
121:4,13,14
123:20 124:9
130:9 134:2,10
139:13 140:17
143:24 144:2
145:20 146:12
149:25 152:10
153:4,5,9
157:19

**timeframe**
157:8

**times** 19:3 78:4
79:22 136:11

**timestamp** 55:4

**tobacco** 34:9

**today** 8:6 9:16
11:12 23:4
50:16,20 51:20
79:5 133:24
146:25

**todd** 2:8 8:11
35:15 145:21

**together** 11:19
11:22 43:21

**tom** 34:18
35:16 84:3

**tomorrow**
152:12,13,16

**took** 54:2 109:1

**top** 17:12 20:17
24:8 31:2
33:12 48:6
50:7 54:22,23
58:17 59:4,6
59:18 64:13
70:13 75:13
76:16 77:6
84:16,17,21
85:7 90:16
95:10,13,25
103:25 111:1
111:15 115:12
115:14 137:24
138:15 144:17

**topics** 9:25
13:5,7,11 72:3

**total** 37:11
45:11 64:19

**totalled** 135:24

**totally** 50:7

**towards** 57:9

**track** 24:15
69:16 70:12
71:8 89:25

**trade** 11:20
43:22 44:18
74:16 77:13
80:9 99:3

**traded** 20:1
120:15,20

**traders** 16:13
16:19 44:19
122:5

Case 9:22-cv-80418-DMM   Document 100-4   Entered on FLSD Docket 06/15/2023   Page 204 of
30(B)(6) Driehaus Capital
209
City of Atlanta Police Officers' Pension Plan v. C
June 12, 2023

**[trades - unrestricted]**

Page 46

**trades** 43:22
  79:23 80:16
**trading** 11:25
  45:9 79:20
  81:3 83:1
  110:20 120:11
  120:21 129:16
**trajectory** 26:2
**transacting**
  100:13
**transaction**
  43:13
**transactions**
  43:13,20 49:9
  74:13
**transcribed**
  153:11
**transcript** 5:19
  102:12 153:13
  154:1 156:3
  157:6,20
**transcripts**
  38:6,7 102:15
  102:17
**transfer** 73:4
**transition** 73:2
  73:25 77:9
  132:24 133:4,9
  133:14,20
**transitioning**
  75:5
**transitory**
  112:3
**transmission**
  144:8

**trigger** 120:7
**trim** 28:1 55:25
  56:5 57:15
  132:18
**true** 22:20
  31:20 47:4
  58:9 60:17
  66:2 118:22
  121:19 147:18
  148:3,14
  153:12,18
  156:7
**truer** 94:12
**trust** 3:13
  72:25 73:9
  74:12
**truth** 10:15
**try** 10:25 76:24
  78:2
**trying** 56:18
  89:7 93:1
**turn** 19:16
  95:23 130:25
**turning** 20:16
  85:4
**two** 13:24 15:8
  19:4 22:15
  24:16 47:22
  48:21 59:4,4,6
  59:7 65:19
  89:16,18
  127:11,12,13
  135:12 137:19
  140:20 142:22
  143:9

**type** 49:18
  79:11 101:4
**types** 15:11
  33:10 71:1
**typical** 54:14
**typically** 23:14
  27:18 42:7
  69:8 70:19
  73:24 121:3
  124:7,8 125:3

**u**

**u** 102:16
  126:19 156:1
**u.s.** 18:17 19:4
  20:1 22:10
  32:8 33:4,4
  65:2 105:13
**ultimately** 15:8
**unaudited** 6:2
  104:23 106:7
**unchanged**
  40:8
**under** 9:21
  10:14 20:21
  23:11 35:24
  49:22 64:24,24
  92:4 97:15
  105:6 135:17
  138:10 153:6
  153:17,17
  156:2
**underlying**
  93:7 108:1
  120:1

**underneath**
  19:24 21:13,23
  24:20 47:10
  135:19 136:16
**underpinning**
  24:13
**understand**
  10:1 11:2,4
  22:22 32:6,10
  32:14 47:16
  49:12,17,21
  50:9 63:7
  72:22 81:1
  97:15 98:12,24
  100:15 151:16
**understanding**
  9:14 30:17
  33:7 36:17
  71:7 73:3,7
  82:13 84:4
  92:25
**understated**
  105:12
**unfortunate**
  135:15
**unique** 100:10
**united** 1:1
**universal** 55:5
**universe** 38:21
**university**
  13:22
**unnamed**
  102:13
**unrestricted**
  49:6

