# Exhibit 7

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

|  |  |
|---|---|
| CITY OF ATLANTA POLICE OFFICERS' PENSION PLAN and CITY OF ATLANTA FIREFIGHTERS' PENSION PLAN, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> CELSIUS HOLDINGS, INC., JOHN FIELDLY, and EDWIN NEGRON-CARBALLO, <br><br> Defendants. | Civil Action No. 9:22-cv-80418 |

# EXPERT REPORT

# OF

# LUCY P. ALLEN

**June 15, 2023**

**TABLE OF CONTENTS**

I.     Scope of Assignment ...................................................................................................1

II.    Summary of Findings...................................................................................................1

III.   Qualifications and Remuneration ...............................................................................3

     A. Qualifications.......................................................................................................3

     B. Remuneration ......................................................................................................4

IV.   Materials Considered .................................................................................................4

V.    Background.................................................................................................................5

     A. Company background ..........................................................................................5

     B. Summary of allegations ......................................................................................6

VI.   Methodology...............................................................................................................9

VII.  The Misstatements Regarding Celsius' Share-Based Compensation Did Not Have Price Impact ...........................................................................................................14

     A. Celsius' stock price did not react to the alleged corrective disclosure, which demonstrates that the misstatements did not have price impact ..................................16

         1. There is no statistically significant price decline on March 2, 2022, the relevant date for analyzing price impact (Celsius' stock actually went up) ..........16

         2. A review of analyst commentary confirms that neither the misstatements nor their correction had price impact ...........................................................................18

     B. Celsius' stock price movement on March 3, 2022, two days after the alleged corrective disclosure, is not evidence of price impact from the misstatements...........20

         1. In an efficient market, stock prices react quickly to new information – if Celsius' stock price reacted to information two days after it was announced, it would be evidence against market efficiency ........................................................20

         2. According to Mr. Torchio's own criteria, Celsius' stock price drop on March 3, 2022 is not evidence of price impact .............................................................21

VIII. In an Efficient Market, the Misstatements Regarding Celsius' Share-Based Compensation Would Not Be Expected to Have Price Impact .........................................23

     A. The corrective information is merely an accounting adjustment that does not affect cash flows or the expectations of future cash flows and thus in an efficient market does not impact the stock price...................................................................23

B. Contrary to Plaintiffs' claim, Celsius' accounting adjustment did not affect any key metrics used by investors to value Celsius' stock .................................................27

    1. In valuing Celsius' stock, analysts specifically used financial metrics that were *unaffected* by Celsius' accounting adjustment ...........................................27

    2. Contrary to Plaintiffs' theory that net income was a "key metric" for Celsius, the Company's stock price did not react negatively to Celsius' 3Q22 announcement of negative net income that was driven by expenses that similarly did not affect the Company's cash flows ...............................................29

C. The fact that the value of Celsius' stock options and RSUs went up substantially when the stock price increased substantially is basic finance and obvious in an efficient market ................................................................................................30

IX. Mr. Torchio's Test of the Cause-And-Effect Relationship, the "Most Important" Test of Market Efficiency, Does Not Test Market Efficiency Over the Alleged Class Period – Applying His Test to the Alleged Class Period Yields Results that Are Contrary to Market Efficiency ..........................................................................37

## I.      SCOPE OF ASSIGNMENT

1.      I have been asked by counsel for Defendants to analyze the price impact of the allegedly false and misleading statements that Plaintiffs claim inflated Celsius Holdings, Inc.'s ("Celsius" or the "Company") stock price between August 12, 2021 and March 1, 2022 (the alleged "Class Period").[1] I have also been asked to review and comment on the Expert Report filed by Frank Torchio on May 18, 2023 (the "Torchio Report").

## II.     SUMMARY OF FINDINGS

2.      Plaintiffs claim that, during the alleged Class Period, Celsius allegedly inflated its stock price because it intentionally understated the non-cash expenses associated with the Company's share-based compensation. Plaintiffs claim that the misstatements were corrected on March 1, 2022 when Celsius disclosed that its reported non-cash expenses associated with its share-based compensation in the second and third quarters of 2021 ("2Q21" and "3Q21") were understated and that, as a result, the alleged inflation in Celsius' stock price dissipated and investors suffered "heavy losses.".["2]

3.      I find no price impact from Celsius' misstatement regarding its non-cash share-based compensation expenses. I find there is no link between Celsius' stock price movements and the misstatements or the correction of the misstatements. In particular, after the corrective information was disclosed Celsius' stock price did not have a statistically significant price decline on March 2, 2022, the relevant date for analyzing price impact. Celsius' stock actually

---

[1]   Amended Complaint for Violations of the Federal Securities Laws, dated July 8, 2022 ("Amended Complaint"), ¶1.

[2]   Amended Complaint, ¶¶10-13.

1

went up on that date. According to both my own event study as well as the event study conducted by Plaintiffs' expert Mr. Torchio, Celsius' stock price reaction to the restatement of its share-based compensation expenses, after controlling for market and industry movements, is within the range of normal expected daily variation in the stock price, and cannot be distinguished from zero. The lack of statistically significant price reaction to the correction of the misstatement affirmatively demonstrates that the misstatements regarding Celsius' share-based compensation expenses did not have price impact.

4.      Further, I find that if Celsius stock is trading in an efficient market, as Plaintiffs allege, then there should be no impact on the stock price from the change in accounting for share-based compensation that Celsius announced on March 1, 2022. The corrective information was an accounting adjustment that does not affect Celsius' cash flows or the expectations of future cash flows and thus in an efficient market does not affect the value of the Company or impact the stock price. Contrary to Plaintiffs' claim, the corrective information was an accounting adjustment that did not affect any of the key financial metrics used by investors to value Celsius' stock. Analysts that cover Celsius specifically used metrics such as revenues, adjusted earnings before interest, taxes, depreciation and amortization ("adjusted EBITDA"), and free cash flows to value Celsius' stock, metrics that were *unaffected* by Celsius' accounting of its share-based compensation.

5.      Moreover, I find that given that the values of the stock options and restricted stock units ("RSUs") are primarily driven by the Company's stock price and that the stock price had increased substantially from the time when the majority of the options and RSUs had been granted and valued, it was clear to the market that the value of those previously granted stock options and RSUs would have been increasing. Thus, even though updated valuations of the

2

previously granted stock options and RSUs are not relevant to the valuation of Celsius' stock because they have no cash impact on Celsius, if investors wanted to determine how the value of non-cash share-based compensation that had already been granted to directors and employees changed as Celsius stock price changed, those calculations could have been made.

6.     I find that Mr. Torchio's test of the cause-and-effect relationship, the "most important" test of market efficiency, does not test market efficiency over the alleged Class Period.[3] Applying Mr. Torchio's cause-and-effect relationship test to the alleged Class Period yields results that are contrary to market efficiency: over the alleged Class Period, there were no statistically significant price reactions on his "news days," while there were statistically significant price reactions on many of his "non-news days."

## III.   QUALIFICATIONS AND REMUNERATION

### A.   Qualifications

7.     I am a Senior Managing Director of NERA Economic Consulting ("NERA") and a member of NERA's Securities and Finance Practice.  NERA provides practical economic advice related to highly complex business and legal issues arising from competition, regulation, public policy, strategy, finance, and litigation.  NERA was established in 1961 and now employs approximately 500 people in more than 20 offices worldwide.  NERA's Securities and Finance Practice, which performs research in securities and financial markets, dates from the early 1970s and employs a research staff of more than 100 professionals holding degrees in economics,

---

[3]   Courts have recognized that the "cause and effect relationship" is "in many ways, the most important" factor among the *Cammer* factors. See *In re PolyMedica Corp. Litig.*, 453 F.Supp. 2d 260, 266 (D. Mass. 2006) ("*PolyMedica II*"). See also, *Loritz v. Exide Techs.*, 2015 WL 6790247, at *9-10 (C.D. Cal. July 21, 2015) ("*Loritz*"); In re *2TheMart.Com, Inc. Sec. Litig.*, 114 F.Supp.2d 955, 964 (C.D. Cal. 2000).

finance, and mathematics.  The practice group counts among its clients major securities exchanges, risk managers, principals needing valuation services, and parties in litigation.

8.        I have an A.B. from Stanford University, an M.B.A. with a concentration in Finance and Accounting from Yale University, and M.A. and M. Phil. degrees in Economics, also from Yale University.  Prior to joining NERA, I was an Economist for both President George H. W. Bush's and President Bill Clinton's Council of Economic Advisers, providing economic analysis on regulation and health care policy issues.  In my over 25 years at NERA, I have been engaged as an economic consultant or expert witness in numerous projects involving securities and financial economics.  In the course of this work, I have analyzed the effect of information on stock prices of over 100 companies.  My resume with recent publications and testifying experience is included as Appendix A.

### B.        Remuneration

9.        NERA is being compensated for time spent by me and my team at standard billing rates and for out-of-pocket expenses at cost.  NERA currently bills for my time at $1,150 per hour.  NERA's fees are not in any way contingent upon the outcome of this matter.

### IV.    MATERIALS CONSIDERED

10.        In preparing this report, I considered the following categories of materials (a complete list of materials considered is included as Appendix B):

a)        Amended Complaint, filed July 8, 2022;

b)        Plaintiffs' Motion for Class Certification, filed May 18, 2023;

c)        Expert Report of Frank C. Torchio dated May 18, 2023 including exhibits and materials turned over;

4

d)      30(B)(6) Deposition of Driehaus Capital, dated June 12, 2023;

e)      Celsius' SEC filings;

f)      Celsius press releases, conference call transcripts, and news stories;

g)      Analyst reports on Celsius;

h)      Financial data from Bloomberg, L.P., and FactSet Research Systems, Inc.;

i)      Legal decisions on class certification; and

j)      Academic literature and textbooks on finance, securities, valuation and statistics.

## V.      BACKGROUND

### A.      Company background

11.      Celsius develops, markets, and distributes "functional drinks and liquid supplements."[4] The Company's main products include pre- and post-workout energy drinks and protein bars.[5]

12.      Since 2016, Celsius' common stock has traded on Nasdaq under the ticker symbol "CELH."[6] Celsius is considered a high-growth company, with "rapid distribution expansion, new product introductions, and surging consumer demand."[7] In the years leading up to and during the alleged Class Period, Celsius had substantial revenue growth, which was accompanied by large increases in its stock price. The table below shows Celsius' yearly revenue between

---

[4]   Celsius FY21 Form 10-K, page 1.

[5]   Celsius FY21 Form 10-K, page 1.

[6]   Celsius General Form for Registration of Securities, dated July 22, 2016.

[7]   Roth analyst report, August 23, 2021. *See, also*, Jefferies analyst report, September 16, 2021, Credit Suisse analyst report, March 2, 2022 and Roth analyst report, March 2, 2022.