**[update - weighting]**                                            Page 47

update 4:24 5:13 72:6 84:1 84:6 85:15 97:25 130:20 131:5 144:10
updated 126:25
updates 5:10 95:6
upgrade 127:25
upper 17:15
upside 133:20
use 15:17 36:8 36:13,18 37:1 67:10 80:15 81:25 82:12 83:16 87:8,23 90:11 99:16 100:6 102:20 104:18 118:10 120:9
used 37:14 63:18 119:23 157:20
useful 93:16
uses 82:10
using 118:5
usually 10:24
utc 55:5,16 121:13,14 142:24
utilizes 35:25

**v**

v 1:10 157:4
vague 150:23 151:14
valid 96:23
valuation 101:17
valuations 100:24 101:1
value 28:21 84:25 95:15
values 27:10 52:21
variety 35:25
various 26:19 27:7 36:3 41:5 68:16 71:22 78:11 84:15 90:7 106:13 123:18 139:16
vehicle 22:7,12
vehicles 21:24
venue 91:23
venues 45:8
verify 157:9
veritext 9:11 157:14,23
veritext.com. 157:15
version 119:13
versus 27:4,5 29:21 91:5,10
vertas 73:1,12 73:16,20 74:17 75:1

viable 75:15
video 10:12 17:17
videographer 2:19 8:1 9:1 53:5,8 72:14 72:18 97:6,9 143:24 144:2 152:8
videotape 1:16 152:9
videotaped 8:4
view 57:14 62:13 107:25 108:5
vijayan 21:14
virtual 1:16
virtue 125:6,12
volume 36:4 120:10 121:1 130:3

**w**

wait 10:19
wal 61:5
want 35:9 38:22,23 67:10 79:9 81:24 97:18 98:18 119:3 129:14 131:8,13 134:1 134:5 135:15 143:4
wanted 114:20 118:2

watched 75:12
way 15:22 21:14 27:6 52:9 54:20,20 55:4,21 56:22 99:5 101:2 103:5 116:14 120:10 131:15 131:17
wdm 1:3
we've 26:19 48:24 51:19 88:14 112:13 119:7 136:5 144:6,16
weakness 111:25,25 120:8
website 105:7
wednesday 6:12 115:3
week 120:3 121:2
weekly 28:5,9
weeks 140:7,20
weigh 16:20 27:9
weighs 121:23
weight 132:19
weighting 27:21 56:20,22 56:24,25 57:2 80:7,15,17,17 80:19

**[weightings - zero]** Page 48

**weightings** 74:1

**weights** 143:11

**went** 91:10 94:1,6 111:23

**west** 2:10

**whatsoever** 138:22

**wide** 102:18

**widely** 112:2

**widespread** 106:18

**wind** 106:19

**witness** 9:2,13 86:19 126:1 143:23 145:11 151:25 152:7 153:5,7 155:1 156:13 157:8 157:10,12,19

**word** 37:23 80:15 89:16 113:25

**words** 47:21 50:1 55:6 59:22

**work** 14:25 27:15 33:10 75:16 82:8 83:17 87:5,24 88:24 96:5 104:19 141:17

**worked** 13:24

**working** 14:2 18:6

**works** 15:23

**worse** 91:15

**worth** 20:24

**would've** 73:12

**write** 24:9,20 54:20 55:2,20 92:4 106:16 107:14 112:8 117:7,18 143:1

**writes** 24:21 39:2 41:14 115:15

**written** 37:20 49:2

**wrote** 117:9 126:18 134:4 138:17

**y**

**yeah** 12:4 27:17 28:18,24 46:22 55:9 61:3 64:24 72:5 78:25 80:2,14 90:22 92:20 98:22 111:24 119:20 120:7 128:4,6 131:21 138:7 151:17,25

**year** 6:3 13:24 29:21 61:9,9 66:10,10 100:23 103:10 104:24 105:3 106:8 128:21

136:1 137:7

**years** 14:20,20 24:19 30:23 64:14,16 65:8 65:17 103:7

**yep** 62:6 76:11 116:15

**york** 2:6,6

**yoy** 61:8

**z**

**zero** 56:23 103:17

Georgia Code

Title 9, Chapter 11

Article 5, Section 9-11-30

(e) Review by witness; changes; signing.

If requested by the deponent or a party before completion of the deposition, the deponent shall have 30 days after being notified by the officer that the transcript or recording is available in which to review the transcript or recording and, if there are changes in form or substance, to sign a statement reciting such changes and the reasons given by the deponent for making them. The officer shall indicate in the certificate prescribed by paragraph (1) of subsection (f) of this Code section whether any review was requested and, if so, shall append any changes made by the deponent during the period allowed. If the deposition is not reviewed and signed by the witness within 30 days of its submission to him or her, the officer shall sign it and state on the record that the deposition was not reviewed and signed by the deponent within 30 days. The deposition may then be used as fully as though signed unless, on a motion to suppress under paragraph (4) of subsection (d) of Code

Section 9-11-32, the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER:   THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.   PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.