2017 and 2022, its year-over-year revenue growth rate, and its stock price as of the end of each year.

| **Celsius Yearly Revenue, Revenue Growth Rate, and End of Year Stock Price** | | | |
|---|---|---|---|
| Year | Revenue | Annual % Growth | Stock Price |
| 2017 | $36M | 59% | $5.25 |
| 2018 | $53M | 45% | $3.47 |
| 2019 | $75M | 43% | $4.83 |
| 2020 | $131M | 74% | $50.31 |
| 2021 | $314M | 140% | $74.57 |
| 2022 | $654M | 108% | $104.04 |

**Source**: Celsius SEC Filings and Factset Research Systems, Inc.

### B.    Summary of allegations

13.    Plaintiffs claim that, during the alleged Class Period, Celsius allegedly inflated its stock price by overstating its net income as a result of understated non-cash expenses associated with the Company's share-based compensation.[8] In particular, Plaintiffs claim that Celsius' stock price was inflated because Celsius understated the non-cash expenses associated with the share-based compensation for nine directors and employees that resigned or were terminated during 2Q21 and 3Q21.[9] According to Plaintiffs' theory, Celsius' alleged intentional understatement of these expenses was an "accounting fraud" that helped Celsius avoid hurting its key financial metrics and "propell[ed] the Company's stock to new heights."[10]

---

[8]    Amended Complaint, ¶¶2-10.

[9]    Amended Complaint, ¶¶8-10.

[10]    Amended Complaint, ¶¶2, 9.

14.     Share-based compensation refers to Celsius' practice of granting stock options and RSUs to directors and employees as incentives to "attract and retain highly competent persons at all levels."[11] Under U.S. Generally Accepted Accounting Principles ("GAAP"), Celsius is required to record an accounting non-cash expense in its financial statements associated with this share-based compensation. The amount of the expense recorded is based on the estimated value of the stock options and RSUs as of the grant date. This expense is recorded as part of Celsius' general and administrative ("G&A") expenses, and rather than being recorded in full on the year of the grant is instead spread or "amortized" over the "two to three-year requisite service or vesting period of the grant."[12]

15.     The alleged "accounting fraud" in this case involved the estimated accounting expense of stock options and RSUs granted to nine directors and employees who either retired or were terminated from Celsius during the alleged Class Period.[13] According to Plaintiffs, upon their retirement or termination, the stock-based compensation expenses associated with those nine directors and employees "are supposed to be calculated and recognized on a company's income statement using the fair market value of the stock as of the date of termination or retirement of an employee."[14] Due to the significant increase in Celsius' stock price between the date the stock options and RSUs were granted to the nine directors and employees and the date of their departure, a "re-valuation" would have required Celsius' to report larger non-cash expenses in its income statements. According to Plaintiffs, Celsius failed to perform this required

---

[11]   Celsius FY21 Form 10-K, p. F-22.

[12]   Celsius FY21 Form 10-K, pp. F-14, F-22.

[13]   Amended Complaint, ¶¶8-10.

[14]   Amended Complaint, ¶69.

"re-valuation" in 2Q21 and 3Q21 and thereby allegedly misleading the market about the Company's net income and inflating Celsius' stock price.[15]

16.     Plaintiffs do not allege that Celsius understated the *number* of stock options or RSUs that were granted. In particular, over the alleged Class Period, Celsius disclosed in its quarterly filings the number of stock options and RSUs granted in each quarter as well as the total number of stock options and RSUs outstanding as of the quarter end. Celsius also disclosed in each quarter the weighted average of the exercise price and remaining term of the options, as well as the "intrinsic value" of all its outstanding stock options, which, like the market value, was increasing along with Celsius' stock price.[16] For example, Celsius' Form 10-K for year 2020 shows that within that one year the intrinsic value of its outstanding stock options increased from $9 million to $241 million (during the same time period Celsius' stock price increased from about $5 to $50).[17] Plaintiffs do not allege any of those numbers relating to Celsius' share-based compensation were false or misleading.

17.     Plaintiffs claim the misstatement was corrected on March 1, 2022, when Celsius announced that the reported non-cash expenses associated with its share-based compensation in 2Q21 and 3Q21 were understated and that its net income for those quarters was lower than previously reported.[18] Plaintiffs claim that Celsius' stock price fell on this news and that investors suffered "heavy losses as a result."[19]

---

[15]   Amended Complaint, ¶9.

[16]   The intrinsic value is calculated as the current stock price minus the option strike price.

[17]   Celsius FY20 Form 10-K, dated March 11, 2021, p. F-28.

[18]   Amended Complaint, ¶¶10-11.

[19]   Amended Complaint, ¶13.

8

18.     The chart below shows Celsius' stock price, trading volume, the dates when the inaccurate financials were issued, and the alleged corrective disclosure:



## VI.   METHODOLOGY

19.     An analysis of price impact is an analysis of whether the alleged misrepresentations affected the market price when made.[20] In general, the price impact of an alleged misrepresentation can be analyzed in at least two ways: (1) directly by analyzing the market reaction following an alleged misrepresentation, including analyzing the stock price

---

[20]   See, for example, *Halliburton I*, 131 S. Ct. 2179, 2186 (2011). ("'[P]rice impact' – that is, whether the alleged misrepresentations affected the market price in the first place.")

movement and examining market and analyst commentary following the alleged misrepresentations, or (2) indirectly by analyzing the market reaction to a disclosure that is corrective of an alleged misrepresentation.[21] It is my understanding that Plaintiffs are claiming that the misrepresentations in this case either "maintained" the alleged inflation in the stock price or were misleading by omission, and thus it is my understanding that according to Plaintiffs' theory a statistically significant price increase would not be expected at the time the misrepresentations were made.[22]

20.     To analyze price impact of the misrepresentations in this case, I examined publicly available information related to Celsius and Plaintiffs' allegations, reviewed Plaintiffs' claims in the Amended Complaint and the Torchio Report, and examined the misrepresentations and the corrective disclosure (including what information was false, when the truth was purportedly revealed to the market and what information was corrective). I analyzed publicly available information on Celsius, including analyst reports, press releases, conference call

---

[21] See, for example, *Halliburton II*, 134 S. Ct. 2398 (2014).

Note that simply testing whether there were statistically significant price reactions on the dates of the alleged corrective disclosures may not be a reliable analysis of price impact of the alleged misrepresentations for a number of reasons, including the following:

a)   The alleged corrective disclosures may not actually be corrective of the alleged misrepresentations. (If the alleged corrective disclosures are not in fact corrective, they cannot help one determine the price impact of the alleged misrepresentations.);

b)   The alleged corrective disclosure dates may not properly correspond to when the alleged misrepresentations were first corrected in the market. (Since, in an efficient market, only new news should affect a security's price, the reaction to repeated news is not a reliable indicator of what the price impact of the news would be initially. If news that is not new affects the price, then that is an indication that the market is not efficient.);

c)   The price reaction on the alleged corrective disclosure dates may be the result of confounding factors or news unrelated to the alleged fraud; and

d)   Market conditions may have changed between the time that the alleged misrepresentations were made and the time of the alleged corrective disclosures.

[22] Note that according to Mr. Torchio's event study there were no statistically significant stock price *increases* following any of the misstatements.

10

transcripts, SEC filings, and news stories from Bloomberg and Factiva.[23] I focused on what the market knew about the misrepresentations, and on how the market reacted in terms of analyst and other market commentary.

21.     Analyst reports are periodic reports issued by professional financial analysts at brokerage firms who perform research and analysis on specific industries and companies. Analysts analyze companies by studying publicly available information, such as SEC filings, as well as participating on conference calls and attending investor conferences where they can ask questions directly to management.  Analysts use this information to model and value companies and industries, using financial techniques such as discounted cash flow models and valuation multiples.  Using these valuations, analysts typically issue price targets (*i.e.*, what price they expect the stock of a company to be in a certain time period), provide estimates reflecting their expectations of the company's future financial performance, and give recommendations to buy, hold or sell the stock.  Analysts typically issue reports after new information about the company is released.  These reports play an important role in disseminating information about a stock and can be a valuable source of information on market knowledge and sentiment at the time.

22.     The review of analyst reports is a standard and generally accepted methodology for determining what information is important to the market in valuing a stock, and thus, for

---

[23]  Bloomberg is a commonly used provider of financial data and news, and Factiva is an online news reporting service and archive owned by Dow Jones & Company, Inc. that aggregates news content from nearly 33,000 sources from around the world.

11

determining whether a piece of information is material to investors.[24] There were at least 47 reports issued by six analysts covering Celsius during the alleged Class Period.[25]

23.    To analyze price impact of the misrepresentations in this case, I used the event study methodology, which is a standard method of testing whether a stock price reacts following a particular announcement. Specifically, an event study is a commonly accepted statistical analysis that measures the movement in a stock's price after an event or public announcement, typically adjusting for the movement in the overall market and/or industry.[26] Academics often use an event study to determine how stock prices respond to new information.[27] An event study typically uses a statistical analysis called a regression to estimate the relationship between the company's daily stock returns and the daily returns of market and/or industry indices, often over

[24]    In particular, courts have relied on analyst reports in determining what information is important to the market in valuing a stock and in determining the cause of stock price movements.  See, for example, *In Re TECO Energy Inc. Securities Litigation*, 2006 U.S. Dist. LEXIS 18101 (M.D. Fla. March 30, 2006) ("Specifically, the analyst reports on September 3, 2002, September 23, 2002, October 8, 2002, and January 23, 2003 address ratings cuts, opinions, and predictions regarding TECO's stock value but do not reference any misstatements, omissions, or accounting practices by Defendants as the reason for the bleak forecasts or changes in market conditions.") and *Barrie v. Intervoice-Brite, Inc.*, 2006 U.S. Dist. LEXIS 69299 (N.D. Tex. Sept. 25, 2006) ("Barry's review of analyst reports and the public press also shows that those information sources did not link the June 6 disclosure to any prior earnings or revenues that were supposedly overstated.").  The First Circuit has also recommended analyzing contemporaneous content for explaining stock price movements, citing a paper that specifically describes performing content analysis of analyst reports and commentary.  *Bricklayers & Trowel Trades International Pension Fund v. Credit Suisse Securities (USA) LLC*, 752 F.3d 82, 92 (1st Cir. 2014), citing David Tabak, "Making Assessments About Materiality Less Subjective Through the Use of Content Analysis," 2007.

[25]    Based on available analyst reports from Refinitiv Eikon.

[26]    See, for example, Alexander, Janet C., "The Value of Bad News in Securities Class Actions," *UCLA Law Review* 41: 1994, Fischel, Daniel R., "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *The Business Lawyer* 38: 1982, and Dunbar, Frederick C., and David I. Tabak, "Materiality and Magnitude: Event Studies in the Courtroom*," Litigation Services Handbook: The Role of the Financial Expert* (John Wiley & Sons, Inc.: New York, NY, 3rd ed., 2001), ch. 19.

[27]    See, for example, MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature*, 35: 1997, and Bowman, Robert G., "Understanding and Conducting Event Studies," *Journal of Business Finance & Accounting* 10(4): 1983.

12

a control period.[28] Using the regression results and the returns of the indices, the predicted stock price movement and excess stock price movement (or the amount the stock price moves in excess of the predicted amount) can be calculated for the day or period being tested. Then, the statistical significance of the excess stock price movement can be tested.[29] If a price reaction is not statistically significant, it is within the range of normal expected daily variation in stock prices. A lack of observable statistically significant price reaction is considered by academics,[30] as well as courts,[31] as providing evidence of no price impact.

24.     In an efficient market, publicly available information is rapidly impounded into the stock price. Accordingly, if information material to investors is disclosed in an efficient market, one would expect a significant reaction in the stock price to the first public announcement of such material news, while confirmatory or repeated news (*i.e.* news that has

---

[28]   Regression analysis is used to estimate the relationship between two or more variables. See, for example, Hogg, Robert V. and Elliot A. Tanis, *Probability and Statistical Inference* (Prentice Hall: Upper Saddle River, NJ, 5th ed., 1997).

[29]   The results of the event study are based on the 5% significance level, the standard typically used. See, for example, Freedman, David A., and David H. Kaye, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence* (Washington, D.C.: The National Academies Press, 3rd ed., 2011), pp. 211-302, and Fisher, Franklin M., "Multiple Regression in Legal Proceedings," *Columbia Law Review*, 80: 1980.

[30]   See, for example, the study in the *International Journal of Economics and Finance* which concludes there is no impact from an event given the lack of a statistically significant reaction: "On the announcement day (day zero), the abnormal return for the bank sector is -0.066% and for both the service and industrial sector is -0.293% and -0.368% respectively, with no significant impact as the t-statistics accept the null hypothesis that the downgrading event has no impact." See, Abdeldayem, Marwan M. and Ramzi Nekhili, "Credit Rating Changes and Stock Market Reaction in the Kingdom of Bahrain," *International Journal of Economics and Finance*, 8(8):2016, pp. 23-32. See, also, Fisher, Franklin M., "Multiple Regression in Legal Proceedings," *Columbia Law Review*, 80(4): 1980.

[31]   See, for example, *Erica P. John Fund, Inc. v. Halliburton Company*, No. 3: 02-CV-1152-M (N.D. Tex. July 25, 2015, ("To show that a corrective disclosure had a negative impact on a company's share price, courts generally require a party's expert to testify based on an event study that meets the 95% confidence standard […] Coffman found an intraday statistically significant price reaction on Day 1 only at a 90% confidence level, which is less than the 95% confidence level both experts require in their regression analyses and which the Court finds is necessary. […] In contrast, with and without a multiple comparison adjustment, Allen found no price impact on December 21, 2000. The Court agrees with Halliburton that there was no price impact on December 21, 2000, and finds that Defendants have rebutted the *Basic* presumption as to the allegedly corrective disclosure made on that date.")

already been publicly disclosed) should not impact the market or cause a statistically significant price reaction.[32]

25.    According to finance theory, the only information that affects the stock price is information that affects the market's expectation of the discounted value of cash flows. Thus, a change in accounting metrics that does not affect the value of cash flows would not be expected to affect the stock price. If the stock price reflected some other measure of income, such as accounting earnings rather than cash flow, that would be evidence that the market was inefficient. For example, *Corporate Valuation*, a commonly cited book on valuation by Bradford Cornell, states the following:

> [E]conomic theory predicts that investor value is derived from cash flow. If market prices reflected some other measure of income, such as accounting earnings rather than cash flow, that would be evidence that the market was inefficient. […] To summarize, intuition, finance theory, and empirical research all support the view that corporate value is based on expectations of future cash flow.[33]

## VII.    THE MISSTATEMENTS REGARDING CELSIUS' SHARE-BASED COMPENSATION DID NOT HAVE PRICE IMPACT

26.    Plaintiffs claim the misstatement regarding Celsius' share-based compensation was corrected on March 1, 2022, when Celsius announced that the reported non-cash expenses associated with its share-based compensation in 2Q21 and 3Q21 were understated.[34]

---

[32]   See, for example, Bodie, Zvi, Alex Kane, and Alan J. Marcus, *Investments* (McGraw-Hill: New York, NY, 8th ed., 2009), p. 345.

Courts have similarly noted that confirmatory news should not cause a price reaction. See, for example, *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657 (5th Cir. 2004). ("[C]onfirmatory information has already been digested by the market and will not cause a change in stock price.")

[33]   Cornell, Bradford, *Corporate Valuation* (McGraw-Hill: New York, NY, 1993), p. 108.

[34]   Amended Complaint, ¶¶10-11.

14

Specifically, according to Plaintiffs, the truth was revealed in a press release issued after market hours on March 1, 2022, where Celsius announced that its 2Q21 share-based compensation was understated by $3.2 million and its 3Q21 share-based compensation was understated by $12.1 million.[35] Plaintiffs claim that Celsius' stock price fell on this news and that investors suffered "heavy losses as a result."[36]

27.    However, following the correction of the misstatements that allegedly inflated the price, Celsius' stock price did not fall and actually *increased* from a closing price of $62.80 on March 1, 2022 to a closing price of $64.82 on March 2, 2022. As discussed below, according to both my own event study and the event study used by Plaintiffs' expert Mr. Torchio, Celsius' stock price movement on March 2, 2022 was *not* statistically significant.

28.    In the Amended Complaint, Plaintiffs appear to ignore the fact that Celsius' stock price *did not* decline on March 2 and instead attribute a drop in stock price on *March 3*, two days after the announcement, to the alleged corrective disclosure.[37] As discussed below, in an efficient market, Celsius' stock price decline two days later could not be attributed to the alleged corrective disclosure on March 1. Furthermore, according to the criteria set out by Mr. Torchio, Celsius' stock price decline on March 3 could not be attributed to the alleged corrective disclosure.

---

[35]    Amended Complaint, ¶¶9-11, 84-85.

[36]    Amended Complaint, ¶13.

[37]    Amended Complaint, ¶13.

15

**A.    Celsius' stock price did not react to the alleged corrective disclosure, which demonstrates that the misstatements did not have price impact**

**1.    There is no statistically significant price decline on March 2, 2022, the relevant date for analyzing price impact (Celsius' stock actually went up)**

29.    To test whether Celsius' stock price reacted to the alleged corrective disclosure, I used an event study to measure whether there was a statistically significant stock price reaction on March 2, 2022, the first trading day after the allegedly corrective information was disclosed.

30.    My event study controls for market movements with the Nasdaq Composite Index, an index of over 3,000 companies listed on the NASDAQ, and for industry movements with an index comprised of Celsius' peer companies (the "Peer Index"). Specifically, the Peer Index is an equal-weighted index of seven "high-growth food and beverage companies" that are compared to Celsius by analysts at Roth Capital Partners ("Roth").[38] My event study uses a control period of 126 trading days, approximately six months prior to March 2, 2022. According to my event study, on March 2, 2022, Celsius' stock price *did not* have a statistically significant decline, and in fact had a non-statistically significant *positive* excess return of 1.42%.

---

[38]   Based on Roth analyst report, dated March 2, 2022. The seven high growth food and beverage companies are: Beyond Meat, Inc., Freshpet, Inc., Monster Beverage Corp., Simply Good Foods Co., National Beverage Corp., Hain Celestial Group, Inc., and Bellring Brands, Inc. The Roth analyst report also compared Celsius to Fevertree Drinks PLC, which is not used in the Peer Index because it trades on the OTC market.

16

### Price Reaction Following the Alleged Corrective Disclosure

| Date | Celsius Return | Market Index Return | Peer Index Return | Celsius Predicted Return | Price Reaction | t-stat[1] | Statistically Significant?[1] |
|---|---|---|---|---|---|---|---|
| 3/2/2022 | 3.22% | 1.63% | -0.23% | 1.80% | 1.42% | 0.41 | No |

**Notes and Sources:**

Data from Bloomberg, L.P.

[1] Significance is based on the price reaction's t-statistic, calculated as the price reaction divided by the standard error of the regression over the sample period. "Yes" indicates significance at the 5% level.

31.      Similarly, Mr. Torchio's event study also shows that Celsius' stock *did not* have a statistically significant price decline on March 2, 2022. According to Mr. Torchio, in order to determine which indices to use for his event study model, he tested several different market and industry indices and used the model with the highest adjusted R-squared.[39] Mr. Torchio's event study controls for market movements using two indices, the Nasdaq Composite Index and the Russell 2000 Index, an index comprised of the 2000 smallest companies in the Russell 3000 index.[40] Mr. Torchio's event study does not control for movements in Celsius' industry.[41] Mr. Torchio's event study uses the same control period as my event study (126 trading days prior to alleged corrective disclosure).[42] The adjusted R-squared of my model, which controls for industry-specific price movements, is higher than the adjusted R-squared of Mr. Torchio's model, and thus, according to Mr. Torchio's logic, my model is better at "explain[ing] the

---

[39]   Torchio Report, ¶¶ 47-48. According to Mr. Torchio, the adjusted R-squared "measures how well the variation in the independent variables (the market and the net-of-market industry index returns) explain the variation in the day-to-day stock price returns of Celsius," adjusting "for the number of independent variables in the model."

[40]   Torchio Report, ¶ 48.

[41]   Torchio Report, ¶ 48.

[42]   Torchio Report, ¶ 51.

variation in the day-to-day stock price returns of Celsius."[43] According to Mr. Torchio's event study, Celsius' stock price return on March 2, 2022 was not statistically significant at either the 5% or 10% level. As discussed above, a lack of observable statistically significant price reaction is considered by academics,[44] as well as courts,[45] as providing evidence of no price impact.[46]

### 2. A review of analyst commentary confirms that neither the misstatements nor their correction had price impact

32.     A review of analysts' commentary following the March 1 alleged corrective disclosure further confirms that neither the misstatements nor their correction had price impact. On March 2, the first trading day after the alleged corrective disclosure, six analysts issued reports on Celsius.[47] None of the six analysts lowered their rating or price target or reduced their

---

[43]   Torchio Report, ¶47. My event study model has an adjusted R-squared of 44%, while, according to my replication of Mr. Torchio's model, his model has an adjusted R-squared of 41%.

[44]   See, for example, the study in the *International Journal of Economics and Finance* which concludes there is no impact from an event given the lack of a statistically significant reaction: "On the announcement day (day zero), the abnormal return for the bank sector is -0.066% and for both the service and industrial sector is -0.293% and -0.368% respectively, with no significant impact as the t-statistics accept the null hypothesis that the downgrading event has no impact." See, Abdeldayem, Marwan M. and Ramzi Nekhili, "Credit Rating Changes and Stock Market Reaction in the Kingdom of Bahrain," *International Journal of Economics and Finance*, 8(8):2016, pp. 23-32. See, also, Fisher, Franklin M., "Multiple Regression in Legal Proceedings," *Columbia Law Review*, 80(4): 1980.

[45]   See, for example, *Erica P. John Fund, Inc. v. Halliburton Company*, No. 3: 02-CV-1152-M (N.D. Tex. July 25, 2015, ("To show that a corrective disclosure had a negative impact on a company's share price, courts generally require a party's expert to testify based on an event study that meets the 95% confidence standard […] Coffman found an intraday statistically significant price reaction on Day 1 only at a 90% confidence level, which is less than the 95% confidence level both experts require in their regression analyses and which the Court finds is necessary. […] In contrast, with and without a multiple comparison adjustment, Allen found no price impact on December 21, 2000. The Court agrees with Halliburton that there was no price impact on December 21, 2000, and finds that Defendants have rebutted the *Basic* presumption as to the allegedly corrective disclosure made on that date.")

[46]   According to analysts, the earnings results announced on March 1, 2022 were mixed, with better-than-expected revenues but lower-than-expected gross margins. The share-based compensation adjustment did not impact Celsius' revenues or gross margins. See, for example, Stifel analyst report, dated March 1, 2022 and B. Riley analyst report, dated March 2, 2022.

[47]   Based on available analyst reports from Refinitiv Eikon. The six analyst reports are from B. Riley, Credit Suisse, Jefferies, Ladenburg, Maxim, and Roth. In addition to the six reports, Stifel published a report on March 1, 2022, after the alleged corrective disclosure came out.

18

valuation of Celsius due to the alleged corrective disclosure. In particular, as shown in the table below, none of the analysts lowered their rating of Celsius' stock, and four of the analysis did not lower their price target. The two analysts that did lower their price targets, Jefferies and B. Riley Securities, did so because of industry and market reasons and not because of the alleged corrective disclosure. The analysts from Jefferies lowered their price targets for Celsius due to the effect of using a "lower market multiple" in their valuation.[48] The analysts from B. Riley Securities lowered their price targets due to the effect of a "market multiple contraction" on their valuation.[49]

**Analyst Recommendations and Price Targets**
**Before and After the March 1, 2022 Alleged Corrective Disclosure**

| Analyst | Recommendation | | | Price Target | | | |
|---|---|---|---|---|---|---|---|
| | **Before** | **After** | **Change?** | **Before** | **After** | **Change** | **Reason for Change** |
| B. Riley | Buy | Buy | No | $130 | $115 | -$15 | "market multiple contraction" |
| Jefferies | Buy | Buy | No | $130 | $100 | -$30 | "lower market multiple" |
| Ladenburg | Buy | Buy | No | $114 | $114 | $0 | N/A |
| Maxim | Hold | Hold | No | N/A | N/A | N/A | N/A |
| Credit Suisse | Hold | Hold | No | $50 | $50 | $0 | N/A |
| Roth | Buy | Buy | No | $110 | $110 | $0 | N/A |
| Stifel | Buy | Buy | No | $67 | $73 | $6 | "sales growth and market share gains" |

**Source:**
Celsius analyst reports.

33.     Further, analyst commentary regarding the adjustment to the non-cash share-based compensation makes clear that this adjustment is not important in valuing the Company and, thus, consistent with the lack of price impact. In particular, none of the analysts indicated that Celsius' adjustment to its share-based compensation expenses would affect their valuation of Celsius stock. Instead, analysts from B. Riley Securities indicated: "**Of critical importance, the**

---

[48] Jefferies analyst report, dated March 2, 2022.

[49] B. Riley analyst report, dated March 2, 2022.

**recognition of additional non-cash share-based compensation expense does not impact the company's cash, revenue, or other aspects of its operations or its business fundamentals.**"[50] Similarly, the analysts from Maxim noted: "The recognition of additional non-cash share-based compensation expense does not impact the company's cash, revenue, and other aspects of its operations or its business fundamentals."[51]

### B. Celsius' stock price movement on March 3, 2022, two days after the alleged corrective disclosure, is not evidence of price impact from the misstatements

#### 1. In an efficient market, stock prices react quickly to new information – if Celsius' stock price reacted to information two days after it was announced, it would be evidence against market efficiency

34.     In the Amended Complaint, Plaintiffs appear to ignore the fact that Celsius' stock price *did not* decline on March 2 and instead attribute a drop in the stock price on *March 3*, two days after the March 1 announcement, to the alleged corrective disclosure. However, in an efficient market, where stock prices react quickly to new information, Celsius' stock price decline on March 3 could not be due to the alleged corrective disclosure. This is particularly true given Plaintiffs' and Mr. Torchio's claim that Celsius traded in an efficient market during the alleged Class Period and that there was no price reaction on March 2, according to either my own event study or Mr. Torchio's event study. Empirical research has shown that, in an efficient market, stock prices react quickly to new information. For example, according to a study frequently cited in finance textbooks, the *majority* of the stock market response to earnings or

---

[50] B. Riley analyst report, dated March 2, 2022, emphasis in original.

[51] Maxim analyst report, dated March 2, 2022.

dividends announcements is completed within 5 to 10 minutes.[52] It would be strong evidence against market efficiency if, having no reaction on the first day after the announcement, Celsius stock price then started to react two days later.

**2.    According to Mr. Torchio's own criteria, Celsius' stock price drop on March 3, 2022 is not evidence of price impact**

35.     In the Torchio Report, Mr. Torchio laid out the criteria for determining whether additional days after the first event date should be included when analyzing the price impact of a disclosure. According to Mr. Torchio, additional days may be considered if "a particular material disclosure continues to generate analyst commentary and additional news stories."[53] A review of analyst reports and news articles following the alleged corrective disclosure shows that those criteria are not met on March 3, 2022.

36.     First, the alleged corrective disclosure did not "continue to generate analyst commentary" beyond March 2, 2022. Based on analyst reports available through Refinitiv Eikon, following the alleged corrective disclosure, there was one report issued on March 1, 2022, seven on March 2, 2022, and *none* on March 3, 2022.[54] In fact, there was no Celsius-specific analyst

---

[52] See, for example, Richard A. Brealey & Stewart C. Myers, *Principles of Corporate Finance* (McGraw-Hill: New York, 7th ed., 2003) 351-353 ("To analyze the semistrong form of the efficient-market hypothesis, researchers have measured how rapidly security prices respond to different items of news, such as earnings or dividend announcements, news of a takeover, or macroeconomic information […] A study by Patell and Wolfson shows just how fast prices move when new information becomes available. They found that, when a firm publishes its latest earnings or announces a dividend change, the major part of the adjustment in price **occurs within 5 to 10 minutes of the announcement**.") (emphasis added). *See, also,* James M. Patell & Mark A. Wolfson, "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements," *Journal of Financial Economics* 13 (1984), 223-252.

[53]  Torchio Report, ¶153.

[54] All Celsius analyst reports dated March 2, 2022 appear to have been issued during or before market hours on March 2. According to news stories, the B. Riley analyst report was published before 9:15am EST on March 2, 2022, before market hours. See, "B. Riley Lowers Celsius Holdings' Price Target to $115 from $130 Lowers Multiple Reflecting Market Multiple Contraction, Keeps Buy Rating," *MTNewswires*, March 2, 2022. Moreover, all of the other analyst reports issued on March 2, 2022 mention Celsius' closing price on March 1 and not on March 2, indicating that they were published during market hours and before closing on March 2.

21

report issued after March 2, 2022 until more than two weeks later, on March 17, 2022, when Celsius filed its Form 10-K.[55]

37.     Similarly, the alleged corrective disclosure did not continue to generate additional news stories beyond March 2, 2022. In particular, a systematic search of news stories on Celsius using Factiva and Bloomberg found no news stories relating to the alleged corrective disclosure on March 3, 2022.[56] In contrast, there were 29 news stories on March 1, 2022 and 10 on March 2, 2022 relating to the alleged corrective disclosure. Consistent with a lack of news on March 3, 2022, the trading volume on that day was lower than the average trading volume over the alleged Class Period.[57] According to Mr. Torchio, "days with important news will tend to correspond with greater-than-normal trading volume as different investors alter positions in accordance with their differing valuation views."[58]

38.     Moreover, as noted in the Torchio Report, when using a 5% significance level, one will find statistically significant price reactions simply due to chance 5% of the time.[59] In fact, Mr. Torchio finds that there were eight "non-news days" during the alleged Class Period that had statistically significant returns at the 5% level (representing roughly 6% of the 139 trading days throughout the alleged Class Period).[60] Several of these days, including September

---

[55]   Based on analyst reports available through Refinitiv Eikon.

[56]    Bloomberg is a commonly used provider of financial data and news, and Factiva is an online news reporting service and archive owned by Dow Jones & Company, Inc. that aggregates news content from nearly 33,000 sources from around the world. The Bloomberg search was based on a search for all news articles available through Bloomberg's "Company News" screen for Celsius between March 1, 2022 and March 3, 2022. The Factiva search was based on a search for all news articles available through Factiva's built-in filter for articles relating to Celsius between March 1, 2022 and March 3, 2022 and excludes identical duplicate articles.

[57]   Based on trading volume data for Celsius from Bloomberg, L.P.

[58]   Torchio Report, ¶83.

[59]   Torchio Report, ¶38.

[60]   Torchio Report, Exhibit 4 and 5.

22

27, 2021, January 4, 2022 and January 10, 2022, had statistically significant price declines that were similar in magnitude to the price decline on March 3, 2022, even though the Company did not issue any press releases or SEC filings, and there were no analyst reports or any news stories about the Company, like on March 3, 2022.[61]

39.   In sum, based on Mr. Torchio's own criteria, Celsius' stock price decline on March 3, 2022 is not relevant for analyzing the price impact of the misstatements, as there was no analyst commentary and no news relating to the alleged corrective disclosure.

## VIII.   IN AN EFFICIENT MARKET, THE MISSTATEMENTS REGARDING CELSIUS' SHARE-BASED COMPENSATION WOULD NOT BE EXPECTED TO HAVE PRICE IMPACT

### A.   The corrective information is merely an accounting adjustment that does not affect cash flows or the expectations of future cash flows and thus in an efficient market does not impact the stock price

40.   According to Plaintiffs, the misstatements were corrected when Celsius announced a non-cash adjustment to its share-based compensation as the result of a "re-valuation" of Celsius' previously-granted stock options and RSUs for nine directors and employees that either retired or were terminated in 2021. However, the corrective information was an accounting adjustment that does not affect cash flows or the expectations of future cash flows and thus in an efficient market does not impact the stock price.

---

[61]   Analyst reports research based on reports available through Refinitiv Eikon. The news searches were conducted on Bloomberg and Factiva. The Bloomberg search was based on a search for all news articles available through Bloomberg's "Company News" screen for Celsius around September 27, 2021, January 4, 2022, and January 10, 2022. The Factiva search was based on a search of all news articles available through Factiva's build-in filter for articles relating to Celsius on the days around September 27, 2021, January 4, 2022, and January 10, 2022.

23

41.     Under U.S. GAAP, companies are required to recognize expenses in connection with their share-based compensation based on the value of the stock options and RSUs granted.[62] However, U.S. GAAP does not require companies recognize the entire expense on the grant date. Instead, U.S. GAAP requires companies to spread or "amortize" these expenses over the vesting period of the options or RSUs.[63] For example, assuming that a company granted stock options with a value of $100 and assuming the vesting period is 2 years, then the company would report an expense of $50 in the first year and another $50 in the second year.[64]

42.     Typically, under U.S. GAAP, the share-based compensation expense is calculated based on the value of the options or RSUs as of the grant date, and companies are not required to perform a re-valuation of already-granted stock options or RSUs over their vesting period.[65] Using the above example and assuming that the value of the stock options increased from $100 to $200 shortly after the grant date, the expense that the company would report is still $50 per year over two years.

43.     The alleged "accounting fraud" in this case, however, involved a "modification" of share-based compensation that according to U.S. GAAP could trigger a re-valuation of previously granted stock options and RSUs.[66] Specifically, according to Celsius, "the stock options and RSUs were modified and the expense should have been calculated and recognized using the fair market value of the awards as of the date of modification and recognized over the

---

[62]   KPMG, *Share-Based Payment Handbook*, April 2023, p. 4.

[63]   KPMG, *Share-Based Payment Handbook*, April 2023, p. 8.

[64]   Assuming straight-line amortization, which is the amortization method used by Celsius. See, for example, Celsius 2Q21 Form 10-Q, dated August 12, 2021, p. 20.

[65]   KPMG, *Share-Based Payment Handbook*, April 2023, p. 4.

[66]   KPMG, *Share-Based Payment Handbook*, April 2023, p. 10.

remaining service period." [67] Subsequently, on March 1, 2022, Celsius announced that the reported non-cash expenses associated with its share-based compensation in 2Q21 and 3Q21 for these nine directors and employees were understated and needed to be adjusted. The adjustment involved expensing the remaining entire unvested portion of the stock-based compensation but using the value of the stock options and RSUs at the time that the directors and employees left the Company instead of at the time they were granted.[68]

44.     Plaintiffs alleged that Celsius' adjustment to its prior share-based compensation expenses for nine directors and employees caused Celsius' stock price to drop when the adjustment was announced. However, this adjustment did not change the market's understanding of Celsius' cash flows, how much money the Company made or what was the value of the Company. This adjustment does not mean that the Company is giving more options or paying more money to these nine directors and employees. The number of stock options and RSUs that Celsius granted to its directors and employees was known at the time of the grant and was never restated or adjusted. This adjustment also does not mean that the Company was actually making less money or losing more money. Instead, this adjustment is simply an accounting non-cash adjustment that reflects the increase in value of Celsius' stock. In fact, this adjustment is so large because the Company has done so well and its stock price has gone up so much from the time many of these stock options and RSUs were granted. This adjustment is simply accounting for the increased value of these previously granted options and RSUs given the current value of the stock, instead of the value of the stock when they were granted. As recognized by the B. Riley analysts, "**Of critical importance, the recognition of additional non-cash share-based**

---

[67]   Celsius Form 8-K dated March 1, 2022, p. 1.

[68]   Celsius FY21 Form 10-K, p. F-24. See, also, Amended Complaint, ¶ 76.

**compensation expense does not impact the company's cash, revenue, or other aspects of its operations or its business fundamentals."[69]**

45.    In an efficient market, Celsius' adjustment to its non-cash, previously issued and disclosed, share-based compensation for the nine directors and employees should not affect the stock price. This adjustment did not affect Celsius' historical or future cash flows and did not give the market any new understanding of how much money the Company made in the past or would make in the future. Instead, the adjustment was simply an accounting change based on the actual increase in Celsius' stock price from the grant date to the time the nine directors and employees left the Company. Empirical finance research has found that, as the theory of efficient markets predicts, when cash flows and accounting changes diverge, it is only the change in cash flows, not accounting numbers, that matter to investors. As discussed in a commonly cited finance textbook:

> The argument that 'only cash matters' has more than theoretical backing; it is also supported by extensive research. This research focuses on listed companies for which it is possible to conduct direct tests of the relation between value and various measures of income, including cash flow and accounting earnings, because market values for listed companies can be estimated by the stock and debt approach. The results of these tests overwhelmingly support the view that corporate value is based on cash flow. When cash flow and earnings diverge, changes in value are associated with changes in cash flow, not changes in earnings.[70]

46.    Moreover, if Celsius' non-cash adjustment to its share-based compensation indeed caused a stock price decline as Plaintiffs allege, it would be evidence against market efficiency.

---

[69]  B. Riley analyst report dated March 2, 2022, emphasis in original. Lead Plaintiffs' investment advisor Driehaus Capital also expressed the view that the accounting adjustment that Celsius announced on March 1, 2022 "looked purely technical" and "does not reflect any change in view of the health of the underlying business or the level of earnings." 30(B)(6) Deposition of Driehaus Capital, dated June 12, 2023, 107:14-108:1.

[70]  Cornell, Bradford, *Corporate Valuation* (McGraw-Hill: New York, NY, 1993), p. 104.

26

According to finance literature, if the stock price reflected some other measure of income, such as accounting earnings rather than cash flow, that would be evidence that the market was inefficient. For example:

> [E]conomic theory predicts that investor value is derived from cash flow. If market prices reflected some other measure of income, such as accounting earnings rather than cash flow, that would be evidence that the market was inefficient. […] To summarize, intuition, finance theory, and empirical research all support the view that corporate value is based on expectations of future cash flow.[71]

### B. Contrary to Plaintiffs' claim, Celsius' accounting adjustment did not affect any key metrics used by investors to value Celsius' stock

#### 1. In valuing Celsius' stock, analysts specifically used financial metrics that were *unaffected* by Celsius' accounting adjustment

47.     In the Amended Complaint, Plaintiffs allege that Celsius intentionally misstated its share-based compensation in order to increase its net income, "a key metric for investors."[72] However, contrary to Plaintiffs' claim, no analyst covering the Company used net income to value Celsius' stock. Instead, analysts valued Celsius using financial metrics that were unaffected by Celsius' adjustment to its accounting for non-cash share-based compensation, including revenues, adjusted EBITDA, and free cash flows. The table below shows the valuation metrics used by each of the analysts following Celsius over the alleged Class Period.

---

[71]   Cornell, Bradford, *Corporate Valuation* (McGraw-Hill: New York, NY, 1993), p. 108.

[72]   Amended Complaint, ¶2.

27

```
┌─────────────────────────────────────────────────────┐
│            Analyst Valuation Metrics                  │
│         During the Alleged Class Period               │
│                                                       │
│      Analyst              Valuation Metric            │
│   ─────────────       ──────────────────────          │
│   B. Riley            Revenue                          │
│   Jefferies           Revenue, Free Cash Flow         │
│   Ladenburg           Revenue                          │
│   Maxim               Revenue, Free Cash Flow         │
│   Credit Suisse       Revenue                          │
│   Roth                Revenue, Adjusted EBITDA         │
│   Stifel              Revenue                          │
│   UBS                 Revenue, Free Cash Flow         │
│                                                       │
│   Source:                                             │
│     Celsius analyst reports.                          │
└─────────────────────────────────────────────────────┘
```

48.     In other words, analysts chose financial metrics that had nothing to do with how Celsius accounted for its share-based compensation (e.g., revenues) or specifically removed the effect of the adjustment to the share-based compensation (e.g., adjusted EBITDA and free cash flows):

- Revenues are a "top line" item that reflect a company's sales.[73] Revenues have nothing to do with share-based compensation expenses or how the company accounts for its share-based compensation.

- Adjusted EBITDA is a measure of a company's financial performance that removes the impact of infrequent or unusual items that affects EBITDA, like Celsius' adjustments to its share-based compensation expenses.[74]

- Free cash flows represent the amount of cash that a company generates by the core operations of the business after accounting for cash outflows that support

---

[73]   Damodaran, Aswath, *Investment Valuation* (John Wiley & Sons, Inc.: New York, NY, 2nd ed., 2002), Chapter 3, p. 3.

[74]   "Roadmap: Non-GAAP Financial Measures and Metrics," *Deloitte*, January 2023, p. 68.

28

operations and maintain its capital assets.[75] Unlike net income, free cash flow is a measure of profitability that is unaffected by non-cash expenses, like the share-based compensation expenses.[76]

### 2. Contrary to Plaintiffs' theory that net income was a "key metric" for Celsius, the Company's stock price did not react negatively to Celsius' 3Q22 announcement of negative net income that was driven by expenses that similarly did not affect the Company's cash flows

49. Plaintiffs allege that Celsius misstated its share-based compensation in order to increase its net income, "a key metric for investors."[77] However, contrary to Plaintiffs' theory, Celsius' stock price did not drop after the Company's 3Q22 announcement of an accounting net loss (*i.e.,* negative net income) of almost $200 million that was driven by expenses that did not affect the Company's cash flows. The lack of a reaction to this announcement is consistent with the lack of a reaction to the alleged corrective disclosure, and further confirms that the misstatements did not have price impact.

50. On November 9, 2022, after market closed, Celsius released its 3Q22 financial results and reported a net loss of $186.5 million.[78] Following the announcement, on November 10, 2022, according to both my event study model and Mr. Torchio's event study model, there was no statistically significant price reaction in Celsius' stock.[79]

---

[75] See, for example, Koller, T., M. Goedhart and D. Wessels, "Valuation," (Hoboken, N.J.: John Wiley & Sons, Inc., 6th Edition, University Edition, 2015), pp. 30, 142.

[76] See, "Understanding free cash flow," *Bank of America Website*, dated March 13, 2023, accessed at https://www.bankofamerica.com/smallbusiness/resources/post/free-cash-flow/. See, also, "Roadmap: Non-GAAP Financial Measures and Metrics," *Deloitte*, January 2023, p. 69

[77] Amended Complaint, ¶2.

[78] Celsius earnings press release, dated November 9, 2022.

[79] My event study uses a control period of 126 trading days, approximately six months prior to November 10, 2022, and uses the same market index and Peer Index as my event study for the alleged corrective disclosure discussed in Section VII of this report. Mr. Torchio did not test the price reaction on this date. I followed Mr. Torchio's

29

51.     Celsius management explained that the $186.5 million net loss was mainly due to termination expenses associated with Celsius' distribution switch to PepsiCo Inc. ("Pepsi"), and that those termination expenses would be covered by Pepsi as part of their agreement. In other words, the termination expenses only caused accounting losses, but Celsius' actual cash flows were not being affected since Pepsi was covering all of those expenses.[80] The lack of a negative price reaction after this announcement is consistent with the fact that the metrics used by analysts to value Celsius, including adjusted EBITDA, were not affected by these accounting losses. Celsius' adjusted EBITDA was positive $24.8 million in 3Q22.[81]

52.     Thus, contrary to Plaintiffs' theory that net income is a "key metric," Celsius' stock price did not react to a $186.5 million net loss in 3Q22, a loss more than 10 times larger than the approximately $15 million adjustment to its share-based compensation announced on the alleged corrective disclosure.

**C.     The fact that the value of Celsius' stock options and RSUs went up substantially when the stock price increased substantially is basic finance and obvious in an efficient market**

53.     According to Plaintiffs' theory, Celsius' investors were allegedly misled because Celsius reported expenses based on value at the time of granting the stock options and RSUs

---

event study methodology by using the same market indices used in the Torchio Report and using a control period of 126 trading days prior to November 10, 2022. For Mr. Torchio's event study mythology, see, Torchio Report, ¶¶48-51.

[80]    Celsius conference call, dated November 9, 2022. ("Let's start with the termination expenses. Included within our quarterly results, we recorded $155.4 million of termination expenses associated with termination notices issued during the quarter so that we could transfer distribution to Pepsi. We had an additional $50 million of termination expenses agreed upon in the fourth quarter, as well, which will be recorded in our Q4 results. We've already transitioned most of our distribution footprint over to Pepsi, but there will be some activity in Q4 and through the beginning of Q1 2023. These expenditures were funded by Pepsi, and as a result we have recorded the funding as a deferred revenue that will be amortized over the 20-year period of the associated distribution agreement.")

[81]    Celsius earnings press release, dated November 9, 2022.

rather than at the time when its employees and directors left the Company. However, the fact that the value of Celsius' stock options and RSUs went up dramatically when Celsius' stock price increased is basic finance and obvious to the market.

54.     The stock options granted by Celsius to its directors and employees are stock options that allow (but do not require) the them to purchase the Company's stock in the future (within a specific timeframe) at a pre-specified price.[82] This pre-specified price is known as the strike price.[83] In general, according to basic finance the value of these stock options increases as the stock price goes up and the difference between the stock price and strike price increases.[84] Take for example the stock options granted to the three directors that left Celsius in 2021, Kevin Harrington, Thomas Lynch and William Milmoe:[85] each of the three directors was granted 110,000 stock options in 2019 at a strike price of approximately $3 to $4.[86] When these options were first granted, Celsius' stock price was trading in the range of the strike prices (*i.e.*, $3 to $4) and thus these options if exercised immediately would yield little value to those directors. However, by the start of the alleged Class Period, Celsius' stock had increased to around $73, much higher than the $3 to $4 strike price, and thus the value of these options had increased dramatically and if exercised would yield a gain about $69 to $70 per option. According to Celsius' SEC filings, by the beginning of the alleged Class Period, when Celsius' stock price was

---

[82]  Hull, John C. *Options, Futures, and Other Derivatives,* (Prentice Hall, 8*th* ed., 2012), p. 6. See, also, Fabozzi, Frank, *The Handbook of Financial Instruments* (John Wiley & Sons: Hoboken, New Jersey, 2002), pp. 13, 742.

[83]  Fabozzi, Frank, *The Handbook of Financial Instruments* (John Wiley & Sons: Hoboken, New Jersey, 2002), p. 725. See, also, Hull, John C. *Options, Futures, and Other Derivatives,* (Prentice Hall, 8*th* ed., 2012), p. 6.

[84]  Hull, John C. *Options, Futures, and Other Derivatives,* (Prentice Hall, 8*th* ed., 2012), pp. 6-7.

[85]  The retirement of those three directors was announced in a press release from Celsius on August 20, 2021. See, "Celsius Holdings, Inc. Announces New Board Members in Conjunction With Board Succession and Refreshment Policy," *PRNewswire*, August 20, 2021.

[86]  See, Celsius 2019 Form 14-A, filed June 15, 2020, p. 16.

trading at $73, the vast majority of unvested and outstanding stock options had a strike price of around $4.[87] The chart below shows Celsius' stock price from 2019, when the options were granted to these three directors, through the end of the alleged Class Period.



**Celsius Holdings, Inc.**
**Daily Stock Price and Stock Options Granted to Directors**

*Alleged Class Period*

By start of the alleged Class Period, the stock price had increased to $73

110K options granted to each of the 3 directors in 2019 at a strike price of $3 - $4

Notes and Sources:
Data from FactSet Research Systems, Inc. and Celsius DEF 14-As. Directors include William Milmoe, Kevin Harrington, and Thomas Lynch.

55.     The number of the stock options and RSUs that Celsius granted through its share-based compensation plan was publicly known. For example, Celsius disclosed in its quarterly SEC filings the number of stock options and RSUs granted each quarter, the number of stock options and RSUs that were exercised or cancelled during that quarter and the total number of stock options and RSUs outstanding as of each quarter end. Plaintiffs do not allege that any of

---

[87]   Celsius 2Q21 Form 10-Q, p. 21.

those numbers were incorrect or understated. The table below shows the annual number of stock options granted, exercised or cancelled, and outstanding for 2019, 2020 and 2021. As the table shows, the vast majority of the stock options in Celsius' share-based compensation plan were granted in 2019 (or even earlier), when Celsius' stock price was approximately $3 to $4 per share.

| | **Celsius Stock Options** | | | |
|---|---|---|---|---|
| **Year** | **Average Stock Price** | **Granted** | **Exercised or Cancelled** | **Outstanding** |
| 2019 | $4.03 | 2,874,000 | 1,186,000 | 6,528,000 |
| 2020 | $15.22 | 575,000 | 1,905,000 | 5,198,000 |
| 2021 | $69.57 | 305,000 | 1,903,000 | 3,600,000 |

**Notes and Sources**:

  Data from FactSet Research Systems, Inc. and Celsius 10-Ks and 10-Qs.

56.     Celsius also disclosed the "intrinsic value" of its outstanding stock options each quarter. The intrinsic value of an option is the difference between the stock price and strike price. Like the value of the options, the intrinsic value increases as the stock price goes up and the difference between the stock price and strike price increases.[88] The table below shows the intrinsic value of Celsius' outstanding options for each year end between 2018 and 2022. For example, as shown in the table, during 2020, the intrinsic value of Celsius' outstanding stock options increased from $9 million to $241 million, an increase of over 20 times, even though the number of outstanding options had decreased by 20%.[89] During the same time period, Celsius'

---

[88]   Hull, John C. *Options, Futures, and Other Derivatives,* (Prentice Hall, 8*th* ed., 2012), pp. 154, 707-708.

[89]   Celsius FY20 Form 10-K, dated March 11, 2021, page F-28.

stock price increased from around $5 to $50, a ten-fold increase.[90] Plaintiffs do not allege any of those numbers were incorrect or understated.

| **Celsius Aggregate Intrinsic Value of Outstanding Stock Options** | | |
| Year | Outstanding Options | Intrinsic Value |
|---|---|---|
| 2018 | 4,840,000 | $5M |
| 2019 | 6,528,000 | $9M |
| 2020 | 5,198,000 | $241M |
| 2021 | 3,600,000 | $242M |
| 2022 | 2,266,000 | $214M |

**Notes and Sources**:
Data from 10-Ks. Displays values as of year-end.

57.     Not only is the intrinsic value of the options publicly disclosed, but if investors wanted to perform a more in-depth valuation of Celsius' stock options at different points in time, they could, since the detail regarding those stock options was publicly disclosed by Celsius. Specifically, Celsius disclosed in its SEC filings that the Company used the Black-Scholes option pricing model to estimate the value of the stock options and also disclosed the inputs that it used in the Black-Scholes option pricing model, including the range of expected volatilities, risk-free rates, and expected terms of the options.[91, 92] Plaintiffs do not allege any of those inputs

---

[90]   Data from Bloomberg L.P.

[91]   See, for example, Celsius 2Q21 Form 10-Q, dated August 12, 2021, p. 20.

The Black-Scholes model is the most popular model for estimating the value of stock options. Fabozzi, Frank, *The Handbook of Financial Instruments* (John Wiley & Sons: Hoboken, New Jersey, 2002), p. 736.

[92]   The "expected term" of an option refers to the length of time before the option is expected to be exercised. See, Celsius FY21 Form 10-K, dated March 16, 2022, p. F-22. See, also, KPMG, *Share-Based Payment Handbook*, April 2023, p. 6.

34

were incorrect or misstated. The table below shows the inputs that Celsius used for its Black Scholes option pricing model for Q4 2019, Q4 2020, and Q2 2021 (data for Q2 2021 became available at the start of the alleged Class Period).

| **Black-Scholes Option-Pricing Model Inputs Used by Celsius** | | | |
|---|---|---|---|
| **As of** | **Expected Volatility** | **Expected Term** | **Risk-Free Interest Rate** |
| Q4 2019 | 58.62% - 121.32% | 4.02 - 5.00 Years | 1.58% - 2.72% |
| Q4 2020 | 69.18% - 81.11% | 4.84 - 5.00 Years | 0.23% - 1.39% |
| Q2 2021 | 69.18% - 81.11% | 4.49 - 5.00 Years | 0.32% - 1.39% |

**Notes and Sources:**
Data from Celsius' 10-K's and 10-Q.

58.     Using these inputs, as well as Celsius' stock price, an updated value of Celsius' stock options can be estimated at different points in time. For example, take a stock option granted in early 2019 with a strike price of $4: at the grant date in early 2019, when Celsius' stock was trading at $4, the value of the option was around $2, but by the end of 2020, when Celsius' stock price was trading around $50, the value of that same option went up to around $47, and by the beginning of the alleged Class Period, when Celsius' stock price was trading around $73, the value of that same option went up to around $69. The table below summarizes these values.

**Example of Applying Black-Scholes Model
For Stock Option Granted in 2019 at Strike Price of $4**

|  | Celsius Stock Price | Estimated Value of Stock Option |
|---|---|---|
| As of grant date | $4 | $1.84 - $3.35 [1] |
| As of year end 2020 | $50 | $46.53 - $46.94 [2] |
| As of start of alleged Class Period | $73 | $69.37 - $69.61 [3] |

**Notes and Sources:**
Celsius stock price from FactSet Research Systems, Inc. Other inputs to the Black Scholes model from Celsius SEC filings.

[1] Based on Black-Scholes model inputs in Celsius FY19 Form 10-K, p. F-28.

[2] Based on Black-Scholes model inputs in Celsius FY20 Form 10-K, p. F-27.

[3] Based on Black-Scholes model inputs in Celsius 2Q21 Form 10-Q, p. 20.

59.    Regarding the RSUs, since the Company disclosed the number of RSUs issued and outstanding each quarter and the weighted average value at the grant date, an updated value of those RSUs could be estimated simply using Celsius' current stock price. For example, if an RSU was issued at a price of $50 in early 2021, by the beginning of the alleged Class Period, when the stock price was at the $73, the value of that RSU would have increased similarly by $23 ($73 minus $50).

60.    In sum, given that the values of the stock options and RSUs are primarily driven by the Company's stock price and that the stock price had increased substantially from the time when the majority of the options and RSUs had been granted and valued, it was clear to the market that the value of the stock options and RSUs that had already been granted to employees and directors would have been increasing. Thus, even though updated valuations of the previously granted stock options and RSUs is not relevant to the valuation of Celsius' stock as it has no cash impact on Celsius, if investors wanted to determine how the value of non-cash share-

36

based compensation that had already been granted to directors and employees changed as Celsius

stock price changed, those calculations could have been made.

**IX.** **MR. TORCHIO'S TEST OF THE CAUSE-AND-EFFECT RELATIONSHIP, THE "MOST IMPORTANT" TEST OF MARKET EFFICIENCY, DOES NOT TEST MARKET EFFICIENCY OVER THE ALLEGED CLASS PERIOD – APPLYING HIS TEST TO THE ALLEGED CLASS PERIOD YIELDS RESULTS THAT ARE CONTRARY TO MARKET EFFICIENCY**

61.     Mr. Torchio's market efficiency test of the cause-and-effect relationship does not

test market efficiency over the alleged Class Period. Instead, applying Mr. Torchio's test to the

alleged Class Period yields results that are contrary to market efficiency.

62.     The court in *Cammer* held that a "cause and effect relationship" between news

and the stock price is the "essence of an efficient market" and the "foundation of the fraud on the

market theory."[93] Other courts have recognized that the "cause and effect relationship" is "in

many ways, the most important" factor among the *Cammer* factors.[94] To test the cause-and-effect

relationship between news and Celsius' stock price, Mr. Torchio performs "a statistical

comparison of stock price movements" on "news days" versus "non-news days" during the

period between August 13, 2020 and March 1, 2022, a period which covers one year before the

alleged Class Period, as well as the alleged Class Period.[95]

---

[93]   *Cammer v. Bloom*, 711 F.Supp. 1264 (D.N.J. 1989).

[94]   See *In re PolyMedica Corp. Litig*., 453 F.Supp. 2d 260, 266 (D. Mass. 2006) ("*PolyMedica II*"). See also, *Loritz v. Exide Techs*., 2015 WL 6790247, at *9-10 (C.D. Cal. July 21, 2015) ("*Loritz*"); In re *2TheMart.Com, Inc. Sec. Litig*., 114 F.Supp.2d 955, 964 (C.D. Cal. 2000).

[95]   Torchio Report, ¶¶74-75.

63.     Mr. Torchio identifies 16 "news dates" during this period and finds that three of those days (or 18.8%) "were accompanied by statistically significant stock-price movements."[96] Conversely, according to Mr. Torchio, of the "374 'non-news' days, only 11 (or 2.9%) were statistically significant […] indicating that Celsius stock was approximately 6.4 times (18.8% / 2.9%) more likely to react in a statistically significant manner on days when the Company issued press releases containing potentially value-relevant information than on days without."[97] Mr. Torchio then tested the difference between these two proportions and found that the difference was statistically significant and that "this analysis supports a finding of market efficiency for Celsius common stock."[98]

64.     Contrary to Mr. Torchio's claim, his analysis of the cause-and-effect relationship does not test market efficiency over the alleged Class Period. Mr. Torchio's findings are based on the three "news days" that he identifies that had statistically significant price movements. However, all 3 of those "news days" occurred *before* the alleged Class Period.

65.     On the other hand, limiting Mr. Torchio's test of the cause-and-effect relationship to just days during the alleged Class Period yields the result that of the four "news days," *zero* were statistically significant and of the 135 "non-news days," 8 (or 6%) were statistically significant. According to Mr. Torchio's logic, this result would indicate that Celsius stock was more likely to react in a statistically significant manner on days when there was no news than on days when there was news, a result that would be contrary to finding of market efficiency for Celsius stock.

---

[96]   Torchio Report, ¶76 and Exhibit 5.

[97]   Torchio Report, ¶76.

[98]   Torchio Report, ¶¶77-78.

38

Lucy P. Allen



**Lucy P. Allen**
Senior Managing Director

NERA Economic Consulting
1166 Avenue of the Americas
New York, New York 10036
Tel: +1 212 345 5913  Fax: +1 212 345 4650
lucy.allen@nera.com
www.nera.com

# Appendix A

## LUCY P. ALLEN
## SENIOR MANAGING DIRECTOR

## Education

**YALE UNIVERSITY**
M.Phil., Economics, 1990
M.A., Economics, 1989
M.B.A., 1986

**STANFORD UNIVERSITY**
A.B., Human Biology, 1981

## Professional Experience

1994-Present  **National Economic Research Associates, Inc.**
Senior Managing Director. Responsible for economic analysis in the areas of securities, finance and environmental and tort economics.
Managing Director (2016-2023).
Senior Vice President (2003-2016).
Vice President (1999-2003).
Senior Consultant (1994-1999).

1992-1993  **Council of Economic Advisers, Executive Office of the President**
Staff Economist. Provided economic analysis on regulatory and health care issues to Council Members and interagency groups. Shared responsibility for regulation and health care chapters of the *Economic Report of the President, 1993*. Working Group member of the President's National Health Care Reform Task Force.

1986-1988
1983-1984  **Ayers, Whitmore & Company (General Management Consultants)**
Senior Associate. Formulated marketing, organization, and overall business strategies including:
Plan to improve profitability of chemical process equipment manufacturer.
Merger analysis and integration plan of two equipment manufacturers.
Evaluation of Korean competition to a U.S. manufacturer.

1

Lucy P. Allen

> Diagnostic survey for auto parts manufacturer on growth obstacles.
> Marketing plan to increase international market share for major accounting firm.

Summer 1985 **WNET/Channel Thirteen, Strategic Planning Department**
<u>Associate</u>.  Assisted in development of company's first long-term strategic plan. Analyzed relationship between programming and viewer support.

1981-1983 **Arthur Andersen & Company**
<u>Consultant</u>.  Designed, programmed and installed management information systems.  Participated in redesign/conversion of New York State's accounting system.  Developed municipal bond fund management system, successfully marketed to brokers.  Participated in President's Private Sector Survey on Cost Control (Grace Commission).  Designed customized tracking and accounting system for shipping company.

## Teaching

1989- 1992 <u>**Teaching Fellow**</u>**, Yale University**
Honors Econometrics
Intermediate Microeconomics
Competitive Strategies
Probability and Game Theory
Marketing Strategy
Economic Analysis

## Publications

"Snapshot of Recent Trends in Asbestos Litigation: 2022 Update," (co-author), NERA Report, 2022.

"Snapshot of Recent Trends in Asbestos Litigation: 2021 Update," (co-author), NERA Report, 2021.

"The Short-Term Effect of Goodwill Impairment Announcements on Companies' Stock Prices" (co-author), *International Journal of Business, Accounting and Finance,* Volume 14, Number 2, Fall 2020.

"Snapshot of Recent Trends in Asbestos Litigation: 2020 Update," (co-author), NERA Report, 2020.

"Snapshot of Recent Trends in Asbestos Litigation: 2019 Update," (co-author), NERA Report, 2019.

"Snapshot of Recent Trends in Asbestos Litigation: 2018 Update," (co-author), NERA Report, 2018.

2

Lucy P. Allen

"Trends and the Economic Effect of Asbestos Bans and Decline in Asbestos Consumption and Production Worldwide," (co-author), *International Journal of Environmental Research and Public Health*, 15(3), 531, 2018.

"Snapshot of Recent Trends in Asbestos Litigation: 2017 Update," (co-author), NERA Report, 2017.

"Asbestos: Economic Assessment of Bans and Declining Production and Consumption," World Health Organization, 2017.

"Snapshot of Recent Trends in Asbestos Litigation: 2016 Update," (co-author), NERA Report, 2016.

"Snapshot of Recent Trends in Asbestos Litigation: 2015 Update," (co-author), NERA Report, 2015.

"Snapshot of Recent Trends in Asbestos Litigation: 2014 Update," (co-author), NERA Report, 2014.

"Snapshot of Recent Trends in Asbestos Litigation: 2013 Update," (co-author), NERA Report, 2013.

"Asbestos Payments per Resolved Claim Increased 75% in the Past Year – Is This Increase as Dramatic as it Sounds?  Snapshot of Recent Trends in Asbestos Litigation: 2012 Update," (co-author), NERA Report, 2012.

"Snapshot of Recent Trends in Asbestos Litigation: 2011 Update," (co-author), NERA White Paper, 2011.

"Snapshot of Recent Trends in Asbestos Litigation: 2010 Update," (co-author), NERA White Paper, 2010.

"Settlement Trends and Tactics" presented at Securities Litigation During the Financial Crisis: Current Development & Strategies, hosted by the New York City Bar, New York, New York, 2009.

"Snapshot of Recent Trends in Asbestos Litigation," (co-author), NERA White Paper, 2009.

"China Product Recalls: What's at Stake and What's Next," (co-author), NERA Working Paper, 2008.

"Forecasting Product Liability by Understanding the Driving Forces," (co-author), The International Comparative Legal Guide to Product Liability, 2006.

"Securities Litigation Reform: Problems and Progress," Viewpoint, November 1999, Issue No. 2 (co-authored).

3

Lucy P. Allen

"Trends in Securities Litigation and the Impact of the PSLRA," Class Actions & Derivative Suits, American Bar Association Litigation Section, Vol. 9, No. 3, Summer 1999 (co-authored).

"Random Taxes, Random Claims," Regulation, Winter 1997, pp. 6-7 (co-authored).

## Depositions & Testimony (4 years)

Deposition Testimony before the United States District Court for the Central District of California in *In re Prime Healthcare ERISA Litigation,* 2023.

Deposition Testimony before the United States District Court for the Southern District of Texas in *Delaware County Employees Retirement System v. Cabot Oil & Gas Corporation, et al.,* 2023.

Testimony and Deposition before the United States District Court for the District of Oregon in *Oregon Firearms Federation, Inc. et al. v. Tina Kotek et al.*, 2023.

Testimony and Depositions before the United States District Court for the Southern District of Texas, Houston Division in *Miriam Edwards, et al. v. McDermott International, Inc., et al.,* 2023.

Deposition Testimony before the United States District Court for the District of Harris County, Texas in *Boxer Property Management Corp. et al. v. Illinois Union Ins. Co. et al.*, 2022.

Testimony before the Supreme Court of the State of New York, County of New York, in *MUFG Union Bank, N.A. (f/k/a Union Bank, N.A.) v. Axos Bank (f/k/a Bank of Internet USA), et al.*, 2022.

Deposition Testimony before the United States District Court for the Eastern District of Virginia, in *Plymouth County Retirement System, et al. v. Evolent Health, Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the Northern District of Georgia, in *Public Employees' Retirement System of Mississippi v. Mohawk Industries, Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the Southern District of New York, in *SEC v. AT&T, Inc. et al.*, 2022.

Deposition Testimony before the Superior Court of New Jersey, Hudson County, in *Oklahoma Firefighters Pension and Retirement System vs. Newell Brands Inc., et al.,* 2022.

4

Lucy P. Allen

Deposition Testimony before the United States District Court for the District of Pennsylvania, in *Allegheny County Employees, et al. v. Energy Transfer LP., et al.,* 2022.

Deposition Testimony before the United States District Court, District of Tennessee, in *St. Clair County Employees' Retirement System v. Smith & Acadia Healthcare Company, Inc., et al.*, 2022.

Deposition Testimony before the United States District Court, District of Colorado, in *Cipriano Correa, et al. v. Liberty Oilfield Services Inc., et al.*, 2022.

Deposition Testimony before the Superior Court of New Jersey, Hudson County, in *Oklahoma Firefighters Pension and Retirement System vs. Newell Brands Inc., et al.,* 2021.

Deposition Testimony before the Superior Court of New Jersey, Middlesex County, in *Dana Transport, Inc. et al., vs. PNC Bank et al.,* 2021.

Deposition Testimony before the United States District Court, Western District of North Carolina, in *Cheyenne Jones and Sara J. Gast v. Coca-Cola Consolidated Inc., et al.,* 2021.

Testimony and Deposition Testimony before the Court of Chancery of the State of Delaware in *Bardy Diagnostics Inc. v. Hill-Rom, Inc. et al.,* 2021.

Deposition Testimony before the United States Bankruptcy Court, Southern District of Texas, Houston Division, in *Natixis Funding Corporation v. Genon Mid-Atlantic, LLC,* 2021.

Testimony and Deposition Testimony before the United States District Court, Southern District of California, in *Miller et al. v. Becerra et al.*, 2021.

Deposition Testimony before the Court of Chancery of the State of Delaware in *Arkansas Teacher Retirement System v. Alon USA Energy, Inc., et al.*, 2021.

Deposition Testimony before the United States District Court, Western District of Oklahoma, in *Kathleen J. Myers v. Administrative Committee, Seventy Seven Energy, Inc. Retirement & Savings Plan, et al.*, 2020.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Nikki Bollinger Grae v. Corrections Corporation of America, et al.*, 2020.

Deposition Testimony before the Supreme Court of the State of New York, County of New York, in *MUFG Union Bank, N.A. (f/k/a Union Bank, N.A.) v. Axos Bank (f/k/a Bank of Internet USA), et al.*, 2020.

5

Lucy P. Allen

Deposition Testimony before the United States District Court, Western District of Washington at Seattle, in *In re Zillow Group, Inc. Securities Litigation*, 2020.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Zwick Partners LP and Aparna Rao v. Quorum Health Corporation,* 2019.

Testimony and Declaration before the United States District Court, Southern District of Iowa, in *Mahaska Bottling Company, Inc., et al. v. PepsiCo, Inc. and Bottling Group, LLC*, 2019.

Testimony before the United States District Court, Southern District of New York, in *Chicago Bridge & Iron Company N.V. Securities Litigation*, 2019.

Deposition Testimony before the United States District Court, Middle District of Florida, in *Jacob J. Beckel v. Fagron Holdings USA, LLC et al.*, 2019.

# Appendix B
# Materials Considered

**Case Documents and Filings in This Matter**

1. Amended Complaint for Violation of the Federal Securities Laws, filed July 8, 2022
2. Expert Report of Frank C. Torchio filed May 18, 2023, including exhibits and materials turned over
3. Plaintiffs' Motion for Class Certification, filed May 18, 2023
4. 30(B)(6) Deposition of Driehaus Capital, dated June 12, 2023
5. Plaintiffs' Production, dated May 11, 2023, including Lead Plaintiffs' trading records for Celsius common stock

**Analyst Reports on Celsius**

1. 2021.08.12 - Credit Suisse
2. 2021.08.12 - Ladenburg
3. 2021.08.12 - Maxim
4. 2021.08.23 - Roth
5. 2021.09.10 - Roth
6. 2021.09.16 - Jefferies
7. 2021.09.21 - Jefferies
8. 2021.10.19 - Jefferies
9. 2021.10.21 - Roth
10. 2021.11.02 - Jefferies
11. 2021.11.08 - Jefferies
12. 2021.11.11 - Jefferies (1)
13. 2021.11.11 - Jefferies (2)
14. 2021.11.11 - Maxim
15. 2021.11.12 - Credit Suisse
16. 2021.11.12 - Ladenburg
17. 2021.11.12 - Roth
18. 2021.11.16 - Jefferies
19. 2021.11.29 - Jefferies
20. 2021.12.02 - UBS (1)
21. 2021.12.02 - UBS (2)
22. 2021.12.14 - Jefferies
23. 2021.12.15 - Roth
24. 2021.12.16 - Jefferies
25. 2021.12.28 - Jefferies
26. 2022.01.11 - Jefferies
27. 2022.01.11 - Roth
28. 2022.01.25 - Jefferies
29. 2022.01.26 - Credit Suisse
30. 2022.02.08 - Jefferies
31. 2022.02.22 - Jefferies
32. 2022.02.25 - Roth
33. 2022.03.01 - Stifel
34. 2022.03.02 - B. Riley
35. 2022.03.02 - Credit Suisse
36. 2022.03.02 - Jefferies

1

# Appendix B
# Materials Considered

37.     2022.03.02 - Ladenburg
38.     2022.03.02 - Maxim (1)
39.     2022.03.02 - Maxim (2)
40.     2022.03.02 - Roth
41.     2022.03.08 - Jefferies
42.     2022.03.09 - Jefferies
43.     2022.03.17 - Jefferies
44.     2022.03.17 - Roth
45.     2022.03.18 - Credit Suisse
46.     2022.04.05 - Jefferies (1)
47.     2022.04.05 - Jefferies (2)
48.     2022.04.18 - Roth
49.     2022.04.19 - Jefferies
50.     2022.05.04 - Jefferies (1)
51.     2022.05.04 - Jefferies (2)
52.     2022.05.17 - Jefferies
53.     2022.05.31 - Jefferies (1)
54.     2022.05.31 - Jefferies (2)
55.     2022.06.21 - Jefferies
56.     2022.06.28 - Jefferies (1)
57.     2022.06.28 - Jefferies (2)
58.     2022.11.09 - Jefferies
59.     2022.11.10 – Credit Suisse
60.     2022.11.10 – Ladenburg
61.     2022.11.10 – Maxim (1)
62.     2022.11.10 - Roth
63.     2022.11.10 - UBS
64.     2022.11.10 - Wedbush
65.     2022.11.10 – Maxim (2)


**Celsius Filings with the SEC Between 2017 and 2022, Including**

1.      Celsius FY16 Form 10-K, filed March 30, 2017
2.      Celsius FY17 Form 10-K, filed March 8, 2018
3.      Celsius FY18 Form 10-K, filed March 14, 2019
4.      Celsius FY19 Form 10-K, filed March 12, 2020
5.      Celsius FY20 Form 10-K, filed March 11, 2021
6.      Celsius FY21 Form 10-K, filed March 16, 2022
7.      Celsius 1Q19 Form 10-Q, filed May 9, 2019
8.      Celsius 2Q19 Form 10-Q, filed August 8, 2019
9.      Celsius 3Q19 Form 10-Q, filed November 7, 2019
10.     Celsius 1Q20 Form 10-Q, filed May 12, 2020
11.     Celsius 2Q20 Form 10-Q, filed August 6, 2020
12.     Celsius 3Q20 Form 10-Q, filed November 12, 2020
13.     Celsius 1Q21 Form 10-Q, filed May 13, 2021
14.     Celsius 2Q21 Form 10-Q, filed August 12, 2021
15.     Celsius 3Q21 Form 10-Q, filed November 12, 2021
16.     Celsius 1Q22 Form 10-Q, filed May 10, 2022

# Appendix B
# Materials Considered

17.   Celsius 2Q22 Form 10-Q, filed August 9, 2022
18.   Celsius 3Q22 Form 10-Q, filed November 9, 2022
19.   Celsius Form 10, filed July 22, 2016
20.   Celsius 2019 Form 14-A, filed June 15, 2020
21.   Celsius 2020 Form 14-A, filed July 2, 2021
22.   Celsius 2021 Form 14-A, filed April 21, 2022
23.   Celsius Form 8-K, filed March 1, 2022

**Celsius Press Releases, Conference Call Transcripts, and News Stories, Including**

1.   Celsius' earnings press releases from 2021 to 2022
2.   Celsius' earnings conference calls from 2021 to 2022
3.   News stories on Celsius from Factiva from August 1, 2021 to March 31, 2022 and additional news stories from Bloomberg, L.P.
4.   "Celsius Holdings, Inc. Announces New Board Members in Conjunction With Board Succession and Refreshment Policy," *PRNewswire*, August 20, 2021
5.   "B. Riley Lowers Celsius Holdings' Price Target to $115 from $130 Lowers Multiple Reflecting Market Multiple Contraction, Keeps Buy Rating," *MTNewswires*, March 2, 2022

**Data from Bloomberg, L.P. and FactSet Research Systems, Inc., Including**

1.   Price, total returns, trading volume, implied volatility, market capitalization, and short interest data for Celsius from Bloomberg, L.P. and FactSet Research Systems, Inc.
2.   Price and total returns data for market and peer indices from Bloomberg, L.P. and FactSet Research Systems, Inc.
3.   Price and total returns data for peer companies from Bloomberg, L.P. and FactSet Research Systems, Inc.
4.   Institutional and insider holdings data for Celsius from FactSet Research Systems, Inc.

**Academic Literature, Textbooks, and Articles on Finance, Securities, Valuation, and Statistics, Including**

1.   Alexander, Janet C., "The Value of Bad News in Securities Class Actions*," UCLA Law Review,* 41: 1994
2.   Fischel, Daniel R., "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *The Business Lawyer,* 38: 1982
3.   Dunbar, Frederick C., and David I. Tabak, "Materiality and Magnitude: Event Studies in the Courtroom*," Litigation Services Handbook: The Role of the Financial Expert* (John Wiley & Sons, Inc.: New York, NY, 3rd ed., 2001)
4.   MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature*, 35: 1997
5.   Bowman, Robert G., "Understanding and Conducting Event Studies," *Journal of Business Finance & Accounting* 10(4): 1983
6.   Hogg, Robert V. and Elliot A. Tanis, *Probability and Statistical Inference,* (Prentice Hall: Upper Saddle River, NJ, 5th ed., 1997)

3

# Appendix B
# Materials Considered

7.  Freedman, David A., and David H. Kaye, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence* (Washington, D.C.: The National Academies Press, 3rd ed., 2011)

8.  Fisher, Franklin M., "Multiple Regression in Legal Proceedings," *Columbia Law Review*, 80: 1980

9.  Richard A. Brealey and Stewart C. Myers, *Principles of Corporate Finance*, (New York:  McGraw-Hill Irwin, 7th Edition, 2003)

10. Feinstein, Steven and Villanueva, Miguel, "Securities Litigation Event Studies in the Covid Volatility Regime," *Journal of Forensic Economics*, vol. 30, no. 1, 2022.

11. Abdeldayem, Marwan M. and Ramzi Nekhili, "Credit Rating Changes and Stock Market Reaction in the Kingdom of Bahrain," *International Journal of Economics and Finance*, 8(8):2016

12. Zvi Bodie, Alex Kane, and Alan J. Marcus, *Investments* (McGraw-Hill: New York, NY, 8th ed., 2009)

13. Cornell, Bradford, *Corporate Valuation* (McGraw-Hill: New York, NY, 1993)

14. James M. Patell & Mark A. Wolfson, "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements," *Journal of Financial Economics* 13 (1984)

15. Damodaran, Aswath, *Investment Valuation* (John Wiley & Sons, Inc.: New York, NY, 2nd ed., 2002)

16. Koller, T., M. Goedhart and D. Wessels, "Valuation," (Hoboken, N.J.: John Wiley & Sons, Inc., 6th Edition, University Edition, 2015)

17. Hull, John C., *Options, Futures, and Other Derivatives*, (Prentice Hall, 8th ed., 2012)

18. Fabozzi, Frank, *The Handbook of Financial Instruments* (John Wiley & Sons: Hoboken, New Jersey, 2002)

19. KPMG, *Share-Based Payment Handbook*, April 2023

20. Bank of America, "Understanding free cash flow," dated March 13, 2023, accessed at https://www.bankofamerica.com/smallbusiness/resources/post/free-cash-flow/

21. Deloitte, *Roadmap: Non-GAAP Financial Measures and Metrics,* January 2023

**Legal Decisions on Class Certification, Including**

1.  *In Re TECO Energy Inc. Securities Litigation*, 2006 U.S. Dist. LEXIS 18101 (M.D. Fla. March 30, 2006)

2.  *Barrie v. Intervoice-Brite, Inc.*, 2006 U.S. Dist. LEXIS 69299 (N.D. Tex. Sept. 25, 2006)

3.  *Bricklayers & Trowel Trades International Pension Fund v. Credit Suisse Securities (USA) LLC*, 752 F.3d 82, 92 (1st Cir. 2014)

4.  *Cammer v. Bloom*, 711 F.Supp. 1264 (D.N.J. 1989)

5.  *In re PolyMedica Corp. Litig.*, 453 F.Supp. 2d 260, 266 (D. Mass. 2006)

6.  *Loritz v. Exide Techs.,* 2015 WL 6790247, at *9-10 (C.D. Cal. July 21, 2015)

7.  *In re 2TheMart.Com, Inc. Sec. Litig.*, 114 F.Supp.2d 955, 964 (C.D. Cal. 2000)

8.  *Greenberg v. Crossroads Sys., Inc*., 364 F.3d

9.  *Halliburton I*, 131 S. Ct. 2179, 2186 (2011)

10. *Halliburton II*, 134 S. Ct. 2398 (2014)

4

# Appendix B
# Materials Considered

11.   *The Erica P. John Fund, Inc. v. Halliburton Company and David J. Lesar* (3:02-CV-1152-M), filed July 25, 2015